UNITED STATES of America

v.

Francis P. SALEMME, et al.

United States of America

v.

John Martorano

Nos. Cr. 94–10287–MLW,
Cr. 97–10009–MLW.

United States District Court,
D. Massachusetts.

Sept. 15, 1999.

Clerical Corrections,
December 23, 1999.

---

Fred M. Wyshak, Jr., Brian T. Kelly, U.S. Attorney's Office, Boston, MA, James D. Herbert, U.S. Attorney's Office, Boston, MA, for U.S.

MaryEllen Kellejer, Law Office of Richard Egbert, Boston, MA, Anthony M. Cardinale, Boston, MA, John Mitchell, Law Office of John Mitchell, New York City, for Francis P. Salemme, Sr.

Martin G. Weinberg, Oteri, Weinberg & Lawson, Boston, MA, Anthony M. Cardinale, Boston, MA, Francis J. DiMento, DiMento & Sullivan, Boston, MA, for John V. Martorano.

Randolph Gioia, Boston, MA, for Robert P. DeLuca

Kenneth J. Fishman, Fishman, Ankner & Horstman, LLP, Boston, MA, Kimberly Homan, Sheketoff & Homan, Boston, MA, for Stephen J. Flemmi.

A. Hugh Scott, Choate, Hall & Stewart, Boston, MA, for James A. Ring.

Jonathan M. Albano, Thomas J. Hennessey, Bingham, Dana & Gould, Boston, MA, for Globe Newspaper Co., Shelley Murphy, Kevin Cullen.

## MEMORANDUM AND ORDER

WOLF, District Judge.

I. SUMMARY ................................................148
 1. The Facts Concerning Defendant Stephen Flemmi's Motion to Dismiss Based on Immunity ................................................148
 2. The Motion to Dismiss Based on Immunity ................................163

3. Flemmi's Motion to Suppress the 1984–85 Electronic Surveillance............166
4. DeLuca's Motion to Suppress Concerning the LCN Induction Ceremony.....170
5. Conclusion of Summary ............................................172

II. FINDINGS OF FACT...................................................175
1. The Standards Applied ...........................................175
2. Rico and Flemmi .................................................176
3. Flemmi as a Fugitive ............................................183
4. The Development of Bulger as an Informant .......................185
5. The FBI Forges the Flemmi–Bulger Partnership ...................186
6. Attorney General Levi's Memorandum on FBI Informants ...........188
7. Bulger and Flemmi Begin to Perform as a Team...................197
8. Morris Becomes Chief of the Organized Crime Squad .............198
9. The Race–Fix Case ..............................................199
10. The FBI Does Not Investigate Bulger or Flemmi..................201
11. The Lancaster Street Garage and 98 Prince Street...............202
12. Sarhatt Extends Bulger and Flemmi As Informants...............207
13. The Wheeler, Halloran, and Callahan Murders ..................208
14. The FBI Identified Other Informants for Flemmi and Bulger .....213
15. The South Boston Liquor Mart...................................215
16. Greenleaf Becomes SAC and Ring Becomes Supervisor of the Organized
 Crime Squad.....................................................216
17. The 1984–85 Electronic Surveillance ...........................220
18. Morris Tells Bulger and Flemmi That They Can Do Anything They Want
 as Long as They Do Not "Clip" Anyone ..........................242
19. Dining with "Donnie Brasco"....................................244
20. Vanessa's......................................................244
21 Flemmi Becomes A Top Echelon Informant Again ..................248
22. Raymond Slinger ...............................................250
23. Bulger and Flemmi Are Protected From Investigation In the Hobart
 Willis Case ....................................................254
24. The Guard Rails at the South Boston Liquor Mart ...............255
25. Joseph Murray..................................................256
26. John Bahorian .................................................258
27. The Leak and the Threat to The Boston Globe ..................259
28. Flemmi and Salemme ............................................262
29. Mercurio as an Informant ......................................263
30. The LCN Induction Ceremony ....................................269
31. Mercurio as a Fugitive ........................................289
32. The Investigation of Flemmi and Bulger ........................293
33. The Indictment of Bulger and Flemmi and Its Aftermath .........301

III. CONCLUSIONS OF LAW ...............................................315
1. Flemmi's Motion to Dismiss or Suppress Based on Immunity........315
 A. The Court is Now Considering Only the Issue of Immunity .....315
 B. The Applicable Standards Concerning Immunity ...............317
 C. Dismissal of This Case Is Not Now Justified Because Flemmi Was
 Not Promised Immunity From Prosecution .....................321
 D. The Issues of Use and Derivative Use Immunity ..............325
 (1) Flemmi Does Not Have An Agreement Providing Use Immunity
 Generally For His Statements to the FBI ................326
 (2) The Promise of Confidentiality Means Statements to the FBI
 Which Have the Effect of Identifying Flemmi as an Informant
 Cannot Be Used Against Him Unless His Defense Makes Them
 an Issue ................................................326
 (3) Flemmi Had an Enforceable Agreement Relating to 98 Prince
 Street, Vanessa's, and 34 Guild Street..................329
 (4) A Hearing Will Be Necessary to Determine If This Case Must Be
 Dismissed and, If Not, Whether Any Evidence Must be Exclud-
 ed at Trial .............................................341

(5) If *Morris* and *Connolly Were Not Authorized to Promise Flemmi that the Evidence Intercepted at 98 Prince Street, Vanessa's, and 34 Guild Street Would Not Be Used Against Him, Flemmi's Statements to the FBI Relating to Those Interceptions May Have Been Involuntary and, In Addition, Use of Any Evidence Intercepted At Those Locations May Violate Flemmi's Right to Due Process* ...................................... 346

2. The Motion to Suppress the 1984–85 Electronic Surveillance ................ 351
 A. Summary ................................................. 351
 B. Suppression is Not Justified Based on the Alleged Violation of 18 U.S.C. § 2616(1) ......................................... 353
 C. The Standards to be Applied in Deciding Whether to Suppress for a Failure to Satisfy the Requirements of 18 U.S.C. § 2518(1)(c)Concerning the Necessity for Electronic Surveillance ..................... 358
 D. The Necessity Provision of Title III, § 2518(1)(c), is Constitutional in Origin ................................................. 364
 E. The Motion to Suppress the 1984–85 Surveillance is Meritorious ......... 369
 F. A Hearing is Necessary to Identify the Evidence Which Must be Suppressed Because of the Government's Unlawful Conduct Concerning the 1984–85 Electronic Surveillance and to Determine if Any Other Remedy is Required .................................... 380

3. Flemmi is Not an "Aggrieved Person" With Standing to Seek Suppression of the Interceptions at Vanessa's Under Title III .................... 381

4. DeLuca Does Not Have Standing to Move to Suppress the Evidence Intercepted at 34 Guild Street For a Violation of Title III Because the 1998 Supreme Court Decision in *Minnesota v. Carter* Indicates That Although His Conversation was Intercepted, It Did Not Constitute an "Oral Communication" As Defined in the Statute, and DeLuca's Fourth Amendment Rights Were Not Violated ................................ 384

IV. CONCLUSION ...................................................... 400

V. ORDER ........................................................... 401

In 1861, Lord Acton wrote that, "[e]very thing secret degenerates, even the administration of justice." John Emerich Edward Dalberg Acton, *Lord Acton and His Circle* 166 (Abbot Gasquet, ed., 1968). This case demonstrates that he was right.

## I. SUMMARY

### 1. *The Facts Concerning Defendant Stephen Flemmi's Motion to Dismiss Based on Immunity*

On January 5, 1995, defendant Stephen Flemmi was arrested on a criminal complaint which charged him, James "Whitey" Bulger, and George Kaufman with conspiring to extort money from a bookmaker, Burton Krantz. Five days later, on January 10, 1995, Flemmi, Bulger, Kaufman, and four other defendants were indicted on multiple charges of racketeering and extortion, among other crimes. A complaint authorizing Flemmi's arrest prior to indict-ment was obtained by the prosecutors because they were concerned that Bulger and Flemmi would be informed of their imminent indictment and flee. This fear was well founded.

Beginning in 1965, Flemmi secretly served as a very valuable and valued confidential informant for the Federal Bureau of Investigation (the "FBI" or "Bureau"). In the thirty years prior to his arrest, Flemmi was, among other things, instrumental in the FBI's successful and acclaimed effort to incarcerate three generations of the leadership of the Patriarca Family of La Cosa Nostra (the "LCN" or "Mafia"). Flemmi had also assisted the FBI in obtaining a warrant that was used to intercept, for the first time, an LCN induction ceremony. § II.30.

In 1976, the FBI played a pivotal role in forging a formidable, enduring partnership

between Flemmi and Bulger, who had in 1975 also become an FBI informant. The FBI made Bulger and Flemmi, who were previously acquainted but not close, a perfect match. In Boston, Flemmi and Bulger uniquely shared an antipathy for the LCN, a desire to profit criminally from its destruction, and, most notably, the promised protection of the FBI. § II.5.

As described in detail in this Memorandum, and as summarized below, many members of the FBI participated in honoring the promise to protect Flemmi and Bulger. Prominent among them was John Connolly, who from 1975 until his retirement in 1990 was their FBI "handler." Although retired in 1995, Connolly remained in contact with his close friends and former colleagues on the Organized Crime squad in the Boston office of the FBI. As a result, he learned that Bulger and Flemmi were scheduled to be indicted on about January 10, 1995. Connolly shared this information with Bulger, who, as Connolly expected, became a fugitive and also warned Flemmi so that he could flee. Flemmi, however, miscalculated. Not expecting to be charged and subject to arrest so soon, Flemmi was still in Boston when the criminal complaint against him was issued on January 4, 1995. § II.32.

Flemmi's arrest represented a radical departure from his historic relationship with the government. At the urging of Attorney General Robert Kennedy, in the mid–1960's a previously reluctant FBI became committed to combatting the LCN. FBI Special Agent H. Paul Rico recruited Flemmi to serve as an asset in that effort, which has since the mid–1960's been the FBI's highest national priority. Flemmi was, among other things, known to Rico as a member of the Winter Hill Gang, which was in the midst of a violent gang war, and as a reputed murderer. Flemmi then had close contact with key members of the Patriarca Family, in meaningful measure because of his partnership with his present codefendant Francis Salemme. Although rightly regarded as a potential member of the Patriarca Family, Flemmi did not share Salemme's unequivocal enthusiasm for the LCN. Thus, Flemmi was responsive to the relationship that Rico proposed. § II.2.

Because of Flemmi's ability to provide information concerning leaders of the LCN, Rico caused the FBI to designate him as a Top Echelon informant, the highest status a Bureau source can achieve. Flemmi, however, was never told that he was opened or closed administratively as an informant. Nor was Flemmi advised that any of the information that he was providing was being memorialized in writing. Rather, instead of treating Flemmi as a criminal to be dealt with cautiously, Rico successfully sought to cultivate in Flemmi the sense that he was an ally in a common cause, primarily a war against the LCN. § II.2. This is a sense that was later nurtured by Connolly, when he succeeded Rico as Flemmi's handler, despite the fact that Connolly too understood that Flemmi had committed many serious crimes, including murder. §§ II.5, II.33.

As the alliance between the FBI and Flemmi and Bulger developed, Flemmi and Bulger were invited to dine periodically with members of the FBI engaged in investigating the LCN, including Connolly, several of his colleagues on the Boston Organized Crime squad, Connolly's supervisors, John Morris and James Ring, and Joe Pistone, an FBI agent from New York who had become famous for his undercover infiltration of the LCN as "Donnie Brasco." The timing of these dinners suggests that they were often arranged to celebrate milestones in the FBI's relationship with Bulger and Flemmi, such as the successful bugging of the LCN's Boston headquarters at 98 Prince Street in 1981, and the frustration of an investigation of Bulger and Flemmi that had been led by the Drug Enforcement Administration (the "DEA") in 1984–85. At these dinners, the agents, Bulger, and Flemmi at times exchanged gifts. Although FBI procedures required that all contacts with informants be docu-

mented, there is only one, 1979 report reflecting matters discussed at these dinners. There is no record of the gifts exchanged. §§ II.10, II.11, II.16, II.17, II.18.

Rico made several promises to Flemmi in the course of developing him as an informant. Among other things, Rico promised Flemmi that his cooperation would be confidential and that his service as a source would not be disclosed to anyone outside of the FBI. This was a customary assurance that the FBI has provided to its informants at least since 1965. It is a promise that Rico and the many other past and present members of the FBI agents who testified in this case regarded as "sacred." §§ II.2, II.8.

There was good reason for agents of the FBI to believe in the importance of the promise of confidentiality that is regularly made by the Bureau to its informants. As the Supreme Court has recognized, providing potential sources reasonable assurances regarding the confidentiality of their cooperation encourages them to provide information and protects their safety. *Roviaro v. United States*, 353 U.S. 53, 59, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). Moreover, the FBI Manual has long instructed agents to exercise constant care to assure that an informant's identity not be disclosed to anyone, intentionally or inadvertently. §§ II.6 and III.1.D(3). Strictly adhering to this principle, unless authorized by the informant, the FBI has regularly refused to identify its sources even to prosecutors and other Department of Justice officials with a legitimate need to know whether, among other things, subjects of investigations were cooperating with the FBI and, therefore, might assert, or indeed have, certain foreseeable defenses to

prosecution, including that they had been promised immunity or authorized to commit acts that would otherwise be criminal. §§ II.2, II.17, II.20, II.30, II.32, II.33.

Officials of the Department of Justice have historically accepted the fact that the FBI would refuse any request to confirm or deny that an individual was an informant. For example, William F. Weld, a former United States Attorney in Boston and a former Assistant Attorney General in charge of the Criminal Division, testified that he expected that if he asked the FBI to identify an informant, he would be told to "go pound sand." §§ II.17, III.1.D(3). As a formal reflection of this attitude, in 1976, when the Attorney General first issued Guidelines for the FBI to use in exercising its discretion with regard to dealing with informants, the Guidelines provided no role for the United States Attorney or the Department of Justice in authorizing an informant to engage in what would otherwise be criminal activity. They were later revised to require consultation with the United States Attorney before the FBI authorized an informant to engage in criminal activity that involved a significant risk of violence, but stated that any such consultation be conducted in a manner that would not reveal the identity of the source. § II.6.

It was the understanding of the present and former members of the FBI who testified in this case that information which Flemmi or any other informant provided the FBI could not properly be used against him or, in any event, that it would not be used against him. Thus, it was the consistent practice of the FBI not to use information received from an informant to investigate him.[1] Nor would the Bureau

---

1. The FBI did at times utilize information provided by a source in an application for a warrant to conduct electronic surveillance and also name that source as a purported target of that investigation in an effort to mask the identity of the informant. In such cases, the FBI had no intention of using any intercepted evidence against the source. This

technique was employed with regard to Flemmi and Bulger in the application for a warrant to bug the storeroom at Vanessa's Restaurant. To protect the confidentiality of their status as sources, however, the FBI did not inform the Assistant Attorney General who authorized the application or the Assistant United States Attorney who filed it of the

disclose information provided by a source to any other agency or any prosecutor investigating him. §§ II.2, II.8, II.14, II.16, II.20, II.21, II.33, III.1.D(2)-(3).

While the repeated promises of confidentiality which Flemmi received were customary and generally regarded as appropriate, Rico also made Flemmi a promise that was irregular, but not unique. He promised Flemmi that if he served as an FBI informant, the Bureau would protect him. § II.2. This is a promise that was expressly reiterated and amplified by Connolly and Morris. §§ II.5, II.11, II.18. As summarized below, the assurance that Flemmi would be protected by the FBI was also communicated by the conduct of Rico, Connolly, and Morris, and was confirmed by the actions of many, but not all, of their colleagues in the FBI.

Flemmi, however, was never told that the protection that he was promised included immunity from prosecution. The word "immunity" was never mentioned. §§ II.2, II.5, II.16. Flemmi understood that it was permissible for agencies other than the FBI, or FBI agents ignorant of his relationship with the Bureau, to investigate him. He also knew that he could properly be prosecuted if any such investigation succeeded despite the best efforts of his FBI handlers to protect him. §§ II.2, II.9, II.17, II.32, III.1.C.

Relying upon the promises made to him by the FBI, and on the repeated performance of those promises, Flemmi rendered exceptional service in the Bureau's war against the LCN and other matters. In the 1960's, Flemmi regularly provided information, that Rico rated as "excellent," regarding the activities of Raymond L.S. Patriarca, and other members and associates of the Family that bore his name, including Gennaro Angiulo, Illario Zannino, who was also known as Larry Baione,

and Salemme. Flemmi was also instrumental in Rico's successful effort to develop LCN member Joseph Barboza into a cooperating witness. Barboza's testimony led to the convictions of Patriarca and several of his associates, and earned him national renown. In addition, in the mid–1960's, Flemmi furnished Rico with an appreciated warning of a threat to the life of Suffolk County District Attorney Garrett Byrne. § II.2.

In 1969, Rico told Flemmi that he and Salemme would soon be indicted for the attempted murder of Barboza's lawyer, John Fitzgerald, and suggested that they flee. Flemmi and Salemme acted on that advice. While a fugitive, Flemmi stayed in touch with Rico. Rico, however, did not tell the agents responsible for the Flemmi fugitive investigation that he had spoken to him. It appears that after separating from Salemme because of a series of disagreements, Flemmi told the FBI where Salemme could be found. Thus, Connolly was able to apprehend Salemme in New York. §§ II.2, II.3.

After Salemme was convicted of the Fitzgerald bombing and incarcerated to serve a lengthy sentence, at Rico's request Flemmi returned to Boston in 1974. As Rico promised, Flemmi was immediately released on bail and the charges against him were dropped. § II.3.

In 1975, with assistance from Bulger, Connolly revived Flemmi's relationship with the Bureau. Flemmi promptly proved his continued value as a source. After Barboza was murdered in 1976, Flemmi provided information that permitted Connolly to convert a coconspirator into a cooperating witness who identified Patriarca Family member Joseph Russo as Barboza's killer. In 1992, Russo pled guilty to that charge and was sentenced by

---

charade. Nor were these officials advised of the fact that Bulger and Flemmi had been told of the planned bug at Vanessa's and, therefore, were not, as represented in the application, expected to be intercepted there.

As a result, an application concerning Vanessa's that the FBI knew was false and misleading with regard to Flemmi and Bulger was submitted to the court. § II.20.

this court to what turned out to be life in prison. § II.7.

In 1980, Flemmi provided Connolly with information concerning the assassination of federal Judge James Wood by a group of major drug dealers. Connolly later advised his superiors that he believed that the contacts Flemmi had made at his direction in that investigation may have created the false impression that Flemmi was involved in narcotics. § II.11.

In 1980, Flemmi and Bulger made a critical contribution to the FBI's ambitious and ultimately successful effort to bug Angiulo's headquarters at 98 Prince Street. The location was viewed as virtually impenetrable. Connolly and Morris asked Flemmi and Bulger to visit 98 Prince Street and obtain information important to the physical feasibility of the proposed bugging. Bulger justifiably feared that he and Flemmi might be killed if they went to that location. Flemmi expressed the additional concern that the bugging of 98 Prince Street would likely result in the interception of information concerning criminal activity in which he and Bulger were engaged. Morris and Connolly, however, assured Flemmi and Bulger that the 98 Prince Street tapes would not be a problem for them; they would be protected for anything intercepted at 98 Prince Street rather than prosecuted. Thus, Flemmi reasonably understood that if he assisted the FBI, none of the evidence intercepted at 98 Prince Street would be used against him, directly or indirectly. §§ II.11, III.1.D(3).

As a result of the promises made by Morris and Connolly, Flemmi went with Bulger to 98 Prince Street, and returned with a diagram of the premises and the other information that the FBI had requested. Subsequently, Bulger and Flemmi were two of the informants relied upon in the application for the warrant which was issued authorizing the installation of a bug at 98 Prince Street. *Id.*

In 1991, Morris assessed for his superiors Flemmi's value as an informant, writing that the information Flemmi provided had been utilized in six successful applications for electronic surveillance, involving, among other things, the two highest priority Organized Crime investigations in Boston. The 98 Prince Street investigation, Morris wrote, "is one of the highest priority organized crime cases in the FBI today and involves what has been characterized by [FBI Headquarters] officials as one of the most important and successful Title IIIs to have been conducted by the FBI in the past ten years." *Id.*

In 1985, at a dinner at Morris' home, in Connolly's presence, Morris again told Flemmi and Bulger that they would not be prosecuted for anything on the 98 Prince Street tapes. In addition, Morris told them, "you can do anything you want as long as you don't 'clip' anyone." § II.18.

Morris' 1981 assessment of the value of the 98 Prince Street tapes to the FBI proved to be accurate. With continued assistance from Flemmi and Bulger, the FBI used the evidence intercepted there to develop a case which secured the convictions, in 1986, of Angiulo, Zannino, and much of the rest of the leadership of the LCN in Boston. §§ II.12, II.20.

Following those convictions, Flemmi quickly contributed to the FBI's effort to incarcerate the next generation of the leadership of the LCN in Boston, including Russo, Vincent Ferrara, and Robert Carrozza. Flemmi reported that the emerging leaders of the LCN were meeting regularly in a storeroom at Vanessa's Restaurant, which was owned by Angelo "Sonny" Mercurio, who had recently been released from prison. § II.20.

The FBI targeted Vanessa's for electronic surveillance. Once again, Flemmi was tasked to obtain vital logistical information and performed his mission. Flemmi and Bulger were later two of the three sources relied upon in the application for a warrant to bug Vanessa's. Before being discovered in 1987, the bug intercepted, among other things, a dramatic extortion

of two elderly bookmakers, "Doc" Sagansky and Mo Weinstein, which Flemmi had told the FBI was being planned. As a result, the Bureau developed a powerful case against Ferrara, Carrozza, Mercurio, and a number of their confederates. *Id.*

At Connolly's request, in 1988, Flemmi began to provide information again on Salemme, who had recently been released after serving fifteen years in prison for the Fitzgerald bombing. Raymond J. Patriarca had by then succeeded his deceased father as Boss of the Family. In early June 1989, Flemmi reported that Patriarca had given his "blessing" to Salemme to assume leadership of the LCN in Boston when, as anticipated after a search warrant was executed at Vanessa's, Russo, Ferrara, and their crew were indicted. Flemmi also kept Connolly up to date on the substantial and escalating risk that the Russo faction of the LCN might soon try to murder Salemme. §§ II.28, II.29. In addition, Flemmi contributed to the FBI's successful effort to target Salemme for electronic surveillance at the Busy Bee restaurant. § II.28.

Flemmi and Bulger also contributed to the recruitment of Mercurio as a Top Echelon informant.[2] As they explained to Connolly, Mercurio was disenchanted with the LCN, close to Bulger and Flemmi, and planning to flee rather than return to prison as a result of the bugging of Vanessa's. Employing a profile provided by Flemmi

and Bulger, Connolly and Ring developed Mercurio into a very valuable source, who, among other things, made it possible for the FBI to bug the LCN induction ceremony conducted on October 29, 1989, at 34 Guild Street in Medford, Massachusetts. §§ II.29, II.30.

Connolly retired from the FBI in 1990. As a result, without their knowledge, Flemmi and Bulger were closed administratively as FBI informants. Flemmi, however, was then characterized as having "furnished the Boston Division [of the FBI] very valuable information through the years regarding LCN activities." Ex. 44. The Bureau did not want to lose Flemmi and Bulger as sources when Connolly retired and, therefore, reported that it was considering options to reopen them. Although not assigned a new handler, Flemmi continued to provide, through Connolly, information that the FBI was seeking concerning the LCN. That information included the numbers of the telephones used by Salemme's brother Jack, which the Bureau wished to tap as part of its investigation of Salemme. § II.32.

As indicated earlier, Rico, Connolly, and Morris each told Bulger and Flemmi that he would be "protected" in return for serving as an informant. §§ II.2, II.5, II.18. The conduct of Rico, Connolly, Morris, and many but not all of their colleagues at the FBI, expressed even more clearly than

---

**2.** In early June 1989, Mercurio confirmed Flemmi's report that Russo and his faction of the Patriarca Family were hoping to murder Salemme before they were indicted, in part because they believed Salemme was planning to kill Ferrara. Connolly improperly provided to Shelley Murphy of *The Boston Herald* information on the imminent indictments and of Patriarca's "blessing" of Salemme's move to seize power in Boston. On June 13, 1989, *The Boston Herald* published an article by Murphy headlined, "Ex-con seen as Hub Mob's heir apparent," which consisted mainly of information that closely tracks the reports Connolly prepared concerning the information that he had received from Flemmi and Mercurio. Three days later, on June 16, 1989, Salemme was shot and Patriarca Fami-

ly Underboss William Grasso was murdered. § II.29.

In view of the potential for imminent violence that Flemmi and Mercurio had described, it appears that the leak to *The Boston Herald* may have had the foreseeable effect, if not purpose, of provoking the attempt to murder Salemme. If Salemme had been murdered by the Russo faction of the Patriarca Family, the FBI would have been spared the necessity of developing a prosecutable case against him. In addition, Flemmi and Bulger would again have received one of the benefits of their bargain with the Bureau—an enhanced opportunity to profit from the vacuum created by the decimation of the LCN in Boston. *Id.*

their words the FBI's agreement to protect Flemmi.

Rico told Flemmi about other individuals who were cooperating with law enforcement so that Flemmi could be careful around them. § II.14. As described previously, in 1969, Rico advised Flemmi that he and Salemme would soon be indicted and suggested that they flee promptly. § II.2. In addition, as Rico promised, Flemmi was immediately released on bail and the fugitive charges against him were dismissed when Flemmi followed Rico's advice and returned to Boston in 1974. § II.3.

Connolly and Morris, individually and in tandem, also acted repeatedly to protect Flemmi. In 1977 or 1978, Connolly intimidated executives of National Melotone from pursuing their complaint that Bulger and Flemmi were extorting the vending machine company's customers. § II.7. In early 1979, with their sources' consent, Morris and Connolly told Strike Force Attorney Jeremiah O'Sullivan that Flemmi and Bulger were valuable informants and persuaded him, with the agreement of Thomas Daly, the FBI agent who was leading the investigation, not to indict them in a race-fix case, in part so that Bulger and Flemmi could contribute to the FBI's effort to bug 98 Prince Street. § II.9. In 1979, Morris received reports from informants that Bulger and Flemmi were shaking down bookmakers, but no investigation was conducted. § II.10.

In 1980, Connolly informed Bulger and Flemmi that the Lancaster Street Garage had been bugged as part of a Massachusetts State Police investigation or confirmed that fact for them. Also in 1980, Flemmi and Bulger were told when the bug at 98 Prince Street was installed and when it was removed so that they would not be intercepted. § II.11.

In 1982, Morris caused Connolly to tell Flemmi and Bulger that Brian Halloran was cooperating with the FBI and had implicated them in the murder of Roger Wheeler, the President of World Jai Lai. About two weeks later, Halloran was killed.[3] Morris believed that Bulger and Flemmi were responsible for Halloran's death, but did not disclose to the agents investigating it that they had been told that Halloran was cooperating with the Bureau. § II.13.[4]

---

3. The files relating to the Wheeler murder, and the FBI's handling of them, exemplify recurring irregularities with regard to the preparation, maintenance, and production in this case of documents damaging to Flemmi and Bulger. First, there appears to be a pattern of false statements placed in Flemmi's informant file to divert attention from his possible crimes and/or FBI misconduct. §§ II.2, II.13.

Second, contrary to the FBI's usual policy and practice, all but one of the reports containing Halloran's allegations against Bulger and Flemmi were not indexed and placed in an investigative file referencing their names. Thus, those documents were not discoverable by a standard search of the FBI's indices. Similar irregularities in indexing and, therefore, access occurred with regard to information that the FBI received concerning an extortion by Bulger of Hobart Willis and from Joseph Murray concerning the murder of Brian Halloran, among other things. §§ II.13, II.23, II.25.

Third, when documents damaging to the FBI were found by the Bureau, they were in

some instances not produced to the defendants or the court at the time required by the court's Orders. For example, some documents relating to Halloran's charges against Bulger and Flemmi that should have been produced earlier were not disclosed until Rico, who was working for World Jai Lai when Wheeler was murdered, and Morris had finished testifying. The FBI agent who had discovered the documents, however, had previously given the documents to the FBI's Special Agent in Charge ("SAC") in Boston, Barry Mawn, and the Assistant Special Agent in Charge ("ASAC"), Mike Wolf, because the information that they contained "was obviously highly singular and sensitive." § II.13. Similarly, there was delayed disclosure of documents relating to John McIntyre which impeded defendants' ability to question relevant witnesses. §§ II.14, II.22, II.23.

4. About a month after Halloran's murder, Morris solicited and received through Connolly $1000 from Bulger and Flemmi. Morris used the money to buy an airplane ticket for his secretary, with whom he was romantically

In an effort to protect Bulger and Flemmi, Morris and Connolly also identified for them at least a dozen other individuals who were either FBI informants or sources for other law enforcement agencies. One of them may have been John McIntyre. McIntyre disappeared about six weeks after he told the FBI and several other law enforcement agencies that Bulger was engaged in illegal activity, and that Bulger's associate Patrick Nee was involved with the Valhalla, a ship that was captured running guns to the Irish Republican Army. McIntyre was planning to meet with Nee the night that he disappeared. § II.14.

In 1984, Connolly received reliable information that Bulger and Flemmi were engaged in an ongoing extortion of Stephen and Julie Rakes to obtain control of a liquor store that came to be known as the South Boston Liquor Mart. Connolly neither recorded the information nor conducted any investigation. He did, however, share the information that he had received with Bulger. § II.15.

As summarized more fully below, in 1984, Connolly also warned Flemmi and Bulger of an investigation targeting them that was being led by the DEA. He subsequently told them that as part of that investigation a wiretap had been placed on the telephone of their colleague Kaufman. § II.17.

In 1986, after tasking Flemmi to acquire information vital to the FBI's effort to bug Vanessa's, Connolly told him when the bug was installed so that Flemmi would not be intercepted. Connolly later told Flemmi when the bug had been removed. § II.20.

In 1988, Connolly advised Flemmi that a Boston Police Lieutenant, James Cox, would be wired and would attempt to engage Flemmi in incriminating conversation. § II.26.

Also in 1988, Morris had Connolly warn Flemmi and Bulger to stay away from John Bahorian, whose telephone was about to be tapped by the FBI in an effort to acquire evidence against Flemmi, among others. Morris also told Connolly to tell Bulger and Flemmi not to do anything to Bahorian because he "did not want another Halloran." Morris later reiterated both of these warnings directly to Bulger and Flemmi. He also told Flemmi that he could keep him out of any indictment arising from the Bahorian electronic surveillance. Although Bahorian and others were ultimately indicted, Flemmi was not. *Id.*[5]

---

involved, so she could visit him in Georgia, where Morris was receiving advanced training. § II.13.

5. By the time Morris told Flemmi and Bulger of the Bahorian investigation he had taken an additional $6000 from Bulger and Flemmi and felt "completely compromised" and vulnerable. §§ II.17, II.18, II.27. Morris feared that if Flemmi or Bulger were prosecuted, the nature of his relationship with them would be revealed. Therefore, Morris decided to try to eliminate Bulger and Flemmi as a threat to him. § II.27.

To accomplish this, Morris told Gerard O'Neill, a reporter for *The Boston Globe*, that Bulger was an FBI informant. Morris expected that the newspaper would publish this fact, while protecting Morris as its source. Morris also calculated that such a story would prompt the LCN to murder Bulger and probably prove fatal to Flemmi as well. *Id.*

When the FBI learned of the proposed article, Daly, who had been the lead agent in the race-fix case, called Kevin Cullen, a reporter working with O'Neill. Daly falsely denied that Bulger was an informant and that he had been protected in the race-fix case because he was an FBI source. Daly attempted to intimidate Cullen and his colleagues from reporting that Bulger was an informant by indicating that Bulger was a very dangerous person, who would not hesitate to kill anyone who wrote such a story. Daly noted that Cullen would be at particular risk because it was well known that he, like Bulger, lived in South Boston. *Id.*

*The Boston Globe* took the threat seriously, but was undeterred. On September 20, 1988, it published an article reporting that Bulger had a special relationship with the FBI, which had provided him protection in many investigations. Perhaps unwittingly, James Ahearn, the SAC in Boston, denied that Bulger was being protected by the FBI. *Id.*

The FBI subsequently investigated whether Morris had leaked the fact that Bulger was an

In 1988 or 1989, Connolly told Bulger that Timothy Connolly was cooperating with the FBI and would try to record conversations with Bulger and Flemmi. Bulger passed this warning on to Flemmi. § II.28.

After providing Connolly information to assist in the FBI's effort to recruit Mercurio as an informant, Flemmi was told when that initiative had succeeded. § II.29.

Following his retirement in 1990, Connolly used his continuing connections with his close friends and former colleagues on the Organized Crime squad to obtain information concerning investigations that might have resulted in charges against Bulger and Flemmi. Connolly regularly shared the information he acquired with them, including the scheduled date for the indictment of Bulger and Flemmi in this case. § II.32.

While Rico, Morris, and particularly Connolly were at the hub of the protection promised and provided to Flemmi, many of their colleagues and superiors in the FBI

also contributed by their conduct to that promise and to its fulfillment.[6]

In 1977, Daly and Special Agent Rod Kennedy were told by Francis Green that Bulger and Flemmi had threatened to kill him in connection with their attempt to collect a debt, but no effort was made to develop the reluctant Green as a witness against them. § II.7. As described earlier, in 1979, Daly later joined O'Sullivan in agreeing not to charge Bulger and Flemmi in the race-fix case. § II.9.

In 1982, the Boston FBI agents aware of Halloran's cooperation did not tell their colleagues in Oklahoma City, who had expressed interest in him, that Halloran was available to be interviewed. When agents from Oklahoma City sought to interview Bulger and Flemmi, ASAC Robert Fitzpatrick successfully opposed this request, in part by falsely claiming that he had interviewed Bulger about the matter. § II.13.

In 1984, Sean McWeeney, the Chief of the Organized Crime Section at FBI Headquarters, told Connolly that the DEA

informant. Morris repeatedly lied under oath in that investigation. He remained with the Bureau until 1995, when he retired as Chief of the Training and Administrative Section at the FBI Academy in Quantico, Virginia, following a menacing telephone call that he received from Bulger, who was then a fugitive. §§ II.27, II.33.

6. The protection Bulger and Flemmi received from their FBI handlers was not unique. Like Flemmi and Bulger, Mercurio was alerted to his imminent indictment and, as expected, became a fugitive. § II.30. While he was a fugitive, Mercurio stayed in contact with Connolly. When Edward Quinn, the Supervisor of the Organized Crime squad, learned on July 5, 1991 that Mercurio was known by the FBI to be in Boston, was expected to be on a boat on Rowes Wharf on July 7, 1991, and was also understood by Salemme to have assisted the FBI in bugging the LCN induction ceremony, Quinn secretly asked Connolly, who had retired, to get a warning to Mercurio of the dangers to him. Connolly did so. As a result, Mercurio promptly fled Boston again and was not at Rowes Wharf when FBI agents went to apprehend him on July 7, 1991. § II.31.

In the course of this case the court also received convincing evidence that another in-

formant was told by his FBI handler (who was not Rico, Connolly, Morris, or James Ring) about investigations concerning him, including wiretaps on his telephone. The court intends to provide this information to the Attorney General for whatever action, if any, she deems appropriate.

In addition, the court notes that there are striking similarities between the relationship Flemmi and Bulger had with their FBI handlers and the relationship that Top Echelon informant Gregory Scarpa, Sr. had with his FBI handler, Supervisory Special Agent R. Lindley Delvecchio, which is depicted in *Orena v. United States*, 956 F.Supp. 1071, 1085–90, 1101–04 (E.D.N.Y.1997). In *Orena*, it was found to be "likely" that "Delvecchio ... 'paid' Scarpa by passing along information, creating a two-way street for communications that was dangerous and unauthorized." *Id.* at 1087, 1090. For example, the evidence indicated that Delvecchio protected Scarpa by alerting him to investigations, advising him of electronic surveillance, identifying individuals cooperating with law enforcement, and warning him of imminent arrests. *Id.* at 1071, 1085–90, 1101–04.

was leading an investigation targeting Bulger and Flemmi. Connolly shared this information with his sources. § II.17.

In 1988, Rod Kennedy, John Newton, their supervisor Bruce Ellavsky, and ASAC Larry Potts provided Bulger and Flemmi protection concerning an ongoing extortion of Raymond Slinger. Although Slinger was willing to wear a recording device and testify against Flemmi and Bulger, after Ellavsky consulted Potts, the information that he provided was neither documented nor investigated. Instead, Bulger was told that Slinger had spoken to the FBI. § II.22.[7]

Bulger and Flemmi were also protected by the FBI in the successful investigation of drug dealer Hobart Willis and others. Although in 1986 and 1987, Ellavsky and James Blackburn, Jr. received increasingly specific information that Bulger was extorting Willis, after Connolly was consulted no investigation of Bulger was conducted. Nor was the information that the FBI had received concerning Bulger shared with the other agencies involved in the joint investigation of Willis. § II.23.

Similarly, in 1987, when James Lavin obtained photographs and other information indicating that City of Boston employees had illegally erected guardrails on the private property of the South Boston Liquor Mart, he consulted Connolly. After being advised that Bulger was a valuable informant, Lavin made no record of the information he had received and conducted no investigation. § II.24.

In 1989, Joseph Murray, an incarcerated drug dealer understood to be closely connected with Bulger, alleged that Connolly and Newton were selling information about electronic surveillance to Bulger and Flemmi. Murray also claimed to know of a witness who saw Bulger participate in the Halloran murder. However, when interviewed by Edward Quinn and Edward Clark in 1989, Murray was either not asked about his allegations concerning Connolly and Newton or his responses were not recorded in the notes and FBI report of the interview. ASAC Dennis O'Callahan, however, subsequently prepared a memorandum, which Ahearn sent to FBI Headquarters, stating that Murray's allegations were unsubstantiated. In addition, Murray evidently was not questioned in detail about the information he indicated that he had concerning Bulger's role in the Halloran murder. Moreover, the information Murray did provide was not given to the FBI agents responsible for the Halloran murder investigation or indexed in a way that would permit them to find it. Nor was any effort made to employ the willing Murray as a source of information to be used against Flemmi, Bulger, or anyone else. § II.25.

Finally, as indicated earlier, members of the Organized Crime squad kept Connolly advised of at least some developments in the investigation of Flemmi and Bulger

---

**7.** The government did not produce at the time required by this court's Orders the documents developed in an Internal Revenue Service ("IRS") investigation relating to Slinger. When they were belatedly furnished for the court's *in camera* inspection, the government argued that the defendants should not be provided the information indicating that Slinger had told the FBI that he was being extorted by Bulger, but the FBI conducted no investigation, in part because no FBI report of his interview had been located and, despite an assiduous effort, the FBI could find no agent who had interviewed Slinger. Thus, the government suggested that Slinger had not told authentic FBI agents about being extorted by Bulger. When the court ordered disclosure to the defendants of the Slinger matter, the government argued, for the same reasons, that the court should not permit evidence to be introduced concerning it. § II.22.

However, at defendants' request, the court asked John Newton, who had served on the squad which would have had responsibility for investigating the Slinger matter, and who was waiting to resume his testimony, if he was familiar with Slinger. Newton promptly acknowledged that he had participated in the interview of Slinger and understood that despite Slinger's willingness to cooperate, Newton's superiors had decided that no further investigation would be conducted because Bulger was a valuable FBI informant. *Id.*

that was initiated after Connolly retired. Connolly used that information to honor his promise to protect Bulger and Flemmi. § II.32.[8]

After Connolly retired, in about 1992, the United States Attorney's Office began a grand jury investigation of Bulger and Flemmi. Agents from the FBI Organized Crime squad participated in the investigation. At least six of the agents who testified before the grand jury knew that Bulger and Flemmi had been FBI informants. Several of them had read all or parts of Flemmi's and Bulger's informant files before testifying. In addition, contrary to the promises made to Flemmi explicitly concerning 98 Prince Street and implicitly concerning 34 Guild Street, evidence intercepted at those locations was presented to the grand juries which indicted him. § II.32.

In 1992, the FBI refused a request by the then United States Attorney Wayne Budd, and his assistants, to confirm that Bulger was an informant or to permit them to review Bulger's informant file. The prosecutors were concerned about the implications for their investigation if Bulger was, or had been, an FBI informant. Among other things, they wished to address the foreseeable issues of immunity and authorization now raised by Flemmi, whose history as an informant would have been revealed if Bulger's had been disclosed. *Id.*

On October 25, 1994, the original indictment in this case was returned against defendant Robert DeLuca. It charged him with participating in the October 29, 1989 LCN induction ceremony. The indictment was evidently obtained because the five-year statute of limitations was about to expire. DeLuca was not immediately given notice of the indictment. Rather, it was sealed and randomly assigned to this court. *Id.*

On about December 22, 1994, in anticipation of the imminent, additional charges in this case, the United States Attorney's Office again asked the FBI if Bulger was an informant, emphasizing its need to know because the government would soon have to disclose exculpatory information to Bulger and his codefendants. Once again, the FBI resisted this request. The Boston Office of the Bureau urged FBI Headquarters to continue to support its opposition to telling the United States Attorney that Bulger had been an informant. It argued that it was not expected that the issue of Bulger's informant status would be raised by Bulger or his codefendants and, in any event, that no judge would compel disclosure of his status if the issue were raised. *Id.*

However, the FBI's Principal Legal Adviser in Boston, John Michael Callahan, examined the Bulger and Flemmi files with a view to determining if they contained information which would be exculpatory in the context of their forthcoming indictment. Callahan focused on the issues raised by the United States Attorney's Office, including whether Bulger and Flemmi had been authorized to engage in conduct which would otherwise be criminal, whether they had been explicitly or implicitly promised any form of immunity, and whether Bulger and Flemmi "had provided information to the FBI which would undercut a central theme of the indictment, namely, that there was a close working relationship between La Cosa Nostra

---

**8.** It should also be recognized that agents of the FBI in Boston were not uniform in their conduct concerning Bulger and Flemmi. James Knotts earnestly sought information to support the effort of the Massachusetts State Police to bug the Lancaster Street Garage. § II.11. Leo Brunnick, Gerald Montanari, and Brendan Clearly genuinely attempted to investigate whether Flemmi and Bulger were responsible for the murders of Wheeler, Halloran, and Callahan. § II.13. SAC James Greenleaf sincerely attempted to insulate Connolly from knowledge of the DEA–FBI joint investigation of Flemmi and Bulger. § II.17. Robert Jordan and Stanley Moody truly targeted Flemmi as part of the Bahorian investigation. § II.26.

and the Winter Hill Gang." Ex. 271; § II.32.

After completing his review, Callahan concluded that Flemmi had been "at least tacitly authorized" by the FBI to participate in "illegal gambling" and "LCN policymaking." The FBI recognized that the Flemmi and Bulger informant files contained information that would be exculpatory in the context of the imminent charges. The Bureau also realized that the failure to tell the United States Attorney that Bulger and Flemmi had been informants, and to provide the prosecutors with relevant materials, "could wreck the proposed organized crime indictments scheduled to be returned on January 9, or January 10, 1995." *Id.*

Accordingly, on January 9, 1995, the FBI told United States Attorney Donald Stern, and two of his assistants who were not directly involved in the investigation, that Bulger and Flemmi had been informants. The FBI also provided what Callahan characterized as a "quick general overview of the kind of information" that he had discovered. *Id.* Stern did not, however, insist that the prosecutors handling the case, or anyone else outside the FBI, review the Bulger and Flemmi informant files before the indictment previously prepared was presented to the grand jury. Nor did Stern share the information that he had received with the prosecutors who were presenting the case to the grand jury, evidently because he recognized the risk that their disqualification might be required if they were exposed to information acquired from Bulger or Flemmi as a result of any promise of immunity. *Id.*

Thus, the indictment that was previously prepared and approved was presented to the grand jury on January 10, 1995, by prosecutors who "did not know that Bulger and Flemmi had been informants or of any assessment of the information in their informant files." Ex. 269; § II.32. Those charges were brought against six more defendants in a ninety-one-page Superced-ing Indictment of the original charges against DeLuca. Therefore, pursuant to the District Court's well-known procedures concerning superceding indictments, the greatly expanded case was not randomly drawn, but rather was assigned to this court. Thus, the government exercised what was in effect an option offered by the District Court's rules to select this court to preside in the case against Bulger, Flemmi, and their original codefendants, Francis Salemme, Francis Salemme, Jr., Robert DeLuca, George Kaufman, and James Martorano. § II.32.[9]

The First Superceding Indictment charged the defendants with, among other things, from 1969 to January 1995, engaging in a conspiracy to violate, and violating, the RICO statute. They were also charged with conspiring to extort, and extorting, bookmakers, from 1979 to 1994. § II.33.

With regard to the RICO charges, the alleged enterprise was neither the Patriarca Family of La Cosa Nostra nor the Winter Hill Gang, organizations that have, in effect, been proven to be RICO enterprises in prior prosecutions. Rather, the defendants were alleged to have been part of a unique association-in-fact enterprise made up of individuals who joined together to use their respective relationships with either the Patriarca Family or the Winter Hill Gang to, among other things, facilitate the unlawful activities of the enterprise and coordinate the activities of the Patriarca Family and the Winter Hill Gang. *Id.*

In view of the roles of Bulger and Flemmi as Top Echelon informants utilized to provide, and in some instances tasked to obtain, information for the FBI concerning the LCN, there is now a serious question presented concerning whether they were authorized to engage in the conduct alleged to be criminal and are, therefore, not guilty as charged. There are also questions relevant to all of the defendants regarding whether the alleged conspiracies

---

**9.** Francis Salemme, Jr. and George Kaufman have each died since being indicted.

and enterprise genuinely existed, because an agreement with someone acting as an agent of law enforcement is not a criminal conspiracy. These questions, however, must be addressed at trial. §§ II.33, III.1.A. It is the issue of immunity that the court must decide in these pretrial proceedings. §§ III.1.B, C, D(1)-(5).

All of these issues, however, present serious impediments to the successful prosecution of this case. If the United States Attorney and other officials of the Department of Justice had been properly informed before the proposed indictment of Bulger and Flemmi was presented to the grand jury, perhaps Bulger and Flemmi would not have been charged at all, or different, more narrow charges might have been fashioned in an effort to reduce the risk that their indictment would prove to be fatally flawed. It is inconceivable to this court, however, that the case against Flemmi and Bulger as indicted in January 1995, would have been brought by any reasonable prosecutor who was properly informed of their relationship with the FBI.

The pending charges against Flemmi and Bulger were brought without anyone outside the FBI reviewing Flemmi and Bulger's informant files or considering carefully the issues that they raised. It was not until July 1995, that a member of the United States Attorney's staff first read those files. The prosecutors in this case were subsequently told that Bulger and Flemmi had been FBI informants. They were not, however, then provided with any additional information because of an enduring fear that if they knew more, their disqualification would be requested, if not required. § II.33.

In August 1995, the government advised the magistrate judge, *ex parte*, that Flemmi had made potentially relevant statements to the FBI in the context of a confidential relationship over the course of many years. The government reported that Department of Justice officials would review the relevant files and would seek guidance from the magistrate judge concerning the government's discovery obligations. Although in September 1995, this court told the parties that it understood that there were no matters pending before the magistrate judge and would decide all future issues itself, the government continued to secretly seek rulings from the magistrate judge relating to the implications for discovery of Flemmi's service as an informant. *Id.*

In the fall of 1995, representatives of the Department of Justice and of the United States Attorney's Office who were not then on the prosecution team for this case, informed the magistrate judge, in sealed *ex parte* submissions, that Callahan had concluded that the FBI had "at least tacitly authorized [Flemmi's] participation" in "illegal gambling and in LCN policymaking," but that "very little in the Flemmi and Bulger files is even arguably *Brady* material." The magistrate judge agreed with this erroneous assessment. Nevertheless, the government recognized that Flemmi was entitled to certain documents that were in his informant file. As requested by the government, in December, 1995, the magistrate judge ordered that those documents be furnished to Flemmi directly, rather than to his attorney. *Id.*

The government, however, did not comply with this Order. Flemmi did not receive any of the documents the government had been directed to produce to him. If those documents had been promptly provided to Flemmi, he would, in 1995 or early 1996, have learned for the first time that the FBI had documented some of the information that he and Bulger had furnished. *Id.*

During 1995 and 1996, this court decided many pretrial matters. Among other things, Flemmi was denied bail; the government was allowed to obtain another superceding indictment to address defects identified by defendants' motion to dismiss; charges against an additional defendant, John Martorano, were brought in the

Flemmi case and later alleged instead in what the court deemed to be a separate indictment; and motions to suppress the electronic surveillance conducted at the Busy Bee restaurant were denied, after evidentiary hearings, despite proven defects in obtaining the warrants and in sealing the tapes. *Id.*[10]

In March 1997, the defendants moved for evidentiary hearings on their motions to suppress certain electronic surveillance evidence, including the electronic surveillance conducted jointly by the DEA and FBI in 1984–85, and by the FBI at 34 Guild Street in 1989. In connection with these motions, each of the defendants, with the significant exception of Flemmi, moved for disclosure of whether Bulger, Mercurio, Robert Donati, and other individuals were FBI informants. Flemmi joined in all of the motions except for the request concerning Bulger. *Id.*

With the agreement of the parties, because the motions implicated the safety of suspected informants, the submissions and hearings on the motions were initially closed to the public. The government strenuously opposed the requests for evidentiary hearings on the motions to suppress and the related requests to confirm or deny that Bulger, Mercurio and/or Donati were informants. In the course of the proceedings the court discovered the sealed submissions indicating that Flemmi and Bulger had been informants. With the consent of all counsel, the court consulted Flemmi privately. Flemmi immediately decided to disclose to his attorney

and his codefendants that he had been an FBI informant. *Id.*

On May 22, 1997, the court issued a decision granting the requests for evidentiary hearings on the motions to suppress and ordering that the government reveal whether Bulger, Mercurio, and/or Donati were informants. At the request of the government, the decision was sealed to permit the Acting Deputy Attorney General to decide whether the government would comply with the Order concerning Bulger, Mercurio, and Donati, dismiss the case, or be held in civil contempt in an effort to render the decision appealable. *Id.*

It was then foreseeable that, if the government did not dismiss this case, Flemmi's history as an informant would soon be disclosed publicly and that Bulger's status as a source would be revealed by Flemmi or, since they were virtual Siamese twins, be easily inferred. In response to the May 22, 1997 Memorandum and Order, the government, in a sealed submission, confirmed that Bulger had been an informant and, contrary to its previous position, conceded that there was a proper basis for the court to have ordered evidentiary hearings on the motions to suppress the electronic surveillance conducted in 1984–85 and at 34 Guild Street. *Id.*

Demonstrating again the Department of Justice's traditional deference to the FBI in matters concerning the confidentiality of its sources, however, the Acting Deputy Attorney General declined to obey the Order to confirm or deny whether Mercurio and/or Donati were informants who had

---

**10.** The court also informed the parties of its tentative decision to exclude the testimony of Hugh Shields and other evidence concerning the 1967 murders of Edward, Walter, William Bennett, and Richard Grasso. These murders were charged for the first time in the Third Superceding Indictment as Racketeering Acts of Flemmi and Salemme. The court tentatively concluded that the government had impermissibly used the grand jury primarily or exclusively to obtain evidence to strengthen the RICO charges previously alleged by obtaining an immunity order, pursuant to 18 U.S.C. § 6001 *et seq.*, to compel the otherwise

unavailable testimony of two witnesses who were essential to charging the murders as Racketeering Acts and to strengthening the evidence of the alleged enterprise. § II.33.

Although this decision is subject to possible change pending the preparation and issuance of a written memorandum and order, it may have significant practical consequences. If Flemmi and/or Salemme are convicted in this case, but not held responsible for any of the four murders, the Guideline ranges for their sentences may be reduced from life in prison to 10 to 13 years for Flemmi and eight to 10 years for Salemme. *Id.*

assisted the government concerning the electronic surveillance conducted at 34 Guild Street. At that point the May 22, 1997 Memorandum and Order was unsealed.[11] *Id.*

The defendants moved to have the Acting Deputy Attorney General held in civil contempt. Thus, he was at risk of being incarcerated until he complied with the court's Order concerning Mercurio and Donati. Nevertheless, he repeatedly refused to do so. When questioned by the court, however, Mercurio acknowledged that he had been an informant. The Department of Justice subsequently represented that the deceased Donati had not been a source. Thus, the motion to hold the Acting Deputy Attorney General in contempt became moot. *Id.*

In connection with the pending motions to suppress, Flemmi filed several increasingly specific affidavits describing promises of protection that he had received from the FBI and instances of those promises being performed. Flemmi alleged, among other things, that Morris had told him and Bulger that they could be involved in any criminal activities short of murder and would be protected by the FBI; that he had been tipped off to the indictment in this case so that he could flee if he wished to do so; and that Mercurio had also been given prior notice of his indictment and, therefore, had been able to become a fugitive. *Id.*

In late June 1997, the court ordered that the government disclose to the defendants information relating to the pending motions. Thus, a great many documents which the FBI expected would never be seen by anyone outside the Bureau were produced and, in many instances, made part of the public record.[12] *Id.*

In addition, pursuant to Federal Rule of Criminal Procedure 12.3(a)(1), Flemmi was required to provide notice of his intention to assert as a defense at trial that conduct alleged to be criminal was actually authorized by the FBI. At the government's request, the defendants were also ordered to file their foreseeable motions to dismiss and supporting affidavits, so that any hear-

---

**11.** After the May 22, 1997 Memorandum and Order was issued, but before it was made public, the FBI announced for the first time that it was offering a $250,000 reward for Bulger's capture. § II.33. However, the evidence in this case raises questions concerning whether the FBI has consistently made its best efforts to apprehend Bulger.

In 1995, after Bulger fled, Charles Gianturco was put in charge of the Bulger fugitive investigation. *Id.* In 1978, Bulger had warned Connolly of the planned, imminent murder of Charles Gianturco's brother, Nick, who was then operating as an FBI undercover agent. Bulger was later credited with saving Nick Gianturco's life. Nick Gianturco dined with Bulger and Flemmi on several occasions, and was among the FBI agents who exchanged gifts with them. § II.7.

Bulger had returned to the Boston area in late January 1995 to drop off his companion Theresa Stanley. Although it was widely known that she had been traveling with Bulger and was back in Boston, the FBI did not contact her until April 1996, fifteen months after her return. When finally interviewed, Stanley provided considerable information concerning her travels with Bugler, but that

information was dated and of diminished value. § II.33.

Connolly was not interviewed in the Bulger fugitive investigation until March 21, 1997, more than two years after Bulger fled. Connolly made several statements that should have been included in the report of that interview. Connolly reported that Morris had told Bulger and Flemmi "that they were so good, he could get them off for anything short of murder." Connolly also said that he hoped that "Bulger was never caught." Charles Gianturco did not, however, record these statements in his report of Connolly's interview. *Id.*

Several weeks before the issuance of this Memorandum and Order, in August 1999, the FBI for the first time placed Bulger on its list of Ten Most Wanted fugitives.

**12.** As indicated earlier, however, the FBI also failed to produce certain damaging documents in a timely manner, including documents concerning Halloran's statements implicating Bulger and Flemmi in the Wheeler murder, documents relating to McIntyre's allegations regarding Bulger and Flemmi, and documents relating to Slinger. §§ II.13, II.14, II.22.

ings granted on those motions could be conducted in conjunction with the hearings on the related motions to suppress. The court allowed Flemmi's request for an evidentiary hearing on his motion to dismiss because of purported promises of immunity. It denied, without prejudice to later consideration, the defendants' request for evidentiary hearings on their motions to dismiss on other grounds, including alleged outrageous government misconduct constituting a denial of their rights to Due Process.

The hearings ordered were held throughout 1998. They generated over 17,000 pages of transcripts and 276 exhibits. The court's findings of fact are detailed in this Memorandum. Its conclusions of law are also described in detail, and are summarized below.

2. *The Motion to Dismiss Based on Immunity*

Flemmi's motion to dismiss based on an alleged promise of general immunity from prosecution is not meritorious. § III.1.C. Further proceedings will be required, however, to determine whether Flemmi is entitled to dismissal because evidence that he was properly promised would not be used against him was presented to the grand juries which returned the indictments in this case. § III.1.D.(2)-(4). As summarized below, it would also have been illegal for evidence derived from the 1984–85 electronic surveillance to have been presented to those grand juries. Future proceedings will also be required to determine whether this occurred. If evidence derived from the 1984–85 electronic surveillance was presented to the grand juries that indicted Flemmi, the court will have to decide if that unlawful use of intercepted evidence requires, or contributes to requiring, dismissal of the case against Flemmi. § III.2.F. In addition, the further hearings will permit the court to identify the evidence which must be excluded at trial if the case against Flemmi is not dismissed.

Flemmi did not have an agreement that he would not be prosecuted in return for his service as an FBI informant. The FBI agents primarily responsible for dealing with Flemmi, by word and deed, for thirty years, promised Flemmi protection in return for the valuable information that he was providing. The conduct of many other members of the FBI, including at least three ASACs, and the Chief of the Organized Crime Section at FBI Headquarters, contributed to creating, communicating, and performing the promise of protection to Flemmi. Flemmi reasonably relied on the FBI's promise of protection and, in return for it, provided very valuable assistance to the government in its war against the LCN and other matters. § III.1.C.

Flemmi was not, however, explicitly or implicitly promised immunity from prosecution. The term immunity was never used in conversation with him. More importantly, Flemmi did not understand that the government, or any of its agents, had agreed that he would not be investigated by the FBI, or any other law enforcement agency, or not be prosecuted. Rather, he expected that the FBI would overlook some of his criminal activity, provide him information concerning any investigations that were conducted, and warn him of any imminent charges against him of which it learned. The FBI performed its part of the bargain. Thus, it is not necessary or appropriate to decide if the agents entering into this agreement were authorized to do so, or whether the agreement was not valid because it violated public policy or because it attempted to provide immunity for future criminal conduct. *Id.*

In addition, the mere fact that Flemmi was an informant does not mean that nothing that he said to the FBI could be used against him in any way. § III.1.D(1). However, the FBI's promise to maintain the confidentiality of the fact that Flemmi was a source also constitutes an enforceable promise not to use statements he made against him if disclosure of those statements would, as a practical matter,

reveal that Flemmi had been an informant. § III.1.D(2).

Therefore, Flemmi's statements that would identify him as an informant could not have properly been presented to the grand juries which indicted him. It is doubtful that any such statements were used in this fashion. However, further evidence will be required to resolve this question. *Id.*

In addition, in the absence of a defense of public authority, or any other defense requiring introduction by Flemmi of some of his communications with the FBI, his statements to its agents that would identify Flemmi as an informant would not be admissible at trial. However, if this case is tried and, as represented, Flemmi relies on some of his communications with the FBI, the court will, pursuant to Federal Rules of Evidence 106 and 611, permit the government to offer other statements of Flemmi to the Bureau in order to assure that the jury is presented with an appropriate record on which to decide fairly the merits of his defenses. *Id.*

Flemmi was expressly and implicitly promised that in return for his contributions to the bugging of 98 Prince Street nothing intercepted there would be used to prosecute him. This promise is enforceable. § III.1.D(3).

The Attorney General has the authority to investigate crime. As part of that power, he has the authority to utilize informants and to provide them promises of immunity informally, rather than conferring it by the process established by statute. *Id.*

The Attorney General's power to investigate violations of federal law has been generally delegated to the FBI. This authority inherently includes the power to develop and utilize informants. As a corollary of this, the Bureau has been delegated the power to promise informants both confidentiality and informal immunity. *Id.*

There is no statute, regulation, order, or other legal limitation that prohibits the FBI from promising a source that any information that he provides will not be used against him, directly or indirectly. When the Attorney General wished to restrict the power of prosecutors and investigators to promise cooperating witnesses entry into the Witness Protection Program, he issued a public order that expressly stated that they were not authorized to do so. That restriction has been enforced by the courts. The Guidelines developed by the Attorney General and incorporated in the FBI Manual do not constitute a comparable prohibition. The Guidelines are neither public documents nor legally enforceable. In addition, while they have at relevant times stated that the FBI "should not" promise its informants immunity, they did not provide that it could not do so. §§ II.6, III.1.D(3).

Moreover, the Attorney General has not directed that the FBI consult a prosecutor before promising an informant immunity. To do so would be inconsistent with the long recognized right and obligation the FBI has to maintain the secrecy of its sources.[13] *Id.*

According to the testimony of the present and former members of the FBI, including its former Acting Deputy Director Potts and former SAC Greenleaf, the supervisor of an informant's handler was generally the FBI's chief decisionmaker regarding informants. The SACs general-

---

**13.** The cases in which informal promises of immunity made by agents without the involvement of any prosecutor have been held to be unenforceable are distinguishable from the instant case in decisive respects. They each involved individuals who were under active investigation or arrest and asked to cooperate in a discrete matter, rather than persons, like Flemmi, approached and cultivated to serve as long term informants. In addition, in those cases relief was denied in part because the government did not use the defendants' statements against him, directly or indirectly. Thus, in contrast to Flemmi, it was found that the defendant had not relied to his detriment on the law enforcement agent's promise. § III.1.D(3).

ly relied completely on the informant's handler and his supervisor for making all decisions and recommendations regarding the informant, including those for which the SAC was responsible under the Guidelines. In Potts' experience, FBI Headquarters never reversed a recommendation from a field office that an individual be used, or continued, as an informant. Moreover, there is no evidence that FBI Headquarters ever inquired about what promises had been made to informants generally or to Flemmi particularly. §§ II.6, II.16, III.1.D(3).

In these circumstances, Morris and Connolly had implied, actual authority to promise Flemmi that if he assisted the FBI's effort to bug 98 Prince Street, nothing intercepted there would be used against him.[14] Therefore, it was impermissible for the government to present evidence intercepted at 98 Prince Street, or any information derived from that evidence, to the grand juries that indicted Flemmi. *Id.*

Similarly, Flemmi had an enforceable agreement, implied in fact from the promise concerning 98 Prince Street and the conduct of the government, that there would be no direct or indirect use against him of the intercepted evidence that he helped the FBI obtain at Vanessa's and 34 Guild Street.[15] Therefore, it was improper for the government to present evidence intercepted at 34 Guild Street to the grand juries which indicted Flemmi. It would also have been improper to provide to those grand juries any evidence derived indirectly from the interceptions at 34 Guild Street or Vanessa's. *Id.*

The conclusion that Flemmi had received enforceable promises of immunity concerning the electronic surveillance conducted at 98 Prince Street, Vanessa's, and 34 Guild Street is not qualified by the fact that the FBI may not have been aware of all of his criminal activity. The Bureau did not generally ask an informant about his own criminal activity and did not expect him to divulge the details of it. The FBI was not misled, however, with regard to the nature of Flemmi and Bulger's crimes, including the fact that they were likely murderers. Indeed, on three occasions Morris attempted to obtain the assistance of reluctant individuals by sending them the message that they would be in danger of being murdered by Bulger if they did not cooperate with the FBI.[16] §§ II.4, II.16, II.33, III.1.D(3).

In addition, the fact that Morris accepted $7000 from Bulger and Flemmi does not render the immunity promised to Flemmi concerning the electronic surveillance conducted at 98 Prince Street, Vanessa's, and 34 Guild Street unenforceable as violative of public policy. An agreement to provide immunity in exchange for information does not inherently, or typically, involve a cooperative violation of the law. No payments were made to Morris before the initial promise concerning 98 Prince Street. Nor were any later payments directly related to the promises at issue. § III.1.D(3).

---

**14.** If, contrary to this court's conclusion, the FBI generally, and Morris and Connolly particularly, lacked the authority to promise Flemmi the immunity at issue here, it would be necessary for the court to decide whether their improper promises of immunity induced Flemmi to involuntarily make statements that the government proposes to use to achieve his conviction. If such statements were involuntary, neither they nor any evidence derived from them would be admissible at trial against Flemmi. However, Flemmi would not be entitled to any remedy for the misuse of such statements before the grand jury. § III.1.D(5).

**15.** Because Flemmi was neither intercepted at Vanessa's nor had a possessory interest in the premises, he is not an "aggrieved person" with standing to litigate a claim that the electronic surveillance conducted at Vanessa's violated Title III.

**16.** The three incidents involved Eddie Miani, Buckey Barrett, and an innocent individual who was erroneously suspected of kidnapping 11–year–old Sara Pryor. § II.4

The court does not by any means suggest that the payments to Morris were proper or should be condoned. However, the FBI's bargain with Flemmi and Bulger was based on the very valuable assistance that they provided to the government. The payments that Bulger and Flemmi made to Morris were only incidental to a relationship that was important to the FBI for valid, professional reasons. Moreover, they were an expression of the sense of a friendship between the FBI and its sources which the Bureau deliberately created and cultivated. In the circumstances, it would be fundamentally unfair to deprive Flemmi of the immunity that he was legitimately promised, and on which he reasonably relied, because of the payments Morris initially sought and ultimately received. *Id.*

Accordingly, further hearings are necessary to determine if the indictment of Flemmi must be dismissed because it was impermissibly secured based upon the direct and possibly indirect use of information Flemmi provided pursuant to promises of immunity. In order to avert dismissal, the government will be required to prove that the information that it presented to the grand juries to obtain the indictments of Flemmi was not tainted by showing that the government had an independent, legitimate source for that evidence. If this burden is not borne, the case against Flemmi will have to be dismissed unless the government proves that its errors were harmless beyond a reasonable doubt. If the government is able to satisfy its heavy, but not necessarily insurmountable, burden of proving that the grand jury proceedings were not fatally infected, the court will have to decide if Due Process nevertheless requires dismissal in order to provide Flemmi fundamental fairness concerning the express and implied promises that he would not be prosecuted based on evidence intercepted at 98 Prince Street, Vanessa's, or 34 Guild Street, and also decide if Flemmi is entitled to dismissal as an exercise of the court's supervisory powers. § III.1.D(4).

In connection with the further hearings, it is likely, but not certain, that it will be necessary for the government to produce to the defendants and the court the transcripts of the grand jury proceedings that resulted in the indictments of Flemmi so that the effect of evidence improperly presented can be assessed. As indicated earlier, issues to be addressed in those hearings will not be limited to the influence of the direct use of the evidence intercepted at 98 Prince Street and 34 Guild Street. Questions of the possible indirect use of that evidence, and of the evidence intercepted at Vanessa's, will also have to be considered. Those questions include whether the monitored conversations produced investigative leads that generated evidence which was presented to the grand juries, and whether the testimony of FBI witnesses who read the informant files of Flemmi, and perhaps Bulger, was shaped by information that the FBI acquired as a result of a promise of immunity. The court may also be required to decide whether the present prosecutors, who have now been exposed to tainted evidence, may participate in the preparation and conduct of Flemmi's trial if the case against him is not dismissed. *Id.*

### 3. *Flemmi's Motion to Suppress the 1984–85 Electronic Surveillance*

Flemmi has moved to suppress the evidence resulting from the 1984–85 electronic surveillance targeting him and Bulger. The facts relating to this motion are set forth in § II.17. Although the law is not clear as to the standard that should be applied in deciding Flemmi's motion to suppress, that uncertainty is not material. § III.2.B–D. Under either of the arguably applicable standards, Flemmi's motion is meritorious. § III.2.E.

Accordingly, although evidence intercepted as a result of 1984–85 electronic surveillance was not presented to the grand juries that indicted Flemmi, further

proceedings are necessary to determine whether the case against him must be dismissed, in whole or in part, because evidence derived from that electronic surveillance was utilized to secure his indictment. Those proceedings will also permit the court to identify the evidence relating to the 1984–85 electronic surveillance which must be excluded if the case against Flemmi is tried. § III.2.F. The factual and legal basis for the resolution of the motion to suppress the 1984–85 electronic surveillance is summarized as follows.

In 1984 and 1985, the DEA and the FBI were authorized by a series of court orders to engage jointly in electronic surveillance targeting Bulger and Flemmi. The investigation was initiated by the DEA. The agents involved preferred not to collaborate with the FBI, primarily because they, and the Assistant United States Attorney working with them, believed that Flemmi and Bulger were FBI informants and that the Bureau would compromise the confidentiality of the investigation to protect its sources. The Bureau preferred not to participate because it viewed the endeavor as doomed to fail and expected that, as with the Lancaster Street Garage investigation, the FBI would be blamed. The two agencies became reluctant collaborators, however, when it was recognized that the FBI's participation was essential if judicial authorization to conduct electronic surveillance was to be sought and received because most of the information to be relied upon in the applications to establish probable cause involved gambling and loansharking—crimes that the FBI rather than the DEA had the federal responsibility to investigate. §§ II.17, III.2.E.

The applications for the court orders authorizing the electronic surveillance of Bulger, Flemmi, Kaufman, and others not only relied heavily on the evidence cited to establish that there was probable cause to believe that they were committing offenses within the investigatory jurisdiction of the FBI. They also clearly conveyed the impression that the FBI would utilize any evidence obtained to attempt to develop prosecutable cases concerning matters within its jurisdiction. The Bureau, however, had no intention of doing so. The FBI was well aware, from information provided by Bulger, Flemmi, and others, that Bulger and Flemmi were engaged in illegal gambling, loansharking, and extortion. The FBI considered such criminal conduct to be essential to maintaining the credibility necessary for Bulger and Flemmi to continue to obtain and provide vital information on the LCN and others. The FBI was committed to honoring its promise of confidentiality to Flemmi and Bulger by not disclosing that they were sources, explicitly or implicitly. Explaining to the DEA, the prosecutors, or the court that the Bureau was not interested in obtaining or using any intercepted evidence of their criminal conduct would have effectively confirmed they were informants. *Id.*

Ring, who had primary responsibility for the matter at the FBI, felt that Flemmi and Bulger had no immunity and would be "on their own" if the DEA could develop a prosecutable narcotics case against them based on the electronic surveillance. Armed with information provided by colleagues, however, Connolly contributed to assuring that the DEA's efforts would not succeed by alerting Bulger and Flemmi to the investigation generally and to the electronic surveillance particularly. *Id.*

Blinded by its determination not to confirm for the United States Attorney's Office or the DEA the accuracy of their understanding that Bulger and Flemmi were FBI informants, the FBI recklessly disregarded the government's legal obligation of candor to the court when applying for authority to conduct electronic surveillance in what was represented to be a joint investigation. At the same time, believing that Bulger and Flemmi were FBI informants, but accepting that the FBI would not confirm or discuss their status, the DEA and the United States Attorney's Office recklessly disregarded their legal obligation to seek from the FBI informa-

tion that, if shared with them, would have resulted in the applications for electronic surveillance now at issue not being filed, let alone approved by the court. The DEA and United States Attorney's Office also acted with reckless disregard for the truth when they filed applications for warrants that in effect represented that electronic surveillance was necessary to obtain evidence that the FBI would use in a Title 18 investigation of Bulger, Flemmi, and others because the prosecutor who was the applicant and the DEA agent who was the affiant did not believe that the FBI would attempt to do so. Rather, they understood that Bulger and Flemmi were FBI informants who the Bureau wished to protect rather than prosecute. *Id.*

As a result, the applications for the 1984–1985 electronic surveillance targeting Bulger and Flemmi failed to include the "full and complete statement" describing the necessity for electronic surveillance that was required by 18 U.S.C. § 2518(1)(c). More specifically, the applications should have included certain material facts about the targets, including the following. As informants Bulger and Flemmi had made statements about their illegal gambling and loansharking that the government now claims can be used as evidence against them. A review of their files would indicate to the FBI that they were tacitly authorized to engage in such activities. Therefore, the conduct which

the government was seeking authority to utilize a wiretap to investigate may not have been criminal. In any event, the FBI did not intend to use any evidence generated by the electronic surveillance in an attempt to develop a prosecutable case against its sources or any of the other named targets, including Kaufman. Moreover, the FBI agent who was most knowledgeable believed that Bulger and Flemmi were not involved in narcotics crimes, but may have mistakenly given that impression while seeking information for the Bureau. No reasonable judge would have granted any request to target Bulger and Flemmi based on an application containing this information. *Id.*

In fact, if properly informed, the Assistant Attorney General would not have authorized the filing of the application for a warrant at all.[17] The Department of Justice would not have allowed the submission to the court of an application that it knew was false and misleading. Nor would it have, over the FBI's inevitable objection, permitted disclosure to the court, and possibly to potential defendants, of the fact that Bulger and Flemmi were FBI informants. The testimony of DEA SAC Robert Stutman, among other things, indicates that if the DEA had been candidly consulted, it would have deferred to the FBI's interest in Bulger and Flemmi, and abandoned its investigation. *Id.*

**17.** 18 U.S.C. § 2516(1) requires that the Attorney General or certain other high ranking officials of the Department of Justice, including the Assistant Attorney General in charge of the Criminal Division, authorize an application to the court for a warrant to conduct electronic surveillance. This provision is solely statutory in origin and is central to the electronic surveillance statute. The Supreme Court has held that § 2516(1) requires the "informed judgment" of a high ranking official before an application is filed in order to be "doubly sure" that electronic surveillance is employed with restraint. *United States v. Giordano*, 416 U.S. 505, 515, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974); § III.2.B.

 Flemmi correctly contends that the Assistant Attorney General was deprived of the

information necessary to perform his statutory function properly and, as a result, an application which would not have been authorized if the Assistant Attorney General had been fully informed was submitted to the court. Existing jurisprudence, however, suggests that there is not a judicial remedy for such a subversion of Title III. Instead, it has been held that the prospect of political accountability, evidently including Congressional oversight, is expected to provide sufficient deterrence and potential structural remedies if § 2516(1) does not operate as intended. While the reasoning of such decisions is questionable in the circumstances of this case, the court has not relied upon § 2516(1) in finding Flemmi's motion to suppress to be meritorious. § III.2.B.

If, however, an application had been filed seeking authority to intercept Bulger and Flemmi to obtain evidence of drug offenses only, the request concerning Bulger would have been obviously unmeritorious because there was no evidence to establish probable cause to believe that he would be intercepted discussing anything on Kaufman's telephone. In addition, the request concerning Flemmi would have been denied because there was not probable cause to believe that Flemmi would be discussing narcotics matters on Kaufman's telephone. Nor was there probable cause to believe that Kaufman would be discussing drug offenses with anyone.

In view of the foregoing, Flemmi's motion to suppress is meritorious regardless of whether it is decided pursuant the standard that the Supreme Court enunciated in *United States v. Giordano,* 416 U.S. 505, 515, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), for violations of central provisions of 18 U.S.C. § 2510 *et seq.* ("Title III"), or pursuant to the judicially crafted exclusionary rule for violations of the Fourth Amendment established in *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). In *Franks,* the Supreme Court held that when constitutionally required probable cause is in question in a case not involving Title III, a defendant must make two showings to obtain suppression based upon possible government misconduct: first, that the information at issue was known by the government to be false or was presented with reckless disregard for its truth; and second, that the information was material to the decision to issue the warrant. 438 U.S. at 156, 98 S.Ct. 2674; § III.2.C.

The *Franks* standard is easier for the government to meet than the standard applied by the Supreme Court in deciding the motion to suppress electronic surveillance evidence in *Giordano.* In *Giordano,* the Supreme Court held that:

> Congress intended to require suppression where there is failure to satisfy any of those statutory requirements [of Title

III] that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device.

416 U.S. at 527, 94 S.Ct. 1820. Such provisions were characterized as "central" to the Title III statutory scheme. *Id.* at 528, 94 S.Ct. 1820. Section 2518(1)(c) concerning the necessity of electronic surveillance is a central provision of Title III. §§ III.2.C and E.

If a central provision of Title III is ignored or otherwise violated, suppression must be ordered unless the government proves that the purpose which the particular procedure was designed to accomplish has been satisfied in spite of the error. *Id.* Thus, in *Giordano,* the Supreme Court in effect found legislative intent to require suppression without regard to the reason for the violation if certain statutory provisions of Title III not rooted in the requirements of the Fourth Amendment are not satisfied. In contrast, under *Franks,* even a material error would not justify suppression unless it is proven that the government filed the false or misleading application for a warrant intentionally or with reckless disregard for its truth. *Id.*

Since *Franks* was decided, the Court of Appeals for the First Circuit has on several occasions, without analysis or explanation, employed the *Franks* standard to decide motions to suppress electronic surveillance evidence alleging failures to meet either the probable cause or necessity requirements of Title III or its Massachusetts counterpart. However, at other times, the First Circuit has stated or indicated that the judicially crafted exclusionary rule does not apply in Title III cases. Some, but not all, other courts have utilized the *Franks* test to decide attacks on warrants for electronic surveillance, including the necessity requirements of § 2518(1)(c). *Id.*

In 1991, in *United States v. Ferrara*, 771 F.Supp. 1266, 1298–1319 (D.Mass.1991), this court applied the *Franks* standard in denying the motion to suppress the tape-recording of the LCN induction ceremony that was intercepted at 34 Guild Street. This approach was predicated on the premise that the judicially crafted exclusionary rule is applicable to provisions of Title III that codify requirements of the Fourth Amendment and that § 2518(1)(c) is such a provision. § III.2.C.

This court continues to find that § 2518(1)(c) is constitutional in origin. § III.2.D. However, the court is now persuaded that the statutory exclusionary rule, as interpreted in *Giordano* and its progeny, rather than the *Franks* test should be applied when a central provision of Title III has been violated. §·III.2.C. Nevertheless, the court has analyzed the motion to suppress the 1984–85 electronic surveillance under both the *Franks* and *Giordano* standards.

Suppression of the 1984–85 electronic surveillance is required under *Franks* because the government filed a series of materially false and misleading applications with at least reckless disregard for the truth. Suppression is also necessary pursuant to *Giordano* because § 2518(1)(c), a central provision of Title III, was violated and the purpose of that provision was not satisfied in spite of the violation. § III.2.E.

As described earlier, further proceedings will be necessary to decide the implications of the meritorious motion to suppress the 1984–85 electronic surveillance for Flemmi's motion to dismiss and, if the case is not dismissed, to determine the evidence that must be excluded at Flemmi's trial. § III.2.F.

### 4. *DeLuca's Motion to Suppress Concerning the LCN Induction Ceremony*

Defendant Robert DeLuca was overheard and tape-recorded participating in the LCN induction ceremony conducted at 34 Guild Street on October 29, 1989. Prior to the Supreme Court's December 1, 1998 decision in *Minnesota v. Carter*, 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998), the government did not contend that De-Luca lacked standing to seek to suppress the evidence at 34 Guild Street. Thus, the evidentiary hearing was conducted on the premise that the court would have to decide the merits of DeLuca's motion to suppress that evidence.

The facts relating to the application for the warrant authorizing "roving" electronic surveillance which was used to bug 34 Guild Street were also relevant to the merits of Flemmi's motion to dismiss. As indicated earlier, Flemmi was one of the four sources relied upon in that application. In addition, the manner in which Ring and Connolly dealt with Mercurio concerning 34 Guild Street was sufficiently distinctive to be probative of Flemmi's claim that he was promised and provided protection as well.

The facts concerning the electronic surveillance of 34 Guild Street are summarized as follows. When Mercurio became an informant, with his consent, the FBI and the Department of Justice successfully sought to have his parole terminated early in part to permit him to be released on bail when he was indicted with other members of Russo faction of the LCN. § II.29.

In the summer of 1989, Connolly and Ring learned from Mercurio and others that there would soon be an LCN induction ceremony. The FBI was very interested in intercepting that ceremony. Ring and Connolly expected that Mercurio would be vital to any effort to do so. §§ II.29, II.30, II.31.

At about the same time, reliable informants advised the FBI that Mercurio had set Salemme up to be shot. Under the Attorney General's Guidelines, this information should either have been provided by the Boston office of the FBI to state and local law enforcement officials, or have been submitted to officials at FBI Head-

quarters and to the Assistant Attorney General. If the Guidelines had been followed, the Assistant Attorney General would have had the responsibility of deciding whether Mercurio would be continued as a Top Echelon informant or closed and subject to investigation and prosecution. The Guidelines, however, were ignored and neither disclosure nor consultation occurred. *Id.*

In the fall of 1989, Mercurio was providing increasingly specific information concerning the forthcoming LCN induction ceremony. The FBI recognized that intercepting such a ceremony for the first time would be of immense value in future prosecutions and Congressional hearings. Ring very much wanted to obtain a warrant to bug that ceremony, but not at the risk of revealing Mercurio's status as an informant—a risk that would have been created if the application for the warrant had mentioned either the ceremony or its location because so few members of the LCN would have had access to that information. § II.30.

To resolve this dilemma, Ring wished to seek a warrant to conduct roving electronic surveillance of oral communications at multiple, unidentified locations. Title III requires that to obtain a warrant for a roving bug the government must submit to the court "a full and complete statement as to why [it] is not practical to specify the place to be bugged." 18 U.S.C. § 2518(11)(a)(ii). If it is shown that it is impractical to specify where the roving authority will be employed, the place or places to be bugged need not be described in the application or the warrant. *Id.*

Ring engaged Strike Force Chief Diane Kottmyer, who knew that Mercurio was an informant because of the Strike Force's role in having his parole terminated early, and agent Walter Steffens, Jr. to prepare the necessary application and supporting affidavit. However, Ring consistently withheld from them certain information that he and Connolly were receiving from Mercurio. That information that would have provided Kottmyer and Steffens clear notice that it was false and misleading for the government to represent on the evening of October 27, 1989, that a warrant for a roving bug was necessary because it was impractical to specify the location to be bugged. In addition, Ring did not tell Kottmyer and Steffens that, contrary to the claim in the documents they were drafting, the FBI did not intend to utilize the warrant that it was seeking more than once. *Id.*

Because Ring and others were not candid with Kottmyer and Steffens, on October 27, 1989, a false and misleading application and affidavit were submitted in a successful effort to obtain a warrant for a roving bug. That warrant was used to intercept the LCN induction ceremony at 34 Guild Street on October 29, 1989. *Id.*

If an honest and accurate application had been filed, it would have revealed the following. At all times prior to October 29, 1989, the FBI, personified by Ring, knew that there would be at least one informant, Mercurio, at the ceremony. The FBI sought a warrant for a roving bug that could be used at multiple, unidentified locations, rather than authorization to bug 34 Guild Street alone, in order to protect the identity of its sources. The FBI had no intention of using that warrant to intercept conversations more than once. Rather, at the time the application was drafted the FBI intended to arrest the participants immediately after the ceremony. The FBI had substantial, corroborated, "rock solid" information that the ceremony would be held at 34 Guild Street several hours before Kottmyer and Steffens met with the judge to obtain the warrant authorizing roving surveillance based upon the representation that it was then "impractical" to identify the location to be bugged. *Id.*

The FBI made no effort to obtain the testimony of Mercurio about the induction ceremony. Nor did the FBI ask him to record the ceremony, which would have

obviated the need for a court ordered bug. The FBI did not try to persuade Mercurio to cooperate in this fashion by threatening him with possible prosecution for his role in the Salemme shooting, as well as the Sagansky–Weinstein extortion and other criminal activity intercepted at Vanessa's. Instead, Ring and Connolly confirmed Mercurio's understanding that the Mafia induction ceremony had been bugged. In addition, they caused him to understand that his indictment was imminent and permitted him to flee, as they expected he would. *Id.*

As a result, the FBI was relieved of the recognized risk that the prosecution of Russo, Ferrara, Carrozza, and their codefendants would be jeopardized by the issues that would have been presented as a result of Mercurio's dual status as a codefendant and an FBI source concerning the induction ceremony, among other things. Mercurio's flight also masked for many years the violation of the Attorney General's Guidelines committed by Ring and his colleagues when they unilaterally decided to continue Mercurio as an informant despite what they believed to be his involvement in the Salemme shooting. *Id.*

The foregoing facts would present serious questions for the court to resolve if DeLuca had standing to litigate his motion to suppress the electronic surveillance conducted at 34 Guild Street. Among other things, it might make a difference whether *Franks* or *Giordano* establishes the applicable standard for deciding that motion. However, following the December 1, 1998 decision in *Carter*, the government argued for the first time that DeLuca lacks the standing necessary to maintain his motion to suppress. Upon careful consideration of the parties' supplemental submissions and oral arguments on this novel issue, the court finds that the government's position is correct. § III.4.

In essence, *Carter* indicates that the bugging of the LCN induction ceremony did not violate DeLuca's Fourth Amendment rights because as a visitor to 34 Guild Street, who did not stay over night, and who engaged in only business discussions, he did not have an expectation of privacy that society would today deem to be justified. In addition, although the matter is not perfectly clear, the court finds that when Title III was enacted it was intended that evolving, contemporary conceptions of reasonable expectations of privacy be applied in deciding whether an intercepted conversation constitutes an "oral communication" as defined in 18 U.S.C. § 2510(2). In view of the decision in *Carter*, the court is compelled to find that DeLuca did not at 34 Guild Street have a justified expectation that he would not be intercepted and, therefore, did not engage in what the statute defines as an "oral communication." Thus, DeLuca is not an "aggrieved person" as defined in § 2510(11). Accordingly, he does not have standing, under § 2518(10)(a), to seek suppression for an alleged violation of Title III concerning the electronic surveillance conducted at 34 Guild Street. Therefore, his motion to suppress must be denied.

As DeLuca's motion to suppress is being denied for lack of standing, it is not necessary for the court to address the merits of the issues he has sought to litigate. If this court's decision concerning standing is appealed and reversed, the Court of Appeals for the First Circuit, or the Supreme Court, may in the process also clarify whether the standards of *Franks* or *Giordano* should be employed in deciding DeLuca's motion to suppress. Therefore, it is most appropriate for this court to decline to analyze the merits of DeLuca's motion at this time. The court will issue the additional necessary findings of fact and conclusions of law if its decision concerning DeLuca's lack of standing is reviewed and this case is remanded.

### 5. *Conclusion of Summary*

In view of the foregoing, Flemmi's motion to dismiss based on a purported promise of immunity from prosecution is being denied. DeLuca's motion to suppress the

electronic surveillance conducted at 34 Guild Street is also being denied.

Flemmi's motion to suppress the 1984–85 electronic surveillance is meritorious. He was also properly promised that if he assisted the FBI none of the evidence intercepted at 98 Prince Street, Vanessa's, or 34 Guild Street would be used against him, directly or indirectly. At least with regard to 98 Prince Street and 34 Guild Street, that agreement was violated.

Further proceedings are required to determine the remedies to which Flemmi is entitled as a result of his meritorious motions, including whether dismissal of the case against him is required. These proceedings will be conducted before the court enters any Order that may be appealable by the United States pursuant to 18 U.S.C. §§ 2510(10)(b) or 3731.

\* \* \* \* \* \*

This case has been pending for almost five years. The defendants' motions to dismiss and to suppress have been the subject of intensive litigation for more than two years. Nevertheless, the merits of Flemmi's motion to dismiss cannot yet be decided. Thus, the present posture of this case may be disappointing to the parties and to the public, as it is, frankly, to the court. However, it should be recognized how this case has come to this point and the spirit in which it will proceed if it must be litigated to a conclusion.

Often the investigation of crime must be secret in order to be effective. This is particularly true when that investigation targets a dangerous and highly secretive organization like the LCN.

Informants are valuable, if not vital, assets in combatting serious crime. The government's ability to promise an informant confidentiality is often important to securing his cooperation and protecting his

safety. In recognition of this, the FBI has historically been permitted to operate its sources in secret, even from officials of the Department of Justice.

However, as Attorney General Harlan Fiske Stone, who later became the Chief Justice of the United States, warned in 1924, when he established the FBI:

> There is always the possibility that a secret police may become a menace to free government and free institutions because it carries with it the possibility of abuses of power which are not always quickly apprehended or understood.[18]

In the mid–1970's, it was discovered that such abuses by the FBI had occurred over many years. They included FBI efforts to "neutralize" Dr. Martin Luther King as an effective civil rights leader and " 'dangerous and degrading tactics' " to disrupt lawful political activity of American citizens.[19]

As information about these abuses began to emerge, FBI Director Clarence Kelly realized that even he had been deceived by subordinates seeking to cover-up misconduct. "Admitting [in 1976] that some FBI activities had been 'clearly wrong and quite indefensible,' he declared that the Bureau should never again occupy the 'unique position that permitted improper activity without accountability.' "[20]

Anticipating the wisdom of this observation, in 1975, Attorney General Edward H. Levi began the development of Guidelines for the FBI's use of informants, among other things. As indicated earlier, those Guidelines did not limit the FBI's authority to promise informants immunity informally and unilaterally. The Guidelines did, however, direct that the FBI not take any action to conceal a crime by one of its informants. If the FBI learned that one of its informants had committed a serious

---

**18.** Alpheus Thomas Mason, *Harlan Fiske Stone: Pillar of the Law* 153 (1956) (quoting *N.Y. Times,* May 10, 1924); § II.6.

**19.** John T. Elliff, *The Reform of FBI Intelligence Operations* 5–6 (1979) (quoting *Report*

of Senate Select Committee to Study Governmental Operations with respect to Intelligence Activities ); § II.6.

**20.** *Id.*

crime and did not wish to disclose that information to the appropriate law enforcement officials, the Bureau was directed to inform the Department of Justice. It was intended that the Department would then decide whether exceptional circumstances justified continuing the informant as a source or whether he should instead be closed and subject to investigation and prosecution. § II.6.

The evidence in this case indicates that the Attorney General's Guidelines were routinely ignored with regard to Top Echelon informants generally. As the government acknowledges, it is clear that they were regularly disregarded concerning Flemmi and Bulger. § II.6.

While the Department of Justice has historically respected the right of the FBI to maintain the secrecy of its sources from other agencies and federal prosecutors, courts have recognized their duty to compel disclosure of an informant's identity when it has been demonstrated that such information is relevant or helpful to the defense of an accused or essential to the fair determination of a case.[21] In 1997, this court found that the defendants in the instant case had proved that they were entitled to know whether Bulger, Mercurio, and Donati were informants.[22] The

court continues to believe that this conclusion was correct.

That decision, however, opened the proverbial "Pandora's Box." As a result, many serious issues emerged. In order to decide them, the court has made an earnest effort to find the true facts and to apply the law to those facts without fear or favor.[23]

In 1940, Attorney General, and future Supreme Court Justice, Robert Jackson urged federal prosecutors, and by implication federal investigators, to "seek[ ] truth and not victims."[24] This, however, is a challenging task for those charged with investigating and prosecuting dangerous criminals who, by definition, do not themselves "play fair." Thus, in our democracy, we do not rely solely on the self-restraint of federal prosecutors and investigators to assure that crime is investigated lawfully.

Instead, we ultimately rely on judges, who take an oath to be impartial, to decide whether the government has violated the law and, if so, to determine whether a defendant's rights have been so irreparably injured that he is entitled to a remedy that may be as drastic as the dismissal of the case against him. Courts are not in-

---

**21.** *Roviaro*, 353 U.S. at 60–61, 77 S.Ct. 623.

**22.** *United States v. Salemme*, 978 F.Supp. 343, 349–52, 356–58 (D.Mass.1997).

**23.** The record from which the facts described in detail in this Memorandum have been found includes many documents and the testimony of many witnesses. It should be recognized, however, there were several potentially important witnesses who were unavailable. Bulger is a fugitive. As the parties agreed, because of his medical condition, O'Sullivan was unable to testify. Connolly asserted his Fifth Amendment right not to testify, the government declined to compel his testimony by granting him immunity, and the court found there was not a proper basis for it to order the government to do so. § II.33.

In addition, no party called John Martorano to testify. However, within the past week, on September 9, 1999, the government filed a plea agreement with John Martorano which provides for his cooperation in future pro-

ceedings. In view of the decisions concerning Flemmi's claims of immunity described in this Memorandum, it is inevitable that if this case is not dismissed Flemmi will assert that Martorano should not be permitted to testify against him because Martorano's cooperation was obtained as a result of the government's breach of its agreement to maintain the secrecy of Flemmi's service as an FBI informant and because the government's questioning of Martorano was impermissibly influenced by information that Flemmi provided to the FBI pursuant to certain enforceable promises of immunity. §§ III.1.D(2)-(4). The court will decide the challenging question of whether Martorano should be permitted to testify against Flemmi if and when it becomes necessary to do so.

**24.** Robert H. Jackson, "The Federal Prosecutor," 24 *J. Am. Judicature Soc'y* 18, 20 (June 1940).

vested with this power and responsibility because we are a nation that is solicitous of criminals. Rather, this duty has been delegated by the people to the courts because we recognize that, as Justice Felix Frankfurter wrote, "[i]t is a fair summary of history to say that the safeguards of liberty have frequently been forged in controversies involving not very nice people." [25]

We live in a nation which, above all, seeks justice. As reflected in the words of Louis D. Brandeis that are engraved in the entrance of the United States Courthouse in Boston, we believe that, "Justice is but Truth in Action." [26] This court will continue to strive to assure that this case is conducted with fidelity to this principle.

## II. FINDINGS OF FACT

### 1. *The Standards Applied*

Forty-six witnesses testified over eighty days in the hearings on the motions to suppress and dismiss now being addressed. The court also received 276 exhibits and several stipulations. The evidence presented placed certain facts in question. The testimony of different witnesses conflicted on various points. In addition, the import of many documents, and the implications of the absence of records, was also often disputed. Thus, the court has been required to determine the credibility of many witnesses and much other evidence.

In doing so, the court has performed as juries are generally instructed with regard to determining credibility and finding the facts. *See, e.g., First Circuit Pattern Jury Instructions—Criminal* §§ 1.05, 1.06 (West 1998). The court has considered both the direct and circumstantial evidence. *Id.* § 1.05. In view of the substantial evidence that members of the FBI

engaged in improper, if not illegal, conduct and thus had a motive to tailor, by omission or distortion, the written records that they reasonably expected would never be seen by others with the knowledge necessary to dispute their accuracy or completeness, at times circumstantial evidence has been particularly important in resolving issues of credibility and in finding the facts.

In judging the believability of witnesses, the court has applied the conventional criteria. *Id.* § 1.06. These include, importantly, the manner of the witness while testifying; whether the witness had a bias, prejudice, or other motive to lie; the consistency of the witness's testimony with his or her prior statements and other evidence; and the reasonableness of the witness's testimony when considered in the light of the credible other evidence. *Id.*

The court has also recognized that witnesses at times testify honestly and accurately about some matters, but not all matters. *Id.* Thus, in certain instances, the court has credited some but not all of a witness's testimony. For example, the court is persuaded that Flemmi testified truthfully in claiming that he was regularly tipped-off by the FBI regarding investigations and impending indictments. He was not, however, always candid in identifying the source of the information he received. Rather, he at times attributed information received from Connolly to other agents of the FBI in an evident effort to protect Connolly and to strengthen his own claim to an enforceable promise of immunity from prosecution.

Applying the foregoing principles, the court finds the following facts have been proven by a preponderance of the credible evidence.[27]

25. *United States v. Rabinowitz*, 339 U.S. 56, 69, 70 S.Ct. 430, 94 L.Ed. 653 (1950) (Frankfurter, J., dissenting).

26. Louis D. Brandeis, *Interlocking Directorates*, in *LVII Annals of American Academy of*

*Political and Social Science* 45, 45 (Clyde L. King ed., 1915).

27. Citations to the record are included for virtually all of the facts found. However, since this matter has required making many credibility determinations and drawing rea-

2. *Rico and Flemmi*

In the early 1960's, Flemmi began exchanging information with the FBI. Ex. 31, ¶ 3. In November 1965, FBI Special Agent H. Paul Rico targeted Flemmi for development as a Top Echelon informant—the highest status a source can achieve in the FBI. Ex. 20. At that time, a Top Echelon informant was defined as an individual who "could provide a continuous flow of quality criminal intelligence information regarding the leaders of organized crime." Jan. 9, 1998 Tr. at 39 (Under Seal).

In 1965, Flemmi was involved in a major gang war among several criminal groups in Boston. Various of the warring factions were led by Flemmi, Howard Winter, Thomas Callahan, and Joseph Barboza. Ex. 20. The gang war had already resulted in several murders. Ex. 20; Flemmi Aug. 25, 1998 Tr. at 26. Flemmi understood that he was in danger of being killed. *Id.;* Flemmi Aug. 25, 1998 Tr. at 26–28.

Flemmi is Italian–American. In the 1960's he had an ambivalent relationship with the LCN, at different times viewing its members as enemies and allies. Ex. 21. Flemmi's association with the LCN was initially linked to his long partnership with Francis Salemme, who was, evidently, unequivocal in his enthusiasm for the LCN. Flemmi and Salemme were particularly close to Ilario Zaninno, also known as Larry Baione, a Boston member of the Patriarca Family of the LCN. *Id.*

In November 1965, Flemmi provided Rico with valuable information about the possibility that Baione would become actively involved in the ongoing gang war, as well as intelligence about past and potential murders. Ex. 20. In Rico's view, if Flemmi survived the gang war, he would become "a very influential individual in the Boston criminal element" and "be in a position to furnish information on LCN members in [the Boston] area." Ex. 20.

For the next twenty-five years, the FBI provided considerable assistance to Flemmi which helped make both of these predictions prophetic.

Since the mid–1960's, the development of Top Echelon informants has been a very high priority for the FBI. The successful development of informants generally, and therefore Top Echelon Informants particularly, has also been regarded as an important achievement for an FBI agent, with the potential to affect significantly the progress of that agent's career. Morris Apr. 29, 1998 Tr. at 44–45 *See also* Ex. 274 (Under Seal), FBI Manual of Instructions (hereinafter "Manual") § 137–2(3) (4-2-79). Thus, agents have been ambitious to develop Top Echelon informants.

The urgency and importance of developing Top Echelon informants in the mid–1960's was particularly pronounced because of the then recent metamorphosis of the FBI's attitude toward Organized Crime during Robert Kennedy's tenure as Attorney General, from 1961 to 1964. More specifically:

When Kennedy arrived, [FBI Director J. Edgar] Hoover did not believe there was such a thing as a national crime syndicate. In 1962 he stated that "no single individual or coalition of racketeers dominates organized crime across the nation." When Kennedy left, Hoover was taking credit for the discovery of La Cosa Nostra. In September of 1963, he wrote in the FBI's *Law Enforcement Bulletin* that the sensational [Joseph] Valachi disclosures [concerning the LCN] merely "corroborated and embellished the facts developed by the FBI as early as 1961 which disclosed the makeup of the gangland hordes." "At first it was like pulling teeth to get the Bureau to enter these areas," recall[ed] a Kennedy assistant, "but by 1963 all that had changed."

sonable inferences from a great volume of evidence, it is not feasible to cite all of the evidence which the court has considered and assessed. The citations to the record that are included are intended to be helpful, but do not describe completely the evidence on which the court has relied in drawing inferences and finding facts.

Victor S. Navasky, *Kennedy Justice* 8–9 (1968).

Rico was an agent who enthusiastically embraced the FBI's new crusade against the LCN. As part of his effort to make Flemmi an asset in that campaign, Rico made Flemmi a clear and customary promise. Rico promised that he would not tell anyone outside the FBI that Flemmi was an informant, and would only disclose that fact to those within the FBI who Rico felt had a need to know it. Rico Jan. 14, 1998 Tr. at 155–59. Rico made this promise to all of his informants. *Id.* at 158–59. To Rico, this promise was "sacred." *Id.* at 156. The promise was to him the "heart" of the agreement between the FBI and its informants. *Id.* at 63–64. Rico's view that an individual's status as an informant should virtually never be disclosed to anyone outside the FBI was, and remains, a sacred article of faith within the FBI. *See, e.g.,* Morris Apr. 24, 1998 Tr. at 130; Gianturco Jan. 20, 1998 Tr. at 131; Darcy Sept. 28, 1998 Tr. at 24.

To Rico, the promise of confidentiality meant, among other things, that information provided by an informant would not be used against him, at least directly, because to do so would necessarily disclose that the individual had been cooperating with the FBI. Rico Jan. 14, 1998 Tr. at 157–58. In fact, Rico understood that, as a matter of law, such statements could not be used against Flemmi or any other informant because no *Miranda* warnings had preceded them. Rico Jan. 13, 1998 Tr. at 126.

Rico consistently honored his promise of confidentiality to Flemmi, among others. Information from informants is recorded on an FBI Form 209 (a "209"). Ex. 274 (Under Seal), Manual § 108(F)(5) (2–15–65); Ring June 15, 1998 Tr. at 59–60. Rico never disclosed information provided by an informant, or any of a source's 209s, to a prosecutor, either to prompt an investigation of the informant or to strengthen a prosecution of him. Rico Jan. 14, 1998 Tr. at 158. For example, when Flemmi told him that he had badly beaten Peter Fiumara in connection with an illegal debt, Rico did not share this information with any prosecutor, agent, or agency that might have investigated Flemmi. Rico Jan. 13, 1998 Tr. at 21–22. As a result of this practice, even after Flemmi was charged with the attempted murder of John Fitzgerald, Rico did not give the prosecutor, his good friend District Attorney John Droney, the statements Flemmi had made to Rico relating to that matter. As far as Rico was concerned, the promise of confidentiality made to Flemmi or any other informant would endure even if Rico learned that the informant had broken the law. Rico Jan. 14, 1998 Tr. at 159.

While FBI agents have long routinely promised sources confidentiality, Rico did not rely on this assurance alone to cultivate informants. Rico characterized his approach to developing informants as "unique." Rico Jan. 13, 1998 Tr. at 119–20. This case demonstrates that while his methods were unorthodox, they were not singular. In any event, as Rico testified, he "did not always conform 100%" to what the FBI policies and procedures required. Rico Jan. 14, 1998 Tr. at 143.

Using his personal style, Rico sought to realize Flemmi's potential as a source by not treating him like a criminal who should be used with caution to obtain valuable information. Rather, Rico created a sense that he and Flemmi were allies in a common cause, primarily a war against the LCN. This is a sense that Rico's successors as Flemmi's "handlers" successfully sought to perpetuate and strengthen. Morris Apr. 22, 1998 Tr. at 15. Significantly, by word and deed, and with increasing clarity over time, Rico promised Flemmi more than confidentiality. Flemmi Aug. 20, 1998 Tr. at 22–26, Aug. 25, 1998 Tr. at 22–23, Aug. 24, 1998 Tr. at 88–89, 140–43. Rico promised Flemmi "protection," *id.,* and he honored that promise. Flemmi was receptive to the alliance with the FBI that Rico proposed. The arrangement offered him an opportunity to

use the FBI to disable his enemies, enhance his safety, and, with the competition diminished and the protection of the FBI, make his own criminal activities more profitable. Flemmi Aug. 25, 1998 Tr. at 25–34.

From 1965 to 1967, Rico found his relationship with Flemmi to be productive. In that period Flemmi provided information which Rico regarded as reliable and valuable. Rico Jan. 13, 1998 Tr. at 58; Exs. 214, 215, 222, 245. For example, Flemmi reported that Stevie Hughes "had been marked for a hit." Exs. 26, 218, 222. Soon after, Hughes was murdered. Ex. 26.

More importantly, Flemmi proved to be able to give Rico what he most wanted—reliable information concerning the leaders of the LCN in New England. Flemmi regularly gave Rico information regarding Raymond L.S. Patriarca, the Boss of the New England Family of the LCN, and Baione. *See, e.g.,* Exs. 245, 214. Flemmi reported, among other things, that Edward "Wimpy" Bennett had told Patriarca that he would remain neutral in a violent feud between the Patriarca Family and Barboza's crew. Ex. 245. As reflected in a 209 rated "Excellent" by Rico, on February 2, 1967, Flemmi reported on a meeting that he had with Baione at which they agreed to settle any disagreements they might have peacefully, and at which Baione made statements indicating that Baione was responsible for the recent murder of Wimpy Bennett. Ex. 214. Beginning with the Third Superceding Indictment (the "3SI") in this case, Flemmi and Salemme have been charged with murdering Wimpy Bennett as part of their alleged pattern of racketeering activity. *See* 3SI, Racketeering Act ("RA") 21.[28]

Flemmi's report that Baione made statements indicating that he was responsible

for Wimpy Bennett's murder may be an early instance of a pattern of false statements placed in Flemmi's informant file to divert attention from his crimes and/or FBI misconduct. For example, as discussed in § II.14, *infra,* in 1982, Morris caused Connolly to tell Flemmi and Bulger that Brian Halloran was providing the FBI information that implicated them in the murder of Roger Wheeler. Halloran was murdered soon after. Morris believed Bulger and Flemmi were responsible. When Halloran was murdered, Connolly prepared a 209 stating that Flemmi had reported that "the wise guys in Charlestown" had heard that Halloran was cooperating with the Massachusetts State Police and, therefore, had a motive to murder him. Ex. 225. Similarly, shortly before John Callahan, another associate of Bulger and Flemmi implicated in the Wheeler investigation, was murdered in Miami in 1983, Connolly prepared a 209 stating that Flemmi had reported that Callahan was trying to avoid a "very bad" Cuban group. Ex. 226. As explained *infra,* Flemmi and Bulger remain suspects in the still open Wheeler, Halloran, and Callahan murder investigations.

In any event, on February 8, 1967, six days after Flemmi provided information indicating that Baione was responsible for Bennett's death, Rico designated Flemmi a Top Echelon informant. Ex. 21. In doing so, Rico vouched for Flemmi's reliability, stating that:

> Informant has furnished information that has proven through investigation or through other sources to be true, and there is no information provided by the informant that has proven to be false.

*Id.*

With regard to Flemmi's past activities, Rico wrote:

---

**28.** As the parties have been informed orally, the court has tentatively decided to grant the motions to dismiss Racketeering Acts 21–24, which relate to the alleged murders of Wimpy Bennett, his two brothers, and Richard Grasso, that were first alleged in the Third Superceding Indictment, because the government improperly used the grand jury to strengthen the previously alleged RICO charges against Flemmi and Salemme. *See, e.g., United States v. Beasley,* 550 F.2d 261, 266 (5th Cir.1977); *United States v. Gibbons,* 607 F.2d 1320, 1328 (10th Cir.1979); *In re Santiago,* 533 F.2d 727, 730 (1st Cir.1976).

Through informants of this office, it has been established that this individual enjoys a reputation of being a very capable individual and that he will now be the leader of the group formerly headed by Edward "Wimpy" Bennett, who according to informants, had been murdered and buried around 1/19/67.

*Informant also has been engaged in bookmaking, shylocking, robberies, and is suspect of possibly being involved in gangland slayings.*

*Id.* (emphasis added).

The record does not reflect what information Rico had from other sources about Flemmi's possible participation in murders. Flemmi would have been circumspect about reporting on his own involvement in murder. Moreover, Rico had an incentive not to document accurately or completely information about Flemmi's possible involvement in serious crimes because he might lose the authority to utilize Flemmi as an informant if Rico's superiors decided that Flemmi deserved to be targeted for possible prosecution rather than employed as a source. However, a glimpse of Rico's reason at least to suspect that Flemmi was involved in murder can be gleaned from the records of Flemmi's own statements. For example, as Rico wrote to the Director of the FBI:

> [Flemmi] advised on 6/1/66 that Cornelius Hughes, who was murdered on 5/25/66 in Revere, Mass, had previously been around Dearborn Square, Roxbury, Mass, obviously in an effort to try to set him [Flemmi] up for a "hit" and that the fact that Connie is now deceased is not displeasing to him.

> Informant was asked if he had any idea of who committed the murder, and he advised that "he had an excellent idea who committed the murder" but it would

be better if he did not say anything about the murder.

Ex. 26 (quoting Ex. 222).

In any event, suspicions that Flemmi was a murderer did not deter Rico and the FBI from making him a Top Echelon informant and an ally in pursuing their highest priority, the LCN.[29] As Rico explained it:

> Efforts have been made to develop this informant, by the writer, since 11/3/65. The informant was originally furnishing information on LCN members whom he considered as his enemies. Since the death of Edward "Wimpy" Bennett, Raymond Patriarca has indicated friendship towards this informant, and Larry Baione has met with the informant as he has now been accepted as an ally of theirs.

> In view of the informant's excellent reputation and his present friendship with the hierarchy of the LCN in this area, he eventually could be brought in as a member of this organization.

Ex. 21.

Thus, viewed as a potential member of the LCN, Flemmi became a Top Echelon informant. Rico was his "handler." Rico's partner, Dennis Condon, was designated Flemmi's alternate agent—the person Flemmi was to contact if he could not reach Rico. Ex. 220; Condon May 5, 1998 Tr. at 31. Flemmi, however, was never told that he was either open or closed administratively as an informant in the files of the FBI. Flemmi Aug. 20, 1998 Tr. at 32–33; Morris Apr. 28, 1998 Tr. at 23, Apr. 30, 1998 Tr. at 72; Quinn Aug. 19, 1998 Tr. at 112–13. Nor did Flemmi know that the FBI was documenting some of the information that he was providing. Flemmi Aug. 27, 1998 Tr. at 56; Morris Apr. 21, 1998 Tr. at 34.

---

**29.** In 1967, murder was not a federal offense. The federal law prohibiting murder in aid of racketeering activity, 18 U.S.C. § 1959, was not enacted until 1984. The federal RICO statute, 18 U.S.C. § 1961 *et seq.*, under which murder may be prosecuted as a racketeering act, was enacted in 1970.

Flemmi quickly validated his perceived potential to provide valuable information concerning the highest levels of the LCN. Within weeks of becoming a Top Echelon informant, he reported on a recent meeting that he and Salemme had with Patriarca in which Patriarca indicated an interest in making Flemmi a member of the LCN. Ex. 215.

For the next two years, Flemmi provided Rico with a steady flow of information concerning the hierarchy of the LCN in which Rico was very interested. Rico Jan. 13, 1998 Tr. at 70. Flemmi's information included, among other things, reports concerning Patriarca, Baione, Gennaro Angiulo, a leader of the LCN in Boston, and Salemme, which Rico regularly rated either very good or excellent. *Id.* at 67–70. *See also* Exs. 23, 24, 217, 219, 221. Flemmi also provided Rico with other valuable information, including intelligence on a threat to the life of the Middlesex County District Attorney Garrett Byrne. Rico Jan. 14, 1998 Tr. at 68; Ex. 27.

In addition, Flemmi was able to provide Rico with certain information and assistance that Rico especially prized. In 1966 and 1967, Rico and Condon were actively attempting to persuade Barboza to become a government witness in connection with an investigation they were conducting, with state officials, of the 1965 murder of Teddy Deegan and other matters. Rico Jan. 9, 1998 Tr. at 72, Jan. 13, 1998 Tr. at 80. They then properly perceived that Barboza had the potential to provide powerful testimony against leading members of the LCN. Rico Jan. 9, 1998 Tr. at 72–73. Rico and Condon were seeking information to use to persuade Barboza to become a witness. Rico Jan. 10, 1998 Tr. at 80. Flemmi provided Rico with such information and through his unwitting brother, Jimmy Flemmi, also provided a valuable means for Rico to communicate information to Barboza that he hoped would cause Barboza to be receptive to Rico's effort to recruit him. *Id.* at 79–83. For example, Flemmi told Rico about Patriarca's plans

to kill some of Barboza's associates and used his brother to convey that information to Barboza. Ex. 245. Thus, Flemmi materially assisted the FBI's successful effort to develop Barboza as a witness. *Id.*

After Barboza agreed to become a government witness, Flemmi's links to the LCN became even more valuable to Rico. Flemmi reported that Patriarca and his colleagues realized that Barboza had become a "rat." Ex. 237 (209 dated 6/27/67). Flemmi reported that Patriarca had embarked on an aggressive effort to determine what Barboza was telling the government and was seeking to diminish the effectiveness of Barboza's anticipated testimony, in part by murdering potential witnesses who might corroborate Barboza's claims and killing Barboza's lawyer, John Fitzgerald. Exs. 23, 34, 219, 221, 237 (209s dated 6/27/67, 7/19/67, 9/1/67, 11/13/67, 12/8/67, 9/20/68). In 1967 and 1968, Flemmi constantly provided information on these efforts to Rico. *Id.;* Rico Jan. 13, 1998 Tr. at 81–85. This information enhanced the FBI's ability to utilize Barboza effectively.

Barboza's cooperation proved to be extremely valuable to the government. Rico Jan. 13, 1998 Tr. at 81. It resulted in a successful federal prosecution of Patriarca. *Id.* It also contributed to the conviction of several Patriarca associates for the murder of Teddy Deegan. *Id.*

By 1969, Barboza was the most important witness Rico had ever developed. Rico Jan. 9, 1998 Tr. at 87. Indeed, Barboza became nationally renowned as a witness against the LCN. Thus, by 1969, Flemmi had, as an informant, made a special contribution to the progress of the FBI's highest priority—combating the LCN. Rico, however, never tried to convert Flemmi into a cooperating witness who would testify for the government. Rico Jan. 13, 1998 Tr. at 71–72.

Rather, Rico continually encouraged Flemmi to maintain and increase his con-

tacts with the LCN, and report back to Rico. Rico Jan. 14, 1998 Tr. at 110; Flemmi Aug. 20, 1998 Tr. at 22–24, Aug. 24, 1998 Tr. at 61, 87. Having designated Flemmi as a Top Echelon informant in 1967, it was particularly important to Rico that Flemmi produce with regard to the LCN.

At the same time, Flemmi became concerned that his increasingly visible involvement with the LCN would enhance the risk that he would be prosecuted as a result of investigations being conducted by the many law enforcement agencies that were beginning to focus on him as part of their pursuit of the LCN, including the Massachusetts State Police and the Organized Crime Unit of the Boston Police Department. Ex. 31, ¶¶ 3–4; Flemmi Aug. 20, 1998 Tr. at 22–24, Aug. 24, 1998 Tr. at 87. Flemmi expressed his concern to Rico. *Id.*

Rico told Flemmi that he should not worry. Ex. 31, ¶ 4; Flemmi Aug. 20, 1998 Tr. at 23, Aug. 24, 1998 Tr. at 61, 88. More specifically, Rico told Flemmi that as long as Flemmi was furnishing him information on the LCN, Flemmi would be "protected." Flemmi Aug. 24, 1998 Tr. at 61, 88–89, 140, Aug. 25, 1998 Tr. at 8, 21, 22–23, 35, 94; Ex. 92, ¶ 2. Rico never used the word "immunity" in speaking to Flemmi. Flemmi Aug. 25, 1998 Tr. 22–23. In addition to promising "protection," however, Rico said, in various ways, that Flemmi would not be prosecuted for crimes he was committing while serving as an informant. Ex. 31, ¶ 3; Flemmi Aug. 20, 1998 Tr. at 23–24, Aug. 24, 1998 Tr. at 61, 141.

Both Flemmi and Rico knew that Flemmi had to be engaged in criminal activity to have access to, and credibility with, the LCN. Flemmi Aug. 24, 1998 Tr. at 61. Rico told Flemmi that this would not be a problem for Flemmi. Flemmi Aug. 24, 1998 Tr. at 162. Rico caused Flemmi to understand that the FBI would overlook Flemmi's criminal activity as long as he was providing information on the LCN. Flemmi Aug. 25, 1998 Tr. at 27–28.

Flemmi understood that his deal with the FBI would not prevent other agencies from investigating him, but Rico assured Flemmi that he could take care of any issues that might arise. Flemmi Aug. 25, 1998 Tr. at 32–33, 38. Thus, Flemmi expected, for example, that Rico would intercede with District Attorneys John Droney and Garrett Byrne, who Rico characterized as good friends, to prevent any state charges from being brought against him. Flemmi Aug. 24, 1998 Tr. at 165–66, Aug. 25, 1998 Tr. at 32–33, 35–36, 38, Aug. 27, 1998 Tr. at 61–62.

Although never discussed with Rico, Flemmi assumed that there was some limit to the protection that Rico and the FBI could provide him and, therefore, did not think that his status as an informant would protect him from being prosecuted if he committed a murder. Flemmi Aug. 27, 1998 Tr. at 140, Aug. 25, 1998 Tr. at 11–12, 21–24, 19. Rico led Flemmi to believe, however, that as long as Flemmi did not kill anyone, the FBI would protect him from prosecution for his criminal activity because of the valuable information Flemmi was providing on the LCN. Flemmi Aug. 25, 1998 Tr. 21–25.

Nevertheless, Flemmi became especially anxious in 1969, when he learned the IRS was investigating him as part of its intensified focus on the LCN. Exs. 25, 31; Flemmi, Aug. 20, 1998 Tr. at 24, Aug. 24, 1998 Tr. at 156–57. Flemmi discussed this problem with Rico. *Id.* Rico reiterated that Flemmi should not be concerned, he would not be prosecuted. *Id.* After that discussion, the IRS investigation "fizzled out." Flemmi Aug. 24, 1998 Tr. at 157. Flemmi inferred that Rico had, as promised, taken care of it. *Id.;* Flemmi Aug. 20, 1998 Tr. at 24.

The government now contends that from 1967 to 1969, Flemmi repeatedly engaged in murder while simultaneously serving as a Top Echelon informant for the FBI. More specifically, it is alleged that in addition to other crimes, in 1967

Flemmi participated in the murders of Wimpy Bennett, his brothers Walter and William Bennett, and Richard Grasso. *See* Fourth Superceding Indictment ("4SI") Count One, RAs 20–24. Although Rico and his FBI colleagues often worked closely with state investigators and prosecutors in organized crime matters, there is no evidence that they contributed to any investigation of Flemmi regarding the murders of the Bennetts or Grasso.

The present indictment also alleges that Flemmi and Salemme attempted to murder Barboza's lawyer, John Fitzgerald. 4SI, Count One, RA 20. Fitzgerald was crippled, but not killed, by a bomb that exploded as he started his car on January 30, 1968. On January 4, 1968, Flemmi had told Rico that Patriarca was incensed with Fitzgerald, who Patriarca had thought would be helpful in his effort to discredit Barboza. Ex. 221. The next day, Fitzgerald was warned that his life was in danger, but he declined the protection offered by the Suffolk County District Attorney's Office. *Id.* On January 25, 1968, Flemmi told Rico that Fitzgerald was still definitely going to be "whacked out." Ex. 34. Several days later, Fitzgerald's car exploded.

The Middlesex County District Attorney took primary responsibility for investigating the Fitzgerald bombing. The record does not reflect the role, if any, of Rico and the FBI in that effort. In 1968, Flemmi learned that he and Salemme were being investigated as possible participants in the attempted murder of Fitzgerald. Flemmi Aug. 24, 1998 Tr. at 137; Exs. 237, 22. Flemmi did not then flee.

In September 1969, however, Flemmi received a telephone call from Rico. Ex. 30, ¶ 6; Flemmi Aug. 20, 1998 Tr. at 27, Aug. 24, 1998 Tr. at 136. Rico told Flemmi that "indictments were coming down" and suggested that Flemmi and "his friend," Salemme, "leave town" promptly. *Id.* Flemmi followed Rico's advice. *Id.* He and Salemme fled together. A few days later, on September 11, 1969, Flemmi and Salemme were indicted in Middlesex County for the Fitzgerald bombing and in Suffolk County for the William Bennett murder as well. *Id.* From Flemmi's perspective, Rico had honored his promise to protect him. Flemmi Aug. 24, 1998 Tr. at 137. In doing so, Rico aided and abetted the unlawful flight of a fugitive, in violation of 18 U.S.C. §§ 1073 and 2.

In view of Flemmi's motive to lie about whether Rico told him that Flemmi was about to be indicted and encouraged him to flee, the court has considered this contention with particular care. However, in the context of all of the credible evidence directly relating to Rico's relationship with Flemmi, Rico's denial of Flemmi's claim is not persuasive.[30]

The court notes that if Flemmi had been prosecuted in 1969 for the Fitzgerald bombing or the William Bennett murder, his role as an FBI informant might have been disclosed, and its legal implications might have been examined, three decades ago. Flemmi's successful flight to avoid that prosecution spared Rico and the FBI the risk of the embarrassment and controversy that disclosure of Flemmi's dual status as an FBI informant and an alleged murderer has recently entailed. Rico had reason to be concerned about embarrassment to the FBI. He was not permitted to open any informant unless he represented to FBI Headquarters that he was "convinced that the potential informant [could] be operated without danger of embarrassment to the Bureau." Ex. 274 (Under Seal), Manual § 108 (9–13–63). By honoring his promise to protect Flemmi, Rico also promoted the possibility that Flemmi would in the future again become a valuable FBI informant.

The conclusion that Rico facilitated Flemmi's flight is reinforced by the fact that the instant case is not the first time that Rico has been found in a judicial

---

30. The government does not dispute the court's finding that Rico told Flemmi of the forthcoming indictments so that he could flee. Apr. 14, 1999 Tr. at 164–66.

proceeding to have engaged in criminal conduct, including perjury, with regard to one of his LCN informants. In *Lerner v. Moran*, 542 A.2d 1089 (R.I.1988), Ex. 259, the Supreme Court of Rhode Island found, among other things, that Rico had urged one of his informants to lie under oath, in part to mask another of Rico's informant's role in a murder. *Lerner*, 542 A.2d at 1090. More specifically, the Rhode Island Court found that in the trial of Patriarca Family member Luigi Manocchio, Rico's informant, John Kelley:

> admitted that during Lerner's trial [for murder], at the direction of Special Agent Rico, he testified falsely in certain matters relating to the factual circumstances surrounding the murders. For example, during Lerner's trial Kelley testified that he had personally "cut down" the shotgun used in the murders. However, during the Manocchio trial, Kelley stated that his armorer had actually "cut down" the shotgun. Kelley said that Special Agent Rico had directed him not to mention the armorer's role in the murders. *It appears that the armorer was a valuable FBI informant that Special Agent Rico wanted to keep on the streets.*

*Id.* (emphasis added). The Rhode Island Supreme Court credited this testimony by Kelley. *Id.* at 1090–91.

The Court found that Rico had also caused Kelley to lie about the promises that Rico had made to obtain his cooperation. *Id.* at 1091. In addition, it stated that, "Kelley's [perjurous] testimony [at the Lerner trial] was then corroborated in all material aspects by Special Agent Rico." *Id.* The Court also noted Kelley's explanation of why he had lied under oath: "Agent Rico told me ... that I should just do as he said, and everything would come out all right." *Id.* Thus, although arrived at independently, this court's conclusion concerning Rico's misconduct in 1969 regarding Flemmi is consistent with the misconduct in which the Supreme Court of

Rhode Island found that Rico had engaged concerning other informants in 1970.

In any event, on September 15, 1969, Flemmi was closed administratively as an informant of the FBI and a federal fugitive warrant was issued for his arrest for his unlawful flight to avoid prosecution. Ex. 28. Flemmi was not told, however, that he had been administratively closed as a source. Flemmi Aug. 20, 1998 Tr. at 32–33.

### 3. *Flemmi as a Fugitive*

Although the FBI was conducting an investigation to find Flemmi and Salemme, Flemmi stayed in contact with Rico. Ex. 30, ¶ 7; Flemmi Aug. 20, 1998 Tr. at 27–32. In about March 1970, Flemmi called Rico. *Id.* Flemmi identified himself as "Jack from South Boston." *Id.* This was the code name that Flemmi and Rico had previously devised to identify each other. *Id.*; Rico Jan. 13, 1998 Tr. at 6–7.

Flemmi told Rico that he had relocated. Flemmi Aug. 20, 1998 Tr. at 28–29. Rico did not ask him where he was and Flemmi did not tell him. *Id.* Flemmi inquired about what was happening and asked how long Rico expected it would take to work out his problems. *Id.* Rico said it would take considerable time, and that Flemmi should be patient and stay away from Boston. *Id.* FBI policy requires that all contacts with informants be recorded. *See, e.g.*, Ex. 274 (Under Seal), Manual § 108(F)(5) (2–15–65); Ring June 15, 1998 Tr. at 59–60. Rico, however, made no record of this conversation, or any other that he had with Flemmi while he was a fugitive. Nor did he tell the agents responsible for searching for Flemmi that he had spoken to him.

In April 1970, Rico was reassigned to the Miami, Florida office of the FBI. Rico Jan. 14, 1998 Tr. at 94. His partner, Condon, remained in Boston and participated in the fugitive investigation of Flemmi and Salemme. Ex. 260; Condon May 5, 1998 Tr. at 165–81. Condon had been Flemmi's alternate agent and knew that Flemmi had

been an informant of Rico's. Condon May 5, 1998 Tr. at 168; Rico Jan. 14, 1998 Tr. at 176; Ex. 94.

The files of the FBI indicate that beginning in September 1969, Condon periodically asked at least one source if he had any information concerning the location of Flemmi and Salemme. Ex. 260. Usually, Condon's source(s) had no such information. *Id.* Beginning in November 1970, however, Condon received information that Flemmi and Salemme were in New York City, where they had been meeting with Manocchio, who was reportedly living in the vicinity of Central Park. *Id.* ·(209s of contacts on 11/23/70, 12/3/70, 12/23/70, 1/5/71). In October 1971, Condon was first advised that Flemmi and Salemme had separated. *Id.* (209 of 10/7/91). Eventually, these reports became more specific, indicating that Flemmi and Salemme had a falling out. *Id.* (209s of contacts on 2/10/72, 12/12 and 22/72). Reportedly, Flemmi "got sick of being ordered around by Salemme." *Id.* (209 of contacts on 10/9/73 and 10/26/73). Condon was told by one informant that if Flemmi and Salemme had serious problems with each other, Flemmi would be the "loser" because Salemme was closer to Baione. *Id.* (209 of contact on 2/10/72).

Although Condon was not in charge of the fugitive investigation, after receiving reports that Flemmi and Salemme had split up, he contacted a young FBI agent from South Boston who was working in New York, John Connolly, in an effort to "spark [them] up." Condon May 5, 1998 Tr. at 165. Connolly and Condon had been introduced by Edward Walsh, the Deputy Superintendent of the ̍Boston Police Department, just as Connolly was joining the FBI. *Id.* at 163, 177–78. Although he was not working on the fugitive investigation, Connolly was receptive to Condon's call. Condon gave Connolly some general information and sent him several photographs. Condon May 5, 1998 Tr. at 165.

Connolly put the photographs to good use. In November 1972, Connolly arrest-ed Salemme in New York City. Condon May 5, 1995 Tr. at 153. According to Condon, Connolly claimed that he was just "strolling down" the street at lunch time with several other agents, recognized Salemme, and arrested him. *Id.* at 171.

After Salemme's arrest, Condon continued to receive reports regarding the serious rift between Flemmi and Salemme. Ex. 260 (209 of contacts on 12/12 and 22/72, 1/18/73, 10/9 and 26/73). However, the recorded instances of Condon's efforts to get information about Flemmi's location diminished after Salemme's arrest. Ex. 260; Condon May 5, 1998 Tr. at 40–42.

Both Flemmi and Condon deny that Flemmi provided the FBI with information that led to Salemme's arrest. Flemmi Aug. 25, 1998 Tr. at 110; Condon May 5, 1998 Tr. at 172. In the context of all of the credible evidence in this case, it appears that this claim is not correct.

In any event, Salemme's arrest and subsequent prosecution for the Fitzgerald bombing proved to be beneficial to Flemmi. In 1970, Hugh Shields, a codefendant in the Bennett murder case, had been tried and acquitted. Ex. 253; Condon May 5, 1998 Tr. at 47. In 1973, Salemme was tried on the Fitzgerald bombing charge. Robert Daddeico, who was being protected by the government, was an important witness. May 1, 1998 Tr. at 67 (Stipulation). Daddeico testified that Salemme had participated in the Fitzgerald bombing. Daddeico claimed, however, that he had lied previously when he had said that Flemmi was also involved. Ex. 260. Salemme was convicted and, as a result, spent the next fifteen years in prison.

Flemmi monitored Salemme's trial from Canada. Ex. 260; Flemmi Aug. 25, 1998 Tr. at 80–81. He did not, however, return to Boston in 1973, when Daddieco exculpated him with regard to the Fitzgerald bombing.

Flemmi did stay in touch with Rico. Ex. 30, ¶ 7; Ex. 31, ¶ 7; Flemmi Aug. 20, 1998 Tr. at 29–30. In 1974, Flemmi called Rico

at the Miami office of the FBI. Flemmi Aug. 20, 1998 Tr. at 29–30. Rico told Flemmi that he should return to Boston and his legal problems would be favorably resolved. Ex. 31, ¶ 7; Flemmi Aug. 20, 1998 Tr. at 31–32. Because of the seriousness of the charges against him, and the fact that Flemmi was living comfortably in Canada, Flemmi had some reservations about following Rico's advice. *Id.* Rico, however, assured Flemmi that when he returned he would be released on bail and all of the charges against him would be dismissed. *Id.* Once again, Rico's representations to Flemmi proved to be reliable.

As arranged by Rico, on May 6, 1974, Flemmi returned to Boston and met in Park Square two Boston Police Detectives, at least one of whom had worked with Condon. *Id.;* Condon May 5, 1998 Tr. at 145. Despite the fact that he had for five years been a fugitive from charges of murder and attempted murder, Flemmi was promptly released on bail by the Middlesex and Suffolk Superior Courts. *Id.* The federal flight charges were dismissed on the same day. Ex. 96. The Fitzgerald bombing charges against Flemmi were subsequently dismissed. Ex. 253; June 25, 1999 Government's Submission Pursuant to 6/21/99 Court Order. On November 13, 1974, the Bennett murder charges concerning Flemmi were dismissed, as they had been against Salemme previously. Ex. 253. Flemmi was a free man.

### 4. *The Development of Bulger as an Informant*

As of at least 1971, the FBI was trying to develop Bulger as an informant. Bulger had been incarcerated at Alcatraz, among other places, as a result of an investigation led by Rico. In 1971, the violent gang war was continuing. Ex. 97 (209 dated 7/21/71). Bulger was associated with Donald Kileen, a leader of a South Boston gang. *Id.* (209 dated 6/14/71). A close colleague of Bulger's, William O'Sullivan, was murdered. *Id.* (Memorandum dated 6/14/71). Bulger understood that he too had been targeted to be killed. *Id.*

Bulger later claimed that he was inclined to help the FBI because of the favorable treatment that his family had received from Rico when Bulger was in prison. Ex. 1. Bulger also felt that he shared with the FBI a hatred of the LCN. *Id.*

As indicated earlier, by 1971, Rico had been reassigned to Miami. His former partner Condon, however, sought to develop Bulger as an FBI informant. Ex. 97; Condon May 1, 1998 Tr. 76–79. This effort was endorsed by FBI Headquarters. Ex. 97 (Teletype dated 9/10/71); Condon May 1, 1998 Tr. at 78. Bulger provided some meaningful information concerning the continuing gang war, and additional information concerning Francis Salemme's brother Jack, among others. *Id.* After several months, however, Condon decided that Bulger was not being sufficiently productive and closed him administratively as a potential informant. Ex. 97 (209 dated 8/4/71); Condon May 1, 1998 Tr. at 77.

In 1972, John Morris was transferred to Boston and assigned to the Organized Crime squad on which Condon also served. Morris Apr. 21, 1998 Tr. at 12. Morris and Condon became friendly and, until about 1976, usually commuted to work together. *Id.* at 60. In about 1974, Connolly was transferred to Boston and also assigned to the Organized Crime squad. Condon May 1, 1998 Tr. at 47.

In 1974 and 1975, Morris and Connolly participated in a loansharking investigation in which the alleged victim was Peter Pallotta. Morris Apr. 23, 1998 Tr. at 49–51, 67–72. Bulger was a subject of the investigation. *Id.* At least seven individuals were prosecuted as a result of that investigation, including James Martorano and Brian Halloran. *Id.* at 49. Bulger was not indicted. *Id.* at 50–51.

In the course of the Pallotta investigation, Connolly decided to approach Bulger and attempt to make him an informant.

*Id.* at 67–72. Connolly had known Bulger since they were both children growing up in South Boston. *Id.* at 70; Ex. 1. Bulger became a source for Connolly and was administratively designated an FBI informant on September 30, 1975. Ex. 68. Bulger later explained to FBI SAC Lawrence Sarhatt that he became an FBI informant in part because he had:

> a close feeling towards SA John Connolly because they both grew up in the same neighborhood in Boston and had mutual childhood problems, as well as a deep hatred for La Cosa Nostra.

Ex. 1.

The written record of what the FBI knew about Bulger in 1974 is sparse and neither Bulger nor Connolly have testified in this case. At a minimum the FBI recognized that Bulger was deeply involved in a violent gang war. Ex. 97. The FBI had also been advised that Bulger was involved in extorting money from shylocks and bookmakers. Ex. 100. Morris' actions, however, make it vividly clear that the FBI was well-aware that Bulger was widely regarded as brutally violent when Connolly sought his cooperation.

More specifically, in 1974 or 1975, Morris hoped to obtain the testimony of Eddie Miani in a pending investigation. Morris Apr. 21, 1998 Tr. at 89, Apr. 27, 1998 Tr. at 52–53. In an effort to do so, Morris planted a fake bomb under Miani's car. *Id.* at 89–92; Ex. 30, ¶ 17. Morris then anonymously called the local police or fire department and alerted it to the "bomb." *Id.* After the device was disabled, Morris met with Miani. *Id.* In the hope of scaring him into cooperating, Morris told Miani

that Bulger had planted the bomb, and offered Miani the protection of the FBI if he would become a cooperating witness. *Id.* Miani expressed fear for his life, but declined Morris' offer. *Id.* at 96. Morris testified that the Miani matter was one of three instances in which he unsuccessfully attempted to exploit Bulger's reputation for violence in an effort to get information for the FBI. Morris Apr. 28, 1998 Tr. at 97–98, Apr. 29, 1998 Tr. at 110, Apr. 30, 1998 Tr. at 98–101, 203–10.[31]

On February 4, 1976, several months after being officially designated an informant, Bulger was up-graded to Top Echelon status because of his "demonstrated ability to produce information regarding the highest levels of organized crime ...." Ex. 68. As set forth below, that assessment may have been based on Bulger's new partnership with Flemmi, which was in meaningful measure forged by the FBI.

### 5. *The FBI Forges the Flemmi–Bulger Partnership*

One of Bulger's earliest contributions to Connolly's efforts was to assist in reestablishing Flemmi's alliance with the FBI. When released after his return to Boston in 1974, Flemmi and two partners, George Kaufman and James Martorano, rented a garage in Somerville, Massachusetts from Howard Winter, the head of the Winter Hill Gang. Flemmi Aug. 25, 1998 Tr. at 101. Bulger, among other alleged criminals, frequented the garage. *Id.* Bulger and Flemmi had met socially once or twice in the 1960's, but did not really know each other previously. *Id.*, Flemmi Sept. 1, 1998 Tr. at 203.

---

**31.** Morris and Connolly told Buckey Barrett, in an effort to intimidate him, that Bulger and Flemmi would be seeking from him a share of the proceeds of the Medford Depositors Trust robbery, but that the FBI would protect him if he cooperated in its investigation of that crime. Morris Apr. 21, 1998 Tr. at 97–98, Apr. 29, 1998 Tr. at 110, Apr. 30, 1998 Tr. at 98–101.

In the late 1980's, an 11–year old girl, Sara Pryor, was kidnapped. A recently arrested individual from South Boston was suspected to be the kidnapper. Morris Apr. 30, 1998 Tr. at 203–10. Morris, Connolly, and another agent, brought Bulger, who was then an informant, to the jail and suggested to the suspect that Bulger would deal with him if he did not confess. *Id.* The suspect, who was later recognized by the FBI to be innocent, did not confess. *Id.*

In the six months that the Bennett murder case remained pending, Flemmi generally tried to maintain a low profile. *Id.* at 115, 154. When all of the charges against him were dismissed in late 1974, he began to become more actively involved in criminal activity, particularly gambling and loansharking. *Id.* at 189. This led to the resumption of Flemmi's contacts with the LCN. *Id.* at 115.

In early 1975, Bulger asked Flemmi whether he would be willing to meet with Connolly. Flemmi Aug. 20, 1998 Tr. at 33–35, Aug. 25, 1998 Tr. at 95–96, 102–06. Bulger had previously told Flemmi that Connolly had approached him and wanted to talk. Flemmi Aug. 25, 1998 Tr. at 106. It was clear to Flemmi that Bulger knew at least generally of his prior relationship with the FBI. *Id.* He told Bulger that talking to the FBI "was a good idea." *Id.* Knowing that Bulger was aware of his prior relationship with the FBI and was talking with Connolly himself, Flemmi was sufficiently comfortable with Bulger's suggestion to agree to meet with Connolly. *Id.* at 102–06, Aug. 20, 1998 Tr. at 35–36.

Soon after, Flemmi met with Connolly and Condon at a coffee shop in Newton, Massachusetts for what Flemmi regarded as an "introductory" meeting. Flemmi Aug. 20, 1998 Tr. at 35–36. Rico was discussed. *Id.* At the meeting, Connolly articulated what Flemmi understood when he was invited—that the FBI was interested in receiving information from him again. Flemmi, Aug. 25, 1998 Tr. at 183.

Following the Newton meeting Flemmi began passing information about the LCN to Connolly through Bulger. *Id.* at 115. Later in 1975, or in early 1976, Flemmi and Bulger had the first of a long series of meetings with Connolly, this one at Bulger's home. *Id.* at 158.

At that meeting, Connolly made clear to Flemmi that he wanted to reestablish the relationship that Rico had with him and regularly receive information from Flemmi about the LCN. *Id.* at 185. Having no prior experience with Connolly, Flemmi

wanted to know what he would get in return for his cooperation. *Id.* Connolly assured Flemmi that he and Bulger would be "protected" for the criminal activity they engaged in while furnishing information to the FBI. *Id.* at 185–86, 202, 206–09; Flemmi Aug. 20, 1998 Tr. at 37–38. Connolly never used the term "immunity," but on various occasions reiterated that the FBI would "protect" Bulger and Flemmi. Flemmi Aug. 20, 1998 Tr. at 211.

Connolly, and his FBI colleagues, understood that only serious criminals would be in a position to provide meaningful information on the LCN. Flemmi Aug. 25, 1998 Tr. at 188–89; Morris Apr. 22, 1998 Tr. at 122–23, Apr. 27, 1998 Tr. at 18–19. Top Echelon informants were, by definition, members of an organized crime group who could furnish information on the highest levels of organized crime groups of national significance. Ex. 274 (Under Seal), Manual § 108.L (1964–77); § 137–12 (1978–80); § 137–16 (1981–83); § 137–15 (1974–87). *See also* Potts May 22, 1998 Tr. at 30–35; Blackburn May 22, 1998 Tr. at 30–35, 75–78. Such informants are difficult to develop. Thus, agents were instructed that, "[t]he success of the Top Echelon Criminal Informant Program depends on a dynamic and imaginative approach in developing quality sources who can assist the Bureau in meeting its investigative responsibilities." Ex. NN (Under Seal), Manual § 108 pt. III(B) (1–12–77); § 137–12(2) (4–12–79).

In the course of telling Connolly about the criminal activities of others, directly and through Bulger, Flemmi initially referred to his own illegal gambling and loansharking activities. *Id.* at 153, 188–89. From the outset, and increasingly over time, however, Connolly was not under the illusion that gambling and loansharking were the only, or most dangerous, crimes in which Flemmi and Bulger were likely involved. Rather, as Connolly recently explained:

We knew what these guys were. They did not have a paper route when we first met them. All of them, Top Echelon Informants, are murderers. The government put me in business with murderers.

Oct. 23, 1998 Tr. at 43 (quoting R. Ranalli, "Agent hoped Bulger eluded feds," *Boston Herald,* Aug. 11, 1998, at 6.) [32]

By February 1976, when Bulger was elevated to Top Echelon informant status, the FBI had been instrumental in the formation of what is now alleged to have been an enduring and formidable criminal partnership between Bulger and Flemmi. The FBI made Bulger and Flemmi a perfect match. By 1976, in Boston, Flemmi and Bulger uniquely shared an antipathy for the LCN, a desire to profit from its destruction, and—most notably—the promised protection of the FBI.

### 6. *Attorney General Levi's Memorandum on FBI Informants*

Connolly was reiterating and reaffirming Rico's promise of FBI protection to Flemmi at a time when the Attorney General of the United States, Edward H. Levi, was working to develop Guidelines relating to the FBI's handling of its informants. Those Guidelines were part of a larger effort by the Attorney General and others to establish standards and procedures aimed at ending a series of serious abuses by the FBI, which had long been masked by the secrecy in which the FBI historically operated.

A book published by the Police Foundation in 1979 described the situation during the Levi administration of the Department of Justice (1975–77) as follows:

Watergate unleashed a torrent of revelations about questionable FBI intelligence activities, going far beyond abuses tied to the Nixon Administration. In his first appearance before a congressional committee after taking office in 1975, Attorney General Edward H. Levi confirmed the existence of previously undisclosed files maintained by former Director J. Edgar Hoover and containing derogatory information on public figures. Levi also presented the results of an inquiry by outgoing Deputy Attorney General Laurence Silberman and the FBI Inspection Division into misuse of the Bureau to gather political intelligence for administrations of both parties and to discredit the FBI's critics.

In reaction to these disclosures, Congress and the legal profession began looking more closely at the FBI, particularly at its internal security operations. Select Committees of the House and Senate included FBI abuses in their investigations of intelligence activities, and the House Judiciary Committee asked the General Accounting Office (GAO) to review FBI domestic intelligence policies and procedures. The American Bar Association set up a Special Committee to Study Federal Law Enforcement Agencies. Within the Justice Department, Attorney General Levi established a committee to draw up guidelines for FBI investigations.

The FBI, under Director Clarence M. Kelley, worked with the Attorney General and with congressional investigators

---

**32.** The Federal Rules of Evidence are not applicable in hearings on motions to suppress. *See* Fed.R.Evid. 1101(d)(1). Nor do they apply with regard to the preliminary factfinding necessary to decide a motion to dismiss under Fed.R.Crim.P. 12(e). *See* Jan. 14, 1998 Tr. at 7–9 (citing 1A Charles A. Wright, *Federal Practice & Procedure, Criminal 2d* § 194, at 715–16; Salzburg, *Federal Rules of Evidence Manual* (6th ed.), Vol. III at 1793). Nevertheless, the court generally applied the Federal Rules of Evidence in deciding whether proffered information was sufficiently reliable to be considered in the pending proceedings.

As discussed in § II.33, *infra*, after denying Flemmi's motion to compel the government to grant Connolly immunity in order to obtain his testimony, the court admitted parts of several of Connolly's public statements, pursuant to Fed.R.Evid. 804(b)(3), as statements against interest by an unavailable declarant. *See* Oct. 23, 1998 Tr. at 34–47.

to assess what had gone wrong in the past and what should be done in the future. The new revelations were sometimes shocking, especially the details of FBI efforts to "neutralize" Dr. Martin Luther King, Jr., as an effective civil rights leader during the 1960s. Former top officials of the FBI and CIA had acted on the assumption that they could disregard the normal legal rights of domestic groups because their work was so important to the national security that they were not governed by legal and constitutional standards applying to the rest of the law enforcement community. They made this claim in defense of opening mail, breaking into homes and offices without a warrant, and using what the Senate Select Committee to Study Governmental Operations with respect to Intelligence Activities (the Church committee) found to be "dangerous and degrading tactics" to disrupt and discredit lawful domestic political activities of Americans.

Even after the congressional committees issued their reports and Attorney General Levi adopted his first FBI guidelines in 1976, Director Kelley discovered that some of his subordinates had "deceived" him by not revealing FBI break-ins that had taken place in 1972–1973. This information triggered still another inquiry—a criminal investigation by the Justice Department leading to indictments of former FBI officials in 1977–1978. *Director Kelley summed up the problems in a landmark address at Westminster College in May 1976. Admitting that some FBI activities had been "clearly wrong and quite indefensible," he declared that the Bureau should never again occupy the "unique position that permitted improper activity without accountability."*

John T. Elliff, *The Reform of FBI Intelligence Operations* 5–6 (1974) (emphasis added).

As Director Kelley indicated, the ability of the FBI to act in secrecy, even from the Attorney General, and thus without any accountability, was a major reason that such abuses were possible. There are, of course, often legitimate reasons for confidentiality. Secrecy, however, also inherently entails risks that were foreseeable, and indeed foreseen, when the FBI was established.

The modern FBI was created in 1924, by Attorney General and future Chief Justice Harlan Fiske Stone, to succeed the corrupt Bureau of Investigation, which Stone characterized as " 'lawless, maintaining many activities which were without any authority in federal statutes, and engaging in many practices which were brutal and tyrannical in the extreme.' " Alpheus Thomas Mason, *Harlan Fiske Stone: Pillar of the Law* 153 (1956) (quoting Stone to Jack Alexander, Sept. 21, 1937). On the day Stone appointed J. Edgar Hoover as the acting Director of the FBI, Stone warned of a danger that he anticipated. He said:

> There is always the possibility that a secret police may become a menace to free government and free institutions because it carries with it the possibility of abuses of power which are not always quickly apprehended or understood; . . . it is important . . . that its agents themselves be not above the law or beyond its reach.

*Id.* at 153 (quoting *N.Y. Times,* May 10, 1924). The problems Levi confronted, and those disclosed by this case, demonstrate the wisdom of Stone's warning.

That warning, however, long went unheeded. The FBI is part of the Department of Justice and formally subject to oversight and direction by the Attorney General. *See* 28 U.S.C. §§ 503, 531–33. However, as Levi testified in 1975, even recognizing that "the Bureau must have considerable autonomy," there were "times . . . when the supervision [of the FBI] by Attorneys General ha[d] been sporadic, practically non-existent, or ineffective." Statement of Attorney General Edward H.

Levi to the Senate Select Committee on Intelligence Activities (Dec. 11, 1975) at 6.

In March 1976, Levi issued Guidelines regulating and limiting the FBI's authority to conduct domestic security investigations and dealing with civil disorders. *See* Elliff, *supra*, at 203–09. The Attorney General also then published draft Guidelines addressing the relationship between the White House and the FBI. *Id.* at 210–14. On December 15, 1976, about a month before leaving office, the Attorney General issued a memorandum to the Director of the FBI that described basic standards and procedures for the FBI's use of informants in Domestic Security, Organized Crime, and Other Criminal Investigations. *Id.* at 215–19 (the "Levi Memorandum"). The Levi Memorandum was incorporated in the FBI's Manual of Instructions on January 12, 1977. *See* Ex. 274 (Under Seal), Manual § 108 pt. IV at 13 (1–12–77).

The Guidelines for FBI informants established by the Levi Memorandum were intended, in part, to diminish the perceived need for legislation to regulate and restrict the FBI's use of informants and also to provide guidance if legislation was to be enacted. As Attorney General Levi testified in 1976:

> I would like to [suggest] a few considerations that should be taken into account in deciding what statutory changes should be made to define more clearly the areas of the Bureau's jurisdiction and the means and methods which the Bureau is permitted to use in carrying out its assigned tasks.
>
> First, there is a temptation to resort to having the courts make many difficult day-to-day decisions about investigations. When a Fourth Amendment search or seizure is involved, of course, recourse to a court for a judicial warrant is in most circumstances required. But the temptation is to extend the use of warrants into areas where warrants are not constitutionally required. *For example, as you know it has been sug-*

*gested that the FBI ought to obtain a warrant before using an informant.* Extending the warrant requirement in this way would be a major step toward an alteration in the basic nature of the criminal justice system in America. It would be a step toward the inquisitorial system in which judges, and not members of the executive, actually control the investigation of crimes. This is the system used in some European countries and elsewhere, but our system of justice keeps the investigation and prosecution of crime separate from the adjudication of criminal charges. The separation is important to the neutrality of the judiciary, a neutrality which our system takes pains to protect.

\* \* \* \* \* \*

In drafting statutory changes, it must be remembered that rigid directions governing every step in the investigative process could sacrifice the flexibility that is necessary if an investigative agency is to adapt to the diverse factual situations it must face. Rigid statutory provisions would invite litigation at every step in the investigative process. Such litigation could very well be used by clever individuals to frustrate legitimate law enforcement efforts without achieving the measure of control for which the statutes were enacted.

Testimony of the Honorable Edward H. Levi, Attorney General of the United States, Before the Subcommittee on Civil and Constitutional Rights, Committee on Judiciary, House of Representatives (Feb. 11, 1976) at 3–5 (emphasis added).

The Guidelines concerning informants described in the Levi Memorandum, among other things, contributed to keeping legislation from being enacted, and regulations from being promulgated, concerning the FBI's use of informants. In contrast to laws or regulations, those Guidelines did not impose any legally enforceable obligations on the FBI or create any rights that are legally enforceable by

defendants. This fact was made explicit in a 1981 amendment to the Guidelines in which the Attorney General stated:

> N. *Reservation* These guidelines on the use of informants and confidential sources are set forth solely for the purpose of internal Department of Justice guidance. *They are not intended to, do not, and may not be relied upon to create any rights,* substantive or procedural, *enforceable at law by any party in any matter,* civil or criminal, *nor do they place any limitations on otherwise lawful investigative and litigative prerogatives of the Department of Justice.*

Ex. 274 (Under Seal), Manual § 137–17(N)(1–12–81) (emphasis added). Thus, the Guidelines did not operate to remove from the FBI authority that it otherwise had to promise its informants immunity.

Prior to the issuance of the Levi Memorandum, the Department of Justice did not have any institutionalized role in the FBI's use of informants. It appears, however, that the FBI occasionally sought legal advice from the Department of Justice on issues relating to them. For example, from at least 1961 until the issuance of the Levi Memorandum the FBI's Manual of Instructions stated that:

> On 7–10–52 the Department furnished an opinion regarding the question whether an informant could be prosecuted for technically violating the law while attempting to obtain evidence regarding a Federal violation. The Department stated "... If the intent throughout was to assist the government agents in the enforcement of the law, and not to violate or to 'cover-up' for a violation of the law, it is not believed a case for prosecution could be made against such an informer ...."
> *The procedures to be followed by informers working under the supervision of your agents in the aid of enforcing the statutes coming within your jurisdiction largely rests upon your sound discretion .... It is not believed that an informer would be otherwise immune*

> *from prosecution for actions which would subject a Federal enforcement officer to prosecution.*

*Id.* § 108(K) (10–13–61) (emphasis added). Prior to the promulgation of the Levi Memorandum, the Manual of Instructions also included the direction that:

> *Care must be exercised in attempting to persuade individuals to act as informants to avoid any allegations of undue influence. An individual who is in custody* and who offers to furnish information generally does so in the hope that he will receive some consideration in return. *Bureau agents cannot promise any immunity* or any reduction in sentence *to a criminal* who furnishes information and they must not put themselves in a situation where they might subsequently be accused of having done so.

*Id.* § 108(D)(4)(11–29–55 through 5–13–76) (emphasis added).

Read together, these provisions, among other things, indicate that prior to the Levi Memorandum the procedures to be employed in dealing with informants were at all times in the sole discretion of the FBI. Consultation with Department of Justice attorneys was not required. Indeed, such consultation with regard to an identified individual would have been inconsistent with the historic direction to FBI agents that: "Constant care must be exercised to avoid any disclosure *to anyone* which might permit identification of a criminal informant or even cast suspicion on a criminal informant." *Id.* § 108(I)(8) (12–11–59) (emphasis added). FBI agents were particularly advised, but not ordered, not to promise immunity or a reduction of sentence to "criminals" *in custody* whose cooperation was being sought. The FBI could, however, authorize informants who were not incarcerated to engage in what would otherwise be criminal activity without the involvement of Department of Justice attorneys. *Id.* § 108(K) (10–13–61).

In addition, the FBI alone could decide if an informant should be targeted for investigation and possible prosecution rather than continued as a source. As a practical matter, if an FBI agent made and honored a promise to protect an informant, the Attorney General and Department of Justice prosecutors would, under then established standards and procedures, virtually never know. It was in this environment that Connolly, in late 1975 or early 1976, repeated the promise of protection to Flemmi that Rico had made and kept.

In the December 15, 1976 Levi Memorandum, the Attorney General described the risks—realized in this case with regard to Bulger and Flemmi—that the operation of informants involves. Levi wrote:

> Courts have recognized that the government's use of informants is lawful and may often be essential to the effectiveness of properly authorized law enforcement investigations. However, *the technique of using informants to assist in the investigation of criminal activity, since it* may involve an element of deception and intrusion into the privacy of individuals or *may require government cooperation with persons whose reliability and motivation may be open to question, should be carefully limited.* Thus, while it is proper for the FBI to use informants in appropriate investigations, *it is imperative that special care be taken* not only to minimize their use but also *to ensure that* individual rights are not infringed and *that the government itself does not become a violator of the law. Informants as such are not employees of the FBI, but the relationship of an informant to the FBI imposes a special responsibility upon the FBI when the informant engages in activity where he has received, or reasonably thinks he has received, encouragement or direction for that activity from the FBI.*

*Id.* § 108 pt. IV (1–12–77) (emphasis added). Among other things, this statement expresses the understanding of the Attor-

ney General that it was the FBI alone that had the power, and therefore the responsibility, for making promises to informants. Thus, the Attorney General encouraged the Bureau to be careful in doing so.

The Levi Memorandum provided explicit factors to be weighed by the FBI in deciding whether to utilize someone as an informant. *Id.* at 14. These included "the potential value of the information he may be able to furnish in relation to the consideration he may be seeking from the government for his cooperation." *Id.* § 108 pt. IV(A)(5) (1–22–77). The initial decision whether to utilize an individual as an informant, however, was left solely to the FBI.

The Levi Memorandum resulted in the deletion from the FBI Manual of the previously quoted § 108(D)(4) concerning granting immunity to informants. The Levi Guidelines included certain unqualified prohibitions, such as the provision stating that, "No active military personnel *can* be developed as informants." *Id.* § 108 pt. I(C)(5)(d) (1–12–77) (emphasis added). However, with regard to immunity, the new Guidelines stated, in language that endured at least until 1984, that:

> Agents *should not* exercise *undue influence* in developing informants *including promising immunity* or reduction of sentence to criminals who furnish information.

*Id.* § 108(I)(C)(6) (1–12–77); § 137–3(6) (1–31–78); § 137–3(6) (4–2–79); § 137–5(4) (1–12–81); § 137–5(4) (9–20–82); § 137–5(4) (3–28–84) (emphasis added). This provision of the Guidelines did not state that FBI agents were not authorized to promise immunity to informants. Rather it only stated that they *should* not do so. Thus, the FBI was discouraged, but not prohibited from promising immunity to informants. This advice was expressly premised on the principle that any such promise would be a form of "undue influence."

If the Attorney General intended to restrict the authority of the FBI to promise an informant immunity, he could and would have said so plainly. For example, on January 10, 1975, the Attorney General issued an Order, available to members of the public, that expressly stated that *"Investigative Agents and Attorneys are not Authorized* to make representations to witnesses regarding funding, protection, or relocation." Department of Justice Order OBD 2110.2, P 7(d) (Jan. 10, 1975) (emphasis in original). The Order also provided that such promises could be made "by authorized representatives of the U.S. Marshals Service only." *Id.* This legal limitation on the authority of prosecutors and investigators was recognized and respected by the courts. *Doe v. Civiletti,* 635 F.2d 88, 90 (2d Cir.1980) (holding that oral representations of a Strike Force attorney and DEA agent did not commit the Marshals Service with regard to placing someone in the Witness Protection Program). Similarly, the United States Attorneys Manual ("USAM") clearly states that " 'No U.S. Attorney or [Assistant United States Attorney] has the authority to negotiate regarding an extradition or deportation order in connection with any case.' " *San Pedro v. United States,* 79 F.3d 1065, 1070 n. 4 (11th Cir.1996) (citing USAM § 9–16.020).

In contrast, neither the Levi Guidelines nor their successors stated that FBI was not authorized to promise immunity. Nor were FBI agents directed to consult a Department of Justice attorney if a promise of immunity, or anything that might be construed as a promise of immunity, was being discussed.

Rather, as indicated earlier, from at least 1977 through 1980, agents were instructed that, "[t]he success of the Top Echelon informant program depends on a dynamic and imaginative approach in developing quality sources who can help the Bureau in meeting its investigatory responsibilities." Ex. NN (Under Seal), Manual § 108 pt. III(B) (1–12–77);

§ 137–12(2) (4–12–79). This direction could understandably have been interpreted by agents as permitting, if not encouraging, informal promises of immunity to potential informants.

Moreover, the Levi Guidelines indicated that the FBI could, without consulting any prosecutor, authorize what would otherwise be criminal conduct by an informant. More specifically, those Guidelines provided that:

> The FBI shall instruct all informants it uses in . . . organized crime and other criminal investigations that in carrying out their assignments they shall not:
>
> . . . (4) participate in criminal activities of persons under investigation, *except insofar as the FBI* determines that such participation is necessary to obtain information needed for purposes of federal prosecution.

Ex. 274 (Under Seal), Manual § 108 pt. IV(B)(4) (emphasis added). Consistent with this the Attorney General stated that, "[t]he FBI may not use informants . . . for acts . . . which *the FBI* could not authorize for its undercover agents." Id. § 108 pt. IV at 13 (emphasis added). Thus, in 1977, the Levi Memorandum expressly treated the issue of authorization as solely within the province of the FBI. As the instant case reflects, immunity and authorization are distinct, but closely related concepts.

In extending the traditional exclusion of Department of Justice attorneys from the process of providing promises to FBI informants in order to obtain information, the Levi Guidelines were consistent with the unaltered provision of the Manual which continued to state that:

> Constant care should be exercised to avoid any disclosure to *anyone* which might result in the identification of an informant or cast suspicion upon an informant.

*Id.* § 108 pt. I(C)(7) (emphasis added). Moreover, FBI agents were also instructed that:

At the earliest possible date all informants should be advised that the FBI will take all possible steps to maintain the full confidentiality of the informant's relationship with the FBI.

*Id.* § 108 pt. I(C)(9)(d).

Although the Levi Memorandum and related Guidelines did not provide Department of Justice attorneys a role regarding the promises that might be made to an FBI informant, they did for the first time establish a role for the Department of Justice when it later appeared that an FBI informant may have committed a crime. Id. § 108 pt. IV(C). First, the Attorney General directed that, "[u]nder no circumstances shall the FBI take any action to conceal a crime by one of its informants." *Id.* § 108 pt. IV(C)(1). As described in this Memorandum, this direction was regularly disregarded concerning Flemmi and Bulger.

In addition, if the FBI learned that one of its informants had violated the law in furtherance of his assistance to the FBI, it was expected that "ordinarily" the FBI would promptly inform the appropriate law enforcement or prosecutive authorities, and the FBI would decide whether the continued use of the informant was justified. Id. § 108 pt. IV(C)(2). If there were "exceptional" circumstances that caused the FBI to believe that such notification was "inadvisable," the FBI was required to inform the Department of Justice. *Id.* The Department would then decide whether law enforcement or prosecutive authorities should be notified and whether the FBI should continue to use the informant. *Id.* The Levi Memorandum also established the same procedures where the FBI had "knowledge" that one of its informants had committed a "serious" crime "unconnected with his FBI assignment." *Id.* § 108 pt. IV(C)(3). As described in this Memorandum, these requirements too were regularly ignored with regard to Bulger and Flemmi.

The December 15, 1976 Memorandum and the related Guidelines incorporated in the FBI Manual on January 12, 1977, were intended to provide guidance to the FBI before Attorney General Levi left office. They contemplated the development of additional Guidelines.

The Levi Guidelines recognized that FBI informants may need to engage in criminal activity to obtain important information. *See* Ex. 274 (Under Seal), Manual § 108 pt. I(D)(5) (1–12–77). In 1981, the Guidelines were revised to clarify this point and to provide more explicitly that informants may, if necessary and appropriate, be authorized to participate in a particular criminal act or "a specified group of otherwise criminal activities." *Id.* § 137–17(F)(2) (1–12–81).

In addition, for the first time, Department of Justice officials were given a role in certain authorization decisions. More specifically, since 1981, "ordinary criminal activity" is to be authorized by an FBI field office supervisor or higher FBI official. *Id.* "Extraordinary criminal activity," including conduct involving a "significant risk of violence," is to be authorized by the SAC with the approval of the United States Attorney. *Id.* § 137–17(F)(2) & (3) (1–12–81). The SAC is not, however, permitted to disclose the informant's identity to the United States Attorney. *Id.* § 137–17(F)(3). Both FBI Headquarters and the Assistant Attorney General in charge of the Criminal Division are to be immediately informed of any authorization of extraordinary criminal activity, although, once again, the identity of the informant is not to be disclosed to the Assistant Attorney General. *Id.* All such authorizations are to be memorialized in writing. *Id.* § 137–17(F)(2).

In 1981, the Guideline provisions regarding the instructions to be given to informants were also revised and implicitly indicated that informants should not be told that Department of Justice attorneys might play a role concerning them. Rather, the 1981 version of the Guidelines provided that each informant:

shall be advised that his relationship with the FBI will not protect him from arrest or prosecution for any violation of Federal, State, or local law, *except where the FBI has determined* pursuant to these guidelines that his association in specific activity, which otherwise would be criminal, is justified for law enforcement . . .

*Id.* § 137–17(E)(1) (1–12–81) (emphasis added).

In 1981, the instructions to be given informants were also revised to state that they should be told that:

Informant's relationship with the FBI will not protect him /her from arrest or prosecution for any violation of Federal, state, or local law, *except* insofar as a *field supervisor or SAC determines* pursuant to appropriate Attorney General's Guidelines that the informant's criminal activity is justified.

*Id.* § 137–3.4(1)(k) (1–12–81) (emphasis added). Thus, if the required warnings were given to an informant, he would reasonably understand that the FBI, without the involvement of any prosecutor, had the authority to decide if the informant would be protected from arrest and prosecution.

The Attorney General's Guidelines for the FBI's use of informants recognize that difficult decisions often must be made to strike a balance between effective law enforcement and providing benefits to criminals who are seeking to help themselves. The Guidelines in certain respects employ the principle that the weighing of these competing interests should be done by informed, but relatively disinterested officials, rather than by agents who have developed a personal relationship with the informant and have a vested interest in the outcome of the investigations to which the informant may be able to contribute. In this sense, although no judicial officer is involved, the Guidelines are similar in their approach to the warrant requirement of the Fourth Amendment, which requires that decisions concerning whether to authorize invasions of privacy be made by neutral magistrates rather than by those engaged in the competitive business of law enforcement, who do not have sufficient objectivity to be trusted to assess correctly the relative strength of the interests which must be weighed. *See, e.g., Steagald v. United States,* 451 U.S. 204, 212, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981).

Attorney General Levi, however, recognized that there were limits to what formal standards and procedures alone could accomplish. As he testified:

No procedures are fail-safe against abuse. The best protection remains the quality and professionalism of the members of the Bureau and of the Department.

Statement of the Honorable Edward H. Levi, Attorney General of the United States, Before the Senate Select Committee on Intelligence Activities (Dec. 11, 1975) at 13. This case demonstrates that the enduring potential for abuse that Levi perceived was quickly realized.

The evidence in this case indicates that at least with regard to Organized Crime matters, the Guidelines were ignored from the outset. There were no special seminars or major training concerning the Guidelines that was received by the witnesses in this case. Morris Apr. 22, 1998 Tr. at 28–33; Ring Sept. 22, 1998 Tr. at 43–44; Darcy Sept. 28, 1998 Tr. at 66–67. Morris apparently did not read the new informant Guidelines when they were issued. Morris Apr. 22, 1998 Tr. at 28–33. The informant Guidelines were discussed occasionally in more general training sessions, but the Organized Crime squad supervisors in Boston did not get answers to any questions that they had. Ring Sept. 22, 1998 Tr. at 44.

In general, Morris and his successor as the supervisor of the Organized Crime squad, Ring, viewed the Attorney General's Guidelines as inconsistent with the Top Echelon informant program and utterly unrealistic. Morris Apr. 22, 1998 Tr. at 122–24, Apr. 27, 1998 Tr. at 18–19; Ring

Sept. 22, 1998 Tr. at 17. Thus, they felt the Guidelines did not apply to Organized Crime matters. *Id.* In their view, Top Echelon informants were, by definition, members of Organized Crime, who had to be involved in serious criminal activity. Morris Apr. 22, 1998 Tr. at 122–24, 128; Ring Sept. 22, 1998 Tr. at 17. Thus, Morris and Ring ignored provisions of the Attorney General's Guidelines that required authorization of criminal activity and reporting of unauthorized crimes committed by informants. *Id.*

The views of the supervisors of the Organized Crime squad were especially important. As described in this Memorandum, the SACs generally relied completely on the informant's handler and his supervisor for making decisions and recommendations for which the SACs were responsible under the Guidelines. Greenleaf Jan. 8, 1998 Tr. at 136–40. As Larry Potts, who served in many field FBI Offices and as Acting Deputy Director of the Bureau, put it, the supervisor of the handling agent was the "chief decisionmaker" regarding whether or not an individual should be continued as an informant. Potts May 22, 1998 Tr. at 7.

With regard to Flemmi and Bulger, at least, the requirements of the Guidelines were either ignored or treated as a bureaucratic nuisance. For example, Connolly filled out forms representing that he gave the required warnings to Flemmi that his relationship with the FBI would not protect him from arrest or prosecution unless a supervisor or SAC authorized his conduct pursuant to the Guidelines. Ex. 43; Gianturco Jan. 20, 1998 Tr. at 151–53. Those representations, however, were false. Flemmi Aug. 28, 1998 Tr. at 133.

The evidence also indicates that FBI Headquarters did not effectively supervise the implementation of the Guidelines. Potts could recall no instance in which a field office's recommendation that an individual be designated an informant was ever reversed. Potts May 22, 1998 Tr. at 6–8.

Moreover, while FBI Headquarters periodically audited the Boston office's informant files, no deficiencies with regard to the handling of Bulger or Flemmi were noted, despite the fact that those files were replete with information indicating that Bulger and Flemmi were involved in serious criminal activity that had not been authorized in writing, investigated by the FBI, reported to other law enforcement agencies, or reported to the Assistant Attorney General for the Criminal Division as required by the Guidelines. Indeed, when on the eve of the indictment of this case the FBI Principal Legal Advisor in Boston, John Michael Callahan, reviewed the Bulger and Flemmi files, he concluded that the FBI in Boston knew a great deal about their criminal activity and, in his opinion, had tacitly authorized at least some of it, including participation in illegal gambling and LCN policy making. Ex. 271. Any serious, earlier review of the files concerning information provided by Flemmi and Bulger in order to determine compliance with the Guidelines would have made clear that the requirements relating to authorization were being ignored. A proper review of the information about Bulger and Flemmi being provided by other informants, some of which is described in this Memorandum, would have made this conclusion even more clear.

Thus, at least with regard to Bulger and Flemmi, the FBI as an institution essentially disregarded the carefully calibrated standards and procedures that were developed by Attorney General Levi and his successors for continuing to use informants after the FBI had decided to employ them. The Department of Justice was apparently ignorant of, or indifferent to, these violations. There is no evidence that the Department of Justice did any review of its own to determine if the Guidelines were being followed. Rather, it seems to have relied solely on the good faith of the FBI.

As a result, it is not disputed that the Guidelines were not obeyed at least with regard to Flemmi and Bulger. As Assistant United States Attorney James Herbert stated:

We don't dispute ... the Court's conclusion that the theory behind the Guidelines and the FBI's policies and procedures was to remove from the line agent the responsibility and the authority to make difficult decisions with respect to criminal informants ... that is what they were designed to do and I don't think they were followed in connection with Mr. Bulger and Mr. Flemmi in the manner they were designed to.

Nov. 19, 1998 Tr. at 94. Herbert's remark to the court echoed an earlier public statement by United States Attorney Donald Stern, who said:

The FBI and attorney general informant guidelines, together with FBI administrative controls, are intended to provide the necessary checks and balances and to ensure that often difficult decisions are made at the appropriate level, based on complete and accurate information. While admittedly no system is foolproof, clearly those objectives were not met here, at least in certain critical respects.

Mitchell Zuckoff, "Bulger Case sparks probe in U.S. House," *The Boston Globe,* July 24, 1998, at A12.

### 7. *Bulger and Flemmi Begin to Perform as a Team*

As indicated earlier, Bulger was designated a Top Echelon informant on February 4, 1976, because of his "demonstrated ability to produce information regarding the highest levels of organized crime." Ex. 68. Flemmi was not officially reopened as a source until September 1980. Exs. 4, 82. Flemmi, however, continued to provide information to Connolly through Bulger and directly, often during meetings with Bulger and Connolly. In the circumstances, it is likely that Flemmi was, directly or indirectly, the source of some of the information attributed to Bulger in the FBI files for the periods that Bulger was open as an informant and Flemmi was not.

Some of the information Bulger and Flemmi provided in 1976 and 1977 was very valuable to the FBI's organized crime effort. Most notably, Barboza was murdered in February 1976. Ex. 5. In May 1976, Bulger reportedly informed Connolly that Jimmy Chalmas had set Barboza up and that the LCN intended to kill Chalmas to keep him quiet. *Id.* Connolly and Condon used this information to persuade Chalmas to admit his guilt and become a cooperating witness. *Id.;* Condon May 1, 1998 Tr. at 130. Connolly predicted that Chalmas' testimony would permit the FBI to obtain the conviction of Joseph Russo, who was regarded as "the # 3 member of the LCN in the Boston Division." Ex. 5. Although Russo was for many years a fugitive, in 1992, after becoming the Consigliere of the Patriarca Family, he was sentenced by this court for participating in the Barboza murder, among other things. *See United States v. Carrozza,* 807 F.Supp. 156, 159 (D.Mass.1992), *aff'd,* 4 F.3d 70 (1st Cir.1993).

The FBI files also record Bulger as the source of other highly valued information. For example, FBI records indicated that in 1977, Bulger warned Connolly that Special Agent Joseph Butchka, who was operating undercover, had been identified and targeted to be killed. Ex. 5. The FBI acted to secure Butchka's safety and Bulger was reportedly successful in preventing the prospective hitmen from acting on their threat against him. *Id.*

Similarly, in 1978, Bulger told Connolly about the planned imminent murder of Nick Gianturco, the FBI undercover agent in an investigation of truck hijacking known as "Operation Lobster." Ex. 5; Morris Apr. 21, 1998 Tr. at 81–84; Gianturco Apr. 20, 1998 Tr. at 10–11. Once again, the FBI took effective steps to protect its undercover agent. *Id.* Bulger was later credited with helping save Gianturco's life. Ex. 5.

Connolly reciprocated by providing Bulger and Flemmi the protection that he had promised. For example, in 1977, Bulger was told to alert Flemmi that a cleaning company had been "wired," in an effort to obtain evidence of Flemmi's loansharking. Ex. 30, ¶ 9. As a result, Flemmi avoided that location and was not intercepted. *Id.*

Similarly, in 1977 or 1978, several officials of National Melotone, a vending machine company, tried to prompt an FBI investigation of Flemmi, Bulger, and their associates for using threats of violence to have National Melotone's vending machines replaced with machines from Flemmi and Bulger's National Vending Company. Flemmi Aug. 20, 1998 Tr. at 112–17; Ex. 30, ¶ 14. Rather than pursue this information, report it to local law enforcement, or advise anyone other than perhaps Morris, who had become the Chief of the Organized Crime squad in December 1977, Connolly successfully sought to protect Flemmi and Bulger. More specifically, Connolly claimed that if an investigation of their allegations was conducted the executives of National Melotone and their families would be in great danger, requiring their participation in the federal Witness Protection Program and relocation. *Id.* This advice exploited what Connolly knew were the frightening reputations for violence that Flemmi and Bulger had acquired. It dissuaded the representatives of National Melotone from pursuing their charges. *Id.* Connolly did, however, tell Bulger and Flemmi about the problem. *Id.* To alleviate the pressure for an investigation, Flemmi and Bulger gave National Melotone back the locations in dispute. Flemmi Aug. 20, 1998 Tr. at 114.

Similarly, in October 1977, FBI Special Agents Thomas Daly and Peter Kennedy, who were then members of the Organized Crime squad, interviewed Francis Green. Exs. 261 and 262. An informant had reported that Bulger and Flemmi were threatening Green. Ex. 163. Green confirmed that Bulger, Flemmi, and John Martorano had approached him about a debt he owed to Colony Finance. *Id.* Bulger told Green that the money Green had been lent belonged to him and his colleagues, and that if it was not promptly repaid "they would positively kill him, that they would cut his ears off and stuff them in his mouth, that they would gouge his eyes out." Ex. 261. Green told the agents he was unwilling to testify, however. *Id.*

It is common for victims of threats to be reluctant to testify initially. Usually, the FBI tries to overcome this reticence. Ring Sept. 22, 1998 Tr. at 34. As Ring put it: "Nobody wants to testify in these types of cases .... You don't just turn around and walk away. If we did that we'd never make an organized crime case." *Id.* Green later became an important government witness in a public corruption case investigated by the IRS. *See United States v. Tracey*, 675 F.2d 433, 436 (1st Cir.1982). The FBI, however, never sought to develop Green as a witness against Bulger and Flemmi.

### 8. *Morris Becomes Chief of the Organized Crime Squad*

As indicated earlier, in December 1977, Morris was promoted to Chief of the Boston Organized Crime squad. Pursuing the LCN remained the FBI's "number 1 priority." Morris Apr. 22, 1998 Tr. at 127; Ex. 50. Morris regarded Bulger and Flemmi as vital assets in that effort.

Morris understood that Bulger and Flemmi viewed the LCN as "mortal enemies." *Id.* at 18. At the same time, Flemmi, particularly, was one of the very few sources who could provide the FBI with "information at the policy making level of the LCN." Ex. 8; Morris Apr. 22, 1998 Tr. at 15.

Connolly urged Morris not to treat Flemmi and Bulger like informants. Morris Apr. 24, 1998 Tr. at 156. Morris agreed and with Connolly cultivated the sense that Bulger and Flemmi were allies of the FBI. For example, Morris initially

met Bulger and Flemmi at a dinner held at his home, which Connolly also attended. Morris Apr. 21, 1998 Tr. at 103–04. This was the first in a series of such meetings with Bulger and Flemmi, which, as discussed *infra,* would come to include Nick Gianturco, Special Agent Michael Buckley, Supervisory Special Agent James Ring, Dennis Condon, Jules Bonovolenta, the ASAC in New York, and Joe Pistone, then a former New York FBI agent who had become famous for his undercover work as "Donnie Brasco." Gianturco Jan. 15, 1998 Tr. at 125–26, 154–55. Neither Morris nor Ring ever had similar, ostensibly social meetings with any other source. Morris Apr. 21, 1998 Tr. at 107; Ring June 10, 1998 Tr. at 94–95.

It was evident to Morris that the attempt to cause Flemmi and Bulger to feel that they were valued allies of the FBI rather than disreputable "rats" was successful. Morris correctly sensed that Flemmi never realized that he and Bulger had been officially opened as informants or that some of the information that they provided was being documented in its files. Morris Apr. 21, 1998 Tr. at 34.

In fact, all contacts with informants were required to be documented on FBI Forms 209. *See, e.g.,* Ex. 274 (Under Seal), Manual § 108 (10–13–60 to 7–13–76); § 108 pt. I(E)(3) (1–12–77); § 137–6(3) (1–31–78); § 137–8(2)(c–d) (1–12–81); Ring June 15, 1998 Tr. at 59. Morris' view of such 209s and the information that they contained was similar to Rico's and also shared by Morris' colleagues in the FBI's Boston office.

More specifically, Morris understood and expected that informants would be told that their relationship with the FBI was confidential and would not be disclosed to anyone outside the FBI. Morris Apr. 24, 1998 Tr. at 130; Apr. 29, 1998 Tr. at 47. During Morris' tenure at the FBI it continued to be the Bureau's routine and practice to maintain the confidentiality of its relationship with an informant as "sacred." Morris Apr. 24, 1998 Tr. at 130.

Morris believed that the FBI would be violating its confidentiality agreement with its informants if it disclosed information provided by an informant to anyone seeking to investigate or prosecute him. Morris Apr. 24, 1998 Tr. at 130. Thus, Morris never told Bulger or Flemmi that information they were giving could be used against them. Morris Apr. 30, 1999 Tr. at 73. Morris did not believe that it could.

Morris correctly understood the FBI's position on this issue. For example, his view was shared by former Supervisory Special Agent James Darcy, whom the government called to testify as an expert concerning the handling of FBI informants. Darcy Sept. 29, 1998 Tr. at 81. Consistent with this, Potts, the former Acting Deputy Director of the FBI, knew of no instance in which information furnished by an informant had been used to assist an investigation or prosecution of him. Potts May 23, 1998 Tr. at 66. Nor did Morris. Morris Apr. 30, 1999 Tr. at 110.

### 9. *The Race–Fix Case*

In 1978 and 1979, Flemmi, Morris, and Connolly each understood that Flemmi and Bulger could properly be investigated by other agents or agencies, and be prosecuted if sufficient evidence were developed. This understanding was manifest in their conduct concerning an investigation of a race-fixing scheme being conducted by Daly, who was then working in the Lawrence or Lowell, Massachusetts office of the FBI, and Jeremiah O'Sullivan, a prosecutor in the Boston Organized Crime Strike Force. Morris Apr. 21, 1998 Tr. at 147–56.

The investigation focused on the payment of bribes to fix horse races by Howard Winter and his associates. *See United States v. Winter,* 663 F.2d 1120 (1st Cir. 1981). The key witness was Anthony Ciulla, who provided evidence that Bulger and Flemmi, among many others, participated in the race-fix scheme. Morris Apr. 21,

1998 Tr. at 112–14, 152. Bulger and Flemmi were aware of the investigation and were concerned about being indicted.

On January 27, 1978, Bulger was closed administratively as an informant because he was a primary subject of the race-fix investigation and might be indicted. Exs. 65, 68. Bulger was not informed that he had been administratively closed as an informant. Morris Apr. 22, 1998 Tr. at 66–67. Indeed, to have done so would have been inconsistent with the FBI's approach of trying to make Bulger and Flemmi feel they were colleagues rather than informants. In any event, Connolly continued his contact with Bulger and Flemmi, but did not document those contacts or the information they provided.

Among other things, Bulger and Connolly discussed the prospect that Bulger and Flemmi would be indicted. Bulger and Flemmi did not, of course, want to be charged. Connolly spoke to Morris. They agreed that they did not want to lose Bulger and Flemmi at a time when their services as informants were *particularly* important. Morris Apr. 22, 1998 Tr. at 57–58. Thus, after consulting Bulger, who received the concurrence of Flemmi, in about January 1979, Morris and Connolly met with O'Sullivan to discuss the situation. Morris Apr. 21, 1998 Tr. at 145–58; Flemmi Aug. 26, 1998 Tr. at 210, Aug. 28, 1998 Tr. at 59.

Morris and Connolly told O'Sullivan that Flemmi and Bulger were FBI informants. Morris Apr. 21, 1998 Tr. at 154–55. This disclosure to O'Sullivan violated FBI policy because it had not been authorized by FBI Headquarters. *Id.* at 159.

Nevertheless, Morris and Connolly told O'Sullivan that Bulger and Flemmi had the ability to continue to provide valuable assistance regarding the highest priority that the FBI and O'Sullivan shared—combatting the LCN. *Id.* at 154. They emphasized that Bulger and Flemmi were "crucial" to the ambitious plan they and O'Sullivan were developing to bug 98 Prince Street, the headquarters of Genna-

ro Angiulo, then the leader of the LCN in Boston. Morris Apr. 27, 1998 Tr. at 67, 72.

Thus, Morris and Connolly asked O'Sullivan not to include Bulger and Flemmi in the forthcoming race-fix indictment. Morris Apr. 21, 1998 Tr. at 147, 154–55. O'Sullivan consulted Daly, and subsequently agreed not to charge Bulger and Flemmi in the race-fix case. *Id.* at 32.

Bulger told Flemmi that the discussions with O'Sullivan had been successful and that they would not be indicted. Flemmi Aug. 28, 1998 Tr. at 63, 65. Flemmi asked Bulger to have Connolly thank O'Sullivan for him. Flemmi Aug. 20, 1998 Tr. at 46, 51–52.

About a month later, a RICO indictment relating to the race-fix scheme was returned against thirteen defendants, including Winter, James Martorano, and John Martorano. Flemmi Aug. 28, 1998 Tr. at 63; *Winter,* 663 F.2d at 1124. Bulger and Flemmi were named as unindicted coconspirators. Morris Apr. 22, 1998 Tr. at 59. After a forty-six-day trial with Ciulla as the vital, "star witness," all of the defendants who had not pled guilty or fled were convicted. *Winter,* 663 F.2d at 1124, 1127, 1137.

Flemmi did not in 1979 claim that he had an enforceable agreement with the FBI that provided him immunity from prosecution in the race-fix case. Rather, he recognized that he could have been indicted. Thus, he was grateful that Connolly and Morris had persuaded O'Sullivan to exercise his discretion not to indict him in order to permit Flemmi to continue to provide valuable information concerning the LCN.

In May 1979, the FBI in Boston requested and received from the Director of the FBI approval to reopen Bulger as an informant. Exs. 66, 67, 68. Bulger was characterized as a source who had "provided consistently excellent information," Ex. 66, with the "demonstrated ability to pro-

duce information regarding the highest levels of organized crime." Ex. 68. The Director was reminded that Bulger had been closed because he had become a "principal subject" of the race-fix investigation. *Id.* The Director was told, however, that "no prosecutable case developed against [Bulger] in the opinion of the Strike Force Attorney handling the matter." This was not true. Rather, Bulger and Flemmi were not prosecuted in the race-fix case because Connolly, Morris, and O'Sullivan had decided that their value as informants outweighed the importance of prosecuting them. In any event, the Director was told that "Boston is of the opinion that [Bulger] has been, and will be once again, one of the most highly placed and valuable sources of this Division." *Id.*

### 10. The FBI Does Not Investigate Bulger or Flemmi

At the time that the FBI officially reopened Bulger as an informant, Connolly and Morris were well-aware that he and Flemmi remained involved in a range of criminal activity, based on information being provided by other informants and statements made by Bulger and Flemmi themselves. The FBI neither investigated nor disclosed such information to any other law enforcement agency because Connolly and Morris were "very anxious" to continue to receive the "valuable" assistance of Bulger and Flemmi in the investigation of the Mafia to which Morris had by then dedicated every member of his Organized Crime squad. Morris Apr. 21, 1998 Tr. at 123–29.

For example, in July 1979, Morris received reports from informants that Bulger and Flemmi were "shaking down" independent bookmakers. Exs. 60, 63; Morris Apr. 22, 1998 Tr. at 28. In the instant case the alleged conspiracy to extort bookmakers, by Bulger, Flemmi and others, is alleged to have begun in 1979. *See* 4SI, Count 3. The FBI, however, made no effort to investigate this matter when it received information concerning it two dec-

ades ago. Morris Apr. 22, 1998 Tr. at 22–29.

Similarly, in 1979 and early 1980, the FBI received information from informants that Bulger and Flemmi were involved in other criminal activity, including illegal gambling and trafficking in cocaine. Exs. 63, 68. These allegations too were not investigated. Morris Apr. 21, 1998 Tr. at 123–29, Apr. 22, 1998 Tr. at 22–29.

In 1979, Bulger was providing Connolly with information concerning his own criminal activities and that of some of his associates. For example, in May 1979, Bulger described himself as a person who ran "the South Boston Irish Mafia" and identified several "extremely dangerous" people who were associated with him. Ex. 71. Bulger also related that his Winter Hill Gang and the LCN had agreed to change the illegal sports betting line. Ex. 40.

In addition, Bulger told Connolly that his associate John Martorano, who was a fugitive in the race-fix case, was in Miami, Florida. Ex. 41. Similarly, he reported that Joe Macdonald and Jimmy Sims, two of his other associates who were fugitives, would be back in Boston in a few days. Ex. 78. It was Morris' standard practice to review the 209s generated by members of his squad. Morris Apr. 29, 1998 Tr. at 8. There is no evidence, however, that the FBI made any effort to act on the information Bulger provided concerning himself or his associates.

Rather, in June or July 1979, Connolly, Bulger, Flemmi, and Gianturco met for the first time at Gianturco's home. Gianturco Jan. 15, 1998 Tr. at 88, 94. Meeting informants in an agent's home was highly unusual. *Id.* at 126–28. However, Bulger and Flemmi appeared to Gianturco to have a very friendly and trusting relationship with Connolly. *Id.* at 98–99. Gianturco felt comfortable with them because of the information they had given Connolly to help save his life. *Id.* at 93–95.

It appears that at this meeting Bulger and Flemmi provided information on the

criminal activities of the Patriarca Family, Myles Connor, and others. Ex. 35. This meeting occurred at about the time that the race-fix case was being tried, suggesting that it may also have been, in part, a celebration of Connolly's success in keeping Bulger and Flemmi from being indicted.

In any event, Gianturco later became the alternate agent for Flemmi. Gianturco Jan. 15, 1998 Tr. at 102–03.· There were a series of dinner meetings at Gianturco's home. *Id.* at 106. At some of those meetings gifts were exchanged. *Id.* at 105–06, Apr. 20, 1998 Tr. at 18–24. Gianturco, for example, received from Bulger and Flemmi a toy truck to commemorate Operation Lobster, a glass statue, and a leather briefcase. *Id.* Gianturco gave Bulger an Alcatraz belt buckle. *Id.* at 21. The June or July 1979 meeting, however, is the only one from which information provided by Bulger or Flemmi is reflected in the FBI's files. There is no record of the gifts.

### 11. *The Lancaster Street Garage and 98 Prince Street*

In 1980, it became necessary for the FBI to provide Bulger and Flemmi more than passive protection in the form of not investigating them in order to preserve their potential to assist the FBI's plan to bug 98 Prince Street. In 1980, the FBI contributed to frustrating a Massachusetts State Police investigation of criminal activity of Bulger, Flemmi, and many others occurring at the Lancaster Street Garage, which was owned by Kaufman.

The Massachusetts State Police had determined that "virtually every organized crime figure in the metropolitan area of Boston, including both LCN and non-LCN (Winter Hill) organized crime figures frequented the premises and it was apparent that a considerable amount of illegal business was being conducted at the garage." Ex. 2. Flemmi and Bulger were among those targeted by the Massachusetts State Police. The Massachusetts State Police consulted O'Sullivan to discuss obtaining

authority for electronic surveillance of the Garage. *Id.;* Ex. 3. The Massachusetts State Police insisted, however, that the FBI not be told about the plan because it believed that Flemmi and Bulger were informants, working with Morris, who might compromise the investigation if he knew about it. Ex. 2. Nevertheless, Morris discerned that the Massachusetts State Police was conducting electronic surveillance at the Lancaster Street Garage, in part because another FBI agent, James Knotts, had consulted him in an earnest effort to obtain information that could be used by the Massachusetts State Police to establish the probable cause necessary to obtain a warrant to bug that location. Morris Apr. 22, 1998 Tr. at 135–38.

The Massachusetts State Police installed a microphone in the Lancaster Street Garage on July 24, 1980. Ex. 2. It was "extremely productive" for about two weeks. *Id.* It then became evident to the Massachusetts State Police that the targets had been tipped off concerning the electronic surveillance. *Id.* The Massachusetts State Police suspected Morris had learned about the investigation and compromised it. *Id.;* Ex. 10.

The Massachusetts State Police's perception that its targets had been tipped off concerning the Lancaster Street Garage electronic surveillance was correct, although Morris may not have been involved. Flemmi initially received information about the bug, through an associate, John Naimovitch, a Massachusetts State Police Trooper. Flemmi Aug. 20, 1998 Tr. at 108–09, Aug. 25, 1998 Tr. at 242–45. Flemmi ·discussed this with Connolly. Flemmi claims that Connolly consulted Morris and O'Sullivan. Flemmi Aug. 20, 1998 Tr. at 104–08, Aug. 25, 1998 Tr. at 240–42. The court questions whether this is correct, particularly with regard to O'Sullivan. In any event, Connolly was somehow able to confirm for Flemmi and Bulger that the Lancaster Street Garage was bugged. Flemmi Aug. 20, 1998 Tr. at 103–05, Aug. 25, 1998 Tr. at 242–43.

Flemmi and Bulger advised some of their associates, including Kaufman, and the discussion of criminal activity at the Lancaster Street Garage ceased. Ex. 9; Flemmi Aug. 26, 1998 Tr. at 93–94.

Realizing that the investigation of the Lancaster Street Garage had been compromised, Colonel O'Donovan, the head of the Massachusetts State Police, complained to the FBI and made it clear that the Massachusetts State Police was convinced that Bulger and Flemmi were FBI informants. Exs. 2, 9, 10. The fact that Bulger and Flemmi's status as FBI sources had been recognized and discussed in the context of a promising criminal investigation was a matter of concern for Sarhatt, who had recently became the SAC in Boston. Ex. 10. The situation had the potential to embarrass the FBI in several ways. First, a belief in the criminal community that Bulger and Flemmi were informants could have caused them to be killed, thus placing in doubt the FBI's ability to protect its sources. Second, Sarhatt recognized that Bulger and Flemmi might be prosecuted for committing serious crimes. Their prosecution would have raised within the FBI, and perhaps more widely, questions concerning the Bureau's decision to work with them rather than investigate them. Thus, Sarhatt wondered whether the FBI should target Bulger and Flemmi for investigation rather than continue them as sources. Sarhatt Jan. 7, 1998 Tr. at 60, 64–66. Finally, Sarhatt was concerned that it might be true that one of his agents had disclosed the Massachusetts State Police investigation to two of its targets. Exs. 2, 9. Sarhatt acted on each of these concerns.

Morris was questioned about whether he had contributed to compromising the Lancaster Street Garage investigation. In response, Morris gave Sarhatt false information about some of his activities and was cleared. Ex. 69; Morris Apr. 22, 1998 Tr. at 154–55, Apr. 23, 1998 Tr. at 38.

Sarhatt also considered whether the FBI should keep Bulger and Flemmi open as informants or target them for investigation. Sarhatt Jan. 7, 1998 Tr. at 60, 64–66. Connolly and Morris urged him to continue them as informants. Connolly wrote memoranda reviewing the history of exceptional service that Bulger and Flemmi had rendered as sources, which Morris endorsed and amplified. In addition, with regard to Flemmi, who had been reopened as an informant in September 1980, Exs. 7, 4, Connolly wrote on December 2, 1980, that:

> Information from this source is currently being utilized in the preparation of an affidavit in support of a Title III application targeting [98 Prince Street], which is the highest priority organized crime investigation in Headquarters City [Washington, D.C.]. In addition to the Angiulo case, this informant is one of the two primary informants who will furnish the majority of probable cause for a Title III application targeting Illario Zannino (# 2 man in the Boston LCN).

Ex. 8. With regard to Flemmi, Morris added:

> I concur with the observations and evaluations of SA Connolly, and recommend continued contacts with captioned source. This source is one of very few sources who can furnish information at the policymaking level of the LCN and has been consistently rated as very good by the reviewing Inspector. *Continuing information from the informant is considered to be a critical factor in Boston's overall Organized Crime Program.*

*Id.* (emphasis added).

Connolly described in the same terms Bulger's importance to the affidavits being prepared to obtain electronic surveillance of 98 Prince Street and of Zannino. Ex. 5. Morris again agreed with Connolly and added that:

> [Bulger] is one of the most highly placed and valuable informants in the Boston Division. [He] was last rated as excellent by the reviewing Inspector in 1976. *The closing of an informant of this cali-*

*ber would deal a serious blow to the [Organized Crime Program] of the Boston Division.*

*Id.* (emphasis added).

In essence, Connolly and Morris advised Sarhatt that Flemmi and Bulger were of vital importance to the plan to bug 98 Prince Street, in which the FBI had a great investment on which it hoped to capitalize imminently, and to the Boston Office's Organized Crime program generally. Thus, they felt strongly that Bulger and Flemmi should not be closed as informants.

Sarhatt also consulted O'Sullivan, who had become the Chief of the Boston Organized Crime Strike Force, with regard to whether Bulger should be continued as an informant. Ex. 3; Sarhatt Jan. 7, 1998 Tr. at 43–49. This was highly unusual because it involved identifying, or confirming the identity of, a confidential source to a prosecutor. O'Sullivan, however, was already aware that Bulger and Flemmi were informants, and also knew that the Massachusetts State Police had concluded that they were sources for the FBI. Exs. 2, 3. According to Sarhatt's memorandum, O'Sullivan urged him to continue Bulger as an informant. Ex. 3; Sarhatt Jan. 7, 1998 Tr. at 53. More specifically, Sarhatt wrote that O'Sullivan told him that:

> it is crucial that the FBI continue this source [Bulger] inasmuch as the information he is currently furnishing is cru-

cial to a Title III application of LCN members in Boston.

Mr. O'Sullivan stated that he did not feel there was any improper conduct on the part of the FBI by continuing the Informant relationship with [Bulger]. He stated that there was sufficient justification for continuing him regardless of his current activities to be able to eventually prosecute LCN members.

Ex. 3.[33]

On November 25, 1980, Sarhatt also took the unusual step of meeting with Bulger himself as part of his effort to determine whether the FBI had compromised the Massachusetts State Police's Lancaster Street Garage investigation and whether Bulger and Flemmi should be continued as informants. Exs. 1, 87; Sarhatt Jan. 2, 1998 Tr. at 14. It was at this meeting that Bulger expressed his appreciation for Rico's courtesy and explained his warm feelings for Connolly, based on their common roots and shared "deep hatred for La Cosa Nostra." Ex. 1. At this meeting, Bulger also falsely claimed that he had not been given any information about the Lancaster Street Garage investigation by the FBI. *Id.* In doing so, Bulger was protecting Connolly.

Sarhatt was also interested in confirming that Bulger understood that the Massachusetts State Police was "fully aware of his Informant role with the FBI" and "his life could be in danger," and in documenting Bulger's response. *Id.* Sarhatt record-

---

**33.** The court notes that Sarhatt did not furnish a copy of his memorandum to O'Sullivan. *See* Ex. 3. This, among other things, suggests that the memorandum was written in meaningful measure for the protection of the FBI and raises questions concerning whether O'Sullivan would dispute Sarhatt's characterization of his comments. Exhibit 3 may be an example of what has been characterized as "Bureau-speak." It has been written that:

> The Bureau employs two separate languages. The first, for internal and interdepartmental communications, may be called Bureau-speak. It is cryptic, telegraphic and routine and its purpose is less to com-

municate than to anticipate, to make a record for future protection. "You can have a conversation with an agent," says Edwin O. Guthman, [Attorney General] Kennedy's press secretary, "and when it is over he will send a memo to the files. Any relation between the memo and what was said in the conversation may be purely coincidental. You would think you were at different meetings."

Navasky, *supra*, at 16. While the court wonders whether O'Sullivan's comments were as strong and unequivocal as described by Sarhatt, it does find that Sarhatt consulted O'Sullivan and O'Sullivan supported the continuation of Bulger as an informant.

ed that Bulger acknowledged that his status as an FBI informant was being widely discussed, but said that:

> [Bulger] was not concerned with his personal safety because no one would dare believe that he is an informant. It would be too incredible. ·Notwithstanding this notoriety, he indicated . . . that he wants to continue the relationship with the FBI.

Ex. 1. This echoed what Bulger and Flemmi had previously told Connolly. Ex. 10. In essence, Bulger explained to Sarhatt that he was confident that the idea of a partnership between the FBI and a criminal of his stature was too extraordinary to be believed.

Bulger included in his interview high praise for the FBI. As Sarhatt recorded it, Bulger said:

> With respect to his association with Colonel O'Donovan . . . he has met him on some occasions especially one in which he made very disparaging and derogatory statements about the professionalism of FBI personnel to which he took great umbrage, inasmuch as his association with the FBI has been nothing but the most professional in every respect.

*Id.*

Thus, with the encouragement of Bulger, O'Sullivan, Morris, and Connolly, Sarhatt in December 1980 decided to continue Bulger and Flemmi as informants, rather than target them for investigation, and to review their status again after March 30, 1981. Exs. 5, 8.

In November and December 1980, when Sarhatt was considering whether to continue Bulger and Flemmi as informants, Connolly and Morris had substantial reason to appreciate what Bulger and Flemmi had contributed to their work, and compelling cause to want to avoid any change in their status. For example, in the midst of the Lancaster Street Garage controversy, on September 11, 1980, Flemmi told Connolly that the Patriarca Family had been quietly

making new members, including Salemme and Vincent Ferrara. Ex. 237, (209 dated 9/11/80). The next day, Flemmi was reopened as an informant because his "past legal problems [had] been resolved" and he had been "recontacted and has provided information of value and continues to be in a position to do so in the future." Ex. 4; *see also* Ex. 82. In the next month Flemmi gave Connolly Jack Salemme's telephone numbers, Ex. 237 (209 dated 9/23/80), and information relating to the murder of federal Judge James Wood. Exs. 8, 231.

Most significantly, however, Flemmi and Bulger had by December 1980 made a critical contribution to the effort to bug 98 Prince Street. In October 1980, Morris and Connolly gave Bulger and Flemmi an assignment. Morris Apr. 20, 1997 Tr. at 12, Apr. 27, 1998 Tr. at 11–12. Bulger and Flemmi were told that the FBI wanted to bug 98 Prince Street. Flemmi Aug. 20, 1998 Tr. at 125–26, Aug. 26, 1998 Tr. at 178–79; Morris Apr. 28, 1998 Tr. at 104–05. Morris and Connolly asked Bulger and Flemmi to obtain information that was important to the feasibility of that effort. They asked them to go to 98 Prince Street, look carefully at the premises, and provide the FBI everything possible concerning the doors, locks, and any security devices. Morris Apr. 27, 1998 Tr. at 11–13; Flemmi Aug. 26, 1998 Tr. at 126.

Bulger and Flemmi expressed two concerns when confronted with the request. Bulger particularly was reluctant to go to 98 Prince Street because he did not trust the LCN and was afraid he and Flemmi might be killed. Morris Apr. 21, 1998 Tr. at 29–30, Apr. 24, 1998 Tr. at 43–45. *See also* Ex. 78. Morris and Connolly felt this fear was well-founded. Flemmi Aug. 20, 1998 Tr. at 43. Indeed, in about December 1980, Morris played for Bulger and Flemmi a tape of still undetermined origin on which Zannino and another member of the Patriarca Family, Domenic Isabella, discussed looking for the right opportunity

to kill Flemmi and Bulger. Flemmi Aug. 20, 1998 Tr. at 52–55.

Flemmi expressed another concern. He recognized that if 98 Prince Street were bugged, discussion of some of his and Bulger's criminal activity was likely to be intercepted. Flemmi Aug. 26, 1998 Tr. at 184–86, 189–91, Aug. 20, 1998 Tr. at 43–45. Flemmi wanted to know what would be done with any such evidence. *Id.* Morris and Connolly assured Bulger and Flemmi that the 98 Prince Street tapes would not be a problem for them. *Id.* They would be protected for any thing picked up on those tapes, rather than prosecuted. *Id.* Thus, Flemmi understood that nothing on the tapes would be used against him. Flemmi Aug. 26, 1998 Tr. at 189–90.[34] That understanding was reasonable. In addition, but for the assurance received from Morris and Connolly, Flemmi and Bulger would not have assisted the FBI in its effort to bug 98 Prince Street.

With this assurance, Flemmi and Bulger went to 98 Prince Street. They returned with the information that the FBI had requested, including a diagram of the premises. Ring June 11, 1998 Tr. at 135–36. The subsequent bugging of 98 Prince Street, which was generally viewed as a virtually impenetrable location, was considered a remarkable technical feat for the FBI. Bulger and Flemmi made a unique contribution to that achievement.

On January 9, 1981, the government applied for, and received, a warrant to bug 98 Prince Street. Aff. of Paul E. Coffey, Apr. 9, 1997 ("Coffey Aff., Apr. 9, 1997"), ¶ 3A. Bulger and Flemmi were two of the sources whose information was used to establish the legally required probable cause. *Id.* Information that they provided was also included in some, but not all, of the periodic requests for extensions. *Id.* In addition, Bulger was a source whose

information was used to get a warrant to bug Zannino's premises at 51 North Margin Street. *Id.*

Bulger and Flemmi were told when the bug had been installed in January and when it was removed in April 1981. Flemmi Aug. 20, 1998 Tr. at 126–27; Morris Apr. 28, 1998 Tr. at 105–06. Accordingly, neither of them went to 98 Prince Street when it was bugged. Thus, neither was recorded on the 98 Prince Street tapes.

It was highly irregular for sources to be told why the FBI was requesting certain information or that a particular location was being electronically monitored. FBI agents are generally instructed that: "Care must be exercised in handling informants to ensure that they are provided no information other than that necessary to carry out their assignments." Ex. 274 (Under Seal), Manual § 137–5(10) (3–28–84). As Ring explained, criminal sources may be very helpful, but are usually regarded as not completely trustworthy. Ring June 10, 1998 Tr. at 68–69. Thus, it is generally unduly risky to tell them about the FBI's intentions or activities. *Id.*

Connolly and Morris, however, had full faith in Flemmi and Bulger. Morris Apr. 28, 1998 Tr. at 105–06, Apr. 27, 1998 Tr. at 14. They were confident that their sources would not betray them. *Id.* Thus, they treated Bulger and Flemmi as colleagues rather than informants in explaining the FBI's plan to bug 98 Prince Street and letting them know when the electronic surveillance was operating.

Indeed, in about January 1981, Flemmi, Bulger, Connolly, and Morris gathered in Morris' home in Lexington, Massachusetts for what Flemmi characterized as a belated Christmas celebration. Flemmi Aug. 20, 1998 Tr. at 55–56. The timing of this first meeting at Morris' home suggests it

---

34. The issue of the representations made to Bulger and Flemmi concerning the use of the 98 Prince Street tapes was raised for the first time in Flemmi's testimony, rather than in his affidavits, which did not purport to be exhaustive. *See, e.g.,* Ex. 30, ¶ 4. The government recalled Ring to refute many of Flemmi's claims. The government did not recall Morris to address the 98 Prince Street immunity issue.

may also have been a celebration of the successful bugging of 98 Prince Street. In any event, Bulger and Flemmi brought wine and a champagne bucket for Morris. *Id.* Morris reciprocated by giving Flemmi, a Korean War veteran, a painting from Korea. *Id.*

### 12. *Sarhatt Extends Bulger and Flemmi As Informants*

As described earlier, in December 1980, when Sarhatt authorized Morris and Connolly to continue Bulger and Flemmi as informants, rather than target them for investigation, he planned to reevaluate Bulger and Flemmi's status after March 30, 1981. Exs. 5, 8. He subsequently had his new ASAC, Robert Fitzpatrick, who had come to Boston in January 1981, meet with Bulger to assist in that assessment. Fitzpatrick Apr. 17, 1998 Tr. at 47–49, 59. Fitzpatrick testified that he had misgivings about continuing Bulger and Flemmi as informants. More specifically, he stated that he was concerned that Bulger and Flemmi were not being sufficiently productive, and were engaged in serious crime, including crimes of violence and collecting "tribute" from drug traffickers. Fitzpatrick Apr. 17, 1998 Tr. at 53–59. There is no written record indicating that Fitzpatrick ever expressed such concerns to Sarhatt, however.

In any event, in memoranda dated April 1, 1981, Connolly and Morris strongly urged that Bulger and Flemmi be continued as informants based on their invaluable contributions to the bugging of 98 Prince Street and 51 North Margin Street, and their potential to assist in the development of cases those tapes might generate and other organized crime matters. Exs. 50, 51. More specifically, with regard to Flemmi, Morris wrote that:

> information provided by this informant has been utilized in six successful affidavits in support of six applications for court authorized electronic surveillance pursuant to the provisions of Title III. These affidavits are in connection with

two of the highest priority organized crime matters under investigation in the Boston Division. *One of these two cases, [98 Prince Street] is one of the highest priority organized crime cases in the FBI today and involves what has been characterized by [FBI Headquarters] officials as one of the most important and successful Title IIIs to have been conducted by the FBI in the past ten years.*

Ex. 50 (emphasis added). Morris reiterated these remarks in endorsing Bulger's continuation as an informant.

In addition, Morris wrote that Bulger and Flemmi were each:

> a highly placed and valuable informant. Informants such as [Bulger and Flemmi] take years to develop and form the nucleus of any viable long range Organized Crime Program. [Each] informant should not only continue to be contacted but in fact targeted for ever increasing productivity.

Exs. 50, 51.

Fitzpatrick reviewed and initialed each memorandum without dissent. Sarhatt agreed to continue Bulger and Flemmi as informants. Exs. 50, 51.

Bulger and Flemmi quickly validated Morris and Connolly's assessment of their potential to continue to contribute to the FBI's organized crime efforts. For example, in April or May 1981, Morris arranged to meet Bulger and Flemmi at the Hotel Colonnade. Flemmi Aug. 20, 1998 Tr. at 60–63. Morris played for them a tape of a conversation intercepted at 98 Prince Street on which Angiulo and Zannino discussed killing their associate Nick Gizo's girlfriend, Liz McDonough. *Id.;* Ex. 210; Morris Apr. 27, 1998 Tr. at 104–05. Morris asked for Bulger and Flemmi's assessment of the threat. Flemmi Aug. 20, 1998 Tr. at 63. Flemmi said that he felt the threat was real. *Id.*

In the course of this meeting, the three drank wine. *Id.* Morris had so much that Bulger decided to drive him home. *Id.* Flemmi kept the tape. *Id.;* Ex. 210.

Subsequently, Bulger and Flemmi began referring to Morris as "Vino." Flemmi Aug. 20, 1998 Tr. at 63.

In addition to assisting with interpreting the tapes, Flemmi promptly provided the FBI valuable assistance in its ongoing effort to develop a strong case against Angiulo and his associates. Among other things, Flemmi told the FBI that the LCN believed Angiulo's office had been bugged. Ex. 237 (209 dated 5/14/81). He also identified an individual Flemmi felt would testify against Angiulo if targeted by the FBI. *Id.* (209 dated 5/14/81). In addition, Flemmi reported on meetings he had with Angiulo at 98 Prince Street and elsewhere. *Id.* (209 dated 9/18/81); Ex. 79.

Flemmi also advised the FBI that: the LCN planned to murder several suspected informants, Ex..237 (209 dated 12/15/81); Joe Russo, who was "on the lam," had returned to visit Zannino, *id.* (209 dated 7/12/82); and the FBI agents and Strike Force attorneys preparing the Angiulo case should be alert to possible violence against them. *Id.* All of this information was highly valued by the FBI as it prepared the Angiulo case.

Bulger and Flemmi also gave the FBI information concerning the drug dealing of Salvatore Michael Caruana and his claim to have been closely connected with Patriarca. Ex. 223. In addition, they reported on the unsolved Blackfriar's murder case. Ex. 7.

Without any apparent concern that the information would be used against him or his associates, Bulger told the FBI about the $200,000 his Winter Hill Gang borrowed from the Angiulos to deal with the financial difficulties they were having due to illegal gambling losses. Ex. 73. Bulger also reported on some of the activities of his Winter Hill associates. Ex. 127.

At the same time the FBI was receiving, but not investigating, reports from informants regarded as reliable concerning criminal activity in which Bulger and Flemmi were engaged. For example, in 1981 and 1982, the FBI was told that Bulger and Flemmi were involved in cocaine distribution with Brian Halloran. Exs. 88, 89. The Bureau was also advised that bookmakers were required to pay Bulger and Flemmi to operate in South Boston. Exs. 89, 91. These allegations were not investigated by the FBI. Rather, with regard to Flemmi's reported drug activity, Connolly wrote that "source's contacts, at my direction, with individuals thought to possess information regarding [Judge Wood's] murder, may have resulted in the false belief that source is involved in narcotics." Ex. 8.

### 13. *The Wheeler, Halloran, and Callahan Murders*

A serious threat to the ability of the Boston office of the FBI to continue to benefit from Bulger and Flemmi as sources arose on March 27, 1981, when Roger Wheeler was murdered in Tulsa, Oklahoma. Based on descriptions provided by witnesses, Bulger, Flemmi, and John Martorano, who was a fugitive, became prime suspects. The FBI in Boston, however, succeeded in keeping agents from other offices and local law enforcement officials from speaking to Bulger and Flemmi. In addition, when Brian Halloran became a potential witness against Bulger and Flemmi in the Wheeler homicide investigation, Morris told Connolly. As Morris anticipated, Connolly told Bulger and Flemmi. Several weeks later Halloran was murdered.

Wheeler owned World Jai Lai, which had facilities, known as "frontons," in Florida and Connecticut, where it was legal to gamble on Jai Lai matches. Initially, Callahan, an accountant and associate of Halloran's, was the President of the business. Morris Apr. 27, 1998 Tr. at 127–28. Rico, who had retired from the FBI in 1975, served as its Director of Security.

Wheeler suspected that Callahan was skimming money from World Jai Lai for members of the Winter Hill Gang, including Halloran, Bulger, and Flemmi. Morris

Apr. 27, 1998 Tr. at 128. Thus, he fired Callahan, put some of his own people in key positions, and began an audit. *Id.* Before it was concluded, however, Wheeler was shot and killed as he left his golf club in Tulsa. Sketches prepared on the basis of descriptions provided by witnesses, among other things, caused the FBI and others to suspect that Bulger had murdered Wheeler. Fitzpatrick Apr. 16, 1998 Tr. at 96, 114, Apr. 17, 1998 Tr. at 42–43, 175–76. Flemmi was also a suspect. Ex. 55. In addition, it was believed that John Martorano may have been involved.

The FBI in Oklahoma City was interested in exploring Callahan's relationship with Halloran, and in investigating Bulger and Flemmi. Morris Apr. 27, 1998 Tr. at 127. The FBI's Boston Organized Crime squad opened an investigation to support Oklahoma City's effort to solve the Wheeler murder. Morris Apr. 27, 1998 Tr. at 120. *See also* Aff. of Special Agent Stanley Moody, Apr. 29, 1998 ("Moody Aff., Apr. 29, 1998"). In 1981, at Morris' request, Connolly interviewed Callahan as part of that investigation. Morris Apr. 27, 1998 Tr. at 127–30. The Boston investigation was then quickly closed. *Id.*

In January 1982, Halloran, who was facing a state murder charge, began to cooperate with the FBI in Boston. Morris Apr. 24, 1998 Tr. at 78, Apr. 27, 1998 Tr. at 115. Special Agents Leo Brunnick and Gerald Montanari, two members of the Boston FBI's Labor and Racketeering squad, were assigned to work with Halloran. Morris Apr. 24, 1998 Tr. at 78, Apr. 27, 1998 Tr. at 112–13. Among other things, Halloran told Brunnick and Montanari that he had met Bulger and Flemmi at Callahan's apartment and was asked if he was willing to murder Wheeler. Morris Apr. 22, 1998 Tr. at 112, Apr. 27, 1998 Tr. at 114.

Brunnick consulted Morris, as the supervisor of the Organized Crime squad, to get his assessment of Halloran's reliability as a potential witness. *Id.* at 78–80. Brunnick told Morris about Halloran's al-legations concerning Bulger and Flemmi. Morris Apr. 24, 1998 Tr. at 83, Apr. 27, 1998 Tr. at 113–14, 127, 130. Morris realized that Halloran's allegations threatened their futures as FBI informants, among other things, because it was the Bureau's practice to close sources that it was investigating. Morris Apr. 24, 1998 Tr. at 74–77. Morris and Connolly did not want to lose their prize sources, who were important to their investigations, and to their own status and future careers in the FBI. *Id.* Morris told Brunnick that Halloran was untrustworthy and unstable, and would not be a believable witness. *Id.* at 78–83.

The FBI in Oklahoma City had expressed interest in Halloran. *Id.* at 87. However, no evidence was introduced indicating that any of its agents were informed of Halloran's discussions with the FBI in Boston.

Morris, however, told Connolly that Halloran was speaking with Brunnick and Montanari, and of the information he was providing about Bulger and Flemmi. *Id.* at 79, 87–88, Apr. 22, 1998 Tr. at 112, 118. Morris expected that Connolly would tell Bulger and Flemmi about Halloran's charges. Morris Apr. 22, 1998 Tr. at 112–13, 117. Morris knew that doing so would endanger Halloran. Morris Apr. 24, 1998 Tr. at 92. Connolly told Bulger and Flemmi about Halloran's cooperation and claims. Morris Apr. 22, 1998 Tr. at 115–16, 118; Flemmi Aug. 20, 1998 Tr. at 20–21 (Lobby, Under Seal), Aug. 26, 1998 Tr. at 81–84, Sept. 1, 1998 Tr. at 88–90; Boeri May 15, 1998 Tr. at 73, May 18, 1998 Tr. at 69–77; Ex. 41.

In early May 1982, the FBI denied Halloran's request to be placed in the Witness Protection Program and told him that his relationship with the FBI was terminated. Morris Apr. 30, 1998 Tr. at 8. *See also* Aff. of Supervisory Special Agent William Chase, Apr. 29, 1998 ("Chase Aff., Apr. 29, 1998"). On May 11, 1982, Halloran was murdered as he emerged from a restau-

rant in South Boston. No one has ever been convicted of that murder. Morris, however, believed that Bulger and Flemmi were responsible. The next time that Morris asked Connolly to tip Flemmi off to an investigation, he added that he "did not want another Halloran"—meaning another murder. Morris Apr. 22, 1998 Tr. at 121.

Morris did not, however, hesitate to capitalize on the extraordinary disclosure of highly confidential information that he had caused Connolly to make to Bulger and Flemmi. At some point prior to Halloran's murder Connolly had told Morris that Bulger and Flemmi "really liked him," and hoped that Morris would let them know if he ever needed anything. Morris Apr. 23, 1998 Tr. at 135–36, 140, Apr. 24, 1998 Tr. at 97–99. Several weeks after Halloran's murder Morris was sent to Glencoe, Georgia for drug training. Ex. 240. At that time, although married, Morris was romantically involved with his secretary. *Id.;* Deborah Morris Sept. 22, 1999 Tr. at 148.

While in Georgia, Morris decided that he would enjoy a visit from her. Morris Apr. 23, 1998 Tr. at 136. Recalling the offer communicated through Connolly, he asked Connolly if Bulger and Flemmi would provide the funds necessary to buy his secretary a plane ticket. *Id.* at 136, 139.

Connolly subsequently gave Morris' secretary an envelope containing $1000 cash, which Morris understood had come from Bulger and Flemmi. *Id.;* Deborah Morris Sept. 22, 1998 Tr. at 150. Flemmi denies that this payment was made. Flemmi Aug. 26, 1998 Tr. at 104–05. Nevertheless, the court finds that Morris' understanding was correct. Connolly, however, told the secretary that Morris had saved the money and wanted her to use it to visit him in Georgia. Morris Apr. 23, 1998 Tr. at 136–37; Deborah Morris Sept. 22, 1998 Tr. at 150–51. She took the money and made the trip. *Id.*

Morris knew that the fact that Bulger and Flemmi had been told by Connolly of Halloran's effort to cooperate with the FBI would be relevant to any investigation of Halloran's murder, but he never provided this information to anyone in the FBI. Morris Apr. 24, 1998 Tr. at 94–97. Nor did he tell the Suffolk County District Attorney's Office, which conducted an investigation and obtained an indictment, but not a conviction, of Jimmy Flynn for the Halloran murder. *Id.*

The Halloran murder presented a dilemma for the FBI. It precipitated a May 25, 1982 meeting at FBI Headquarters to grapple with Bulger and Flemmi's dual status as valuable FBI informants and also suspects in the investigations of the Wheeler and Halloran murders. Ex. 54; Fitzpatrick Apr. 16, 1998 Tr. at 94–102, Apr. 17, 1998 Tr. at 179. Representatives of the FBI offices in Boston, Oklahoma City, and Miami met with FBI Headquarters officials, including Sean McWeeney, Chief of the Organized Crime Section, and Jeff Jamar, the Informant Coordinator. *Id.*

At the May 25, 1982 meeting, the Miami, Oklahoma City, and Boston offices of the FBI agreed to coordinate their investigations of the Wheeler and Halloran homicides. Ex. 54. It was also agreed that O'Sullivan, as the Organized Crime Strike Force Chief in Boston, and the United States Attorney in Oklahoma would discuss where any grand jury investigation should be conducted. *Id.;* Fitzpatrick Apr. 16, 1998 Tr. at 90, Apr. 17, 1998 Tr. at 181.

In addition, a decision was made to keep Bulger and Flemmi open as sources unless and until "substantiated information" implicating them in the murders was received. Ex. 54; Fitzpatrick Apr. 17, 1998 Tr. at 180. It does not appear that there was any discussion of whether Bulger and Flemmi had immunity that would protect them from possible prosecution for the Wheeler or Halloran murders. Nor does it appear that the implications of the Attorney General's Guidelines concerning informants were considered. More specifi-

cally, there was evidently no discussion of whether local law enforcement authorities in Boston or Oklahoma, which were conducting investigations, should be advised of the information Halloran had provided concerning Bulger and Flemmi or of whether the Assistant Attorney General should have been consulted.

On August 4, 1982, the body of John Callahan was found in the trunk of his car in Miami, Florida. Apr. 17, 1998 Tr. at 184. He had evidently been dead for several weeks.

On September 23, 1982, Flemmi was administratively closed as an informant. Ex. 83. Connolly and Morris told FBI Headquarters that they were closing Flemmi because he was being targeted for possible prosecution in the 98 Prince Street and 51 North Margin investigations. *Id.*; Morris Apr. 28, 1998 Tr. at 15–20. This was not true. Morris Apr. 28, 1998 Tr. at 20; Ring June 10, 1998 Tr. at 40.

As in the past, Flemmi was not told he had been administratively closed as a source. Morris Apr. 28, 1998 Tr. at 23; Flemmi Aug. 29, 1998 Tr. at 33. In any event, Flemmi continued to provide information regularly to the FBI. Exs. 224, 265. Indeed, the records reflect forty-six contacts between Flemmi and the FBI between February 1983 and May 1986, a period when Flemmi was administratively closed as a source. *Id.* There was no diminution in Bulger's official status as an informant. Rather, as discussed *infra*, in February 1983, Bulger was elevated to Top Echelon status. Ex. 11.

Nevertheless, Montanari attempted to investigate whether Bulger and/or Flemmi played a role in the Wheeler homicide and related matters. Pursuant to standard practice, the files of his investigation were kept in an area that was accessible to other agents. Montanari, however, suspected that Connolly was surreptitiously reviewing those files and furnishing information about his investigation to Bulger and Flemmi. Fitzpatrick Apr. 16, 1998 Tr. at 103–05, Apr. 17, 1998 Tr. at 191–92. He complained to Fitzpatrick, who was sufficiently concerned that he locked the files in his own office. *Id.*

While Fitzpatrick secured the files in an effort to keep the information Montanari was developing away from Connolly, he did not want anyone outside of the Boston office of the FBI to have access to Bulger and Flemmi. In April 1983, the FBI in Oklahoma City sought authority from the Director of the FBI to interview Bulger and Flemmi. Ex. 53. Fitzpatrick strongly and successfully opposed this request. *Id.*; Fitzpatrick Apr. 17, 1998 Tr. at 184–86. In doing so, Fitzpatrick claimed that he had interviewed Bulger concerning the Wheeler and Callahan murders, and that Bulger had denied being involved. *Id.* As Fitzpatrick testified, this was not true. Fitzpatrick Apr. 17, 1998 Tr. at 47, 184–86. Fitzpatrick had never questioned Bulger on these subjects. *Id.* at 184–86. Although he himself did not trust Connolly fully, Fitzpatrick also argued that Oklahoma City should not be allowed to interview Bulger and Flemmi in part because Connolly was in continual contact with them and was disseminating all relevant information that he received regarding the Wheeler and Callahan murders. *Id.*; Ex. 53. In essence, the Boston office of the FBI was determined to control the information, and therefore the decisions to be made, concerning its prize informants.

In May 1983, shortly after Fitzpatrick prevented FBI agents from Oklahoma City from interviewing Bulger and Flemmi, Connolly urged the SAC to reopen Flemmi as an informant because he was continuing "to voluntarily furnish sensitive information of an extremely high quality." Ex. 55. Thus, Connolly argued that if Flemmi was not going to be indicted imminently as a result of the Wheeler, Callahan, or 98 Prince Street investigations, he should be restored to Top Echelon informant status. *Id.* The timing of this memorandum suggests that it may have been, in part, an attempt by Connolly to determine

whether there was a threat that Flemmi would soon be charged as a result of the Halloran and Callahan murder investigations.

The FBI in Boston did not, however, immediately act on Connolly's request. Rather, Ring, the new supervisor of the Organized Crime squad, ordered that Bulger and Flemmi come in to the Boston office to be photographed, as requested by the FBI in Oklahoma, and to be interviewed by Montanari. Ring June 18, 1998 Tr. at 46–48. Ring told Montanari, however, that he did not want to be told anything about the progress of his investigation, but when it was concluded he hoped Montanari would give him his opinion on whether Bulger and Flemmi were involved in the Wheeler and Callahan murders. Ring June 18, 1998 Tr. at 48.

Although Connolly resisted Ring's request by claiming that he did not believe that Bulger and Flemmi were involved in the homicides, Ring did not relent. *Id.* at 52–53. As a result, in November 1983, Bulger and Flemmi were interviewed together by Montaneri and Brendan Cleary. *Id.;* Exs. 75 (Under Seal), 227.

It was highly unusual for two subjects of an investigation to be interviewed together. Bulger and Flemmi denied any involvement in the Wheeler and Callahan murders. Exs. 75 (Under Seal), 227. They refused, however, to take a polygraph examination and objected to being photographed. *Id.* Ring recalls that the FBI did photograph them. Ring June 10, 1998 Tr. at 50. No such photographs, however, were produced in discovery or introduced as evidence.

No one has ever been charged with committing the Wheeler and Callahan murders. Officially, those investigations remain open. The FBI in Boston, however, departed from the Bureau's standard procedures to render the information that it had received from Halloran regarding Bulger and Flemmi virtually inaccessible to others who might wish to review or evaluate it.

More specifically, in 1982 and 1983, FBI reports containing allegations against an individual were to be indexed by that individual's name and placed in an investigative file. *See* Moody Aff., Apr. 29, 1998, ¶ 5. With one exception, however, the many reports containing Halloran's charges against Bulger and Flemmi were not properly indexed with a reference to their names. *Id.* at ¶ 5–6; Apr. 17, 1998 Tr. at 8, Apr. 24, 1998 Tr. at 20–21, Apr. 30, 1998 Tr. at 4–10. Thus, these documents were not found or considered by the Department of Justice officials who were assigned, in July 1997, as a result of this case to review allegations that had been made by informants and witnesses against Bulger and Flemmi. *See* Chase Aff., Apr. 29, 1998.

Nor, when found by the Boston office of the FBI, were the documents promptly produced to the defendants as required by this Court's June 26, 1997 Order and other rulings. June 26, 1997 Order, ¶ 4(c); Moody Aff., Apr. 29, 1998; May 5, 1998 Tr. at 2–12 (Lobby, Under Seal). If the documents had been produced in a timely manner, Rico and Morris could have been questioned about them. None of the documents, however, were provided to the defendants at the time Rico testified in January 1998. In addition, some documents relating to Halloran's charges against Flemmi and Bulger that should have been produced in connection with Morris' appearance were not disclosed until his lengthy testimony was complete. However, Special Agent Moody, who had found the Halloran documents, had provided them long before to Boston ASAC Mike Wolf and SAC Barry Mawn to review because the information that they contained "was obviously highly singular and sensitive." Moody Aff., Apr. 29, 1998, ¶ 4, Aff. of Special Agent Stanley Moody, May 5, 1998 ("Moody Aff., May 5, 1998"), ¶ 2; May 1, 1998 Tr. at 3–8.

Both Flemmi and the government had reasons to hope that Halloran's allegations

against Flemmi and Bulger would not be fully exposed or resolved in this case. From Flemmi's perspective, a thorough exploration of the Halloran charges might prove that he participated in murder. From the FBI's perspective, exposure of its agents' conduct had the foreseeable potential to reveal an extraordinary effort to protect Bulger and Flemmi that involved serious impropriety, if not illegality. In any event, neither Morris nor Rico was recalled as a witness.

As a result of the delayed disclosure of the Halloran documents by the government and of the failure of the adversary system to operate fully and effectively on this issue, questions remain regarding the role, if any, played by Flemmi and Bulger in the Wheeler, Halloran, and Callahan murders, and the full degree to which the FBI in Boston has, from 1981 until recently, attempted to keep any such role from being discerned and demonstrated.

### 14. *The FBI Identified Other Informants for Flemmi and Bulger*

Halloran was not the only informant that the FBI identified for Bulger and Flemmi. Flemmi Aug. 20, 1998 Tr. at 16–17, 134–36, Aug. 20, 1998 Tr. at 2–23 (Lobby, Under Seal). Rico disclosed the identity of several informants to Flemmi. Flemmi Aug. 20, 1998 Tr. at 14–21 (Lobby, Under Seal). Connolly identified for Bulger and Flemmi at least a dozen individuals who were either FBI informants or sources for other law enforcement agencies. Flemmi Aug. 20, 1998 Tr. at 2–23 (Lobby, Under Seal). These disclosures were usually made so that Bulger and Flemmi could avoid making any unnecessary, incriminating statements to other informants. Flemmi Aug. 20, 1998 Tr. at

16–17, Aug. 20, 1998 Tr. at 10–11 (Lobby, Under Seal).

The evidence raises a question of whether Connolly also told Bulger and Flemmi about John McIntyre, who was providing information about them and their associates, and who disappeared about six weeks after the FBI learned of his allegations. This question cannot, however, be resolved on the present record, in part because of the delayed disclosure of documents by the government and in part because, as with Halloran, it evidently was not in either the interest of Flemmi or of the FBI to have this issue fully developed in this case.[35]

In mid-October 1984, McIntyre began cooperating with Richard Bergeron of the Quincy Police Department. Bergeron June 4, 1998 Tr. at 24–26. McIntyre reported, among other things, that he worked for Joseph Murray, initially in drug dealing. *Id.;* Ex. 257. McIntyre also revealed that he was the engineer on a ship named the Valhalla, which had been used in an attempt to deliver guns and ammunition from Massachusetts to the Irish Republican Army (the "IRA") in Ireland. Bergeron June 2, 1998 Tr. at 113–24, June 4, 1998 Tr. at 24–26. McIntyre said that Murray secretly owned the Valhalla. Bergeron June 2, 1998 Tr. at 115. McIntyre also explained that Murray was closely connected to Bulger and that Bulger, through his associates Kevin Weeks and Patrick Nee, was involved in the Valhalla arms shipment. Bergeron June 2, 1998 Tr. at 117–18, 123, June 4, 1998 Tr. at 17–18, 24–25. Flemmi was also mentioned. Bergeron June 2, 1998 Tr. at 116, June 4, 1998 Tr. at 128.

McIntyre was willing to cooperate with law enforcement, but seemed to Bergeron to be too "petrified" of the people that he was discussing to be a potential witness

---

**35.** Flemmi's counsel stated that he and his client were "certainly not" arguing that the FBI leaked information about McIntyre's cooperation and that Bulger and Flemmi were responsible for his murder. June 22, 1998 Tr. at 117. Rather, the defendants contend that the information McIntyre provided and his disappearance involved matters within the FBI's investigative jurisdiction, which were not pursued as part of the FBI's performance of its promise to protect Bulger and Flemmi from prosecution. June 2, 1998 Tr. at 133–34.

whose cooperation would be publicly disclosed. Bergeron June 4, 1998 Tr. at 25, 35–36. Bergeron realized that the information McIntyre was providing would be significant to several federal law enforcement agencies. *Id.* at 24–25. Thus, he immediately arranged for agents of the DEA and the United States Customs Service ("Customs") to participate in the debriefing of McIntyre.

In addition, Bergeron told FBI Special Agent Roderick Kennedy that McIntyre was cooperating and, among other things, of McIntyre's charges against Bulger and his associates. Bergeron June 2, 1998 Tr. at 113, 116, June 4, 1998 Tr. at 25, 28. Kennedy was the FBI's operational liaison with other agencies concerning narcotics matters.

At the time Bergeron contacted him, Kennedy knew that Bulger and Flemmi were Connolly's informants. Kennedy Apr. 14, 1998 Tr. at 26, 115–16, 121, 144. In fact, in 1983, Connolly told Kennedy that Bulger had disclosed that he had extorted $60,000–$90,000 in "rent" from Murray because Murray was storing marijuana in a warehouse in South Boston, which was part of Bulger's territory. *Id.* at 62–63, 79, 115, 121–29.

Kennedy had participated with the DEA in a raid of that warehouse. *Id.* at 100–15. Kennedy did not, however, share the information he received from Connolly with the DEA, with which he was conducting an ongoing joint investigation, or with the prosecutors working on the case. *Id.* at 111–14, 121–29, 130–32. Nor did he use that information in any of the FBI's independent efforts. *Id.* at 133–34.

Kennedy knew that Connolly expected confidentiality concerning the information Bulger had provided. *Id.* at 123. Like his colleagues going back to Rico, Kennedy understood implicitly that an informant's statements could not properly be used against him. In any event, Kennedy was willing to subordinate the interests of investigations in which he was involved to the interest that Connolly and the FBI had in Bulger and Flemmi as sources.

Although he did not disclose that Bulger and Flemmi were FBI informants, Kennedy, with a Customs Agent, interviewed McIntyre on October 17, 1984. Exs. 257, 258. With regard to drugs, McIntyre told Kennedy that "an individual named WHITEY who operates a liquor store in South Boston [had become] partners with JOE MURRAY." Ex. 257. Kennedy recognized this as a reference to Bulger who, as discussed in § II.15, *infra,* was at that time an owner of the South Boston Liquor Mart. McIntyre also recounted the story of the Valhalla, including the role of Bulger's associate Patrick Nee, who had traveled to Ireland to meet the shipment of guns. Ex. 258. Kennedy reported the information that he received from McIntyre to the SAC. Exs. 257, 258.

It is not clear whether Kennedy also discussed McIntyre's charges with Connolly. The reports of his interview with McIntyre, Exs. 257, 258, were not, as required by the court's June 26, 1998 and December 27, 1998 Orders, and the government's practice concerning "Jencks" materials, produced before Kennedy testified. June 5, 1998 Tr. at 4–5, June 22, 1998 Tr. at 117–19, Oct. 23, 1998 Tr. at 113–20. Rather, the documents were produced only after the court ordered that the FBI search for them. June 2, 1998 Tr. at 134–35. No party recalled Kennedy to testify about the McIntyre matter or questioned him concerning it when the court directed that he appear to be interrogated concerning Raymond Slinger, as described *infra.*

Kennedy had earlier acknowledged, however, that he and Connolly often exchanged information. Kennedy Apr. 14, 1998 Tr. at 26. In addition, the evidence concerning Murray's warehouse and the Slinger matter indicate that Kennedy on other occasions participated in protecting Bulger and Flemmi from investigation and possible prosecution. Thus, there is circumstantial evidence to suggest that Ken-

nedy may have told Connolly about McIntyre's cooperation and claims and, in view the Halloran matter, reason to be concerned that Connolly may have told Bulger and Flemmi. These issues cannot, however, be resolved on the present record.

In any event, despite the obvious potential for McIntyre's cooperation to result in several significant, if not sensational, cases, no evidence has been presented that the FBI conducted any investigation based on McIntyre's charges concerning Bulger and Flemmi, or discussed with DEA or Customs deferring to any investigation that they might conduct. Bergeron June 2, 1998 Tr. at 133–34. Several years later, there was a prosecution of a number of people involved with the Valhalla. Reilly May 20, 1998 Tr. at 46. The FBI did not in the course of its investigation ask the DEA whether it had any evidence linking Bulger or Flemmi to the Valhalla. *Id.* at 46. If asked, the DEA could have reported that the electronic surveillance it conducted jointly with the FBI in 1984 and 1985, discussed in § II.17, *infra,* "showed that Bulger and Flemmi shipped guns and ammunition to the IRA in Ireland." Ex. 145. More specifically, the electronic surveillance recorded that upon seeing a news report that the Valhalla had been seized, Bulger exclaimed: "That's our shipment. That's ours." *Id.* at 74–75. Bulger and Flemmi were not, however, charged in the Valhalla case.

On December 6, 1984, the Quincy Police realized that McIntyre had disappeared. Ex. 155; Bergeron June 2, 1998 Tr. at 139. Only Kennedy and a Customs agent were informed immediately. *Id.* It was assumed that McIntyre had been killed. Neither he nor his body has ever been found.

Bergeron suspected that Bulger might have been involved in McIntyre's murder, in part because McIntyre's father reported that his son was going to meet Patrick Nee on the night that he disappeared. Bergeron, June 2, 1998 Tr. at 39. Bergeron had heard rumors that Bulger and Flemmi were FBI informants, but did not believe them. Bergeron June 2, 1998 Tr. at 152–55. Bergeron knew that Bulger and Flemmi had been linked to several murders. *Id.* at 154. Validating the view that Bulger had expressed several years before to Sarhatt, Bergeron testified that he "didn't think that somebody at that level, doing what they [Bulger and Flemmi] were doing, could be informants for the FBI." *Id.*

### 15. *The South Boston Liquor Mart*

In about January 1984, Connolly received very reliable information concerning an ongoing extortion by Bulger and Flemmi. In violation of FBI policy and practice, Connolly did not record the information or disclose it to his Supervisor as required by the FBI Guidelines. Nor did he try to obtain the testimony of the victims or conduct any other investigation. Instead, he told Bulger of the charges.

In January 1984, Joseph Lundbohm was a Boston Police Detective. Lundbohm Sept. 29, 1998 Tr. at 112–18. Lundbohm's niece, Julie Rakes, and her husband Stephen had recently bought a liquor store in South Boston. *Id.* at 116.

Bulger and Flemmi evidently decided that the store would be an excellent hub for their activities. They, and Kevin Weeks, visited the Rakes and said they wanted to buy the liquor store. *Id.* The Rakes told them that it was not for sale. *Id.* Flemmi responded by pulling out a gun, commenting on how lovely the Rakes' young child was, and reiterating that they were going to buy the liquor store. *Id.* at 116–17.

The Rakes sought Lundbohm's assistance, telling him what occurred. *Id.* at 116. Lundbohm knew that Bulger and Flemmi were reputed to be dangerous members of organized crime. *Id.* at 138. He felt that the FBI would be the most appropriate law enforcement agency to investigate the ongoing extortion. *Id.* at 134. He did not know that Bulger and

Flemmi were FBI informants, or that Connolly was their handler. *Id.* at 123, 145.

Lundbohm was acquainted with Connolly professionally, knew that he was involved in investigating organized crime and, with the Rakes' consent, decided to speak with Connolly in an effort to prompt an FBI investigation. *Id.* at 118. Lundbohm related to Connolly what the Rakes had told him. *Id.* at 119. Connolly asked whether the Rakes would "wear a wire" to record conversations with Bulger, Flemmi, and Weeks. *Id.* at 119, 126. Lundbohm indicated that he would advise them not to do so. *Id.* Connolly responded that he would take the information, but did not feel that there was much that the FBI could do. *Id.*

Connolly made no record of the information Lundbohm had provided to him. Nor did he disclose it to Ring, who had become the Acting Supervisor of the Organized Crime squad in January 1983. Ring June 4, 1998 Tr. at 44.

Connolly did, however, tell Bulger of his conversation with Lundbohm. Bulger subsequently urged the Rakes to "back off." Lundbohm Sept. 29, 1998 Tr. at 122. Lundbohm correctly inferred that Bulger had learned that the Rakes had been trying to generate an FBI investigation of him. *Id.* at 122, 139–40.

The FBI did not investigate the extortion of the Rakes in any way. More specifically, Connolly did nothing to attempt to obtain the testimony of Mr. and Mrs. Rakes. Nor did he do anything else to acquire evidence of the effort of Bulger and Flemmi to frighten them into selling their liquor store.

In any event, the extortionate scheme succeeded. The Rakes reluctantly sold their liquor store to Bulger and Flemmi. *Id.* at 117. It was re-named the South Boston Liquor Mart, and in the near future became a focus of the investigative efforts of several law enforcement agencies, not including the FBI.

### 16. *Greenleaf Becomes SAC and Ring Becomes Supervisor of the Organized Crime Squad*

In November 1982, James Greenleaf became the FBI SAC in Boston. Greenleaf Jan. 8, 1998 Tr. at 7. He served in that capacity until December 1986. *Id.* While the SAC, Greenleaf delegated the responsibility for recommending the opening and closing of informants to the agent who was his handler. *Id.* at 171–72. The handler, acting in concert with his supervisor, was also given the responsibility for any review of the informant's status that became necessary. *Id.* As described earlier, in this period the Attorney General's Guidelines, which had been incorporated in the FBI's Manual, required that the SAC himself make certain decisions, including, after consultation with the United States Attorney, whether to authorize extraordinary criminal activity involving a "serious risk of violence," and "reviewing all such criminal activity at least every 90 days." Ex. 274 (Under Seal), Manual § 137 F.(2) and (3) (1–12–81). Greenleaf's approach, however, had the practical effect of delegating these responsibilities, among others, to an informant's handler and his supervisor.

While SAC, Greenleaf knew that Bulger was an FBI informant. Greenleaf Jan. 8, 1998 Tr. at 136–38. He also knew that although Flemmi may have been technically closed as an informant, he was constantly in the company of Bulger and was regularly providing information to the FBI. *Id.* Greenleaf was well aware that Connolly was the handler for both Bulger and Flemmi. *Id.* Consistent with his usual practice, Greenleaf generally relied on Connolly and his supervisor to deal with Bulger and Flemmi, and with any matters relating to them. *Id.* at 136–40.

In January 1983, Greenleaf made James Ring the Supervisor of the Organized Crime squad. Ring June 4, 1998 Tr. at 44. Ring held that position until he retired in 1990. *Id.* When replaced by Ring, Morris became the FBI Supervisor of the new, interagency Organized Crime Drug En-

forcement Task Force ("OCDETF"). Morris Apr. 21, 1998 Tr. at 14.

In the course of the transition, Morris spoke with Ring about Bulger and Flemmi. Morris Apr. 29, 1998 Tr. at 65–66; Ring June 10, 1998 Tr. at 34–36. Morris told Ring that, in his opinion, Bulger and Flemmi "had outlived their usefulness." Morris Apr. 29, 1998 Tr. at 66, Apr. 30, 1998 Tr. at 91. Morris recognized that Bulger and Flemmi "looked like they were going to do a pretty good number on the LCN" and would, as a result, become more powerful in the criminal community. Morris Apr. 29, 1998 Tr. at 66. Thus, Morris suggested that Ring terminate Bulger and Flemmi as sources. *Id.*[36]

Ring did not, however, seek to have Bulger closed as an informant. Rather, on February 23, 1983, he approved a memorandum, prepared by Connolly, to FBI Headquarters recommending that Bulger be elevated to Top Echelon informant status. Ex. 11; Ring June 11, 1998 Tr. at 22–24. Although the memorandum was captioned as coming from the SAC, pursuant to his normal practice of relying on subordinates with regard to informant matters, Greenleaf did not see it. Greenleaf Jan. 8, 1998 Tr. at 140.

The memorandum characterized Bulger as "one of the most highly placed and valuable informants in the Boston Division." Ex. 11. The memorandum then explained that:

> [Bulger] is the titular head of the Winter Hill Mob and as such sits as an equal at the policy making level with major Boston LCN figures, to include Gennaro Angiulo, Underboss of Raymond Patriarca, and Boston Capo Illario Zannino, a/k/a Larry Baione. To date, this source has been utilized in six (6) successful affidavits in support of six (6) applications of court authorized electronic surveillances under the provisions of

Title III. These electronic surveillances involved matters targeting the LCN at the policy making level. One of the two cases in which electronic surveillance has been utilized has been characterized by FBIHQ officials as "one of the most important and successful Title III's conducted by the FBI in the past ten years." Information provided by source has run the gamut from identifying individuals who have been marked for execution by the LCN, allowing law enforcement to advise these individuals of their status, to providing information on policy changes in the Boston–Providence LCN structure to include the recruiting of new LCN members.

> UACB, captioned source will be converted to [Top Echelon] status and will continue to be targeted for ever increasing productivity.

Ex. 11.

On May 26, 1983, Connolly wrote a memorandum to "SAC Boston (ATTN Acting Supervisor J.A. Ring)," requesting a determination of whether Flemmi would imminently be indicted as a result of the Wheeler–Callahan investigations or in the case arising from electronic surveillance at 98 Prince Street. Ex. 55. Connolly based his request on the fact that Flemmi "continues to voluntarily furnish sensitive information of an extremely high quality." *Id.*

As indicated earlier, no action was taken immediately on Connolly's request. Nevertheless, Connolly was correct in contending that Flemmi was continuing to provide very valuable information to the FBI.

For example, on February 1, 1983, Flemmi told Connolly that Gennaro Angiulo could normally be found at Francesco's Restaurant on Monday, Tuesday, and Friday nights. Exs. 79, 172. Flemmi also furnished a drawing that he had made of

---

**36.** In 1988, SAC James Ahearn asked Morris if he ever recommended that Bulger and Flemmi be closed as informants because they had "outlived their usefulness." Morris Apr. 30, 1998 Tr. at 89–90, 111–12. Morris now admits that he lied when he denied he had done so. *Id.,* Morris Apr. 28, 1998 Tr. at 82.

the restaurant, including the back room where Angiulo sat. Ex. 172. In addition, he reported on eleven people who met with Angiulo at Francesco's, including, according to the 209, Flemmi himself, who was described as being with "a young, good looking girl." Exs. 79, 172. Angiulo was indicted in September 1983. *See United States v. Angiulo,* 755 F.2d 969 (1st Cir. 1985). The FBI arrested him at Francesco's.

On February 1, 1983, Flemmi also told Connolly that Zannino regularly met members of his regime and others on Monday and Tuesday evenings at the Bella Napoli restaurant. Ex. 171. Once again, Flemmi provided a diagram of the restaurant, indicating where Zannino sat to conduct business. *Id.* Flemmi reported, however, that Zannino had become more careful about discussing criminal matters, but still did so freely in Domenic Isabella's automobile. *Id. See also* Ex. 237 (209s dated 2/23/83 and 5/17/83). Both Flemmi and Bulger were used as sources in the successful August 1983 application for a warrant to conduct electronic surveillance of Isabella's car. Coffey Aff., Apr. 9, 1997, ¶ 3.C.

In the fall of 1983, Connolly and Morris had dinner with Bulger and Flemmi at Flemmi's parents' home in South Boston. Flemmi Aug. 20, 1998 Tr. at 97–98. The LCN was, as always, discussed. Flemmi Aug. 20, 1998 Tr. at 64. The timing of the meeting suggests that the occasion was a celebration of the Angiulo indictments.

If that meeting was a celebration of the Angiulo indictments, Ring, who was then the head of the Organized Crime squad and Connolly's supervisor, was not invited. This may have been because Ring had criticized Connolly for bringing him to another meeting at Flemmi's parents' home. Ring June 10, 1998 Tr. at 94–97.

By the fall of 1983, Ring had met Bulger and Flemmi twice. Flemmi Aug. 20, 1998 Tr. at 80–84. The first time Ring went with Connolly to Bulger's apartment. *Id.* at 81–82. The second meeting involved a dinner that Connolly arranged at Flemmi's parents' home. *Id.* at 82–84.

Ring used these occasions, in part, to observe and evaluate Connolly's interaction with Bulger and Flemmi, and did not like what he saw. Ring June 10, 1998 Tr. at 87–100. Ring considered the meeting at Flemmi's parents' home to be "extraordinary," "stupid," and "not an appropriate way to be dealing with informants." *Id.* at 94–95. Ring particularly felt that it was improper for FBI agents to meet with sources in the presence of third parties. This feeling was heightened when Bulger's brother, William, who was the President of the Massachusetts Senate and lived next door to the Flemmis, came to visit while Ring and Connolly were there. *Id.* at 92–93.

Ring perceived that Connolly was treating Bulger and Flemmi like "friends" or "consultants" rather than as informants. Ring June 22, 1998 Tr. at 51–52. For example, Connolly was giving Bulger and Flemmi information and asked Ring to do the same. *Id.* Ring expressed to Connolly his concern about what he had observed, and his view that the meeting at Flemmi's parents' home was particularly inappropriate. Ring June 10, 1998 Tr. at 95–97, June 22, 1998 Tr. at 51–52.

Ring did not, however, discipline Connolly or alter his responsibilities concerning Bulger and Flemmi. June 10, 1998 Tr. at 96. Nor did Ring then advise the SAC of what had occurred and the problems that he perceived. *Id.* at 98. Moreover, while it was generally Ring's practice to require agents under his supervision to obey the requirement, set forth in the FBI Manual, that all contacts with an informant be recorded promptly on a 209 even if no positive information was received, there is no 209 relating to the meeting that Ring attended at Flemmi's parents' home. Ring June 15, 1998 Tr. at 59–60, June 10, 1998 Tr. at 97–98. In addition, Ring did not make a record of his admonitions to Connolly. Ring June 10, 1998 Tr. at 97–98.

In 1983 and 1984, Ring knew that Bulger and Flemmi were engaged in "a whole host of criminal activities." Ring June 11, 1998 Tr. at 24. Indeed, Ring expected them, and other informants, to be involved in criminal activity. *Id.* at 92. Ring felt that the Informant Section at FBI Headquarters was well aware, from the opening teletypes, of the range of criminal activity in which Bulger and Flemmi were involved and their status in the criminal community. Ring Sept. 22, 1998 Tr. at 42–45. Headquarters asked no questions and Ring did not perceive a need to provide updated information on Bulger and Flemmi's criminal activities. *Id.*

Shortly after becoming Supervisor of the Organized Crime squad, Ring considered the implications of the Attorney General's Guidelines for Organized Crime informants. Ring June 19, 1998 Tr. at 134. He also discussed this subject with Morris. *Id.* at 135. Ring felt that the Guidelines process for providing authorization to an informant to commit crimes was not feasible for Organized Crime informants, in part because utilizing it would, as he understood it, require discussion and disclosure of the informant's identity. *Id.* at 134–37. Morris told Ring that seeking authorization for criminal activity of Organized Crime informants was not "worth the aggravation." *Id.* at 135. Ring agreed. *Id.*

In Ring's view, the FBI knew its informants were engaged in criminal activity, but they were not authorized to commit crimes. *Id.* Thus, if someone caught them, they were subject to prosecution. *Id.* Ring did not interpret the Guidelines as requiring that he report information he learned about crimes committed by informants for the Organized Crime squad to other, interested law enforcement agencies, or to FBI Headquarters and the Assistant Attorney General. Rather, he believed that he was only required to tell Headquarters if an informant was arrested, indicted, or targeted in an order authorizing electronic surveillance. Ring June 22, 1998 Tr. at 17–18.

Although Ring did not regard his squad's informants as authorized to engage in criminal activity, he believed that it would have been unfair and improper for the government to attempt to use information that a source provided against him. Ring June 22, 1998 Tr. at 46–52. He also felt that it would be unwise, because if an informant perceived that the FBI might use information he provided against him, he would quickly cease serving as a source. *Id.* at 49–50. In any event, Ring never participated in any discussion in which Bulger and Flemmi were told that the information that they were providing could be used against them. *Id.* at 50. Nor did he see any document indicating that they had been given such a warning. *Id.*

As indicated earlier, the record does include documents certifying that at various times Connolly gave Bulger and Flemmi the annual warnings required by the Attorney General's Guidelines, including the warning that they were not protected from prosecution for any criminal activity unless it was authorized by the SAC or a Supervisor. Ex. 43; Gianturco Jan. 20, 1998 Tr. at 151–53. Flemmi denies that he ever received any such warning. Flemmi Aug. 28, 1998 Tr. at 133. The compelling evidence of the FBI's enduring, assiduous effort to cultivate in Bulger and Flemmi the sense that they were "friends," "consultants," and allies rather than informants, among other things, persuades the court that Flemmi's contention is correct.

Bulger and Flemmi never discussed with Ring whether their relationship with the FBI would afford them any protection or immunity. Ring Sept. 18, 1998 Tr. at 126–29. Ring did not tell them that they had immunity or would be protected. *Id.* Nor did he express to them his view that if they were caught engaging in crime, they were "on their own," meaning subject to prosecution. Ring June 19, 1998 Tr. at 144. The protection that the FBI would provide its valuable sources was an issue

that Rico, Connolly, Morris, Flemmi, and Bulger were comfortable discussing with each other. This was not true, however, with regard to Ring, Bulger, and Flemmi.

After having some experience as the Supervisor of the Organized Crime squad, Ring recommended to Greenleaf that a new, Non–Traditional Organized Crime squad be established. Ring June 11, 1998 Tr. at 98, June 22, 1998 Tr. at 54–55. Greenleaf agreed and formed the new squad.

From Ring's perspective, the new squad had several advantages. It made it proper for him to focus his squad's work exclusively on the LCN. Ring June 22, 1998 Tr. at 54–55. It also removed responsibility for investigations of Bulger and Flemmi from his squad, which Ring felt would insulate him and the FBI from the criticism that their handlers could not be trusted to investigate Bulger and Flemmi, but rather would compromise the investigations of their informants of which they became aware. *Id.*

While Ring believed that it was not proper for Bulger and Flemmi's handlers to be investigating them, he felt it was permissible for others in the FBI to do so. Ring June 22, 1998 Tr. at 47. As a practical matter, however, the creation of the new squad did not imperil Bulger and Flemmi. Instead, as set forth below, when members of that squad received reliable information about criminal activity in which Bulger and Flemmi were engaged, they regularly consulted Connolly and then did not pursue any investigation. Among those who participated in the process of consulting Connolly and then deferring to the commitment he had made to protect Bulger and Flemmi were: ASAC Larry Potts, Supervisory Special Agent Bruce Ellavsky, Rod Kennedy, and John

Newton concerning the extortion of Raymond Slinger; James Blackburn regarding the extortion of a drug dealer; and James Lavin regarding guard rails constructed by the City of Boston on the property of the South Boston Liquor Mart. As described below, contrary to FBI policy and practice, the important information provided by Slinger was never documented and Lavin did not place the evidence he had received in the FBI's files. Ring, however, never knew of any of this. Ring June 11, 1998 Tr. at 98–100, June 22, 1998 Tr. at 54–57.[37]

### 17. *The 1984–85 Electronic Surveillance*

In 1984 and 1985, the DEA and the FBI were authorized by a series of court orders to engage jointly in electronic surveillance targeting Bulger and Flemmi. The investigation was initiated by the DEA. The DEA agents involved preferred not to collaborate with the FBI, primarily because they, and the Assistant United States Attorney working with them, believed that Flemmi and Bulger were FBI informants and that the Bureau would compromise the confidentiality of the investigation to protect its sources. The Bureau preferred not to participate because it viewed the endeavor as doomed to fail and expected that, as with the Lancaster Street Garage investigation, the FBI would be blamed. The two agencies became reluctant collaborators, however, when it was recognized that the FBI's participation was essential if judicial authorization to conduct electronic surveillance was to be sought and received because most of the information to be relied upon in the applications to establish probable cause involved gambling and loansharking—crimes that the FBI

---

**37.** The Non–Traditional Organized Crime squad did not initiate any investigations of Bulger and Flemmi. As described in § II.26, *infra*, the Non–Traditional Organized Crime squad did continue an investigation targeting Flemmi, among others, that was begun by agents who were under Ring's supervision

and who were later transferred. That investigation of Flemmi, however, was frustrated when Morris, who was then the supervisor of the Non–Traditional Organized Crime squad, and Connolly tipped Flemmi off concerning it.

rather than the DEA had the federal responsibility to investigate.

The applications for the court orders authorizing the electronic surveillance of Bulger, Flemmi, George Kaufman, and others not only relied heavily on the evidence cited to establish that there was probable cause to believe that they were committing offenses within the investigatory jurisdiction of the FBI, but also clearly conveyed the impression that the FBI would utilize any evidence obtained to attempt to develop prosecutable cases concerning matters within its jurisdiction. The Bureau, however, had no intention of doing so. The FBI was well aware, from information provided by Bulger, Flemmi, and others, that Bulger and Flemmi were engaged in illegal gambling, loansharking, and extortion. The FBI considered such criminal conduct to be essential to maintaining the credibility necessary for Bulger and Flemmi to continue to obtain and provide vital information on the LCN and others. The FBI was committed to honoring its promise of confidentiality to Flemmi and Bulger by not disclosing that they were sources, explicitly or implicitly. Explaining to the DEA, the prosecutors, or the court, that the Bureau was not interested in obtaining or using any intercepted evidence of their criminal conduct would have effectively confirmed that they were informants.

Ring, who was at the hub of the matter for the FBI, felt that Flemmi and Bulger had no immunity and would be "on their own" if the DEA could develop a prosecutable narcotics case against them based on the electronic surveillance. Armed with information provided by colleagues, however, Connolly contributed to assuring that DEA's efforts would not succeed by alerting Bulger and Flemmi to the investigation generally and to the electronic surveillance particularly.

As described in detail below, the FBI, blinded by its determination not to confirm for the United State Attorney or the DEA the accuracy of their understanding that Bulger and Flemmi were FBI informants, recklessly disregarded the government's legal obligation of candor to the court when applying for authority to conduct electronic surveillance in what was represented to be a joint investigation. At the same time, believing that Bulger and Flemmi were FBI informants, but accepting that the FBI would not confirm or discuss their status, the DEA and the United States Attorney's Office recklessly disregarded their legal obligation to seek from the FBI information that, if shared with them, would have resulted in the applications for electronic surveillance now at issue not being filed, let alone approved by the court. The DEA and United States Attorney's Office also acted with reckless disregard for the truth when they filed an application for a warrant that in effect represented that electronic surveillance was necessary to obtain evidence that the FBI would use in a Title 18 investigation of Bulger, Flemmi, and others because the prosecutor who was the applicant and the DEA agent who was the affiant did not believe that the FBI would conduct any such investigation. As a result, the applications for the 1984–1985 electronic surveillance targeting Bulger and Flemmi failed to include the "full and complete statement" describing the necessity for its use that was required by Title III.

More specifically, if submitted by a properly informed applicant, the applications should have included certain material facts about the targets, including the following. As informants Bulger and Flemmi had made statements about their illegal gambling and loansharking that the government now claims can be used as evidence against them. A review of their files would indicate to the FBI that they were tacitly authorized to engage in such activities and, therefore, the conduct which the government was seeking to investigate may not have been criminal. In any event, the FBI did not intend to use any evidence generated by the electronic surveillance in an attempt to develop a prosecutable case

against its sources or any of the other named targets, including George Kaufman. Moreover, the FBI agent who was most knowledgeable believed that Bulger and Flemmi were not involved in narcotics crimes, but may have mistakenly given that impression while seeking information for the Bureau. No reasonable judge would have granted any request to target Bulger and Flemmi based on an application containing this information.

The DEA honestly and earnestly wished to conduct an investigation that it hoped would result in the successful prosecution of Bulger and Flemmi for narcotics offenses. The Department of Justice would not have allowed the submission to the court of an application that it knew was misleading. Nor would it have, over the FBI's inevitable objection, permitted disclosure to the court, and possibly to potential defendants, of the fact that Bulger and Flemmi were FBI informants. If, however, an application were filed seeking authority to intercept Bulger and Flemmi to obtain evidence of drug offenses only, the initial request concerning Bulger would have been obviously unmeritorious because there was not probable cause to believe that he would be intercepted discussing anything on Kaufman's telephone. In addition, the request concerning Flemmi would have been denied as well because there was not probable cause to believe that Flemmi would be discussing narcotics matters on Kaufman's telephone. Nor was there probable cause to believe that Kaufman would be discussing drug offenses with anyone.

Thus, but for the material omissions caused by the government's reckless disregard for the truth and for the obligations imposed by Title III and the Constitution, the warrants for the 1984–85 electronic surveillance would not have issued. The facts on which this conclusion rests are set forth below.

By 1984, Bulger and Flemmi were considered by the Boston law enforcement community to be "well known organized crime figures." Ex. 140. With the LCN diminished by the indictments of Angiulo, Zannino, and their colleagues, Bulger and Flemmi were also regarded as increasingly powerful and dangerous. Thus, in late 1983, the DEA decided to attempt to develop the information, and obtain the resources, necessary to conduct electronic surveillance of Bulger and Flemmi. Reilly May 19, 1998 Tr. at 114.

Stephen Boeri and Albert Reilly were designated as the DEA case agents for the investigation. Boeri May 14, 1998 Tr. at 28–29, 39–40. Assistant United States Attorney Gary Crossen was later assigned to work with them. Crossen had recently become an Assistant United States Attorney after serving as an Assistant District Attorney for Suffolk County. Crossen May 11, 1998 Tr. at 132.

Boeri, Reilly, and Crossen shared a genuine interest in investigating Flemmi and Bulger. Crossen May 11, 1998 Tr. at 143, May 12, 1998 Tr. at 131. It was not clear, however, whether they could obtain the necessary resources or judicial authorization for electronic surveillance, which was an essential part of their plan. Stutman Apr. 14, 1998 Tr. at 12. The government must invest considerable manpower and money for a prolonged period of time to conduct electronic surveillance. Stutman Apr. 15, 1998 Tr. at 68; Reilly May 19, 1998 Tr. at 143–46. In this case, it was initially expected that the investigation would take at least a year. Stutman Apr. 14, 1998 Tr. at 69. The approval of DEA Headquarters was needed to conduct such a lengthy investigation with uncertain prospects. *Id.* If approved, resources would have to be found and committed to fund it. Reilly May 19, 1998 Tr. at 133–34. Moreover, many months would have to be devoted to attempting to obtain the information necessary to receive authorization from the Department of Justice to apply for a judicial warrant to conduct electronic surveillance, and to make a compelling case for the issuance of such an order.

At the outset of their investigation, Boeri and Reilly were convinced that Bulger and Flemmi were FBI informants. Stutman Apr. 15, 1998 Tr. at 36–37; Reilly May 19, 1998 Tr. at 123; Kennedy Apr. 14, 1998 Tr. at 143–44. Crossen also believed that Bulger and Flemmi were "in the FBI stable of informants." Crossen May 11, 1998 Tr. at 149–50. Crossen, Boeri, and Reilly had all been told about the Lancaster Street Garage experience. Crossen May 12, 1998 Tr. at 114; Boeri May 14, 1998 Tr. at 67–70; Reilly May 19, 1998 Tr. at 123–24; Ex. 146. This contributed to their belief that Bulger and Flemmi were not only FBI sources, but informants that the FBI wished to protect. They felt, however, that serving as an informant did not prevent an individual from being investigated and prosecuted if he were also committing crimes. Crossen May 13, 1998 Tr. at 28–29; Boeri May 14, 1998 Tr. at 70.

Their belief that Bulger and Flemmi were highly valued FBI informants presented Crossen, Boeri, and Reilly with a dilemma. In planning their investigation they hoped to develop sufficient evidence that Bulger and Flemmi were involved in gambling and extorting money from drug dealers to obtain a warrant for electronic surveillance targeting them in order to acquire evidence of those crimes, as well as narcotics offenses. Crossen May 11, 1998 Tr. at 151–52, May 13, 1998 Tr. at 52–53; Boeri May 14, 1998 Tr. at 41, 64. Crossen believed that the investigation generally, and any effort to obtain a court order to conduct electronic surveillance particularly, would have to include a law enforcement agency with the authority to investigate for possible prosecution gambling and other, relevant non-narcotics offenses because evidence of such offenses was expected to be overheard. Crossen May 13, 1998 Tr. at 90–91. *See* 18 U.S.C. § 2516(1) (1994) ("judge may grant ... an order authorizing or approving the interception of wire or oral communications by the Federal Bureau of Investigation, or a Federal agency having responsibility for the investigation of the offense as to which the application is made ...").

It was also understood by Crossen, the DEA agents, and their SAC, Robert Stutman, that the DEA did not have the authority or federal responsibility to investigate non-narcotics offenses. Crossen May 13, 1998 Tr. at 151–53; Boeri May 14, 1998 Tr. at 61–63; Stutman Apr. 15, 1998 Tr. at 14. Rather, the FBI was the federal agency that had the jurisdiction and responsibility to investigate gambling, loan-sharking, extortion, and other conduct constituting federal crimes under Title 18 of the United States Code. *Id.* Crossen and his colleagues recognized, however, that the Massachusetts State Police were also empowered to investigate gambling, loan-sharking, and extortion, which are crimes under the laws of Massachusetts as well as federal offenses. Crossen May 11, 1998 Tr. at 152.

Boeri and Reilly had a strong preference for working with the Massachusetts State Police rather than the FBI. In 1984, the FBI and DEA had an unhappy history as rivals. Ahearn May 11, 1998 Tr. at 117–19; Crossen May 13, 1998 Tr. at 813. The FBI, particularly, had traditionally been unwilling to share information or otherwise collaborate with other federal law enforcement agencies. *Id.*; Reilly May 19, 1998 Tr. at 123. This culture had generated difficulties and tensions between the FBI and the DEA, among others. Ahearn May 11, 1998 Tr. at 117–18; Stutman Apr. 18, 1998 Tr. at 85. Thus, Boeri and Reilly were generally reluctant to attempt to work jointly with the FBI. Reilly May 19, 1998 Tr. at 123. This predilection was strongly reinforced by their fear that if the FBI was told of their investigation, the Bureau would seek to subvert it by informing Bulger and Flemmi. Reilly May 19, 1998 Tr. at 125, May 20, 1998 Tr. at 115–16.

Shortly before 1984, however, the FBI had been given jurisdiction concurrent with the DEA's to investigate drug offenses. Ahearn May 11, 1998 Tr. at 118.

In connection with this, the Department of Justice was actively promoting greater cooperation between the FBI and the DEA. McCurnin Sept. 15, 1998 Tr. at 79–80. Stutman Apr. 15, 1998 Tr. at 85; Boeri May 14, 1998 Tr. at 70–71. Francis Mullen, a former FBI official, was made the Administrator of the DEA. McCurnin Sept. 15, 1998 Tr. at 98. John McCurnin, who had formerly been Sean McWeeney's deputy in the Organized Crime Section of the FBI, served as Mullen's Executive Assistant and was responsible for coordinating major matters with the FBI, particularly with McWeeney. *Id.* at 79–80. The Organized Crime Drug Enforcement Task Force was established to institutionalize the new policy of cooperation. Crossen May 13, 1998 Tr. at 83. The United States Attorney, William F. Weld, and the FBI and DEA SACs, Greenleaf and Stutman, were committed to the effort to enhance cooperation. Stutman Apr. 15, 1998 Tr. at 85–86.

Reilly, however, urged Stutman not to try to involve the FBI in the investigation of Bulger and Flemmi. Reilly May 19, 1998 Tr. at 123–25; Stutman Apr. 14, 1998 Tr. at 85. Reilly argued that the FBI would not share information, its technical expertise in installing bugs was not essential, and there was an unacceptable risk that DEA's efforts would be undermined because the FBI would compromise the investigation to protect its informants. *Id.* Nevertheless, Stutman saw the investigation of Bulger and Flemmi as an opportunity for the collaboration between the DEA and the FBI that was being encouraged. *Id.*

Stutman discussed the situation with Weld. Weld May 26, 1998 Tr. at 23–31. It was Weld's understanding that Bulger and Flemmi had served as sources for the FBI, and had provided some of the information necessary to obtain the court orders for electronic surveillance of 98 Prince Street and 51 North Margin Street. *Id.* at 21–22. He had also heard that the FBI, particularly Connolly, was suspected of having told Bulger and Flemmi of the bug at the Lancaster Street Garage. *Id.* at 22–23, 34–35. Weld understood, however, that the FBI's "official line" was to deny that Bulger and Flemmi were informants. *Id.* at 21.

Stutman and Weld discussed two issues. First, Stutman wanted to know if the United States Attorney would support the DEA's effort to investigate Bulger and Flemmi, and to utilize electronic surveillance as a key component of that investigation. *Id.* at 29. Weld said he would "back [DEA] up" and that the investigation could proceed with his support. *Id.*

Second, Stutman and Weld discussed whether the FBI should be involved in the electronic surveillance that was being planned or whether the Bureau was so close to the targets that there would be an unacceptable risk that the investigation would be compromised if it was included. *Id.* at 25. Weld knew that his prosecutors shared the DEA agents' deep doubts about working with the FBI in any investigation of Bulger and Flemmi. *Id.* at 28. Weld and Stutman agreed, however, that Greenleaf should be asked to have the FBI participate in the investigation and, particularly, in the hoped for electronic surveillance. *Id.* at 30.

In about April 1984, Stutman met with Greenleaf and explained that the DEA planned to conduct a major investigation, including electronic surveillance, of Bulger and Flemmi in which it wanted the FBI to participate because it was expected that the investigation would develop information concerning crimes that were within the jurisdiction of the FBI rather than the DEA. Stutman Apr. 14, 1998 Tr. at 10–18, 22, 82; Greenleaf Jan. 8, 1998 Tr. at 37–38, 66–69, 195–96. Stutman provided Greenleaf with detailed information about the investigation to date, including a description of the information that he felt should be of active interest to the FBI. Greenleaf Jan. 8, 1998 Tr. at 125, 195; Stutman Apr. 14, 1998 Tr. at 12. Stutman would have given Greenleaf any additional information

that he requested. Stutman Apr. 14, 1998 Tr. at 90. Greenleaf did not, however, ask for more details or immediately respond to Stutman's request.

At about the same time, Weld also met with Greenleaf. Weld May 26, 1998 Tr. at 31. Weld too asked Greenleaf if the FBI would participate in the investigation and any electronic surveillance of Bulger and Flemmi. *Id.* at 33. Greenleaf said he would have to get back to Weld. *Id.* In view of Greenleaf's usual enthusiasm for major investigations, Weld found his response to be so "odd" that it strengthened his sense that Bulger and Flemmi may have been FBI informants. *Id.*

About a week later, Greenleaf told Weld that the FBI would not be able to participate in the investigation of Bulger and Flemmi. *Id.* at 37–40. Weld was surprised. *Id.* at 45. Although the conversation was brief, Weld inferred that Greenleaf had consulted FBI Headquarters and determined that the FBI did not want to participate because of the risk that its involvement would result in the disclosure of the fact that Bulger had been an FBI informant and a source for the electronic surveillance that targeted Angiulo and Zannino. *Id.* at 40. Greenleaf did not, however, discourage Weld from pursuing the investigation of Bulger and Flemmi. Weld May 27, 1998 Tr. at 71.

Weld told Stutman of Greenleaf's response. Weld May 26, 1998 Tr. at 46. They discussed the possibility that Bulger and Flemmi were FBI sources. Stutman Apr. 14, 1998 Tr. at 71–72. Neither Weld nor Stutman, however, ever asked Greenleaf if either or both were informants, and Greenleaf did not tell them. Stutman Apr. 14, 1998 Tr. at 73; Weld May 26, 1998 Tr. at 133; Greenleaf Jan. 8, 1998 Tr. at 195. Rather, Weld and Stutman simply accepted the fact that the FBI would not identify its informants, even to trusted colleagues in the Department of Justice with a legitimate need to know. Stutman did not ask Greenleaf if Bulger and Flemmi were FBI informants because Stutman knew that, "it

would have required [Greenleaf] either lying about it or saying 'I can't tell you.'" Stutman Apr. 14, 1998 Tr. at 73. Similarly, Weld never asked the FBI to identify an informant because, if he did, he "would have expected [the FBI] to tell [him] to go pound sand." Weld May 26, 1998 Tr. at 133.

When approached by Stutman and Weld, Greenleaf immediately recognized that the investigation of Bulger and Flemmi, particularly any electronic surveillance, would present problems for the FBI because Bulger was still open as an informant and both were providing information. Greenleaf Jan. 8, 1998 Tr. at 69–71. Greenleaf consulted several colleagues before deciding how to respond. One was Fitzpatrick, who was the ASAC with responsibility for relations with the DEA. Fitzpatrick May 16, 1998 Tr. at 114–16. In addition, Greenleaf had a meeting which included Ring, in his capacity as chief of the Organized Crime squad, Rod Kennedy, who had been assigned to work with the DEA and knew prior to the meeting that the DEA was attempting to target Bulger and Flemmi, and Kennedy's supervisor on the Drug Squad, who was then Morris. Kennedy Apr. 14, 1998 Tr. at 32–39; Morris Apr. 21, 1998 Tr. at 14, Apr. 23, 1998 Tr. at 123.

The meeting focused on the DEA's interest in electronic surveillance targeting Bulger and Flemmi and whether the FBI should participate in that effort. Kennedy Apr. 14, 1998 Tr. at 32–33, 36–37. Each of the participants knew that Bulger and Flemmi were FBI sources.

Ring did not want the FBI to become involved in the investigation for several reasons. Greenleaf Jan. 8, 1998 Tr. at 74; Ring June 10, 1998 Tr. at 74; Ring June 10, 1998 Tr. at 144–49, 153–55, Sept. 22, 1998 Tr. at 122–28. Ring believed that any suspicion that Bulger and Flemmi were involved in narcotics trafficking was not well-founded, in part because no FBI informant had, to his knowledge, reported

such criminal conduct and in part because Connolly asserted that they would never deal drugs or even allow them in South Boston. Ring June 10, 1998 Tr. at 153–54, Sept. 22, 1998 Tr. at 123–24; Ex. 13. Ring believed that Bulger and Flemmi were engaged in gambling, loansharking, and, perhaps, murder. Ring Sept. 22, 1998 Tr. at 126–27. However, he felt that the DEA's effort was doomed because too many investigators knew about it, and Bulger and Flemmi may have already realized that they were being targeted. Ring June 19, 1998 Tr. at 151–53; Ex. 13. Ring argued that if the FBI agreed to participate, it would be blamed if the investigation failed and, particularly, if it appeared that its confidentiality had been compromised. Greenleaf Jan. 8, 1998 Tr. at 73–74.

Greenleaf decided that the FBI would not join the investigation of Bulger and Flemmi, but would offer technical support and make Kennedy the liaison with the DEA for the purposes of the investigation. Ex. 8; Kennedy Apr. 14, 1998 Tr. at 18, 37. Greenleaf also decided to "compartmentalize" the information that the FBI had received about the investigation. Kennedy Apr. 14, 1998 Tr. 37–38, 46; Greenleaf Jan. 8, 1998 Tr. at 71–72. In essence, Greenleaf wanted the information the FBI received about the investigation of Bulger and Flemmi to be maintained with "a very high level of integrity and security." Greenleaf Jan. 8, 1998 Tr. at 2. As set forth below, this effort failed.

On April 12, 1984, Greenleaf sent FBI Headquarters a teletype concerning Bulger and Flemmi that he designated as "Priority." It said:

SAC, DEA, Boston, has advised that his office currently has requested a special enforcement operation proposal of DEAHQ, which is targeted at a large scale cocaine and marijuana trafficking area. This proposal is a joint investigative effort of DEA and the Quincy, Massachusetts Police Department.

Primary targets in this investigative probe are captioned sources [Bulger and Flemmi] whom DEA alleges are individuals who control this narcotic trafficking group.

DEA anticipates extensive investigation to include surveillances and pen registers to develop need[ed] probable cause for electronic microphone of principals involved in this investigation.

FBI, Boston is not a participant in this investigation, however, SAC, Boston has offered technical assistance to DEA when and if desired and liaison has been established between FBI and DEA in this matter.

As FBIHQ is aware, [Flemmi] is presently closed. At this time, Boston does not feel that [Bulger] should be closed due to past, present and future valuable assistance to the FBI. In addition, at present time DEA allegations are unsubstantiated and DEA has furnished no specific information relative to the involvement of [Bulger] in criminal activities. Boston will follow and advise FBIHQ of pertinent developments.

Ex. 12. Notably, the teletype did not include the information Stutman had provided Greenleaf concerning the gambling, loansharking, and other Title 18 offenses that Bulger and Flemmi were believed to be committing. Nor did it reflect that the FBI had declined a request to join the investigation.

Although FBI Headquarters was informed of the issue of whether Bulger should have been kept open as an informant, the Assistant Attorney General for the Criminal Division, Stephen Trott, was not. As described below, the failure to inform the Assistant Attorney General of the dilemma posed by the information Stutman provided Greenleaf, or indeed of Bulger's earlier admission that he was extorting money from at least one narcotics trafficker, Murray, violated the Attorney General's Guidelines. *See* Ex. 274 (Under Seal), Manual § 137–17(G)(1 & 2) (1–12–81); § 137–16(G)(1 & 2) (3–28–84).

While the Assistant Attorney General was being kept in the dark, Connolly soon learned of the information in the April 12, 1984 teletype. As Bulger's handler, he may have received a copy for Bulger's file. In any event, Ring told Connolly that Bulger and Flemmi might be under investigation by other agencies, but would give him no further details. Ex. 13. He also warned Connolly to be prepared to take a polygraph in the event that there was ever a claim that the confidentiality of any such investigation had been compromised. *Id.*

In addition, McWeeney, the Chief of the Organized Crime Section at FBI Headquarters, who was involved in the issues presented by the Wheeler, Halloran, and Callahan murders, received a copy of Greenleaf's teletype. Ex. 233; Kennedy Apr. 14, 1998 Tr. at 27–34, 40–43, 195. Despite Ring's effort to limit Connolly's knowledge of the DEA's plans, McWeeney told Connolly that the DEA was trying to obtain a wiretap targeting Bulger and Flemmi. Kennedy Apr. 14, 1998 Tr. at 30–34, 40–43.

It is also likely that Morris told Connolly about the investigation targeting Bulger and Flemmi. He had previously disclosed Halloran's allegations about them to Connolly. As discussed, in § II.26, *infra,* he would in 1986 again use Connolly as a conduit to alert Flemmi to a bug aimed at intercepting him. There is no reason to believe that he would have behaved any differently in 1984. Rather, circumstantial evidence suggests that Morris did tell Connolly about the investigation. Morris received his first payment of $1000 from Bulger and Flemmi in June 1982, shortly after causing Connolly to tell them of Halloran's allegations. Morris Apr. 23, 1998 Tr. at 136, 139. He received a second $1000 payment from them, and a case of wine, about two years later, in the spring of 1984. Morris Apr. 29, 1998 Tr. at 65. The timing of this payment suggests that it may have been an expression of Bulger and Flemmi's appreciation for Morris' assistance concerning the DEA investigation.

It is also likely that Kennedy discussed the DEA investigation with Connolly. Beginning in 1984, Kennedy on several occasions discussed with Connolly what would happen if Bulger and Flemmi were ever arrested. Kennedy Apr. 14, 1998 Tr. at 94–99. Kennedy repeatedly told Connolly that he believed that if Bulger or Flemmi were arrested they would divulge their relationship with Connolly and the FBI. *Id.* at 97–98. Connolly regularly responded that he did not have to worry because they were too smart to get caught. *Id.* at 99.

Connolly was relying on more than Flemmi and Bulger's cunning when he told Kennedy that he did not have to be concerned about the problems that would be generated if Bulger or Flemmi were arrested. Connolly knew he would protect them, and himself, by furnishing Bulger and Flemmi any information he could obtain that might help them avoid arrest and prosecution.

The court finds that, consistent with this, Connolly told Bulger and Flemmi that the DEA investigation had been initiated and advised them of the information he obtained concerning its progress. Flemmi admits some, but not all of this.

Flemmi acknowledges that the FBI warned him and Bulger that they were under investigation. Flemmi Aug. 24, 1998 Tr. at 20. Flemmi claims that in February 1984, he and Bulger "started noticing things" that made them aware that they were under active investigation by the DEA. Flemmi Aug. 20, 1998 Tr. at 84. Flemmi asserts that in 1984 Ring attended some of their meetings with Connolly and told them the DEA was investigating them. *Id.* at 84–87, Aug. 24, 1998 Tr. at 19. Flemmi also claims that in December 1984, Ring called to tell him that a wiretap was about to be placed on George Kaufman's telephone and on his own. *Id.* at 86–87. Ring denies that he told Flemmi about the prospective DEA

wiretaps. Ring Sept. 22, 1998 Tr. at 28–29.

This is a matter on which the court finds that Flemmi's testimony is in part accurate and in part false. More specifically, the credible direct and circumstantial evidence proves that Bulger and Flemmi were told of the investigation generally and of the electronic surveillance particularly. It was, however, Connolly not Ring who gave them this information.

On February 7, 1984, as part of his early investigation, Reilly asked the National Crime Information Center ("NCIC"), which is run by the FBI in Washington, D.C., for a copy of Bulger's criminal record. Ex. 137; Ring June 16, 1998 Tr. at 101–03. At that time, if the subject of such a request was an FBI informant, the Informant Section at FBI Headquarters would be advised of the inquiry, and send notification of it to the informant's handler and his supervisor for inclusion in the informant's file. Ring June 16, 1998 Tr. at 101–05. This practice was followed with regard to Reilly's inquiry concerning Bulger. Ex. 137; May 15, 1998 Tr. at 43. Thus, in February 1984, Connolly learned that the DEA was focusing on Bulger. Based in part on Connolly's previous and future practice, the court infers that he told Bulger and Flemmi about the DEA investigation. It is, therefore, not surprising that in February 1984, they "started noticing things." Flemmi Aug. 20, 1998 Tr. at 84.

In addition, recognizing they were under surveillance, Bulger and Flemmi ceased meeting Connolly at Bulger's apartment in Quincy. Flemmi Aug. 24, 1998 Tr. at 84–85. Instead, they began meeting at Connolly's home in South Boston and later at the apartment of his colleague, John Newton. Id.; Newton May 22, 1998 Tr. at 126–27, June 2, 1998 Tr. at 77, 80.

In 1984, Flemmi maintained regular contact with Connolly and continued to provide valuable information concerning the LCN. For example, he reported that: Raymond J. Patriarca would soon be named to succeed his deceased father as Boss; Joe Russo, who was a fugitive as a result of the Barboza murder was living in Montreal, but being urged by Zannino to return to Boston, where the LCN was being depleted; and Frank Salemme had a potentially violent dispute with Joe "Black" LaMattina, a member or associate of the Patriarca Family. Exs. 19, 237 (209 dated 7/16/84).

Ring did meet with Connolly, Bulger, and Flemmi several times in 1984. Exs. 13, 178. Beginning at some time prior to April 1984, Bulger and Flemmi reported that they were aware that they were under investigation and surveillance. Exs. 13, 14. They also indicated that they had observed intensified law enforcement attention to them in the summer of 1984. Ex. 14.

Flemmi's reaction to the joint DEA, Massachusetts State Police, and Quincy Police Department investigation is significant. Flemmi did not complain to Connolly or Ring that his agreement with the FBI gave him immunity from being investigated by other agencies or from being prosecuted if that investigation were successful. Flemmi Aug. 24, 1998 Tr. at 24–25. This was not Flemmi's understanding. Rather, Flemmi understood that it would be legally permissible for him to be prosecuted as a result of the investigation that was being conducted in 1984 by the DEA, the Massachusetts State Police, and the Quincy Police Department. Id. at 24–26, Aug. 25, 1998 Tr. at 246.

Flemmi believed that the FBI was obligated to protect him by providing him information about investigations that he could use to frustrate them, one way or another. Flemmi Aug. 24, 1998 Tr. at 22–26, Aug. 25, 1998 Tr. at 247. Flemmi now believes that in 1984 and 1985, the FBI provided him with the protection that he had been promised by warning him of the pending investigation and of the electronic surveillance that was part of it. Flemmi Aug. 24, 1998 Tr. at 20, 22–24. According

to Flemmi, the warnings that he received concerning the 1984–85 investigation of him were part of both the FBI's promise to him and of its fulfillment. For example, he testified:

A. [Ring] advised us that there was a telephone tap on my phone. That was in a sense telling me that we were being protected. We were aware of the investigation that was ongoing.

Q. And in your mind was that the FBI's obligation to you?

A. Yes, absolutely. They're notifying me that there's an investigation going on. To me, it says I'm getting protected. I can't think of any other way.

*Id.* at 23–24.

In any event, after Greenleaf declined to have the FBI become a formal participant in the joint investigation in April 1984, the FBI provided some advice and assistance to the DEA. Fitzpatrick discussed the DEA investigation with his counterpart, DEA ASAC Paul Brown. Fitzpatrick Apr. 14, 1998 Tr. at 117. Brown frequently told Fitzpatrick that he knew that Bulger and Flemmi were FBI informants, and claimed that Greenleaf had told Stutman of their status. *Id.* at 124–25. Fitzpatrick regarded Bulger and Flemmi's status as FBI informants as "the worst kept secret in the world." *Id.* at 117. Fitzpatrick told an official at FBI Headquarters that McCurnin, the former FBI official who was the Executive Assistant to the Administrator of the DEA, knew that Bulger was an FBI informant. Ex. 233; McCurnin Sept. 15, 1998 Tr. at 85, 89. Nevertheless, Fitzpatrick joined Greenleaf in urging that Bulger not be closed as an informant. Ex. 233.

Kennedy, who was the FBI's liaison agent to the DEA in Boston, also discussed the ongoing DEA investigation with his counterparts, Boeri and Reilly. They too said they believed Bulger and Flemmi were FBI informants. Kennedy May 14, 1998 Tr. at 143–44. Kennedy, however, did not confirm this. *Id.* at 160.

The DEA agents asked Kennedy for any information which the FBI had that would support the application for electronic surveillance of Bulger and Flemmi that was being prepared. *Id.* at 102–04, 119, 208. Kennedy told them that there were two FBI sources who said that Bulger and Flemmi were extorting money from drug traffickers. *Id.* at 208; Ex. 45. Both sources, he said, reported that Hobart Willis and Joseph Murray, who controlled the recently raided South Boston warehouse in which fifteen tons of marijuana were seized, were associated with Bulger. Ex. 45. Kennedy also advised that one source stated that Willis and Murray were not required to pay Bulger, but that "every other 'bookie' and drug dealer in the Boston area [was] paying 'tribute' to [him]." *Id.* As described earlier, however, Kennedy did not tell the DEA agents that Bulger himself had told Connolly that he had received $60–90,000 in drug money from Murray. *Id.*; Kennedy Apr. 14, 1998 Tr. at 62–63, 79, 115, 121–29.

In November 1984, several FBI agents with specialized, technical expertise in installing microphones came to Boston to advise the DEA on installing a bug in Bulger's automobile, and condominium, each of which had sophisticated alarms. Ex. 146; Reilly May 20, 1998 Tr. at 10–12, 35–36. The FBI experts, however, reported that it was not possible to bug either Bulger's vehicle or residence. *Id.* This reinforced Reilly's view that the FBI was determined to protect its informants. Reilly May 20, 1998 Tr. at 37. Although they had no specialized training, Reilly and Boeri later installed listening devices in Bulger's home and automobile. *Id.* at 12, 37.

Prior to October 17, 1984, Greenleaf provided Stutman with information that the FBI was receiving from Bulger and Flemmi indicating their awareness of the investigation targeting them. Exs. 13, 146; Ring June 10, 1998 Tr. at 129–36; Reilly May 20, 1998 Tr. at 35–36, 71; Boeri May 15, 1998 Tr. at 50–51. Greenleaf did not,

however, tell Stutman that Bulger and Flemmi were the sources of the information. Greenleaf Jan. 8, 1998 Tr. at 201–09.

By at least mid-October 1984, the DEA and United States Attorney's Office realized that they faced a difficult dilemma. Boeri May 14, 1998 Tr. at 134–35. They had invested almost a year in conducting an investigation intended to lead to electronic surveillance targeting Bulger and Flemmi. It appeared, however, that the potential for their investigation to succeed in developing prosecutable cases had been seriously diminished because Bulger and Flemmi were well aware that they had been targeted. *Id.;* Ex. 18. It was decided to try to resolve this dilemma by continuing the investigation of Bulger and Flemmi, while attempting to give them the impression that it had been aborted. Reilly May 20, 1998 Tr. at 113–14.

More specifically, the DEA's effort to have the investigation targeting Bulger and Flemmi designated as an Organized Crime Drug Enforcement Task Force case succeeded on November 7, 1984. Ex. 140; Reilly May 19, 1998 Tr. at 143–45. The Organized Crime Drug Enforcement Task Force designation constituted recognition that the investigation of Bulger and Flemmi was a major matter and provided the "big money" necessary to continue it. *Id.* Bulger and Flemmi were the sole named targets of the investigation. Exs. 140, 146. The investigation would not have been authorized or sustained in the hope of merely developing a case against anyone else, including George Kaufman. The DEA believed that "[t]he success of the . . . investigation relie[d] upon the successful installation of a 'car bug' in the BULGER vehicle, and the installation of a 'room bug' in the BULGER residence." Ex. 146. A wiretap on Kaufman's telephone was being contemplated only as a means of obtaining the probable cause necessary to obtain warrants to bug Bulger's car and home. *Id.* The DEA would not have sought authority to tap Kauf-

man's telephone if Bulger and Flemmi were not the targets of that effort.

At the same time, it was decided that in view of the information about Bulger and Flemmi's awareness of the investigation that Stutman had received from the FBI, it was important to reduce the number of people who knew about the investigation in an effort to minimize the risk of leaks and, particularly, to try to give Bulger and Flemmi the impression that it had been ended. Reilly May 20, 1998 Tr. at 113–14; Boeri May 14, 1998 Tr. at 40–41, 90–91. Accordingly, it was decided that the Massachusetts State Police would be cut out of the investigation on the pretext that the effort was being abandoned. *Id.*

As a result, the DEA lost the partner in the joint investigation that had both the authority and experience to investigate gambling and loansharking. Boeri May 18, 1998 Tr. at 40. As described earlier, Crossen believed that any effort to obtain a warrant to conduct such electronic surveillance would require the participation of an agency with the authority to investigate gambling, loansharking, and other nonnarcotics offenses that there was probable cause to believe would be discussed during any electronic surveillance of Bulger and Flemmi. Crossen May 13, 1998 Tr. at 90–91. Crossen also believed that the DEA lacked such authority. Thus, at some point between October and December 1984, the FBI was again asked to participate in the investigation and the proposed electronic surveillance. Boeri May 14, 1998 Tr. at 44–45, 61–65, 72, May 18, 1998 Tr. at 40; Reilly May 19, 1998 Tr. at 118–19.

This time Greenleaf agreed. He assigned the matter to the Organized Crime squad and directed Ring to provide two agents from that squad to work with the DEA on the investigation, including the electronic surveillance. Ring June 10, 1998 Tr. at 117–18, 130.

Ring was not pleased with the arrangement because he continued to be concerned that the FBI would be blamed if, as

he expected, the investigation did not succeed. Carter Aug. 17, 1998 Tr. at 98. Ring decided to discharge his new responsibilities in a way that would minimize the potential for fair criticism of the FBI if and when the investigation failed. Ring assigned two agents who were new to Boston and the Organized Crime squad, Richard Carter and Brian Rossi, to work with the DEA on the electronic surveillance targeting Bulger and Flemmi. Ring June 10, 1998 Tr. at 118, Sept. 22, 1998 Tr. at 106–08, 112; Carter Aug. 17, 1998 Tr. at 47, 97. Neither agent knew that Bulger or Flemmi was an FBI informant. Carter Aug. 17, 1997 Tr. at 97, 101–12. Thus, there was no risk that either would divulge that Bulger and Flemmi were FBI sources.

Ring told Carter and Rossi to stay away from the FBI while they were working with the DEA. *Id.* at 97. Ring also directed them not to tell any member of the FBI what evidence or information was being gathered in the joint investigation. Ring June 10, 1998 Tr. at 117–19, June 19, 1998 Tr. at 154. As these instructions demonstrate, Ring, and the FBI that he represented, had no intention of using evidence obtained by the electronic surveillance in any investigation or prosecution of Flemmi, Bulger, Kaufman, or anyone else for any Title 18 offense, including gambling, loansharking, or extortion. Carter and Rossi obeyed Ring's order and did not provide him with any of the information they acquired while participating, on behalf of the FBI, in the investigation of Bulger and Flemmi. Ring June 10, 1998 Tr. at 119, June 19, 1998 Tr. at 153–54.

Although representatives of the United States Attorney's Office, the DEA, and the FBI were all involved in the decision to have the FBI join the investigation of Bulger and Flemmi, nobody considered the implications of the Bureau's involvement for the necessity portion of the application for a warrant authorizing electronic surveillance targeting Bulger and Flemmi that would soon be filed. Crossen May 12,

1998 Tr. at 29–35; Greenleaf Jan. 8, 1998 Tr. at 227–28; Ring June 22, 1998 Tr. at 81–83; Boeri May 14, 1998 Tr. at 36–37; Reilly May 20, 1998 Tr. at 118. Crossen and Boeri were primarily responsible for preparing the application and the affidavit on which it relied. In December 1984, however, Crossen had no prior experience with federal applications and Boeri had never served as the case agent or affiant in an investigation involving electronic surveillance. Crossen May 12, 1998 Tr. at 21; Boeri May 14, 1998 Tr. at 29–30. Reilly and Boeri did consult O'Sullivan to get advice concerning the procedures to be followed to obtain a warrant for electronic surveillance. Ex. 254. Nevertheless, central requirements of Title III were utterly overlooked or ignored.

More specifically, Title III requires, among other things, that each application for an order authorizing electronic surveillance establish that: there is probable cause to believe that a particular offense is being committed; there is probable cause to believe that the proposed wiretap or bug will intercept evidence of that crime; and electronic surveillance, which is an especially intrusive investigative technique, is necessary. *See* 18 U.S.C. § 2518(1)(b),(c) and (3)(a)(b) and (c). With regard to necessity, the statute states that the application must include:

> (c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

18 U.S.C. § 2518(1)(c) (1994).

As the Court of Appeals for the First Circuit explained in *United States v. Mastroianni,* a decision rendered on October 30, 1984, § 2518(1)(c) requires that the affiant in an application for an order authorizing electronic surveillance obtain relevant information from "all agencies involved in the investigation ..." before representing that electronic surveillance is necessary. *United States v. Mastroianni,*

749 F.2d 900, 910 (1st Cir.1984). As discussed in the Conclusions of Law, § III.2.E, *infra*, the *Mastroianni* decision was not novel. *See, e.g. Franks*, 438 U.S. at 164 n. 6, 98 S.Ct. 2674; *United States v. Dorfman*, 542 F.Supp. 345, 366 n. 18 (N.D.Ill.1982), *aff'd sub nom. United States v. Williams*, 737 F.2d 594 (7th Cir. 1984); *United States v. Tufaro*, 593 F.Supp. 476, 485–86 (S.D.N.Y.1983). Moreover, as a practical matter, in 1984, participants in joint investigations routinely shared relevant information with the DEA without even being asked. Stutman Apr. 15, 1998 Tr. at 146–47, 164.

In this case, however, Crossen, who had a practice of reading First Circuit decisions in criminal cases and should have read the *Mastroianni* decision, did not direct the DEA to consult the FBI concerning the necessity for electronic surveillance targeting Bulger and Flemmi. Crossen May 12, 1998 Tr. at 29–35, May 13, 1998 Tr. at 87–89; Reilly May 20, 1998 Tr. at 6, 116–17; Boeri May 14, 1998 Tr. at 133–34. He essentially relied on Boeri and Reilly to collect the legally required information. Crossen May 13, 1998 Tr. at 85–88.

The DEA, however, relied on the United States Attorney's Office for direction regarding legal requirements. Reilly May 20, 1998 Tr. at 118–19; Boeri May 14, 1998 Tr. at 37. Neither Reilly nor Boeri was aware of the *Mastroianni* decision or of the requirement that all participating agencies be consulted concerning the necessity for electronic surveillance. Reilly May 20, 1998 Tr. at 118–19; Boeri May 14, 1998 Tr. at 36–37. Nor was Stutman. Stutman Apr. 15, 1998 Tr. at 167. The DEA agents asked that FBI indices be checked to determine whether there had been any prior applications for electronic surveillance targeting Bulger or Flemmi, as required by 18 U.S.C. § 2518(1)(e). Reilly May 19, 1998 Tr. at 134–35. However, no inquiry was addressed to the FBI regarding the requirements of § 2518(1)(c) concerning the necessity for electronic sur-

veillance. Boeri May 14, 1998 Tr. at 118; Reilly May 20, 1998 Tr. at 5–6. Boeri did not believe that it was required that he do so. Boeri May 14, 1998 Tr. at 95–96.

Similarly, the FBI did not recognize or discharge its obligation to furnish for inclusion in the application the significant information it had concerning the necessity of electronic surveillance targeting Bulger and Flemmi. Greenleaf had neither training nor experience regarding the requirements of Title III. Greenleaf Jan. 8, 1998 Tr. at 227. He was generally aware that an applicant was obligated to make a full and complete statement concerning why conventional investigatory techniques were insufficient, but did not think about this in the context of the investigation that the FBI had joined. *Id.* at 228–29.

Ring also gave no consideration to this issue. Ring June 22, 1998 Tr. at 81–82. Consistent with the effort to compartmentalize the information that Bulger and Flemmi were being targeted for electronic surveillance, Ring did not discuss with the FBI's Principal Legal Adviser or anyone else the legal requirements of Title III or the implications for the proposed electronic surveillance of Bulger and Flemmi's relationship with the FBI. *Id.* at 81–83. Thus, no consideration was given by the FBI to the requirements of § 2518(1)(c) or the ruling in *Mastroianni.*

Determined not to acquire any additional information about the joint investigation, Ring also did not review the application for the order authorizing electronic surveillance of Bulger and Flemmi, or the Boeri affidavit on which it relied. Ring June 19, 1998 Tr. at 154–55. Nor did Greenleaf. Greenleaf Jan. 8, 1998 Tr. at 229–30.

In essence, with regard to the 1984–1985 electronic surveillance, the DEA and the FBI were necessary, but reluctant partners. The FBI was determined not to violate the sacred promise of confidentiality that it made to all of its informants, including Bulger and Flemmi. The prosecutors and members of the DEA believed

that Bulger and Flemmi were FBI sources, but accepted the fact that the Bureau would not divulge or discuss their status. In the circumstances, the prosecutors and DEA agents sought to minimize the information about the investigation that was disclosed to the FBI in order to limit the risk that the confidentiality of their investigation would be compromised. Ring sought to insulate everyone at the FBI except Rossi and Carter from the investigation in order to avoid blame if the investigation failed. In the process the government recklessly disregarded its legal obligation to include in its application the legally required "full and complete statement" concerning the necessity for electronic surveillance.

The FBI also ignored the essential point of the Attorney General's Guidelines, which required consultation with the Assistant Attorney General for the Criminal Division when the Bureau learned that an informant had engaged in criminal activity, but wished to continue to utilize the informant rather than share the pertinent information with another law enforcement agency. *See* Ex. 274 (Under Seal), Manual § 137–17(G)(1 & 2) (1–12–81); § 137–16(G)(1 & 2) (3–28–84). This violation of the Guidelines contributed to a violation of Title III as well.

The Supreme Court has held that Title III, "plainly calls for the prior, informed judgment" of prosecutors, rather than investigators, before an application for electronic surveillance may be filed. *Giordano,* 416 U.S. at 515, 94 S.Ct. 1820. The exercise of such judgment by, in this case the Assistant Attorney General for the Criminal Division, "is interposed as a critical precondition to any judicial order." *Id.* at 516, 94 S.Ct. 1820.

In the instant case, if the facts necessary for an informed judgment to have been made had been disclosed by the FBI, or if the well-known issue of Bulger and Flemmi's status as sources had even been discussed with the FBI, no application for authority to conduct electronic surveillance

targeting them would have been filed in 1984. If, however, an application with the required "full and complete statement" concerning the necessity for electronic surveillance had been submitted, the request for a warrant would have been denied.

Mere discussion with the FBI of the implications of Bulger and Flemmi's status as sources for the investigation that the DEA was leading and for the proposed electronic surveillance would, in 1984, have probably caused the termination of the investigation and, in any event, would have prevented any application for electronic surveillance from being made. More specifically, the DEA agents and the prosecutor primarily responsible for the investigation each now acknowledges that if he had been told officially that Bulger and Flemmi were FBI informants, a high level decision, involving officials of the Department of Justice, would have had to be made concerning whether to continue that investigation. Boeri May 14, 1998 Tr. at 96–97; Crossen May 13, 1998 Tr. at 11–16. They also recognize that if Bulger and Flemmi were valuable sources for the FBI, there was a good chance that they would not have been allowed to proceed with their investigation. Crossen May 13, 1998 Tr. at 11–16.

Their understanding is accurate. Indeed, if Stutman had received confirmation that Bulger and Flemmi were FBI informants and were able to talk to Greenleaf about it, he would have abandoned the investigation. Stutman Apr. 15, 1998 Tr. at 169–71. Stutman would have asked Greenleaf whether the FBI was aware of the criminal activity in which Bulger and Flemmi were engaged; whether Bulger and Flemmi were involved in any of the activity under investigation in connection with their relationship with the FBI; whether the FBI was going to compromise any continuing investigation; and, most importantly, whether the DEA's investigation would interfere with the FBI's efforts. *Id.* Candid responses would have been "yes" to each of these questions. More-

over, the FBI would have undoubtedly emphasized the great value of Bulger and Flemmi to the Bureau in its war against the LCN. In the circumstances, Stutman would have deferred to the FBI rather than invest a great deal of time and money in investigating Bulger and Flemmi. *Id.* This decision would have been supported, if not dictated, by DEA Headquarters, where McCurnin would have had the responsibility to work out any conflict with his former boss, McWeeney. McCurnin Sept. 15, 1998 Tr. at 79–80.

If, however, Crossen were somehow permitted to submit an application for electronic surveillance targeting Bulger and Flemmi, he would have insisted on sharing with the judge the information that he had received from the FBI, including their status as informants, any information suggesting that they may have been authorized to commit any of the possible crimes referenced in the application, and the fact that the government did not intend to use any intercepted evidence of possible Title 18 offenses in an investigation or prosecution of Bulger or Flemmi. *Id.*

Similarly, Weld would not have knowingly permitted a false or misleading affidavit to be filed in support of an application for electronic surveillance. Weld May 27, 1998 Tr. at 108–09. Nor would Assistant Attorney General Trott, who had to authorize the application. Rather, Trott would have required that the court be provided with accurate and complete information in the possession of any agency involved in the joint investigation, including the FBI. Indeed, Trott, now a judge of the Ninth Circuit Court of Appeals, recently participated in a decision which recognized and described this responsibility. *See United States v. Aviles,* 170 F.3d 863, 867 (9th Cir.1999), *petition for cert. filed* (U.S. June 9, 1999)(No. 9705).

It is clear to the court that if the matter had been discussed, the FBI would have ardently argued that Bulger and Flemmi were invaluable informants, whose status had to be maintained as confidential even if it meant abandoning the investigation or the proposed electronic surveillance. Its conduct in the instant case indicates that the Department of Justice would have given en great weight to the importance of honoring the FBI's promise of confidentiality to Bulger and Flemmi. For example, as discussed in § II.33, *infra,* in 1997, the Acting Deputy Attorney General accepted a serious risk that this court would hold him in civil contempt rather than confirm that Angelo "Sonny" Mercurio, who had been already prosecuted and imprisoned, was an FBI informant. The Department of Justice would have been even more strongly supportive of Bulger and Flemmi in 1984, when disclosure that they were FBI sources could have complicated the pending prosecution of Angiulo and his colleagues. *See* Ex. 176.

The FBI's determination not to confirm that Bulger and Flemmi were informants or to discuss the implications of their status for the pending investigation, and the acceptance by the DEA and the United States Attorney's Office of the FBI's position, caused the applications for electronic surveillance now at issue to be submitted with reckless disregard for their accuracy and completeness and, as a result, with materially misleading omissions and misstatements. More specifically, at 12:30 p.m. on December 24, 1984—the verge of Christmas Eve—Crossen submitted to United States District Judge W. Arthur Garrity, Jr. an Application, incorporating a 104–page affidavit of Boeri, and a proposed Order authorizing electronic surveillance. Exs. 133, 138, 139. The Order was, without modification, promptly issued. Ex. 139.

The government now claims that there was not a joint DEA–FBI investigation prior to the issuance of the December 24, 1984 Order by Judge Garrity. *See* Government's Post–Hearing Brief in Opposition to Defendants' Motions to Dismiss Indictment and to Suppress Electronic Surveillance Evidence (Jan. 29, 1999) ("Gov. Post–Hearing Brief") at 319–23.

As described earlier, this contention is, as a matter of a fact, incorrect. It is also clearly inconsistent with the representations that the government made to three United States District Judges in 1984 and 1985.

The application for electronic surveillance submitted to Judge Garrity on December 24, 1984 cited Bulger and Flemmi as the first two named targets. Ex. 138, ¶ 3. This was compatible with their status as the "top"—indeed indispensable—targets of the investigation. Crossen May 11, 1998 Tr. at 142–43; Exs. 140, 146. Relying on the Boeri affidavit, the Application asserted that there was probable cause to believe that Bulger and Flemmi were engaged in conduct constituting drug offenses in violation of various provisions of Title 21 of the United States Code and in activities constituting an illegal gambling business in violation of several provisions of Title 18 of the United States Code. Ex. 138, at 3–4 (¶ 5(a) and (c)). The Application also asserted that there was probable cause to believe the wiretap of George Kaufman's telephone being proposed would cause the interception of "admissible evidence" of both Title 18 and 21 offenses. *Id.* Thus, the Application requested authority for the DEA and the FBI to wiretap Kaufman's telephone. *Id.* at 8.

With regard to the FBI, the Boeri's affidavit explained that:

> Because of the information supporting a finding of probable cause regarding Title 18 offenses as specified herein and in the accompanying Application of Assistant U.S. Attorney Gary C. Crossen, Special Agents of the Federal Bureau of Investigation *have been* assigned to work in conjunction with other agents previously working on this investigation.[38] Authorization is therefore also sought for the assigned FBI agents to participate in the authorized interceptions.

**38.** The Boeri Affidavit previously stated that the investigation had initially been conducted jointly by the DEA, the Quincy Police Department and the Massachusetts State Police. Ex.

Ex. 133 at 104 (emphasis added). *See also* Reilly May 20, 1998 Tr. at 117. Reaffirming the original representation that FBI agents had been assigned to work on the joint investigation before the initial Application was submitted, the February 1, 1985 request for a renewal and expansion of the first Order, which was presented to Judge Joseph Tauro, stated that:

> This investigation *remains* a joint investigation participated in by Special Agents of the Drug Enforcement Administration, ... Special Agents of the Federal Bureau of Investigation ..., and detectives of the Quincy Police Department ... and troopers of the Massachusetts State Police and coordinated by the United States Department of Justice, New England Narcotics Task Force.

Ex. 135 at 2 (emphasis added). The March 1, 1985 request for another extension, which was submitted to Judge A. David Mazzone, reiterated that, "this investigation *remains* a joint investigation participated in by" the DEA, the FBI, and the Quincy Police Department, and coordinated by the Task Force. Ex. 136 at 2 (emphasis added). The Massachusetts State Police, were for the first time, not included.

Consistent with the representation that the FBI was involved in the investigation, the December 24, 1984 Boeri affidavit in support of the Application included information that came from the FBI and, in some instances, was attributed to FBI sources. *United States v. Salemme,* 978 F.Supp. 343, 348 (D.Mass.1997); May 15, 1998 Tr. at 6–7; Exs. 45, 133 at 47 (¶ 75), 79 (¶ 108).

As described earlier, the DEA considered only Bulger and Flemmi to be the "subjects of this investigation." Ex. 146. The DEA agents felt that bugging Bulger's automobile and residence would be

133 at 22. It did not explain that the State Police had been dropped from the investigation. *Id.*

essential if the investigation were to succeed. *Id.* The December 24, 1984 Application, however, sought only authority to wiretap Kaufman's telephone. Ex. 138. As described earlier, the evidence convinces the court that no application for authority to wiretap Kaufman's telephone would have been made except as part of the DEA's effort to develop cases against Bulger and Flemmi. As required by law, however, the application also identified other individuals who were expected to be overheard engaging in criminal conversation with Kaufman. *See* 18 U.S.C. § 2518(1)(b) (1994); *Ferrara,* 771 F.Supp. at 1300.

The December 24, 1984 Boeri affidavit in support of the Application rambles over 104 pages. Ex. 133. It was not organized to identify clearly the probable cause to believe that any named target was involved in specific criminal activity or, particularly, that he would be overhead discussing any such activity over Kaufman's telephone. *Id.*

The failure of the Boeri affidavit to summarize the particular "probable cause" relating to each named target obscured key facts. Most importantly, the form of the affidavit made it very difficult, if not impossible without extraordinary effort, to discern that there was no evidence to establish probable cause that Bulger would be intercepted speaking to Kaufman about anything, and only slight evidence to suggest that Flemmi might discuss any narcotics offense on Kaufman's telephone.

More specifically, the Boeri affidavit includes over thirty pages of charts and other information derived from pen registers indicating the telephone numbers dialed by the eight individuals purportedly expected to be overheard on the Kaufman telephone. Ex. 133 at 69–100. At the conclusion of this detailed portion of his affidavit, Boeri stated, among other things, that, "Kaufman has ... telephonic contact ... with ... Bulger." *Id.* at 100 (¶ 127). Boeri acknowledged in his testimony, however, that the mass of information generated from many months of pen registers on various telephones used by Bulger does not include a single call from Bulger to Kaufman's telephone, or from Kaufman to Bulger. *Id.* at 69–100; Boeri May 18, 1998 Tr. at 14–16. Thus, contrary to the contentions in Crossen's Application and Boeri's affidavit, there was no probable cause to believe that Bulger would be intercepted discussing anything on Kaufman's telephone. Ex. 133 at 3 and 4 (¶ 7(b) and (d)); 138 at 3–5 (¶ 5(b) and (d)). The statement that such probable cause existed was clearly made with at least reckless disregard for its truth and, the court infers, knowledge that it was not true.

The pen registers did indicate that Flemmi and Kaufman spoke often by telephone. Ex. 133 at 69–100. Boeri's 104-page, 136-paragraph affidavit, however, contained only several paragraphs that included, among other things, any informant information that Flemmi was involved with drug dealers. *Id.* at 7–8 (¶ 12), 8 (¶ 13), 39 (¶ 62(k),(*l* ),(m)), 40–41 (¶ 62(v),(x)), 44 (¶ 68(d)).[39] The essence of this information was that Flemmi was, with Bulger, extorting money from Frank Lepere and other, unnamed drug dealers, who had to pay Bulger and Flemmi if they wished to stay in business. *Id.* Extortion is a Title 18 offense. *See* 18 U.S.C. § 1951 (1994).

In contrast to the skimpy information associating Flemmi with conduct criminalized by Title 21 of the United States Code, the Boeri affidavit contained information that was both more extensive and detailed concerning Flemmi's and Bulger's possible involvement in illegal gambling and loansharking, which are Title 18 offenses. *See, e.g.,* Ex. 133 at 11–20 (¶¶ 21 and 22), 28 (¶ 46(a)), 36–41 (¶ 62), 41–43 (¶ 64), 44–45 (¶ 68), 46–47 (¶¶ 72, 73). Much of this

---

**39.** There is also a reference to an informant in Florida stating that the "Howie Winter organization" and Baione were receiving marijuana and cocaine from Florida by truck. Ex. 133 at 43 (¶ 66).

information was derived from the 1980 electronic surveillance of the Lancaster Street Garage. *Id.* at 11–19 (¶ 21). Massachusetts State Trooper John Naimovitch, who had tipped Flemmi to the Lancaster Street Garage bug, was the source of some of the additional Title 18–related information on which Boeri relied. *Id.* at 15–16 (¶ 21(B)), 17 (¶ 21(D)), 44–45 (¶ 68), 46 (¶ 72).

The Boeri affidavit contained ample evidence to establish that Flemmi and Kaufman spoke often by telephone, but provided virtually no basis to believe that they discussed any narcotics offenses. The few paragraphs of the Boeri affidavit which the government contends establish probable cause to believe that Bulger and Flemmi were committing narcotics offenses contain no reference to Kaufman. *See* Gov. Post-Hearing Brief at 347–49. Moreover, the informant characterized as CS–4, who was represented to be "personally acquainted" with Kaufman, characterized him as being "close to Flemmi in the illegal gaming and loansharking business," a "front man" for Bulger and Flemmi in the "hot car" business, and a person they use for their more difficult sports betting. Ex. 133, § 68(h),(i),(k). CS–4 did not claim Kaufman was involved in narcotics activity with Flemmi, Bulger, or anyone else.[40]

Read closely, the 104–page Boeri affidavit contains only two references to Kaufman's possible involvement with narcotics. More specifically, Kaufman's telephone number was found in an address book seized from a fugitive from drug charges, Salvatore Caruana. Ex. 133, ¶ 41 (at 27). Although pen registers were utilized for more than eight months, however, the Boeri affidavit does not indicate that Caruana ever called Kaufman or was expected to do so. Ex. 133. The pen registers did indicate that Joseph Murray's telephone was called six times from Kaufman's home. *Id.* at 108. The affidavit did not

claim, however, that a wiretap was being sought because there was probable cause to believe Kaufman and Murray would be intercepted discussing any drug offense. *Id.* Nor did the court make such a finding. Ex. 139.

The Application and Boeri affidavit stated that Assistant Attorney General Trott had authorized the Application. Ex. 138 at 1 (¶ 2). In addition, it was expressly represented that the requested electronic surveillance was necessary to obtain admissible evidence of the Title 18 and Title 21 offenses that Crossen and Boeri claimed there was probable cause to believe Bulger and Flemmi would be discussing on Kaufman's telephone. Ex. 133 at 4 (¶ 8), 101 (¶¶ 129–133); Ex. 138 at 5.

As indicated earlier, Judge Garrity issued the proposed Order authorizing the wiretap of Kaufman's telephone shortly after receiving the Application, and the lengthy, convoluted Boeri affidavit, on the afternoon before Christmas. Viewing the government's submission in a common sense manner, as a reasonable judge, he would have received the following messages. The Assistant Attorney General had made an informed and considered decision to authorize the Application. The Application had as its primary targets Bulger and Flemmi, two notorious, reputed organized crime figures. The FBI was genuinely involved in the investigation and was interested in developing a prosecutable case against Bulger, Flemmi, Kaufman, and others for engaging in illegal gambling and other Title 18 offenses. The DEA was hopeful of generating a prosecutable narcotics case against them as well. Electronic surveillance was necessary to obtain admissible evidence to be used to prosecute Bulger, Flemmi, Kaufman, and others for illegal gambling and other Title 18 offenses. Although there did not appear to be adequate evidence to establish probable cause to believe that conversations con-

---

40. In its Post–Hearing Brief, at 349, the government edited the quotations ascribed to CS–4 to obscure the fact that the informant

expressly linked Kaufman only to Title 18 offenses, none of which related to narcotics activity.

cerning any Title 21 narcotics offense would be intercepted by a wiretap of Kaufman's telephone, it was not necessary to rely on the Title 21 information because there was sufficient evidence that conversation concerning conduct that was criminal under Title 18 of the United States Code would be overheard.

The submission of the Application and Boeri affidavit communicating these messages was made with reckless disregard for the truth because they conveyed a message that was inconsistent with the facts as Boeri and Crossen understood them. Boeri and Crossen had obvious reasons to doubt the veracity of the message that they were communicating to the judge and, indeed, did not believe that it was true. More specifically, neither Boeri nor Crossen expected that the FBI would use any evidence generated by the proposed electronic surveillance to try to develop a prosecutable Title 18 case against Bulger or Flemmi. To the contrary, they believed that Bulger and Flemmi were valued informants that the FBI would seek to protect rather than prosecute. Similarly, Boeri and Crossen did not expect the FBI to try to develop a prosecutable Title 18 case against Kaufman, who had been targeted by the DEA for electronic surveillance because he was a close colleague of Flemmi and Bulger.

If Ring had reviewed Boeri's affidavit on behalf of the FBI, he would have recognized that it sent a false and misleading message. More particularly, he would have recognized that it falsely indicated that the FBI wished to investigate Bulger, Flemmi, Kaufman, and others in order to develop a prosecutable case concerning illegal gambling and other Title 18 offenses, and that the requested electronic surveillance was necessary to the success of that investigation. He also would have seen representations that Bulger and Flemmi were engaged in drug trafficking that he seriously doubted were true and that Connolly believed were not true. However, motivated by a desire to minimize the risk

that the FBI could be blamed for compromising the investigation if it failed, Ring, on behalf of the FBI, completely and recklessly, disregarded the question of whether false and misleading representations were being made in the Boeri affidavit.

As a result of the foregoing, the Application and Boeri affidavit did not include the "full and complete statement" concerning the necessity for electronic surveillance required by Title III. If it had, neither Judge Garrity nor any other reasonable judge would have granted the request.

The government in this case did far more than fail to inform the issuing judge that Bulger and Flemmi were FBI informants. If the required disclosures had been made, they would have revealed the following.

Bulger and Flemmi were longstanding FBI informants. The FBI had for many years known of their involvement in gambling, loansharking, extortion, and other Title 18 offenses. *See, e.g.,* Ex. 271. Some of this information came from Bulger and Flemmi themselves. Exs. 40, 45, 46, 60, 70, 71, 72, 73, 74, 171, 271. For example, beginning prior to 1970, Flemmi had "told the FBI that he was engaged in illegal gambling and other illegal activity of a non-violent nature." Ex. 271. The government believes that it would be legally permissible to use Bulger and Flemmi's statements against them. Nov. 12, 1998 Tr. at 141–43; Apr. 13, 1999 Tr. at 154–55; Gov. Post–Hearing Brief at 110–23. The FBI, however, would not provide those statements to any prosecutor for use in a grand jury or judicial proceeding. Nor would the FBI use evidence generated by the electronic surveillance being requested to investigate any Title 18 offense Bulger, Flemmi, or Kaufman might be committing. Rather, the FBI regarded its sources' involvement in criminal activity as critical to their maintaining the credibility necessary for them to continue to obtain and provide the FBI important information concerning members of the LCN and other criminals.

Moreover, if fully informed, a reasonable judge would have considerable doubts about whether the activity of Bulger and Flemmi alleged in the Boeri affidavit were criminal at all, rather than authorized by the FBI. More specifically, the judge would have been informed that a review of the FBI files by the FBI's Principal Legal Adviser in Boston would indicate that:

[There were] some [documents regarding information provided by the informant], primarily in the files pertaining to [Flemmi] which pertain to information which clearly reflected that this informant was engaged in illegal gambling activity at a very high level within the Winter Hill Gang. Moreover, it showed that this informant had a close working relationship with the LCN in making policy decisions regarding illegal gambling in the Boston area, which both the Winter Hill group and the LCN agreed to abide by. The serials disclosing this kind of information were dated in the middle 1980's. Similar information from this informant was also found in the file prior to 1980. The information in the file prior to 1970 indicated that this informant told the FBI that he was engaged in illegal gambling activities and other illegal activity of a non-violent nature. In one instance, source advised that he was involved in administering a severe beating to an organized crime figure who had stepped out of line. Because these serials were in [Flemmi's] file, *there was a clear indication that FBI Agents were aware of his involvement in illegal activity (primarily illegal gambling activity) and at least had tacitly authorized his participation in such activity.* Nowhere in the files pertaining to [Flemmi] was there any express authorization to commit criminal activity from any FBI Agent.

Ex. 271 (emphasis added).

In addition, a fully informed judge would also have doubted whether Bulger, Flemmi, or their colleague Kaufman were genuinely engaged in any narcotics offenses.

More specifically, the judge would have known that Ring felt that any indication that Bulger and Flemmi were involved with drugs was "not consistent with [the FBI's] intelligence" regarding them, Ex. 13, and that their handler, Connolly, was concerned that Flemmi's "contacts, at [Connolly's] direction ... may have resulted in the false belief that [Flemmi] is involved in narcotics," Ex. 8.

If given the foregoing information, no reasonable judge would have entered the Order that Judge Garrity issued on December 24, 1984. It was issued, however, and Bulger and Flemmi quickly learned of the wiretap.

More specifically, soon after December 24, 1984, Connolly, Bulger, and Flemmi were discussing the Kaufman wiretap and other elements of the ongoing investigation. As described earlier, Flemmi acknowledges that he was told by the FBI of the Kaufman wiretap, and the court concludes that it was Connolly, rather than Ring as Flemmi claims, who provided the tip. Flemmi Aug. 24, 1998 Tr. at 86–87. This conclusion is reinforced by the fact that in late 1984 or early 1985, Connolly began meeting with Bulger and Flemmi at Newton's apartment, rather than at Bulger's home or his own, because Connolly needed a new, secure location. Newton May 22, 1998 Tr. at 126–27. It is also likely that Flemmi had access to any information known to Naimovitch, who, in 1980, had alerted him to the bug at the Lancaster Street Garage, and was later convicted on charges of corruption.

Among other things, Connolly reported that on December 26, 1984, he discussed with Bulger and Flemmi the physical surveillances being conducted against them. Ex. 14. (Memorandum dated 12/28/84). This meeting would have provided an occasion for him to discuss the Kaufman wiretap as well. In an ostensible effort to be helpful, Connolly provided Ring and Greenleaf detailed information about the surveillance vehicles Bulger and Flemmi had identified as part of the investigation

of them. *Id.*[41] Greenleaf forwarded this information to Stutman. *Id.* While Greenleaf was motivated by a desire to be genuinely cooperative, the practical effect of telling the DEA that Bulger and Flemmi were alert to its investigation could have been to discourage further efforts.

The DEA was not deterred by the information Greenleaf had furnished. On February 1, 1985, Crossen submitted to Judge Tauro a ninety-five-page affidavit from Boeri seeking renewal of the wiretap on Kaufman's telephone and additional authority to bug Bulger's automobile and residence as well. Ex. 135. The request for authority for a wiretap and two bugs in a single application may have been unlawful. *See* Feb. 6, 1997 Tr. at 5–6, 16–27. In any event, it made the affidavit confusing on the issues of probable cause, among other things, by obscuring key facts.

The February 1, 1985 Boeri affidavit incorporated his earlier affidavit. *Id.* at 2 (¶ 5). It stated that the FBI was part of the continuing joint investigation. *Id.* at 2 (¶ 6). The government acknowledges that the FBI was part of the joint investigation by February 1, 1985. *See* Gov. Post–Hearing Brief 319–23; Dec. 2, 1998 Tr. at 122–23. There was no indication in Boeri's affidavit that the FBI was not receiving the information being generated by the electronic surveillance for use in its purported investigation of Bulger and Flemmi for possible prosecution on Title 18 charges. Crossen May 13, 1998 Tr. at 76.

In his affidavit Boeri asserted that there was probable cause to believe that "wire communications" of Bulger would be obtained if the wiretap on Kaufman's telephone were reauthorized. Ex. 135 at 3 (¶ 7(b)). This representation was not true and, indeed, was made with at least reckless disregard for the truth. As described earlier, the pen registers had disclosed no calls between Bulger and Kaufman prior to December 24, 1984. Ex. 133 at 69–100; Boeri May 18, 1998 Tr. at 14–16. The initial wiretap of Kaufman's telephone did not intercept any conversations with Bulger either. Boeri May 18, 1985 Tr. at 23, 26–27.

Flemmi continued to call Kaufman in an effort to mask the fact that he had been tipped off to the tap, but engaged only in innocuous conversation. Flemmi Aug. 26, 1998 Tr. at 99–100. John Martorano, who was still a fugitive, was also intercepted. Jan. 8, 1998 Tr. at 96.

Boeri's February 1, 1985 affidavit also claimed that there was probable cause to believe that if the requested electronic surveillance was authorized, Bulger, Flemmi, Kaufman, and the other named targets would be intercepted discussing the distribution of marijuana and cocaine. Ex. 135 at 3 (¶ 7(a) and (b)). As Boeri now acknowledges, the prior month of intercepts, however, had provided no evidence that Bulger and Flemmi would discuss drug activity on Kaufman's telephone. Boeri May 15, 1998 Tr. at 23–24. Moreover, the ninety-five-page affidavit includes only two references to drugs at all. In one instance Kaufman said that a bookmaker, who Boeri in the affidavit stated had no connections with Bulger, Flemmi, Kaufman, or the Winter Hill Gang, also sold "junk"— meaning drugs. Ex. 135 at 14–15 (¶¶ 24 and 25); Boeri May 15, 1998 Tr. at 18–23. In the other instances, Kaufman asked an unknown male if an individual named "Allen" was in the "junk" business and was told "yes." *Id.* at 70 (¶ 128). If Boeri's affidavit had been presented in support of a request for authority to conduct electronic surveillance for the purpose of developing only a Title 21 narcotics prosecution, it would have been obviously insufficient to justify an extension or expansion of the original order. Thus, the false and misleading message, conveyed by the affidavit, that the FBI was conducting a genuine Title 18 investigation of Bulger, Flemmi,

---

**41.** The fact that he was providing such information could have been an element of his defense if Connolly were ever accused of undermining the DEA's investigation.

Kaufman, or anyone else was, again, highly material.

Judge Tauro issued the requested order authorizing the continued wiretap on Kaufman's telephone and the bugging of Bulger's automobile and residence as well. For the reasons described earlier, neither he nor any other reasonable judge would have done so if the required full and complete statement concerning necessity had been made.

While the wiretap on Kaufman's telephone did not intercept Bulger, it did result in Zannino being overheard. Ex. 176. O'Sullivan was informed and alarmed because the interception had the potential to complicate the pending prosecution of Zannino. *Id.* O'Sullivan consulted Ring. *Id.* To prevent further problems, at some point prior to February 7, 1985, Ring was asked to remove Carter and Rossi from the work they were doing with the DEA, and to instruct them not to discuss the statements Zannino had been overheard making with anyone at the FBI or to introduce them into the FBI's files. *Id.* The court concludes that this was done.

Not surprisingly, there was a "stunning lack of success" from the bugging of Bulger's home and automobile. Crossen May 12, 1998 Tr. at 153. Indeed, the government has represented that it does not wish to offer any evidence from these bugs in its case in chief. Gov. Post–Hearing Brief at 316–17; Nov. 20, 1998 Tr. at 113. The bug in Bulger's car, however, did intercept Flemmi telling Bulger that Connolly had become "a little . . . nervous." Ex. 136 at 18 (¶ 21); Crossen May 12, 1998 Tr. at 149–50.

On March 1, 1985, Crossen presented to Judge A. David Mazzone a forty-page affidavit of Boeri seeking authority to extend the bugs in Bulger's home and automobile, but not the wiretap on Kaufman telephone. Ex. 136. The prior applications and affidavits were incorporated in that request. *Id.* at 2 (¶¶ 5 and 6). As indicated earlier, Boeri again represented that the FBI was part of the joint investigation and that

there was probable cause to believe that evidence concerning illegal gambling, as well as narcotics offenses, would be intercepted. *Id.* at 2 (¶ 7) 3–5 (¶ 8). Boeri again claimed that electronic surveillance was necessary to obtain evidence of these offenses. *Id.* at 5 (¶ 10).

However, it appears that the representation that the FBI was still involved in the joint investigation was false because, as directed by O'Sullivan, Rossi and Carter were no longer participating. In any event, contrary to the message communicated by the affidavit, the FBI continued to have no intention of utilizing evidence obtained from the electronic surveillance in any investigation of Bulger or Flemmi. Not knowing this, or any of the other material information that the required full and complete statement concerning necessity would have included, Judge Mazzone entered the government's proposed order.

The extended authorization for the bugs, however, was of no value to the investigation. On March 11, 1985, Bulger found the bug in his car. Ex. 142. Just before he pulled it out, Boeri and Reilly, who were monitoring the bug, heard Bulger say: "He's right. They did put a bug in the car." Ex. 145; Reilly May 20, 1998 Tr. at 16. That statement reinforced Reilly's belief that Bulger and Flemmi were FBI informants. Reilly May 20, 1998 Tr. at 16.

As the electronic equipment cost $15–20,000, Boeri and Reilly rushed into the garage to recover it. Ex. 142; Weld May 26, 1998 Tr. at 69. Bulger expressed surprise that they were able to bug his automobile. Ex. 142. Bulger also told the agents: "We're all good guys here. You're the good good guys, and we're the bad good guys." Boeri May 18, 1998 Tr. at 81–83; Weld May 26, 1998 Tr. at 69. Bulger did not, however, claim to have immunity from investigation by the DEA or prosecution if a case against him could be developed. Ex. 142.

Two days later, on March 13, 1985, Bulger approached Boeri, who was conducting a physical surveillance him. Ex. 141.

Bulger knew Boeri's name and the location of the supposedly secret site where the monitoring of the wiretaps and bugs had been conducted in an effort to maintain the confidentiality of the investigation. *Id.*

At this point, the DEA and the United States Attorney's Office accepted that the confidentiality of the investigation generally, and the electronic surveillance particularly, had been compromised. Ex. 145; Reilly May 20, 1998 Tr. at 16; Weld May 26, 1998 Tr. at 68. Although the DEA made some follow-up efforts, its lengthy and expensive investigation was deemed unsuccessful and was eventually closed. Reilly May 20, 1998 Tr. at 119; Weld May 26, 1999 Tr. at 70; Ex. 145. The DEA shared with the IRS some of the information concerning Bulger and Flemmi that it had developed. Ex. 145; Reilly May 20, 1998 Tr. at 119. Believing that the FBI had compromised their investigation and would not itself investigate Bulger and Flemmi, the DEA agents did not offer the FBI any evidence that they had obtained relating to potential Title 18 offenses, including information concerning the Valhalla. Reilly May 20, 1998 Tr. at 119. Nor did the FBI ever ask for any such evidence. *Id.* at 46–47.

In an attempt to give some redeeming value to his futile investigation, Boeri decided to try to recruit Flemmi and Bulger as informants for the DEA. Boeri May 11, 1998 Tr. at 111. Boeri sent Flemmi and Bulger cards congratulating them on frustrating the DEA's investigation and a box of cigars. Boeri May 18, 1998 Tr. at 109–12. He also gave Flemmi, a former paratrooper, a tape of army motivational marching chants. *Id.* Boeri's efforts were unavailing, however. Bulger and Flemmi evidently recognized that they had a good deal with the FBI and were not interested in working with the DEA.

18. *Morris Tells Bulger and Flemmi That They Can Do Anything They Want as Long as They Do Not "Clip" Anyone*

In April 1985, Connolly, Morris, Condon, Bulger, and Flemmi met for dinner at Morris' home in Lexington, Massachusetts. Flemmi Aug. 20, 1998 Tr. at 5; Condon May 1, 1998 Tr. at 108–10. The dinner was held several weeks after Bulger found the bug in his car and it had become obvious that the investigation led by the DEA would not succeed. Bulger and Flemmi brought a bottle of wine and, for the first time, also a bottle of champagne. Flemmi Aug. 20, 1998 Tr. at 10.

The dinner was evidently planned to celebrate the failure of the effort to investigate Bulger and Flemmi. Ring was not invited to attend. Meetings with Ring, Flemmi had found, were "strictly business." Flemmi Aug. 27, 1998 Tr. at 64, Aug. 28, 1998 Tr. at 5–6. Condon, however, was included. He was then serving as the Undersecretary of Public Safety for the Commonwealth of Massachusetts. Condon May 1, 1998 Tr. at 108–10. The Massachusetts State Police was one of several agencies he shared responsibility for supervising. *Id.* at 92–94.

Condon spent about an hour eating dinner and participating in the discussion before leaving. Condon May 1, 1998 Tr. at 117. The conversation then turned to the Angiulo wiretaps. Flemmi Aug. 20, 1998 Tr. at 14–15, Aug. 26, 1998 Tr. at 153–56. Flemmi and Bulger knew that they had been discussed in some of the intercepted conversations. *Id.* They again expressed concern about whether the information on those tapes might be used against them in an investigation or prosecution. *Id.* Morris and Connolly told them not to worry because they would not be prosecuted for anything on those tapes. *Id.* Morris went on to say to Bulger and Flemmi, "[y]ou can do anything you want as long as you don't 'clip' anyone." *Id.*; Ex. 92, ¶ 2; Condon May 1, 1998 Tr. at 122–25; Newton May 28, 1998 Tr. at 140–41. Morris was not inebriated when he made this statement. Flemmi Aug. 20, 1998 Tr. at 10, Aug. 27, 1998 Tr. at 72; Morris Apr. 23, 1998 Tr. at 88–90.

Morris' comment contributed to Flemmi's understanding that the FBI would protect him from investigation of and possible prosecution for any crime he might be a threat to commit other than murder— although, as described previously, in the Halloran matter the Bureau had done even that. Ex. 92.

Morris testified that he did not recall telling Bulger and Flemmi that they could do anything they wanted as long as they did not "clip" anyone and doubted that he did so. Morris Apr. 29, 1998 Tr. at 90–91. Nevertheless, the court finds that the statement, as related by Flemmi, was made.

It is possible that Morris merely forgot a comment that he made thirteen years before his testimony. If the matter does not involve a failure of recollection, however, Morris has again lied. Morris acknowledges that he has a long history of lying to protect himself. Morris Apr. 27, 1998 Tr. at 151, 163, Apr. 30, 1998 Tr. at 90. He lied to his superiors about his conduct concerning the Lancaster Street Garage investigation. Morris Apr. 30, 1998 Tr. at 85. Morris also lied to SAC Ahearn when he denied that he had advised Ring to close Bulger as an informant. *Id.* at 91–92. In addition, as discussed in § II.27, *infra,* after telling a *Boston Globe* reporter that Bulger was an FBI informant, Morris lied in claiming that he was not the source of that and other leaks in interviews with agents from the FBI's Office of Professional Responsibility ("OPR") and later in two written, sworn statements, although he knew that his conduct was criminal. Morris Apr. 27, 1998 Tr. at 151–56, 163, Apr. 30, 1998 Tr. at 93. In each instance Morris was motivated by a desire to protect himself and to avoid possible prosecution. Morris Apr. 27, 1998 Tr. at 51.

Morris had the same incentive to lie about whether he in fact or in effect told Bulger and Flemmi, in 1985, that they could do anything they wanted, as long as they did not kill anyone, and would be protected. Flemmi's claim that this statement was made contributed to the court's decision to grant his motion for an evidentiary hearing on the issue of immunity. Ex. 92. When Morris made his proffer it was evident that he might not be given immunity by the prosecutors in exchange for his testimony if he corroborated Flemmi's claim on this point. His concern was not only understandable, it was well-founded. As discussed in § II.33, *infra,* the court has since determined that the government's refusal to grant Connolly immunity was motivated in part by genuine interest in investigating him for possible prosecution, and also in part by "a desire not to facilitate the introduction of evidence that the government expects would substantially corroborate Flemmi and might hurt its case, as well as embarrass the government." Oct. 16, 1998 Tr. at 23.

Although the court need not decide whether Morris' failure to acknowledge the now controversial statement that he made to Bulger and Flemmi in April 1985 is an innocent failure of memory or another willful lie, the court does find Flemmi's characterization of that statement to be correct.

In addition, at the April 1985 meeting Morris and Connolly told Bulger and Flemmi about sources that the FBI and other law enforcement had who were members or associates of the LCN. Flemmi Aug. 20, 1998 Tr. at 16–17. Bulger and Flemmi were encouraged to stay away from those individuals in order to protect themselves. *Id.*

Shortly before they left Morris' home, Bulger told Flemmi that he wanted to loan Morris $5000 to help him out with financial problems Morris was having. *Id.* at 19–21; Ex. 30, ¶ 16. Flemmi gave Bulger $3000. *Id.* Morris was having financial difficulties due to medical problems in his family. Morris Apr. 23, 1998 Tr. at 142–43. Bulger told Morris that he wanted to help him out and gave Morris $5000 in cash. *Id.* at 142–44, Apr. 29, 1998 Tr. at 56–57, 67; Ex. 30, ¶ 16; Flemmi Aug. 20, 1998 Tr. at 19–

21, Aug. 28, 1998 Tr. at 35; Newton June 2, 1998 Tr. at 7–8.

Morris never returned or repaid the $5000. Morris Apr. 23, 1998 Tr. at 144; Ex. 30, ¶ 16; Flemmi Aug. 20, 1998 Tr. at 20. Nor was he ever asked to do so by Flemmi or Bulger. Flemmi Aug. 20, 1998 Tr. at 20.

### 19. *Dining with "Donnie Brasco"*

In June 1985, the trial of Gennaro Angiulo and several of his codefendants began. Kottmyer Aug. 13, 1998 Tr. at 165, Aug. 14, 1998 Tr. at 139; Flemmi Sept. 15, 1998 Tr. at 35, Nov. 20, 1998 Tr. at 63–64. It culminated in Angiulo's conviction in February 1986. Nov. 20, 1998 Tr. at 63–64.

With Connolly's assistance, Bulger and Flemmi had evaded the DEA's efforts to have them prosecuted and continued to be highly valued allies in the FBI's war against the LCN. The character and quality of this alliance was exemplified by a dinner that Bulger and Flemmi had with Connolly, Nick Gianturco, Jules Bonovolenta, and Joe Pistone.

At about the time of the Angiulo trial, Bonovolenta and Pistone, who were from New York, were in Boston to review some documents in preparation for possibly testifying as experts in the Angiulo case or some other LCN prosecution. Gianturco Jan. 15, 1998 Tr. at 125–26, 156–57, Apr. 20, 1998 Tr. at 26, 35. Bonovolenta was the ASAC in New York City, who was in charge of the FBI's Organized Crime Division. Gianturco Jan. 20, 1998 Tr. at 83–84. Pistone, who had recently left the FBI, was renowned for having, as "Donnie Brasco," infiltrated the LCN in New York City and for testifying in many successful Mafia prosecutions. *Id.* at 82, Gianturco Jan. 20, 1998 Tr. at 130–31, Apr. 20, 1998 Tr. at 26–30, 34. As a result, it was understood that there was a $500,000 "contract" out on Pistone's life. Gianturco Apr. 20, 1998 Tr. at 28–29. Thus, precautions were being taken to assure the secrecy of Pistone's location and activities. *Id.*

Gianturco had worked with Bonovolenta and Pistone in New York. Gianturco Jan. 15, 1998 Tr. at 125. With Connolly's concurrence, when his friends were in Boston, Gianturco invited them to his home for dinner with Bulger and Flemmi. *Id.* at 159–60. Gianturco had complete confidence that Bulger and Flemmi would do nothing to endanger Pistone. Gianturco Apr. 20, 1998 Tr. at 30. Pistone had recently received the Attorney General's Award for Distinguished Service. *Id.* at 28. By being invited to dine with Pistone and Bonovolenta, Flemmi and Bulger could also rightly regard themselves as honored members of the government's team combatting the LCN.

Bulger and Flemmi soon validated again their value to the FBI by making an indispensable contribution to the successful effort to incarcerate Angiulo's successors in the Boston LCN—Joe Russo, Vincent Ferrara, and Robert Carrozza. Indeed, ultimately Flemmi particularly contributed to the successful prosecution of Raymond J. Patriarca, who had, as Flemmi reported, succeeded his father as Boss of the Family.

### 20. *Vanessa's*

By mid–1986 Angiulo and his codefendants had been convicted and Zannino, who was ill, was incapacitated while awaiting trial. The LCN in Boston was diminished and in disarray. This created a temporary vacuum which, according to their plan, Flemmi and Bulger sought to fill by expanding their own criminal activities.

More specifically, Flemmi understood that he and Bulger had formed a partnership with the FBI, which had "taken down" the LCN in Boston. Flemmi Aug. 28, 1998 Tr. at 119–20. This provided an opportunity for Bulger and Flemmi to take over criminal activities in Boston that had previously been controlled by the LCN. *Id.* With the protection of the FBI, Bulger and Flemmi could operate very profitably. *Id.*, Aug. 25, 1998 Tr. at 31. Basically, Flemmi had been led to reasonably under-

stand that he could "extort people, earn a living as a criminal, and not get prosecuted if [he gave] information to the FBI." *Id.* This was an important benefit of his bargain with the FBI because, for Flemmi, making money was "the name of the game." *Id.*

After Angiulo was convicted, the FBI's conduct continued to be consistent with Flemmi's understanding of his arrangement with the Bureau. For example, one of Morris' informants reported that bookmakers who were "with" Angiulo were receiving very little direction from the remnants of his regime; Flemmi was challenging the LCN by "taking over" its bookmakers and numbers agents; and the LCN was unable to do anything to stop him. Ex. 61. Yet the FBI made no effort to investigate these allegations.

Initially, the LCN sought to deal with the situation described by Morris' informant by proposing to make Flemmi a member. Ex. 123. Flemmi, however, remained uninterested in the offer. As an informant told Connolly:

> Flemmi would not want membership inasmuch as he is an independent person and would not want to be subject to the rules of the Mafia ... Flemmi does not need the headaches and he, along with Whitey Bulger, are "their own bosses with their own things going for them."

*Id.;* Ahearn May 7, 1998 Tr. at 139.

The LCN was not, however, the only organization interested in formalizing its relationship with Flemmi. In July 1986, the Bureau in Boston requested authority from FBI Headquarters to reopen Flemmi as an informant. *Id.* at 89–90; Ex. 110. The request described Flemmi as a proposed member of the LCN, who "remains in a position to provide valuable informa-

tion at the policymaking level of the Boston LCN." *Id.*[42]

Connolly, Ring, and their colleagues were very interested in targeting and immobilizing Angiulo and Zannino's successors. As predicted in the request that he be reopened, Flemmi proved to be an invaluable asset in that effort.

Beginning in April 1986, Flemmi reported to Connolly on the activities of Russo and Ferrara, who were emerging as the new leaders of the LCN in Boston, and their colleagues, Carrozza, Mercurio, Dennis Lepore, and Biagio DiGiacomo. Exs. 16, 17, 18, 117, 118, 128. He also provided information concerning LCN members in Providence, including Patriarca, Matthew Gugliametti, and Anthony St. Laurant. Exs. 117, 211.

As Flemmi explained to Connolly, the LCN in Boston wanted to establish a cooperative relationship with Bulger and him in order to minimize the threat that they posed. Ex. 117. Mercurio, who was already friendly with Bulger and Flemmi, took a leading role in this effort. *Id.* Flemmi also reported that Mercurio, who had recently been released from prison, was bitter toward the Angiulos. *Id.*

Flemmi told Connolly that the LCN wanted to meet with Bulger and him to discuss the payoff on the illegal numbers and other gambling issues. Ex. 117. The FBI was very interested in the information such meetings would generate.

Flemmi subsequently met several times with members of the Boston LCN in a storeroom of Vanessa's, a restaurant owned by Mercurio. Exs. 16, 17, 118. Flemmi told Connolly about at least some of the meetings in advance. Exs. 117, 118. As requested by Connolly, he also reported on what was discussed. Flemmi Aug.

---

42. The request that Flemmi be reopened as an informant also explained that he had been closed on September 23, 1982 because of purported, pending investigations arising from the interceptions at 98 Prince Street and 51 North Margin Street. Exs. 83, 110. As described in § II.11, *supra*, Flemmi had not

been targeted for investigation relating to that electronic surveillance. Morris Apr. 23, 1998 Tr. at 20; Ring June 10, 1998 Tr. at 40. Rather, when closed as an informant in September 1982, Flemmi was a subject in the investigation of the Wheeler, Halloran, and Callahan murders.

29, 1998 Tr. at 91–95; Exs. 16, 17, 118. Among other things, Flemmi described the LCN's plans concerning: illegal football cards; changing the payoff odds on the illegal numbers; the extortion of bookmakers generally; and, particularly, a scheme to obtain money from "Doc" Sagansky, who was a major bookmaker. Exs. 16, 17, 118.

The FBI promptly decided to target Vanessa's for electronic surveillance. In addition to utilizing Flemmi and Bulger to obtain information necessary for the application for a warrant, Flemmi was asked to obtain valuable logistical information concerning Vanessa's. Flemmi Aug. 20, 1998 Tr. at 95. For example, at Connolly's request, Flemmi reported that participants accessed the storeroom by taking a service elevator, and that the storeroom had an alarm system which was not operative. Exs. 16, 17. At Ring's request, Flemmi provided the FBI with a detailed diagram of the storeroom. Flemmi Aug. 20, 1998 Tr. at 94–95; Carter Aug. 17, 1998 Tr. at 55; Ex. 209.

As a result of these requests, Flemmi correctly understood that the FBI was planning to bug Vanessa's. Flemmi Aug. 20, 1998 Tr. at 95; Ring June 15, 1998 Tr. at 17–18. Connolly told Flemmi when the bug was installed. *Id.* at 95–96. As a result, Flemmi and Bulger stayed away from Vanessa's and, as with 98 Prince Street, neither was intercepted. *Id.;* Carter Aug. 8, 1998 Tr. at 56, 106.

In contrast to 98 Prince Street, however, there is no evidence there was any discussion of whether any evidence acquired by the bug at Vanessa's would be used against Bulger or Flemmi. However, Flemmi believed that because the FBI had asked him to obtain information concerning Vanessa's, as it had asked him to obtain information about 98 Prince Street, he would have the same protection with regard to any evidence intercepted at Vanessa's as he had concerning the evidence intercepted at 98 Prince Street. Flemmi

Aug. 27, 1998 Tr. at 70. This understanding was reasonable.

The application for the warrant to bug Vanessa's was filed on October 31, 1986. Ex. 153. The supporting affidavit was submitted by Carter. *Id.* Most, if not all, of the information contained in the affidavit was provided to Carter by Connolly, who reviewed the affidavit. Flemmi and Bulger were two of the three confidential sources relied upon in the affidavit. Carter Aug. 18, 1998 Tr. at 33; Coffey Aff., Apr. 9, 1997, at 3; Ex. 109. The court concludes that but for the information provided by Flemmi and Bulger, the government could not have obtained the warrant to bug Vanessa's. Carter Aug. 17, 1998 Tr. at 47–48, 51–52, 54, 105; Ex. 207.

Ring generally supervised the preparation of the affidavit. Ring June 15, 1998 Tr. at 14. In addition, the affidavit was reviewed at FBI Headquarters. Carter Aug. 17, 1998 Tr. at 107–09.

At some point in 1985, Carter had been told that Bulger and Flemmi were FBI informants. *Id.* at 102. He understood that they were two of the three sources who had supplied much of the information for his affidavit. *Id.* at 51–52, Aug. 18, 1998 Tr. at 33; Coffey Aff., Apr. 9, 1997, at 3. For example, Carter knew that Flemmi was the source of the diagram of Vanessa's that he included in his affidavit. *Id.* at 105. It was Carter's understanding that Flemmi's statements to Connolly could not be used against him, at least directly. *Id.* at 164–65. The affidavit was sent to FBI Headquarters in a manner that revealed that Bulger and Flemmi were both two of the named targets and two of the three referenced sources. *Id.* at 107–09.

Morris testified that it was a common practice for the FBI to name sources who had provided information for an affidavit as targets in applications seeking authority to conduct electronic surveillance in an effort to mask their status as informants. Morris Apr. 30, 1998 Tr. at 171–72. This practice was followed with regard to Bulger and Flemmi in Carter's affidavit con-

cerning Vanessa's.[43] In the process, the FBI intentionally, and with reckless disregard for the truth, prepared an affidavit that was false and misleading with regard to Flemmi and Bulger, and caused it to be authorized for filing and submitted by attorneys in the Department of Justice who were not informed of its deceptive character. Carter Aug. 17, 1998 Tr. at 110; Weld May 27, 1998 Tr. at 109–12.

For example, the application and Carter affidavit represented that there was probable cause to believe that Bulger and Flemmi, among others, were conspiring with Russo, Ferrara, and their associates to conduct an illegal gambling business and a RICO enterprise. Ex. 153. The submissions also stated that Flemmi and Bulger were expected to be intercepted if the request to bug Vanessa's was allowed. *Id.* The application and affidavit represented that the requested electronic surveillance was necessary with regard to Bulger and Flemmi, among others. *Id.* The clear import of the submissions was that the FBI would employ any evidence that it intercepted to try to develop a prosecutable case against Flemmi and Bulger, as well as the other named targets.

Based on the collective knowledge of the participants, the FBI well knew that none of this was true. There was no reason to believe that Flemmi or Bulger would visit Vanessa's while it was bugged and be intercepted. Carter certainly did not expect that they would. Carter Aug. 18, 1998 Tr. at 166. Moreover, in view of their close cooperation with the FBI concerning Vanessa's, it was doubtful that any conversation in which Flemmi and Bulger might engage there could properly be deemed criminal activity rather than conduct authorized by the government. In any event, with regard to necessity, the FBI had relevant statements by Bulger and

Flemmi that it now claims are not immunized. Nov. 12, 1998 Tr. at 141–43; Apr. 13, 1999 Tr. at 154–56; Gov. Post–Hearing Brief at 110–123. In addition, the FBI had no intention of investigating Flemmi or Bulger based on any information generated by the bugging of Vanessa's.

While the FBI knew that the submissions seeking authority to bug Vanessa's were deceptive, the Department of Justice attorneys who were involved in the matter did not. Honoring the FBI's promise of confidentiality to Bulger and Flemmi, Carter did not tell the Strike Force Attorney with whom he was working, Jane Serene, that Flemmi and Bulger were FBI informants. Carter Aug. 17, 1998 Tr. at 110. Thus, he did not discuss with her the legality of including them as both sources and purported targets in the application and affidavit. *Id.* Nor did he discuss this issue with anyone at the FBI. *Id.*

In October 1986, Weld became the Assistant Attorney General in charge of the Criminal Division. Weld May 26, 1998 Tr. at 5. As such, he authorized the application for the Vanessa's bug. Ex. 153. Weld reviewed the application before authorizing its submission. Weld May 27, 1998 Tr. at 50. His prior experience in Boston, including the unsuccessful 1984–85 electronic surveillance targeting Bulger and Flemmi, provided reason for him to question the FBI's representations concerning them, but Weld did not. Weld May 27, 1998 Tr. at 92, 97–98. Nor was Weld told that Bulger and Flemmi were two of the informants relied upon in the affidavit, as well as named targets. *Id.* at 51–52.

If Weld had understood that Bulger and Flemmi were informants, he would have seriously questioned the necessity for the proposed electronic surveillance. *Id.* at

---

**43.** This conclusion is reinforced by the statement in Carter's affidavit that the informants relied on in the affidavit:

> [H]ave provided information in other investigations. Some of this information resulted in the identification and conviction of a

number of criminals. Use of informant testimony, even if compelled by a grant of immunity, would seriously jeopardize if not totally destroy their continued usefulness in other investigations.

Ex. 153, Carter Aff., at 28.

67–68, 88, 110–13. Even if they were reluctant to testify voluntarily, Weld would have considered seeking an order providing them immunity and compelling them to do so. *Id.* at 87. In any event, Weld would not have permitted the application and affidavit which were false and misleading with regard to Bulger and Flemmi to be filed. *Id.* at 110–13.

Weld understood that deliberately providing false information in an application for a warrant could constitute perjury and, in any event, would "undercut the entire process that Congress enacted ... to hedge ... the ... authorization of electronic surveillance." *Id.* at 108–09. Thus, if properly informed, Weld would have insisted that all of the false and misleading statements in the proposed affidavit be corrected or deleted, or that the application not be submitted to the court. *Id.* at 87–88, 109–12.

In essence, if Weld had requested or received all of the relevant information regarding Bulger and Flemmi, a politically accountable official would have made the informed judgment concerning the propriety of the proposed application that Title III contemplates. The FBI's determination both to honor its promise not to disclose to anyone outside the Bureau that Bulger and Flemmi were informants and to perpetuate their ability to serve as sources prevented that informed judgment from being made with regard to Vanessa's.

The Application and Carter affidavit were submitted on October 31, 1986, and approved by Judge William Young the same day. Ex. 153; Coffey Aff., Apr. 9, 1997, at 3. The government received a series of extensions and the storeroom of Vanessa's was bugged until June 1987. Flemmi and Bulger provided information relied upon in some, but not all, of the requests for extensions. Coffey Aff., Apr. 9, 1997, at 3. The electronic surveillance of Vanessa's was terminated after Mercurio secretly found the bugs, and reported to Bulger that he, Ferrara, and others had begun making exculpatory statements in an effort to help themselves. Ex. 175.

Before it was discovered, the electronic surveillance of Vanessa's was very productive. Among other things, the bug intercepted the successful extortion of $250,000 from Sagansky and his colleague Mo Weinstein that Flemmi had predicted. Ring June 4, 1998 Tr. at 108–09; Kottmyer Aug. 12, 1998 Tr. at 61. That evidence was eventually used as a cornerstone of the successful prosecution of Russo, Ferrara, Mercurio, and other members of the Boston LCN. *See Carrozza*, 807 F.Supp. at 156. In addition, as described in § II.29, *infra*, after Vanessa's was searched pursuant to a warrant issued in the spring of 1987, the fruits of the bug gave the FBI powerful leverage in its successful effort to convert Mercurio promptly into an informant. Ring June 15, 1998 Tr. at 45; Ex. 113. As Flemmi reported, the Russo faction knew that the Sagansky–Weinstein extortion was a big problem for them and Mercurio did not want to return to prison. Ex. 165.

### 21. *Flemmi Becomes A Top Echelon Informant Again*

In November 1986, James Ahearn became the SAC in Boston. Ahearn May 7, 1998 Tr. at 67. Two months earlier, Larry Potts became an ASAC in Boston, with responsibility for matters relating to the Organized Crime squad, among other things. Potts May 21, 1998 Tr. at 9. Potts ultimately went on to hold several of the highest positions in the FBI, serving as the Assistant Director in charge of the Criminal Division from 1992 to 1995, and as Acting Deputy Director in 1995. *Id.* at 9–10.

Soon after Ahearn became SAC, Potts told him that, "Morris proposed that Whitey Bulger was no longer providing information of sufficient value to maintain his relationship as an FBI informant and should be considered as a subject of investigation rather than as a confidential source." Ex. 134; Ahearn May 11, 1998

Tr. at 110–11; Ahearn May 7, 1998 Tr. at 92–94; Potts May 22, 1998 Tr. at 12, 26. In response, Ahearn asked Potts to conduct a "suitability review" of Bulger and Flemmi. Ahearn May 7, 1998 Tr. at 93; Potts May 21, 1998 Tr. at 28–29, 133.

At that time, the FBI Manual established criteria that were to be taken into consideration in conducting a suitability review. Ex. 111 (3/28/84, § 137–3.1.1.); Ahearn May 7, 1998 Tr. at 95–98; Potts May 22, 1998 Tr. at 5. Among the factors to be weighed in deciding whether to utilize someone as an informant were:

> (a) the nature of the matter under investigation and the importance of the information being furnished as compared to the seriousness of past and contemporaneous criminal activity of which the informant may be suspected.
>
> \* \* \* \* \* \*
>
> (e) any record of conformance by the informant to FBI instructions and control in past operations; how closely the FBI will be able to monitor and control the informant's activities insofar as he/she is acting on behalf of the FBI.

*Id.*

In conducting his review, Potts did not consider the range of factors prescribed by the FBI Manual. Potts May 21, 1998 Tr. at 118, 133. He understood that Bulger and Flemmi were engaged in criminal activity. Potts May 22, 1998 Tr. at 9. Potts, however, sought merely to evaluate their productivity, rather than to weigh it against the seriousness of the threat posed by the crimes Bulger and Flemmi were understood to be committing. Potts May 21, 1998 Tr. at 118, 133.

Potts reviewed the files of inserts reflecting information that Bulger and Flemmi had provided, and spoke to Morris, Ring, Connolly, and Nick Gianturco. Potts May 21, 1998 Tr. at 34–37; Ahearn May 7, 1998 Tr. at 93. He did not review the administrative portion of their files, or information provided by other sources concerning Bulger and Flemmi's criminal activity. Potts May 21, 1998 Tr. at 35–37.

Ring and Connolly told Potts that Bulger and Flemmi were providing information that was very significant to the organized crime program. Potts May 21, 1998 Tr. at 31, 54. Referring in part to Vanessa's, they emphasized Bulger and Flemmi's ability to support successful applications for electronic surveillance. *Id.* at 31, 56. As the Organized Crime squad then had another agent, Vincent Delamontaigne, operating undercover in an attempt to infiltrate the LCN, their potential to help protect him was particularly important. *Id.* at 31. *See also United States v. DiGiacomo*, 746 F.Supp. 1176 (D.Mass.1990).

Thus, Potts advised Ahearn that "the information in [Bulger's informant] file was of substantial value and in his opinion Whitey Bulger should be maintained as an informant rather than a target." Ex. 134; Ahearn May 7, 1998 Tr. at 92–93, 103. Potts evidently made the same recommendation regarding Flemmi. Ahearn concurred in Potts' recommendations.

At that time the FBI Manual also required that FBI Headquarters review at least annually the determination by a field office that an individual was suitable to serve as an informant. Potts May 22, 1998 Tr. at 5–6; Ex. 274 (Under Seal), Manual § 137–16(1)(D)(5) (3–28–84). Potts' advice to Ahearn was given orally. Potts May 21, 1998 Tr. at 33–34. Ahearn's decision to continue Bulger and Flemmi as informants was not memorialized in writing at that time. Thus, it was never reviewed by FBI Headquarters.

This deviation from the requirements of the Manual was, however, immaterial. In Potts' vast experience, FBI Headquarters had never reversed a field office's decision that an individual was suitable to serve as an informant. Potts May 22, 1998 Tr. at 6–8. Essentially, the supervisor of the informant's handler was the "critical," "chief decision maker" regarding whether or not an informant should be opened or continued. *Id.* at 8. In Potts' experience,

the SACs, ASACs, and FBI Headquarters all relied on the squad supervisors to comply with the Guidelines and Manual provisions concerning informants, including the reporting requirements regarding unauthorized criminal conduct by informants. *Id.* at 809.

Moreover, in Potts' extensive experience no informant had ever been targeted for investigation based on statements he had made to the FBI. Potts May 22, 1998 Tr. at 24–25, 48–49, 64–65. Potts knew of no instance in which an informant's statements to the FBI had been used against him directly or to obtain electronic surveillance targeting him. *Id.* at 28–29, 48. Nor did Potts know of any instance in which a 209 including information that an informant had furnished to the FBI was provided to another law enforcement agency to prompt or facilitate an investigation of the Bureau's source. *Id.* at 25, 27, 65.

In any event, following Potts' review and Ahearn's decision, on February 2, 1987, the Boston office of the FBI informed Headquarters that a suitability inquiry had been conducted, that Ring, as Connolly's supervisor, had certified that Flemmi was an appropriate candidate, and that Flemmi was being opened as an informant. Ex. 15. The report noted that Flemmi "has been active in gambling and loansharking." *Id.* It emphasized his significant contribution to the bugging of Vanessa's and to a police corruption investigation as well. *Id.*

Following the conclusion of the electronic surveillance of Vanessa's, in December 1987, Flemmi was designated a Top Echelon informant. Exs. 109, 268. In the request that he be elevated to that status, Flemmi was described as the Winter Hill Gang's liaison with the Mafia, a source of valuable information leading to the electronic surveillance of Vanessa's, and a person who would continue to provide high quality information. Ex. 109. In approving the request, FBI Headquarters congratulated the Boston office for developing such a fine informant. Ex. 268. Thus, Flemmi regained the title of Top Echelon

informant that he had relinquished when, after being warned of his impending indictments by Rico, he became a fugitive in 1969.

### 22. *Raymond Slinger*

As described earlier, Ahearn had asked Potts to evaluate whether Bulger "should be considered as a subject of investigation *rather than* as a confidential source." Ex. 134; Ahearn May 11, 1998 Tr. at 110–11 (emphasis added). Potts' conducted his review and reported that "Bulger should be maintained as an informant *rather than* a target." *Id.* (emphasis added). As Ahearn's formulation of the question and Potts' answer indicate, the FBI generally viewed the roles of FBI informant and target of FBI investigation to be mutually exclusive. Indeed, as explained in § II.9, *supra*, that is why Bulger was closed as an informant when he became a primary subject of the race-fix investigation. The lengths to which the FBI would go to protect Bulger and Flemmi because of their value as Top Echelon informants, rather than target them for prosecution, is vividly demonstrated by the manner in which it dealt with Raymond Slinger in 1987.

At that time Slinger was a real estate broker in South Boston. Slinger Sept. 23, 1998 Tr. at 71. In 1986, he was introduced to Bulger and Flemmi, by Kevin O'Neil, to discuss real estate in South Boston. *Id.* Slinger knew that Flemmi and Bulger were reputed to be violent criminals. *Id.* at 88–89.

In early 1987, O'Neil asked Slinger to come to Triple O's, a bar that O'Neil owned. *Id.* at 72. There, in a private room on the second floor, Slinger was reintroduced to Bulger. *Id.* at 72–73. Bulger told Slinger that he had been hired to kill him, but that Slinger could avoid that fate if he paid Bulger instead. *Id.* at 73–74. Bulger scornfully rejected Slinger's offer of $2000, saying that his boots cost more than that, and demanded $50,000. *Id.*

After leaving Triple O's, Slinger called his friend, Boston City Councilor James Kelly. *Id.* at 132–37. Slinger told Kelly that Bulger and O'Neil were shaking him down, and gave Kelly the details. *Id.* Kelly indicated that he knew Bulger and O'Neil, and would speak to them. *Id.* Kelly said that he would try to help Slinger. *Id.* at 75, 127, 132–37. Kelly subsequently told Slinger that he had spoken to someone, who Slinger understood to be Bulger or O'Neil, and that Slinger should have no further problems, but if he did, Slinger should call "the authorities." *Id.*

A week or two later, in March 1987, O'Neil again called Slinger and told him that Bulger wanted to see him at Triple O's. *Id.* at 75–78, 95, 97. This time Slinger took with him his assistant, Arlene Lehane, and a hidden handgun. *Id.* At Triple O's, Slinger was separated from Lehane and again taken to the second floor. *Id.* There, Bulger, O'Neil, and Kevin Weeks found the handgun, beat Slinger badly, and berated him for talking about the shakedown. *Id.* Bulger then put Slinger's loaded gun to the top of Slinger's head, said that if he shot him from that angle there would be no blood shed, and ordered Weeks to get a body bag. *Id.* Bulger subsequently said, however, that he would give Slinger another chance to get the $50,0000 quickly. *Id.* Slinger agreed to do so. *Id.*

Slinger left with Lehane, who had remained downstairs. *Id.* at 78, 125–26. He was badly swollen and his shirt was ripped. *Id.* On the ride back to his office, he told Lehane what had happened. *Id.* at 79.

In March 1987, Slinger borrowed money from his sister and wife, and made an initial $10,000 payment to O'Neil. *Id.* at 79. He then made weekly payments to O'Neil of about $2000 each, amounting to a total of $25,000 by about May 1987. *Id.* at 79, 82, 98. The time for the payments was arranged by telephone and they were made, in cash, in O'Neil's automobile. *Id.*

Although he does not now admit it, it appears that in about May 1987, Slinger called the FBI. *Id.* at 82; Newton May 28, 1998 Tr. at 64; Ellavsky June 1, 1998 Tr. at 21. *See also* May 28, 1998 Tr. at 13–14 (Lobby, Under Seal). In any event, the squad responsible for non-traditional organized crime matters, whose supervisor was Bruce Ellavksy, was informed of the ongoing Slinger extortion. Ellavsky June 1, 1998 Tr. at 17, 21. Rod Kennedy was assigned to interview Slinger. *Id.* at 22; Newton May 28, 1998 Tr. at 6, 8–9. He asked Newton to accompany him. *Id.* at 9.

Kennedy and Newton interviewed Slinger at his office in South Boston. Slinger Sept. 23, 1998 Tr. at 98. Slinger told Kennedy and Newton exactly what had occurred and about the continuing payments that he was making. *Id.* at 98–100. Although Slinger expressed concern for himself and his family, he said that he was willing to testify. Newton May 28, 1998 Tr. at 22, 34, 45.

Newton thought that the Slinger matter "looked like a great case." *Id.* at 44–45. His squad had the jurisdiction to investigate the "Irish Mob," and Bulger was then viewed as its highest member. *Id.* at 54. There was no pending investigation of Bulger and his colleagues. *Id.* Slinger was the first of Bulger's victims to provide Newton with any information. *Id.* at 54–55. Slinger was not only willing to testify, but would "wear a wire" to record incriminating conversations as well. *Id.* at 55; Ellavsky June 1, 1998 Tr. at 59, 145. In addition, the FBI had the opportunity to interview Lehane, to record O'Neil's telephone conversations with Slinger, and to conduct physical surveillances. Ellavsky June, 1, 1998 Tr. at 52. Ordinarily, the United States Attorney's Office would have been promptly consulted to obtain authority to consensually record Slinger's conversations. *Id.* at 46, 48.

Newton, however, knew that Bulger was a Top Echelon informant, who was being handled by Connolly and Morris. Newton May 28, 1998 Tr. at 57–58, 61. Newton

understood that because Bulger was an informant, supervisors would have to be consulted and something would "have to be worked out." *Id.* More specifically, he knew that a high level decision would have to be made concerning whether to investigate Bulger. *Id.* If no effort to develop a case was to be made, Newton expected that something would be done to protect Slinger. *Id.* Newton was right about all of this.

Newton and Kennedy told Ellavsky what Slinger had said. *Id.* at 36–37; Ellavsky June 1, 1998 Tr. at 29–30. Ellavsky understood that Slinger was willing to wear a wire and testify. Ellavsky June 1, 1998 Tr. at 59, 145–46. Ellavsky also knew, however, that Bulger was an FBI informant. *Id.* at 21–22, 195.

Thus, Ellavsky consulted the ASAC who was then his "boss," Potts. *Id.* at 30–31, 141, 192. Following that discussion, several striking things occurred.

Slinger's allegations and willingness to testify provided, under the Attorney General's Guidelines, a quintessential case for either referring Slinger's allegations to state or local law enforcement, or reporting the desire not to do so to FBI Headquarters and the Assistant Attorney General. The Guidelines, however, were utterly ignored. Instead Potts and Ellavsky evidently decided that no further investigation would be conducted. The FBI did not speak with Slinger again. *Id.* at 103. Nor was Lehane ever interviewed by the FBI.

Moreover, contrary to both the requirements set forth in the FBI's Manual and standard the FBI practice, no FBI Form 302 (a "302") or other written record was made of the interview of Slinger. Newton May 28, 1998 Tr. at 34–36; Kennedy May 28, 1998 Tr. at 80; Ellavksy June 1, 1998 Tr. at 26. This dereliction of duty minimized the risks that Slinger's information would ever be used against Bulger and that those responsible for protecting him would ever be held accountable for arrogating to themselves the decision to do so.

As Newton had recognized, however, there was plainly a problem presented by the continuing extortion of Slinger. The FBI apparently decided to deal with that problem in the manner that it dealt with the National Melotone matter a decade before—by telling Bulger to "lay off." Slinger testified that in an effort to protect himself, he promptly told O'Neil that he had been visited by the FBI. Slinger Sept. 23, 1998 Tr. at 82. If this occurred, it would not alone have been enough to deter Bulger, who had for many years been consistently protected by the FBI. Rather, the court infers that Bulger was advised by Connolly to desist. The day after the FBI interview of Slinger, O'Neil told him that he would not have to pay the remaining $25,000 that he owed. *Id.* at 82, 137.

In 1996, Slinger was interviewed by IRS agents who were investigating the Rakes extortion concerning the South Boston Liquor Mart. *Id.* at 106; May 8, 1998 Government's Ex Parte, In Camera Motion for Protective Order (the "Motion for Protective Order"). Slinger told them, in detail, about his own experience with Bulger. *Id.* In September 1996, he testified about this matter before the grand jury, where he was questioned by James Herbert and Brian Kelly, two of the prosecutors in this case. *Id.*

The IRS interview report and Slinger's grand jury transcript should have been promptly produced in discovery pursuant to the June 26, 1997 Order. *See United States v. Salemme,* 978 F.Supp. 386, 387–88 & n. 5 (D.Mass.1997). That Order stated, in part, that the government was required to produce to counsel for each defendant, by July 18, 1997:

c) Any document or record that tends to show that Department of Justice and/or FBI regulations or guidelines were, in any way, not complied with concerning Flemmi and/or Bulger. The documents and records covered by this subparagraph include, but are not limited to, materials indicating that: (i) re-

quired records were not prepared or maintained; ...(iv) established procedures for seeking authorization or guidance concerning the participation of an informant in criminal activity were not followed; and/or (v) any required notification to appropriate authorities of unauthorized criminal activity by Flemmi and/or Bulger was not made.

*Id.* at 387–88. The court in that Order warned the government that:

If government agents failed to follow required or customary procedures to record accurately communications with informants relevant to this case, the court will consider the possibility of ordering the government, in the discharge of its *Brady* obligations, to conduct appropriate interviews as part of its "duty to learn of any favorable evidence known to others acting on the government's behalf." *Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 1567, 131 L.Ed.2d 490 (1995); *see also, United States v. Hanna,* 55 F.3d 1456, 1460–61 (9th Cir. 1995) (holding that government, as part of its duty under *Kyles,* was required in particular circumstances to inquire about oral, unrecorded statements between police officers); *United States v. Van Nuys,* 707 F.Supp. 465, 470 (D.Colo. 1989) (holding that deliberate failure to prepare DEA 6 reports of witness interviews constituted a violation of the duty to preserve evidence that deprived defendant of right to a fair trial).

*Id.* at n. 5.

Nevertheless, although the government submitted, *ex parte,* many documents for *in camera* consideration by the court to decide whether they should be produced to the defendants, the Slinger documents were not disclosed to the court prior to the commencement of the evidentiary hearings in January 1998. The government did file

a motion for a protective order concerning them on May 8, 1998. In seeking authorization not to produce them, the government relied in part on the possibility that providing the documents to the defendants might endanger Slinger and also in part on the assertion that Slinger's "claim" that he was "allegedly visited" by two FBI agents could not be corroborated because there was no 302 concerning an interview of him and the government had "never been able to identify" the agents who reportedly conducted the interview and "did not know in fact whether or not they were FBI agents." Motion for Protective Order at 1–2; May 12, 1999 Tr. at 7–8 (Under Seal).

The court held a series of *ex parte, in camera* conferences concerning this matter. *See* May 12, 1998 Tr. (Under Seal); May 13, 1998 Tr. (Under Seal); May 27, 1998 Tr. (Under Seal); May 28, 1998 Tr. (Under Seal). The court informed the government that in view of the defendants' constitutional right to certain discovery, the IRS report of Slinger's allegations, but not the grand jury transcript, would have to be disclosed and, if necessary and appropriate, steps should be taken to provide Slinger protection. May 12, 1998 Tr. at 10 (Under Seal); May 13, 1998 Tr. at 4–5 (Under Seal); May 28, 1998 Tr. at 4–6 (Under Seal). The defendants were given the IRS report on May 28, 1998.[44] May 28, 1998 Tr. at 12–13.

The government promptly reiterated its contention that the Slinger matter should not be deemed admissible because the government had not been able to find any 302 indicating that he had been interviewed, and neither the FBI nor the OPR team that had conducted an investigation in July 1997 had been able to identify any FBI agent who interviewed him. *Id.* at 16–18. Thus, the government questioned whether

---

**44.** The court also ordered disclosure to defendants of a 1991 302 stating that a witness had reported that, in 1991, John Connolly was telling certain individuals to be cautious in dealing with Slinger. May 28, 1998 Tr. at 13 (Under Seal). The witness also reported that

Bulger and Flemmi had made contingency plans to escape if indicted and "would know in advance of their indictment, and would run." *Id.* at 13–14. Neither the government nor the defendants, however, called that witness to testify.

the individuals who visited Slinger "were really FBI agents." *Id.* at 16. The court expressed skepticism about this argument, based in part on the FBI's handling of the evidence concerning Bulger provided by Joseph Runci, which is discussed in § II.24, *infra. Id.* at 17. Defense counsel suggested that Newton, who was during the relevant period a member of the squad responsible for investigating non-traditional organized crime and was waiting to resume his testimony, be questioned in the lobby about the Slinger matter. *Id.* at 25–26. The prosecutors and the court agreed. *Id.* at 26. It took only three questions by the court for Newton to acknowledge that he and Kennedy had interviewed Slinger. *Id.* at 29.

### 23. *Bulger and Flemmi Are Protected From Investigation In the Hobart Willis Case*

The FBI's handling of the Slinger matter was not an aberration. In 1980, Ellavsky joined the squad, known as C–2, which came to have responsibility for non-traditional organized crime investigations, as well as drug cases. Ellavsky June 1, 1998 Tr. at 17–18, 55. He succeeded Morris as the supervisor of that squad in March 1987, and held the position for several years. *Id.* at 16–17. Although Ellavsky's squad was responsible for investigating nontraditional organized crime groups such as the Winter Hill Gang, no investigation of Bulger or Flemmi was conducted during Ellavsky's tenure on that squad. *Id.* at 54–55, 110–11; Blackburn May 7, 1998 Tr. at 27. Indeed, rather than investigate Bulger and Flemmi, Ellavksy and his colleagues protected them from investigation in the Hobart Willis case.

James Blackburn was a member of Ellavsky's squad. *Id.* at 19; Blackburn May 4, 1998 Tr. at 7. In late 1986 or 1987, Blackburn was working with the DEA and other law enforcement agencies in a joint investigation of reputed drug dealer Hobart Willis and others. Blackburn May 4, 1998 Tr. at 8, 22, 29, 45, May 7, 1998 Tr. at

27; Ellavsky June 1, 1998 Tr. at 96. Blackburn received information that Willis was paying "tribute" to Bulger. Blackburn May 4, 1998 Tr. at 9, 31, 34.

Blackburn understood that Bulger was an informant for Connolly. Blackburn May 6, 1999 Tr. at 35, 37. Nevertheless, he promptly spoke to Connolly about the joint investigation of Willis generally and about the allegation that he was paying "tribute" to Bulger particularly. *Id.* at 36–38, May 7, 1998 Tr. at 47–48. Among other things, Blackburn told Connolly that electronic surveillance of Willis was planned. Blackburn May 4, 1998 Tr. at 37. When that electronic surveillance was conducted, Bulger was not intercepted. *Id.* at 37–38.

Connolly told Blackburn that Bulger's practice was to extort money from bookmakers, drug dealers, loansharks, and others who could not complain to the police without incriminating themselves. *Id.* at 18, 43. However, Connolly expressed the view that although Willis was a drug dealer in South Boston, Bulger was not extorting him. *Id.* at 17, 39. Following his conversation with Connolly, Blackburn never pursued any investigation concerning whether Bulger was indeed receiving payments from Willis. *Id.* at 45, May 7, 1998 Tr. at 48–49.

The FBI's refusal to investigate Bulger's connection to Willis persisted despite increasingly specific information that Blackburn and Ellavsky received from their informants. Exs. 102, 103, 104, 105. For example, in September 1986, Ellavsky was told that "Willis is tired of having to pay Whitey Bulger $2000 per month to operate his narcotics business in South Boston." Ex. 104; Ellavsky June 1, 1998 Tr. at 73–76. In April 1987, Ellavsky's informant reported that Willis was "paying Whitey Bulger and Stevie Flemmi $4000–$6000 per month to operate in South Boston." Ex. 105. Blackburn testified, however, that he was not given this information for his use in the Willis investigation, even after Ellavsky reviewed a July 1, 1988 302

from one of Blackburn's informants stating that "Willis continues to pay Whitey Bulger a "tax" of $1000 to $3000 per month to operate his cocaine business." Ex. 102; Blackburn May 4, 1998 Tr. at 25, 58, May 6, 1998 Tr. at 7, May 7, 1998 Tr. at 60. The court questions Blackburn's claim that Ellavsky did not provide him with the information from his sources.[45]

In any event, the 209s reflecting the information that the FBI's sources were providing concerning the extortion of Willis by Bulger and Flemmi were not used by the FBI to investigate Bulger or Flemmi; *Id.* at 14; Ellavsky June 1, 1998 Tr. at 101–04; Blackburn May 7, 1998 Tr. at 27. Nor were the 209s indexed in a way that would make them accessible to any FBI agent searching for source information about Bulger and Flemmi. May 4, 1998 Tr. at 60–66. In addition, the information was not shared with the other agencies or prosecutors involved in the joint investigation of Willis, or used by the FBI in that investigation. *Id.;* Ellavsky June 1, 1998 Tr. at 97; Blackburn May 7, 1998 Tr. at 26.

On August 5, 1990, one of Blackburn's sources reported that Willis expected to be indicted with Bulger within two weeks. Ex. 103; Blackburn May 6, 1998 Tr. at 22, 24. Willis and a number of other drug dealers in South Boston were soon indicted. May 5, 1998 Tr. at 183; Blackburn May 4, 1998 Tr. at 95; Ellavsky June 1, 1998 Tr. at 86–87. Bulger, however, was not charged.

24. *The Guard Rails at the South Boston Liquor Mart*

It was not only the Organized Crime squad and the squad responsible for investigating non-traditional crime that declined to investigate Bulger and Flemmi in order to perpetuate them as informants. The Public Corruption squad did so as well.

Joseph Runci was a *Boston Globe* reporter and photographer, who also served as an FBI informant handled by James Lavin, an agent on the Public Corruption squad. Ex. 144; Runci May 19, 1998 Tr. at 43. Runci observed City of Boston workers erecting guard rails on the private property of the South Boston Liquor Mart, which he understood was owned by Bulger, a reputed member of organized crime. Runci May 19, 1998 Tr. at 53–56. Runci photographed the workers and their City truck. Ex. 101. Runci May 19, 1998 Tr. at 43. In December 1987, Runci told Lavin what he had seen and provided him the photographs, as well as some additional documents suggesting that Bulger had bought another liquor store through a "straw." *Id.;* Lavin May 6, 1998 Tr. at 22–30.

Lavin recognized Bulger as a well-known member of organized crime. *Id.* at 40. He perceived the potential for a promising public corruption investigation of Bulger and indicated to Runci that he was very interested in pursuing the matter. *Id.* at 82–87, 85; Runci May 19, 1998 Tr. at 56. Indeed, he told Runci that he should expect to be called to testify before a grand jury. Runci May 19, 1998 Tr. at 58–59.

Following his usual practice, Lavin reported what he had learned and received to his supervisor, John Morris. Lavin May 6, 1998 Tr. at 23, 25, 31. Morris told him to "run it by" Connolly. *Id.* at 32, 58. Lavin understood that he was given this instruction because Bulger was rumored to be an informant being handled by Connolly. *Id.* at 34, 39, 86.

Lavin met with Connolly and related to him the information Runci had furnished. *Id.* at 36, 62. Connolly confirmed that Bulger was an informant and told Lavin that he had provided valuable information. *Id.* This conversation occurred while the electronic surveillance of Vanessa's was being conducted and Connolly's character-

---

45. Blackburn initially claimed that he had not seen the 209s which are Exhibits. Blackburn May 7, 1998 Tr. at 62–63. It was later disclosed he had prepared those 209s. *Id.*

ization of Bulger's contributions was true. Connolly suggested that Lavin not conduct any investigation. *Id.* at 76.

Lavin complied with Connolly's suggestion. Contrary to the requirements of the FBI Manual and his uniform practice, Lavin did not prepare a 209 or any other written record of the information Runci had provided. *Id.* at 24, 26–27, 32, 38, 40, 63, 80–81. Nor did he conduct any investigation. *Id.* at 60. Rather, he placed the materials in his desk, where they could not be discovered or accessed by anyone who might become interested in investigating Bulger. *Id.* at 38, 40.

Shortly after Lavin spoke to Connolly, Runci called and told Lavin that the guard rails had been removed. *Id.* at 43, 62; Runci May 19, 1998 Tr. at 57–58. Lavin inferred that Bulger may have been tipped off to the information that the FBI had received by Connolly or Morris. *Id.* at 43–46. The court concludes that Bulger was, once again, told by the FBI of the allegations concerning him and of potential for an investigation. Lavin knew that if this had occurred, it was wrong, and he was concerned. *Id.* at 46. Thus, Lavin discussed the matter with his colleague and friend John Michael Callahan. *Id.* After speaking with Callahan, however, Lavin continued to keep the materials he had received from Runci in his desk. *Id.*

In 1997, after the claim that the FBI had improperly protected Bulger and Flemmi became public in this case, Callahan reminded Lavin of the Runci matter. *Id.* at 52–54. They agreed that the foregoing information should be provided to the OPR team that was investigating the allegations that had emerged. *Id.* That was done. *Id.*

### 25. *Joseph Murray*

In 1988, Joseph Murray, who was then in federal prison, alleged, among other things, that Connolly and Newton were selling information to Bulger and Flemmi concerning electronic surveillance. The FBI assumed responsibility for investigat-

ing Murray's charges. Although Murray was interviewed by agents in the FBI's Boston office, he was either not asked about his claim that Connolly and Newton had tipped Bulger and Flemmi off to electronic surveillance or the information that he provided was not included in the 302 of his interview. Nevertheless, the Boston office characterized that charge as "unsubstantiated" and the administrative inquiry of Connolly and Newton was quickly terminated. The evidence presented in the instant case, however, demonstrates that Murray's claim was correct.

More particularly, beginning in January 1988, Weld's secretary at the Department of Justice received a series of increasingly specific telephone calls from an individual, who asked that the information being provided not be passed on to Boston authorities because of the people involved. Ex. 148; Weld May 26, 1998 Tr. at 78–115. The caller initially claimed that Connolly and Boston Police Deputy Ed Walsh "sell information to Whitey Bulger and Stevie Flemmi—and that's how they find wiretaps." Ex. 147. *See also* Ex. 148. The source later alleged that Newton was "another agent besides John Connolly who fed Bulger, Flemmi, Nee and Weeks information." Ex. 160.

Weld took these allegations seriously. Weld May 26, 1998 Tr. at 93. Based on his knowledge and experience in Boston, he felt there might be a "weak link" between Connolly and Bulger. *Id.* at 94. Initially, he referred the matter to his Deputy, Jack Keeney, with a note saying "I know all this. So this [source] is on the up and up." *Id.* at 92; Ex. 147.

The source also claimed to have information that Bulger and Pat Nee had murdered Halloran and Bucky Barrett. Exs. 149, 150. The source subsequently said that there was an eyewitness to the Halloran shooting who might come forward, and elaborated that: "there is a person named John, who claims he talked to Whitey and Nee as they sat in the car waiting for

Halloran on Northern Avenue. He sits in a bar and talks about it. He saw the whole operation." Exs. 149, 152. The source added that the person providing the information to the source "will be willing to talk to you (authorities) soon." Ex. 152. On February 3, 1988, Weld directed Keeney to have the information that he had received sent to the United States Attorney in Boston, Frank McNamara, and to the Strike Force Chief, O'Sullivan. Ex. 151. Weld added that: "Both O'Sullivan and [Assistant United States Attorney] Bob Mueller are well aware of the history, and the information sounds good." *Id.*

At some point, it was determined that the ultimate source of the information being communicated to Weld was Joseph Murray, who was then in federal prison. Ex. 156. His allegations were referred to the Boston office of the FBI. Ex. 156; Clark June 3, 1998 Tr. at 28. These allegations included the claim that "FBI Agents John Connolly, Jr. and John Newton were selling information regarding wiretaps, to Whitey Bulger and Stevie Flemmi." Ex. 156.

Dennis O'Callahan, the ASAC who had succeeded Potts, was charged with directing an administrative inquiry of Murray's claims concerning Connolly and Newton. Clark June 13, 1998 Tr. at 106, 116. In June 1989, O'Callahan assigned Edward Clark, the supervisor of the Bank Robbery squad, to interview Murray. *Id.* at 29. Edward Quinn, a member of the Organized Crime squad who had then worked with Connolly for thirteen years and characterized Connolly as a "close friend," accompanied Clark to witness the interview. *Id.* at 39; Quinn Aug. 19, 1998 Tr. at 13–14.

Clark and Quinn were briefed and given the documents reflecting the information that Weld had received. *Id.* at 29–31. Clark testified that they were instructed to focus on the allegations of misconduct against Connolly and Newton in their interview of Murray. *Id.* at 31, 61–62.

Clark and Quinn spoke to Murray at the Strike Force's office in the federal courthouse in Boston, on June 14, 1989—more than a year and a half after the initial call to Weld. Ex. 156. Murray was fully cooperative. Clark reported that:

> Murray was asked if he would furnish information regarding the above matters and what he wanted as a *quid pro quo.* Murray said that Whitey Bulger and Stevie Flemmi have a machine and that the Boston Police and the FBI have a machine and he cannot survive against those machines. He is willing to furnish information and wants nothing in return. The information he furnished now will help save the life of a friend or a loved one in the future.

*Id.*

Clark and Quinn each knew that Bulger and Flemmi were informants handled by Connolly. *Id.* at 85–86; Quinn Aug. 19, 1998 Tr. at 19. Although the purported primary purpose of the interview was to explore Murray's claim that Bulger and Flemmi were paying Connolly and Newton for information concerning electronic surveillance, there is no reference to this allegation in either the notes Clark made at the interview or in the 302 that he later prepared. Exs. 151, 158; Clark June 3, 1998 Tr. at 89. The court concludes that either Murray was not asked about his allegations concerning Connolly and Newton or that the information that he provided concerning them was not recorded. Similarly, although Murray reiterated that Bulger and Nee had murdered Halloran, neither Clark nor Quinn asked him about the individual named "John" who Murray had previously asserted witnessed the killing. Exs. 151, 158; Clark June 3, 1998 Tr. at 80, 114–15.

Clark discussed the interview with O'Callahan and gave him the 302, which included information linking Bulger and Flemmi to the Halloran and Barrett murders. Ex. 156; Clark June 3, 1998 Tr. at 65. Clark was not asked to do anything further. *Id.* at 64.

Two months later, however, O'Callahan prepared a memorandum from the SAC, Ahearn, to the Director of the FBI, reporting that Murray had been interviewed and that, "[T]he allegations that SSA Connolly and SA Newton are disclosing information regarding investigations being conducted by this Division to criminal elements are unsubstantiated by specific facts ..." Ex. 157. The administrative inquiry was then terminated in Boston and, evidently, the matter was not pursued by FBI Headquarters, the United States Attorney's Office, the Strike Force or the Department of Justice, which Weld had left in March 1988. Weld May 26, 1998 Tr. at 5.

Moreover, although Clark viewed it as significant, the information that Murray provided implicating Bulger and Flemmi in the Halloran and Barrett murders was not provided to any agents responsible for investigating those matters or indexed so that it could be accessed by such agents. Clark June 3, 1998 Tr. at 66–67, 116–18. Similarly, while Clark felt Murray would make a "terrific" informant, there is no evidence that any effort was made to utilize him as a source despite his demonstrated willingness to provide information. Id. at 118–23. Accordingly, Murray was effectively eliminated as a threat to the symbiotic relationship between the FBI and Bulger and Flemmi.

### 26. John Bahorian

Prior to Ring becoming the Supervisor of the Organized Crime squad in 1983, two agents on that squad, Robert Jordan and Stanley Moody, became involved in an investigation of payoffs to members of the Boston Police Department. Ring Sept. 18, 1998 Tr. at 131. The investigation continued after Ring became supervisor. In the course of that investigation, Jordan and Moody obtained the cooperation of a Boston Police Lieutenant, James Cox. After consultation with O'Sullivan, it was decided to have Cox attempt to record conversations with Flemmi and Bulger, among oth-

ers. Ring June 15, 1998 Tr. at 6–12, June 19, 1998 Tr. at 118, 129–30, 155–57.

Flemmi claims that Ring told Bulger that Cox would be wearing a wire and approaching him. Flemmi Aug. 20, 1998 Tr. at 70, Aug. 28, 1998 Tr. at 103–04. Bulger passed this information on to Flemmi. Id. Ring denies that he tipped off Bulger and Flemmi to Cox's cooperation. Ring Sept. 3, 1998 Tr. at 134. The court finds this denial credible.

It is true, however, that Flemmi was forewarned about Cox. Ex. 30, ¶ 11; Flemmi Aug. 20, 1998 Tr. at 70–73. Connolly had asked Morris, and perhaps others, whether Cox was "wired." Morris Apr. 21, 1998 Tr. at 36–37, Apr. 23, 1998 Tr. at 80. The court infers that Connolly is the person who told Bulger and Flemmi that Cox was cooperating with the FBI.

About a week later, on September 5, 1988, Cox approached Flemmi and they spoke briefly. Morris Apr. 23, 1998 Tr. at 64; Ring June 15, 1998 Tr. at 6–12; Flemmi Aug. 20, 1998 Tr. at 70. Flemmi was circumspect and said nothing suspicious or incriminating. Connolly subsequently told Flemmi that the FBI had listened to the tape and considered it "unproductive." Id. at 73–75, Aug. 28, 1998 Tr. at 111.

Flemmi's informant file includes an insert stating that on October 29, 1986, Flemmi told Connolly that "the word around the Boston Police is that a cop by the name of Cox is wired up on other cops." Ex. 229. Flemmi did not, however, provide this information to Connolly. Flemmi Aug. 20, 1998 Tr. at 71–72, Aug. 28, 1998 Tr. at 105–09. Rather, the court concludes that this insert is another document containing false information in an effort to make it more difficult to discern and demonstrate improper conduct by Connolly.

Soon after the encounter between Cox and Flemmi, Jordan, Moody, and their investigation were transferred to the White Collar Crime squad in an effort to distribute the "good investigations" more equally.

Ring June 15, 1998 Tr. at 12, June 19, 1998 Tr. at 157–58, Sept. 18, 1998 Tr. at 132; Morris Apr. 23, 1998 Tr. at 62, Apr. 29, 1998 Tr. at 73–74. Morris was then the supervisor of the White Collar Crime squad. Morris Apr. 22, 1998 Tr. at 97–101.

As the investigation evolved, it came to focus on John Bahorian, a bookmaker believed to be making payments to Flemmi. Morris Apr. 22, 1998 Tr. at 101, Apr. 29, 1998 Tr. at 69–70. In the spring of 1988, Moody and Jordan were preparing an application for electronic surveillance of Bahorian, which targeted Flemmi as well. Morris Apr. 22, 1998 Tr. at 101–02.

Morris was afraid that the electronic surveillance would lead to Flemmi's arrest and indictment. Morris Apr. 29, 1998 Tr. at 68, 70. Morris was concerned that if that occurred, the nature of his relationship with Bulger and Flemmi would be revealed. *Id.* Thus, Morris asked Connolly to tell Flemmi and Bulger to stay away from Bahorian. *Id.* at 67, Apr. 22, 1998 Tr. at 120–21. Morris also asked Connolly to tell Bulger and Flemmi not to do anything to Bahorian because Morris "did not want another Halloran." Morris Apr. 22, 1998 Tr. at 121–22. Morris believed that Bulger and Flemmi had been involved in the Halloran murder. *Id.* His directions to Connolly in 1988 were both a reminder and performance of his 1985 promise that Bulger and Flemmi would be protected as long as they did not murder anyone. *Id.*

Connolly delivered Morris' message to Bulger and Flemmi. *Id.* He later reported to Morris that they wanted to meet with him to discuss the Bahorian matter. *Id.* at 103, 121.

Thus, in the spring of 1988, prior to the inception of the electronic surveillance of Bahorian, Bulger, Flemmi, and Connolly met with Morris at his home. *Id.* at 103, 105, 109, 121; Flemmi Aug. 20, 1998 Tr. at 76, Aug. 28, 1998 Tr. at 115. Morris told Bulger and Flemmi about the planned electronic surveillance and warned them to stay away from Bahorian. *Id.* at 103–04. Morris also said that he could keep Flem-

mi out of any indictment arising out of the Bahorian electronic surveillance. Flemmi Aug. 20, 1998 Tr. at 78.

As in the past, neither Bulger nor Flemmi claimed that he had immunity and could not properly be investigated or prosecuted. Nor did Morris believe that they were immune from prosecution. Rather, Morris felt that by warning Bulger and Flemmi he was engaging in an illegal obstruction of justice. *Id.* at 104, Apr. 30, 1998 Tr. at 102.

Bahorian's telephone was wiretapped from June 22 to September 25, 1988. Apr. 29, 1998 Tr. at 113. Flemmi was named as a target in the application for that electronic surveillance. Morris Apr. 22, 1998 Tr. at 102. The wiretap produced evidence that led to the indictment of Bahorian and others. *Id.* at 101–02, 109. Because he was warned, however, Flemmi was neither intercepted nor charged. *Id.*

### 27. *The Leak and the Threat to The Boston Globe*

After telling Flemmi and Bulger about the imminent Bahorian wiretap, Morris was "very upset." Morris Apr. 29, 1998 Tr. at 123. He felt "completely compromised" and vulnerable. *Id.* at 67. As described earlier, Morris was afraid that if Flemmi or Bulger were prosecuted, the nature of his relationship with them would be revealed. *Id.* at 68, 70. Morris decided that he was "going to do whatever [he] could to stop Bulger and Flemmi short of admitting [his] crimes." *Id.* at 125.

Morris had previously told Ring that Bulger had "outlived [his] usefulness," but he had not been closed as an informant. Morris Apr. 29, 1999 Tr. at 66, Apr. 30, 1999 Tr. at 91. Now Morris wanted to "destroy the relationship between the FBI and [Bulger and Flemmi]" himself. Morris Apr. 29, 1998 Tr. at 124. Thus, Morris took an extraordinary step calculated to terminate the threat that Bulger and Flemmi presented to him in a manner that minimized the risk that his role in doing so

would be exposed. In essence, he attempted to provoke "another Halloran."

More specifically, in about June 1988, Morris spoke to Gerard O'Neill, a reporter for *The Boston Globe's* investigative unit, the "Spotlight Team." Ex. 85; Morris Apr. 28, 1998 Tr. at 74–76. Morris understood that as a responsible journalist, O'Neill would protect the confidentiality of Morris as his source. Morris told O'Neill that Bulger was an FBI informant. Morris. Apr. 27, 1998 Tr. at 154–57, Apr. 28, 1998 Tr. at 31, 74–75, Apr. 29, 1998 Tr. at 74–75, 80–81. Morris also indicated that Flemmi was an FBI informant. Morris Apr. 28, 1998 Tr. at 74–75. Morris did not say that the conversation was "off the record" and understood that *The Boston Globe* would likely publish at least that Bulger was an FBI informant. Morris Apr. 29, 1998 Tr. at 78, 80–81.

Morris was well aware that an article reporting that Bulger was an informant could cause him to be killed by the LCN, among others. Morris Apr. 28, 1998 Tr. at 77–78. More specifically, as Morris later put in an affidavit in which he falsely swore under oath that he had not deliberately told O'Neill that Bulger was an informant:

> [T]he consequences of individuals being identified as informants, regardless of the accuracy of the information, could be serious.... a human life [is] a human life, be that person criminal, informant, or both.... the criminal element would not need proof or documentation to take action, so, such statements as inferences could be deadly.

Ex. 85; Morris Apr. 28, 1998 Tr. at 76–77, Apr. 30, 1998 Tr. at 93.

Morris also knew that public disclosure that Bulger was an informant could be fatal to Flemmi. As Morris testified concerning the possible closure by the FBI of Bulger as an informant, it "would have been the end of Flemmi too ... [b]ecause they were so closely tied together." Morris Apr. 28, 1998 Tr. at 79.

Morris' call prompted *The Boston Globe* Spotlight Team to plan to write a series of articles that would address, among other things, the events and information indicating that Bulger was a source for the FBI, who was being protected from investigation and prosecution. Among the matters of interest to the Spotlight Team were the race-fix case in which Bulger was not indicted, the Lancaster Street Garage investigation, and the 1984–85 investigation led by the DEA. As part of its research, a member of the Spotlight Team, Richard Lehr, directed a letter to Ciulla, the "star witness" in the race-fix case, who was then being protected by the government. Cullen Oct. 15, 1998 Tr. at 38, 47.

On July 19, 1988, Daly, who was the lead FBI agent on the race-fix case, called Kevin Cullen, another member of the Spotlight Team. *Id.* at 131. Daly and Cullen had talked several times before, but were not friends. *Id.* at 44–45. Daly indicated that he knew about the letter to Ciulla and expressed regret that Cullen had not called him first. *Id.* at 47.

Cullen told Daly that the Spotlight Team was preparing an article that would report that Bulger was an FBI source and, as a result, had been protected by the FBI in the race-fix case, among others. *Id.* at 133–55, 159. Daly denied that Bulger was an informant. *Id.* at 104–07, 133–35. He also denied that Bulger was protected from prosecution in the race-fix case because he was an FBI source. *Id.* at 50–51. As described previously, both of these assertions were false.

Daly proceeded to tell Cullen that as Ciulla had purportedly told Daly, Bulger was a very dangerous man who would think nothing of "clipping" anyone who wrote the sort of story Cullen described. *Id.* at 48, 50, 160; Ex. 242. Daly emphasized that, in his opinion, Cullen was especially vulnerable because it was well-known that he lived in South Boston. Cullen Oct. 15, 1998 Tr. at 50, 164.

Cullen believed that Bulger was a violent person and, indeed, a killer. *Id.* at 65–67. Cullen also believed that Daly's comments constituted a threat intended to discourage *The Boston Globe* from publishing the story it was planning. *Id.* at 52, 74, 75, 138–39, 146–47; Ex. 242. Cullen was correct. Daly made no written record of his call to Cullen, as he would have if it had been intended as an official warning by the FBI to a potential victim of violence. Cullen Oct. 15, 1998 Tr. at 178.[46]

The SAC, Ahearn, subsequently spoke on the record to the Spotlight Team, which reported that:

James F. Ahearn, special agent in charge of the FBI in Boston, was unequivocal when asked last month if Bulger had relations with the FBI that have left him free of its scrutiny.

"That is absolutely untrue," said Ahearn. "We have not developed anything of an evidentiary nature that would warrant it and, if we ever do develop anything of an evidentiary nature, we will pursue it. We specifically deny that there has been any special treatment of this individual."

Ex. 243. Whether he knew it or not, Ahearn's statement was utterly incorrect.

In any event, Cullen discussed Daly's call with his colleagues. Cullen Oct. 15, 1998 Tr. at 52–53, 119. They too interpreted Daly's comments as a threat intended to intimidate them from publishing the series of articles that they were planning. *Id.;* Morris Apr. 30, 1998 Tr. at 178. Nevertheless, the reporters and *The Boston Globe* were undeterred.

*The Boston Globe* did, however, take the threat to Cullen seriously. Prior to publication of the article concerning Bulger, the newspaper paid to have Cullen and his wife relocated. *Id.* at 57–58, 123. Although still uneasy, after about a week Cullen returned to his home in South Boston. *Id.* at 123.

On September 20, 1988, *The Boston Globe* published its article on Whitey Bulger. *Id.* at 131; Ex. 243. The article reported that the FBI had "for years had a special relationship with Bulger" and reviewed the events suggesting that the FBI was protecting him, including the race-fix case, the Lancaster Street Garage investigation, and the investigation led by the DEA in 1984–85. *Id.*

At Ahearn's request, the FBI conducted an administrative inquiry focusing primarily on whether Morris had leaked the fact that Bulger was an informant and other confidential information to *The Boston Globe.*[47] Ex. 134. Morris repeatedly lied under oath during the course of that investigation by suggesting that he may have, at most, perhaps inadvertently confirmed that Bulger was a source. Morris Apr. 28, 1998 Tr. at 64–73, Apr. 30, 1998 Tr. at 93; Exs. 84, 85. Morris refused to take a polygraph test. Ex. 84. His deception succeeded. Morris emerged from the investigation with a censure and fourteen days of unpaid leave. Morris Apr. 28, 1998 Tr. at 72. These sanctions did not prevent Morris from progressing through the hierarchy of the FBI until 1995, when he became Chief of the Training and Administrative Section at the FBI Academy in Quantico, Virginia.

---

**46.** Although Daly continues to serve as an FBI agent in Boston, the government decided not to call him as a witness following Cullen's testimony. Cullen Oct. 15, 1998 Tr. at 184.

**47.** Morris had also leaked to *The Boston Globe* the fact that the FBI and United States Attorney's Office had reopened a public corruption investigation of William Bulger relating to a building known as 75 State Street. Morris Apr. 27, 1998 Tr. at 163, Apr. 28, 1998 Tr. at 31–34. In an interview and two sworn

statements, Morris lied in denying this leak as well. Morris Apr. 27, 1998 Tr. at 163, Apr. 28, 1998 Tr. at 64–73; Exs. 84, 85. Ironically, Morris had previously improperly assisted William Bulger concerning the 75 State Street investigation by telling Connolly to advise the Senate President to submit to an interview because the case against him was not very strong and an interview would put an end to the matter. Morris Apr. 28, 1998 Tr. at 34–35.

### 28. Flemmi and Salemme

*The Boston Globe* article was upsetting to Bulger and Flemmi, who felt betrayed and endangered. Flemmi Aug. 21, 1998 Tr. at 96–99; Ex. 159. On or about October 6, 1988, several weeks after the article was published, they met with Connolly and Morris, who was still the alternate agent for handling Flemmi. Ex. 42; Flemmi Aug. 20, 1998 Tr. at 78, Aug. 28, 1998 Tr. at 115–19. This was the last meeting or discussion that Flemmi had with Morris. Flemmi Aug. 21, 1998 Tr. at 86, 103, Aug. 28, 1998 Tr. at 115–16.

Connolly told Bulger and Flemmi that because of the articles, others in the FBI wanted to distance themselves from them. Flemmi Aug. 21, 1998 Tr. at 78–79, Aug. 28, 1998 Tr. at 116–18. Flemmi sensed that Connolly might be under some pressure to terminate their relationship. Flemmi Aug. 28, 1998 Tr. at 118. Connolly, however, disagreed and urged Bulger and Flemmi to "hang in." Flemmi Aug. 20, 1998 Tr. at 97, Aug. 28, 1998 Tr. at 116–18.

Among other things, Connolly said he was *very concerned about Salemme*, who had completed his sentence for the Fitzgerald bombing and been released from prison in the past year. Flemmi Aug. 20, 1998 Tr. at 97; Ex. 237 (209 dated 1/24/98). Salemme had reestablished contact with Flemmi. Ex. 237 (209 dated 1/24/98). Connolly had asked Flemmi to report to him on Salemme's activity and Flemmi had been doing so. Flemmi Aug. 20, 1998 Tr. at 98; Ex. 237 (209s dated 1/24/88 and 7/15/88). Ultimately, after Bulger had spoken again to Connolly, he and Flemmi agreed to follow Connolly's advice and continue their alliance. Flemmi Aug. 21, 1998 Tr. at 102–03, Aug. 28, 1998 Tr. at 116–18.

Subsequently, Bulger told Flemmi that he suspected Morris was the source of the leaks to *The Boston Globe*. Flemmi Aug. 21, 1998 Tr. at 93–94. In view of their relationship, it is likely that Bulger was echoing views expressed by Connolly while the FBI was focusing unsuccessfully on Morris as the source of those leaks.

*The Boston Globe* article contributed to Bulger and Flemmi's decision to withdraw from some of their most obvious criminal activity in an effort to insulate themselves from effective investigation and prosecution. As Mercurio described it when he became an informant, Bulger and Flemmi were "backing away from illegal activity" in part because "they had more than adequate . . . legitimate businesses," including real estate, that they may have acquired illegally. Mercurio Aug. 5, 1998 Tr. at 116–17, 121–22; Exs. KKK, LLL. In this sense, the timing of *The Boston Globe* article was fortuitous. In 1988 and 1989, without the knowledge of the FBI in Boston, the DEA conducted another investigation involving electronic surveillance, targeting Bulger and Flemmi, which led to many indictments, but no charges against the FBI's prize sources. Ex. 126; Blackburn May 7, 1999 Tr. at 41.

Flemmi continued to provide Connolly with the information that the FBI wanted concerning the LCN generally and Salemme particularly. Flemmi had previously told Connolly that Salemme was "extremely paranoid" about the Boston faction of the LCN and that he had allied himself with Patriarca, who viewed Salemme as a valuable, direct link to Flemmi and the Winter Hill Gang. Ex. 237 (209 dated 7/15/88). Flemmi subsequently reported that Salemme was frequently meeting with Patriarca and also that he was holding meetings at the Busy Bee restaurant, which the government later obtained a warrant to bug. Exs. 36 (209 dated 4/11/90), 237 (209s dated 3/7/99 and 3/20/99); Flemmi Aug. 20, 1998 Tr. at 100–01.

Importantly, Flemmi kept Connolly informed of the rising tension between Salemme and the Boston faction of the LCN. Most notably, on June 6, 1989, Flemmi reported that, with Patriarca's "blessing," Salemme was "moving all over the city to consolidate his power in anticipation of

imminent federal indictments which will cripple the North End 'Outfit' people, allowing Salemme to step into the vacuum left by their arrests." Ex. 37 (209 dated 6/6/89). Flemmi explained that Russo, Ferrara, Carrozza, Mercurio, and others in the Boston faction of the LCN were furious with Salemme and might kill him if they had time to do so before their anticipated indictments. *Id.* As discussed in § II.29, *infra,* ten days later, on June 16, 1989, Salemme was shot, but not killed, and William Grasso, another Patriarca ally, was murdered in Connecticut. June 5, 1998 Tr. at 5. As also discussed, in § II.29, *infra,* the FBI understood that Salemme had been set up by Mercurio, who, with Flemmi and Bulger's assistance, Connolly had recruited as a Top Echelon informant. *Id.* at 5–6; Flemmi Aug. 20, 1998 Tr. at 136–37; Ring June 15, 1998 Tr. at 18–21.

Connolly appreciated the important information that Flemmi was furnishing and continued to provide Bulger and Flemmi with the protection that he had promised. For example, in 1988 or 1989 Connolly told Bulger that Timothy Connolly, who is alleged to have been a victim of extortion in the instant case, was cooperating with the FBI and would attempt to record conversations with Bulger and Flemmi. Ex. 30, ¶ 11; Flemmi Aug. 20, 1998 Tr. at 139–45, Aug. 28, 1998 Tr. at 113; 4SI, RA 56. Bulger shared this warning with Flemmi. Ex. 30, ¶ 11; Flemmi Aug. 20, 1998 Tr. at 139–45, Aug. 28, 1998 Tr. at 113.

### 29. *Mercurio as an Informant*

In the late 1980's, Flemmi not only continued to provide the FBI with valuable information that he had obtained concerning the LCN. He and Bulger also assisted in recruiting Mercurio, a made member of the LCN, as a Top Echelon informant.

Mercurio had been released from prison in 1986. Mercurio Aug. 4, 1998 Tr. at 73. As he explained in one of his earliest encounters with Connolly, Mercurio was then "disenchanted with the mafia because no

one in the mafia did anything for him while he was away." Exs. 113, 181. Mercurio reported that, in contrast, he "remain[ed] close to James "Whitey" Bulger and Stevie Flemmi who sent his girlfriend $100 a week while he was in the 'can.' " *Id. See also* Flemmi Sept. 1, 1998 Tr. at 52–53.

As described previously, Mercurio knew that Vanessa's had been bugged. Mercurio Aug. 5, 1998 Tr. at 61; June 5, 1998 Tr. at 5 (Under Seal). He also knew that the Sagansky–Weinstein extortion had been intercepted and that he would be prosecuted. *Id.* at 65; Ex. 165. Bulger reported this to Connolly and advised that "Mercurio [would] go on the 'lam' before he goes to prison again." Ex. 165; Flemmi Sept. 1, 1998 Tr. at 50–52; Ring June 8, 1998 Tr. at 103. This was indeed Mercurio's plan. Mercurio Aug. 5, 1998 Tr. at 123–24.

Ring and Connolly decided to try to exploit Mercurio's discontent with the LCN and fear of returning to prison to recruit him as an informant. Ring June 15, 1998 Tr. at 18–21. Connolly consulted Flemmi and Bulger to develop a "profile" of Mercurio that he could employ in this effort. Flemmi Aug. 20, 1998 Tr. at 137–38. Flemmi and Bulger proved to be very knowledgeable about Mercurio. Ring June 19, 1998 Tr. at 140.

Armed with the information Bulger and Flemmi provided, and as directed by Ring, Connolly approached Mercurio. Ex. 200; Ring June 15, 1998 Tr. at 18. In about October 1987, Mercurio began providing information to the FBI and was soon opened as an informant. Ex. 200; Ring June 8, 1998 Tr. at 24–25; June 6, 1998 Tr. at 5–6 (Under Seal). Connolly told Bulger and Flemmi that he had developed Mercurio as an informant. Flemmi Aug. 20, 1998 Tr. at 137–38.

Mercurio testified that he never had any conversations with Connolly or Ring concerning what he would receive in return for his cooperation. Mercurio Aug. 5, 1998 Tr. at 23. Mercurio contends that he became an informant after Connolly threat-

ened to tell Ferrara and Russo that Mercurio had revealed that they had a source in law enforcement who tipped them off to the search of Vanessa's. *Id.* at 113–14, 120. Mercurio's testimony on this issue, among others, is not credible. Rather, the court infers that in the process of recruiting him, the FBI indicated to Mercurio that he would be alerted when he was about to be indicted so that he could flee. As discussed, in § II.30, *infra,* this promise was honored.

Mercurio was upgraded to a Top Echelon informant in May 1988. Ring June 9, 1998 Tr. at 99, June 15 Tr. at 22, 31. He was then on parole until 1993. *Id.;* Ex. 234. One of the conditions of his parole was that he not serve as an informant for any law enforcement agency. Ring June 15, 1998 Tr. at 23. In addition, there was a threat that the publicized search of Vanessa's would prompt the Parole Commission to revoke Mercurio's release and that he would, therefore, be lost to the FBI as a Top Echelon informant. *Id.* at 44; Ex. 235.

Mercurio testified that he never discussed the issue of the early termination of his parole with the FBI. Mercurio Aug. 5, 1998 Tr. at 27–28. This assertion is not correct. Although he may have initially been reluctant to have his cooperation disclosed, he ultimately told Connolly that he wanted the FBI to seek the early termination of his parole. Ring June 15, 1998 Tr. at 33, 46; Ex. 234. Ring and Mercurio also discussed this issue. Ring June 15, 1998 Tr. at 25, 34, 46. Ring explained to Mercurio that the request for early termination of his parole would involve generating documents describing his status and value as an informant, which would be maintained outside of the FBI. *Id.* at 33–35. Nevertheless, Mercurio told Ring that he wanted the request made. *Id.;* Ex. 200. Accordingly, Mercurio authorized Ring to discuss the dilemma posed by his parole status with O'Sullivan, and to have the FBI and Department of Justice ask the Parole Commission to terminate his parole early. Ring June 15, 1998 Tr. at 33–55, 44–55.

O'Sullivan sent a letter dated October 31, 1998 to Benjamin Baer, the Chairman of the Parole Commission, requesting that Mercurio's petition for early termination of his parole be allowed because of "the extremely valuable services that Mr. Mercurio [had] rendered to the Federal Bureau of Investigation." Ex. 182. The letter was based on information that O'Sullivan had received from Connolly. Ring June 15, 1998 Tr. at 32. In support of his request O'Sullivan wrote:

It is the very strong desire of the Federal Bureau of Investigation that Mr. Mercurio be rewarded with early termination of his parole because of the extremely valuable information that Mr. Mercurio has provided and continues to provide to the F.B.I. concerning the activities of the leadership element of La Cosa Nostra in the Boston area. Information provided by Mr. Mercurio has allowed the F.B.I. to identify newly made members of the Patriarca L.C.N. Family, as well as learning about the restructured leadership of the Family. Even more importantly, the information provided by Mr. Mercurio has been used in affidavits in support of court authorized electronic surveillance directed at the L.C.N. Information gathered in this electronic surveillance is the basis upon which a R.I.C.O. indictment will soon be returned in the District of Massachusetts against the restructured leadership of the Patriarca Family.

Because of the extremely sensitive nature of the information contained in this letter, I request that this letter be maintained by you in a secure file and receive only the most limited circulation. If you have any questions of me, please feel free to contact me.

Thank you for your personal attention to this matter. Ex. 182. The claim that Mercurio had provided information used to support applications for electronic surveillance is, as far as Ring knows, not true.

Ring June 15, 1998 Tr. at 33. In any event, in about February 1989, Diane Kottmyer, who was about to succeed O'Sullivan as the head of the Strike Force, was told of Mercurio's status as an FBI informant and of O'Sullivan's letter to the Parole Commission. Kottmyer Aug. 13, 1998 Tr. at 83–88.

O'Sullivan's letter alone was not sufficient to persuade Baer that Mercurio's parole should be terminated. Exs. 234, 235. Rather, Baer requested that the FBI provide a letter supporting O'Sullivan's request. *Id.*

Accordingly, on December 6, 1988, Ring sent to FBI Headquarters a memorandum and draft letter, for signature by Assistant Director Floyd Clarke, endorsing the request that Mercurio's parole be terminated. Ex. 234. On January 5, 1989, an addendum to those documents was prepared by Dennis Maduro, who worked in the Organized Crime Section of FBI Headquarters, evidently after speaking to Ring or Connolly. Ex. 234; Summerford Sept. 15, 1998 Tr. at 102–05. The addendum stated in part that:

> Mercurio will be indicted along with other Patriarca La Cosa Nostra Family members in the near future. *Early termination of Mercurio's parole will ensure that at the time of his arraignment, Mercurio is afforded bail* and not otherwise remanded to the federal Metropolitan Correction Center which would jeopardize his physical safety.

Ex. 234 (emphasis added).

The materials, including the addendum, were forwarded to James Summerford, who was the Chief of the FBI's Informant Unit. Summerford Sept. 15, 1998 Tr. at 100, 125. Summerford discussed the materials by telephone with Ring on January 6, 1989. *Id.* at 105–13; Ex. 234. In response to issues raised by Summerford, Ring explained that Mercurio would only be charged with crimes committed before he became an informant. Ex. 234; Summerford Sept. 15, 1998 Tr. at 110–13, 119. This issue was important because if it were

contemplated that Mercurio might be charged with crimes committed while he was serving as an FBI source, a substantial question would be presented concerning whether he could be continued as an informant. Summerford Sept. 15, 1998 Tr. at 111–13. In such circumstances, the FBI in Boston, the Strike Force, the Organized Crime Section of FBI Headquarters, the Organized Crime Section of the Department of Justice, and the Parole Commission would all have had to participate in deciding whether sustaining Mercurio as an informant was appropriate. *Id.*

Ring also told Summerford that when Mercurio was indicted, "[h]is cooperation would be made known to the court." *Id.* at 113, 119; Ex. 234. In addition, after speaking with Ring, Summerford understood that one reason that the FBI in Boston was requesting the early termination of Mercurio's parole was to ensure that when he was arrested, he would be released on bail. Summerford Sept. 15, 1998 Tr. at 117–24.

Following his conversation with Ring, Summerford prepared a memorandum to the Criminal Division of the Department of Justice and a letter to Baer, each of which were sent by Clarke in support of the request for the early termination of Mercurio's parole. *Id.*; Ex. 235. The memorandum stated, in part, that:

> Mr. Mercurio will be indicted in the near future for extortion and conspiracy to commit extortion in connection with gambling activities involving the New England Region La Cosa Nostra (LCN). These criminal acts were perpetrated prior to his current cooperation with the FBI. His past criminal activities have given him direct access to individuals who are responsible for policy making at the highest levels of the LCN in New England. The FBI believes that Mr. Mercurio will continue to cooperate and provide invaluable information that will have significant impact in countering LCN activity in New England and that

the benefits of his continued cooperation far outweighs any drawbacks that can be foreseen or reasonably anticipated. *The FBI will make a factual presentation to the sentencing judge concerning his cooperation to date. Early termination of Mr. Mercurio's parole will help ensure that he is not sent to jail for violating his parole where his safety could be in danger.* Approval of this request will also mean his continued freedom which will enable him to continue to work for the FBI.

Ex. 235 (emphasis added).

Both Ring and Mercurio persuasively deny that there was ever any discussion with Mercurio about bringing his cooperation to the attention of a judge. Ring June 19, 1998 Tr. at 161–62; Mercurio Aug. 5, 1998 Tr. at 27; Kottmyer Aug. 13, 1998 Tr. at 85. The FBI in Boston did not expect that Mercurio's cooperation would ever be disclosed and, therefore, there would not have been any foreseeable risk to him if he were detained pending trial.

The claim of such a risk was, however, used as a reason to try to assure that when indicted and arrested, Mercurio would be released on bail. Ex. 234; Summerford Sept. 15, 1998 Tr. at 117–24. Kottmyer testified that she was never told that the FBI did not want Mercurio detained after he was indicted. Kottmyer Aug. 13, 1998 Tr. at 86–88. However, on September 1, 1989, she wrote to her superior in Washington that O'Sullivan had written to the Parole Commission to do something for Mercurio as an act of good faith, to avoid parole revocation, and to decrease the likelihood of pretrial detention when Mercurio was indicted. June 15, 1998 Tr. at 18–19 (Under Seal).

With Clarke's letter, the effort to secure the early termination of Mercurio's parole

succeeded. His parole was terminated in about February 1989. Mercurio Aug. 4, 1998 Tr. at 158–61.

On February 10, 1989, about the time that his parole was terminated, Mercurio told Connolly that he, Ferrara, Carrozza, and Lepore planned to "take off" before being indicted. Ex. 166. Ring reviewed the 209 that included this information. Ring June 8, 1998 Tr. at 104. Mercurio's report of his intention to flee confirmed the information that Bulger had provided in September 1987. Ex. 165.

The inserts in Mercurio's informant file indicate that in early 1989 he was frequently furnishing information to Connolly, including reports on information that was being provided by Anthony Cardinale, Ferrara's attorney. *See, e.g.,* 209s dated 1/25/89 and 2/14/89.[48] When she became Chief of the Strike Force in February 1989, Kottmyer expressed to the FBI concern about the possibility that Mercurio would report on defense strategy, and about other issues, including whether Mercurio might assert an authorization defense. Kottmyer Aug. 13, 1998 Tr. at 66–70.

By May 1989, Ring realized that when Mercurio was indicted his dual status as an informant and defendant would present a difficult dilemma for the government. Ex. 170; Ring June 9, 1998 Tr. at 52–58, 91–99. As Ring understood it, Mercurio's involvement with his codefendants after their indictment would implicate their Sixth Amendment rights to the confidentiality of joint discussions of defense strategy, and dealing with this issue would entail the risk of disclosing that Mercurio was cooperating with the government. *Id.* Ring discussed this matter with Kottmyer and the Boston FBI's Principal Legal Ad-

---

48. After the court reviewed the Mercurio informant file *in camera,* some, but not all, of the inserts that it included were produced to the defendants. The two cited inserts may not have been produced. In any event, they were not admitted as exhibits. While not essential to the court's analysis, reference to

the information concerning the advice that the putative defendants were receiving from Cardinale which Mercurio gave the FBI provides context for understanding Ring's concern about Mercurio's potential dual status as an informant and defendant.

viser, John Michael Callahan. *Id.* They decided that, in order to minimize the risks that they recognized, Mercurio should be closed as an informant before he was indicted and instructed not to contact the FBI unless he learned of planned violence or potential corruption of the judicial process. *Id.*

Prior to May 8, 1989, Ring and Connolly told Mercurio of the prospective dilemma and the proposed plan for dealing with it. Ex. 170; Ring June 9, 1998 Tr. at 97. At that time Ring expected to close Mercurio as an informant in about two weeks and to tell him that had occurred. Ex. 170; Ring June 9, 1999 Tr. at 64, 97–98, June 22, 1998 Tr. at 71.

On May 8, 1989, Ring wrote a memorandum to the SAC, Ahearn, describing the issue posed by Mercurio's potential dual status as informant and defendant, and the proposed plan for dealing with it that he had discussed with Kottmyer, Callahan, Connolly, and Mercurio. Ex. 170. Ring did not, however, receive a response to his recommendations from Ahearn before Ring left for vacation at the beginning of June 1989. Ring June 9, 1998 Tr. at 64. Thus, he did not before departing close Mercurio as an informant or tell Mercurio that he had done so. Ring June 22, 1998 Tr. at 71–72.

Ring did, however, tell his colleagues, including Connolly, that he felt that the tensions in the LCN might soon explode into violence. Ring June 19, 1998 Tr. at 196. Ring's instinct was right.

On June 5, 1989, Mercurio told Connolly that he, Russo, Carrozza, Ferrara, and "Spucky" Spagnoulo felt under pressure because of their anticipated indictments and were angry at Salemme, who was poised to take over after they were indicted, and Charlie Quintina, who had allied himself with Patriarca and Salemme. Ex. 185. Mercurio added that it was believed that Salemme, Quintina, and Grasso would kill Ferrara if they could set him up. *Id.* Thus, Mercurio explained, the Boston LCN was hoping to murder Salemme and those associated with him first. *Id.* As described in § II.28, *supra*, Flemmi provided Connolly with essentially the same information the next day. Ex. 37 (209 dated 6/6/89).

On June 13, 1989, *The Boston Herald* published an article by Shelley Murphy headlined "Ex-con seen as Hub Mob's heir apparent." Ex. TTT;[49] Ring June 19, 1998 Tr. at 200–04. The article cites "law enforcement sources" and consists mainly of information that closely tracks the information that is included in 209s prepared by Connolly based on his discussions with Mercurio and Flemmi. *Id.;* Exs. 37 (209s dated 3/20/89 and 6/6/89), 185, 195.

More specifically, the article reported accurately that "local Mob leaders" Russo, Carrozza, Lepore, and Mercurio would soon be indicted. Ex. TTT. As Mercurio had told Connolly, the article stated that Salemme had been "made" a member of the Patriarca Family. *Id.;* Exs. 188, 191 (*See also* Mercurio 209 dated 8/18/88, # 60 in Mercurio informant file). The article went on to explain that Salemme was meeting frequently with Patriarca and, using the precise term that Connolly ascribed to Flemmi a week earlier, had Patriarca's "blessing" to take over the Boston LCN's loansharking and gambling activities when the expected indictments were issued. Ex. TTT; Ex. 37 (209 dated 6/6/89). Moreover, the article reported that, as Mercurio had told Connolly, Salemme had also aligned himself with Quintina. Ex. TTT; Exs. 185, 188, 191. In addition, the article contained the accurate information that the FBI had recently

---

**49.** The court initially sustained the government's objection to admission of the article on the grounds of relevance and marked it Ex. TTT for identification only. June 19, 1998 Tr. at 201–03. In the course of writing this decision, the court has discerned the relevance of the document, not for the truth of the matters reported, but as context for understanding evidence that was admitted concerning Flemmi's motion to dismiss. Thus, this Memorandum refers to the text of the article, as well as to the testimony concerning it.

made Salemme the subject of a separate investigation. Ex. TTT; Ex. 185. In view of the foregoing, and the fact that the article was written while Ring was away from Boston on vacation, the court is persuaded that Connolly was a source for the article.

*The Boston Herald* article may have inflamed the volatile and potentially violent situation that Mercurio and Flemmi had recently reported to Connolly. On June 16, 1989, three days after it was published, Salemme was shot, but not killed, and Grasso was murdered in Connecticut. June 5, 1998 Tr. at 5. In view of the government's objection that the issue of whether the FBI prompted the attempt on Salemme's life related only to the defendants' motion to dismiss based on outrageous government misconduct on which the court had not granted an evidentiary hearing, the court did not permit questioning concerning the motive for what the court now recognizes to be the leaking of highly confidential and provocative information by the FBI. Ring June 19, 1998 Tr. at 201–03. This ruling may have been a mistake. If Salemme had been murdered by the Boston faction of the LCN, the FBI would have been spared the necessity of developing a prosecutable case against him, and Flemmi and Bulger would have again received one of the benefits of their bargain with the Bureau—an enhanced opportunity to profit from the vacuum created by the decimation of the LCN in Boston. Flemmi Aug. 25, 1998 Tr. at 31.

On June 27, 1989, Mercurio told Connolly that the Salemme shooting and the Grasso murder were planned and carried out by the Russo faction of the LCN. Ex. 187. Mercurio reported that Russo, Ferrara, and Carrozza had handled most of the details of the Salemme "hit." *Id.* The 209 records no reference to Mercurio's role in the shootings. *Id.*

Ring returned from his vacation after the Fourth of July. Ring June 9, 1998 Tr. at 92, June 19, 1998 Tr. at 18. He then found that on June 9, 1998 Ahearn and ASAC O'Callahan had approved his recommendation that Mercurio be closed as an informant. Ex. 170; Ring June 22, 1998 Tr. at 72. The Grasso murder and Salemme shooting, however, caused Ring to revise his view on whether Mercurio should be closed immediately. Ring June 29, 1998 Tr. at 65–66, June 22, 1998 Tr. at 73. Maintaining Mercurio as a source had become especially important in view of the potential for more violence, among other things. Ring, June 9, 1998 Tr. at 66, June 19, 1998 Tr. at 19, June 22, 1998 Tr. at 73–74. Thus, after consulting Ahearn and O'Callahan, Ring decided to postpone closing Mercurio as an informant, although he still intended to do so shortly before Mercurio was indicted. Ex. 170; Ring June 9, 1998 Tr. at 64, June 19, 1998 Tr. at 20, June 22, 1998 Tr. at 73.

On August 2, 1989, another informant who Ring regarded as highly reliable advised that Mercurio played a central role in the Salemme shooting. Exs. 188, 194, 237, 246; Ring June 16, 1998 Tr. at 55. The informant stated, among other things, that Mercurio had fled after the shooting because he had lured Salemme to the meeting at which the attempt on his life was made. Exs. 188, 194, 234, 246. The informant stated that Ferrara, Russo, Carrozza, and Mercurio were seeking to "finish off" what they started before they were indicted. *Id.* In addition, the informant reported that while Patriarca was urging Russo and Salemme to settle their problems peacefully, Mercurio was opposing that effort. *Id.* Ring believed that this information was true and that Mercurio had previously failed to inform the FBI of plans for imminent violent activity in which he was involved. Ring June 19, 1998 Tr. at 20, 254; June 6, 1998 Tr. at 6 (Under Seal); Ex. 164. Ring also recognized that there was an enduring threat of additional violence about which Mercurio would be knowledgeable because of his involvement. Ring June 19, 1998 Tr. at 19.

As discussed, in § II.6, *supra,* in 1989, the Attorney General Guidelines, which

were incorporated in the FBI Manual, required a special review process if an FBI field office wanted to keep an informant open after it learned that he had participated in a serious act of violence or any other serious crime. Ex. 274 (Under Seal), Manual § 108, pt. IV(C) (1–12–77); § 137–13(1)(C) (1–31–78); § 137–17(1)(G) (1–12–81); § 137–16(1)(G) (3–28–84); Summerford Sept. 16, 1998 Tr. at 62–67. In essence, the Guidelines required either that state or local law enforcement authorities be informed of the evidence concerning the informant's crime or that FBI Headquarters and the Assistant Attorney General be promptly consulted. *Id.* Murder and attempted murder are serious acts of violence. Summerford Sept. 16, 1998 Tr. at 65, 67. FBI Headquarters and the Assistant Attorney General should have been advised of the credible information that had been received concerning Mercurio's involvement in the Grasso murder and Salemme shooting. *Id.* at 157–58; Summerford Sept. 16, 1998 Tr. at 18. The Boston FBI, however, did not provide the required notification to Headquarters or the Department of Justice. Summerford Sept. 15, 1998 Tr. at 157–58. Rather, it arrogated to itself the decision to continue to utilize Mercurio as an informant despite the fact that it was believed that he had, while an FBI informant, been involved in murder and attempted murder.

When Kottmyer later learned of the reliable report of Mercurio's involvement in the Salemme shooting she asked Ring whether it presented a problem under the Attorney General's Guidelines. Kottmyer Aug. 14, 1998 Tr. at 180–81. Ring told her that it did not. *Id.*

30. *The LCN Induction Ceremony*

On October 29, 1989, the Patriarca Family conducted a ceremony at 34 Guild Street, Medford, Massachusetts, to induct new members as part of an effort to make peace between its Boston faction and Patriarca's loyalists, including Salemme, who was not present. The FBI bugged 34 Guild Street and recorded that ceremony. It was the first time that the FBI had ever overheard an LCN induction ceremony. The interception was perceived and later proven to be of vast value to the government in prosecuting members of the LCN and in publicizing the success of that effort.

Flemmi and Mercurio were two of the four informants relied upon in the application for the court order that authorized the "roving" bug that was employed at 34 Guild Street. As described in the Conclusions of Law, § III.4, *infra*, although defendant DeLuca was among those intercepted at 34 Guild Street, the Supreme Court's recent decision in *Minnesota v. Carter*, 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998), persuades the court that he does not have standing to litigate whether the electronic surveillance was obtained in violation of Title III or involved a violation of the Fourth Amendment.

The recording of the LCN induction ceremony was, however, played for the grand juries which returned the indictments against Flemmi in the instant case. Dec. 18, 1997 Tr. at 35. Thus, the court has been required to decide whether that use of this evidence that Flemmi helped obtain violated any enforceable agreement which he had with the government. As described in § III.1.D.(3), *infra*, it does. In addition, the manner in which Connolly and Ring dealt with Mercurio concerning the ceremony is sufficiently distinctive to be probative of Flemmi's claims that he and Bulger, like Mercurio, were generally protected by Connolly and the FBI in return for their services as informants and, as part of that protection, were alerted to their imminent indictment so they could flee.

In *United States v. Ferrara*, 771 F.Supp. 1266 (D.Mass.1991), this court made findings of fact relating to the electronic surveillance conducted at 34 Guild Street. Those findings were based on a limited record. Kottmyer was the only witness, and the court accepted an affida-

vit from Ring. *Ferrara*, 771 F.Supp. at 1275–81. In addition, in 1991, the court did not require the government to respond to questions that might disclose the identity of any informant. Aug. 12, 1998 Tr. at 43.

In the instant case, Mercurio's role as an FBI informant and person present at the ceremony has for the first time been revealed; many more documents have been reviewed, including at least one, Exhibit 164, that the government acknowledges should have been disclosed in 1991; and many more witnesses have testified. As a result, the court is now persuaded that in 1989, Ring, among others, did not share significant information with Kottmyer, the applicant, or Special Agent Walter Steffens, Jr., the affiant, regarding the then proposed electronic surveillance that captured the Mafia induction ceremony. This was part of a larger effort intended to assure that information that might suggest that Mercurio was an informant would not be disclosed to any judge. Because she was incompletely informed, although honest as to her understanding, Kottmyer's 1991 testimony was not reliable in certain, important respects.

Because of the more accurate and complete information now available, the findings of facts in this case differ in some, but not all, respects from those made in 1991. Among other things, the court now finds the following.[50]

At all times prior to October 29, 1989, the FBI, personified by Ring, knew that there would be at least one informant, Mercurio, at the ceremony.[51] The FBI sought a warrant for a "roving" bug that could be used at multiple, unidentified locations, rather than authorization to conduct electronic surveillance at 34 Guild Street alone, in order to protect the identity of its sources. The FBI had no intention of using that warrant to intercept conversations more than once. Rather, at the time the application was drafted, the FBI intended to arrest the participants immediately after the ceremony. The FBI had substantial, corroborated "rock solid" information that the ceremony would be held at 34 Guild Street several hours before Kottmyer and Steffens met with the judge to obtain the warrant authorizing roving surveillance based upon the representation that it was then "impractical" to identify the location to be bugged.

The FBI made no effort to obtain the testimony of Mercurio about the induction ceremony. Nor did the FBI ask him to record the ceremony, which would have obviated the need for a court ordered bug.

50. As described in the Conclusions of Law, § III.4, *infra*, because the court has found that DeLuca lacks standing to challenge the admissibility of the evidence intercepted at 34 Guild Street, the court is not now addressing the merits of the issues presented by his motion to suppress, including whether, if applicable, *Franks* requires suppression. Thus, the court has, among other things, not now made some of the factual findings required by *Franks*. If, however, the court's conclusion concerning DeLuca's lack of standing is reviewed and reversed on appeal, the court will on remand make the legally required findings, which with regard to at least the first prong of the *Franks* test may depend in meaningful measure on assessments of credibility.

51. As defendants were advised on August 14, 1998, at the request of the government and pursuant to the procedure suggested in *United States v. Higgins*, 995 F.2d 1, 3 (1st Cir.1993), the court questioned *ex parte* the informant

described as CS–3 in the Steffens affidavit and certain FBI agents to determine whether the defendants' request that CS–3 be identified and required to testify was meritorious. Aug. 14, 1998 Tr. at 2–4 (Under Seal). Based on that inquiry, the court found that disclosure of the informant's identity was not justified under the standards established by *Roviaro*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 and its progeny. *Id.* More specifically, the court found that CS–3 did not know the location at which the October 29, 1989 induction ceremony would be held. *Id.* at 3. Although he was never asked if he would testify, if asked, CS–3 would have refused to do so, even if presented with an immunity and compulsion order issued pursuant to 18 U.S.C. § 6001 *et seq*. *Id.* In addition, assuming, without finding, that CS–3 could have attended the ceremony, he would have refused to utilize a device to record it. *Id.*

Instead of seeking to persuade Mercurio to cooperate in this fashion by threatening him with possible prosecution for his role in the Salemme shooting, as well as the Sagansky–Weinstein extortion and other activities intercepted at Vanessa's, Ring and Connolly alerted Mercurio to the bugging of the Mafia induction ceremony and, as previously contemplated, permitted him to flee the indictment that they caused him to understand was imminent.

As a result, the FBI was relieved of the risk that the prosecution of Russo, Ferrara, Carrozza, and their co-defendants would be jeopardized by the issues that would have been presented by Mercurio's dual status as a defendant and an FBI source concerning the induction ceremony, among other things. Mercurio's flight also masked for many years the violation of the Attorney General's Guidelines committed by Ring and his colleagues when they decided to continue Mercurio as an informant, despite his perceived involvement in the Salemme shooting, without consulting FBI Headquarters and, particularly, the Assistant Attorney General.

More specifically, after the Grasso murder and the Salemme shooting, the government understood the potential for additional violence involving the Patriarca and Boston factions of the LCN. Kottmyer Aug. 12, 1998 Tr. at 12. In the summer of 1989, various informants kept the FBI advised of developments in the Patriarca Family. Among other things, they reported the following.

Russo and Ferrara believed that Patriarca had received information indicating that Ferrara was trying to make a deal with the FBI, causing Patriarca to want to have Ferrara murdered. Ex. 248. Thus, they made a preemptive strike against Salemme and Grasso. *Id.* After the shootings, Patriarca feared that Russo's crew would try to kill all of his allies. Mercurio Aug. 14, 1998 Tr. at 16–17; Exs. 162, 188, 191, 192, 247, 248. In an effort to promote peace, Patriarca made Russo Consigliere of the Family. *Id.* Russo insisted that

about fifteen new members of the Family be made, including three or four immediately. *Id.* Patriarca indicated that he was agreeable, but was reportedly actually stalling in the hope that the anticipated federal indictments would remove the Boston faction as a threat and eliminate the necessity of making new members loyal to it. *Id.* Beginning in June 1989, Mercurio was among those telling the FBI that there might soon be a ceremony to make new members of the Patriarca Family. Mercurio Aug. 4, 1998 Tr. at 16–17.

During the summer of 1989, informants also reported that Russo and other members of the LCN were meeting at a variety of new locations and would at times talk while walking outside. Exs. 191, 196, 188 (at 57–66). Physical surveillances conducted by the FBI confirmed this. Ex. 188 (at 57–64).

Ring did several things in response to this situation. He had Kottmyer draft criminal complaints concerning Russo and his colleagues. Kottmyer Aug. 12, 1998 Tr. at 65; Ring June 9, 1998 Tr. at 133–37. He and Kottmyer wanted the complaints to be immediately available if it proved necessary to make arrests promptly. *Id.*

The information he had received concerning the potential for violence, the possibility of an induction ceremony that could be bugged, and the uncertainty as to where that ceremony would be held also prompted Ring, in July 1989, to assign Steffens to begin drafting an affidavit to support an application for a warrant for a roving bug. Ring June 22, 1998 Tr. at 12–13. Ring also discussed with Kottmyer in about July 1989 the possibility of getting a roving warrant. Ring June 19, 1998 Tr. at 32.

Title III permits the government in certain limited circumstances to obtain an order authorizing the interception of particular conversations at one or more unspecified locations, notwithstanding the particularity clauses of the Fourth Amendment. 18 U.S.C. § 2518(11)(a)(ii)

(1994). More specifically, as this court has previously written:

> The Fourth Amendment requires that searches and seizures be reasonable and establishes certain requirements for the issuance of warrants. Among these is the requirement that any warrant "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. As originally enacted, Title III implemented the particularity clauses of the Fourth Amendment by requiring: (1) that each application concerning electronic surveillance include "a particular description of . . . the place where the communication is to be intercepted," 18 U.S.C. § 2518(1)(b)(ii), and (2) that the judge find that "the place where, . . . communications are to be intercepted [is] being used, or [is] about to be used," in the commission of a specified offense, § 2518(3)(d).
>
> In enacting Title III, Congress expressed the belief that electronic surveillance was indispensable to investigating and prosecuting organized crime. Subsequently, many cases in Massachusetts and elsewhere showed this conviction to be correct. As the ability of the government to intercept criminal conversations became manifest, however, sophisticated criminals began structuring their communications to frustrate efforts to intercept them.
>
> In recognition of this, Title III was amended in 1986 to add "roving intercept [bug]" and "roving wiretap" provisions, 18 U.S.C. § 2518(11) (1988). With regard to the roving intercept provision at issue in the instant case, subsection 11 provides that the usual particularity requirements of Title III, § 2518(1)(b)(ii) and (3)(d), do not apply if a judge finds such specification is not practical, based upon an application by the government containing:
>
> > *a full and complete statement as to why such specification is not practical* and identif[ying] the person committing the offense and whose communications are to be intercepted.
>
> § 2518(11)(a)(ii).
>
> In essence, the roving intercept provision replaces the usual practice that the place to be searched be identified in a warrant by an address with a description of that place as the location at which an identified person is engaging in identified criminal conversation. Thus, a roving intercept order gives executing officers less specific direction, and more discretion, concerning the place to be searched than a conventional warrant.

*Ferrara,* 771 F.Supp. at 1270–71 (emphasis added).

When he received his assignment to draft an affidavit to support an application for a roving bug, Steffens had no training or experience concerning the requirements of Title III. Steffens Aug. 6, 1998 Tr. at 64–67. He viewed the assignment as a good opportunity for on the job training. *Id.*

When he received his assignment, Steffens did not seek legal advice from Kottmyer or any other Strike Force attorney. *Id.* at 71. Rather, he consulted the Boston FBI's Principal Legal Advisor, Callahan, and several more experienced FBI agents. *Id.* at 68–69.

Callahan gave Steffens an annotated form to be used as a guide for the preparation of an affidavit in support of an application for authorization to intercept either wire communications or oral communications. Steffens Aug. 10, 1998 Tr. at 138–39; Ex. 197. Callahan told Steffens that he would want to review any affidavit before it was filed. Steffens Aug. 6, 1998 Tr. at 65–66. However, after consulting Ring, Steffens did not provide Callahan with a copy of the affidavit that he filed on October 27, 1989. *Id.*

As indicated earlier, in order to receive authorization for a roving *bug* to be used to intercept oral communications, the government is required to submit to the court "a full and complete statement as to why

[it] is not practical" to specify the place to be bugged as is generally required by 18 U.S.C. § 2518(1)(b)(ii) and 3(d). The statutory standard for obtaining a roving *wiretap* order, however, is somewhat different. To obtain a warrant authorizing wiretapping at an unspecified location, the government was in 1989 required to identify the person committing the alleged offense and make "a showing of a purpose, on the part of that person, to thwart interception by changing facilities." 18 U.S.C. § 2518(11)(b)(ii) (1989).[52]

> Thus, while the roving intercept and roving wiretap provisions were apparently similarly motivated, they include somewhat different, and potentially confusing, standards. More specifically, the roving intercept provision requires a "full and complete statement;" the roving wiretap provision does not. Similarly, the roving intercept provision requires a showing that it is impractical to satisfy the usual specification requirements of Title III; [in 1989] the roving wiretap provision require[d] a demonstration that the individual to be targeted [was] attempting to evade interception.

*Ferrara*, 771 F.Supp. at 1289.

The annotated form that Callahan gave Steffens recognized the difference in the requirements for obtaining authorization for roving bugs and roving wiretaps. Ex. 197. It stated, in pertinent part, that:

> When requesting a *roving wire* interception, *you must establish that the specifically targeted subject(s) uses various and changing facilities for the purpose of avoiding electronic surveillance* (2518(11)(b)(ii)). This purpose may be evinced either by informant information (e.g., the subject's past or current statements to that effect) or by the subject's actions over a period of time (e.g., physi-

cal surveillance establishing that the subject travels from phone to phone to call other coconspirators). Roving wiretaps will be authorized for public telephones only, and only when it is clear that the telephones cannot be identified in advance, and the subject's intent to avoid electronic surveillance is manifested clearly.

> In *roving oral* interceptions (2518(11)(a)(ii)), *you must establish probable cause that it is not practical to specify the place where the oral communications of the targeted individual(s) are to be intercepted.* Once again, a roving oral interception will be authorized only for public facilities, vehicle, hotel rooms, or similar locations, and a pattern of activity demonstrating the impracticability of naming specific premises must be established.

Ex. 197 (emphasis added).

In 1989, Steffens knew that there was some distinction between what was required to obtain a warrant for a roving bug and a roving wiretap. Steffens Aug. 6, 1998 Tr. at 70–71. Nevertheless, he believed that to obtain a warrant for a roving bug it was only necessary to show the use of various and changing locations. *Id.* This view was mistaken. Section 2518(a)(ii) requires not only an effort to evade surveillance, but a *successful* effort which renders it "impractical" to identify the place to be bugged at the time the warrant is issued. *Ferrara*, 771 F.Supp. at 1309.

Throughout the summer and early fall of 1989, Steffens collected information for his draft affidavit. At the same time, Ring was working hard to prevent the attorneys who would prosecute the Russo faction from knowing that Mercurio was an informant and from reviewing his FBI file.

---

52. In 1998, § 2518(11)(b)(ii) was amended to delete the requirement of "a showing of a purpose ... to thwart interception" and to replace that standard with the requirement "that there is probable cause to believe that the person's actions could have the effect of thwarting interception from a specified facility ...." Pub.L. No. 105–272, Title VI, § 604, 112 Stat. 2413. Section 2518(11)(a)(ii) concerning roving bugs was not amended in 1998.

Jeffrey Auerhahn and Gregory Sullivan were the Strike Force attorneys presenting the case against Mercurio, Russo, and others to the grand jury. Kottmyer Aug. 13, 1998 Tr. at 64–65. When they learned that Mercurio's parole had been terminated early, they suspected corruption and wanted to investigate. *Id.* Kottmyer knew that Mercurio was an FBI informant and discussed the matter with Ring. *Id.* at 66; Ex. 200. Kottmyer felt that it was essential that Auerhahn and Sullivan be advised of Mercurio's status, and be permitted to review his FBI informant file to determine whether it contained any exculpatory information or evidence to support an authorization defense, or raised any possible issues concerning whether Sixth Amendment rights had been violated because an informant was reporting putative defendants' discussions with their attorneys, among other things. Kottmyer Aug. 13, 1998 Tr. at 66; Ex. 200.

On several occasions, Kottmyer presented her position that her assistants must view Mercurio's informant file to Ring, the SAC, Ahearn, and the ASAC, O'Callahan. Kottmyer Aug. 13, 1998 Tr. at 66–69, Aug. 14, 1998 Tr. at 169–70. She also explained to them her concerns about possible exculpatory information, evidence of authorization, and Sixth Amendment issues that only the attorneys working on the case could properly assess. *Id.* The United States Attorney, Wayne Budd, supported Kottmyer's requests. June 6, 1998 Tr. at 6 (Under Seal). Nevertheless, Ring and his colleagues refused to permit Auerhahn and Sullivan to be told that Mercurio was an informant or to review his file. Ex. 200.

On September 1, 1989, Kottmyer sent a memorandum to David Margolis, the Chief of the Organized Crime and Racketeering Section of the Criminal Division of the Department of Justice, seeking support for her insistence that Auerhahn and Sullivan be permitted to review Mercurio's informant file. June 6, 1998 Tr. at 5–7 (Under Seal); June 15, 1998 Tr. at 18–19 (Under Seal). Kottmyer told Margolis that a proposed RICO indictment of Mercurio and others would soon be submitted. *Id.* She also advised him that O'Sullivan had requested the early termination of Mercurio's parole in part to decrease the likelihood of pretrial detention when Mercurio was indicted. June 15, 1998 Tr. at 18–19 (Under Seal). Kottmyer explained her concerns about exculpatory information, the possible authorization defense Mercurio might assert based in part on the successful effort to have his parole terminated, and foreseeable Sixth Amendment issues that could arise when Mercurio was charged. *Id.;* June 6, 1998 Tr. at 5–7 (Under Seal). Kottmyer also told Margolis that the FBI was in possession of reliable information, which it believed to be true, that Mercurio had set up the June 19, 1989 attempted murder of Salemme. June 6, 1998 Tr. at 6 (Under Seal).

The proposed indictment of Mercurio, Russo, and their colleagues was submitted to the Department of Justice later in September 1989. Kottmyer Aug. 12, 1998 Tr. at 68, 73. On September 28, 1989, Kottmyer wrote to Margolis again to reiterate and amplify her contention that it was essential that Auerhahn and Sullivan be allowed to review Mercurio's informant file. June 6, 1989 Tr. at 7 (Under Seal). Margolis was persuaded and, without the authorization of the FBI, decided to tell Auerhahn and Sullivan of Mercurio's status. Ex. 200.

On October 4, 1989, Ring sent a memorandum to Ahearn reciting the history of his dispute with Kottmyer; explaining his view that the prosecutors had no need to know that Mercurio was an informant; and recording his previously expressed concern that if the prosecutors were told of Mercurio's status, it might be disclosed in court, thus endangering Mercurio. *Id.* Kottmyer, however, had asserted that no indictments would be returned unless and until Auerhahn and Sullivan reviewed Mercurio's informant file. *Id.* Ring urged

that any review of Mercurio's file be done only by FBI personnel and that the SAC go to Washington if necessary to support his position. *Id.* The next day, however, Kottmyer reaffirmed to Ahearn that Auerhahn and Sullivan would have to review Mercurio's file before any proposed indictment would be presented to the grand jury. June 6, 1998 Tr. at 7 (Under Seal).

The FBI's battle to keep Auerhahn and Sullivan from reviewing Mercurio's informant file continued throughout October 1989. Ex. 168. It was finally resolved by an agreement between high level officials of the Department of Justice and FBI in Washington, D.C. *Id.* On October 25, 1989, it was agreed that Sullivan would be allowed to review Mercurio's informant file in the presence of an FBI agent, but could not take notes or copy any document. *Id.* The information Sullivan acquired could only be disclosed to Kottmyer, Auerhahn, and the attorneys at the Department of Justice who already knew that Mercurio was an informant. *Id.* In addition, the Department of Justice agreed to the FBI's condition that Mercurio's "relationship with the FBI ... not be disclosed without the prior approval of the FBI." *Id.* Subject to the foregoing conditions, Sullivan read Mercurio's informant file on October 26, 1989. June 6, 1998 Tr. at 8–9 (Under Seal).

The determined effort by Ring and the FBI to keep the prosecutors from knowing that Mercurio was an informant, in part to minimize the risk that his status would be disclosed to the court and possibly others in future litigation, illuminates the motivation for many other decisions made in September and October 1989. In late September or early October Mercurio told the FBI that Vincent Federico, Richard Floramo, Carmen Tortora, and Robert DeLuca would soon be made new members of the Patriarca Family. Mercurio Aug. 4, 1998 Tr. at 15–17, 79–80. Mercurio related that Ferrara had told him that the ceremony would have to be conducted while Federico, who was in prison, was on furlough.

*Id.* at 79, 82–83, Aug. 5, 1998 Tr. at 82. Mercurio also reported that the ceremony would be held somewhere in the vicinity of the Howard Johnson's restaurant at Wellington Circle, Medford, Massachusetts. Mercurio Aug. 4, 1998 Tr. at 95–98. Mercurio said that he had been designated to drive participants from Wellington Circle to the site of the ceremony. *Id.*

Ring and Connolly continuously asked Mercurio to provide them more information concerning the ceremony. *Id.* at 91, 102. Mercurio provided the information he received promptly to Connolly or Ring. *Id.* There are, however, no 209s reflecting the information Mercurio furnished to the FBI about a month before the ceremony.

Mercurio's reports prompted the FBI to seek information about the forthcoming induction ceremony from other sources. Some information was obtained from a source in Rhode Island. Kottmyer Aug. 12, 1998 Tr. at 15–16, Aug. 13, 1998 Tr. at 27. In addition, after receiving the information that Mercurio provided in late September or early October 1989, Connolly told Flemmi about the anticipated ceremony and asked him to try to find out about it. Ex. 92; Flemmi Sept. 1, 1998 Tr. at 61, 63–65, 68–69. Flemmi agreed and tried, but failed, to get helpful information for Connolly. Flemmi Sept. 1, 1998 Tr. at 64–65.

About a week before the ceremony, Ferrara told Mercurio that Federico had received a furlough for Sunday, October 29, 1989, and that the induction ceremony would be held then. Mercurio Aug. 4, 1998 Tr. at 98, Aug. 5, 1998 Tr. at 39. Mercurio promptly reported this to the FBI and said that the ceremony was a "definite go" for October 29, 1989. Mercurio Aug. 4, 1998 Tr. at 19–20, 26–27, 87–88, Aug. 5, 1998 Tr. at 38. Mercurio still did not have the address of the ceremony. Mercurio Aug. 4, 1998 Tr. at 48. However, as one who would be driving participants to the ceremony, he and the FBI expected that he would be told it in ad-

vance of the event. Mercurio Aug. 5, 1998 Tr. at 40.

On Friday, October 20, 1989, Kottmyer met with Ahearn, O'Callahan, and Ring. Kottmyer Aug. 12, 1998 Tr. at 5–6, 45. They told Kottmyer that the Patriarca Family would be conducting an induction ceremony in the near future. Kottmyer Aug. 12, 1998 Tr. at 15. Kottmyer understood that Mercurio was one source of the FBI's information about the ceremony and that his information had catalyzed the meeting in which she was participating. *Id.* at 15–16. Information emanating from Rhode Island was also discussed with Kottmyer. *Id.* at 15–16, 40, Aug. 13, 1998 Tr. at 27–28. Therefore, she knew that Mercurio was not the FBI's sole source of information about the ceremony. *Id.*

The representatives of the FBI indicated that they wanted to seek a warrant that would permit them to intercept and record the anticipated ceremony. Kottmyer was told, however, that few people knew about the induction ceremony and if information about it were included in an application for a warrant, it could lead to the identification of the FBI's source or sources. Kottmyer Aug. 12, 1998 Tr. at 59. Thus, Kottmyer was told that information concerning the ceremony was regarded as "singular" by the FBI and that the Bureau would not allow it to be used in any submission to the court for fear that doing so would have the effect of identifying one of its informants. *Id.* at 44–45; Ring June 11, 1998 Tr. at 141–42, June 6, 1998 Tr. at 8.

Kottmyer believed that once the FBI told her that the information was singular, she could not lawfully use that information in an application for a warrant because she did not, under the pertinent provisions of the Code of Federal Regulations, have the authority to disclose an informant's identity. Kottmyer Aug. 12, 1998 Tr. at 45–46, 52–57. At the time, the relevant regulations provided that ordinarily no disclosure of an informant's identity could be made unless the informant and the agency utilizing him did not object. 28 C.F.R. § 16.26(b)(4). However, any such objection would be trumped if the Deputy Attorney General or Associate Attorney General "determine[d] that the administration of justice require[d] disclosure." 28 C.F.R. § 16.26(c).

Everyone present on October 20, 1989 wanted to intercept the anticipated ceremony. Electronic surveillance of Russo, who had not been previously intercepted, would strengthen the proposed case against him. Kottmyer Aug. 12, 1998 Tr. at 47, Aug. 13, 1998 (P.M.) Tr. at 5–6. In addition, the FBI had never succeeded in recording a Mafia induction ceremony. Ring June 5, 1998 Tr. at 45. As Ahearn wrote on October 30, 1989, "[t]he Bureau had an outstanding opportunity for the first time ever, of overhearing and recording an LCN induction ceremony, which would be invaluable for years to come at other LCN trials and Congressional hearings." Ex. 183.

Thus, Kottmyer was presented with the question whether an application for a warrant to conduct electronic surveillance that would be used to intercept the forthcoming induction ceremony could lawfully be presented without reference to that ceremony. Kottmyer Aug. 12, 1998 Tr. at 45–47, 56–57. As long as the information concerning the ceremony remained singular, Kottmyer felt there were two options—foregoing the application for electronic surveillance or submitting it without any reference to the ceremony if it were legally permissible to do so. *Id.*

The FBI definitely wanted to proceed with the application, without including the information that it deemed singular. *Id.* at 47. Thus, Kottmyer was asked to review all of the available information to determine whether there was sufficient, current probable cause to support an application for roving electronic surveillance that could be filed without any reference to the induction ceremony. *Id.* at 47–48. At the conclusion of the meeting, Kottmyer was given the draft affidavit intended to

support an application for a roving bug or wiretap that Steffens had been preparing. *Id.* at 48.

However, in what would become a pattern in the following week, the FBI did not provide Kottmyer with the detailed information that Mercurio had furnished concerning the forthcoming induction ceremony. More specifically, Kottmyer was not told that Mercurio had identified the four people who would be inducted; that the ceremony would be conducted while Federico was on furlough; that Wellington Circle in Medford would be a meeting place for at least some of the participants; or that Mercurio would be driving people from there to the ceremony. *Id.* at 37–39.

Kottmyer had never prepared an application for roving electronic surveillance before. Kottmyer Aug. 13, 1993 (P.M.) Tr. at 26. She was, however, generally familiar with the statutory provisions concerning roving bugs and wiretaps. *Id.* at 27. Over the weekend, she did some research on the roving bug provisions of Title III, which had been enacted in 1986. Kottmyer Aug. 13, 1998 Tr. at 116, Aug. 13, 1998 (P.M.) Tr. at 26, Aug. 14, 1998 Tr. at 160. She read the statute and a treatise. *Id.* She also reviewed the applications and affidavits utilized to apply for warrants for both roving and conventional, fixed electronic surveillance in another case, *United States v. David.* Kottmyer Aug. 14, 1998 Tr. at 160, 167. Kottmyer did not that weekend, or at any other time, discuss with anyone at the Department of Justice whether 18 U.S.C. § 2518(11)(a)(ii), which required a "full and complete statement" as to why it was "impractical" to identify the place to be bugged, meant that reliable information concerning the address at which the ceremony would be held had to be included if it were obtained before the application was filed. *Id.* at 159.

During the weekend Kottmyer decided that she could comply with the statutory requirements for a roving bug without including any reference to the induction ceremony in the application because there was current probable cause to support the application based on electronic surveillance that had been conducted in Connecticut and physical surveillances. Kottmyer Aug. 12, 1998 Tr. at 56. In Kottmyer's view, an application for a roving bug was appropriate if specification of the place to be bugged was not feasible, and therefore was impractical, because the targets were using changing locations to conduct their criminal business. Kottmyer Aug. 14, 1998 Tr. at 166. She recognized, however, that it might in certain circumstances be practical, and therefore necessary, to identify the place to be bugged even if targets were frequently changing locations in an effort to thwart electronic surveillance. *Id.* at 167. In such a case, the government could apply for separate warrants authorizing conventional and roving electronic surveillance. *Id.* Indeed, this was done in the *David* case. *Id.*

With regard to the duty of disclosure to the court, Kottmyer believed that the statutory requirements were the same for a "full and complete statement" regarding probable cause and regarding the impracticality of identifying the place to be bugged when an order for roving bug was at issue. Kottmyer Aug. 13, 1998 Tr. at 123, Aug. 13, 1998 Tr. (P.M.) at 9–12. This understanding was incorrect.

> With regard to establishing that there is probable cause for the issuance of a warrant, the government must make "a full and complete statement of the facts and circumstances *relied upon by the applicant,* to justify his [or her] belief that an order should be issued." § 2518(1)(b) (emphasis added). Thus, the government has some discretion to rely upon and disclose less than all of its evidence tending to establish probable cause, as long as there is no effort to mislead the court into approving a warrant which might otherwise not have been issued.

\* \* \* \* \* \*

In contrast to the requirements concerning probable cause, the government's obligation to make a "full and complete statement" concerning the practicality of specifying the place or places to be bugged is unqualified; the government is obligated to inform the court of all of its information relating to this issue.

*Ferrara,* 771 F.Supp. at 1306–07 (emphasis added).

Thus, with regard to establishing probable cause, the government generally has legitimate discretion not to rely on singular information that could lead to the identification of a source and, therefore, to omit such information from the section of its application for a warrant that seeks to establish probable cause. With regard to an application for a roving bug, however, if such singular information also relates to whether it is impractical to specify the location to be bugged, the government does not have the discretion to withhold it from the court.

As Kottmyer knew, the Department of Justice and the courts had authorized the use of sealed, supplemental submissions as a means of advising judges of singular information that the government believed could not be safely included in the application and affidavits that would ultimately be disclosed to defendants. Kottmyer Aug. 14, 1998 Tr. at 162–65.[53] Kottmyer, however, had misgivings about this approach, in part because the government could not control whether the information would be disclosed in the future and in part because of concerns about the propriety of litigating the admissibility of evidence obtained by court ordered electronic surveillance without a defendant knowing all of the information on which the court relied in issuing the warrant. *Id.* at 164–65. Thus,

Kottmyer did not consider this approach in October 1989. *Id.*

By Monday, October 23, 1989, Kottmyer had decided that it was permissible and appropriate to ask the Department of Justice to give expedited authorization for an application for a roving bug. Kottmyer Aug. 12, 1998 Tr. at 7–8. The FBI's strategy with regard to the application was explained by Ahearn in an October 30, 1989 memorandum to the Director of the FBI. Ex. 183. He wrote:

Within the last week, information was developed by Boston that a major sit down was to be held in Boston on Sunday, October 29, 1989 at which time new members would be inducted and the internal dispute settled.

As FBIHQ is aware, the Boston Division immediately submitted for approval affidavits in support of two separate MISURS [microphone surveillance] installations which were intended to intercept conversations in a vehicle and at a meeting of the hierarchy of the Patriarca Family, on Sunday, 10/29/89. Expected to be in attendance at the meeting were RAYMOND PATRIARCA, the Boss; NICKY BIANCO, the Underboss, J.R. RUSSO, the Consigliere, and all nine Capos. *Although four sources of the Boston Division have provided the probable cause to support application for these MISURS, in an attempt to continue to protect their identities Boston utilized transcripts from a New Haven Division intercept.* These transcripts had been provided to Boston previously by New Haven for use in an affidavit prepared and submitted by the Springfield RA with full knowledge of New Haven.

*It was also the Boston Division's intention to effect the arrests of RUSSO,*

---

53. With regard to Vanessa's, Weld testified that if he had been fully informed and somehow persuaded to submit an application characterizing Bulger and Flemmi as targets, when they were really sources who were not expected to be overheard or investigated, he would "at a minimum ... have sought ... an

off balance sheet proceeding with the judge." Weld May 27, 1998 Tr. at 113. This is an approach that has been judicially endorsed both before and after 1986. *United States v. Strini,* 658 F.2d 593, 595 n. 2 (8th Cir.1981); *United States v. Falls,* 34 F.3d 674, 682 (8th Cir.1994).

*VINCENT FERRARA, and ROBERT CARROZZA at the conclusion of the meeting.* Top echelon informants have advised that these three subjects are expecting to be indicted, and intend to flee the area as soon as they believe the indictment is about to be returned. Historically, Boston has experienced little success in preventing indictments from leaking prematurely, and therefore opted to seek complaints and warrants just prior to indictment. More importantly, the potential for additional violence within the family increases daily. RUSSO, CARROZZA, and FERRARA were responsible for planning and approving the murder of former Underboss BILLY GRASSO, and the attempted murder of FRANK SALEMME. The attempt on SALEMME was made with automatic weapons being fired from a moving vehicle in a crowded shopping center with total disregard for the safety of innocent bystanders. As SALEMME ran from his attackers, they sprayed the area with automatic weapons fire.

*Id.* (emphasis added).

Ahearn's memorandum indicates that neither he nor Ring had any intention or desire to use the warrant that they were seeking for a roving bug more than once, to intercept the forthcoming induction ceremony. As discussed, *infra,* until overruled by FBI Headquarters on October 27, 1989, they intended to use the complaints previously drafted to arrest Russo, Ferrara, and Carrozza after the ceremony. Ahearn did not inform the Director that Mercurio had also expressed his intention to flee. As subsequent documents, among other things, confirm, the FBI did not intend to arrest Mercurio on a complaint to prevent his flight.

Kottmyer and Steffens worked hard on October 23, 1989 to finalize his affidavit. Steffens Aug. 6, 1998 Tr. at 39, 139; Kottmyer Aug. 12, 1998 Tr. at 77. Ring controlled and limited the access that they had to information from informants that could be included in the affidavit. Steffens

Aug. 6, 1998 Tr. at 36, Aug. 10, 1998 Tr. at 97. Mercurio was one informant relied on in the affidavit, but neither Kottmyer nor Steffens had the opportunity to review his full informant file. Steffens Aug. 10, 1998 Tr. at 98–99, 108–09, 121. Rather, they relied on the limited information provided by Ring. *Id.*

Ring gave Steffens informant information for his affidavit for the first time on October 23, 1998. *Id.* at 108; Exs. 192, 194. That information was not included in the draft affidavit that Kottmyer was furnished on October 20, 1989. *Id.* The informant information that Ring gave Steffens included no references to the forthcoming induction ceremony. Exs. 192, 194; Ring June 19, 1998 Tr. at 39–40. Initially, Ring refused to allow Steffens to see the 209s which contained the information Ring had summarized for inclusion in the affidavit, but acquiesced when Kottmyer insisted that Steffens review them. *Id.* at 109. Ring never told Steffens the identity of any informant. Aug. 6, 1998 Tr. at 29–30. Ring did, however, emphasize to Steffens that information about the induction ceremony was singular and had to be maintained as confidential. Steffens Aug. 6, 1998 Tr. at 62.

Pursuant to Ring's instructions, the affidavit that Steffens and Kottmyer drafted named Russo, Carrozza, and Ferrara as targets. Exs. 188 (Under Seal), 190 (Under Seal); Ring June 19, 1998 Tr. at 252–55. It was expected that Mercurio would be overheard as well. Ring June 19, 1998 Tr. at 252–55. Pursuant to 18 U.S.C. § 2518(1)(b)(iv), Mercurio was required to have been named as a target "if the Government ha[d] probable cause to believe that [he was] engaged in the criminal activity under investigation and expect [ed] to intercept [his] conversations." *United States v. Donovan,* 429 U.S. 413, 428, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977); *see also Ferrara,* 771 F.Supp. at 1314–15. In this case, however, the failure to name Mercurio as a target was consistent with the FBI's intent to treat him as a protected

source rather than as subject to prosecution for his participation in the induction ceremony. In any event, Mercurio was identified as "CS–1" in the Steffens Affidavit. June 10, 1998 Tr. at 100.

Flemmi was "CS–2" in the Steffens Affidavit. Coffey Aff., Apr. 9, 1997, at 3–4. With regard to his qualifications, Steffens stated that Flemmi had provided reliable information for more than seven years and that:

> Information provided by this informant has led to the arrest and conviction of more than eight individuals for the crimes of illegal gambling and loan-sharking in connection with a major LCN criminal enterprise. Information provided by this informant has been utilized in prior Title III intercepts authorized by United States District Court. During the course of this informant's confidential relationship with law enforcement authorities, information he provided has been corroborated by independent investigation, other reliable informants and information obtained from court authorized electronic surveillance. CS–2 has stated [that] he will not testify against the subjects due to fear of reprisals.

Ex. 188 (Under Seal).

On October 21, 1989, Flemmi left Boston on an International Association of Airborne Veterans parachute jumping trip to Asia. Ex. 250. He did not return until October 31, 1989. *Id.* Thus, he was not available to provide the FBI with any emerging information about the ceremony in the week before it occurred.

Flemmi was not among those intercepted at 34 Guild Street on October 29, 1989. Nor did he have a possessory interest or other relationship with the premises. Therefore, the issues of whether it was proper to present the evidence of the intercepted Mafia induction ceremony to the grand juries which returned indictments against him and whether it is permissible to use such evidence against Flemmi in any trial must be analyzed in the context

of his claim to have an enforceable agreement with the government rather than under Title III. *See* § III.1.D(3), *infra.*

In any event, the affidavit to which both Mercurio and Flemmi contributed employed the approach required by Ring. Ex. 188. Russo, Ferrara, and Carrozza were the only named targets. *Id.* It was stated that there was also probable cause to believe that evidence concerning Patriarca, Nicholas Bianco, Matthew Gugliametti, Jr., Gaetano Milano, Louis Failla, John Castegna, John Farrell, and Frank Pugliano would be intercepted. *Id.* Mercurio was not described as a person as to whom evidence was expected to be acquired. *Id.*

The section of the affidavit concerning probable cause focused on the rift in the Patriarca Family and, especially, the Grasso murder and Salemme shootings. *Id.* It emphasized information indicating that Russo, Ferrara, and Carrozza used various and changing locations to meet and talk. *Id.*

The affidavit did not disclose that those directing matters for the FBI intended to use the authority for a roving bug only once, to intercept a Mafia induction ceremony at a location they expected to know in advance. *Id.* Nor did the affidavit disclose that at least one informant would be at the ceremony. *Id.*

The affidavit did represent that all of the informants had stated that they would not testify because of fear of reprisals. *Id.* at 13, 16, 17, 18. Although not known to Steffens and Kottmyer, who were relying on information provided by Ring, this statement was not accurate. Neither Flemmi nor Mercurio was asked to testify or said that he would not for fear of reprisal. Mercurio Aug. 4, 1998 Tr. at 85, 104; Flemmi Sept. 5, 1998 Tr. at 23–25. It was, however, true that if asked, both Mercurio and Flemmi would have said that they did not wish to testify because they did not want to be revealed as informants. Mercurio Aug. 15, 1998 Tr. at 28, 85, 120.

The affidavit also stated that the issuance of orders granting immunity and compelling testimony were likely to be unavailing. Ex. 188 at 69. With regard to Mercurio, this may not have been true. Ring knew that Mercurio did not want to return to prison and could, in October 1989, have been fairly threatened with the possibility of prosecution for the Salemme shooting, with a potential life sentence, as well as for the Sagansky–Weinstein extortion and other criminal activity intercepted at Vanessa's. As Ring explained, witnesses in Organized Crime cases are often reluctant to testify initially, but at times change their minds when the FBI is persistent in pursuing them. Ring Sept. 22, 1998 Tr. at 120–22, 138–40. This approach was not employed with regard to Mercurio. If tried, it might have succeeded. According to the government's expert, James Darcy, informants in LCN cases have become cooperating witnesses when faced with the prospect of lengthy sentences in RICO cases. Darcy Sept. 28, 1998 Tr. at 136. In the instant case, in 1997, Mercurio acknowledged that he had been an FBI informant and testified after perceiving the prospect of being held in civil contempt. *See United States v. Salemme*, 978 F.Supp. 379, 381 (D.Mass. June 19, 1997).

Steffens' affidavit did truthfully state that the four sources utilized had provided valuable information in other cases. Ex. 188 (Under Seal). Thus, Steffens accurately reported that one reason that the government did not try to compel its sources to testify was that, "use of informant testimony, even if compelled by a grant of immunity, would seriously jeopardize, if not destroy, the future usefulness

of those informants in other investigations." *Id.* at 68.[54]

On October 23, 1989, Ring spoke to Maduro, who was still working in the Organized Crime Section at FBI Headquarters, to advise him that Steffens would soon deliver his affidavit and a request for expedited authorization to apply for a warrant. Ex. 195.[55] As a result of this conversation, on October 24, 1989, Maduro wrote the following back to Boston:

> In furtherance of investigative objectives in the Salemme case, Boston is preparing an affidavit in support of an application for emergency title III electronic surveillance (ELSUR) of *a meeting* between members of the Patriarca LCN Family (representing the Patriarca LCN "dissident faction") which is scheduled to occur on or about Sunday, 10/29/89, at a presently unknown location in Boston. Reliable and singular top echelon informant information indicates that the purpose of this meeting is to make new Patriarca LCN members. *Boston will be in a position to identify the precise location of this meeting and upon receipt of same will immediately provide these details to the OCS [Organized Crime Section] for incorporation into their Title III Affidavit.*
>
> As of 10/23/89, prospective Title III principals include the following Patriarca LCN Family members: Joseph "J.R." Russo, Consigliere, Vincent "Vinny" Ferrara, Capo and Robert "Bobby" Carrozza, Capo.
>
> On 10/23/89, SSA Jim Ring telephonically advised the OCS that *should it not be ultimately feasible to effect installation*

---

54. The affidavit also did not indicate that the FBI had a cooperating witness who was meeting with several prime suspects in the Salemme shooting, and was willing to record conversations with them and to testify. Ex. 189; Steffens Aug. 6, 1998 Tr. at 116–17. The limited evidence presented does not indicate that the cooperating witness was meeting with Russo, Ferrara, and Carrozza. *Id.*

55. Exhibit 195 should have been maintained in the files of the FBI's Boston office and produced prior to August 1998. It was not produced, however, until August 1998, after Assistant United States Attorney Herbert found a copy at FBI Headquarters and furnished it to the defendants. Aug. 10, 1998 Tr. at 10. Thus, the document was not available when Ring testified over many days in June 1998.

*of emergency court ordered ELSUR, Boston will interrupt this meeting and effect arrests based upon complaints of subject Russo, Ferrara and Carrozza. These individuals, who are also subjects in the concurrent Boston "Jungle Mist" investigation (along with Patriarca LCN Soldier Anthony Mercurio) will subsequently be indicted in Boston pursuant to information already presented before the "Jungle Mist" Special Grand Jury.*

*Id.* (emphasis added).

Maduro's teletype confirms three things with regard to Ring's state of mind on October 23, 1989. First, the warrant to conduct roving electronic surveillance being sought was intended to be used only one time, to intercept "a" meeting. *Id.* Second, Ring expected to know the location of that meeting soon enough to incorporate it in the application for electronic surveillance if necessary. *Id.* Third, Ring discussed having Russo, Ferrara, and Carrozza arrested, but intended to leave Mercurio free at least until he was indicted. *Id.*

Steffens, however, was not given Maduro's teletype or the information that it contained. Steffens Aug. 10, 1998 Tr. at 9. Nor was Kottmyer then told that the FBI expected the ceremony to be held on October 29, 1989 or that the FBI expected to be able to identify the location of the ceremony before the application for a warrant to bug it was filed. Kottmyer Aug. 12, 1998 Tr. at 86–89, Aug. 13, 1998 Tr. at 139–40.

On October 25, 1989, Ring was away from Boston, attending an Organized Crime conference. Ring June 4, 1998 Tr. at 63. Special Agent Robert Walthers served as Supervisor of the Organized Crime squad in Ring's absence. June 8, 1998 Tr. at 4–5. In that capacity, he wrote a memorandum for Steffens to carry to FBI Headquarters with his affidavit. *Id.* at 6–7. It stated, in pertinent part that:

The enclosed application/affidavit for "roving" Title III coverage of RUSSO, FERRARA, and CARROZZA has been drafted with the goal of obtaining authorization to direct electronic surveillance techniques at any meeting site utilized by the these subjects; such tactics are deemed necessary to counter the LCN's practice of meeting at various and changing locations. *Such authorization will also help to protect the identity of any confidential sources, who otherwise might be revealed if singular information (in this case, the location of sensitive LCN meeting) provided by the source was incorporated into the affidavit of a traditional Title III application.*

Ex. 164 (emphasis added).

This memorandum makes explicit that, contrary to this court's finding in *Ferrara*, 771 F.Supp. at 1279, one motive, if not the sole motive, for seeking authorization for a roving bug was a determination not to risk revealing the FBI's sources of information concerning the induction ceremony. Although this memorandum was maintained in the files of the FBI's Boston Office, it was not produced during the *Ferrara* litigation. Nor was it produced in this case until after the court issued its May 22, 1997 decision granting defendants' motion for an evidentiary hearing on the motion to suppress the electronic surveillance of 34 Guild Street, and noted its prior finding that the failure of the government to make the full and complete statement required by § 2518(11)(a) "was not motivated by the desire to protect the identity of any informant." *Salemme*, 978 F.Supp. at 356 (citing *Ferrara*, 771 F.Supp. at 1279). Rather, the government produced the October 25, 1989 Walthers memorandum on June 3, 1997 and acknowledged that it should have been disclosed in 1991, in the *Ferrara* litigation. June 3, 1997 Tr. at 10; June 19, 1997 Order at 8 n.4.

On October 25, 1989, Steffens delivered the package of documents to Moody, the head of the FBI's Organized Crime Section, Steffens Aug. 6, 1998 Tr. at 49. Moody told Steffens that the Boston Office

was going to have to add information to the affidavit that might reveal that Mercurio was an informant. *Id.* at 49–51. Moody was evidently referring to information regarding the location to be bugged when Mercurio furnished it. Steffens, however, disagreed. *Id.* He explained that because the targets were using various and changing locations, this would not be necessary. *Id.* He felt that Moody did not understand the roving statute. *Id.* Steffens, however, was wrong.

On October 26, 1989, Mercurio again told Ring that the induction ceremony would be held on October 29, 1989, in the vicinity of Wellington Circle, Medford, and that Federico was scheduled to attend. Ex. 161; Ring June 4, 1998 Tr. at 85–88. Kottmyer was told that day that the ceremony would be held on October 29, 1989, near Wellington Circle. Kottmyer Aug. 12, 1998 Tr. at 87–88, Aug. 13, 1998 Tr. at 141. She was not told Federico was expected to be there. Aug. 13, 1998 Tr. at 141.

As indicated earlier, on October 25, 1989, it was agreed that Sullivan could review Mercurio's informant file on certain conditions. Ex. 168. That review was conducted on October 26, 1989. June 6, 1998 Tr. at 8–9 (Under Seal). In the course of that review, Ring told Sullivan and Kottmyer that Mercurio had not been promised that he would not be prosecuted. *Id.*

As the review she had demanded had occurred, there was from Kottmyer's perspective no longer any impediment to pursuing indictments of Russo, Mercurio, and their colleagues. Kottmyer Aug. 12, 1998 Tr. at 73–76. Thus, on October 27, 1989 Kottmyer sent Ahearn a memorandum. June 6, 1998 Tr. at 9 (Under Seal); June 15, 1998 Tr. at 20–21; Kottmyer Aug. 12, 1998 Tr. at 73–76, Aug. 13, 1998 Tr. at 95. Kottmyer wrote that indictments against the current leadership of the LCN would be returned in the near future. *Id.* Therefore, as previously discussed, Mercurio's status as an informant would have to cease

when he or any of his putative codefendants were arrested. *Id.* Kottmyer directed the FBI to tell Mercurio that he should not contact the Bureau except to report a threat of violence or a planned obstruction of justice. Kottmyer Aug. 13, 1998 Tr. at 95–98. Kottmyer understood that these principles had been generally discussed with Mercurio previously and that the FBI would soon implement them. *Id.*

In addition, Kottmyer wrote that, "[i]n accordance with Bureau policy, all contacts between informant and FBI will be documented so that a full and complete record of the relationship between the informant and the Bureau exists." June 15, 1998 Tr. at 20–21 (Under Seal). This policy was not, however, followed with regard to Mercurio, either before or after Kottmyer's October 27, 1989 memorandum.

Knowing that Federico was scheduled to attend the October 29, 1989 induction ceremony, Delamontaigne caused one of the FBI's employees, George Hurley, to obtain Federico's furlough application. Hurley Aug. 17, 1998 Tr. at 19. By the early morning of October 27, 1989, Ring had received and reviewed that application. Ring June 19, 1998 Tr. at 64–65; Steffens Aug. 6, 1998 Tr. at 54–55; Ex. 205. The application indicated that on October 29, 1989, Federico was planning to go to 34 Guild Street, Medford, which was near Wellington Circle. Ex. 205. Ring knew that prior surveillances had shown that Federico had gone to the destination listed on his furlough application in the past. Ring June 5, 1998 Tr. at 16–17; Kottmyer Aug. 12, 1998 Tr. at 182.

Accordingly, Ring sent several agents to conduct surveillance of that address. Ring June 5, 1998 Tr. at 17; Steffens Aug. 6, 1998 Tr. at 54. He also told Kottmyer that Federico's furlough application listed 34 Guild Street as his destination. Kottmyer Aug. 12, 1998 Tr. at 110.

On the morning of October 27, 1989, knowing that it was Friday and there was a great deal of information to review, Kott-

myer provided a draft of the application and Steffens affidavit to District Judge David S. Nelson. Kottmyer Aug. 13, 1998 Tr. at 95. However, at about the same time, a major impediment to proceeding with the application arose. Ring June 4, 1998 Tr. at 65–78, June 5, 1998 Tr. at 29–30, 45; June 22, 1998 Tr. at 57–60.

By the morning of October 27, 1989, Ring had informed the Organized Crime Section at FBI Headquarters that he intended to arrest Russo, Ferrara, and Carrozza at the conclusion of the forthcoming induction ceremony. *Id.* at 68. Ring and his colleagues believed that immediate arrests were important to avert a repetition of violence comparable to the Salemme shooting and to eliminate the risk of flight. Ring June 4, 1998 Tr. at 68, June 15, 1998 Tr. at 165; Ex. 183. As the head of the Organized Crime Section, however, Moody was concerned that those arrests would result in the prompt disclosure of the Steffens affidavit and, therefore, revelation of the ongoing electronic surveillance being conducted in Connecticut. *Id.* Moody was unwilling to jeopardize the electronic surveillance in Connecticut. *Id.* Thus, he refused to provide his required approval for the application for the Boston warrant unless Ring abandoned his plan to make immediate arrests. *Id.* Later that morning, Ring reluctantly acquiesced in this demand. *Id.* As a result, Ring expected that the FBI and Department of Justice would soon authorize the application for the warrant for a roving bug. Ring June 5, 1998 Tr. at 45.

On October 30, 1989, Ahearn wrote to the Director of the FBI about the dispute with Moody. Ex. 183. Among other things, Ahearn stated that:

> In the [October 27, 1989 telephone calls], Section Chief MOODY advised SAC, Boston that the New Haven Division objected to the arrest plan, in that it could expose their wire. MOODY then advised that Boston would have to "compromise," and could either effect the arrests, or make the interceptions, but the affidavits would not be approved if Boston insisted on the arrests. MOODY was informed that Acting Strike Force Chief DIANE KOTTMYER, whose office also covers the New Haven Division, had discussed New Haven's concern, and both she and the Strike Force Attorney responsible for New Haven's interception were confident that a protective order could be secured to prevent any disclosure for at least six months.
>
> The Bureau had an outstanding opportunity for the first time ever, of overhearing and recording an LCN induction ceremony, which would be invaluable for years to come at other LCN trials and Congressional Hearings. Forced to choose, SAC, Boston decided that he would delay arrests and proceed with the interception which, if accomplished, could have a major effect on the Bureau's national strategy against the LCN. Faced with this unfortunate, and avoidable dilemma, SAC, Boston informed FBIHQ that responsibility for injury or death to any individuals, either LCN members or innocent citizens, rested entirely on the shoulders of FBIHQ.

*Id.* This memorandum was written because on October 30, 1989, Ring and his colleagues were still seeking authority from Headquarters to make arrests as soon as possible. Ring June 19, 1998 Tr. at 57. As it indicates, on and after October 27, 1989, neither Ring nor Ahearn wished to delay arrests in an attempt to conduct additional electronic surveillance after the induction ceremony was intercepted.

At about 12:50 p.m. on October 27, 1989, several FBI agents observed Russo, Ferrara, and Mercurio arrive at 34 Guild Street, with a person who proved to be its owner, Stephen DiStefano. Steffens Aug. 10, 1998 Tr. at 76. They promptly reported this to Steffens and Ring. *Id.*, Aug. 6, 1998 Tr at 54–55; Ring June 4, 1998 Tr. at 136–37, June 5, 1998 Tr. at 18–19, 21. The surveillance agents were excited. Steffens Aug. 6, 1998 Tr. at 54–55. Steffens also

understood that the information was significant, in part because Steffens knew that Federico was expected to be at the ceremony and had stated that he would be at 34 Guild Street on the morning of October 29, 1989. Steffens Aug. 6, 1998 Tr. at 54, 57. Ring told Kottmyer about the observations at 34 Guild Street by about 2:00 p.m. on October 27, 1989. Kottmyer Aug. 12, 1998 Tr. at 111.

After leaving 34 Guild Street, Mercurio returned to the vicinity of Vanessa's and called Ring. Ring Sept. 22, 1998 Tr. at 131; Mercurio Aug. 4, 1998 Tr. at 29–30. Ring memorialized their conversation in a 209, which stated:

> On 10/27/89, [Mercurio] advised that VINNIE FEDERICO will go to 34 Guild Street, Medford, the residence of his brother-in-law, on Sunday 10/29/89, and that the LCN making ceremony will take place at the location around 11:00 a.m. FEDERICO's brother-in-law and sister will vacate the house on Saturday afternoon as the sister knows nothing about the use of the house but the brother-in-law does.

Ex. 161; Ring June 4, 1998 Tr. at 138–39. Mercurio told Ring that he was "sure" that the ceremony would be held at 34 Guild Street. Mercurio Aug. 14, 1998 Tr. at 100. Ring told Mercurio that the FBI had observed him at 34 Guild Street. Mercurio Aug. 4, 1998 Tr. at 30, Aug. 5, 1998 Tr. at 54–55.

Neither Kottmyer nor Steffens was told on October 27, 1989 that Mercurio had spoken to Ring or that he had provided additional information identifying the location of the induction ceremony. Kottmyer Aug. 12, 1998 Tr. at 114; Steffens Aug. 6, 1998 Tr. at 100; Ring June 19, 1998 Tr. at 74. Thus, neither Kottmyer nor Steffens knew before applying for the warrant for a roving bug that Mercurio had confirmed that the induction ceremony would be held at 34 Guild Street. *Id.* at 114, 116. In essence, Ring provided Kottmyer with relevant information from other sources, particularly Federico's furlough application

and the surveillance of 34 Guild Street, but did not share with her before the application for a roving bug was filed the information provided by Mercurio that strongly reinforced the fact that on the afternoon of October 27, 1989, it was practical to specify the location that would be bugged to achieve the FBI's sole goal—the interception of the induction ceremony. *Id.* The failure to provide this information to Kottmyer prevented her from considering on a fully informed basis whether it continued to be legally permissible to omit any reference to the ceremony from the application, which had not yet been approved by the Department of Justice or formally submitted to the court.

On the afternoon of October 27, 1989, it was not too late to revise the documents that had been submitted for approval to FBI Headquarters and the Department of Justice. At times, the Department of Justice "had compressed the entire normal review process into a few hours in appropriate situations." Ex. HHHH; Kottmyer Aug. 14, 1998 Tr. at 169. Moreover, Kottmyer had faxed changes in proposed applications to the Department of Justice in the past. *Id.* at 71. She knew that she could always fax proposed changes to the Department. *Id.* at 91.

In the late afternoon of October 27, 1989, Connolly, who had been out of town on business, returned to Boston. Ex. 249. After closing Vanessa's at 5:00 p.m., Mercurio met Connolly and Ring in a hotel room. Mercurio Aug. 4, 1998 Tr. at 33; Kottmyer Aug. 14, 1998 Tr. at 160–62. They spoke for twenty to thirty minutes. Mercurio Aug. 4, 1998 Tr. at 38, Aug. 5, 1998 Tr. at 93. Mercurio reaffirmed that the ceremony was a "definite go" for 34 Guild Street, on October 29, 1989. Mercurio Aug. 4, 1998 Tr. at 36. As Ring testified, Mercurio was not asked if he would wear a device to record the ceremony or testify about it. Ring June 19, 1998 Tr. at 94–95, Sept. 22, 1998 Tr. at 136–37. Contrary to FBI policy and practice, neither Ring nor Connolly prepared a 209 or any

other written record of this meeting with Mercurio.

Mercurio understood from his conversation with Ring and Connolly that the FBI would try to bug the ceremony. Mercurio Aug. 5, 1998 Tr. at 94. He thought that this would be difficult because he expected that Russo or Ferrara would be at 34 Guild Street after the DiStefanos left. *Id.*

Late in the afternoon of October 27, 1989, Kottmyer received by fax the approval of the Department of Justice to submit her application for a roving bug to Judge Nelson. Kottmyer Aug. 14, 1998 Tr. at 71. She and Steffens met with the judge, who entered the government's proposed order at 6:25 p.m. on October 27, 1989. Ex. 204 (Under Seal).

As previously described, at the time that the application incorporating Steffens' affidavit was formally filed, it was not accurate for the government to represent that it was "impractical" to identify the location where the proposed bug would be employed. The government had substantial, reliable, corroborated information indicating that the ceremony would be held at 34 Guild Street and no information that the ceremony would be held any place else in Massachusetts. Kottmyer Aug. 12, 1998 Tr. at 174.

Kottmyer testified that if she had been fully informed of the information Mercurio had previously provided to Ring, and was not concerned about singularity, she would have filed an application for a conventional warrant for 34 Guild Street and another application for a warrant authorizing a roving bug. Kottmyer Aug. 14, 1998 Tr. at 177–79. As described earlier, concerns about singularity do not justify a failure to make the full and complete statement required by § 2518(11)(a)(ii). If, however, two applications had been filed, the judge would have been properly presented with the issue of whether, in the circumstances, the issuance of anything more than a conventional warrant to bug 34 Guild Street was appropriate. *See* 18 U.S.C. § 2518(3) (1994) ( "[T]he judge may enter an *ex*

*parte* order, as requested or as modified . . .").

As indicated earlier, the judge was not informed that the warrant he was being asked to issue would be used to intercept a forthcoming Mafia induction ceremony, in which at least one FBI informant would participate. Thus, he was deprived of the opportunity to question whether any form of court ordered electronic surveillance was really necessary at all. *See* 18 U.S.C. § 2518(2) (1994) ("The judge may require the applicant to furnish additional testimony or documentary evidence in support of the application.").

On the afternoon of Saturday, October 28, 1989, surveillance agents observed the DiStefanos pack their suitcases in their car and leave home, as Mercurio had said they would. Kottmyer Aug. 12, 1998 Tr. at 172–75, Aug. 14, 1998 Tr. at 9–10. The warrant that had been issued required that, if possible, Kottmyer inform the judge in advance of any surreptitious entry. Ex. 204. Thus, after the DiStefanos departed it was necessary for Ring to persuade Kottmyer to attempt to reach the judge to inform him that a bug was going to be installed. *Id.* at 130–31, 174; Ex. 204. Accordingly, on the afternoon of October 28, 1989, Ring told Kottmyer about his discussions and meeting with Mercurio the day before. Kottmyer Aug. 12, 1998 Tr. at 130–31. More specifically, Ring then told Kottmyer for the first time that Mercurio had the day before identified 34 Guild Street as the location for the ceremony. Kottmyer Aug. 12, 1998 Tr. at 115–16, 130. Ring characterized this information as "rock solid." *Id.* at 130. As indicated earlier, this information could and should have been shared with Kottmyer on the afternoon of October 27, 1989.

Kottmyer tried unsuccessfully on Saturday, October 28, 1989, to reach the judge. *Id.* at 64. The entry and necessary installation at 34 Guild Street was made that evening. Ring June 5, 1998 Tr. at 102–03. Kottmyer eventually spoke to the judge on

the morning of Sunday, October 29, 1989, and told him that the entry had been made. Kottmyer Aug. 12, 1998 Tr. at 64.

On October 29, 1989, events developed precisely as Mercurio had said they would. Mercurio drove some of the participants from Wellington Circle to 34 Guild Street. Mercurio Aug. 4, 1998 Tr. at 126. There, Federico, DeLuca, Floramo, and Tortora were inducted as members of the Patriarca Family. Ex. 203 (Under Seal). As Kottmyer explained in her report to the judge:

> Interception of oral communications at [34 Guild Street] commenced at 9:47 a.m., October 29, 1989, after Vincent M. Ferrara and Joseph A. Russo were observed entering the house. Interception was terminated at 4:32 p.m. when Ferrara and Russo were observed leaving the house. The recorded communications memorialize a meeting of approximately seventeen known members of the Patriarca Family of La Cosa Nostra ("LCN") held for the purpose of inducting or "baptizing" four additional individuals into the Patriarca Family. In addition to Russo, Ferrara and Carrozza, the following Patriarca Family members were present: Raymond J. Patriarca, Matthew L. Gulielmetti, Jr. and Pasquale Gallea from Providence, Rhode Island; Louis Failla and Dominic "Slats" Marangelli from Connecticut; Gaetano Milano from Springfield, Massachusetts; and a number of LCN members from the Boston area, including Biagio Digiacomo and Charles Quintina.

> The intercepted communications establish that Patriarca is the Boss of the Patriarca Family, Russo is Consigliere to the Family and Ferrara, Carrozza, Guglielmetti, DiGiacomo, and Quintina are Capo Regimes. Following introductory remarks by Patriarca in which he referred to past "problems" which he stated that he and Russo had resolved, individual ceremonies were held at which Vincent Federico, Robert DeLuca, Carmen Tortora and Richard Floramo

were "baptized" as Soldiers in the Family. Each took an oath swearing, among other things, that he would abide by "omerta," the code of silence. On at least two occasions, the inductee promised to kill without hesitation any police informant posing a threat to the Family, even if the informant were his son or brother. During the ceremony, each inductee was required to identify the finger with which he pulls "the trigger" which was then apparently cut to draw blood for use in the ritual.

> Following the induction, an explication of some of the rules of La Cosa Nostra was given by Russo, Ferrara, DiGiacomo and others. Among the rules discussed was each Soldier's obligation to obey his Capo Regime and his obligation not to disclose that he was a "Friend of Ours," i.e., a member of La Cosa Nostra, to another person unless that person had been formally introduced to him by another member as a "Friend of Ours." Russo instructed each inductee that in the event of a disagreement with his Capo Regime, he should bring the matter to the attention of Russo who, as Consigliere, would render a decision.

*Id.* Thus, as Ahearn characterized it the next day, "[t]he Bureau ... for the first time ever, ... overhear[d] and record[ed] an LCN induction ceremony, which would be invaluable for years to come at other LCN trials and Congressional Hearings." Ex. 183.

On the evening of October 29, 1989, Mercurio called Ring. Ring June 15, 1998 Tr. at 154–55. There had been a television on for part of the ceremony, which interfered with the bug's ability to record clearly what was being said. Ex. 203. Mercurio told Ring that he had turned the television down. *Id.* at 163. Ring understood that Mercurio was indicating that he knew that the ceremony was bugged and had tried to facilitate the recording of it. *Id.* Ring knew that if he acknowledged that he was aware that the television had been turned down, he would be confirming

that the ceremony had been bugged. *Id.* at 148. Ring also knew that if he confirmed that the ceremony had been bugged, Mercurio would understand that his indictment was imminent and would flee. *Id.* at 149. Nevertheless, Ring told Mercurio that he was aware that Mercurio had turned the television down, and admonished him not to mention the matter to anyone else because it could jeopardize Mercurio's safety. *Id.* at 148–49.

At some time prior to November 17, 1989, possibly in the October 29, 1989 telephone conversation with Ring, Mercurio was, as directed by Kottmyer, also told not to contact the FBI again except to report a threat of violence or an effort to obstruct justice. Ex. 169. This too signaled to Mercurio that it was time to "disappear." Mercurio Aug. 5, 1998 Tr. at 127.

At the end of their conversation on October 29, 1989, Ring believed that Mercurio was saying goodbye and that he would not hear from Mercurio again. Ring June 15, 1998 Tr. at 147–48, June 22, 1998 Tr. at 66. Ring, however, prepared no 209 or other written record of that conversation. Ring June 15, 1998 Tr. at 154; Ex. 161. Nor did Ring then initiate any efforts to find Mercurio. Ring June 22, 1998 Tr. at 66.

On October 30, 1989, Mercurio spoke to Connolly. Mercurio Aug. 4, 1998 Tr. at 40, Aug. 5, 1998 Tr. at 75. In response to a question, Connolly confirmed that Mercurio had been tracked by airplane while driving to 34 Guild Street. *Id.* Mercurio and Connolly also discussed the television being turned down. *Id.* Following his conversation with Connolly, Mercurio left Boston in an effort to "lay low." Mercurio Aug. 4, 1998 Tr. at 135, Aug. 5, 1998 Tr. at 78.

Mercurio's departure from Boston at about the time of Flemmi's return from Asia on October 31, 1989, causes the court to doubt Flemmi's claim that Mercurio told him that the FBI had tipped Mercurio off to his imminent indictment. Flemmi Sept. 1, 1998 Tr. at 24–25. If Flemmi were aware that this occurred, it is more likely that he and Bulger were told by Connolly. *Id.;* Flemmi Aff., Apr. 27, 1998. In any event, the court concludes that Mercurio was alerted by the FBI that it was time for him to act on his previously expressed intention to become a fugitive, and he did so.

Although they had frequently requested meetings in the past, neither Ring nor Connolly sought to meet with Mercurio after October 29, 1989. Mercurio Aug. 4, 1998 Tr. at 143, 156. However, between October 30 and November 14, 1989, the FBI was able to contact Mercurio by leaving messages at Vanessa's. Mercurio Aug. 4, 1998 Tr. at 136. On November 10, 1989, Mercurio told Ring that Russo and Ferrara had returned to Boston from Atlantic City. Ex. 161; Ring June 15, 1998 Tr. at 153.

On November 13, 1989, Mercurio told Ring that Russo, Ferrara, and Carrozza were all in the Boston area. Ex. 161; Ring June 15, 1998 Tr. at 151. Mercurio, however, was not in Massachusetts. Mercurio Aug. 4, 1998 Tr. at 57. Nor did Ring expect him to be in Massachusetts because Ring knew that Mercurio would not stay around to be arrested. Ring June 15, 1998 Tr. at 152.

After the conversation on November 13, 1989, a memorandum that was reviewed, if not written, by Ring was sent to FBI Headquarters, stating that:

> Based upon previous review by the Boston Division PLA and discussion with the Boston Division Organized Crime Strike Force Chief, Boston is closing contact with [Mercurio] effective 11/13/89.
>
> This informant has been instructed to initiate no further contact with the FBI unless a) there is a threat to life or physical well being; b) information as to corruption of the judicial process. Any contact for these limited purposes will be with other than the primary contact or alternate contact agent.

Ex. 169; Ring June 9, 1998 Tr. at 50–51.

Like Ring, Kottmyer knew that Mercurio was not in Boston in mid-November

1989. On November 14, 1989, after consultation with Ring, Kottmyer obtained from a magistrate complaints authorizing the arrest of Russo, Ferrara, Carrozza, Mercurio, and Lepore. Ex. 201. She understood at the time, however, that Mercurio and Lepore could not then be located. *Id.*

In fact, Connolly and Ring could have contacted Mercurio by calling Vanessa's. Mercurio Aug. 4, 1998 Tr. at 136. Mercurio had always returned Connolly's calls, and met with him and Ring whenever asked. Mercurio Aug. 5, 1998 Tr. at 135. The FBI, however, made no effort to contact, meet with, or arrest Mercurio. Ring June 22, 1998 Tr. at 64–66. Ring established separate teams to arrest Russo, Ferrara, and Carrozza. Ring June 15, 1998 Tr. at 165–66, June 22, 1998 Tr. at 64–66. No team was established to try to find and arrest Mercurio, who was then in Florida. *Id.;* Mercurio Aug. 5, 1998 Tr. at 81.

On November 13, 1989, Judge Nelson was advised that Russo, Ferrara, and Carrozza would soon be arrested and, therefore, there would be no further effort to employ the roving bug he had authorized. Kottmyer Aug. 14, 1998 Tr. at 20; Ex. 203. In fact, consistent with the FBI's original intent, there had been no genuine effort to do so after the induction ceremony was intercepted on October 29, 1989.

Accordingly, Mercurio received the benefit of his bargain with the FBI—an opportunity to become a fugitive. Because Mercurio was not present for the proceedings concerning his codefendants, the FBI and the government did not in the Russo case have to grapple with the vexing issues arising from Mercurio's service as an informant about which—as the instant case vividly demonstrates—Kottmyer had been so correctly concerned.

31. *Mercurio as a Fugitive*

The conduct of the FBI concerning Mercurio when he was a fugitive is instructive with regard to Flemmi's claim that Bulger and he were informed of the imminent indictment in this case so that they could flee. Indeed, it is important to understanding the relationship between Quinn and Connolly, which is relevant to that claim.

On November 16, 1989, Russo, Mercurio, and others were initially indicted. *See Ferrara,* 771 F.Supp. at 1281. The original indictment did not include any reference to the October 29, 1989 induction ceremony and, therefore, presented no threat of prematurely disclosing the continuing electronic surveillance being conducted in Connecticut. *Id.* On March 22, 1990, a superceding indictment was returned which included charges relating to that ceremony. *Id.*

A fugitive investigation concerning Mercurio, and a related file, were opened shortly after November 16, 1989. Carter. Aug. 17, 1998 Tr. at 67. Carter, the case agent for the Russo prosecution, was in charge of the Mercurio fugitive investigation. *Id.* at 67; Quinn Aug. 19, 1998 Tr. at 16–17. Carter knew that Mercurio was an informant who had provided important information that led to the interception of the Mafia induction ceremony at 34 Guild Street. Carter Aug. 17, 1998 Tr. at 58. He also knew that Connolly and Ring were Mercurio's handlers. *Id.* at 65.

Carter and Connolly were "close friends" as well as colleagues. *Id.* Nevertheless, Carter did not ask Connolly to help him find Mercurio. *Id.* at 94–95. Connolly and Ring told Carter that they did not know where Mercurio was. *Id.* at 143. They did not tell Carter that they had always been able to contact Mercurio through Vanessa's or that he had attended meetings whenever asked to do so. *Id.* at 69–70.

After becoming a fugitive, Mercurio called Connolly every several months. Mercurio Aug. 4, 1998 Tr. at 60, 63, Sept. 16, 1998 Tr. at 86. This practice continued after Connolly retired from the FBI in December 1990. *Id.* The fact that Mercu-

rio was calling Connolly would have been significant information for Carter to receive. Carter Aug. 17, 1998 Tr. at 144. Connolly, however, never told Carter about Mercurio's calls. *Id.* at 71, 144.

It appears that Connolly also did not tell Carter's supervisors that he was in contact with Mercurio. Quinn Aug. 19, 1998 Tr. at 28. Ring retired from the FBI in the summer of 1990. Ring June 4, 1998 Tr. at 45. He was succeeded as the supervisor of the Organized Crime squad by Quinn, who served in that capacity for the next five years. Quinn Aug. 19, 1998 Tr. at 9. Quinn and Connolly had worked together for more than fifteen years and were, according to Quinn, also "close friends." *Id.* at 14–15. Connolly should have told his supervisors about Mercurio's calls. Ring June 19, 1998 Tr. at 105. Quinn and Ring each testified, however, that Connolly did not tell them that Connolly was speaking to Mercurio during the time that Mercurio was a fugitive. *Id.;* Quinn Aug. 19, 1998 Tr. at 28.

In 1991, the FBI, the DEA, and other agencies were conducting a joint drug investigation of Mercurio's brother Michael, Anthony D'Amore, and others. Hobbs Aug. 11, 1998 Tr. at 13. Special Agent Joseph Hobbs was the lead FBI agent in the joint investigation. Michael Cunniff was his DEA counterpart.

On July 3, 1991, Sonny Mercurio also became a target of the joint investigation. Ex. 199; Cuniff Aug. 11, 1998 Tr. at 11, 28. More specifically, an investigation targeting him was then opened because Ronald Jacobson, a reliable cooperating witness, had reported that Sonny Mercurio, Michael Mercurio, and others were planning to smuggle in excess of 2000 kilograms of marijuana into Massachusetts. Ex. 199. On July 4, 1991, it was further reported that Sonny Mercurio was in Massachu-

setts, but was planning to go to California to purchase marijuana and drive it back to Massachusetts. Ex. 208; Cuniff Aug. 11, 1998 Tr. 11, 28. All of this information was provided to Hobbs, who knew that Sonny Mercurio was a fugitive. Cuniff Aug. 11, 1998 Tr. at 21–22; Hobbs Aug. 11, 1998 Tr. at 13.

On July 4, 1991, Jacobson attended a barbecue at Michael Mercurio's home in Woburn, Massachusetts. Ex. 256; Hobbs Aug. 11, 1998 Tr. at 26–27, 33–34, 29–30, 43. Sonny Mercurio was present. Mercurio Sept. 16, 1998 Tr. at 78. Immediately after the barbecue, Jacobson met with Hobbs and reported that:

> CW [Jacobson] was at a party given by MICHAEL MERCURIO at 30 Squanto Road, Woburn, MA on July 4, 1991. While attending the party, CW was told by MICHAEL MERCURIO and ANTHONY DAMORE that "SONNY" MERCURIO was in the house. CW was later pointed out to an individual and told that was Sonny. CW described this individual as having short crew-cut cropped gray hair, bushy eyebrows, white/gray mustache, heavy set. CW stated SONNY was with an individual named RICHIE (LNU), who had served some time with Sonny in the past. RICHIE (LNU) had three sons who were also at the party.

> CW learned from ANTHONY DAMORE and MICHAEL MERCURIO that Sunday July 7, 1991, a boat was going to be rented or charted and leave from the wharf where the Marriott is located. There was going to be an all day long party on the boat which would be leaving around 9:45 a.m. SONNY, MICHAEL, DAMORE and others would be on the boat, along with several "girls." [56]

---

**56.** Prior to Mercurio's testimony on August 4, 1998, in the course of *ex parte* proceedings not involving the defendants, the court discerned that an FBI informant had in July 1991 been credited with saving Mercurio's life by providing information that kept Mercu-

rio from being on a boat as previously planned. Aug. 17, 1998 Tr. at 1–5 (Under Seal). In response to a question from the court, Mercurio testified that he was in New York in July 1991. Mercurio Aug. 5, 1998 Tr. at 128–29. The court subsequently ques-

Ex. 256.[57]

On July 5, 1991, Quinn, who was then the supervisor of the Organized Crime squad, received two important reports concerning Mercurio. More specifically, Quinn received a telephone call from another FBI agent who reported information that he had just received from an informant Quinn knew to be reliable. Quinn Aug. 19, 1998 Tr. at 23–31. Quinn was told that Salemme[58] and others in the LCN had determined that Mercurio was an FBI informant and the source for the bugging of 34 Guild Street, in part because an unidentified FBI agent had disclosed this to an unnamed fireman. *Id.* Therefore, it was expected that Mercurio would be killed if Salemme or his associates could find him. *Id.*

Quinn knew that Mercurio was an informant who was instrumental to the bugging of 34 Guild Street. *Id.* at 17–19. He regarded the threat to Mercurio as a serious and urgent matter. *Id.* at 33, 116.

In addition, on July 5, 1991, Hobbs gave Quinn and Carter the information about Sonny Mercurio that he had received from Jacobson the day before. Hobbs Aug. 11, 1998 Tr. at 34–39; Quinn Aug. 19, 1998 Tr. at 40–43; Carter Aug. 17, 1998 Tr. at 74–83, 94. Carter told Hobbs, among other things, that an attempt to arrest Mercurio at the wharf would be made on July 7, 1991. Hobbs Aug. 11, 1998 Tr. at 73, 90. Hobbs told Cuniff that the FBI's Organized Crime squad would make that effort and pursue any other leads relating to

Sonny Mercurio. Cuniff Aug. 11, 1998 Tr. at 23, 31.

Carter understood that the individual named "Richie" who was with Mercurio on July 4, 1991 was Richard Floramo. Carter Aug. 17, 1998 Tr. at 81–82. Quinn undoubtedly understood this as well. As Floramo had been made a member of the Patriarca Family on October 29, 1989, Quinn would also have recognized that because Floramo knew where Mercurio was on July 4, 1989, Mercurio might be in imminent danger of being killed.

If standard practice and procedure had been followed, Quinn would have immediately told Carter about the information that he had received concerning the threat to Mercurio's life. Quinn Aug. 19, 1998 Tr. at 44–45; Carter Aug. 17, 1998 Tr. at 50, 61. Ordinarily, it would have been Carter's responsibility to try to warn Mercurio by telling his family about the threat. *Id.* Quinn did not, however, tell Carter about the information regarding the threat to Mercurio. Carter Aug. 19, 1998 Tr. at 55–57, 60–61; Quinn Aug. 19, 1998 Tr. at 135.

Instead, Quinn called Connolly. Quinn Aug. 19, 1998 Tr. at 21. Quinn told Connolly that Salemme and others had determined that Mercurio was an FBI source for the interception of the Mafia induction ceremony, in part because an FBI agent had disclosed this to a fireman. Quinn Aug. 19, 1998 Tr. at 50–52. Among other things, common sense compels the court to conclude that Quinn also told Connolly that

tioned Quinn *in camera.* Aug. 11, 1998 Tr. (Under Seal). The court later told the defendants of the information that it had received *ex parte,* without identifying the source. Aug. 17, 1998 Tr. at 1–5 (Under Seal). Carter and Quinn publicly testified about the boat matter on August 17, 18, and 19, 1998. On September 16, 1998, Mercurio appeared again and testified that he had been in Massachusetts, rather than New York, on July 4, 1991, and, indeed, had at that time been in Massachusetts for several months. Mercurio Sept. 16, 1998 Tr. at 77–78, 87.

**57.** Hobbs prepared the 302, which is Ex. 256, on July 11, 1991. Ex. 256. A copy was sent

to Carter. *Id.;* Hobbs Aug. 11, 1998 Tr. at 48–49, 84. The 302 should have been maintained in the Mercurio fugitive file. *Id.* at 91; Carter Aug. 17, 1998 Tr. at 122; Quinn Aug. 19, 1998 Tr. at 62. It was not. Carter Aug. 17, 1998 Tr. at 122.

**58.** Quinn testified that he recalled that he was told that it was Manacchio who believed that Mercurio was an FBI informant. Quinn Aug. 19, 1998 Tr. at 50. The source who prompted the conversation with Quinn had reported that Salemme had determined that Mercurio was an informant. The court infers that Quinn was accurately informed of this fact.

it had been reliably reported that Mercurio was then in the Boston area, was known to be planning to get on a boat near the Marriott on July 7, 1991, and, therefore, was in particular danger. Quinn asked Connolly to find a way to inform Mercurio of the situation. *Id.* at 28, 50–52. Connolly said that he would contact Frank Pagano, a friend of the Mercurio brothers, and ask him to convey the message promptly to Michael Mercurio. *Id.*

Quinn made no written record of his discussion with Connolly. *Id.* at 163. Nor did he ever tell Carter about it. Carter Aug. 17, 1998 Tr. at 66–67, 145.

Quinn expected that if Sonny Mercurio received the message being sent to him through Connolly, he would leave Boston immediately. Quinn Aug. 19, 1998 Tr. at 54, 56, 117–18, 121. Thus, Mercurio would not, as previously planned, be at the wharf for the boat trip on July 7, 1991. *Id.* Quinn's expectation was accurate.

Mercurio promptly received Connolly's message. On July 6, 1991, Michael Mercurio told D'Amore that he had received a call from a "friend," evidently Pagano, who had warned him that the "feds" knew that his brother was in the Boston area. D'Amore Oct. 1, 1998 Tr. at 85–86, 141–43, 151–52. As a result, Michael Mercurio said Sonny Mercurio had to leave town immediately. *Id.* at 86. Sonny Mercurio did leave Boston and went to California. Mercurio Sept. 16, 1998 Tr. at 80. As he testified, Mercurio "got word" from "somebody" that an agent had said that if he talked to Mercurio he should tell him that Mercurio was on Salemme's "hit list" and was going "to get himself killed." Mercurio Aug. 4, 1998 Tr. at 62. Mercurio called Connolly to discuss this. *Id.* at 62–63. Connolly confirmed that Mercurio's life was in danger. *Id.*

On July 7, 1991, Carter led a team of FBI agents to the wharf where it had been reported that Mercurio was planning to be. Carter Aug. 17, 1998 Tr. at 83, 94; Quinn Aug. 19, 1998 Tr. at 44. Typically, as the supervisor of the Organized Crime squad,

Quinn would have been present if it were expected that a fugitive might be arrested. Quinn Aug. 19, 1998 Tr. at 56. Quinn did not, however, join Carter on July 7, 1991. *Id.*

Carter and his colleagues observed Michael Mercurio at the wharf on July 7, 1991. Carter Aug. 17, 1998 Tr. at 83–84. Sonny Mercurio, however, was not there. *Id.* Carter reported this to Quinn and Hobbs. Carter Aug. 17, 1998 Tr. at 47; Hobbs Aug. 11, 1998 Tr. at 42. Although a written record of this surveillance should have been made, none was prepared. *Id.* at 62; Quinn Aug. 19, 1998 Tr. at 59–60; Carter Aug. 17, 1998 Tr. at 88.

Quinn subsequently spoke to the agent whose informant had on July 5, 1991 reported the threat to Mercurio's life. Quinn Aug. 19, 1998 Tr. at 89–91. As a result, on July 24, 1991, an entry was made in the informant's file which stated that, "[s]ource furnished information concerning LCN knowledge of subject's identity as source for FBI and planned hit saving source's life." *Id.* at 123. The informant was told that Mercurio was planning to go on a boat, but did not because of the information he had provided and, as a result, Mercurio's life had been saved. *Id.* at 124. Carter, however, was never given this information. Carter Aug. 17, 1998 Tr. at 69–70, 72, 122, 124, 126.

Following July 7, 1991, there were several obvious avenues of investigation that were not pursued as part of the Mercurio fugitive investigation. Although Mercurio was known to have been at his brother's home in Woburn on July 4, 1991, no surveillance of that location was conducted. Quinn Aug. 19, 1998 Tr. at 63. Nor was Jacobson interviewed as part of the Mercurio fugitive investigation. *Id.* at 64. Similarly, the information that the FBI had indicating that Mercurio would be in Los Angeles in connection with the contemplated marijuana deal should have caused Carter to contact the FBI's Los Angeles office, but this was not done. *Id.*

at 72, 152; Ex. 209. However, the marijuana delivery to Jacobson that had been planned to occur shortly after July 4, 1991, which Cuniff hoped would result in Sonny Mercurio's arrest and prosecution, was never made. Cuniff Aug. 11, 1998 Tr. at 18–20.[59]

In August 1991, Carter heard a "rumor" that Mercurio's life was in danger. Carter Aug. 17, 1998 Tr. at 50–51, 90, 123, Aug. 18, 1998 Tr. at 90–91. Carter promptly approached Michael Mercurio to convey that information and to ask him to encourage his brother to turn himself in. *Id.* This effort was unavailing. *Id.*

Mercurio was eventually arrested in Georgia, on state drug charges, in 1994. Mercurio Aug. 4, 1998 Tr. at 51–54. Soon after, he was visited by FBI agent Michael Buckley and a colleague. *Id.* Mercurio told them that if the state charges were not dismissed, he preferred to be sentenced in Georgia before returning to Boston to deal with the federal charges against him. *Id.* Buckley then gave Mercurio the telephone number of an FBI agent in Atlanta to call if Mercurio needed anything. *Id.*

Before returning to Boston, Mercurio, through his attorney, began negotiating a plea agreement concerning the federal charges against him. *See United States v. Mercurio*, 89–CR–289–MLW, Government's Submission Concerning Sentencing (Sept. 6, 1996) at 9. On July 31, 1995, after Mercurio had returned to Boston, the government informed Magistrate Judge Lawrence Cohen, who was handling pretrial discovery matters, that Mercurio had served as an FBI informant and requested authority to disclose certain statements previously made by Mercurio to him directly, rather than through his lawyers. *Salemme*, 978 F.Supp. at 357 n. 9. The magistrate judge granted the request, and

impounded the motion and Order. *Id.* Neither the magistrate judge nor the government informed this court, to which Mercurio's case was assigned, of these matters or of Mercurio's status as an informant. *Id.*

FBI agents did, however, promptly meet with Mercurio. Mercurio Aug. 4, 1998 Tr. at 53–54. Mercurio said that he did not want copies of his statements to be provided to him or his attorney. Mercurio Aug. 5, 1999 Tr. at 99. Thus, the documents that would have disclosed that Mercurio was an informant were not included in the discovery provided to his attorney on August 1, 1995. *See United States v. Mercurio*, 89–CR–289–MLW Docket Entry No. 1187.

When Mercurio fled in 1989, he believed that if he were ever apprehended, he would be dealt with more leniently than if he had been arrested with his codefendants. Mercurio Aug. 5, 1998 Tr. at 137–38. Mercurio was correct. Russo, Ferrara, Carrozza, Lepore, and Tortora received sentences of between thirteen and twenty-two years in prison. *Carrozza*, 807 F.Supp. at 158–59. The government, however, entered into a binding plea agreement with Mercurio, pursuant to Fed. R.Crim.P. 11(e)(1)(C), and persuaded the court to depart downward and impose the agreed-upon 110–month sentence, which in accordance with the government's plea agreement was to be served concurrently with Mercurio's Georgia sentence. *Salemme*, 978 F.Supp. at 357. Thus, in 1996, Mercurio received little, if any, punishment for his federal offenses, while his role as an informant, and its implications for the legality of the bugging of 34 Guild Street, remained masked from this court.

### 32. The Investigation of Flemmi and Bulger

As indicated earlier, Ring retired in the summer of 1990. Ring June 4, 1998 Tr. at

---

59. In the period of April through August 1991, DEA agents and other law enforcement officials told Hobbs that they believed Mercurio was an FBI informant. Hobbs Aug. 11, 1998 Tr. at 87–92. Hobbs attempted to determine if this was true by asking Nick Gianturco, who was the head of the Informant Coordinating Unit. *Id.* at 91–92. Gianturco would not confirm that Mercurio was an informant. *Id.*

45. He was, in about November 1990, succeeded as the supervisor of the Organized Crime squad by Connolly's "close friend," Quinn. Quinn Aug. 19, 1998 Tr. at 9.

In about December 1990, Connolly retired on short notice. Exs. 38, 39. By this time, Connolly had enjoyed a very successful career as an FBI agent, based largely on his handling of Top Echelon informants, and at times received unusually favorable treatment by the Bureau. For example, Ahearn successfully sought to have FBI Headquarters make Connolly a Supervisory Special Agent even though he had not been recommended by the Career Board for promotion. Morris Apr. 27, 1998 Tr. at 143–48. This was, to Morris' knowledge, unprecedented. Id.

As a result of Connolly's retirement, Flemmi and Bulger were administratively closed as informants on December 3, 1990. Exs. 38, 39. In a subsequent request for funds to reimburse Connolly for certain expenses, Nick Gianturco, the Informant Coordinator, wrote that Flemmi had "furnished Boston Division [of the FBI] very valuable information through the years regarding LCN activities." Ex. 44; Gianturco Jan. 20, 1998 Tr. at 156. The FBI did not want to lose Flemmi and Bulger as sources and, therefore, reported to Headquarters when Connolly retired that "Boston Division is considering options to reopen" each of them "in the future." Exs. 38, 39. Consistent with prior practice, Flemmi was not told that he had been closed as a source or that his relationship with the FBI had been altered. Flemmi Aug. 29, 1998 Tr. at 33; Quinn Aug. 19, 1998 Tr. at 108–13; Ex. 92.

By 1992, however, the United States Attorney's Office had begun a grand jury investigation targeting Bulger and Flemmi, among others. Ex. 269. Agents from the Organized Crime squad participated in the investigation, including John Gamel, who served as the case agent. Quinn Aug. 19, 1998 Tr. at 107. The government has represented that five of the agents who testified before the grand jury—Quinn, Gamel, Steffens, Walther, and Buckley— knew that Bulger and Flemmi were informants. Oct. 31, 1997 Letter to the court, ex parte and Under Seal; [60] United States v. Salemme, 1997 WL 810057, at *8 (D.Mass. Dec.29, 1997); Dec. 18, 1997 Tr. at 58–59. The government also represented that Daly "knew that Bulger was an informant, but was unaware that Flemmi was an informant at the time he testified." Oct. 31, 1997 Letter to the court, ex parte and Under Seal. As described previously, however, Daly had been told in 1979 that Flemmi was an informant when the decision was made not to indict him or Bulger in the race-fix case. In any event, the government represents that before testifying to the grand jury, Gamel had reviewed Bulger's informant file, Buckley had reviewed Flemmi's informant file, and Walther had reviewed parts of both files. Id.

Although the FBI was participating in the investigation of Bulger and Flemmi, despite multiple requests, the Bureau refused until the eve of their indictment to tell the United States Attorney or his assistants whether Bulger was ever an FBI informant. Ex. 269; Gianturco Jan. 20, 1998 Tr. at 5–13. As with Mercurio, the United States Attorney and his colleagues, who were not called as witnesses, were evidently concerned about the implications for their investigation if Bulger was, or had been, an FBI informant. These included the foreseeable issues of immunity and authorization now raised by Flemmi, whose status as an informant would have been revealed if Bulger's had been disclosed.

---

**60.** This Memorandum includes some information contained in the October 31, 1997 letter to the court which was not disclosed previously to the defendants because it is relevant to foreseeable issues concerning whether this case should be dismissed for grand jury abuse.

More specifically, in February 1992, United States Attorney Wayne Budd and two of his top assistants, A. John Pappalardo and Robert Ullman, met with the SAC, Thomas Hughes, ASAC O'Callaghan, and Gianturco, the Informant Coordinator. *Id.* The prosecutors asked for confirmation that Bulger was an informant and for an opportunity to review his file. Gianturco Jan. 20, 1998 Tr. at 7. They were told that pursuant to the Attorney General's Guidelines and Bureau policy, the FBI would not confirm or deny Bulger's status. *Id.* at 9. Budd and his colleagues indicated that they would, like Kottmyer concerning Mercurio, seek relief from the Department of Justice. *Id.* Gianturco contacted the Informant Section at FBI Headquarters as part of an effort to combat that request. *Id.* at 10.

Despite repeated attempts by the United States Attorney, the requests for information concerning Bulger's relationship with the FBI were rebuffed until January 9, 1995, four days after Flemmi's arrest, and the day before he and Bulger were indicted. Exs. 269, 271. Thus, in contrast to the Mercurio matter, the FBI succeeded in the bureaucratic battle concerning the confidentiality of Bulger and Flemmi's status as informants.

While the United States Attorney could not obtain information that he was seeking from the FBI, Connolly, who was no longer employed by the Bureau, was able to monitor the progress of the grand jury investigation and keep Bulger and Flemmi advised concerning it. Flemmi Aug. 21, 1998 Tr. at 103–09, Sept. 1, 1998 Tr. at 126–28. Connolly knew that Bulger and Flemmi were targets of the grand jury investigation and often discussed it with each of them, particularly Bulger. *Id.* Among other things, Connolly told Bulger and Flemmi not to be concerned. Flemmi Aug. 21, 1998 Tr. at 106–07.

Connolly, Bulger, and Flemmi also discussed the bugging of the Rotary Variety Store, which was in the vicinity of the South Boston Liquor Mart that Flemmi and Bulger owned. Flemmi Aug. 20, 1998 Tr. at 153, Aug. 24, 1998 Tr. at 34–43. Connolly also spoke with members of the Organized Crime squad about this matter. *Id.*

No FBI witness admitted to giving Connolly information concerning the investigation of Bulger and Flemmi. As described earlier, however, Quinn ignored established procedures to provide Connolly rather than Carter highly confidential information that he knew would prompt Mercurio's further flight and probably frustrate efforts to apprehend him, without making a record of that irregular, if not illegal, communication.

The evidence also indicates that Buckley provided Connolly confidential information concerning Bulger and Flemmi after Connolly had retired from the FBI. Buckley Sept. 23, 1998 Tr. at 8–14, 22–28. Buckley too characterized Connolly as a "close friend," as well as a colleague for fourteen years. *Id.* at 8. Buckley acknowledged that in about 1993, he told Connolly that William Ierardi had accused Bulger and Flemmi of being involved in the Blackfriars massacre, in which five or six people were murdered, and later failed a polygraph examination on this subject. *Id.* That information had not been publicly disclosed. *Id.* at 23.

The foregoing examples concerning Quinn and Buckley, among other things, cause the court to conclude that Connolly's enduring relationships with members of the Organized Crime squad gave him access to some information concerning the ongoing investigation of Bulger and Flemmi. As explained below, that information was at times not complete or fully reliable. However, Connolly used the information that he received to honor his promise to protect the sources who had contributed so much to his success.

Flemmi too continued to perform as an ally of the FBI, particularly with regard to its interest in Salemme, who had become the Boss of the Patriarca Family. Flemmi

Aug. 20, 1998 Tr. at 150. For example, in about 1993, Connolly asked Flemmi if he could get the telephone numbers used by Frank Salemme's brother, Jack. *Id.* Flemmi made some inquiries and gave Connolly the information that he requested. *Id.* Buckley subsequently gave Jack Salemme's telephone numbers to Steffens, who included them in a successful application for wiretap warrants. *Id.* at 14–22; Steffens Sept. 18, 1998 Tr. at 90–115.

From 1992 to 1995, Flemmi spoke to Connolly "constantly" concerning the ongoing grand jury investigation. Flemmi Aug. 21, 1998 Tr. at 104–06. In 1993, as a result of discussions with Connolly, among other things, Flemmi thought that he would soon be indicted along with Joseph Yerardi. *Id.* at 103–09. Thus, he left Boston in an effort to avoid being arrested. *Id.* Flemmi was not, however, included in the Yerardi indictment and returned to Boston. *Id.* at 105.

Flemmi did not in 1993 assert to Connolly or anybody else that it was improper for the government generally, or the FBI particularly, to target him because he had been granted immunity from prosecution. *Id.* at 103–09. Rather, his conduct is consistent with the conclusion that he had been promised "protection," which included being tipped off to forthcoming charges so that he could flee.

In addition to his direct contacts with Connolly, Flemmi received frequent reports concerning the progress of the grand jury investigation from Bulger, who was in even more regular contact with Connolly. Flemmi Sept. 1, 1998 Tr. at 121–36. Bulger and Flemmi knew that the grand jury would, unless extended or succeeded, expire in mid-September 1994, because several witnesses who had been held in contempt and been incarcerated expected to be released in mid-September. *Id.* at 122, 124, Aug. 21, 1998 Tr. at 56. In about August 1994, Bulger told Flemmi that "John says the indictment will be coming down." *Id.* at 127. *See also id.* at 122–23. The court concludes that Bulger was then

referring to Connolly. Bulger told Flemmi that "it was time to take a vacation." *Id.* at 121–24. Flemmi understood that he was being advised to flee to avoid arrest and prosecution. *Id.* at 128. Thus, he went to Montreal for several months. Flemmi Aug. 21, 1998 Tr. at 62.

Once again, Flemmi did not then say to Bulger, or anyone else, that they were immune from prosecution by virtue of their agreement with the FBI. *Id.* at 129. Rather, Flemmi viewed the tip about his possible indictment as part of the protection that he had been promised. *Id.* at 131.

In August 1994, Bulger also told Theresa Stanley, with whom he had been romantically involved for thirty years, that they too would take "a vacation." Stanley Sept. 17, 1998 Tr. at 83–84. On August 29, 1994, they visited Graceland, Elvis Presley's home, in Memphis, Tennessee. Ex. 251; Stanley Sept. 18, 1998 Tr. at 14. In the next several months they also traveled to Dublin, London, Rome, and throughout the United States, including New York, New Orleans, California, and the Grand Canyon. Stanley Sept. 17, 1998 Tr. at 84–86, Sept. 18, 1998 Tr. at 14.

From September 1994 to January 1995, despite their distant and disparate locations, Flemmi and Bulger were in frequent contact Flemmi Sept. 1, 1998 Tr. at 133. Their "beepers" permitted them to stay in close touch. *Id.* at 134. When they spoke, Bulger told Flemmi that he was staying "on top of things." *Id.* at 135. Flemmi knew from their conversations that Bulger was continuing to get information concerning the possible indictment of them. *Id.* Bulger undertook to keep Flemmi up to date and did so. *Id.* at 135–36.

On October 25, 1994, the original indictment in this case was returned, against one defendant, Robert DeLuca. In five pages it charged DeLuca with conspiring to violate the Travel Act, 18 U.S.C. § 1952, and with a substantive violation of the statute based upon his alleged attendance

at a Mafia induction ceremony held at 34 Guild Street, Medford, Massachusetts on October 29, 1989. At the government's request, the indictment was sealed and DeLuca did not immediately receive notice of it. The timing of the indictment was evidently influenced by the fact that the five-year statute of limitations on the offenses charged was about to expire. *See* 18 U.S.C. § 3282. The DeLuca case was randomly assigned pursuant to the District Court's established procedures. It was drawn to this court.

Bulger and Stanley returned to Boston prior to Christmas, 1994. Stanley Sept. 18, 1998 Tr. at 81. They stayed for a few days before leaving for another "trip." *Id.*

By January 1995, Flemmi too had returned to Boston. About a week before January 10, 1995, Flemmi received a telephone call, at his mother's home, from Bulger. Flemmi Aug. 20, 1998 Tr. at 154–55, Aug. 21, 1998 Tr. at 82–85, Sept. 1, 1998 Tr. at 144–46, Sept. 2, 1998 Tr. at 107–08. Bulger told Flemmi that there was a prosecution memorandum that had been sent to Washington, D.C., recommending their indictment. Flemmi Aug. 20, 1998 Tr. at 154–55, Aug. 28, 1998 Tr. at 138, Sept. 1, 1998 Tr. at 145–46. Bulger said that he understood that they would be indicted in about a week, or around January 10, 1995. Flemmi Aug. 20, 1998 Tr. at 154–55, Aug. 21, 1998 Tr. at 83–84, Sept. 1, 1998 Tr. at 144–46, Sept. 2, 1998 Tr. at 107–08.

Flemmi claims that in their telephone conversation Bulger said that he had received this tip from "Vino," meaning Morris. Flemmi Aug. 20, 1998 Tr. at 154–55, Sept. 1, 1998 Tr. at 145. This claim is not credible. The relationship between Bulger and Morris was chilled by *The Boston Globe* 1988 article reporting that Bulger was an FBI source. According to Morris, he met with Bulger and Flemmi shortly after that article was published and did not speak with Bulger again until Bulger called him angrily in October 1995. Mor-

ris Apr. 28, 1998 Tr. at 87–88, Apr. 29, 1998 Tr. at 140–41.

At some point during Morris' tenure as the supervisor of the Organized Crime squad, Connolly told him that what Flemmi and Bulger wanted from their relationship with the FBI was a "head start." Morris Apr. 22, 1998 Tr. at 80–82, 85–86. Morris did not object to this arrangement. *Id.* at 87–90, 96–97. The court concludes that in early January 1995, Connolly, who remained close to Flemmi and, particularly, Bulger, had been monitoring the grand jury investigation in part through his contacts in the FBI, and was in constant communication with Bulger and Flemmi about the investigation, was the source of the tip to Bulger concerning the indictments expected to be returned on or about January 10, 1995.

The information Bulger received and shared with Flemmi was accurate, but from Flemmi's perspective materially incomplete and misleading. In early January 1995, indictments charging him and Bulger were scheduled to be returned on January 9 or 10, 1995. Ex. 271. Being told this on about January 3, 1995, evidently lulled Flemmi into believing he did not need to flee immediately. Flemmi apparently did not realize, however, that by not leaving promptly he ran the risk of being arrested on a complaint before he was indicted—the procedure that had been used to capture Russo, Ferrara, and Carrozza because of the government's well-founded concern about leaks that would prompt the putative defendants to flee before the then forthcoming indictments were issued. Flemmi Sept. 1, 1998 Tr. at 145; Ex. 201.

On January 5, 1995, Flemmi was arrested on a criminal complaint charging him, Bulger, and Kaufman with conspiring to extort a bookmaker, Burton Krantz. Crim. Compl. No. 95–M0001–LPC, Jan. 4, 1995. Flemmi Sept. 1, 1998 Tr. at 145. Flemmi felt he had been arrested "prematurely," before he "even had a chance to

exercise [his] feelings" and flee. Flemmi Aug. 28, 1998 Tr. at 138.

When Flemmi was arrested, Bulger and Stanley were driving back to Boston. Stanley Sept. 18, 1998 Tr. at 16–21, 85. Stanley had told Bulger that she wanted to go home. *Id.* Bulger was planning to drop her off and leave again. *Id.* While in Connecticut, Bulger and Stanley heard on the car radio that Flemmi had been arrested. *Id.* Bulger turned around immediately and went to New York. *Id.*

In anticipation of the imminent indictment of Bulger, on or about December 22, 1994, the United States Attorney's office again asked the FBI whether he was an informant because it was anticipated that the government would soon have to disclose exculpatory information to Bulger and his codefendants. Ex. 269. The Boston office of the FBI did not wish to comply with this request.

In seeking support for its continued resistance to telling the United States Attorney whether Bulger was an informant:

> On December 28, 1994, the Boston Division of the FBI expressed the view to FBI Headquarters that there was no reasonable expectation that [Bulger] or his co-defendants would raise the issue of his former informant status, nor was there any evidence to suggest that if issues concerning the informant's prior cooperation were raised that the presiding judge would not accept affidavits submitted by the Boston Division's Principal Legal Advisor or a representative from the FBI's Legal Counsel Division.

*Id.* The fact that Bulger and Flemmi were about to be alerted to their imminent indictments and thus provided an opportunity to flee suggests that the view that the issue of Bulger's, and implicitly Flemmi's, informant status would not be raised may have been premised, in part, on the expectation that they, like Mercurio, would not be present to participate in the proceedings involving their codefendants. In any event, in late December 1994, the FBI in Boston believed that even if asked, no judge would compel the disclosure of Bulger and Flemmi's relationship with the FBI.

Nevertheless, the FBI's Principal Legal Adviser in Boston, John Michael Callahan, was on January 3, 1995 directed by Richard Swensen, the SAC, to review the Bulger and Flemmi informant files for possible exculpatory information. Ex. 271. As Callahan wrote, in a January 10, 1995 memorandum that was not shared with the United States Attorney's office:

> On 1/3/95, SAC SWENSEN instructed the PLA to contact AUSA JAMES FARMER and obtain copies of a 250–page prosecution memo and an 85–page indictment concerning captioned individuals and other organized crime subjects. Moreover, SAC instructed the PLA to obtain guidance from AUSA FARMER with respect to reviewing the files pertaining to captioned individuals. *The purpose of the proposed file reviews was to determine whether or not the informant files pertaining to captioned persons contained information which might include Brady material. If Brady material were located, the SAC intended to give consideration to disclosing the identities of captioned individuals to the U.S. Attorney's Office because of the fact that their indictment was imminent.* It should be noted that the SAC had not admitted that captioned persons were informants at this point and had not confirmed the existence of pertinent informant files.

> On 1/4/95, *PLA contacted AUSA JAMES FARMER and was informed that in addition to carefully reviewing the prosecution memo and the indictment, which would be provided, he suggested that the PLA examine any files that might be relevant, to determine if any persons named in the proposed indictment had received any authorization to commit any of the crimes set forth in the proposed indictment by or from any FBI Agent. Moreover, he ad-*

*vised that the files should be reviewed to determine whether or not there were any express or implied promises to any of the prospective indictees from the FBI which would have included assurances that anything any of them told the FBI would not be used against them. Finally, he suggested that the review focus on whether or not any of the proposed indictees had provided information to the FBI which would undercut a central theme of the indictment, namely, that there was a close working relationship between La Cosa Nostra (LCN) and the Winter Hill Gang.* AUSA Farmer asked that the file reviews commence immediately due to the fact that arrests were expected in the case early in the following week and the Grand Jury was expected to return an indictment against several organized crime figures early in the following week.

*Id.*[61] (emphasis added).

In essence, Farmer, who was a supervisor of the prosecutors primarily responsible for this case, had recognized the potentially important issues of whether Bulger and Flemmi were authorized to commit the acts being presented to the grand jury as criminal, whether they had been expressly or implicitly promised use or transactional immunity, and whether their possible service as informants was inconsistent with the existence of the enterprise to be alleged in this case—a criminal cartel consisting of members of the LCN and of the Winter Hill Gang. These are serious questions which, despite the government's opposition, contributed to this court's decision to compel disclosure of Bulger's history as an FBI informant. *Salemme,* 978 F.Supp. at 346–47, 353–54.

Callahan went on to write that:

AUSA FARMER sent a copy of the prosecution memo and the indictment to the PLA and both of these documents were reviewed on January 4, 1995. On January 5, 6, and 9, 1995, the PLA reviewed the informant files pertaining to [Flemmi and Bulger]. Each file was reviewed in its entirety. These file reviews disclosed numerous informant reports from both informants in which information was provided against LCN members. Some of the information furnished by both informants was used in at least six Title III affidavits for electronic surveillance against the Mafia. *In addition, the PLA discovered some serials, primarily in the files pertaining to [Flemmi] which pertain to information which clearly reflected that this informant was engaged in illegal gambling activity at a very high level within the Winter Hill Gang. Moreover, it showed that this informant had a close working relationship with the LCN in making policy decisions regarding illegal gambling in the Boston area, which both the Winter Hill group and the LCN agreed to abide by.* The serials disclosing this kind of information were dated in the middle 1980's. Similar information from this informant was also found in the file prior to 1970. The information in the file prior to 1970 indicated that this informant told the FBI that he was engaged in illegal gambling activities and other illegal activity of a nonviolent nature. In one instance, source advised that he was involved in administering a severe beating to an organized crime figure who had stepped out of line. *Because these serials were in [Flemmi's] file, there was a clear indication that FBI Agents were aware of his involvement in illegal activity (primarily*

---

**61.** Exhibit 271 was disclosed to defendants and admitted after the court overruled the government's claim that it was protected by the deliberative process privilege and as work-product. Dec. 14, 1998 Tr. at 4–17. For the purposes of this decision, however, the court has not considered the opinion which Callahan expressed, in Exhibit 271, that Flemmi had been "at least tacitly authorized" to engage in illegal activity, including gambling and LCN policymaking, for the truth of whether Flemmi was indeed authorized, but primarily for the purpose of placing in context what occurred subsequently.

*illegal gambling activity) and at least had tacitly authorized his participation in such activity.* Nowhere in the files pertaining to [Flemmi] was there any express authorization to commit criminal activity from any FBI Agent.

There was also a small number of serials in the informant files pertaining to [Bulger] from which an inference could be drawn that he was also involved in illegal gambling activities. The inference was less clear in the case of [Bulger] because he never placed himself actually in the criminal activity. Nonetheless, he reported on certain illegal gambling activity by the Winter Hill group and from this, an inference can be drawn that he was personally involved. This is true because it was well known that this informant was one of the leaders of the Winter Hill group during the time these reports were made.

Ex. 271 (emphasis added).

Thus, as John Coffey, the Chief of the Organized Crime and Racketeering Section of the Criminal Division of the Department of Justice later advised a magistrate judge, four days after Flemmi was arrested, "Callahan had concluded that Flemmi's control agents were obviously aware over the years from what Flemmi reported that he was engaged in illegal gambling and in LCN policy making" and "(by receiving this information and not arresting Flemmi) at least tacitly authorized (his) participation." Aff. of Paul E. Coffey, Esq., Nov. 13, 1995 ("Coffey Aff., Nov. 13, 1995"), at 4 n.1; *Salemme,* 978 F.Supp. at 354, n. 6.

As Callahan also wrote on January 10, 1995:

Upon completion of the file reviews, this information was brought to the attention of the SAC, ASAC O'CALLAGHAN, and SSA EDWARD M. QUINN. Upon being briefed by the PLA regarding the information discovered, *SAC SWEN-SEN made a decision to disclose the identities of captioned informants to the U.S. Attorney because of the likelihood*

*that the information discovered was indeed Brady material that could not be withheld from the U.S. Attorney's Office. Failure to disclose this material to the U.S. Attorney could wreck the proposed organized crime indictments which were scheduled to be returned on January 9, or January 10, 1995.*

On January 9, 1995, SAC SWENSEN, ASAC O'CALLAGHAN, SSA QUINN, and the PLA attended a meeting in the U.S. Attorney's Office with U.S. ATTORNEY DONALD STERN, AUSA JAMES FARMER, and AUSA JONATHAN CHIEL. During that meeting, the SAC disclosed to the three representatives of the U.S. Attorney's Office the identity of the two captioned informants [Flemmi and Bulger] and requested that their identities not be disclosed beyond the three individuals in the room plus one representative of their selection from their office who would pursue the matter further with the PLA. The U.S. Attorney, on behalf of the other two AUSAs, agreed to this request. *The SAC then instructed SSA QUINN, and the PLA to give the representatives from the U.S. Attorney's office a quick general overview of the kind of information discovered during the PLA's file review. This was done in a general way and no specific information was provided. The U.S. Attorney requests that the PLA be available at some future time to discuss the kind of specific information that he learned through the file reviews with a designated AUSA who is not involved in the prosecution or decision making regarding the prospective indictments. SAC SWENSEN agreed to make the PLA available for this purpose.*

Ex. 271 (emphasis added).

In striking contrast to Kottmyer's conduct concerning Mercurio, in 1994 the United States Attorney, Stern, did not insist that the prosecutors presenting the case, or indeed anyone outside of the FBI, review the Bulger and Flemmi informant files before indictments were sought. *Id.*

Stern's decision to insulate the prosecutors handling the case from even the limited information that he had received was evidently based on the concern Farmer had previously expressed about possible promises to Bulger and Flemmi that their statements and/or evidence that they helped obtain would not be used against them, and the foreseeable possible claim that the prosecutors' disqualification would be required if they were exposed to evidence provided pursuant to a promise of immunity.

The information concerning Bulger and Flemmi that Stern and his colleagues received on January 9, 1995, did not cause them even to pause in their pursuit of indictments against Bulger and Flemmi. Rather, the proposed indictments that had been prepared and approved previously were presented to the grand jury the next day by prosecutors who "did not know that Bulger and Flemmi had been informants or of any assessment of the information in their informant files." Ex. 269.

It would be almost seven months before any member of the United States Attorney's Office would ask to review Flemmi and Bulger's informant files. *Id.* When made, that request was promptly granted. *Id.*

### 33. *The Indictment of Bulger and Flemmi and Its Aftermath*

On January 10, 1995, the government obtained a ninety-one page superceding indictment of the earlier charges against DeLuca. The First Superceding Indictment (the "1SI") added six defendants— Bulger, Flemmi, George Kaufman, Francis P. Salemme, Francis P. Salemme, Jr., and James Martorano. The First Superceding Indictment also radically altered the charges in the case. The new charges included, among others, an alleged RICO conspiracy lasting more than thirty years and a lengthy conspiracy to extort bookmakers and drug dealers. DeLuca was named in only a fraction of the alleged racketeering acts and substantive charges.

The new charges against DeLuca and his codefendants could have been brought as a separate indictment, which would have been randomly assigned to a member of the District Court. However, as those charges were brought in a superceding indictment in an existing case, they were, in accordance with the District Court's standard and well-known practice, assigned to this court. Thus, the government exercised what was in effect an option offered by the District Court's procedures to select this court to preside in this case against Bulger, Flemmi, and the other defendants added to the original DeLuca case.

The First Superceding Indictment charged the defendants with, among other things, from 1969 to January 1995, engaging in a conspiracy to violate, and violating, the RICO statute, 18 U.S.C. § 1961 *et seq.* (1994). *See* 1SI Counts 1 and 2. They were also charged with conspiring to extort, and extorting, bookmakers, from 1979 to 1994. *See* 1SI, Counts 3–17.

With regard to the RICO charges, the alleged enterprise was neither the Patriarca Family of La Cosa Nostra nor the Winter Hill Gang, organizations that have, in effect, been proven to be RICO enterprises in prior prosecutions. *See, e.g., United States v. Angiulo,* 897 F.2d 1169, 1175 (1st Cir.1990) (Patriarca Family); *United States v. Angiulo,* 847 F.2d 956, 960, 969–70 (1st Cir.1988) (Patriarca Family); *United States v. Winter,* 663 F.2d 1120, 1127–28 (1st Cir.1981) (Winter Hill Gang). Rather, the defendants were alleged to have been part of a unique association-in-fact enterprise made up of individuals who joined together to use their respective relationships with either the Patriarca Family or the Winter Hill Gang to, among other things, facilitate the unlawful activities of the enterprise and coordinate the activities of the Patriarca Family and the Winter Hill Gang. 1SI, ¶ 1(k); Feb. 14, 1997 Bill of Particulars; Nov. 15, 1995 Government's Response to

Magistrate Judge Cohen's Order dated Aug. 23, 1995, filed *ex parte* and Under Seal, at 4.

In view of Bulger and Flemmi's roles as Top Echelon informants utilized to provide and, in some instances tasked to obtain, information for the FBI concerning the LCN, there are serious issues presented concerning whether they were authorized to engage in the conduct alleged to be criminal and are, therefore, not guilty as charged. *See United States v. Baptista–Rodriguez,* 17 F.3d 1354, 1368 n. 18 (11th Cir.1994), *cert. denied,* 119 S.Ct. 2365 (1999); *United States v. Johnson,* 139 F.3d 1359, 1365–66 (11th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 2365, 144 L.Ed.2d 770 (1999); *United States v. Light,* 64 F.3d 660, 1995 WL 507241 at *2 (4th Cir. Aug. 28, 1995); *United States v. Achter,* 52 F.3d 753, 755 (8th Cir.1995). There are also questions relevant to all of the defendants regarding whether the conspiracies and enterprise alleged in the First Superceding Indictment genuinely existed because an agreement with someone acting as an agent of law enforcement is not a criminal conspiracy. *See Salemme,* 978 F.Supp. at 353–54 (citing *United States v. Duff,* 76 F.3d 122, 127 (7th Cir.1996) and *United States v. Nason,* 9 F.3d 155, 161 n. 2 (1st Cir.1993)). As explained in § III.1.A, *infra,* however, these issues must be addressed at trial. It is the question of immunity that the court can and must decide in these pretrial proceedings. *Salemme,* 1997 WL 810057 at *1–3 (D.Mass. Dec.29, 1997).

On January 17, 1995, the magistrate judge conducted a detention hearing concerning Flemmi. As Flemmi was leaving the courtroom he saw Quinn. Flemmi Aug. 20, 1998 Tr. at 155, Aug. 21, 1998 Tr. at 50–51. Flemmi knew that Quinn was aware of his valuable service as an informant concerning the LCN. Flemmi Aug. 20, 1998 Tr. at 156–57. Flemmi thought that Quinn would at least do something to facilitate his release on bail. *Id.* Thus, Flemmi said to Quinn, "How about a break

on bail." Flemmi Aug. 20, 1998 Tr. at 155, Aug. 21, 1998 Tr. at 50–51. However, Assistant United States Attorney Kelly, who was with Quinn, told Flemmi that Quinn could not speak to him because Flemmi's attorney would object. Flemmi Aug. 29, 1998 Tr. at 156–57.

After Bulger's indictment on January 10, 1995, the FBI opened a fugitive investigation of him. Charles Gianturco was put in charge of it. Steffens Aug. 10, 1998 Tr. at 24; Walther Oct. 1, 1998 Tr. at 166. He is the brother of Nick Gianturco, who, as described earlier, understood that Bulger had helped save his life when Gianturco was an undercover agent in Operation Lobster, and had subsequently dined and exchanged gifts with Bulger and Flemmi.

On about January 23, 1995, Bulger returned to the Boston area briefly to drop off Stanley. Stanley Sept. 18, 1998 Tr. at 40–41, 47, 84, 85. It was widely known that Stanley had been traveling with Bulger and was back in Boston. *Id.* at 63. Yet the FBI did not contact her until April 1996, about fifteen months after she had returned. *Id.* at 42–43, 53; Walther Sept. 10, 1998 Tr. at 166–67.

When approached, Stanley was cooperative. Among other things, she told FBI agents Charles Gianturco and Walther that during their trip prior to his indictment Bulger had driven a Grand Marquis, used the alias "Tom Baxter," and stayed with the Matos family in Selden, New York, with whom she and Bulger had stayed before. Stanley Sept. 19, 1998 Tr. at 11–13. Stanley had not, however, heard from Bulger since he returned her to the Boston area. *Id.* at 48–54. Thus, by the time that she was interviewed by the FBI, the information that Stanley could provide was dated and of diminished value. Nevertheless, the FBI paid Stanley $1000 in November 1996. Walther Sept. 10, 1998 Tr. at 169.

In late June 1995, Assistant United States Attorney Stephen Heymann asked to review Bulger and Flemmi's FBI infor-

mant files. Ex. 269. He did so on July 3, 1995. *Id.* As a result, the United States Attorney's Office evidently decided that it was essential that the prosecutors presenting the case be informed that Bulger and Flemmi had been FBI informants. This was done at some time prior to August 23, 1995. *See* Aug. 23, 1995 Government's *Ex Parte,* In Camera Motion for Protective Order.

On August 1, 1995, the government obtained a Second Superceding Indictment that added John Martorano as a defendant. As described previously, John Martorano had, in 1979, become a fugitive from RICO charges in the race-fix case against Winter, himself, and others, which was, in effect, alleged to be a racketeering act of a RICO enterprise known as the Winter Hill Gang. *See Winter,* 663 F.2d at 1127–28. After he was apprehended, John Martorano's case was assigned to District Judge Reginald Lindsay. On July 24, 1995, over the government's objection, Judge Lindsay dismissed the case against John Martorano, without prejudice, because a violation of the Speedy Trial Act, 18 U.S.C. § 3161. Rather than attempting to reinstate the dismissed charges, the government brought new charges against Martorano in this case. Thus, this court became responsible for presiding in the case against John Martorano.

On August 23, 1995, Assistant United States Attorney Herbert filed, under seal, with Magistrate Judge Lawrence Cohen, the Government's *Ex Parte,* In Camera Motion for a Protective Order concerning documents to be produced in discovery to Flemmi and his counsel. Herbert stated that Flemmi had made "potentially relevant" statements to the FBI "in the context of a confidential relationship over the course of many years." *Id.* at 1. Herbert explained that trial counsel had not read or been informed of the statements in order to avoid any arguable claim that the statements had been used improperly in investigating Flemmi. *Id.* at 2 n. 1. The government noted that Flemmi had not requested

his statements and, therefore, the government had no obligation to produce them pursuant to Fed.R.Crim.P. 16(a)(1)(A) or Rule 116.1 of the Local Rules of the United States District Court for the District of Massachusetts. *Id.* at 3. The government requested confirmation of this view. *Id.*

The government also represented that it recognized that it had an independent and continuing obligation to produce exculpatory information pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny. *Id.* at 4 n. 3. Thus, the government expressed the intention to have the documents reviewed by a senior official of the Department of Justice "to determine whether they contain any information that must be disclosed to the defendant Flemmi or any of his codefendants on constitutional grounds." *Id.*

The motion concluded with the representation that, "if the Court determines that the statements or their existence should be disclosed to defendant Flemmi, the government would request an *ex parte* conference with the Court on the record to determine the proper mechanism for disclosure." *Id.* at 4–5.

In 1995, Flemmi did not realize that the FBI had memorialized, in writing, some of the statements he made to several of its agents over more than twenty-five years. Flemmi Aug. 27, 1998 Tr. at 56; Morris Apr. 21, 1998 Tr. at 34. In any event, as set forth below, when the magistrate judge eventually ordered that certain of the 209s containing Flemmi's statements be provided to him, the government neither requested an *ex parte* conference to discuss the appropriate procedure for disclosure nor produced the documents.

The magistrate judge responded to Herbert's August 23, 1995 motion the same day. *See* Aug. 23, 1995 Order (Under Seal). He agreed that Fed.R.Crim.P. 16(a)(1)(A) and Local Rule 116.1 did not require immediate disclosure of Flemmi's statements. *Id.* Apparently assuming the

outcome of the government's proposed review, he gave the government until October 20, 1995, to file an affidavit representing that Flemmi's file contained no information subject to disclosure before conviction under *Brady*. *Id.* Indeed, he opined that, "it appears highly unlikely— even from the vantage point of not having reviewed the matters sought to be protected—that the information protected herein is exculpatory as to the trial stage of this case." *Id.* This was simply incorrect. *See, e.g., Salemme,* 978 F.Supp. at 353–54; *United States v. Salemme,* 978 F.Supp. 386, 386–87 (D.Mass. June 26, 1997). The magistrate judge did, however, recognize that Flemmi's statements as an informant would be relevant to his punishment if he pled guilty or were convicted. *Id.* To deal with this foreseeable possible development, he ordered the prosecutors to seek guidance from him, rather than from this court, if either of those events occurred. *Id.*

On September 15, 1995, this court conducted a hearing to address a number of pending matters. The court began the hearing by stating that: "There have been developments since I saw some of you in June of 1995, and I want to see if I have an accurate and complete understanding of where matters are." Sept. 15, 1995 Tr. at 4. At the conclusion of the lengthy proceeding, the court stated that: "I am going to take this [case] I think from Judge Cohen. There is nothing in front of him and I will just deal with it directly." *Id.* at 75. The prosecutors did not then, or later *ex parte,* inform this court that the magistrate judge had been advised that Flemmi was an informant and had established a schedule to deal with the implications of that fact himself. Rather, the government continued to address that issue with the magistrate judge, while this court dealt with all other matters in this case.

More specifically, on or about October 20, 1995, the government responded to the magistrate judge's August 23, 1995 Order by filing an affidavit from Coffey and a related memorandum signed by Assistant United States Attorney James Rehnquist, who was not a member of the prosecution team. Aff. of James H. Herbert, Oct. 22, 1997 ("Herbert Aff., Oct. 22, 1997").[62] It was in these sealed submissions that the government noted that Callahan had concluded in January 1995 that the FBI had "at least tacitly authorized [Flemmi's] participation" in "illegal gambling and LCN policymaking." Nov. 15, 1995 Government's Response to Magistrate Judge Cohen's Order Dated Aug. 23, 1995 at 6 n.2; Coffey Aff., Nov. 13, 1995, at 4 n.1. Nevertheless, the government represented that Coffey had found that "very little in the Flemmi and Bulger files is even *arguably Brady* material." Government's Response at 7 (emphasis added).

In a sealed November 14, 1995 Order, the magistrate judge directed the government to submit a proposed protective order for him to enter. On December 12, 1995, he adopted the government's proposal and entered an Order which stated, in part, that:

> The government shall disclose to the defendant Stephen J. Flemmi Inserts 1–7 of the Appendix to the Affidavit of Paul E. Coffey, Esquire, previously filed. The government shall disclose those materials directly to the defendant Stephen J. Flemmi in person, without providing a copy of the same to his counsel, and without further notification to his counsel.

Dec. 12, 1995 Order (Under Seal). The magistrate judge also held that the government was not required to disclose any additional information to Flemmi or his codefendants. *Id.*

**62.** The government withdrew the October 22, 1995 filings and replaced them with revised versions on November 15, 1995. *See* June 23, 1997 Order (Under Seal). This court has ordered the government to produce the original October 22, 1995 submissions, but has not received them.

The magistrate judge did, however, order that the matter of Flemmi's status as an informant be brought to this court's attention at least thirty days before trial. *Id.* At that time, this court had presided in cases against nine members of the Patriarca Family, each of which resulted in guilty pleas. *See Carrozza,* 807 F.Supp. at 157; *United States v. Patriarca,* 776 F.Supp. 593 (D.Mass.), *remanded,* 948 F.2d 789 (1st Cir.1991); *DiGiacomo,* 746 F.Supp. 1176. Thus, it was foreseeable that by virtue of the December 12, 1995 Order, the government might never be required to disclose to this court that Flemmi had been an FBI informant.

As indicated earlier, the government did not, as it had previously represented, seek a hearing to determine how to implement the magistrate judge's December 12, 1995 Order. Nor did it comply with the Order by providing Flemmi with the documents that the magistrate judge directed that he receive.

The three prosecutors primarily responsible for this case have represented that Assistant United States Attorney Rehnquist, who was not on the prosecution team, had worked with Coffey in making the subsequent submissions to the magistrate judge and neither Rehnquist nor Coffey told the FBI about the Order. Herbert Aff., Oct. 22, 1997. The government contends that the "FBI was waiting for confirmation that the order had been issued before attempting to make arrangements to deliver the documents to the defendant Flemmi." *Id.* Thus, Herbert represented that, "however regrettable the delay in complying with Magistrate Judge Cohen's Order of December 12, 1995, the failure to comply with the order more promptly was inadvertent rather than intentional." *Id.*

However, on June 21, 1996, Callahan wrote a memorandum reciting the history of the submissions to the magistrate judge and stating that, "Judge Cohen ultimately ruled, with respect to the government's request for instructions regarding its dis-covery obligations, that the government only had to disclose certain limited documents to meet its discovery obligations . . . ." Ex. 272. Thus, it is evident that the FBI was well aware of the magistrate judge's December 12, 1995 Order and, with Coffey and Rehnquist, simply ignored it.

Although Flemmi did not receive the documents that the magistrate judge ordered be furnished to him, he was anticipating assistance from Connolly and the FBI. Flemmi Aug. 21, 1998 Tr. at 46–47. This court reviewed Flemmi's detention and, on June 13, 1995, again denied his request to be released on bail. *See* June 13, 1995 Order. At that point, Flemmi asked Weeks to speak to Connolly about the assistance he had expected to receive. *Id.* at 40–52. Weeks reported to Flemmi that he had talked several times to Connolly, who said that he was very upset that Bulger and Flemmi had been indicted and that the FBI had evidently abandoned them. *Id.* at 40–41. Flemmi shared this view. *Id.* at 42.

Nevertheless, Flemmi had faith that Bulger would "contact somebody" and get their problems "squared away." Flemmi Aug. 20, 1998 Tr. at 157–58, Aug. 21, 1998 Tr. at 21–22. Flemmi planned to persevere quietly until that occurred. Flemmi Aug. 20, 1998 Tr. at 158. He felt that he had been required to be a fugitive for more than four years before Rico succeeded in protecting him with regard to the charges concerning the Bennett murders and the Fitzgerald bombing. *Id.* He intended to wait out this matter too, rather than reveal that he and Bulger had been informants, and thus endanger Bulger. *Id.* at 157–58.

As Flemmi expected, Bulger did attempt to get their problems "squared away." On October 13, 1995, Bulger called Morris. Ex. 86; Morris Apr. 28, 1998 Tr. at 85, Apr. 29, 1998 Tr. at 30. Morris had by then been promoted to Chief of the Training Administration Section of the FBI Academy at Quantico, Virginia, where Bul-

ger called him. Morris Apr. 28, 1998 Tr. at 85.

Bulger reminded Morris that he had taken money from Bulger, asserted that he had witnesses, and "said that if he went to jail, he was taking [Morris] with him." Ex. 86; Apr. 28, 1998 Tr. at 88–90. Morris testified that Bulger demanded that Morris use his "Machiavellian mind" to devise a story to tell *The Boston Globe* to persuade its reporters that his previous statements that Bulger was an informant were not true. *Id.* Morris asserts that Bulger did not ask him to do anything to resolve the charges against him and Flemmi. *Id.* The court finds that this contention is not credible.

Morris prepared a 302 of his telephone conversation with Bulger which he claims, falsely, was accurate and complete. Ex. 86; Morris Apr. 28, 1998 Tr. at 90, Apr. 29, 1998 Tr. at 32–33. Morris sent copies of the 302 to the Organized Crime Section and Office of Professional Responsibility at FBI Headquarters, and to Swensen, the SAC in Boston. Morris Apr. 30 1998 Tr. at 196–97.

In the 302 Morris stated, in part, that Bulger had "accused [Morris] of accepting money from him and said that if went to jail, he was taking [Morris] with him. He claimed he had witnesses." Ex. 86. The 302 also contained Morris' rendition of his response, that this was "an outright lie." *Id.* Morris subsequently received a telephone call from Gamel, who inquired about the Training Academy's capacity to track in-coming calls. Morris Apr. 30, 1998 Tr. at 91. However, prior to December 1997, when Morris made the proffer which persuaded the government to grant him immunity in the pending proceedings, the FBI never asked Morris about Bulger's claim that he had made payments to Morris. Morris Apr. 28, 1998 Tr. at 91–92, Apr. 30, 1998 Tr. at 198.

In any event, Bulger's call to Morris was unavailing. This case continued.

On May 21, 1996, the government obtained what it called a Third Superceding Indictment (Docket No. 359), with two parts, one of which included only the charges against John Martorano. The government characterized this as a "bifurcation" of the Second Superceding Indictment. Neither counsel nor the court was familiar with any precedent for such a severance of charges by a grand jury within a single indictment. The court, therefore, deemed the charges against John Martorano to constitute a separate indictment, and had it given a separate case number. As many motions in which John Martorano had joined were pending, with the consent of the parties, in the interest of efficiency, the court consolidated for pretrial purposes the case against John Martorano and the case against his former codefendants. Jan. 9, 1997 Tr. at 8–9.

In the Third Superceding Indictment (the "3SI"), Bulger and Flemmi were charged with participating in the race-fixing scheme as one of their alleged racketeering acts. (3SI, Count One, RA 3). As described in § II.9, *supra*, this was the matter for which Connolly, Morris, Daly, and O'Sullivan decided, in 1979, that Bulger and Flemmi should not be charged in order to permit them to assist in the FBI's important effort to bug Angiulo's headquarters at 98 Prince Street. As also described previously, Bulger and Flemmi made unique contributions to the ultimate success of that effort.

At hearings in June 1996, the court indicated that motions to dismiss the Third Superceding Indictment for failure to allege properly certain elements of a RICO offense, including the description of the alleged enterprise, might be meritorious. On July 2, 1996, the government obtained a Fourth Superceding Indictment, which was intended to cure the alleged defects in pleading. *See Salemme,* 978 F.Supp. at 346. The court subsequently conducted lengthy hearings on some of defendants' many remaining motions to dismiss and to suppress.

As of March 1997, the court had denied the defendants' motion to dismiss the Fourth Superceding Indictment and many of the alleged Racketeering Acts. *See United States v. Salemme*, 1997 WL 37530, *1–6 (D.Mass. Jan.13, 1997). In doing so, however, the court emphasized the foreseeable difficulty the government might have in proving the enterprise alleged. More specifically:

After subsequent hearings, the court held that the Fourth Superseding Indictment adequately alleged the existence of an enterprise, but that the government would, among other things, have to prove that the alleged Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity in which it engaged. *See United States v. Salemme*, 1997 WL 37530, *1 (D.Mass. January 13, 1997). The court also held that, " '[t]he function of coordinating the commission of several different offenses and other activities on an on-going basis is adequate to satisfy the separate existence requirement.' " *Id.* (quoting *United States v. Console*, 13 F.3d 641, 651 (3rd Cir.1993)).

The court did, however, order that the government submit a bill of particulars concerning the purported structure of the alleged Enterprise. *Id.* In response to that filing, the defendants have renewed their motion to dismiss.

*Salemme*, 978 F.Supp. at 346–47.

As of March 1997, the court had also orally announced its decision denying the motion to suppress certain electronic surveillance conducted by the Massachusetts State Police, although the court found that the government had violated state law by obtaining the warrant authorizing that electronic surveillance in the wrong county, Jan. 29, 1997 Tr. at 1–7, 26, and had not had the resulting tape recordings sealed in the time required by federal law. Feb. 18, 1998 Tr. at 3–52.

In addition, on several occasions the court informed the parties of its tentative decision to exclude the testimony of Hugh Shields and other evidence concerning the 1967 murders of Edward, Walter, and William Bennett, and Richard Grasso, which were charged for the first time in the Third Superceding Indictment as racketeering acts of Flemmi and Salemme, because the government had used the grand jury primarily or exclusively to obtain evidence to strengthen the RICO charges previously alleged by obtaining an immunity order, pursuant to 18 U.S.C. § 6001 *et seq.*, to compel the otherwise unavailable testimony of two witnesses essential to charging the murders as racketeering acts and to strengthening the evidence of the alleged enterprise. *See, e.g., Beasley*, 550 F.2d at 266; *Gibbons*, 607 F.2d at 1328; *Santiago*, 533 F.2d at 730.

This issue may have significant practical consequences for this case. If Flemmi and/or Salemme are convicted, but not held accountable at sentencing for any of the four murders, it appears that the Guideline ranges for their sentences may be reduced from life imprisonment to as little as ten to thirteen years for Flemmi and eight to ten years for Salemme. As the court has told the parties, however, its decision is tentative pending the preparation and issuance of a written memorandum and order.

On March 21, 1997, Nick Gianturco and Steffens interviewed Connolly as part of the Bulger fugitive investigation. Steffens Aug. 10, 1998 Tr. at 23, 25. Connolly said that he had not seen or heard from Bulger. *Id.* at 28; Ex. 222. In fact, according to the 302 that Gianturco prepared, "Connolly stated that he has not seen or heard from Bulger since December of 1989." Ex. 222. If said by Connolly, this was untrue. If not said, the statement, which tends to exculpate Connolly with regard to any suggestion that he had abetted Bulger's flight, should not have been included in the 302 Gianturco prepared.

In any event, Connolly also told Gianturco and Steffens that he had known Bulger

since they were both boys and Bulger had bought him an ice cream cone. Aug. 10, 1998 Tr. at 30. Connolly added that he hoped that "Bulger was never caught." *Id.* at 31. Connolly also said that at a party at Morris' house, Morris was "in his cups" and told Flemmi and Bulger "that they were so good, he could get them off for anything short of murder." *Id.* at 31, 53, 149. Connolly also indicated that he knew that Bulger had called Morris since becoming a fugitive. *Id.* at 32. This had not been publicly disclosed at that time. *Id.* at 52.

Steffens regarded Connolly's statement that he hoped Bulger would not be caught as "startling." *Id.* at 33. However, it was not included in the 302 that Gianturco belatedly prepared on May 7, 1997, and that Steffens reviewed. *Id.* at 26, 34; Ex. 222. Nor did the 302 include Connolly's report of Morris' statement that he could get Bulger and Flemmi off for anything short of murder. *Id.* at 34; Ex. 222. Steffens did, however, tell one of the prosecutors, Kelly, about this statement. Steffens Aug. 10, 1998 Tr. at 35, 151–52.

On March 21, 1997, before Connolly was interviewed, the defendants moved for evidentiary hearings on their motions to suppress certain electronic surveillance evidence, including the electronic surveillance conducted jointly by the DEA–FBI in 1984–85 and the FBI's 1989 34 Guild Street interceptions.[63] Steffens Aug. 10,

1998 Tr. at 22. In connection with these motions, each of the defendants, with the significant exception of Flemmi, moved for disclosure of whether Bulger, Mercurio, Robert Donati, a deceased, former close associate of Ferrara, and certain other individuals were FBI informants; Flemmi joined in all of the motions except the request concerning Bulger. *See Salemme,* 978 F.Supp. at 350–51 & n. 3.

In the process of addressing these motions, the court discovered for the first time the submissions made to the magistrate judge which disclosed that Bulger and Flemmi had been FBI informants. *Id.* at 351 n. 3. Knowledge of Flemmi's status prompted the court to seek and receive permission to question him privately. *Id.*; Apr. 16, 1997 Tr. at 118–22 (Under Seal). As a result, Flemmi immediately decided to disclose to his attorney, Kenneth Fishman, and his codefendants that he had been an FBI informant. *Id.*[64]

Following a conference with the court in which Flemmi, Fishman, and Coffey participated, Coffey spoke briefly to Flemmi and Fishman. Flemmi Aug. 24, 1998 Tr. at 50–54. Coffey told Flemmi that because of his past services to the government Coffey would like to assist Flemmi, and requested his cooperation with the government in the prosecution of the instant case. *Id.* Flemmi responded by stating that, "[i]f I was so valuable to you,

---

**63.** The defendants also moved to suppress the electronic surveillance conducted on December 11, 1991, by the FBI, at the Hilton Hotel in East Boston, Massachusetts. *Salemme,* 978 F.Supp. at 346–47. In connection with this motion, the defendants sought an order compelling the government to disclose whether Anthony St. Laurent and/or Kenneth Guarino were FBI informants. *Id.* The court granted the motion for an evidentiary hearing concerning the Hilton Hotel intercepts. *Id.* at 346–47, 358–61, 363. The court also initially ordered the government to disclose whether St. Laurent and/or Guarino were informants. *Id.*

The government subsequently moved for reconsideration of the court's decision regarding St. Laurent and Guarino. The court

agreed to decide that request and address the motion to suppress concerning the Hilton Hotel intercepts separately from the issues concerning the 1984–85 and 34 Guild Street interceptions. *United States v. Salemme,* 978 F.Supp. 379, 380 n. 1 (D.Mass. June 19, 1997). Thus, this Memorandum contains no further reference to the Hilton Hotel motion and related matters, except to note that they will have to be decided before Flemmi's motion to dismiss is resolved.

**64.** Flemmi also stated to the court: "Your honor, you're getting to the core of the matter. There's no doubt about that. You're right there. If you go a little further, you could get the whole complete story." Apr. 16, 1997 Tr. at 122 (Under Seal).

what am I doing being indicted," and the conversation ended. *Id.* at 53.

The government strenuously opposed the requests for evidentiary hearings on the motions to suppress and the related request that it be required to confirm or deny whether Bulger, Mercurio, and/or Donati were informants. *Salemme,* 978 F.Supp. at 345. The court conducted a series of hearings, over several months, in an effort to address the motions carefully. *Id.* Because the motions involved allegations that specified individuals had secretly served as informants, the court recognized that they implicated the generally recognized interest of the government in maximizing the confidentiality of its sources to encourage the free flow of information from informants and the interest of particular possible informants in their own safety. *Id.* Thus, at the request of the parties, the court temporarily sealed all of the submissions concerning the motions, received some *ex parte* filings by the government, and conducted several hearings that were closed to the public. *Id.*

On May 22, 1997, the court issued its Memorandum and Order finding that the defendants were entitled to evidentiary hearings on their motion to suppress the electronic surveillance jointly conducted in 1984 and 1985 by the DEA and FBI which targeted Bulger and Flemmi, and the electronic surveillance conducted on October 29, 1989, at 34 Guild Street. *Id.* at 345, 363. The court also ordered the government to disclose whether Bulger, Mercurio, and/or Donati were informants. The decision was temporarily sealed to permit the government to decide whether to obtain the authorization of the Acting Deputy Attorney General, Seth Waxman, to comply with the Order, or to decide instead either to dismiss the case or to be held in civil contempt in an effort to render the decision appealable. *Id.* at 346.

Prior to the unsealing of the May 22, 1997 Memorandum and Order, the FBI announced for the first time that it was offering a $250,000 reward for Bulger's capture. *See* Patricia Nealon, "FBI offers $250,000 for Whitey Bulger's arrest," *The Boston Globe,* May 30, 1997, at B1. At the press conference announcing the reward, the SAC, Barry Mawn, reportedly stated that he "was very satisfied that there was an all out effort by the Boston FBI to find Whitey Bulger" and that he wanted to "clear up any perception that may exist that the FBI is not aggressively pursuing [him]." *Id.*

At that point it was foreseeable that if the case was not dismissed by the government, Flemmi's history as an informant would soon be disclosed publicly, and that Bulger's status as a source could be revealed by Flemmi and, in any event, easily be inferred because of their close association. In response to the May 22, 1997 Memorandum and Order the government confirmed that Bulger had been an informant and, contrary to it previous position, conceded that there was a proper basis for the court to have ordered evidentiary hearings on the motions to suppress electronic surveillance conducted in 1984–85 and at 34 Guild Street. *See United States v. Salemme,* 978 F.Supp. 364, 365 (D.Mass. June 6, 1997).

Demonstrating again the Department of Justice's traditional deference to the FBI in matters concerning the confidentiality of its sources, however, the Acting Deputy Attorney General declined to obey the Order to confirm or deny whether Mercurio and/or Donati were informants in connection with the electronic surveillance at 34 Guild Street. *Id.* Rather, reconsideration of that Order was requested. *Id.* The May 22, 1997 Memorandum was then unsealed and public proceedings on these issues commenced. *Id.* at 366.

The motion to reconsider was denied. *Id.* The Acting Deputy Attorney General continued to decline to obey the direction to disclose the status of anyone other than Bulger. *Id.* The defendants moved to have him held in civil contempt and incarcerated. *Id.* at 365. The Acting Deputy

Attorney General asked that the court instead enter an order of conditional exclusion of the 34 Guild Street electronic surveillance evidence so the government could attempt to appeal. *See U.S. v. Salemme,* 978 F.Supp. 375, 376 (D.Mass. June 13, 1997). The court found, however, that the government had not satisfied the requirements for a conditional order of exclusion. *Id.* at 376–77. The Acting Deputy Attorney General did not immediately relent and, therefore, faced the risk of being held in civil contempt and incarcerated until he complied with the court's Order.

However, in an effort to cut the Gordian Knot, the court required Mercurio to appear to be questioned concerning whether he was an FBI informant when he attended the Mafia induction ceremony on October 29, 1989. *Id.* at 379. On June 18, 1997, Mercurio testified that he was cooperating with the government in connection with that ceremony. *United States v. Salemme,* 978 F.Supp. 379, 381 (D.Mass. June 19, 1997). In response to a renewed Order, *id.* at 385, the Acting Deputy Attorney General revised his refusal to address the status of Donati and represented that he had not been an informant. *United States v. Salemme,* 978 F.Supp. 390, 391 (D.Mass. June 27, 1997). Thus, the motion to hold the Acting Deputy Attorney General in civil contempt for failure to confirm or deny whether Mercurio and/or Donati was an informant was rendered moot. *Id.*

On June 25, 1997, Flemmi filed an affidavit intended to respond to certain representations made by the government concerning his status as an informant. Ex. 92. Among other things, Flemmi asserted that Morris had told him and Bulger that they could be involved in any criminal activities short of murder and would be protected by the FBI. *Id.* He also claimed that as part of his continuing relationship with the FBI he was specifically informed of the date his indictment in this case was to be returned so he could flee if he chose to do so. *Id.* Flemmi had previously asserted that in 1991 Mercurio had been given prior notice of his indictment so he could flee. Ex. 213.

On June 26, 1997, the court ordered that the government produce certain documents and information which was relevant to the forthcoming evidentiary hearings on the motions to suppress and to Flemmi's charges. *United States v. Salemme,* 978 F.Supp. 386 (D.Mass. June 26, 1997). The required discovery included, among other things: virtually all of Flemmi's FBI informant file, *id.* at 387; the documents relied upon by FBI Special Agent John Michael Callahan, Chief Division Counsel for the Boston Division of the FBI, in concluding that "Flemmi's control agents were obviously aware over the years from what Flemmi reported that he was engaged in illegal gambling and in LCN policymaking" and that such agents " 'at least tacitly authorized [his] participation,' " *id.* (citations omitted); comparable records regarding Bulger, *id.;* and documents and information tending to show that Department of Justice and/or FBI regulations or guidelines had not been complied with concerning Flemmi, Bulger, or Mercurio, *id.* at 387–88. The next day the government repeatedly objected to the scope of the discovery order. *See, e.g.,* June 27, 1997 Tr. at 18, 20–21, 24, 28, 36. Generally, the objections were overruled. *Id.; United States v. Salemme,* 978 F.Supp. 386 (D.Mass. June 26, 1997).

In late June 1997, the Attorney General established a task force of Department of Justice and FBI personnel to investigate the allegations of misconduct raised by Flemmi and the motions to suppress. That task force conducted its investigation in July and early August 1997, and issued a confidential report to the Attorney General. With the agreement of the government, the court reviewed the Executive Summary of that report and some of the documents that the investigation generated in order to decide certain issues concerning discovery to be produced in connection with the motions to suppress. Sept. 12, 1997 Tr. at 14–16.

In August 1997, the government requested that the evidentiary hearings on the motions to suppress not be conducted until the defendants filed a notice, pursuant to Fed.R.Crim.P. 12.3(a)(1), of any intent that they had to assert a public authority defense, and motions to dismiss the Fourth Superceding Indictment based on claims of immunity and other grounds. The government's motion was granted. Aug. 11, 1997 Order at ¶ 2.

On September 3, 1997, the defendants filed under seal their motion to dismiss, a sixty-three page memorandum, and two supporting affidavits of Anthony Cardinale, Esq., who was then counsel for Salemme and DeLuca. The grounds for the motion to dismiss included the contentions that: the government had engaged in systematic, outrageous misconduct in connection with the investigation of this case and thus violated defendants' rights to Due Process; dismissal was required as an exercise of the court's supervisory powers; there had been gross abuse by the government in failing to inform the grand jury of Flemmi and Bulger's status and activities as informants; that immunized testimony had been improperly presented to the grand jury; and illegally obtained electronic surveillance evidence had been presented to the grand jury. *See* Memorandum of Law in Support of Defendants' Motion to Dismiss All Pending Indictments (Sept. 2, 1997).

Cardinale's affidavit charged that Connolly had attempted to foment violence by telling him in 1989 that Salemme was planning to kill his then client Ferrara. Aff. of Anthony Cardinale, Sept. 3, 1997 ("Cardinale Aff., Sept. 3, 1997"). In addition, Flemmi filed a notice that as part of his defense he would assert that he was authorized by the FBI to engage in the acts now charged as crimes. Defendant Flemmi's Notice Under Fed.R.Crim.P. 12.3 (Docket No. 696). The defendants submissions were, despite the government's objection, unsealed on September 10, 1997. *United States v. Salemme*, 985 F.Supp. 193 (D.Mass. Sept.10, 1997).

On October 6, 1997, the defendants filed, under seal, an eighty-five page Factual Submission in Support of Defendants' Motion to Dismiss. This Factual Submission referenced and analyzed information defendants had received in discovery. The court did not grant the defendants' requests to unseal this document. Oct. 6, 1997 Order.

On October 22, 1997, the government filed, under seal, a ninety-nine page Opposition to Defendants' Motion to Dismiss All Pending Indictments, and attachments. The memorandum thoroughly addressed the law relating to virtually all of defendants' claims except Flemmi's contention that he had been provided immunity. The theme of the government's submission was, in essence, that the defendants were not entitled to a pretrial evidentiary hearing on their motion to dismiss and that their claims would at trial be proven to be unmeritorious.

Over the next several months, the court held a series of hearings concerning the motions to dismiss and other matters.[65] The court expressed the view that the defendants' claim that the case should be dismissed because of outrageous misconduct might not be viable as a matter of law, but their supervisory powers claim might be valid if certain facts were proven. Oct. 29, 1997 Tr. at 45–46, 58.

The court also provided the parties with the opportunity to supplement their submissions concerning Flemmi's suggestion

---

**65.** These other matters included a criminal contempt trial at which Cardinale was found not guilty of violating the protective order issued concerning the documents produced to defendants in discovery. *See* Oct. 29, 1997 Tr. at 14. In addition, the court conducted hearings before allowing defendants' motion to have their counsel appointed to continue to represent them at public expense, under the Criminal Justice Act, because the defendants no longer had the resources to retain them privately. *See* Nov. 14, 1997 and Dec. 29, 1997 Memoranda and Orders.

that the case against him be dismissed because he had been promised immunity. Flemmi confirmed that he was asserting an immunity defense. On December 15, 1997, the government filed a lengthy memorandum opposing Flemmi's motion for an evidentiary hearing on his motion to dismiss based on immunity. On December 22, 1997, Flemmi filed another affidavit in support of his immunity claim. Ex. 31.

After additional hearings on December 18 and 23, 1997, the court granted Flemmi's motion for an evidentiary hearing on his motion to dismiss based on immunity. *See United States v. Salemme*, 1997 WL 810057 at *1–3 (D.Mass. Dec.29, 1997). As the issues presented are integrally related, the court decided that the hearings on the motions to suppress and the motion to dismiss based on immunity would be conducted concurrently. *Id.* at *3. The court did not grant the defendants' request for an evidentiary hearing on the other grounds of their motions to dismiss.

The evidentiary hearings began on January 6, 1998. On January 20, 1998, they were suspended for three months while the court addressed and denied the government's suggestion that it be disqualified, pursuant to 28 U.S.C. § 455(a), because, although the government acknowledged that the court was actually unbiased, a reasonable person would question its impartiality. *See* Feb. 13, 1998 and Mar. 30, 1998 Memoranda and Orders.

The testimony was completed on October 30, 1998. The documentary record was completed on December 14, 1998. Several days of closing arguments were held. Nov. 12, 1998 Tr.; Nov. 16, 1998 Tr.; Nov. 17, 1998 Tr.; Nov. 18, 1998 Tr.; Nov. 19, 1998 Tr.; Nov. 20, 1998 Tr.; Nov. 23, 1998 Tr. In all, more than 17,000 pages of transcripts were generated in the evidentiary hearings. The parties' initial, voluminous post-hearing submissions were completed by January 29, 1999. The court ordered and received on April 6 and 30, 1999, additional, lengthy memoranda on certain electronic surveillance issues. Further hearings were held on April 13 and 14, 1999. Additional submissions followed. As a result, more than 1000 pages of briefs were filed.

The findings of facts detailed in this Memorandum are based on the direct and circumstantial evidence that this court found to be credible. Implicit in those findings are decisions that contradictory evidence was not credible. There is, however, one witness whose testimony deserves further reference.

Over the defendants' objection, the court permitted the government to question former FBI Supervisory Special Agent James Darcy as an expert witness. Sept. 24, 1998 Tr. at 12. Darcy had been the supervisor of the Organized Crime squad in the Atlantic City, New Jersey office of the FBI. Darcy Sept. 28, 1998 Tr. at 14. His testimony included the following.

Darcy generally would not have targeted an informant for investigation for engaging in the type of criminal activity that was known to the FBI when he was opened. Darcy Sept. 29, 1998 Tr. at 6–7. On two or three occasions, Darcy employed the procedures established by the Attorney General's Guidelines, and included in the FBI Manual, to authorize an Organized Crime informant to engage in what would otherwise be a criminal act. *Id.* at 28–31. Usually, however, it was simply understood and accepted that Organized Crime informants had to be engaged in unauthorized criminal activity to obtain the information that the FBI wanted concerning the highly secretive LCN, which was the Bureau's highest priority for many years. Darcy Sept. 28, 1998 Tr. at 42–44.

Darcy confirmed that it was the practice of the FBI to do everything possible to maintain the confidentiality of the fact that an individual was serving as an FBI informant. Darcy Sept. 29, 1998 Tr. at 75. Consistent with this, Darcy never provided an informant's self-incriminatory statements to anyone outside the FBI. *Id.* at

80–84. To have done so would have exposed the informant's relationship with the FBI and violated the Bureau's confidentiality agreement with him. *Id.*

Nor did Darcy, or the FBI to his knowledge, ever use an informant's statements against him. *Id.* Darcy's experience is consistent with that of Potts, the former Acting Deputy Director of the FBI. Potts May 22, 1998 Tr. at 25–28, 64–66.

Darcy did not expect an informant to report to the FBI concerning his own criminal activity. Darcy Sept. 29, 1998 Tr. at 26. Like Ring, Darcy did not ask informants about their own criminal activity. *Id.;* Ring June 22, 1998 Tr. at 44–49.

Darcy was never involved in any matter in which the FBI used information provided by an informant to obtain a warrant for electronic surveillance and later used against the informant the intercepted evidence that he had helped obtain. Darcy Sept. 29, 1998 Tr. at 82. In this respect Darcy's experience was consistent with Ahearn's. Ahearn May 11, 1998 Tr. at 51–52. In addition, Darcy had never listed an informant as a target in an application for a warrant to conduct electronic surveillance in order to conceal the informant's identity. *Id.* at 25.

As Darcy explained, in some instances the FBI found a person to be more valuable as a continuing informant than as a cooperating witness whose ability to obtain information would vanish when his relationship with the FBI was disclosed. Darcy Sept. 28, 1998 Tr. at 135–36.

Finally, there were several potentially meaningful witnesses who were not available to testify. The parties agreed that a heart attack and a stroke that O'Sullivan suffered during the pendency of these proceedings rendered him unavailable. Oct. 6, 1998 Order.

In addition, the court did not receive the testimony of Connolly. The defendants sought to question Connolly. Connolly Apr. 30, 1998 Tr. at 11–13, Oct. 30, 1998 Tr. at 5–6. However, Connolly properly invoked his Fifth Amendment privilege not to answer any substantive questions because his responses might tend to incriminate him. Connolly Apr. 30, 1998 Tr. at 12–13, Oct. 30, 1998 Tr. at 5–6.

After Connolly declined to testify, the defendants asked the court to direct the government to request an immunity and compulsion order concerning Connolly, under 18 U.S.C. § 6001 *et seq.,* or to dismiss the case. Although such orders are rare, the request presented a serious issue in this case. Oct. 16, 1998 Tr. at 6. Upon consideration of the parties' submissions, and after several hearings, the defendants' motion was denied. *Id.* at 4–30.

In summary, the court found Connolly had made many public statements which, if repeated under oath, would corroborate meaningful aspects of Flemmi's testimony. *Id.* at 8–9; Ex. DDDDD. More specifically, the court assumed that if immunized and compelled to testify, Connolly would state that:

> [He] was the FBI handling agent for Mr. Flemmi and James Bulger from about 1975 to 1990, that Flemmi and Bulger were Top Echelon informants. The FBI understood that Bulger and Flemmi were engaged in a wide range of criminal activity, possibly including murder. Flemmi and Bulger were extremely valuable confidential informants who provided vital information [regarding] the government's successful efforts to investigate and prosecute La Cosa Nostra in New England, the Department of Justice's top priority here. Mr. Connolly regarded Bulger and Flemmi as the two most valuable sources the FBI in Boston had.
>
> The FBI as an organization, . . . rather than isolated aberrant agents, authorized Bulger and Flemmi to engage in loansharking, gambling, and related activities in order to permit them to perform as confidential informants. The FBI promised that Flemmi and Bulger's identity as confidential informants would

never be disclosed, and that if necessary cases would be dismissed to avoid doing so . . . .

John Morris told Bulger and Flemmi that they could do anything short of murder, and they would be protected by the FBI.

After Connolly retired, the government failed to honor the promises that were made to Flemmi and Bulger. The indictment in this case . . . is inconsistent with the promises that the government made to Bulger and Flemmi.

Oct. 16, 1998 Tr. at 8–9.

The court, however, found that it could, as a matter of law, issue the requested order only if it decided that the government was refusing to grant Connolly immunity *solely* to distort the factfinding process and thus deprive Flemmi of Due Process. *Id.* at 9–16. The decision was based on precedent that indicates that under the Due Process theory, the court may order the government to request an immunity and compulsion order only if the government's decision not to immunize is motivated solely by a desire to distort the factfinding process to the detriment of a defendant. *Id.* at 5 (citing *Angiulo*, 897 F.2d at 1192; *United States v. Mackey*, 117 F.3d 24, 27 (1st Cir.), *cert. denied,* 522 U.S. 975, 118 S.Ct. 431, 139 L.Ed.2d 331 (1997); *United States v. Castro*, 129 F.3d 226, 232 (1st Cir.1997), *cert. denied,* 523 U.S. 1100, 118 S.Ct. 1569, 140 L.Ed.2d 803 (1998)).

As the court explained, in the instant case the government had a mixture of motives for deciding not to immunize Connolly. One motive was a good faith desire not to injure the investigation of Connolly that had been initiated and his possible criminal prosecution for, among other things, aiding and abetting Bulger's flight to avoid prosecution, which would be a violation of 18 U.S.C. § 1073 that had occurred within the statute of limitations. Oct. 16, 1998 Tr. at 17–19, 24. The government's decision concerning Connolly was also motivated in part by a desire to

keep information that might be helpful to Flemmi out of the record. *Id.* at 19–24.

Thus, the court held that because the government had one valid motive for its refusal to immunize Connolly, its conduct did not violate Flemmi's right to Due Process. *Id.* at 24–25. Therefore, his motion to compel the government to immunize Connolly or dismiss the case was denied. *Id.* at 29.

Connolly subsequently made certain public statements which caused the court to wonder whether he had become willing to testify without immunity. Oct. 27, 1998 Tr. at 32. Thus, the defendants were allowed to subpoena him again. Oct. 27, 1998 Tr. at 34. However, Connolly again properly asserted his Fifth Amendment privilege with regard to all substantive questions. Connolly Oct. 30, 1998 Tr. at 5–6.

As Connolly was unavailable to testify, the defendants moved to have some of Connolly's public statements admitted as evidence. *See* Ex. EEEEE (Defendants' Proffer of Declarations Against Penal Interest of Potentially Unavailable Witness John Connolly). Although the court was not required to apply the Federal Rules of Evidence in this proceeding, it utilized Rule 804(b)(3), and the related jurisprudence, including *Williamson v. United States*, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994), as a guide in deciding this motion. Oct. 23, 1998 Tr. at 33–38. As a result, Flemmi's motion was allowed in part and denied in part. More specifically, the court admitted the following public statements because they tended to expose Connolly to criminal liability and were adequately corroborated to be deemed sufficiently trustworthy to be considered. *Id.* at 36.

According to Connolly, the "FBI knew what [Flemmi and Bulger] were. They didn't have a paper route when [the FBI] first met them. All . . . Top Echelon informants are murderers. The government

put [Connolly] in business with murderers." *Id.* at 43.

Bulger and Flemmi "were guaranteed that they could run a gambling and loan-sharking operation." *Id.* at 38. Bulger and Flemmi "were indicted for things they were guaranteed they would not be indicted for." *Id.* at 46. The indictment in this case "charging Bulger and Flemmi with gambling and loansharking was a betrayal of the promises made to [them]." *Id.* at 44–45. However, "the minute [Connolly] told [the government] that [he] would testify to the fact that these people were authorized to run a gambling and loan-sharking business, the [government] did not want to hear from [him]." *Id.* at 42.

Connolly "hoped that Bulger was never caught." *Id.* at 43. "At least he kept his end of the bargain." *Id.* at 45. With regard to the government Connolly wondered, "What ever happened to keeping your word." *Id.* at 46.

## III. CONCLUSIONS OF LAW

1. *Flemmi's Motion to Dismiss or Suppress Based on Immunity*

A. *The Court is Now Considering Only the Issue of Immunity*

■ On December 29, 1997, the court allowed Flemmi's request for an evidentiary hearing on his motion to dismiss to the extent that the motion asserted that he was promised immunity from prosecution in return for his cooperation with the FBI. *See Salemme,* 1997 WL 810057, at *1 (Dec. 29, 1997). As the court wrote:

Federal Rule of Criminal Procedure 12(e) directs a court to decide a pretrial motion prior to trial unless there is good cause to defer a decision. In addition, Federal Rules of Criminal Procedure "12(e) and (g) clearly envision that a district court may make preliminary findings of fact necessary to decide the questions of law presented by a pre-trial motion so long as the court's findings on the motion do not invade the province of the ultimate finder of fact." *United*

*States v. Jones,* 542 F.2d 661, 664–65 (6th Cir.1976). *See also* 24 James Wm. Moore et al., *Moore's Federal Practice,* § 612.07[1] (3rd ed.1997). Moreover, a district court must decide a pretrial motion prior to trial if deferring a decision would adversely affect a party's right to appeal. *See* Fed.R.Crim.P. 12(e).

A claim of an enforceable promise of immunity which prohibits a particular prosecution presents an issue to be decided by the court rather than the jury. *See, e.g., United States v. McLaughlin,* 957 F.2d 12, 16 (1st Cir.1992)(holding that district court did not err in concluding, after an evidentiary hearing, that the immunity agreement between defendant and the government did not extend to the charge being prosecuted); *United States v. Rodman,* 519 F.2d 1058, 1059–60 (1st Cir.1975) *(per curiam )* (affirming a pretrial order dismissing an indictment because of bad faith of Securities and Exchange Commission ("SEC") official in promising to recommend no prosecution of defendant). *See also* Charles Alan Wright, *Federal Practice and Procedure* § 193 (2d ed. 1982) ("The third class of matters contemplated by Rule 12(b) are defenses and objections capable of determination without trial of the general issue.... These include ... immunity."). Thus, Flemmi's claim of immunity can be properly decided, by the court, prior to trial. Indeed, a pretrial ruling may be required to preserve the government's right to appeal pursuant to 18 U.S.C. § 3731 because in some circumstances a motion to dismiss granted at trial may constitute an acquittal for double jeopardy purposes. *See* 24 Moore, *supra,* at §§ 612.07[1] and 629.23. *See also United States v. Barletta,* 644 F.2d 50, 51–59 (1st Cir.1981) (discussing interaction of Fed.R.Crim.P. 12 and 18 U.S.C. § 3731).

*Id.* at *1–2.

■ With regard to immunity, if an individual is compelled to testify pursuant

to § 6002 *et seq.*, he is granted use immunity that is coextensive with his Fifth Amendment privilege and, therefore, protects the individual from prosecution through the use of the immunized testimony or evidence derived from that testimony. *See* 18 U.S.C. § 6002 (1994); *Kastigar v. United States,* 406 U.S. 441, 453, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). However, in exchange for his cooperation the government may also grant an individual "varying degrees of immunity in an informal agreement." *United States v. Dudden,* 65 F.3d 1461, 1467 (9th Cir.1995).

 Therefore, the government may in entering into an informal immunity agreement promise that an individual will not be prosecuted at all in exchange for his cooperation, which is generally called "transactional immunity." *Id.* at 1468; *United States v. McHan,* 101 F.3d 1027, 1034 (4th Cir.1996); *United States v. Eliason,* 3 F.3d 1149, 1152 (7th Cir.1993); *Rowe v. Griffin,* 676 F.2d 524, 526–27 (11th Cir.1982); *United States v. Harvey,* 869 F.2d 1439, 1443 (11th Cir.1989). Similarly, the government may agree to provide use and derivative use immunity coextensive with that granted by operation of § 6002, or only that an individual's statements will not be used directly against him. *United States v. Plummer,* 941 F.2d 799, 803–04 (9th Cir.1991); *United States v. Lyons,* 670 F.2d 77, 80 (7th Cir.1982). With regard to informal immunity, "[a] defendant's rights are determined by the terms and conditions of the bargain as found by the court." *United States v. McLaughlin,* 957 F.2d 12, 16 (1st Cir.1992).

It is the question of alleged immunity that the court is now addressing. It may be valuable to recognize, however, the related issues that are not now before the court, but which may have to be decided at trial, by a jury if there is sufficient evidence for the government to survive a motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29.

The court is not now considering Flemmi's intended public authority, or authorization, defense, "which may come into play when a defendant undertakes certain acts, reasonably relying on the statements of a government agent cloaked with actual authority." *United States v. Holmquist,* 36 F.3d 154, 161 n. 7 (1st Cir.1994). In essence, "[a]ctions properly sanctioned by the government are not illegal." *Baptista–Rodriguez,* 17 F.3d at 1368 n. 18.

Nor is the court now evaluating Flemmi's foreseeable defense of entrapment by estoppel, which:

> is predicated upon fundamental notions of fairness embodied in the Fifth Amendment's due process clause. Whether the prosecution of a defendant violates his due process rights depends not solely upon whether he was incorrectly informed or misled by a government official, but upon the totality of the circumstances surrounding the prosecution.

*United States v. Smith,* 940 F.2d 710, 714 (1st Cir.1991). *See also United States v. Ellis,* 168 F.3d 558, 561 (1st Cir.1999).

In addition, it is premature for the court to consider the merits of the defendants' foreseeable claim that the government has not proven the particular enterprise or precise conspiracies alleged in the Fourth Superseding Indictment. More specifically, as indicated earlier,

> In this case, the government must prove the precise RICO conspiracy, RICO Enterprise, and conspiracy to extort bookmakers and drug dealers which are at the heart of the Fourth Superseding Indictment. *See* 4SI counts 1 and 3. Any material variance in the proof of those charges should result in the defendants' acquittal. *United States v. Glenn,* 828 F.2d 855, 858–60 (1st Cir. 1987) (Breyer, J.) (dismissing drug conspiracy conviction due to variance between indictment and proof at trial); *United States v. Gorman,* 807 F.2d 1299, 1305 (6th Cir.1986) ("Variances which create a substantial likelihood that a de-

fendant may have been convicted of an offense other than charged by the grand jury ... are considered per se prejudicial."), *cert. denied,* 484 U.S. 815, 108 S.Ct. 68, 98 L.Ed.2d 32 (1987); *United States v. Snider,* 720 F.2d 985, 989–90 (8th Cir.1983) (reversing convictions due to variance between number of conspiracies charged and proven), *cert. denied,* 465 U.S. 1107, 104 S.Ct. 1613, 80 L.Ed.2d 142 (1984).

The Fourth Superseding Indictment charges that Bulger and Flemmi were integral members of each of the conspiracies alleged; indeed, they are two of the five named coconspirators. *See* 4SI, Count 1, ¶ 2 and Count 3. They are also two of the five named members of the alleged RICO Enterprise, one purpose of which, the government contends, was to coordinate the activities of the Patriarca Family and the Winter Hill Gang. *See* 4SI Count 1, ¶¶ 1(b)(2), 1(k); February 14, 1997 Bill of Particulars.

If informed that Bulger, as well as Flemmi, was cooperating with the government during the relevant period, it is foreseeable that the other defendants are likely to argue at trial that Flemmi and Bulger were government agents; that, therefore, they were not members of the conspiracies or RICO Enterprise alleged in the indictment, *see, e.g., United States v. Duff,* 76 F.3d 122, 127 (7th Cir.1996) ("[A]n agreement with an agent of the police is not a criminal conspiracy."); *United States v. Nason,* 9 F.3d 155, 161 n. 2 (1st Cir.1993) (citing *United States v. de Bright,* 742 F.2d 1196, 1198–1200 (9th Cir.1984)); and, thus, that the conspiracies and substantive RICO offenses charged in the indictment have not been proven. This defense may be particularly promising with regard to the RICO charges on which the government will be required to prove both the existence of the Enterprise alleged and its on-going effort to coordinate the activities of the Patriarca Family and the Winter Hill Gang, which Bulger and Flemmi are alleged to have

led. Similarly, if Bulger and Flemmi were informants, their codefendants are likely to contend that their statements may not be admitted under Federal Rule of Evidence 801(d)(2) because they were not truly coconspirators. *See United States v. Eisenberg,* 596 F.2d 522, 527 (2d Cir.1979) (holding that declarations of individuals acting as government informants may not be admitted on the theory that they are agents of defendants.).

Moreover, it is foreseeable that if both Bulger and Flemmi were secretly providing information to the government during the period relevant to this case, the defendants may contend that they have been entrapped or otherwise victimized by government misconduct.

*Salemme,* 978 F.Supp. at 353–54 (footnotes omitted).

Finally, the court is, of course, not now addressing the implications of Flemmi's valuable service to the government for the sentence that should be imposed if he is convicted. If that contingency occurs, the facts described in this Memorandum will undoubtedly generate a claim that Flemmi's case is not within the "heartland" contemplated by the Sentencing Commission when it promulgated its Guidelines and that Flemmi is entitled to a downward departure from the ordinarily applicable Guideline range. *See* 18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0.

## B. *The Applicable Standards Concerning Immunity*

"Since ... immunity-in-exchange-for-cooperation agreements are in the nature of contracts, their scope and effects are strongly influenced by contract law principles." *McLaughlin,* 957 F.2d at 16. Courts, however, "are not obliged to follow blindly the law of contracts in assessing ... cooperation agreements." *United States v. Carrillo,* 709 F.2d 35, 36 n. 1 (9th Cir.1983). *See also Plummer,* 941 F.2d at 802. Rather, as the Court of Appeals for

the Fourth Circuit said concerning plea agreements, in terms also applicable to immunity agreements in which individuals, among other things, relinquish Fifth Amendment rights:

> [T]he courts have recognized that [the rules relating to private contracts] have to be applied ... with two things in mind which may require their tempering in particular cases. First, the defendant's underlying "contract" right is constitutionally based and therefore reflects concerns that differ fundamentally from and run wider than those of commercial contract law. *See Mabry v. Johnson,* 467 U.S. at 509, 104 S.Ct. at 2548 (broken government promise that induced guilty plea implicates due process clause because it impairs voluntariness and intelligence of plea). Second, with respect to federal prosecutions, the courts' concerns run even wider than protection of the defendant's individual constitutional rights—to concerns for the "honor of the government, public confidence in the fair administration of justice, and the effective administration of justice in a federal scheme of government." *United States v. Carter,* 454 F.2d 426, 428 (4th Cir.1972).

*United States v. Harvey,* 791 F.2d 294, 300 (4th Cir.1986). *See also United States v. Streebing,* 987 F.2d 368, 372 (6th Cir.1993) (for the purposes of deciding whether to enforce a promise "a cooperation agreement is analogous to a plea bargain agreement.").

■ Thus, "[d]ue process requires the government to adhere to the terms of any plea bargain or immunity agreement it makes." *Harvey,* 869 F.2d at 1443. *See also United States v. Thompson,* 25 F.3d 1558, 1562 (11th Cir.1994); *United States v. Lua,* 990 F.Supp. 704, 709 (N.D.Iowa 1998). This principle is not disputed. Rather, the government represents that:

> The United States recognizes that Due Process requires that it adhere to the terms of any plea bargain or immunity agreement that it makes. *Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971) (plea agreement); *Bemis v. United States,* 30 F.3d 220, 221 (1st Cir.1994) (plea agreement); *Rowe v. Griffin,* 676 F.2d 524 (11th Cir. 1982) (immunity).

Gov. Post–Hearing Brief at 50–51. In essence, Due Process means that generally applicable principles of contract law must be applied, and if necessary modified, to assure that an individual is "not deprived of his liberty in any fundamentally unfair way." *Mabry v. Johnson,* 467 U.S. 504, 510, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984).

As indicated earlier, with regard to alleged immunity agreements, the court must first determine if a bargain was made. *Lua,* 990 F.Supp. at 710. If an agreement exists, a "defendant's rights are determined by the terms and conditions of the bargain as found by the court." *McLaughlin,* 957 F.2d at 16. *See also United States v. Hogan,* 862 F.2d 386, 388 (1st Cir.1988); *Plummer,* 941 F.2d at 805; *Dudden,* 65 F.3d at 1467.

■ Informal grants of immunity may be oral as well as written. *McLaughlin,* 957 F.2d at 16; *Harvey,* 869 F.2d at 1439;[66] *Lua,* 990 F.Supp. at 709. In addi-

---

**66.** The government does not contend that any immunity agreement that Flemmi had is not enforceable because it was not in writing and therefore is unenforceable under the statute of frauds, M.G.L. ch. 259, § 1, which requires that "an agreement not to be performed within one year" be memorialized in a writing and signed by, or on behalf of, the party to be charged. Any such contention would be unmeritorious for two reasons.

First, Flemmi claims, in effect, that he was promised that if he served the FBI as an informant he would not be prosecuted for crimes that he might commit. Flemmi's agreement to assist the government was of indefinite duration. It could have been performed in less than a year. Thus, even if the statute of frauds were deemed applicable, it would not require that Flemmi's agreement with the government be in writing. *See, e.g., Boothby v. Texon, Inc.,* 414 Mass. 468, 479, 608 N.E.2d 1028 (1993) ("The Statute of Frauds 'applies only to contracts which by their terms cannot be performed within the

tion, an informal immunity agreement may be express or implied from the conduct of the parties. More specifically:

> While a contract is made when the parties verbally express their mutual assent to its essential terms, it may also be implied when the parties' conduct manifests their agreement. *See* 1 *Restatement (Second) of Contracts* § 19 (1979).

*McHan,* 101 F.3d at 1034. *See also Lua,* 990 F.Supp. at 709. As the Supreme Court has explained:

> An agreement implied in fact is "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding."

*Hercules Inc. v. United States,* 516 U.S. 417, 424, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996) (quoting *Baltimore & Ohio R. Co. v. United States,* 261 U.S. 592, 597, 58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816 (1923)). Among other things, "[a]n implied-in-fact contract arises from '[c]onduct that would lead a reasonable person in the other party's position to infer a promise in return for performance or promise ....'" *Prescott v. Morton Int'l, Inc.,* 769 F.Supp. 404, 410 (D.Mass.1990) (quoting E.A. Farnsworth, *Contracts* § 3.10 at 124 (1982)).

■ " 'The rule requiring compliance by the government with promises made during plea bargaining and analogous contexts generally requires that the agent be authorized to make the promise.' " *Margalli–Olvera v. Immigration and Naturalization Serv.,* 43 F.3d 345, 353 (8th Cir. 1994) (quoting *Thomas v. Immigration and Naturalization Serv.,* 35 F.3d 1332, 1338 (9th Cir.1994)). *See also San Pedro,* 79 F.3d at 1068.

> In the law of agency, actual authority takes two forms: (1) express authority, and (2) authority that is implied or incidental to a grant of express authority. W. Edward Sell, *Sell on Agency* 25–31 (1985).

*Thomas,* 35 F.3d at 1338. *See also San Pedro,* 79 F.3d at 1068; *Margalli–Olvera,* 43 F.3d at 353.

■ Implied or incidental actual authority is derived from the express powers given to the agent. Generally, "authority to conduct a transaction includes authority to do acts which are incidental to it, usually accompany it, or are reasonably necessary to accomplish it." *Restatement (Second) of Agency* § 35 (1957). Actual authority is "created by acts of a principal ... that would *reasonably lead another* ... to believe that the other was authorized to act for the principal." *United States v. Greene,* 995 F.2d 793, 800 (8th Cir.1993) (citing *Restatement (Second) of Agency* § 7 at 28, § 7 cmt. c at 29–30, § 26 at 100, § 26 cmt. a at 101, § 26 cmt. b at 101–02 (1957)).[67] Thus, the existence

---

year. It does not apply to contracts which may be performed within, although they may also extend beyond, that period.' "); *Dunne v. Fall River,* 328 Mass. 332, 334, 104 N.E.2d 157 (1952); *Meng v. Trustees of Boston Univ.,* 44 Mass.App.Ct. 650, 652, 693 N.E.2d 183 (1998); Caroline N. Brown, 4 *Corbin on Contracts* § 19.3 (Joseph M. Perillo, ed., Rev.ed. 1997); E. Allen Farnsworth, *Contracts* § 6.4 (1990); *Restatement (Second) of Contracts* § 130, cmt. a. (1979).

More significantly, as stated previously, with regard to immunity agreements Due Process requires that generally applicable principles of contract law be modified if necessary to assure fundamental fairness. It is reasonable and consistent with usual practice to require that certain commercial contracts be embodied in signed, written documents. However, the government's agreements with its informants are highly confidential and are not ordinarily written. A requirement that such agreements be in writing could discourage many potential sources from cooperating with the government. In the circumstances, depriving Flemmi of the benefit of any bargain he may have with the government because of the lack of a written agreement would be fundamentally unfair.

**67.** Implied actual authority is different than apparent authority, which focuses on actions that create a reasonable belief *in a third person* that the putative agent has the authority to act for the principal. *See Hinchey v. NYNEX Corp.,* 144 F.3d 134, 141 (1st Cir. 1998).

of implied or incidental actual authority depends on whether the principal's actions would create the belief in a reasonable person that the principal had bestowed authority on that person. "Authority 'is generally implied when such authority is considered to be an integral part of the duties assigned to a[g]overnment employee.'" *Thomas,* 35 F.3d at 1340 (quoting *H. Landau & Co. v. United States,* 886 F.2d 322, 324 (Fed.Cir.1989)).

■ There are, however, circumstances in which Due Process may require that the government perform a promise made by an agent who exceeded his actual authority. As the Court of Appeals for the First Circuit has noted:

> courts on occasion have specifically enforced promises that would encroach on the jurisdiction of independent entities. *See, e.g., Palermo v. Warden,* 545 F.2d 286, 296 (2d Cir.1976).

*Bemis v. United States,* 30 F.3d 220, 221 n. 1 (1st Cir.1994). In general, those decisions are rooted in the principle that, "fundamental fairness and public confidence in government officials require that [the government] be held to 'meticulous standards of both promise and performance.'" *Palermo v. Warden,* 545 F.2d 286, 296 (2d Cir.1976) (quoting *Correale v. United States,* 479 F.2d 944, 947 (1st Cir.1973)). Thus, as the Court of Appeals for the First Circuit has written, for the purposes of determining whether an individual has been deprived of Due Process, "'the crucial question is not whether the Government had the authority to carry out the promise which [petitioner] claims he understood it to make, but whether it did in fact make such a promise.'" *Bemis,* 30 F.3d at 222 (quoting *United States v. Cook,* 668 F.2d 317, 320 (7th Cir.1982)).

This principle has been applied to informal immunity agreements, which, as previously described, have been regularly analyzed pursuant to the same principles as plea agreements. *See, e.g., United States v. Rodman,* 519 F.2d 1058, 1059–60 (1st Cir.1975) (dismissing on grounds

of fairness indictment of defendant based on unfulfilled promise of Securities and Exchange Commission attorney to recommend strongly no prosecution, where defendant made self-incriminatory statements, but there was no finding that they had been used against him directly or indirectly); *Carrillo,* 709 F.2d at 36–37 (enforcing promise by DEA agents that defendant would not be prosecuted if he cooperated in their investigation despite apparent lack of participation of a prosecutor in the promise or any evidence provided by defendant being used against him).

■ In addition, "under the self-incrimination clause of the fifth amendment, evidence of guilt induced by a government promise of immunity is 'coerced' evidence and may not be used against the accused." *Rowe,* 676 F.2d at 527. *See also Shotwell Mfg. Co. v. United States,* 371 U.S. 341, 347–48, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963); *United States v. Walton,* 10 F.3d 1024, 1028–31 (3rd Cir.1993); *United States v. Rogers,* 906 F.2d 189, 190–91 (5th Cir. 1990); *United States v. Swint,* 15 F.3d 286, 290 (3rd Cir.1994); *United States v. Conley,* 859 F.Supp. 830, 835–37 (W.D.Pa. 1994). If it is proven that a defendant was induced to make statements to the FBI because its agents caused him to have a reasonable, but erroneous belief that he had a valid immunity agreement with the government, a constitutional violation has been established and neither his statements nor any evidence derived from them may be used against him. *Oregon v. Elstad,* 470 U.S. 298, 305, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); *United States v. Byram,* 145 F.3d 405, 409 (1st Cir.1998).

■ When the government obtains evidence as a result of a formal or informal grant of use and derivative use immunity, and it appears that such evidence may have been misused to secure the defendant's indictment, the case against him must be dismissed unless the government proves by a preponderance of the evidence

that it had a legitimate, independent source for the information presented to the grand jury or, if the government cannot disprove taint, that the error was harmless beyond a reasonable doubt. *Kastigar*, 406 U.S. at 460; *United States v. Schmidgall*, 25 F.3d 1523, 1530–31 (11th Cir.1994) (*"Schmidgall I"*); *United States v. Schmidgall*, 25 F.3d 1533, 1538 (11th Cir. 1994) (*"Schmidgall II"*); *United States v. Bartel*, 19 F.3d 1105, 1112 (6th Cir.1994); *United States v. Palumbo*, 897 F.2d 245, 251 (7th Cir.1990); *United States v. Poindexter*, 951 F.2d 369, 377 (D.C.Cir.1991). If, however, statements were made involuntarily as a result of an unauthorized promise of immunity and used, directly or indirectly, to secure the defendant's indictment, the remedy is suppression at trial rather than dismissal of the case. *United States v. Calandra*, 414 U.S. 338, 345, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974).

### C. *Dismissal of This Case Is Not Now Justified Because Flemmi Was Not Promised Immunity From Prosecution*

██ Flemmi claims that he had an enforceable, unwritten agreement that he would not be prosecuted in return for his service as an FBI informant. Thus, he contends that this case should be dismissed for violating the immunity conferred on him by that agreement. As indicated earlier, this claim requires that the court initially determine, from the credible direct and circumstantial evidence, whether Flemmi and the government entered into any agreement and, if so, the terms of their bargain.

The court finds that the FBI agents primarily responsible for dealing with Flemmi, by word and deed, for thirty years, promised Flemmi protection in return for his service as an informant. The conduct of many other members of the FBI, including at least three ASACs, and the Chief of the Organized Crime Section at FBI Headquarters, contributed to creating, communicating, and performing the promise of protection to Flemmi. Flemmi reasonably relied on the FBI's promise of protection and, in return for it, provided very valuable assistance to the government in its war against the LCN, among other things.

Flemmi was not, however, explicitly or implicitly promised immunity from prosecution. The term immunity was never used in conversation with him. More importantly, Flemmi did not understand that the government, or any of its agents, had agreed that he would not be investigated, by the FBI or any other law enforcement agency, or prosecuted. Rather, he expected that the FBI would overlook some of his criminal activity, provide him information concerning any investigations that were conducted, and warn him of any imminent charges against him of which it learned. As set forth in this Memorandum, the FBI performed its part of the bargain. Thus, it is not necessary or appropriate to decide if the agents entering into this agreement were authorized to do so, or whether the agreement was not valid because it violated public policy or because it attempted to provide immunity for future criminal conduct.

More specifically, as described in detail in this Memorandum, Rico, Connolly, and Morris each told Flemmi that he would be "protected" in return for serving as an informant. §§ II.2, II.5, II.18, *supra.* Only Morris qualified this promise in any way by telling Flemmi, in effect, that he would be protected "as long as he did not clip anyone." § II.18, *supra.* As Flemmi testified, neither Rico nor Connolly ever used the word "immunity." §§ II.2, II.5, *supra.* Nor did Morris. § II.18, *supra.*

The conduct of Rico, Connolly, Morris, and many but not all of their colleagues at the FBI, expressed even more clearly than their words the FBI's agreement to protect Flemmi. Rico told Flemmi about other individuals who were cooperating with law enforcement so that Flemmi could be careful around them. § II.14, *supra.* In 1969, Rico advised Flemmi that he and

Salemme would soon be indicted and suggested that they flee promptly. § II.2, *supra.* In addition, as Rico promised, Flemmi was released on bail and the fugitive charges against him were dismissed when Flemmi followed Rico's advice and returned to Boston in 1974. § II.3, *supra.*

Connolly and Morris, individually and in tandem, also acted repeatedly to protect Flemmi. In 1977 or 1978, Connolly intimidated executives of National Melotone from pursuing their complaint that Bulger and Flemmi were extorting the company's customers. § II.7, *supra.* In early 1979, with their sources' consent, Morris and Connolly told O'Sullivan that Flemmi and Bulger were valuable informants and persuaded him, with the consent of Daly, not to indict them in the race-fix case, in part so they could contribute to the FBI's effort to bug 98 Prince Street. § II.9, *supra.* In 1979, Morris received reports from informants that Bulger and Flemmi were shaking down bookmakers, but no investigation was conducted. § II.10, *supra.*

In 1980, Connolly informed Bulger and Flemmi that the Lancaster Street Garage was bugged or confirmed this fact for them. § II.11, *supra.* In 1980, in a further effort to obtain needed assistance, Morris and Connolly told Flemmi and Bulger that any evidence intercepted at 98 Prince Street would not be a problem for them. *Id.* Bulger and Flemmi, they said, would be protected, rather than prosecuted, for anything captured by the bug the FBI hoped to place at 98 Prince Street. *Id.* Flemmi and Bulger were subsequently told when the bug at 98 Prince Street was installed and when it was removed so that they would not be intercepted. *Id.*

In 1982, Morris caused Connolly to tell Flemmi and Bulger that Halloran was cooperating with the FBI and had implicated them in the Wheeler murder. § II.13, *supra.* In an effort to protect Bulger and Flemmi, Morris and Connolly also identified for them at least a dozen other individuals who were either FBI informants or sources for other law enforcement agencies. § II.14, *supra.* McIntyre may have been among them. *Id.*

In 1984, Connolly received reliable information that Bulger and Flemmi were engaged in an ongoing extortion of the Rakes concerning the South Boston Liquor Mart, but neither recorded the information nor conducted any investigation. § II.15, *supra.* He did, however, share the information that he had received with Bulger. *Id.*

In 1984, Connolly also warned Flemmi and Bulger of the investigation, being led by the DEA, targeting them. § II.17, *supra.* He subsequently told them of the wiretap that had been placed on Kaufman's phone. *Id.*

In April 1985, at a dinner that may have been held to celebrate the success of the effort to protect Bulger and Flemmi by frustrating what had become a joint DEA–FBI investigation of them, Morris reiterated that they would not be prosecuted for anything on the 98 Prince Street tapes. § II.18, *supra.* He also said to them, in Connolly's presence, that "you can do anything you want as long as you don't clip anyone." *Id.*

In 1986, after tasking Flemmi to acquire information vital to the FBI's effort to bug Vanessa's, Connolly told him when the bug was installed so that Flemmi would not be intercepted. § II.20, *supra.* Connolly later told Flemmi when the bug had been removed. *Id.*

In 1988, Connolly advised Flemmi that Cox would be wired and would attempt to engage Flemmi in incriminating conversation. § II.26, *supra.* Also in 1988, Morris had Connolly warn Flemmi and Bulger to stay away from Bahorian, whose telephone was about to be tapped in an effort to acquire evidence against Flemmi, among others. *Id.* Morris later reiterated this warning directly to Bulger and Flemmi. *Id.* He also told Flemmi that he could keep him out of any indictment arising from the Bahorian electronic surveillance. *Id.* Although Bahorian and others were ultimately indicted, Flemmi was not. *Id.*

In 1988 or 1989, Connolly told Bulger that Timothy Connolly was cooperating with the FBI and would try to record conversations with Bulger and Flemmi. § II.28, *supra.* Bulger passed this warning on to Flemmi. *Id.*

After providing Connolly information to assist in the FBI's effort to recruit Mercurio as an informant, Flemmi was told when that initiative had succeeded. § II.29, *supra.*

Following his retirement in 1990, Connolly used his enduring connections with Quinn and other former friends and colleagues on the Organized Crime squad to obtain information concerning investigations that might have resulted in charges against Bulger and Flemmi. § II.32, *supra.* Connolly regularly shared the information he acquired with them. *Id.* In early January 1995, Connolly accurately advised Bulger that he and Flemmi would be indicted on about January 10, 1995. *Id.* This warning, which Bulger shared with Flemmi, facilitated Bulger's flight to avoid prosecution and would have done the same for Flemmi if he had acted on Connolly's advice immediately. *Id.*

While Rico, Morris, and particularly Connolly were at the hub of the protection promised and provided to Flemmi, many of their colleagues and superiors in the FBI also contributed by their conduct to that promise and to its fulfillment.

In 1977, Daly and Kennedy were told by Green that Bulger and Flemmi had threatened to kill him in connection with their attempt to collect a debt, but no effort was made to develop the reluctant Green as a witness against them. § II.7, *supra.* In 1979, Daly later joined O'Sullivan in agreeing to leave Bulger and Flemmi out of the race-fix indictment. § II.9, *supra.*

In 1982, the Boston FBI agents aware of Halloran's cooperation did not tell their counterparts in Oklahoma City, who had expressed interest in him, that Halloran was available to be interviewed. § II.13, *supra.* When agents from Oklahoma City sought to interview Bulger and Flemmi, ASAC Fitzpatrick successfully opposed this request, in part by falsely claiming that he had interviewed Bulger about the matter. *Id.*

In 1984, McWeeney, then the Chief of the Organized Crime Section at FBI Headquarters, told Connolly that the DEA was leading an investigation targeting Bulger and Flemmi. § II.17, *supra.* Connolly shared this information with his sources. *Id.*

In 1988, Rod Kennedy, Newton, their supervisor Ellavsky, and ASAC Potts provided Bulger and Flemmi protection concerning the on-going extortion of Slinger. § II.22, *supra.* Although Slinger was willing to wear a wire and testify against Flemmi and Bulger, after Ellavsky consulted Potts, the information that he provided was neither memorialized nor investigated. *Id.* Instead, Bulger was told that Slinger had spoken to the FBI. *Id.*

Bulger and Flemmi were also protected by the FBI in the successful investigation of Willis and others. § II.23, *supra.* Although in 1986 and 1987, Ellavsky and Blackburn received increasingly specific information that Bulger was extorting Willis, after Connolly was consulted no investigation of Bulger was conducted. *Id.* Nor was the information the FBI had received concerning Bulger shared with the other agencies involved in the joint investigation of Willis. *Id.*

Similarly, in 1987, when Lavin obtained photographs and other information indicating that City of Boston employees had illegally erected guardrails on the private property of the South Boston Liquor Mart, he consulted Connolly. § II.24, *supra.* After being advised that Bulger was a valuable informant, Lavin made no record of the information he had received and conducted no investigation. *Id.*

When Murray was interviewed by Quinn and Clark in 1989, he was either not asked about his allegations that Connolly and Newton were selling information concern-

ing electronic surveillance to Bulger and Flemmi or his responses were not recorded in the notes or 302 of the interview. § II.25, *supra*. ASAC O'Callahan, however, subsequently prepared a memorandum which the SAC, Ahearn, sent to FBI Headquarters stating that those allegations were unsubstantiated. *Id.* In addition, Murray evidently was not questioned in detail about the information he indicated that he had concerning Bulger's role in the Halloran murder, or Bulger and Flemmi's roles in the murder of Barrett. *Id.* Moreover, the information Murray did provide was not given to the FBI agents responsible for those murder investigations or indexed in a way that would permit them to find it. *Id.* Nor was any effort made to utilize the willing Murray as a source of information to be used against Flemmi, Bulger, or anyone else. *Id.*

Finally, the evidence indicates that members of the Organized Crime squad kept Connolly advised of at least some developments in the investigation of Flemmi and Bulger that was initiated after Connolly retired. § II.32, *supra*. Quinn, the supervisor of that squad, provided Connolly with highly confidential information concerning a threat to Connolly's former source Mercurio, and may have done the same regarding Flemmi and Bulger. *Id.* In any event, some member(s) of the FBI told Connolly the date that indictments in this case were expected. Connolly used that information to honor his promise to protect Bulger and Flemmi.

It should also be recognized, however, that agents of the FBI in Boston were not uniform in their conduct concerning Bulger and Flemmi. Knotts earnestly sought information to support the effort of the Massachusetts State Police to bug the Lancaster Street Garage. § II.11, *supra*. Brunnick, Montanari, and Cleary were genuinely attempting to investigate whether Flemmi and Bulger were responsible for the Callahan, Halloran, and Wheeler murders. § II.13, *supra*. Greenleaf sincerely attempted to insulate Connolly from

knowledge of the joint investigation of Flemmi and Bulger. § II.17, *supra*. Jordan and Stanley Moody targeted Flemmi as part of the Bahorian investigation. § II.26, *supra*.

Although advised by members of the FBI of virtually all of these investigations, and many others, Flemmi never claimed that they were improper because he had an agreement with the FBI that provided him with immunity from investigation by the FBI or any other agency, or from prosecution. Rather, when informed of the forthcoming indictments in the Fitzgerald bombing and Bennett murder cases, Flemmi fled. § II.2, II.3, *supra*. Twenty-five years later, Flemmi fled again when he was advised that he might soon be indicted with Yerardi. § II.32, *supra*. When told that O'Sullivan had agreed to leave him out of the race-fix case, Flemmi expressed gratitude, rather than assert that it would have been impermissible for him to have been indicted. § II.9, *supra*. As Flemmi testified, he viewed the tip that there was a wiretap on Kaufman's telephone as both a manifestation of the FBI's promise of protection and as part of the performance of that promise. § II.17, *supra*.

As Flemmi's conduct indicates, and as his testimony confirms, he always understood that his status as an FBI informant did not mean that he could not be investigated or prosecuted. §§ II.2, § II.9, § 11.17, *supra*. Rather, he only expected the sort of protection that Rico, Connolly, Morris, and many of their colleagues regularly provided to him for thirty years. That protection permitted Flemmi and Bulger to survive repeated efforts by various law enforcement agencies to investigate them and allowed them to profit from their contribution to the FBI's campaign to destroy the LCN. As Flemmi testified, the potential for such profit was valuable consideration for his services. § II.20, *supra*.

Accordingly, the court finds that Flemmi did not have either an express agreement

or an agreement implied in fact that he would not be prosecuted. It is, therefore, not necessary or appropriate to determine if the agents who, expressly and/or through their actions, promised Flemmi protection were authorized to do so. Nor, for the purposes of deciding the motion to dismiss must the court decide whether any such agreement would be void and unenforceable as against public policy because it was inherently "an agreement to achieve mutual benefit from the parties' cooperative violation of the law." *Kiely v. Raytheon*, 105 F.3d 734, 736 (1st Cir.1997).

Finally, although Flemmi rendered very valuable service to the government for thirty years, he did not rely to his detriment on an unfulfilled promise that he would not be prosecuted. He was promised protection and that protection was provided until January 1995. Thus, his motion to dismiss based on an alleged promise of immunity generally is being denied.

### D. *The Issues of Use and Derivative Use Immunity*

As an alternative to his motion to dismiss for a violation of his alleged agreement with the FBI that he would not be prosecuted, Flemmi asserts that he is entitled to direct and derivative use immunity concerning his statements to the FBI. With regard to this claim, the court concludes that Flemmi does not have immunity with regard to everything that he said to the FBI. However, the FBI's promise to maintain the confidentiality of Flemmi's service as an FBI informant also constitutes an enforceable promise not to use statements he made against him if disclosure of those statements would, as a practical matter, reveal that Flemmi had been an informant.

Therefore, Flemmi's statements that would identify him as an informant could not have properly been presented to the grand juries which indicted him. Circumstances suggest that it is doubtful that any such statements were used in this fashion. However, additional evidence will be required to resolve this question.

In addition, in the absence of a defense of public authority, or any other defense requiring presentation by Flemmi of some of his communications with the FBI, his statements to its agents that would identify Flemmi as an informant would not be admissible at trial. However, if, as represented, Flemmi relies at trial on some of his communications with the FBI, the court will, pursuant to Federal Rules of Evidence 106 and 611, permit the government to offer other statements of Flemmi to the Bureau in order to assure that the jury is presented with an appropriate record on which to decide fairly the merits of his defenses.

The promise of confidentiality that Flemmi received and reasonably relied upon does not alone preclude the government from making derivative use of his statements to the extent that such indirect use does not necessarily entail disclosure of Flemmi's informant status. However, as set forth in § III.1.D(3), *supra*, Flemmi does have an enforceable agreement that made it improper for the government to present the 98 Prince Street and 34 Guild Street interceptions, and any evidence derived from them, to the grand juries that indicted him. Although the Vanessa's interceptions were not presented to those grand juries, if any evidence derived from them was introduced, that too was improper. In this case, several witnesses before the grand jury read some or all of Flemmi's informant file. Thus, their testimony may have been impermissibly influenced by statements Flemmi made pursuant to valid promises of immunity. In addition, such statements may have been improperly utilized as investigatory leads, to identify witnesses or shape the questioning of them.

In the circumstances, a further hearing will be required to determine whether the case against Flemmi must be dismissed because the grand jury was exposed to evidence presented in violation of the promises of immunity to Flemmi. At this hearing the government will be required to

prove that the information it presented to secure the indictments of Flemmi was not tainted by showing that it had a legitimate, independent source for that evidence. If it cannot satisfy this burden, to avoid dismissal the government will have to prove that its error was harmless beyond a reasonable doubt. The required hearing will probably necessitate the production to Flemmi of the full transcripts of the grand jury proceedings.

Moreover, as discussed in § III.1.D(5), *supra*, there is substantial evidence suggesting that if, contrary to this court's conclusion, Flemmi does not have an enforceable agreement prohibiting the direct and indirect use against him of the statements that he made which the government used to obtain the warrants used to bug 98 Prince Street, Vanessa's, and 34 Guild Street, those statements were not voluntary, and their use against him, directly or indirectly, would therefore violate his constitutional rights under the self-incrimination and Due Process clauses of the Fifth Amendment. If this is true, neither Flemmi's statements nor any evidence derived from them may be used against him at trial. In addition, it may be appropriate for the court to decide whether this is one of the rare instances in which a case should be dismissed as an exercise of its supervisory powers or to afford the defendant the fundamental fairness to which he is entitled as a matter of Due Process. The parties have not, however, adequately addressed these issues, which have come into clear focus only as a result of the facts found in this Memorandum. Thus, the court will provide them an opportunity to present their views on these issues before deciding them.

(1) *Flemmi Does Not Have An Agreement Providing Use Immunity Generally For His Statements to the FBI* .

■■■ The mere fact that an individual is an informant does not mean that nothing he says to the FBI may be used against him as a matter of law. As Flemmi recognizes, to the extent that the courts have, in other contexts, recognized a common law "informant's privilege," it relates to protecting the informant's identity rather than the content of the informant's communication with law enforcement agents. Flemmi's Post–Hearing Memorandum in Support of Motion to Dismiss Indictment Based on Promise of Immunity at 40 n.15 (citing *Irons v. Federal Bureau of Investigation*, 880 F.2d 1446, 1450 (1st Cir.1989)). As the Court of Appeals for the District of Columbia Circuit wrote in *Westinghouse Elec. Corp. v. City of Burlington, Vt.*, 351 F.2d 762, 768 (D.C.Cir.1965), *Roviaro, supra*, establishes that: "Only the identity of the informer is privileged. The content of the communication is not privileged unless it would tend to reveal the identity of the informer."

In this case, the general question of whether what Flemmi said to the FBI could be used against him was never discussed with him. The term "immunity" was never used. In 1979, Flemmi was sufficiently concerned about what would be done with any evidence that might be intercepted at 98 Prince Street to ask about this issue. §§ II.11, *supra*, III.1.D(3), *infra*, This indicates that he did not believe that he had been previously promised use immunity generally.

As described in detail in this Memorandum, it was the practice of the FBI not to use an informant's statements against him, §§ II.2, II.5, II.8, II.16, II.20, II.21, II.33, *supra*, and this practice was followed with regard to Flemmi. This practice alone, however, did not establish an agreement that none of Flemmi's statements would ever be used against him, directly or indirectly. Thus, the motion to suppress all such statements and any evidence derived from them is not meritorious.

(2) *The Promise of Confidentiality Means Statements to the FBI Which Have the Effect of Identifying Flemmi as an Informant Cannot Be Used Against Him Unless His Defense Makes Them an Issue*

■■■ As the government recognizes, "the evidence adduced during the hearing

indicated that there was an understanding between Flemmi and the FBI that his status as an informant would be confidential." Apr. 6, 1999 Government's Submission Pursuant to Court's Mar. 28, 1999 Order at 65. Indeed, the evidence establishing that Flemmi was promised confidentiality is unequivocal and overwhelming. As each of the relevant witnesses beginning with Rico testified, the promise of confidentiality is at the "heart" of the FBI's relationship with all of its informants. It is an assurance that the Bureau regards as "sacred." Thus, as demonstrated by the matters described in this Memorandum concerning Flemmi, Bulger, Mercurio, Donati, and others, the FBI will rarely, if ever, disclose the identity of an informant even to Department of Justice attorneys without the source's consent.

Inherent in the promise of confidentiality is the assurance that no statement that would as a practical matter disclose the fact that the speaker is an FBI informant will be disclosed to any law enforcement officer or prosecutor. As statements directly or indirectly identifying an informant may not be disclosed, it necessarily follows that they may not be presented against him in any grand jury investigation or prosecution.

The promise of confidentiality made to an informant, however, does not alone assure him that no other use against him will be made of the information that he provides. To the extent that the use of information provided by an informant masks its source, that use is not inconsistent with the assurance of confidentiality.

The FBI was authorized to promise an informant confidentiality expressly and, therefore, to assure him implicitly that nothing he said would be used against him in a manner that would identify him as an FBI source. In essence, the Attorney General is authorized to appoint officials "(1) to detect and prosecute crimes against the United States; ... and (3) to conduct such other investigations regarding official matters under the control of the Department of Justice ..." 28 U.S.C. § 533 (1994). The FBI is in the Department of Justice. 28 U.S.C. § 531 (1994). The Attorney General has formally delegated to the Bureau the authority to "[i]nvestigate violations of the laws, including the criminal drug laws, of the United States and collect evidence in cases in which the United States is or may be a party in interest, except in cases in which such responsibility is by statute or otherwise specifically assigned to another investigative agency." 28 C.F.R. § 0.85(a) (1999).

The use of informants is a traditional and important means of detecting crime and developing the evidence necessary to prosecute criminals successfully. Confidentiality is recognized as critical to developing informants. *See, e.g., Roviaro v. U.S.*, 353 U.S. 53, 59, 77 S.Ct. 623, 1 L.Ed.2d 639 ("[B]y preserving their anonymity" citizens are encouraged to communicate their knowledge of crimes to law enforcement officials and thus promote the public interest in effective law enforcement.). Therefore, the FBI's authority to investigate crime naturally entails the power to develop and utilize informants.

There is no statute, regulation, or order that restricts the FBI's right to promise informants confidentiality. To the contrary, the Attorney General's Guidelines and other provisions of the FBI Manual expressly recognize that the FBI has that authority. As described more fully in § II.6, *supra*, FBI agents have long been instructed to advise every informant that the Bureau would "take all possible steps to maintain the full confidentiality of the informant's relationship with the FBI." Ex. 274 (Under Seal), Manual § 108 pt. I(C)(9)(d) (1–12–77). In addition, FBI agents have historically been instructed that "constant care should be exercised to avoid any disclosure to anyone which might result in identification of an informant or cast suspicion on an informant." *Id.* § 108 pt. I(C)(7) (1–12–77).

The FBI, as a practical matter, has delegated to an informant's handler and his supervisor the authority to make all decisions regarding the informant. § II.6, *supra.* Even since the issuance of the Attorney General's Guidelines in 1977, the handler and his supervisor have made the decisions and recommendations for which the SAC was, on paper, responsible. §§ II.6, II.21, *supra.* Thus, an agent, at least with the approval of his supervisor, could properly promise an informant confidentiality and, in the process, implicitly assure him that nothing he told the FBI would be used against him if doing so would disclose his cooperation with the FBI.

Flemmi understood that his relationship with the FBI would not be disclosed to anyone outside the Bureau without his consent. As described with particularity in this Memorandum, he was treated by the representatives of the FBI with whom he dealt primarily as a friend and ally rather than as an informant. He did not realize that he was ever opened or closed as an informant. Nor did he know that any of the information that he provided the FBI was being memorialized in writing. Flemmi was never told that anything he said to the FBI could be used against him.

The FBI's promise to Flemmi that his status as an informant would be kept confidential established an agreement that nothing that he said would be used against him if such use would entail identifying Flemmi as an FBI source. In return for this promise, among other things, Flemmi rendered very valuable services to the government. Therefore, it would have been a violation of that agreement for the government to have presented statements that could identify Flemmi as an FBI source to the grand juries that indicted him. As indicated earlier, additional evidence will be necessary to determine whether this was done and, if so, what remedy, if any, is required.

Ordinarily, it would also violate Flemmi's agreement with the government to permit any of his statements that might identify Flemmi as an informant to be admitted against him at trial, notwithstanding the fact that his relationship with the FBI is no longer confidential. In general, such statements would be inadmissible hearsay except for the fact that they were made by Flemmi himself. *See* Fed. R.Evid. 801(d)(2)(A).

In the instant case, Flemmi's history as an informant is now known. Flemmi did not, however, initiate the revelation that he was an informant. Having obtained Flemmi's indictment, the government disclosed his status to the magistrate judge in the process of seeking guidance concerning its discovery obligations. This court eventually found the sealed submissions and Orders relating to that request. Thus, the court asked Flemmi privately if he was willing to have his counsel and codefendants told that he was an informant. *See Salemme,* 978 F.Supp. at 351 n. 3; Apr. 16, 1997 Tr. at 118–22 (Under Seal). In the circumstances, an issue exists concerning whether Flemmi's acknowledgment that he was an informant can properly be characterized as a voluntary waiver of the rights that he had under his agreement with the FBI that his status would be kept confidential and statements attributable to him would not be used against him. *Cf. Roviaro,* 353 U.S. at 60, 77 S.Ct. 623 (with regard to the informer's privilege, "once the identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable.").

It is, however, not necessary to decide this question now. It is not clear whether the government will seek to introduce any of Flemmi's statements on the theory that he had voluntarily waived his right to confidentiality. More importantly, Flemmi has expressed his intention to contend at trial that his conduct now alleged to be criminal was authorized by the FBI. It is also foreseeable that he will rely on a claim of entrapment by estoppel, which like his authorization defense will require Flemmi

to present evidence of some of his communications with the FBI.

If Flemmi offers some of the written records of his statements to the FBI, the government will be entitled to introduce "any other part [of a particular document] or any other writing or recorded statement which ought in fairness to be considered . . ." Fed.R.Evid. 106. Thus, the government may introduce additional documents reflecting Flemmi's statements if " 'necessary to qualify' " the documents, or portions, of them introduced by Flemmi. *United States. v. Branch,* 91 F.3d 699, 728 (5th Cir.1996) (quoting *United States v. Pendas–Martinez,* 845 F.2d 938, 944 (11th Cir.1988)).

"While Rule 106 by its terms applies only to writings and recordings, the principle of completeness embodied in the Rule has been applied to the introduction of oral out-of-court statements as well." 1 S. Saltzburg, *Federal Rules of Evidence Manual* (7th ed.1998) at 99. In essence, Federal Rule of Evidence 611(a) "imposes an obligation for conversations similar to what Rule 106 does for writings." *Branch,* 91 F.3d at 728 (citing *United States v. Haddad,* 10 F.3d 1252, 1258 (7th Cir.1993) and *United States v. Castro,* 813 F.2d 571, 576 (2d Cir.1987)). Accordingly, as the Court of Appeals for the Second Circuit said in *Castro:*

> whether we operate under Rule 106's embodiment of the rule of completeness, or under the more general provision of Rule 611(a), we remain guided by the overarching principle that it is the trial court's responsibility to exercise common sense and a sense of fairness to protect the rights of the parties while remaining ever mindful of the court's obligation to protect the interest of society in the "ascertainment of the truth." Fed.R.Evid. 611(a).

813 F.2d at 576.

Accordingly, although Flemmi may otherwise have a right to preclude his statements to the FBI that could disclose his status as an informant from being offered against him at trial, if he persists in his intention to introduce some of those statements himself, the government will be permitted to offer any of his other statements that are necessary to the fair "ascertainment of truth."

### (3) *Flemmi Had an Enforceable Agreement Relating to 98 Prince Street, Vanessa's, and 34 Guild Street*

 Flemmi also contends that he was, expressly and implicitly, promised that in return for his contributions to the bugging of 98 Prince Street that none of the evidence intercepted there would be used against him, directly or indirectly, and this promise is enforceable. As set forth below, this contention is correct. In addition, Flemmi asserts that he had an agreement implied in fact from the promise concerning 98 Prince Street and the conduct of the government that there would be no direct or indirect use against him of the intercepted evidence that he helped the FBI obtain at Vanessa's and 34 Guild Street. This assertion is also accurate.

Contrary to the government's claim, the FBI agents who dealt with Flemmi had the actual authority to grant the immunity promised to him. As described in detail below, the cases in which promises of informal immunity made by agents without the involvement of any prosecutor have been held to be unenforceable are distinguishable from the instant case in decisive respects. More specifically, they each involved individuals who were under active investigation or arrest and asked to cooperate in a discrete matter rather than persons, like Flemmi, approached and cultivated to serve as long term informants. *See, e.g., United States v. Kettering,* 861 F.2d 675, 676 (11th Cir.1988) (indicted defendant); *United States v. Hudson,* 609 F.2d 1326, 1327 (9th Cir.1979) (individual under arrest); *Streebing,* 987 F.2d at 371 (target of investigation).

In addition, in the foregoing cases, relief was denied in part because the govern-

ment did not use the defendant's statements directly or indirectly against the defendant, either in presenting the case to the grand jury or in prosecuting the case at trial, and it was, therefore, found that he had not relied to his detriment on the law enforcement agent's promise. *Kettering*, 861 F.2d at 678–80; *Hudson*, 609 F.2d at 1329; *Streebing*, 987 F.2d at 372–73. In contrast, evidence intercepted at 98 Prince Street and 34 Guild Street was presented to the grand juries which indicted Flemmi. Derivative use of that evidence, and of the evidence intercepted at Vanessa's, may also have been made to secure Flemmi's indictment. Moreover, the government proposes to introduce the interceptions from 98 Prince Street, Vanessa's, and 34 Guild Street against Flemmi at trial.

As described in § II.11, *supra*, when Morris and Connolly asked Flemmi and Bulger to go to 98 Prince Street to acquire information on the layout of the premises, including the doors, locks, and security devices, in order to assess the feasibility of installing a bug, Flemmi and Bulger expressed two concerns. One was a well-founded fear for their safety. The other concern was about what would be done with any evidence intercepted at 98 Prince Street regarding Bugler and Flemmi.

As described in § II.11, *supra*, Morris and Connolly assured Bulger and Flemmi that the 98 Prince Street tapes would not be a problem for them. Flemmi Aug. 26, 1998 Tr. at 184–86, Aug. 20, 1998 Tr. at 43–45. They said Bulger and Flemmi would be protected for anything picked up on those tapes, rather than prosecuted. *Id.* These assurances were not qualified in any way.

Thus, Flemmi understood that nothing on the 98 Prince Street tapes would be used against him. Flemmi Aug. 26, 1998 Tr. at 189–90. This understanding was reasonable. *Hogan*, 862 F.2d at 388. Flemmi relied on it in going to 98 Prince Street to obtain the logistical information that the FBI requested and in providing additional information that the government

used to obtain the warrant to bug 98 Prince Street.

■■ Moreover, in view of what Flemmi was told, and the fact that neither Morris nor Connolly said that indirect use of the evidence intercepted at 98 Prince Street would be made against him, it was fair for Flemmi to understand that if he helped the FBI in its effort to bug 98 Prince Street, he would not be harmed in any way, including by the derivative use of evidence intercepted there. This conclusion is reinforced by the principle that:

*The common understanding of "use immunity" in the criminal justice world is that it encompasses derivative use immunity.* Although, the Supreme Court's thorough discussion of use immunity in *Kastigar* carefully distinguishes between use immunity and the broader derivative use immunity, 406 U.S. at 442, 450, 453, 92 S.Ct. at 1655, 1659, 1661, the two now almost always arise together in federal courts; statutory immunity, requiring both use and derivative use immunity, 18 U.S.C. § 6002, is much more common than informal immunity. Consequently, it is not uncommon for courts to define use immunity as including derivative use immunity even when informal, rather than statutory, immunity is involved. *See, e.g., United States v. Pelletier*, 898 F.2d 297, 302 (2d Cir.1990) ("The specific terms of these agreements contemplated use, rather than transactional, immunity and thus prohibited the government's direct or derivative use of the immunized testimony."); *United States v. Harvey*, 869 F.2d 1439, 1444 (11th Cir.1989) ("Use immunity prohibits the use of compelled testimony, or any evidence derived directly or indirectly from that testimony, against the witness in a criminal prosecution."). Even Special Agent Gary F. Deak, who participated in the interview of Mr. Plummer, testified that in five years experience he had "never been involved with an immunity that allowed for the use of the

fruits of the leads. So I wouldn't even have any occasion to consider that."

*Plummer*, 941 F.2d at 804 (emphasis added). Therefore, as the Court of Appeals for the Ninth Circuit has stated, "if the government informally promises that ... statements will not be used against the defendant, it is also precluded from using the statements to uncover other incriminating evidence, unless the agreement expressly provides otherwise." *Dudden*, 65 F.3d at 1467.

The promise made to Flemmi and Bulger, in 1980, concerning the interceptions at 98 Prince Street was reaffirmed in 1985. § II.18, *supra*. At the April 1985 dinner at Morris' home, Flemmi and Bulger, knowing that they had been discussed in some of the conversations intercepted at 98 Prince Street, again questioned whether the information on those tapes might be used against them in any investigation or prosecution. Flemmi Aug. 20, 1998 Tr. at 14–15, Aug. 26, 1998 Tr. at 153–56. Once again, Morris and Connolly told them not to worry because they would not be prosecuted for anything on the tapes. *Id.* Morris went on to tell Bulger and Flemmi, "you can do anything you want as long as you don't clip anyone." *Id.;* Ex. 92, ¶ 2.

■ The FBI generally, and Morris and Connolly particularly, had implied actual authority to make the foregoing promise of immunity to Flemmi and Bulger. The authority to grant immunity is shared, rather than vested solely in the United States Attorney. A statutory grant of immunity may be sought by the United States Attorney only with the approval of the Attorney General or another, specified high official of the Department of Justice. 28 U.S.C. § 6003 (1994). The Attorney General and the United States Attorney each have independent statutory authority to prosecute federal crimes. *Thomas*, 35 F.3d at 1339; 28 U.S.C. §§ 515(a), 547 (1994). Incidental to that, each also has the implied actual authority to enter into plea bargains and comparable agreements, including agreements to grant immunity

informally, without the participation of the other. *Id.*

As described in § III.1.D(2), *supra*, the Attorney General's power to investigate and prosecute criminal activity is delegable to agencies within the Department of Justice. 28 U.S.C. §§ 510, 533 (1994). The power to investigate violations of federal law generally has been delegated to the FBI. 28 C.F.R. § 0.85 (1999). The authority to investigate federal crime inherently entails the power to develop and utilize informants.

As indicated in § II.6, *supra*, there is no statute that prohibits the Attorney General from delegating to the FBI his power to informally promise use immunity, among other things, to informants. Nor is there any statute that prohibits the FBI from receiving or exercising such authority.

In addition, there is no regulation, having the force of law, which prohibits the FBI from properly promising an informant use immunity to obtain or maintain his services. This contrasts with the power of the Attorney General to admit individuals to the Witness Protection Program which, during the relevant period, by regulation, was expressly and exclusively delegated to the United States Marshals Service. *See* 28 C.F.R. § 0.111(C) (1979); Department of Justice Order OBD 2110.2 P 7(d) (Jan. 10, 1975); *Civiletti*, 635 F.2d at 90; *Thomas*, 35 F.3d at 1339. As the Court of Appeals for the Ninth Circuit has said:

> *Doe v. Civiletti*, 635 F.2d 88, 90 (2d Cir.1980), holds that the oral representations of a Strike Force Justice Department attorney and a DEA agent did not commit the Marshals Service with regard to the Witness Protection Program. Their lack of authority was express, under an Attorney General's order that attorneys and others "are not authorized" to make such commitments, which were to be made by "authorized representatives of the U.S. Marshals Service only." *Id.* No comparable order or oth-

er express restriction of authority has been shown to us in this case. *Thomas*, 35 F.3d at 1339. Similarly, no comparable order or express restriction on the Attorney General's power to delegate to the FBI the authority to grant informants immunity informally has been shown in the instant case.

This conclusion is not qualified by the existence of the Levi Guidelines, which were part of the FBI Manual in 1980 when Morris and Connolly promised Flemmi that the information intercepted at 98 Prince Street would not be used against him. "[T]he Supreme Court [has] held that intra-office manuals, unlike official regulations, have no legal force." *Kugel v. United States*, 947 F.2d 1504, 1507 (D.C.Cir.1991) (citing *Schweiker v. Hansen*, 450 U.S. 785, 789, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981)). Consistent with this principle, the Guidelines did not have the force of law. Rather, as was understood when they were issued in 1976, and as expressly clarified in 1981, the Guidelines did not "create any rights ... enforceable at law" or "place any limitations on otherwise lawful investigative and litigative prerogatives of the Department of Justice," including the FBI. Ex. 274 (Under Seal), Manual § 137–17(N) (1–12–81). *See also Kugel,* 947 F.2d at 1507.

As described in § II.6, *supra,* prior to the issuance of the Levi Memorandum, the Department of Justice did not have any institutionalized role in the FBI's use of informants. It appears, however, that the FBI occasionally sought legal advice from the Department of Justice on issues relating to them. For example, from at least 1961 until the issuance of the Levi Memorandum the FBI's Manual of Instructions stated that:

> On 7–10–52 the Department furnished an opinion regarding the question whether an informant could be prosecuted for technically violating the law while attempting to obtain evidence regarding a Federal violation. The Department stated "... If the intent throughout was

to assist the government agents in the enforcement of the law, and not to violate or to 'cover-up' for a violation of the law, it is not believed a case for prosecution could be made against such an informer ...."

> *The procedures to be followed by informers working under the supervision of your agents in the aid of enforcing the statutes coming within your jurisdiction largely rests upon your sound discretion .... It is not believed that an informer would be otherwise immune from prosecution for actions which would subject a Federal enforcement officer to prosecution.*

*Id.* § 108(K) (10–13–61) (emphasis added); Ex. 275 (Under Seal). Prior to the promulgation of the Levi Memorandum, the Manual of Instructions also included the direction that:

> *Care must be exercised in attempting to persuade individuals to act as informants to avoid any allegations of undue influence. An individual who is in custody* and who offers to furnish information generally does so in the hope that he will receive some consideration in return. *Bureau agents cannot promise any immunity* or any reduction in sentence *to a criminal* who furnishes information and they must not put themselves in a situation where they might subsequently be accused of having done so.

*Id.* § 108(D)(4)(11–29–55 through 5–13–76) (emphasis added).

Read together, these provisions, among other things, indicate that prior to the Levi Memorandum the procedures to be employed in dealing with informants were at all times in the sole discretion of the FBI. Consultation with Department of Justice attorneys was not required. Indeed, such consultation with regard to an identified individual would have been inconsistent with the historic direction to FBI agents that: "Constant care must be exercised to avoid any disclosure *to any-*

*one* which might permit identification of a criminal informant or even cast suspicion on a criminal informant." *Id.* § 108(I)(8)(12–11–59). FBI agents were admonished not to promise immunity or a reduction of sentence to "criminals" *in custody* whose cooperation was being sought. The FBI could, however, authorize informants who were not incarcerated to engage in what would otherwise be criminal activity without the involvement of Department of Justice attorneys. *Id.* § 108(K) (10–13–61).

The Levi Guidelines also recognized that the handling of FBI informants remained solely the responsibility of the FBI. More specifically, the Levi Memorandum stated that:

Informants as such are not employees of the FBI, but the relationship of an informant to the FBI *imposes a special responsibility upon the FBI* when the informant engages in activity where he has received, or reasonably thinks he has received, encouragement or direction from the FBI.

*Id.* § 137–17(N)(1–12–77) (emphasis added). As this statement reflects, the Attorney General understood that the Department of Justice had no role or responsibility in giving FBI informants direction or in providing the assurances that might be necessary to influence informants to follow those directions. That was solely the responsibility of the FBI, which was advised by the Attorney General to be careful in exercising its authority.

Consistent with the Attorney General's understanding, the Levi Guidelines provided no role for Department of Justice attorneys with regard to FBI informants. The FBI alone retained the power to decide whether to use someone as an informant. *Id.* § 108 pt. IV(A)(5)(1–12–77)

Similarly, the Levi Guidelines indicated that the FBI alone—without the involvement of any prosecutor—could authorize informants to engage in criminal activity.

More specifically, the Levi Guidelines provided that informants be instructed that:

in carrying out their assignments they shall not:

(4) participate in criminal activities of persons under investigation, *except insofar as the FBI determines* that such preparation is necessary to obtain information needed for purposes of federal prosecution.

*Id.* § 108 pt. IV(3)(4) (emphasis added). *See also Kentucky v. Long,* 837 F.2d 727, 732–33 (6th Cir.1988) (Chief of FBI Criminal Informant Unit testifies that one instruction in the Levi Guidelines was "that the informant is to be told that he or she is not to engage in any illegal activity *unless they are authorized to do so by the FBI.*") (emphasis added).

Moreover, after the issuance of the Levi Guidelines the FBI Manual continued to advise agents to "avoid any disclosure to *anyone*"—including prosecutors—"which might result in the identification of an informant . . ." Ex. 274 (Under Seal), Manual § 108 pt. I(C)(7) (1–12–77) (emphasis added). As reflected throughout this Memorandum, the FBI as an institution and each of its agents was dedicated to not disclosing an informant's identity to any prosecutor without the source's consent. Department of Justice attorneys accepted the fact that the FBI would not disclose or discuss its informants with them unless authorized to do so by the informant. As Weld, the former United States Attorney and Assistant Attorney General, most colorfully put it: "In general, if I as a political appointee had gone to the Bureau and said, 'Tell me who your informants are,' I would have expected them to tell me to 'go pound sand.'" Weld May 26, 1998 Tr. at 133.

As a practical matter, a prosecutor could not, and would not, participate in granting a person immunity without knowing that individual's identity. Thus, implicit in the acceptance by the Attorney General and his subordinates of the principle that the FBI was never required to disclose to

them the identity of an informant was recognition that the FBI was not required to consult them concerning informal promises of immunity made to its sources. Indeed, the government has in at least one other case implicitly acknowledged that FBI agents have the authority to promise potential cooperating individuals immunity. *Conley*, 859 F.Supp. at 859 n. 6. As the court in *Conley* stated, "[T]he Government has not argued or attempted to prove that [FBI Special Agent] Donnelly's promise was not authorized by a prosecutor. The Court notes the impracticality that could be visited upon potential agent-informant relationships absent promises such as [FBI Special Agent] Donnelly's promise." *Id.*

The Levi Guidelines did attempt to provide guidance to the FBI concerning the exercise of its power to confer immunity. They did not, however, require that prosecutors be consulted if a promise of immunity were contemplated. Rather, they indicated that agents were discouraged, but not prohibited, from promising immunity themselves. More specifically, the Levi Guidelines stated, in language that endured at least until 1984, that:

> Agents *should not* exercise undue influence in developing informants including promising immunity or reduction of sentence to criminals who furnish information.

Ex. 274 (Under Seal), Manual § 108(I)(C)(6) (1–12–77); § 137–3(6) (1–31–78); § 137–(3)(6) (4–2–79); § 137–5(4) (1–12–81); § 137–5(4) (9–20–82); § 137–5(4) (3–28–84) (emphasis added). *Compare, id.* § 108(D)(4) ("No active military personnel *can* be developed as informants") (emphasis added). As the analysis in § III.1.D(5), *infra*, indicates, the Attorney General's admonition concerning a promise of immunity constituting a form of "undue influence" was wise. It did not, however, operate to limit legally the FBI's power to promise an informant immunity.

If the Attorney General intended to entrust the FBI with the authority and discretion to develop informants, but prohibit the FBI from promising them use immunity if necessary to secure their valuable services, he could and should have done so clearly in a public, legally binding regulation or Order. As indicated earlier, such an Order was employed to prohibit United States Attorneys from promising admittance to the Witness Protection Program and to put interested individuals on notice that prosecutors lacked that authority. *See* Department of Justice Order OBD 2110.2, P 7(d) (Jan. 10, 1975). In contrast, the Levi Guidelines, which the government has insisted remain under seal in this case, were neither legally binding nor generally available to the public. Moreover, as indicated earlier, they did not even state to agents that the FBI lacked the authority to promise its informants immunity.

These features of the Levi Guidelines were not inadvertent oversights or the result of inartful drafting. Rather, as described in § II.6, *supra*, the FBI has traditionally operated with great independence from the Attorney General. It has been particularly fierce in protecting its prerogatives concerning informants. While the Levi Guidelines were an initial effort to provide guidance to the FBI in exercising its authority, they did not impose any legal limitations on the Bureau's power to promise long term informants immunity.

Virgil Young, the Assistant Section Chief and Unit Chief of the Criminal Informant and Witness Security Programs Unit of the FBI, testified in another case that from the FBI's perspective, "the Levi Guidelines were unclear in many respects, with the result that a great deal of discretion was given to individual agents." *Long*, 837 F.2d at 732. As an example of this Young cited the fact that the Levi Guidelines did not "say that a particular agent can authorize [an informant's participation in illegal activity] or can't authorize it, nor does it say that authorization [is] required by a special agent in charge or any other specific individual." *Id.* at 732–33. Thus, at least from 1977 to 1981, the

FBI interpreted the Levi Guidelines to allow any agent or his supervisor to authorize an informant to participate in otherwise illegal activity. *Id.* at 733.

The evidence in this case demonstrates that Connolly and Morris had comparable, implied actual authority to promise Flemmi immunity. §§ II.6, II.16, II.21. As Potts, the former Acting Deputy Director of the FBI, testified, the supervisor of the handling agent was generally the FBI's "chief decision maker" regarding informants. Potts May 22, 1998 Tr. at 7. As Greenleaf testified, the SACs generally relied completely on the informant's handler and his supervisor even for making decisions and recommendations for which SACs were responsible under the Guidelines. Greenleaf Jan. 8, 1998 Tr. at 136–40. In Potts' experience, Headquarters never reversed recommendations from a field office that an individual be used, or continued, as an informant. Potts May 22, 1998 Tr. at 6–8. Nor is there any evidence that FBI Headquarters ever inquired about what promises had been made to informants generally or to Flemmi and Bulger particularly.

As described earlier, the FBI urged agents and their supervisors to use "a dynamic and imaginative approach in developing" the Top Echelon informants necessary to combat Organized Crime. Ex. NN (Under Seal), Manual § 108 pt. III(B) (1–12–77); § 137–12(2) (4–12–79). In 1980, Morris and Connolly would have reasonably understood that they had, even under the Levi Guidelines, the power to authorize Flemmi and Bulger to engage in criminal activity in connection with their service as informants. When Bulger and Flemmi sought assurance that any evidence that might be obtained if 98 Prince Street was successfully bugged would not be used against them, it was, in view of all of the relevant circumstances, reasonable—and indeed correct—for Morris and Connolly to believe that they also had the

actual authority to promise that immunity in order to obtain the critical assistance they were seeking from Flemmi and Bulger. *Restatement (Second) of Agency* § 35 (1957); *Greene*, 995 F.2d at 800; § III.1.B, *supra.*[68]

The conclusion that Morris and Connolly had actual authority to promise the FBI's longstanding informants, Flemmi and Bulger, that any evidence obtained if 98 Prince Street was bugged would not be used against them is not inconsistent with the cases on which the government relies. Those cases are distinguishable from the instant case in material respects. Indeed, the analysis employed in those cases concerning both authority and detrimental reliance reinforces this court's conclusion concerning the enforceability of the agreement regarding 98 Prince Street, and the importance of the issues of Due Process and involuntariness discussed, in § III.1.D(5), *infra.*

The government has long relied primarily on *Streebing, supra,* and *Kettering, supra. See, e.g., Salemme* 1997 WL 810057 at *2 (Dec. 29, 1997). *Kettering* involved an indicted defendant rather than an informant. 861 F.2d at 676. The defendant and his attorney met with a DEA agent to discuss Kettering's case. *Id.* The information that he provided was never recorded in a DEA report. *Id.* Kettering's attorney gave the DEA a proposed letter agreement pursuant to which Kettering would plead guilty not to the indictment against him, but to a single count information involving no mandatory minimum sentence. *Id.* The DEA agent consulted the Assistant United States Attorney handling the case concerning the proposed plea agreement. *Id.* The prosecutor felt that the proposed sentence was too low and promptly informed Kettering's attorney that the proposed agreement was unacceptable. *Id.*

---

**68.** Morris testified that he did not believe that he had the power to confer immunity. Mor-

ris Apr. 29, 1998 Tr. at 48–50. The court finds that this testimony is not credible.

Kettering subsequently claimed, however, that the discussions with the DEA agent had generated an enforceable plea agreement. *Id.* at 676–77. The District Court held that the defendant had failed to establish that the DEA agent had the authority to enter into a plea agreement, despite his mistaken belief that he could do so. Thus, the District Court denied the motion to dismiss. *Id.*

The Court of Appeals for the Eleventh Circuit treated the issue of authority as a factual question and found that the District Court's finding of a lack of authority was not clearly erroneous. *Id.* This was one ground for affirming its decision. *Id.* at 677–78. The Eleventh Circuit observed, however, that "if the defendant's cooperation was induced by the misrepresented plea agreement, the court could determine whether the statements were involuntary and, if so, exclude them at trial." *Id.* at 679 (citing *United States v. Coon,* 805 F.2d 822, 824–25 (8th Cir.1986)). This principle as applied to Flemmi is addressed in § III.1.D(5), *infra.*

In *Kettering,* the Eleventh Circuit also stated that, "all attorneys (prosecutors and defense counsel) and government agents should exercise great care in making certain that defendants are apprised of limitations in authority and the rules surrounding such negotiations." *Id.* at 678 n. 2. In the instant case, Flemmi did not have an attorney and neither Morris nor Connolly suggested that there was any limitation on their authority to promise that any evidence intercepted at 98 Prince Street would not be used against him.

In addition, and significantly, in *Kettering* the Eleventh Circuit did not rely solely on the agent's lack of authority in refusing to find that an enforceable agreement existed. Rather, the court also relied on the fact that the defendant had failed to establish any prejudicial reliance because neither his statements nor any fruits of them were used against him. *Id.* at 678–79 & n. 3. As the court wrote, "The United States Supreme Court in *Mabry v. Johnson,* 467

U.S. 504, 104 S.Ct. 2543, 81 L.Ed.2d 437 ...(1984) stated that as long as the defendant is not in a worse position, there is no detrimental reliance." *Id.* at 680. The Eleventh Circuit held that "[a]ny statements [Kettering] made while cooperating with [the DEA agent] could be excluded in subsequent proceedings." *Id.* Thus, his cooperation "did not place him in a position where restoration of the status quo ante would be impossible." *Id.* at 679.

In contrast, Flemmi relied on the assurance that any evidence intercepted at 98 Prince Street would not be used against him. He performed his part of the bargain and rendered a very valuable service to the government by providing information that was significant for the feasibility of bugging 98 Prince Street and that was used to establish that the issuance of a warrant to do so was appropriate. Nevertheless, evidence intercepted at 98 Prince Street, and perhaps information derived from it, was presented to the grand juries that indicted Flemmi, and the government proposes to introduce the 98 Prince Street tape-recordings at trial. Thus, Flemmi's case is not comparable to Kettering's.

Similarly, *Streebing* involved statements to FBI agents by an individual who knew that he was the target of their investigation. *Streebing,* 987 F.2d at 371. The defendant claimed that the agents promised that he would not be prosecuted if he spoke to them. *Id.* The court, however, found that no such promise was made. *Id.* Rather, the defendant was told explicitly that a prosecutor would have to decide if he would be indicted. *Id.* at 371–72. In addition, the government represented that none of the defendant's statements had been presented to the grand jury and stipulated that none would be used at trial. *Id.* at 372.

Accordingly, Streebing's motion to dismiss the charges against him as an exercise of the court's supervisory powers was denied because he was not promised that he would not be prosecuted; the FBI

agents lacked the actual or apparent authority to make such a promise; and the defendant did not rely to his detriment on the purported promise. *Id.* at 372–73. Essentially, for the reasons described with regard to Kettering, Flemmi's claim concerning 98 Prince Street is distinguishable from Streebing's claim.

The other cases that the government relies on for the purported proposition that as investigatory agents Morris and Connolly lacked authority to promise Flemmi that evidence obtained from the bugging of 98 Prince Street are inapposite for similar reasons. None involves an individual who, like Flemmi, served as an FBI informant long before being indicted or targeted for investigation·by the FBI. *See, e.g., Hudson,* 609 F.2d at 1327 (arrested defendant); *United States v. Williams,* 780 F.2d 802, 803 (9th Cir.1986) (target of investigation); *Johnson v. Lumpkin,* 769 F.2d 630, 632 (9th Cir.1985) (convicted individual); *Lua,* 990 F.Supp. at 707 (individual offered brief opportunity to be a witness rather than a defendant in a murder case). As explained previously, the FBI has been granted exclusive authority to recruit informants from the general population and to provide them the assurances necessary to obtain their services. The courts have understandably found that law enforcement agents do not have the same, unqualified authority when the judicial process has been invoked and government attorneys are already involved in the matter or must be imminently. *Hudson,* 609 F.2d at 1327–28; *Williams,* 780 F.2d at 803; *Johnson,* 769 F.2d at 632; *Lua,* 990 F.Supp. at 706.

Accordingly, the court finds that Morris and Connolly were authorized to promise Flemmi that any evidence intercepted would not be used against him if he assisted in the FBI's effort to bug 98 Prince Street. Flemmi performed his part of the bargain. Nevertheless, the government claims that it should not be required to provide Flemmi the benefit of that bargain.

More specifically, the government contends that any agreement that Flemmi had with the government is invalid because Flemmi committed many serious crimes, including murder, but did not candidly disclose to the FBI all of his criminal activity. Thus, the government now claims that Flemmi breached any agreement he had with the government by not providing the FBI with accurate and complete information concerning his own criminal activity.

From the outset, however, the FBI was under no illusions about the nature of Flemmi's criminal activity. When Rico wrote to FBI Headquarters to recommend that Flemmi be opened as an informant, he described Flemmi as the leader of the gang previously headed by Wimpy Bennett and as a person who had "been engaged in bookmaking, shylocking, robberies, and is suspect of possibly being involved in gangland slayings." Ex. 21. As described in § II.2, *supra,* Rico had good reason to suspect Flemmi had participated in murder. Similarly, Connolly has stated that: "All Top Echelon informants are murderers. The government put me in business with murderers." Oct. 23, 1998 Tr. at 43; § II.33. As described in § II.4, *supra,* Morris not only knew from the outset that Flemmi and Bulger were frightening figures, but attempted to exploit their reputations for violence by urging Miani and Barrett to cooperate with the FBI in order to obtain protection from them. Ring too was aware that Flemmi and Bulger engaged in many serious crimes, perhaps including murder. § II.17. Potts knew that they were serious criminals as well. § II.21.

Flemmi was under no obligation to disclose to the FBI all of his criminal activity and, therefore, his failure to do so did not constitute fraudulent concealment. *See, e.g., Kasuri v. St. Elizabeth Hosp. Med. Ctr.,* 897 F.2d 845, 852 (6th Cir.1990).[69]

---

**69.** Moreover, as the FBI received the valuable

benefits of its bargain, a breach of the pur-

The FBI did not know the details of all of Flemmi's criminal activity in meaningful measure because its agents did not ask. As Ring explained, it was understood that Top Echelon informants were necessarily involved in serious criminal activity; they had to be in order to have the intimate knowledge of the LCN that the FBI was seeking. The FBI regarded it as inappropriate and counterproductive, however, to ask an informant for the details of his own criminal activity because to do so might suggest that the FBI was investigating him and, therefore, cause him to cease serving as a source. § II.17.

In essence, the government's present position boils down to a claim that any immunity agreement is invalid because the FBI agents who dealt with Flemmi and Bulger were dimwits who were duped by their sources. In view of the facts described in this Memorandum, this contention is utterly unconvincing. *See United States v. Brown,* 763 F.Supp. 1518, 1526–28 (D.Ariz.1991), *aff'd,* 979 F.2d 1380 (9th Cir.1992). In summary, the FBI's highest priority was combating the LCN. Agents were encouraged to be imaginative in recruiting Top Echelon informants, who by definition were involved in serious criminal activity themselves. It was natural that such informants would seek protection from the FBI, particularly including immunity for information they provided or helped obtain. It was also foreseeable that Top Echelon informants would be given such assurances by their handlers, and their handlers' supervisors, in order to secure their services. Rico, Connolly, Morris, Ring, and their colleagues knew the character of Flemmi and Bulger's criminal activity. They were not defrauded in deciding to make them allies in the FBI's war against the LCN generally or in promising them immunity concerning 98 Prince Street particularly.

For the foregoing reasons, Flemmi had an enforceable express and implied in fact agreement that precludes the use and derivative use against him of any of the evidence intercepted at 98 Prince Street. He also had an equally valid agreement implied in fact that the evidence intercepted at Vanessa's and 34 Guild Street would not be used against him in any way.

█ In contrast to 98 Prince Street, Flemmi did not discuss with the FBI whether any of the evidence intercepted at Vanessa's or 34 Guild Street would be used against him. However, as described in § III.1.B, the conduct of the parties may manifest the meeting of the minds necessary to infer a valid, tacit understanding in fact. *Hercules,* 516 U.S. at 424, 116 S.Ct. 981; *Baltimore & Ohio R. Co.,* 261 U.S. at 597, 43 S.Ct. 425; *McHan,* 101 F.3d at 1034; *Lua,* 990 F.Supp. at 709. Such an agreement existed with regard to Vanessa's and 34 Guild Street.

As described in § II.20, *supra,* the facts relating to Vanessa's are similar to those involving 98 Prince Street. In 1986, Flemmi told Connolly about his visits to the storeroom at Vanessa's and his discussions there with members of the LCN concerning illegal gambling, among other things. Connolly made it clear that the FBI wanted to bug Vanessa's. Flemmi was tasked to acquire information relating to the premises that would be important to the feasibility of installing a bug. He provided that information, including a diagram of Vanessa's. He and Bulger were also two of the three informants relied upon in the affidavit used to obtain the warrant to bug Vanessa's. But for their information, the government could not have obtained the warrant to bug Vanessa's.

Flemmi understood that in return for his services regarding Vanessa's, he would have the same protection concerning any evidence intercepted there that he had been promised concerning 98 Prince

ported, but unproven, obligation of Flemmi to provide the FBI the details of his own criminal activity would be immaterial and, there-

fore, not provide a ground for rescinding the agreement at this time. *United States v. Castaneda,* 162 F.3d 832, 837–39 (5th Cir.1998).

Street. This belief was reasonable. Rico and Connolly had each promised Flemmi protection. Being provided immunity for information that Flemmi furnished or helped obtain was consistent with that promise. Morris and Connolly had twice expressly assured Flemmi and Bulger that they would be protected, rather than prosecuted, with regard to matters intercepted at 98 Prince Street. By 1986, that promise had been honored. Angiulo and his allies had been prosecuted. As with the race-fix case, Bulger and Flemmi were not charged.

After the 98 Prince Street experience, no one told Flemmi that the ground rules had changed. Therefore, based on the foregoing, it was reasonable for Flemmi to believe that he had an agreement with the government that any evidence intercepted at Vanessa's would not be used against him directly or indirectly.

The court recognizes that following the bugging of 98 Prince Street Morris and Connolly also engaged in improper conduct in order to provide Flemmi and Bulger protection. Morris caused Connolly to tell Bulger and Flemmi that Halloran was cooperating with the FBI. Connolly tipped them off to the 1984–1985 joint DEA–FBI investigation. If Flemmi had relied primarily or exclusively on such improper conduct in concluding that he had an immunity agreement with the government, that reliance would have been unreasonable and the court would not enforce the purported agreement. *Kiely*, 105 F.3d at 737. However, in the instant case there were ample, legitimate reasons for Flemmi to reasonably believe that the immunity he had been promised and provided concerning 98 Prince Street also extended to Vanessa's. As he relied on this reasonable belief, that agreement implied in fact will be enforced.

The government has represented that the Vanessa's recordings were not presented to the grand juries that indicted Flemmi. Gov. Submission Pursuant to 6/21/99 Court Order, ¶ 5. As discussed in § III.1.D(4), *infra*, Flemmi correctly contends, however, that it would have been impermissible for any evidence derived from the Vanessa's intercepts to have been presented to those grand juries. In addition, the agreement implied in fact on which Flemmi relied precludes use of the Vanessa's intercepts, or any evidence derived from them, at trial.

The analysis and conclusion concerning Vanessa's is equally applicable to the evidence intercepted at 34 Guild Street, which was presented to the grand juries which indicted Flemmi. *Id.* Once again, prior to providing the FBI information used to obtain the warrant used to bug 34 Guild Street, Flemmi was not told that the ground rules had changed. In 1989, there remained a substantial, legitimate basis for Flemmi to have reasonably believed that if he assisted the FBI in its effort to intercept the forthcoming Mafia induction ceremony neither that evidence nor any evidence derived from it would be used against him. Any misconduct by the FBI to protect Flemmi after 1986, does not alter this fact. Flemmi relied on the reasonable belief that he would be protected rather than prosecuted if he helped the FBI bug such a ceremony in performing his part of the bargain. Thus, the use of the 34 Guild Street interceptions to secure Flemmi's indictment violated his agreement with the government. Whether any remedy for that violation is required remains to be determined. The government may not, however, use the evidence intercepted at 34 Guild Street, or any evidence derived from it, against Flemmi at trial.

The court has considered whether the conclusion that Flemmi had an immunity agreement concerning the evidence intercepted at 98 Prince Street, Vanessa's, and 34 Guild Street is qualified by the principle that agreements that require the commission of an illegal act are not enforceable. It is not.

The Court of Appeals for the First Circuit has held that an "alleged contract . . .

to achieve mutual benefit from the parties' cooperative violation of the law .... even if explicitly agreed to by both parties, is void and unenforceable as against public policy .... It would have been unreasonable for [plaintiff] to rely on such an illegal contract." *Kiely*, 105 F.3d at 736–37. *See also Restatement (Second) of Contracts* § 178 (1979). As the court explained during the hearings in this case, if a violation of the promise of protection—including a promise to tip off Flemmi to investigations and imminent indictments—were proven, a serious question would be presented concerning whether any or all of that agreement should be deemed enforceable. However, for the reasons described in § III.1.D(1), *supra*, the facts do not place this issue before the court.

An agreement providing immunity in exchange for cooperation does not inherently, or typically, involve a cooperative violation of the law. The power to make such promises is important to effective law enforcement. Thus, the government may informally grant an individual immunity. *Harvey*, 869 F.2d at 1443. Ordinarily, Due Process requires that such promises be honored rather than abrogated. *Id.*

As described in §§ II.13, II.17, and II.18, *supra*, Morris accepted three payments, totaling $7000, and several gifts from Bulger and Flemmi. Therefore, the court has particularly considered whether Flemmi's immunity agreement, or any element of it, should not be enforced.

When Morris and Connolly promised Flemmi and Bulger immunity concerning 98 Prince Street in 1980, no payment had been made to Morris. That promise was not the product of any bribe or corrupt conduct proven in this case. The first $1000 payment to Morris was made, at his request, in June 1982. § II.13, *supra*. As

described previously, this payment was sought and received about a month after Halloran was murdered. *Id.* Thus, there is a question, that cannot be answered on the present record, of whether the initial $1000 payment was an illegal gratuity given for Morris' tip concerning Halloran's cooperation. *See* 18 U.S.C. § 201(c)(1)(A) (1994); *United States v. Sun–Diamond Growers of Cal.*, 526 U.S. 398, 119 S.Ct. 1402, 1407, 143 L.Ed.2d 576 (1999).[70] That payment was not, however, made in connection with the immunity promised concerning 98 Prince Street, Vanessa's, or 34 Guild Street.

The second $1000 payment, delivered by Connolly to Morris with a case of wine, was made in the spring of 1984. § II.17, *supra*. As described previously, the timing of this payment raises a question whether it was an expression of appreciation for any assistance Morris may have rendered Bulger and Flemmi concerning the investigation then being led by the DEA. *Id.* However, it too was not a payment relating to the immunity promised to Flemmi concerning 98 Prince Street, Vanessa's, or 34 Guild Street.

The third payment of $5000, which was characterized as a "loan," was made to Morris, by Bulger, in April 1985, at the dinner at Morris' home that may have been held to celebrate the failure of the 1984–1985 joint investigation of Bulger and Flemmi. § II.18, *supra*. Prior to the payment being made, Morris and Connolly did reaffirm that Bulger and Flemmi would not be prosecuted for anything on the 98 Prince Street tapes and Morris went on to tell Bulger and Flemmi that, "you can do anything you want as long as you don't clip anyone." *Id.* At that point, however, Flemmi and Bulger had already

---

70. In addition to the open issue concerning the motivation for the payment there is a question whether the tip concerning Halloran's cooperation constituted an "official act," which must be implicated to trigger the applicability of § 201(c)(1)(A). *See United States v. Singleton*, 165 F.3d 1297, 1302 n. 2 (10th Cir.1999), *cert. denied*, ―― U.S. ――, 119 S.Ct. 2371, 144 L.Ed.2d 775 (1999) ("It is inconceivable that any court would hold that a prosecutor who pays for the false testimony of a witness is carrying out an official function of the government" as required by § 201).

relied on the earlier, untainted promise that any evidence intercepted at 98 Prince Street would not be used against them and the government had already derived great benefit from the services that they rendered in reasonable reliance on that promise. There was also, by then, a history of the agents and their sources exchanging gifts. The $5000 "loan" was an extension of this practice. In the circumstances, it would be unfair and improper to deprive Flemmi of the benefit of his bargain with the government concerning 98 Prince Street because of the payments made to Morris.

There were no payments made to Morris after 1985. Nor, as described earlier, was the issue of immunity concerning Vanessa's or 34 Guild Street discussed. In the circumstances, the payments to Morris cannot be deemed to be a bribe paid to obtain that immunity. *See Sun–Diamond Growers of Cal.*, 119 S.Ct. at 1406 ("[F]or bribery there must be a quid pro quo—a specific intent to give or receive something of value in exchange for an official act.").

The court does not suggest that the payments from Bulger and Flemmi to Morris were appropriate or that the acceptance of payments by an FBI agent from informants should be condoned. However, as explained in this Memorandum, the FBI's interest in Bulger and Flemmi was founded on the invaluable assistance that they provided in the FBI's war against the LCN, among other things. The payments to Morris were not material. Rather, they were incidental to a relationship that was important to the FBI for valid, professional reasons. The government derived great benefit from the services Flemmi rendered regarding 98 Prince Street, Vanessa's, and 34 Guild Street. In the circumstances, it would be fundamentally unfair to deprive Flemmi of the immunity that he was expressly and implicitly promised because of the payments initially sought, and ultimately received, by Morris.

**(4)** *A Hearing Will Be Necessary to Determine If This Case Must Be Dismissed and, If Not, Whether Any Evidence Must be Excluded at Trial*

■■■ In view of the foregoing, Flemmi had an enforceable agreement concerning the evidence intercepted at 98 Prince Street, Vanessa's, and 34 Guild Street. Flemmi was expressly promised that he would be protected rather than prosecuted if he helped the FBI bug 98 Prince Street, and had the same agreement implied in fact concerning Vanessa's and 34 Guild Street. Nevertheless, evidence intercepted at 98 Prince Street and 34 Guild Street was presented to the grand juries that indicted Flemmi, and evidence derived from all three bugs may have been used to secure the charges against him. Thus, there is an issue of what, if any, remedy is required in the circumstances.

Flemmi contends that this case should be dismissed as against him. In essence, he argues that he, like every other citizen, is entitled to Due Process and that dismissal is necessary to provide the performance of his agreement with the government that fundamental fairness requires. Flemmi analogizes the instant case to *Rowe*, in which the Court of Appeals for the Eleventh Circuit stated with regard to an agreement not to prosecute:

> as a matter of fair conduct, the government ought to be required to honor such an agreement when it appears from the record that: (1) an agreement was made; (2) the defendant has performed on his side; and (3) the subsequent prosecution is directly related to offenses in which the defendant, pursuant to the agreement, either assisted with the investigation or testified for the government.

*Rowe*, 676 F.2d at 527–28. The instant case, however, is distinguishable from *Rowe* because it does not involve an agreement not to prosecute at all. Nevertheless, Flemmi's Due Process argument requires continued consideration.

Flemmi's Due Process claim is reinforced by the related issue of whether the case against him should be dismissed as an exercise of the court's supervisory powers. Such powers must be exercised sparingly. *United States v. Stokes,* 124 F.3d 39, 45 (1st Cir.1997), *cert. denied,* 522 U.S. 1139, 118 S.Ct. 1103, 140 L.Ed.2d 156 (1998); *United States v. Santana,* 6 F.3d 1, 10 (1st Cir.1993). However, as the Supreme Court wrote in *United States v. Williams,* 504 U.S. 36, 46, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992):

> *Bank of Nova Scotia v. United States,* 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988), makes clear that the supervisory power can be used to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct amounts to a violation of one of those "few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions," *United States v. Mechanik,* 475 U.S. 66, 74, 106 S.Ct. 938, 943, 89 L.Ed.2d 50 (1986) (O'Connor, J., concurring in judgment).

The Supreme Court identified as two of those few clear rules, 18 U.S.C. §§ 6002 *et seq.,* the federal immunity statute, and 18 U.S.C. § 2515, which prohibits grand jury use of unlawfully intercepted communications. *Id.* at n. 6, 112 S.Ct. 1735. In this case, Flemmi's rights are not rooted in those statutes, but he was promised protection that is more expansive than that provided by § 6002 *et seq.,* and evidence obtained by electronic surveillance was used against him in violation of that promise. Thus, the implications of *Williams* for this case in its present posture must also be addressed by the parties and considered by the court.

It is not now clear whether dismissal should be ordered as necessary to provide Flemmi Due Process or as an exercise of the court's supervisory powers. In *United States v. Gallo,* 859 F.2d 1078, 1084 (2d Cir.1988), the Court of Appeals for the Second Circuit declined to dismiss a case in which the defendant was granted immunity pursuant to 18 U.S.C. § 6002, his immunized testimony was included in a successful application for a wiretap warrant, and evidence intercepted by that wiretap was inadvertently presented to the grand jury that indicted him. In *Gallo,* the court found that the wiretap would have been obtained even without the immunized information provided by the defendant and deemed the errors made to be "harmless." *Id.* at 1083.

The extent to which the facts of the instant case are analogous to *Gallo* is not now evident. At a minimum, however, the promise made to Flemmi—that he would be protected rather than prosecuted if he helped the FBI in its effort to bug 98 Prince Street, Vanessa's, and 34 Guild Street—is broader than the use immunity at issue in *Gallo.* This may have implications for the result in this case even if *Gallo* is regarded as rightly reasoned.

It would, however, be premature to decide now whether this case should be dismissed to afford Flemmi Due Process or as an exercise of the court's supervisory powers. At a minimum, Flemmi is entitled to a hearing to determine whether this case should be dismissed against him because tainted evidence was presented to the grand juries that indicted him and this error was not harmless. The resolution of this issue may present another, or an alternative, ground for ordering the dismissal that Flemmi requests.

More specifically, in *Kastigar,* 406 U.S. at 461, 92 S.Ct. 1653, the Supreme Court held that testimony compelled by a grant of immunity pursuant to § 6002 "can in no way lead to the infliction of criminal penalties." Thus, an individual compelled to testify pursuant to § 6002 is provided with use and derivative use immunity. *Id.* at 453, 92 S.Ct. 1653. Such immunity "prohibits the prosecutorial authorities from using the compelled testimony in any respect, and it therefore insures that the

testimony cannot lead to the infliction of criminal penalties on the witness." *Id.*

It has been generally held that, "the logic of *Kastigar*—that 18 U.S.C. section 6002 should be sufficiently broad to protect an individual from being compelled to testify against himself—applies to grand jury proceedings as well as to trials." *Palumbo,* 897 F.2d at 249. *See also United States v. North,* 920 F.2d 940, 947–49 (D.C.Cir.1990)(en banc) ("grand jury may not consider immunized testimony or evidence derived from it"); *In re Grand Jury Proceedings Kinamon v. United States,* 45 F.3d 343, 347 (9th Cir.1995) ("prohibition against the use of immunized testimony covers such use at grand jury proceedings as well as at trial"); *Schmidgall II,* 25 F.3d at 1536–37 ("focus on the evidence actually used by the government in obtaining the indictment is a correct application of *Kastigar* "); *United States v. Pelletier,* 898 F.2d 297, 301 (2d Cir.1990) ("A challenge to an indictment on the basis that it was improperly obtained through the use of immunized testimony is timely under rule 12(b)"); *United States v. Tormos-Vega,* 656 F.Supp. 1525, 1535 (D.P.R.1987).

■ Except in certain circumstances, discussed below, the remedy for presenting to a grand jury evidence obtained directly or indirectly as a result of a grant of immunity is dismissal of the indictment. *North,* 920 F.2d at 947–49; *Poindexter,* 951 F.2d at 377; *Schmidgall II,* 25 F.3d at 1538–39; *Pelletier,* 898 F.2d at 303; *Unit-*ed *States v. Holloway,* 74 F.3d 249, 253 (11th Cir.1996); *Tormos–Vega,* 656 F.Supp. at 1535–37. As the Court of Appeals for the District of Columbia Circuit explained in *North,* there is a distinction between presenting to a grand jury evidence that has been wrongfully obtained in violation of a defendant's constitutional rights and a violation of a legally permissible promise of immunity. 920 F.2d at 948–49. While, pursuant to *Calandra,* 414 U.S. at 354, 94 S.Ct. 613, suppression at trial is deemed to be a sufficient and appropriate remedy if illegally obtained evidence has been presented to the grand jury, it is not adequate if information that has been legally obtained as a result of a promise of immunity is presented to the grand jury. *Id. See also United States v. North,* 910 F.2d 843, 868–70 (D.C.Cir.1990), *vacated in part, superseded in part,* 920 F.2d 940 (D.C.Cir.1990); *United States v. Garrett,* 797 F.2d 656, 661 (8th Cir.1986); *United States v. Hampton,* 775 F.2d 1479, 1489 (11th Cir.1985); *United States v. Beery,* 678 F.2d 856, 860 (10th Cir.1982).[71]

■ The principle that the government may not present to the grand jury that indicted a defendant information obtained, directly or indirectly, as a result of a grant of immunity is not limited to cases involving formal immunity provided by operation of § 6002. It is equally applicable to informal promises of immunity, including oral promises. *See, e.g., Holloway,* 74 F.3d at

---

71. In *United States v. Rivieccio,* 919 F.2d 812, 816 (2d Cir.1990), the court in effect applied the *Calandra* standard in a case involving the presentation of immunized evidence to the grand jury. This approach was inconsistent with the Court of Appeals for the Second Circuit's then recent decision in *Pelletier,* which held that "[i]f the government used the [defendants'] immunized testimony to secure indictment ... the district court should dismiss the indictment, unless the immunized testimony presented was so minimal or of such inconsequential nature in light of the other evidence before the grand jury as to constitute harmless error." *Pelletier,* 898 F.2d at 303. More recently, the Court of Appeals for the Second Circuit has stated:

[I]f the government has presented immunized evidence to the grand jury, the indictment should be dismissed unless the government establishes that the grand jury would have indicted even absent that testimony. *See, e.g., Rivieccio,* 919 F.2d at 816 n. 4; *Pelletier,* 898 F.2d at 303.

*United States v. Nanni,* 59 F.3d 1425, 1433 (2d Cir.1995). Thus, it appears that the relevant law in the Second Circuit is now generally consistent with the standard this court understands to be correct. However, to the extent that *Rivieccio* suggests a different standard, this court respectfully disagrees.

252 (oral assurance that there would be no criminal prosecution if defendant testified in a civil deposition); *Schmidgall I*, 25 F.3d at 1526 (oral promise of use and derivative use immunity); *Schmidgall II*, 25 F.3d at 1535 (same); *Palumbo*, 897 F.2d at 248 (informal grant of immunity).

As indicated earlier, the pertinent promises to Flemmi included the assurance that information that he provided to assist the FBI in its efforts to bug 98 Prince Street, Vanessa's, and 34 Guild Street, and any information directly or indirectly derived from that information, would not be used against him. The Court of Appeals for the Second Circuit has characterized the use of information obtained as a result of a promise of immunity in an application for court authorization to obtain evidence against the witness as a "direct use" that "is plainly a violation of the witness's Fifth Amendment rights." *Nanni*, 59 F.3d at 1431 (citing *Pelletier*, 898 F.2d at 303; *Gallo*, 859 F.2d at 1082). It appears to this court that such a use might be more properly characterized as "indirect." However, whether deemed "direct" or "indirect" use, the presentation of evidence intercepted at 98 Prince Street and 34 Guild Street to the grand juries which indicted Flemmi alone requires a hearing to determine whether this case must be dismissed.

In addition, as described in § II.32, *supra*, at least two witnesses before the grand juries were exposed to information recorded by the FBI that Flemmi had provided, raising the question of whether their testimony was tainted by exposure to information obtained as a result of a promise of immunity. More specifically, the government has represented that Buckley read all of Flemmi's informant file and Walther reviewed part of it. In addition, Gamel read Bulger's informant file, which may have included information provided by Flemmi when he and Bulger were meeting with the FBI during periods when Flemmi was administratively closed as an informant.

■ "The protection against self-incrimination is violated whenever the prosecution presents a witness whose testimony is shaped—directly or indirectly—by immunized [information] regardless of how or by whom the witness was exposed to that [information]." *Schmidgall I*, 25 F.3d at 1528. *See also North*, 920 F.2d at 942, 949; *United States v. Byrd*, 765 F.2d 1524, 1529 (11th Cir.1985). Thus, the fact that grand jury witnesses were exposed to Flemmi's informant file, which contains information that he provided after receiving promises including use and derivative use immunity, is another reason that a *Kastigar* analysis is required to decide Flemmi's motion to dismiss. *North*, 920 F.2d at 948–49 n. 9; *North*, 910 F.2d at 866–67.

■ In addition, information obtained as a result of a grant of immunity may not be used as an "investigatory lead." *Kastigar*, 406 U.S. at 460, 92 S.Ct. 1653; *Schmidgall II*, 25 F.3d at 1537. This means, among other things, that such information may not be used to identify potential witnesses or shape the questioning of them. *Schmidgall II*, 25 F.3d at 1537. The question whether this occurred must also be addressed in the instant case.

Accordingly, an adversary hearing to address the foregoing issues is necessary. *United States v. Zielezinski*, 740 F.2d 727, 734 (9th Cir.1984) ("The government cannot simply provide transcripts to the court, *in camera*, and assume that it has met its *Kastigar* burden. Only a hearing can convincingly establish that the command of the Fifth Amendment has been satisfied.") At that hearing, the government will have the burden of proving, most likely by a preponderance of the evidence, that the information it presented to secure the indictments of Flemmi was not tainted by showing that it had an independent, legitimate source for that evidence. *Kastigar*, 406 U.S. at 460, 92 S.Ct. 1653; *Schmidgall I*, 25 F.3d at 1530–31; *Bartel*, 19 F.3d at 1112; *Palumbo*, 897 F.2d at 251; *Hampton*, 775 F.2d at 1485–86; *United States v.*

*Romano,* 583 F.2d 1, 7 (1st Cir.1978); *United States v. McGee,* 798 F.Supp. 53, 55 n. 3 (D.Mass.1992); *United States v. Serrano,* 680 F.Supp. 58, 62 (D.P.R.1988), *aff'd,* 870 F.2d 1 (1st Cir.1989).

If the government fails to prove that all of the evidence presented to the grand juries that indicted Flemmi was untainted, the case against Flemmi must be dismissed unless the government proves that its error was harmless beyond a reasonable doubt. *Poindexter,* 951 F.2d at 377 ("unless the [Independent Counsel] proves on remand that the evidence received by the grand jury was untainted, or that any taint was harmless beyond a reasonable doubt, the indictment must be dismissed."); *Schmidgall II,* 25 F.3d at 1538 ("Dismissal of the indictment is not required when use of the immunized testimony was 'harmless beyond a reasonable doubt.'"); *Gallo,* 859 F.2d at 1082–84; *Byrd,* 765 F.2d at 1529 n. 8.

Thus, at this point the burden on the government is "heavy." *Kastigar,* 406 U.S. at 461–62, 92 S.Ct. 1653; *Palumbo,* 897 F.2d at 251. It is not, however, necessarily insurmountable. *Compare e.g. Palumbo,* 897 F.2d at 251 (ordering dismissal of case because government failed to satisfy its burden); *Hampton,* 775 F.2d at 1490–91 (same) *and Schmidgall II,* 25 F.3d at 1539 (affirming conviction because presentation of immunized evidence to grand jury was "harmless beyond a reasonable doubt.").

In order to determine whether this case must be dismissed because of misuse of information that Flemmi provided after being given enforceable assurances that included use and derivative use immunity for the information that he provided to assist the FBI in its efforts to get warrants used to bug 98 Prince Street, Vanessa's, and 34 Guild Street, it will be necessary to "focus on the evidence actually used by the government in obtaining the indictment[s]" of Flemmi. *Schmidgall II,* 25 F.3d at 1536. Thus, it is likely, but not certain, that the government will be ordered to produce that evidence to the defendants.[72] *Zielezinski,* 740 F.2d at 734; *Schmidgall II,* 25 F.3d at 1537–39 (analyzing evidence before grand jury); *Hampton,* 775 F.2d at 1486–90 (same). *See also United States v. Vest,* 842 F.2d 1319, 1333 (1st Cir.1988) ("grand jury minutes are not part of the record on appeal, and thus [defendant] has presented no basis on which [Court of Appeals] can even begin to consider whether the district court erred" in deciding defendant was not prejudiced by presentation of illegally obtained tape-recording to grand jury). *Cf. Byrd,* 765 F.2d at 1532 ("courts have in fact considered *in camera* evidence when claims of *Kastigar* violations are raised prior to trial").

If this case is not dismissed because of the presentation of any tainted evidence to the grand juries that indicted Flemmi, such evidence will be excluded from use at trial. Thus, the hearing to be conducted will also serve to identify any such evidence.

It may also be necessary for the court to determine whether the present prosecutors, who have now been exposed to the information in Flemmi and Bulger's informant files, and thus may have been exposed to tainted evidence, may participate in Flemmi's trial if this case is not dismissed against him. *Byrd,* 765 F.2d at 1532 n. 11 ("In a *Kastigar* setting, we are of the firm opinion that it would be unwise to permit an attorney familiar with the immunized testimony to participate in the trial or preparation of the case"); *Palumbo,* 897 F.2d at 251 (quoting *Byrd* ); *Tormos–Vega,* 656 F.Supp. at 1531–32 (case dismissed in part because prosecutor was exposed to immunized testimony). *But see United States v. Serrano,* 870 F.2d 1, 18 (1st Cir.1989) ("[W]e reject the notion that

---

**72.** The court previously denied, with limited exceptions, the defendants' motion for production of the evidence presented at to the grand jury. *See United States v. Salemme,* 1997 WL 810057 at *5 (D.Mass. Dec.29, 1997).

the mere exposure to immunized testimony or the mere possibility of nonevidentiary use automatically results in the dismissal of the indictment.") As described in § II.33, *supra,* recognition of the risk that exposure to Bulger and Flemmi's informant files might require their disqualification caused the prosecutors presenting this case not to read them in connection with the government's successful effort to obtain a protective order concerning discovery from the magistrate judge. However, the court may have to decide this issue if this case is not dismissed as against Flemmi.

(5) *If Morris and Connolly Were Not Authorized to Promise Flemmi that the Evidence Intercepted at 98 Prince Street, Vanessa's, and 34 Guild Street Would Not Be Used Against Him, Flemmi's Statements to the FBI Relating to Those Interceptions May Have Been Involuntary and, In Addition, Use of Any Evidence Intercepted At Those Locations May Violate Flemmi's Right to Due Process*

In the interest of completeness, it should be recognized that even if Morris and Connolly were not authorized to promise Flemmi that the evidence intercepted at 98 Prince Street, Vanessa's, and 34 Guild Street would not be used against him, their conduct may have violated his Fifth Amendment right not to incriminate himself and his related right to Due Process. The parties have not, however, addressed these questions. The court will afford them the opportunity to do so before deciding their implications for this case. To facilitate their work, the essence of these issues is set forth below.

As indicated earlier, it has been held that there are circumstances in which Due Process may require that the government perform a promise made by an agent who exceeded his actual authority. As the Court of Appeals for the First Circuit has noted: "courts on occasion have specifical-

ly enforced promises that would encroach on the jurisdiction of independent entities. *See, e.g., Palermo v. Warden,* 545 F.2d 286, 296 (2d Cir.1976)." *Bemis,* 30 F.3d at 221 n. 1.

In *Palermo,* the Court of Appeals for the Second Circuit ordered the release of a prisoner who had been denied parole by the Parole Board because a prosecutor, who had exceeded his authority, promised in a plea agreement that Palermo would be paroled. 545 F.2d at 296. In doing so, the Court of Appeals for the Second Circuit stated:

[F]undamental fairness and public confidence in government officials require that prosecutors be held to "meticulous standards of both promise and performance." *Correale v. United States,* 479 F.2d 944, 947 (1st Cir.1973). Thus, the courts have afforded relief where prosecutors have made specific sentencing promises which were unfulfillable, since sentencing lies totally within the court's discretion, *United States v. Hammerman,* 528 F.2d 326 (4th Cir.1975); *Harris v. Superintendent, Va. State Penitentiary,* 518 F.2d 1173 (4th Cir.1975); *Correale v. United States, supra,* or where one federal prosecutor promised immunity from federal prosecution outside his own jurisdiction, *United States v. Carter,* 454 F.2d 426 (4th Cir.1972) (en banc), *cert. denied,* 417 U.S. 933, 94 S.Ct. 2646, 41 L.Ed.2d 237 (1974). *Geisser v. United States,* 513 F.2d 862 (5th Cir.1975) involved breach of a Department of Justice plea bargain which entailed, in part, a promise of parole after three years imprisonment. On appeal, the Department argued that the district court usurped the exclusive power of the Parole Board by ordering release. The Court of Appeals, although it remanded the case for a determination of what the Parole Board would do when informed of the bargain, concluded that such a bargain "fits well within the realm of enforceable constitutional rights ...." 513 F.2d at 869 n. 11. We agree and hold

that where a defendant pleads guilty because he reasonably relies on promises by the prosecutors which are in fact unfulfillable, he has a right to have those promises fulfilled.

*Id.* at 296 (footnotes omitted).

In *Bemis,* the Court of Appeals for the First Circuit was confronted with a claim that prosecutors had reneged on a promise that a defendant would ultimately be admitted to the Witness Protection Program. 30 F.3d at 221. The government argued that the United States Attorney's Office lacked the authority to make such a promise and it was, therefore, unenforceable. *Id.* The Court of Appeals for the First Circuit, however, rejected this as a general proposition stating that for the purposes of determining whether the petitioner had been deprived of Due Process, " 'the crucial question is not whether the Government had the authority to carry out the promise which [petitioner] claims he understood it to make, but whether it did in fact make such a promise.' " *Id.* at 222 (quoting *Cook,* 668 F.2d at 320).

In *Palermo,* the Court of Appeals for the Second Circuit affirmed a decision to enforce an unauthorized promise of parole because the petitioner had reasonably relied on that promise and "specific performance of the plea bargain would constitute the only meaningful relief in the context of the case." 545 F.2d at 296. For the reasons described previously, Flemmi understandably argues that he relied to his detriment on the promises Morris and Connolly made, expressly or implicitly, that any evidence intercepted at 98 Prince Street, Vanessa's, and 34 Guild Street would not be used against him and, at this time, Due Process requires specific performance of those promises even if Morris and Connolly exceeded their authority in making them.

There are cases in which promises of immunity not involving any prosecutor have been enforced even in the absence of detrimental reliance by the defendant. *See Rodman,* 519 F.2d at 1059–60 (dismissing on grounds of fairness indictment of defendant based on unfulfilled promise of Securities and Exchange Commission attorney to recommend strongly no prosecution, where defendant made self-incriminatory statements, but there was no finding that they had been used against him directly or indirectly); *Carrillo,* 709 F.2d at 36–37 (enforcing promise by DEA agents that defendant would not be prosecuted if he cooperated in their investigation despite apparent lack of participation of a prosecutor in the promise or any evidence provided by defendant being used against him).

If Due Process is deemed to require performance of the promises made to Flemmi by Morris and Connolly, even if they exceeded their authority, it appears that, at a minimum, the appropriate remedy would be to preclude any use or derivative use, before the grand jury and at trial, of the evidence intercepted at 98 Prince Street, Vanessa's, and 34 Guild Street because that was part of the promise that Morris and Connolly made to Flemmi.

In *Palermo,* the Court of Appeals for the Second Circuit rested its ruling requiring specific performance of an unauthorized promise in meaningful measure on the fact that "the voluntariness of a plea induced by unfulfillable promises is, of course, open to grave doubt." 545 F.2d at 296. The facts found by the court in this case present a similar substantial question of whether, if the promise of immunity made to Flemmi was not valid for lack of authority, the statements that he made which the government utilized in successfully seeking the warrants used to bug 98 Prince Street, Vanessa's, and 34 Guild Street were involuntary. However, the defendants have cited only one district court case on this issue and the government has not addressed it at all. The court will, therefore, provide the parties an opportunity to address this issue too.[73]

---

**73.** Flemmi may also contend that all of his statements to the FBI were involuntary based

More specifically, as indicated earlier, statements induced by a government promise of immunity are coerced and both the Self–Incrimination Clause of the Fifth Amendment and the Due Process Clause of the Fifth and Fourteenth Amendments bar use and derivative use at trial of such statements against a defendant. *Swint*, 15 F.3d at 288–89. As the Supreme Court has held:

It is of course a constitutional principle of long standing that the prosecution 'must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth.' *Rogers v. Richmond*, 365 U.S. 534, 541, 81 S.Ct. 735, 739, 5 L.Ed.2d 760 (1961). We have no hesitation in saying that this principle also reaches evidence of guilt induced from a person under a governmental promise of immunity, and where that is the case such evidence must be excluded under the Self–Incrimination Clause of the Fifth Amendment.... Evidence so procured can no more be regarded as the product of a free act of the accused than that obtained by official physical or psychological coercion.

*Shotwell Mfg. Co.*, 371 U.S. at 347–48, 83 S.Ct. 448 (citations omitted).

Consistent with this principle, it has been found that promises of immunity have in certain cases induced statements which were, therefore, deemed involuntary. *See Walton*, 10 F.3d at 1030; *Swint*, 15 F.3d at 290; *Conley*, 859 F.Supp. at 839; *Quartararo v. Mantello*, 715 F.Supp. 449, 461 (E.D.N.Y.1989), *aff'd*, 888 F.2d 126 (2d Cir.1989). Indeed, as described earlier, the FBI *Manual* has long cautioned agents that promises of immunity may constitute a form of *"undue influence"* Ex. 274 (Under Seal), Manual § 108(D)(4) (11–29–55 through (5–13–76); § 108(I)(C)(6) (1–12–77); § 137–3(6) (1–

31–78); § 137(3)(6)(4–2–79); § 137–5(4) (1–2–81); 137–5(4) (9–20–82); § 137–5(4) (3–28–84) (emphasis added)).

However, the mere fact:

That a law enforcement officer promises something to a person suspected of a crime in exchange for the person's speaking about the crime does not automatically render inadmissible any statement obtained as a result of that promise. Despite some language in early Supreme Court cases such as *Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 187, 42 L.Ed. 568 (1897) (indicating that a confession cannot be obtained by " 'any direct or implied promises, however slight, nor by the exertion of any improper influence' "), it is clear that the voluntariness of a confession does not depend solely upon whether it was made in response to promises. Instead, we must determine voluntariness by judging the totality of the circumstances. *See Arizona v. Fulminante*, 499 U.S. 279, 284–85, 111 S.Ct. 1246, 1251, 113 L.Ed.2d 302 (1991) (noting that the above-quoted passage of *Bram*, "which under current precedent does not state the standard for determining the voluntariness of a confession," was itself part of a totality of the circumstances test). *See also Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir.1986). "The question in each case is whether the defendant's will was overborne when he confessed." *Id.* The burden is on the government to establish, by a preponderance of the evidence, that a challenged confession was voluntary. *Id.*

*Walton*, 10 F.3d at 1028. *See also Byram*, 145 F.3d at 407–08.

As the court in *Walton* went on to write, however, "given the uniquely influential nature of a promise from a law enforce-

---

upon the explicit promises of "protection" that he received from Rico, Connolly, and Morris and the FBI's conduct over three decades. The principles discussed in this Memorandum concerning 98 Prince Street,

Vanessa's, and 34 Guild Street would also be generally applicable in analyzing any broader claim for suppression based on involuntariness.

ment official not to use a suspect's inculpatory statement, such a promise may be the most significant factor in assessing the voluntariness of an accused's confession in light of the totality of the circumstances." *Walton*, 10 F.3d at 1030. *See also Streetman v. Lynaugh*, 812 F.2d 950, 957 (5th Cir.1987) (noting, while analyzing defendant's claim of ineffective assistance of counsel, that "certain promises, if not kept, are so attractive that they render a resulting confession involuntary. A promise of immediate release or that any statement will not be used against the accused is such a promise." (citation omitted)).

Statements induced by a promise made by a person lacking actual authority to grant immunity have been held to be involuntary. For example, state and local law enforcement officials generally lack authority to make promises that bind the federal government. *See, e.g., United States v. Fuzer*, 18 F.3d 517, 520 (7th Cir.1994); *United States v. Cordova–Perez*, 65 F.3d 1552, 1554 (9th Cir.1995). However, statements induced by such promises have been held to be both involuntary and inadmissible in federal proceedings. *Swint*, 15 F.3d at 290; *Rogers*, 906 F.2d at 192. The principle that unauthorized promises may render statements involuntary was also addressed in *Conley*, a case involving a promise of use immunity made to an informant by an FBI agent. *Conley*, 859 F.Supp. at 839 n. 6. In *Conley*, the court stated:

> the Government has not argued or attempted to prove that [FBI Special Agent] Donnelly's promise was not authorized by a prosecutor. The Court notes the impracticality that could be visited upon potential agent-informant relationships absent promises such as [FBI Special Agent] Donnelly's promise . . . . [I]t is the making of the promise in this case that is relevant to the voluntariness inquiry, rather than the question of whether the promise was, or

should be, within the lawful authority of S.A. Donnelly.

*Id.*

■ For the purposes of the voluntariness inquiry, the question whether Flemmi was promised immunity must be examined from his perspective. *Walton*, 10 F.3d at 1029. However, a "defendant's perception that he is providing testimony under a grant of immunity does not make his statement involuntary, unless the perception was reasonable." *Cahill*, 920 F.2d at 427. *See also Walton*, 10 F.3d at 1029 ("the appropriate inquiry is whether the defendant reasonably perceived the alleged promise as he asserts.").

One factor to be considered in determining the reasonableness of Flemmi's belief that any information that he provided to assist the FBI's efforts to bug 98 Prince Street, Vanessa's, and 34 Guild Street would not be used against him is the understanding of FBI agents experienced in such matters. *Walton*, 10 F.3d at 1029 (perception that statements defendant made would not be used against him was reasonable in part because agents with whom he spoke had the same understanding). In this case, Flemmi can cite the testimony of a series of FBI agents to support the reasonableness of his reliance on the promises Morris and Connolly made to him, explicitly and implicitly, concerning 98 Prince Street, Vanessa's, and 34 Guild Street. For example, Rico believed that, as a matter of law, an informant's statements generally could not be used against him because no *Miranda* warnings had been given. Rico Jan. 13, 1998 Tr. at 126; § II.2. Darcy, the government's expert, was never involved in a matter in which the FBI used information provided by an informant to obtain a warrant for electronic surveillance and later used against him any of the intercepted evidence that he helped obtain. Darcy Sept. 29, 1998 Tr. at 82; § II.33. Darcy's experience was consistent with Ahearn's. Ahearn May 11, 1998 Tr. at 51–2; § II.3. Carter, who was the affiant concerning Vanessa's, believed

that the statements Flemmi made to Connolly which Carter included in his affidavit could not be used against Flemmi at least directly. Carter Aug. 18, 1998 Tr. at 164–65; § II.20.

Another factor that would weigh in favor of finding that Flemmi reasonably believed that the government would not use against him the information that he provided which helped secure the warrants to bug 98 Prince Street, Vanessa's, and 34 Guild Street is the manner in which the FBI, over several decades, cultivated the sense that he was a friend and ally, rather than a potential target for prosecution. It has been held that, " '[e]xcessive friendliness on the part of an interrogator can be deceptive ... and thereby prompt admissions that the suspect would ordinarily make only to a friend, not to the police.' " *Walton,* 10 F.3d at 1030 (quoting *Miller v. Fenton,* 796 F.2d 598, 607 (3rd Cir.1986)). Thus, in finding a promise of immunity rendering the defendant's statements involuntary, the court in *Walton* found it "significant" that the agent making the promise had reminded the defendant of their long, prior relationship. *Id.* Similarly, in *Conley,* the court suppressed statements after finding that an FBI agent's "promise to speak off the record and his friendly manner combined to overcome Conley's reticence about making statements to the FBI." 859 F.Supp. at 837. As described in detail in this Memorandum, Flemmi has a substantial basis for making a similar argument in this case concerning the promises made to him relating to 98 Prince Street, Vanessa's, and 34 Guild Street.

If the government fails to prove that Flemmi voluntarily made the statements that were included in the applications for the warrants used to bug 98 Prince Street, Vanessa's, and 34 Guild Street, those statements and any evidence derived from them should not have been presented to the grand juries which indicted Flemmi and may not be used against him at trial. *Byram,* 145 F.3d at 409 (where statement

is coerced "evidence derived directly from the [statement] can also be excluded as involuntary under a doctrine similar to the 'fruits of the poisonous tree' doctrine"); *Biller v. Lopes,* 834 F.2d 41, 46 (2d Cir. 1987); *Pilotti v. Superintendent Great Meadow Correctional Facility,* 759 F.Supp. 1031, 1037 (S.D.N.Y.1991). In *Quartararo,* the court applied this concept in the context of a promise of leniency which was deemed to be a promise of immunity. 715 F.Supp. at 461. After finding the defendant's initial confession to have been coerced by the promise of immunity, the court suppressed his subsequent statements as directly produced by the existence of the earlier statements. *Id.*

Accordingly, if after hearing from the parties the court finds that the statements Flemmi made that were included in the applications for the warrants used to bug 98 Prince Street, Vanessa's, and 34 Guild Street were not voluntary, it will be necessary to determine what, if any, remedy is appropriate.

The Supreme Court has held that an indictment is not subject to challenge because the grand jury acted on the basis of information provided involuntarily and, therefore, in violation of a defendant's Fifth Amendment privilege against self-incrimination. *Calandra,* 414 U.S. at 345, 94 S.Ct. 613. Thus, dismissal would not be required if statements made by Flemmi involuntarily, or evidence derived from them, was presented to the grand juries that indicted him. *Id.*

Nevertheless, if the statements Flemmi made that were included in the applications for the warrants to bug 98 Prince Street, Vanessa's, and 34 Guild Street were involuntary, it appears that such statements, and any evidence derived from them, would not be admissible at his trial. *Id.* Thus, it would be necessary to conduct a hearing to identify any such evidence.

2. *The Motion to Suppress the 1984–85 Electronic Surveillance*

A. *Summary*

Flemmi and John Martorano were intercepted during the 1984–85 wiretap of George Kaufman's telephone. Thus, each is an "aggrieved person," who has standing to request suppression of the evidence intercepted by that wiretap and any evidence derived from it. *See* 18 U.S.C. §§ 2510(1), (11), 2515, 2518 (1994). They have moved to do so and their motion to suppress is meritorious.

Initially, defendants assert that the 1984–85 electronic surveillance evidence should be suppressed because § 2516(1) was violated. Section 2516(1) requires that the Attorney General or another, specified high ranking official of the Department of Justice, including the Assistant Attorney General in charge of the Criminal Division, authorize the filing of an application for a warrant to conduct electronic surveillance.[74] The Supreme Court has held that the purpose of this provision is "to make doubly sure" that electronic surveillance is necessary and appropriate by making the "mature" and "informed" judgment of a high ranking, politically accountable official a "critical precondition to any judicial order." *Giordano*, 416 U.S. at 515, 94 S.Ct. 1820.

In the instant case the application for the warrant to conduct the 1984–85 electronic surveillance was authorized by the Assistant Attorney General in charge of the Criminal Division. Thus, the literal requirements of § 2516(1) were met. However, the purposes of that provision were subverted because the Assistant Attorney General was deprived of vital information which, if disclosed, would have caused him to decline to authorize the application. Thus, the informed judgment of a politically accountable official was not rendered in this matter.

Only one reported case directly addresses the question of whether suppression is required when the official of the Department of Justice who has authorized the application was denied material information by his associates. *United States v. Williams*, 565 F.Supp. 353, 368–69 (N.D.Ill.1983), *aff'd*, 737 F.2d 594. In another context, however, the Court of Appeals for the First Circuit has agreed with other courts which "have uniformly held that once the proper official is found to have authorized a wiretap application, his authorization is not subject to further judicial review." *United States v. O'Malley*, 764 F.2d 38, 41 (1st Cir.1985). The reasoning of such cases is questionable, particularly as applied to the instant case. However, in view of the broad language in *O'Malley* and the fact that the motion to suppress the 1984–85 electronic surveillance is meritorious for other reasons, this court is not allowing that motion based upon the purported violation of § 2516(1).

Rather, the motion to suppress the 1984–85 electronic surveillance is being allowed because: the initial application was filed with at least reckless disregard for the truth; it was materially false and misleading because the requested electronic surveillance was not necessary to acquire evidence to be used by the FBI in an effort to develop a Title 18 prosecution against Flemmi, Bulger, Kaufman, or anyone else; there was not probable cause to believe that the requested wiretap of Kaufman's telephone would result in the interception of any evidence of a Title 21 drug offense; and the purpose of § 2518(1)(c), which requires that an application include a full and complete statement as to why electronic surveillance is necessary, was not satisfied.

The parties disagree on the standard to be applied in deciding whether suppression for a violation of § 2518(1)(c) is required. More specifically, as set forth below, the

---

**74.** It is actually the interaction of §§ 2516(1) and 2518(1)(a) that together require that a specified, politically accountable official authorize an application for electronic surveillance. The court, however, refers only to § 2516(1) as a sort of simple shorthand.

parties dispute whether this court was correct in finding in *Ferrara*, 771 F.Supp. at 1298–1304, that the judicially crafted exclusionary rule is applicable to deciding motions to suppress electronic surveillance involving a violation of a provision of Title III that codifies a requirement of the Fourth Amendment. Defendants contend that the stricter standard of § 2515, as interpreted by the Supreme Court in *Giordano, supra*, is applicable in all Title III cases. They also assert that, in any event, the necessity provision of Title III, 18 U.S.C. § 2518(1)(c), is not a codification of a constitutional requirement. In addition, defendants argue that if a judicially fashioned exclusionary rule is to be applied, the *Franks* standard, which was developed to address questions concerning probable cause, is not appropriate when necessity is at issue.

As discussed below, the defendants raise serious legal issues which ultimately make no difference with regard to the outcome of the motion to suppress the 1984–85 electronic surveillance. The motion to suppress is meritorious under both the *Franks* and *Giordano* standards.

If the *Franks* test is utilized, defendants have proven that the application for the warrant to tap George Kaufman's telephone involved false and misleading statements and omissions that were material, and were made with at least reckless disregard for the truth. If the *Giordano* standard is applied, the government violated a "central" provision of Title III in failing to make the required "full and complete statement" concerning necessity and the purposes of that provision were not satisfied. Rather, the government's violation of the law caused a warrant to be issued that would not have been obtained if the requirements of Title III had been met.

The facts on which the analysis rests are described in detail in § II.17, *supra*, and referenced in the following analysis. In brief summary, in applying for a warrant to tap Kaufman's telephone, the government relied on a lengthy and confusing affidavit of DEA Agent Boeri that was false and misleading in many important ways, and which was submitted with at least reckless disregard for its truth.

More specifically, the application and affidavit represented that the investigation was a joint DEA–FBI endeavor and that there was probable cause to believe that Bulger, Flemmi, and Kaufman would discuss illegal gambling, loansharking, and other Title 18 offenses on Kaufman's telephone. It was also represented that the requested wiretap was necessary to the FBI's effort to develop a Title 18 prosecution of Bulger, Flemmi, Kaufman, and others. The FBI, however, had no intention of using any intercepted evidence to develop such a case. Neither Boeri nor Crossen, the affiant and applicant, believed that the FBI would attempt to do so. Rather, they understood that Bulger and Flemmi were FBI informants who the Bureau wished to protect rather than prosecute.

Accepting that the FBI would not confirm that Bulger and Flemmi were informants or discuss the implications of their status for the proposed electronic surveillance, Boeri and Crossen recklessly disregarded their obligation to obtain from the FBI the information required to provide the court with the legally mandated full and complete statement concerning the necessity for electronic surveillance. Acting for the FBI, Ring intentionally withheld that information from the DEA, the United States Attorney, and the court. In addition, Crossen and Boeri acted with reckless disregard for the truth when they filed applications for warrants that in effect represented that electronic surveillance was necessary to obtain evidence that the FBI would use in a Title 18 investigation of Bulger, Flemmi, and others because they did not believe that the FBI would attempt to do so.

As a result, the issuing judge was deprived of important information which, if disclosed, would have caused the request

for a warrant to be denied. More particularly, the required full and complete statement would have included the following information. As informants, Flemmi and Bulger had made statements about their illegal gambling and loansharking activities which the government now claims can be used against them. A review of their files, however, would indicate to the FBI that they were tacitly authorized to engage in such activities and, therefore, the conduct which the government was seeking authority to utilize a wiretap to investigate may not have been criminal. In any event, the FBI did not intend to use any evidence generated by the electronic surveillance to investigate Flemmi, Bulger, Kaufman, or anyone else. Indeed, the FBI agents assigned to participate in the joint investigation were instructed not to disclose the information being intercepted to anyone else employed by the FBI.

The DEA also did not intend to conduct any investigation concerning potential Title 18 violations. Rather, its representatives believed that the FBI was the sole federal agency with the authority to do so. The prosecutor and DEA agents involved were genuinely interested in trying to develop a drug case for which Flemmi and Bulger could be prosecuted. There was, however, no evidence to establish probable cause to believe Bulger would be intercepted by a wiretap on Kaufman's telephone. While there was a basis to expect Flemmi and Kaufman would be overheard, there was not probable cause to believe that they would be discussing any drug offense, or that Kaufman would be discussing such an offense with anyone. Indeed, the FBI agent who was most knowledgeable did not believe that Bulger and Flemmi were involved in narcotics crimes and felt that their work for the Bureau may have created the mistaken impression that they were.

If, as the court now believes, *Giordano* rather than *Franks* provides the applicable standard, § 2518(1)(c) is a "central" provision of Title III because it "directly and substantially implement[s] the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *Giordano*, 416 U.S. at 527, 94 S.Ct. 1820. The government failed to make the legally required full and complete statement concerning necessity and the statutory purpose of that requirement was not nevertheless achieved. Rather, a warrant that was not justified was issued.

In the circumstances, the motion to suppress the 1984–85 electronic surveillance is meritorious. The intercepts were not presented to the grand juries that returned the indictments in the instant case. However, it is necessary to determine whether any evidence derived from them was provided to those grand juries and, if so, whether such use of illegally obtained evidence requires, or contributes to requiring, dismissal of this case. In addition, the 1984–85 intercepts, and any evidence derived from them, may not be used in the government's case-in-chief at trial. Further proceedings will be necessary to identify any such derivative evidence.[75]

**B.** *Suppression is Not Justified Based on the Alleged Violation of 18 U.S.C. § 2616(1)*

 Flemmi asserts that the 1984–85 electronic surveillance evidence should be suppressed because of an alleged violation of 18 U.S.C. § 2516(1). Section 2516(1) provides that the Attorney General or certain other high ranking officials of the Department of Justice, including the Assistant Attorney General in charge of the Criminal Division, must authorize an application to the court for a warrant to conduct electronic surveillance. This require-

---

**75.** The government has intended to use in its case-in-chief only the interceptions obtained from the wiretap of Kaufman's telephone, rather than the interceptions from Bulger's automobile and apartment. Gov. Post–Hearing Brief at 316–17.

ment is solely statutory in origin, going beyond any duty established by the Constitution. *Giordano,* 416 U.S. at 526, 94 S.Ct. 1820.

The Supreme Court has classified § 2516(1) as "central" to the statutory scheme established by Title III. *Id.* at 528, 94 S.Ct. 1820. Therefore, generally, suppression must be ordered if the statutory purpose of § 2516(1) is not satisfied. *Id.; United States v. Cunningham,* 113 F.3d 289, 293–94 (1st Cir.), *cert. denied,* 522 U.S. 862, 118 S.Ct. 165, 139 L.Ed.2d 109 (1997).

Title III requires that a senior official of the Department of Justice authorize an application for a warrant to conduct electronic surveillance in order "to make doubly sure that the statutory authority be used with restraint and only where the circumstances warrant the surreptitious interception of wire and oral communications." *Giordano,* 416 U.S. at 515, 94 S.Ct. 1820. In other words, in enacting Title III, Congress and the President did not intend to rely on the courts alone to limit the use of electronic surveillance. Rather, it was expected that the requirement that applications be authorized by a senior official of the Department of Justice "would inevitably foreclose resort to wiretapping in various situations where investigative personnel would otherwise seek intercept authority from the court and the court would very likely authorize its use." *Id.* at 527, 94 S.Ct. 1820.

As the Supreme Court has stated, Title III:

> plainly calls for the prior, *informed* judgment of enforcement officers desiring court approval for intercept authority, and investigative personnel may not themselves ask a judge for authority to wiretap or eavesdrop. The *mature judgment* of a particular, responsible Department of Justice official is interposed as a critical precondition to any judicial order.

*Id.* at 515, 94 S.Ct. 1820 (emphasis added). The legislative history of Title III explains that the authority to apply for warrants to conduct electronic surveillance is limited to officials "responsive to the political process" so if " 'abuses occur, the lines of responsibility lead to an identifiable person.' " *Id.* at 520 (quoting S.Rep. No. 1097, 90th Cong., 2d Sess., 96–97 (1968)).

In this case the literal requirements of § 2516(1) were met because the application for the warrants to conduct the 1984–85 electronic surveillance were authorized by Trott, the Assistant Attorney General in charge of the Criminal Division. Flemmi asserts, however, that suppression is required because the purpose of § 2516(1) was subverted when the Assistant Attorney General was deprived of information that was vital to making the "informed" judgment contemplated by Title III and if he had been properly informed no application would have been filed. Flemmi is correct as a matter of fact. The existing jurisprudence, however, suggests that he is not entitled to suppression based on a violation of § 2516(1).

As described in § II.17, *supra,* if the FBI, DEA, and United States Attorney's Office in Boston had engaged in candid discussions concerning Bulger and Flemmi's relationship and value to the FBI, the DEA would have abandoned its investigation. If it did not, the Department of Justice would have aborted the investigation to maintain the confidentiality of Flemmi and Bulger's status as informants. In any event, if the Assistant Attorney General had been told that Bulger and Flemmi were FBI informants and that the FBI had no intention of investigating them, or anyone else, based on evidence of Title 18 offenses intercepted by the proposed electronic surveillance, he would not have authorized the filing of the initial application to tap Kaufman's telephone because it was fundamentally false and misleading. Trott, however, was deprived of this information and, therefore, of the opportunity to exercise the informed judgment contemplated by § 2516(1).

The existing jurisprudence indicates that the foregoing is not a basis for ordering suppression. As the Court of Appeals for the First Circuit has observed, "courts have uniformly held that once the proper official is found to have authorized a wiretap application, his authorization is not subject to further judicial review." *O'Malley,* 764 F.2d at 41 (citing cases).

More specifically, in declining to consider "the adequacy of the Assistant Attorney General's examination procedure and thought processes," the Court of Appeals for the First Circuit noted that the Ninth Circuit had held that:

> Once a proper authorizing officer is properly identified ... thereby fixing on him responsibility for a particular authorization, *the basis on which,* or the method by which, he gave the authorization is not, in our judgment, subject to review for compliance with § 2516(1). Rather, *it is presumed* that the officer has properly exercised the judgment called for by the statute when he affixes his signature to an order authorizing the application.

*Id.* (quoting *United States v. Turner,* 528 F.2d 143, 151 (9th Cir.1975)) (emphasis added). *See also United States v. United States Dep't. of Probation and Parole,* 536 F.2d 179, 183–84 (7th Cir.1976) (reversing decision to suppress on ground that Attorney General who authorized application was not given sufficient information because "the statute does not state what the Attorney General must review.").

These principles were applied in the sole reported case directly addressing the question of whether suppression is required when the authorizing official of the Department of Justice has been denied material information by his subordinates. *See Williams,* 565 F.Supp. at 368–69. In *Williams,* the court held that:

> Congress intended that beyond ensuring that the authorization was given, courts engage in no review of the authorization decision. The purpose of the statute was to have an official high enough in the Department of Justice to be subject to political checks and balances go on the line by authorizing the application. *See Giordano,* 416 U.S. at 520, 94 S.Ct. at 1829. Congress intended the political process, and not the courts, to hold the authorizing official responsible for his decision and to review that decision. Thus, § 2516(1) depends on political and not judicial review.

*Id. See also Turner,* 528 F.2d at 150–51; *United States v. Edmond,* 718 F.Supp. 988, 990 n. 5 (D.D.C.1989) (if officials regularly signed authorizations without exercising the " 'mature judgment' " contemplated by the statute, "the structure of § 2516(1) would come into play: the 'publicly responsible official subject to the political process' would be held accountable.").

This court, however, questions the foregoing analysis. Political accountability and judicial review are not mutually exclusive. As the Supreme Court has held, § 2516(1) is of "central" importance to the Title III statutory scheme. *Giordano,* 416 U.S. at 528, 94 S.Ct. 1820. The law contemplates a careful, informed evaluation by a senior official of the Department of Justice as part of the effort to be "doubly sure" that use of electronic surveillance is both permissible and appropriate. *Giordano,* 416 U.S. at 515.

Such careful and reliable scrutiny by the Department of Justice is important. There are inherent limitations on the court's ability to recognize applications for warrants that are false and misleading. *Franks,* 438 U.S. at 169, 98 S.Ct. 2674. As the Supreme Court wrote with regard to requests for warrants generally:

> The pre-search proceeding is necessarily *ex parte,* since the subject of the search cannot be tipped off to the application for a warrant lest he destroy or remove evidence. The usual reliance of our legal system on adversary proceedings itself should be an indication that an *ex parte* inquiry is likely to be less vigorous. The magistrate has no acquain-

tance with the information that may contradict the good faith and reasonable basis of the affiant's allegations. The pre-search proceeding will frequently be marked by haste, because of the understandable desire to act before the evidence disappears; this urgency will not always permit the magistrate to make an extended independent examination of the affiant or other witnesses.

*Id. See also United States v. Ailemen,* 986 F.Supp. 1228, 1246 (N.D.Cal.1997).

"Federal district courts annually approve over 500 requests for authorization to tap ... telephones .... Requests are very rarely denied." *Aviles,* 170 F.3d at 869 (citations omitted). Indeed, since January 1985, courts have denied only seven of 11,889 applications for orders authorizing the interception of wire, oral, or electronic communications. *See* Administrative Office of the U.S. Courts, *Report on Applications for Orders Authorizing or Approving the Interception of Wire or Oral Communications (Wiretap Report),* (1985, 1986, 1987, 1988, 1989, 1990, 1991, 1992); Administrative Office of the U.S. Courts, *Wiretap Report* (1993, 1994, 1995, 1996, 1997). Since January 1989, courts have denied only one of the 8934 applications they have received. *See id.* These statistics do not reflect the number of times that courts have required the submission of additional information or modified proposed Orders. Nor do they indicate the number of times a Department of Justice official has refused a request to authorize an application for fear that it would be denied by the court. Nevertheless, these statistics do suggest that in evaluating applications judges implicitly rely, in part, on the premise that a senior official of the Department of Justice has made a fully informed and deliberate decision that there is a proper basis for electronic surveillance and that the application fairly presents all of the legally required information.

It may ordinarily be appropriate to "presume[ ] that the officer has properly exercised the judgment called for by the statute when he affixes his signature to an order authorizing the application." *O'Malley,* 764 F.2d at 41. This presumption is not, however, valid when FBI informants are purported targets of electronic surveillance. As the facts of this case, among other things, demonstrate, the Department of Justice generally does not require the Bureau to disclose the identity of its informants even to the highest officials of the Department. *See also* Ex. 274 (Under Seal), Manual § 137–17(F)(3) (1–12–81), § 137–16(F)(3) (3–28–84, 5–26–89)(notice of FBI's authorization of informants to engage in extraordinary criminal activity must be forwarded to the Assistant Attorney General "in a form suitable to protect the identity of the informant"); *id.* § 137–17(G)(3) (1–12–81), § 137–16(G)(3) (3–28–84, 5–26–89) (records of informants' participation in serious acts of violence shall be maintained by FBI Headquarters and be subject to review by a designee of the Deputy Attorney General "in a form suitable to protect the identity of the informants ..."). Thus, the Department of Justice official authorizing the application will almost always be unaware of the type of issues presented in the instant case.

The dimensions of the problem posed by requests for wiretaps purportedly targeting informants are difficult to discern because officials of the Department of Justice and judicial officers will only rarely later learn that they have been misled. There is, however, reason to be concerned that the § 2516(1) question presented with regard to the 1984–85 electronic surveillance is not an isolated or aberrant occurrence. Morris testified that it was the practice of the FBI to mischaracterize informants as targets of proposed electronic surveillance in an effort to protect the confidentiality of their status. This happened at least twice concerning Flemmi and Bulger without the knowledge of the Assistant Attorney General who authorized applications for warrants targeting them: Trott with regard to the 1984–85 electronic surveillance and

Weld with regard to Vanessa's. It has also been discovered to have occurred in at least one other Title III case. *See Falls,* 34 F.3d at 681. *See also Strini,* 658 F.2d at 594–95 (cooperating witness falsely characterized as a suspect in application for search warrant).

The foregoing suggests that the threat of judicial review and suppression might prompt the Department of Justice to take the steps necessary to assure that the purposes of § 2516(1) have been satisfied when informants are purported targets of electronic surveillance. Evidentiary hearings could be limited to cases in which a substantial preliminary showing is made that the authorizing Department of Justice official was deprived of material information. "The requirement of a substantial preliminary showing would suffice to prevent the misuse of a[ ] hearing for purposes of discovery or obstruction." *Franks,* 438 U.S. at 170, 98 S.Ct. 2674. As Judge James Carr has written in his treatise:

> An examination of the review of surveillance applications would not be wholly without precedent. [citing *United States v. Kerrigan,* 514 F.2d 35, 37 (9th Cir.) *cert. denied,* 423 U.S. 924, 96 S.Ct. 266, 46 L.Ed.2d 249 (1975).] The government conceded the reviewability of such criteria with reference to warrantless national security eavesdropping in its brief in *United States v. United States District Court,* [407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) ]. In view of the emphasis placed on the importance of § 2516(1) in *Giordano,* commentators have recommended that courts examine the quality of the authorization official's review of electronic surveillance applications. [citing Pulaski, "Authorizing Wiretap Applications Under Title III: Another Dissent to Giordano and Chavez," 123 *U. Pa. L.Rev.* 750, 814 n. 272 (1975) ].

James Carr, *The Law of Electronic Surveillance* § 4.3(a)(1), at 4–19 (1998).

However, in view of the facts that: the literal requirements of § 2516(1) were in the instant case satisfied because the Assistant Attorney General authorized the application for the 1984–85 electronic surveillance; the Court of Appeals for the First Circuit had stated, in a different factual context, that in such circumstances further judicial review is not appropriate, *O'Malley,* 764 F.2d at 41; and the motion to suppress the 1984–85 electronic surveillance is meritorious for other reasons, the court does not intend to grant the motion to suppress based on the alleged violation of § 2516(1). Indeed, perhaps the best reason for not permitting further judicial review if a proper official has authorized an application is the fact that the court is ultimately responsible for deciding whether a requested warrant is justified. *See, e.g., United States Dep't. of Probation and Parole,* 536 F.2d at 183–84 ("We find nothing in the statutes or the cases to indicate that the Attorney General must make a totally independent 'probable cause' determination or that he cannot rely on his subordinate to summarize applications for him or make recommendations to him concerning their merits. The probable cause determination is made by the judge who authorizes the wiretap."); *United States v. Acon,* 403 F.Supp. 1189, 1194 (W.D.Pa. 1975) ("A specifically named officer could determine the policy [of whether to file an application]; the administration of that policy in accordance with the statute in the individual case ... [is] a judicial function."). If it can be demonstrated that the senior official of the Department of Justice was materially misled in authorizing an application, suppression is likely to be justified because the application itself did not satisfy the requirements of Title III. Thus, it would arguably be unnecessarily redundant to provide a judicial remedy when the purposes of § 2516(1) have been subverted because the Department of Justice official authorizing an application has been misinformed.

C. *The Standards to be Applied in Deciding Whether to Suppress for a Failure to Satisfy the Requirements of 18 U.S.C. § 2518(1)(c) Concerning the Necessity for Electronic Surveillance*

As indicated earlier, the parties dispute the standard to be applied in deciding whether suppression is required because the government failed to make the full and complete statement concerning the necessity for electronic surveillance required by § 2518(1)(c). Although not outcome determinative with regard to the motion to suppress the 1984–85 electronic surveillance conducted jointly by the DEA and FBI, the court believes that analysis of this issue may contribute to the clarification of an important and confused area of the law.[76]

In *Ferrara*, this court noted that there was "some uncertainty concerning the standards to be utilized" in deciding the motion to suppress the electronic surveillance evidence intercepted at 34 Guild Street and characterized this as "the most vexing of the many challenging issues presented by defendants' motion to suppress." 771 F.Supp. at 1298. This court concluded that "analysis indicates that for the provisions of Title III which address requirements of the Fourth Amendment, the evolving constitutional law concerning suppression is applicable." *Id.* That law was deemed to include the standards established by *Franks. Id.*

Title III as originally enacted in 1968 contained provisions intended to meet the requirements of the Fourth Amendment as then recently interpreted in *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) and *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). *See Ferrara*, 771 F.Supp. at 1287–88. It also contained

many additional provisions to regulate the interception of communications that were not constitutionally compelled. *Id.*

Since its enactment in 1968, 18 U.S.C. § 2515 has provided that intercepted wire communications are not admissible at "any trial, hearing, or other proceeding ... if the disclosure of that information would be in violation of [Title III]." Section 2518(10)(a)(i) has since 1968 provided for suppression of any wire communication that was "unlawfully intercepted."

When enacted in 1968, §§ 2515 and 2518(10)(a)(i) were coextensive with search and seizure law generally. *Ferrara*, 771 F.Supp. at 1299. "At that time, there was no good faith or other exception to the judicially crafted exclusionary rule applicable to violations of the Fourth Amendment." *Id.* As described in detail in *Ferrara*, 771 F.Supp. at 1299–1304, in the 1970's the Supreme Court issued a pair of decisions involving motions to suppress electronic surveillance which suggested, without holding, that the evolving law concerning the exclusionary rule in Fourth Amendment cases was applicable to provisions of Title III which codified constitutional requirements and the static, statutory standard for suppression contained in Title III was applicable to violations of provisions which were solely statutory in origin. *See Giordano*, 416 U.S. at 524, 527, 548, 558, 94 S.Ct. 1820; *United States v. Donovan*, 429 U.S. 413, 427 n. 15, 432–33, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977).

In 1978, the Supreme Court decided *Franks* and, in the process, altered the previously existing exclusionary rule for Fourth Amendment cases not involving Title III. In *Franks* the Supreme Court held that when constitutionally required probable cause is in question in a case not involving Title III, a defendant must make two showings to obtain suppression based

---

**76.** In addition, if on any appeal it should be decided that, contrary to this court's conclusion, § III.4, *infra*, the interceptions at 34 Guild Street did involve "oral communications" as defined by 18 U.S.C. § 2510(2) and,

therefore, DeLuca is, within the meaning of § 2510(11), an "aggrieved person" who has standing to maintain a motion to suppress, the standard to be applied might make a difference to the ruling on that motion.

upon possible government misconduct: first, that the information at issue was known by the government to be false or was presented with reckless disregard for its truth; and second, that the information was material to the decision to issue the warrant. 438 U.S. at 156, 98 S.Ct. 2674.

The *Franks* standard is easier for the government to meet than the standard applied by the Supreme Court in deciding the motion to suppress electronic surveillance evidence in *Giordano*. In *Giordano*, the Supreme Court held that:

> Congress intended to require suppression where there is failure to satisfy any of those statutory requirements [of Title III] that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device.

416 U.S. at 527, 94 S.Ct. 1820. Such provisions were characterized as "central" to the Title III statutory scheme. *Id.* at 528, 94 S.Ct. 1820. If a central provision of Title III is ignored or otherwise violated, suppression must be ordered unless the government proves that the purpose which the particular procedure was designed to accomplish has been satisfied in spite of the error. *Id.* at 524–28, 94 S.Ct. 1820; *United States v. Chavez*, 416 U.S. 562, 573–74, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974); *Cunningham*, 113 F.3d at 293–94.

Thus, in *Giordano*, the Supreme Court in effect found legislative intent to require suppression without regard to the reason for the violation if certain statutory provisions of Title III not rooted in the requirements of the Fourth Amendment are not satisfied. In contrast, under *Franks*, even a material error would not justify suppression unless it is proven that the government filed the false or misleading application for a warrant intentionally or with reckless disregard for its truth.

After *Franks* was decided, the Court of Appeals for the First Circuit on several occasions, without analysis or explanation, employed the *Franks* standard to decide motions to suppress electronic surveillance evidence alleging failures to meet either the probable cause or necessity requirements of Title III or its Massachusetts counterpart. *See United States v. Southard*, 700 F.2d 1 (1st Cir.1983) (probable cause); *United States v. Mastroianni*, 749 F.2d 900, 908–09 (1st Cir.1984) (necessity); *United States v. Cole*, 807 F.2d 262, 267 (1st Cir.1986) (necessity). Other courts also utilized the *Franks* test to decide attacks on warrants for electronic surveillance. *See Ferrara*, 771 F.Supp. at 1302 n. 11 (citing cases).

This court wrote in *Ferrara*, 771 F.Supp. at 1304:

> In 1986, Title III was amended in a manner which again recognizes that there is a distinction between violations of constitutional and non-constitutional provisions of that statute, and between the exclusionary rules applicable to each. To respond to the development of new technology, Congress in 1986 amended Title III to cover electronic as well as wire and oral communications. In doing so, § 2518(10)(c) was added to the statute. It provides:
>
> > The remedies and sanctions described in this chapter with respect to the interception of electronic communications are the only judicial remedies and sanctions for nonconstitutional violations of this chapter involving such communications. (emphasis added).
>
> The "remedies and sanctions" in Title III include subsection (10)(a), which was not explicitly amended to cover electronic as well as oral and wire communications.
>
> The reference in subsection (10)(c) to "non-constitutional" violations indicates it is the contemporary understanding of Congress and the President that the judicially crafted exclusionary rule governs conduct which violates both the Fourth Amendment and the provisions of Title III which implement its require-

ments. The legislative history reinforces this view. The House Report states:

> In the event that there is a violation of law of a constitutional magnitude the court involved in a subsequent criminal trial will apply the existing constitutional law with respect to the exclusionary rule. *Mapp v. Ohio*, 367 U.S. 643, 652 [81 S.Ct. 1684, 1690, 6 L.Ed.2d 1081] (1961); *Massachusetts v. Sheppard*, [468 U.S. 981], 104 S.Ct. 3424 [82 L.Ed.2d 737] (1984); *United States v. Leon*, [468 U.S. 897], 104 S.Ct. 3405, [82 L.Ed.2d 677] (1984).

H.R. No. 99–647, 99th Cong., 2d Sess., 48 (1986), 1986 U.S.C.C.A.N. 3555; 1986 Leg.Hist. 3555, at 3577.

In *Ferrara*, this court viewed the foregoing, 1986 amendment as implicitly clarifying that the judicially crafted exclusionary rule was always intended to apply to violations of the provisions of Title III which codify requirements of the Fourth Amendment.

Further reflection in this case causes this court to believe that its interpretation in *Ferrara* of § 2518(10)(c) and the related legislative history was not correct. The 1986 amendments to Title III concerning electronic communications authorized civil and criminal penalties, but not suppression, as a remedy for conduct that violated Title III, but did not also violate the Fourth Amendment. *Compare* § 2511(4) (providing criminal penalties for illegal interception of wire, oral, or electronic communications), § 2520 (providing civil penalties for illegal interception of wire, oral, or electronic communications) *and* § 2518(10)(a) (providing for suppression for illegal interception of oral and wire communications, but not of electronic communications). The statement in the legislative history that the judicially crafted constitutional exclusionary rule would apply to violations of Title III involving electronic communications that also violated the Constitution appears to be a recognition that Congress and the President do not have the power to eliminate by statute the authority of the courts to provide a remedy for a violation of the Constitution, or at least that the courts should be allowed to protect the integrity of judicial proceedings by excluding evidence obtained as a result of a violation of the Constitution.

Nevertheless, in his treatise, Judge James Carr has written:

> As a result of the amendment of § 2518(10) in 1986, whereby subsection (c) was added to that section, Congress has incorporated the good faith exception for violations of a constitutional magnitude.

Carr, *supra*, § 6.3A, at 6–84.4.[77]

In addition, in *United States v. Bianco*, the district court addressed a motion to suppress the electronic surveillance conducted at 34 Guild Street and adopted this court's findings of fact and conclusions of law in *Ferrara* in their entirety. *See United States v. Bianco*, 998 F.2d 1112, 1119–

---

**77.** Although the defendants do not agree that Congress and the President intended that the judicially crafted exclusionary rule ever be applied in any Title III case, they argue that Judge Carr's commentary indicates that the statutory exclusionary rule was applicable prior to the 1986 amendments and, therefore, should be employed to resolve the motion to suppress the 1984–85 electronic surveillance. Defs.' Mem. in Supp. of Mot. to Suppress at 60, 62. The government contends that even if the judicially fashioned exclusionary rule were not incorporated in Title III for certain cases prior to 1986, the 1986 amendment should be applied retroactively and utilized to decide the motion to suppress the 1984–85 electronic surveillance. Government's Submission Pursuant to Court's March 28[sic], 1999 Order and Opposition to Defendant Flemmi's Motion to Suppress the Fruits of Electronic Surveillance at Vanessa's Restaurant (April 6, 1999) at 35–37. Because the motion to suppress is meritorious under both the *Franks* and *Giordano* standards, it is not necessary to decide the question of retroactivity if the constitutionally crafted exclusionary rule was in 1986, as Judge Carr indicates, for the first time made applicable to violations of Title III which also violate the constitution.

20 (2d Cir.1993). In affirming the denial of the motion to suppress, the Court of Appeals for the Second Circuit rejected the defendants' contention that "the court should look directly to the exclusionary rule of the statute, rather than to focus on fourth-amendment considerations or a *Franks* analysis." *Id.* at 1125. The Court of Appeals for the Second Circuit explained that several courts had "applied a *Franks* analysis to alleged falsehoods or omissions in wiretap affidavits and applications under Title III." *Id.* at 1126 (citing *United States v. Ferguson,* 758 F.2d 843, 848 (2d Cir.1985); *Mastroianni,* 749 F.2d at 908–09; *United States v. Leisure,* 844 F.2d 1347, 1357 (8th Cir.1988); *United States v. Ippolito,* 774 F.2d 1482, 1485 (9th Cir.1985)). The Second Circuit added that:

> Use of the *Franks* standard is consistent with the purposes of § 2515, which are "not only to protect the privacy of communications, but also to ensure that the courts do not become partners to illegal conduct: the evidentiary prohibition was enacted also 'to protect the integrity of court and administrative proceedings.'" *Gelbard v. United States,* 408 U.S. 41, 51, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972) (citation omitted).

*Bianco,* 998 F.2d at 1126.

This court's 1991 *Ferrara* decision was not appealed because the defendants pled guilty. *See Carrozza,* 807 F.Supp. at 156. In addition, the Court of Appeals for the First Circuit has not applied *Franks* to a request for a warrant to conduct electronic surveillance since its 1989 dicta in *United States v. Ashley,* 876 F.2d 1069, 1073 (1st Cir.1989), indicating that *Franks* is applicable. Many other courts, however, have since 1989 applied *Franks* to such issues, once again without analysis. *See, e.g., United States v. Miller,* 116 F.3d 641, 664 (2d Cir.1997), *cert. denied,* 524 U.S. 905, 118 S.Ct. 2063, 141 L.Ed.2d 140 (1998) (probable cause); *United States v. Muldoon,* 931 F.2d 282, 286 (4th Cir.1991) (probable cause); *United States v. Guer-ra–Marez,* 928 F.2d 665, 670–71 (5th Cir. 1991) (necessity); *United States v. Jackson,* 65 F.3d 631, 635–36 (7th Cir.), *vacated on other grounds sub nom., Lamb v. United States,* 516 U.S. 1156, 116 S.Ct. 1038, 134 L.Ed.2d 186 (1996) (probable cause); *Falls,* 34 F.3d at 681 (probable cause); *Aviles,* 170 F.3d at 868–69 (necessity); *United States v. Green,* 175 F.3d 822, 827 (10th Cir.1999), *petition for cert. filed* (U.S. June 7, 1999) (No. 98–9775) (necessity).

Nevertheless, defendants present several cogent criticisms of the decisions, including *Ferrara,* which apply *Franks* to Title III issues. In essence, they argue the following. Section 2518(10)(a) provides for suppression of oral or wire communications that have been "unlawfully intercepted." An interception that results from a violation of Title III is "unlawful." The statute itself does not provide that the state of mind of the individuals acting for the government in violating any of the provisions of Title III is germane to the issue of suppression. Thus, the application of at least the first prong of the *Franks* test to motions to suppress electronic surveillance is a rewriting of Title III which constitutes an abuse of judicial power. If Congress and the President intend that the judicially crafted exclusionary rule for Fourth Amendment violations be applied when any or all of the provisions of Title III are at issue, they can and should express this intention plainly. This is particularly true if the standards of *Franks* rather than *Giordano* are to be applied when Fourth Amendment rights are implicated because it is anomalous to provide more protection for purely statutory rights than for rights that are both constitutional and statutory.

There is support for the contention that the judicially crafted exclusionary rule for Fourth Amendment violations does not apply in any cases involving Title III. In 1995, the Deputy Attorney General testified on behalf of an amendment to Title III that would provide a "good faith exception

to [the] Title III exclusionary rule," stating:

> Current law [Title III] contains a statutory exclusionary rule which dates back to 1968. Thus, constitutional law in the area of wiretaps has been frozen at a point in time thirty years ago. We agree that the wiretap statute ought to be strictly construed and a high standard of review maintained. However, there is no public purpose of maintaining standards that are inapplicable elsewhere in the law.
>
> The current statute should be amended to require suppression of evidence only where the law enforcement agent acted in bad faith in obtaining the evidence.[78]

Clinton Administration Proposals on Counterterrorism Intelligence Gathering: Hearings on S.761 Before the Sen. Comm. on the Judiciary, 104th Cong. 146 (1995) (statement of Jamie S. Gorelick, Deputy Attorney General).

Defendants contend that the Court of Appeals for the First Circuit expressed a similar view in *United States v. Vest,* 813 F.2d 477 (1st Cir.1987) (*"Vest I"*). In *Vest I,* the Court of Appeals for the First Circuit addressed the question whether a tape-recording made by a private individual could be introduced by the government in a criminal prosecution. In affirming the exclusion of the tape-recording from the government's case-in-chief in a perjury case, the court stated:

> The government argues that we should read into section 2515 the exception to the fourth amendment exclusionary rule for evidence falling into the government's hands after a private search and seizure .... (citations omitted). *But the fourth amendment exclusionary rule is a judicially-fashioned rule serving different purposes than the congressionally-created rule of section 2515—a rule*

*that we are here limited to interpreting rather than modifying.*

\* \* \* \* \* \*

Because we and other courts have recognized an exception to the fourth amendment exclusionary rule permitting the use of unlawfully-seized evidence in perjury prosecutions, (citation omitted), the government argues that the same exception should be incorporated in section 2515. We disagree, for the following reasons.

First, we note that Congress, acting in 1968, specified its intent not to "press the scope of the suppression rule [sic] beyond present search and seizure law" ... the government has cited no case decided before or during 1968 that recognized an exception to the fourth amendment exclusionary rule for perjury prosecutions; ... *[W]e believe that if Congress had intended to commit to the courts general authority to create exceptions to section 2515 in the same manner as the courts might develop future exceptions to the fourth amendment exclusionary rule, Congress could certainly have said so more clearly. We therefore agree with the district court's conclusion that Congress did not intend to confer such discretion on the courts.*

Second, a full reading of the quoted passage in the Senate Report demonstrates that Congress carefully considered which aspects of the fourth amendment exclusionary rule would and would not [apply] .... In view of Congress' careful consideration of these matters, *we are reluctant to conclude that Congress intended ... [to provide] a blank check to the courts to incorporate into section 2515 every change in the scope of*

---

**78.** The Deputy Attorney General also noted, however, that "several judicial circuits have already extended the good faith exception to certain situations under Title III. The pro-posed amendment would make such a good faith exemption applicable to all Title III cases." *Id.*

*the fourth amendment exclusionary rule.*

*Id.* at 481–82 (emphasis added).

The decision in *Vest I,* however, is not necessarily inconsistent with the Court of Appeals for the First Circuit's use of the *Frank's* standard in *Southard, Mastroianni,* and *Cole. Vest I* involved a tape-recording made by a private party, rather than a government search and seizure. Thus, neither the Fourth Amendment nor any provision of Title III rooted in it was involved in the case. *See United States v. Curzi,* 867 F.2d 36, 45 n. 8 (1st Cir.1989) ("we were not dealing [in *Vest I* ] with the Constitution"). Nevertheless, the expansive language used by the First Circuit in *Vest I* lends support to defendants' argument that the judicially crafted exclusionary rule does not apply in Title III cases.

The most recent relevant decision of the Court of Appeals for the First Circuit employs a hybrid approach to deciding a motion to suppress electronic surveillance because of a failure, due to clerical errors by the government, of the application and resulting warrant to describe with the particularity required by the Fourth Amendment and Title III the place to be searched and the conversation to be seized. *Cunningham,* 113 F.3d at 289. In *Cunningham,* the application and warrant mistakenly referred to the interception of both wire and oral communications, although the applicant, the executing officer, and the court all knew that only a bug to intercept oral communications at a particular location was being sought. *Id.* at 293–94. While the defects related to the particularity clauses of the Fourth Amendment and associated provisions of Title III, the court applied the standard established by *Giordano,* rather than *Franks,* but also relied on Fourth Amendment jurisprudence developed after the enactment of Title III in 1968, in denying the motion to suppress. *Id.* In doing so, the court stated:

Title III is designed to protect privacy interests similar to those reflected in the Fourth Amendment. Whether or not *Leon*'s good faith exception should be interpolated into the statute—an issue we do not decide—Fourth Amendment precedent is highly relevant in deciding whether … a defect in wording is of a kind that threatens the central interests sought to be protected.

*Id.* at 294. However, in dicta, the Court of Appeals for the First Circuit indicated that *Franks* would be applied if the truthfulness of the affidavit were at issue. *Id.* at 295 ("it would be the defendant's burden [of proof] if the warrant were facially valid but sought to be impugned by proof of perjury.").

Accordingly, there is a meaningful question regarding the standard that should be employed to decide the motion to suppress the 1984–85 electronic surveillance. If this court were writing on a clean slate, it would now hold that the statutory standard of § 2518(10)(a)(i), as interpreted by *Giordano* and its progeny including *Cunningham,* is applicable to all violations of Title III unless the provision of the statute at issue codifies a requirement of the Fourth Amendment *and* the evolving, judicially crafted exclusionary rule provides subjects of electronic surveillance more protection than the statute. In other words, if conduct violates both Title III and the Constitution, and the judicially crafted exclusionary rule would provide the defendant a remedy for the constitutional violation, Title III should not be interpreted to deprive him of that remedy. As discussed in § III.4, *infra,* although the judicially crafted exclusionary rule could have evolved in a way that provides subjects of electronic surveillance more protection than Title III, it has not done so to date. Thus, it appears most appropriate that the higher *Giordano* standard be applied in the instant case. However, as indicated earlier, and as set forth below, the motion to suppress the 1984–85 electronic surveillance is meritorious under both the *Franks* and *Giordano* tests.

**D.** *The Necessity Provision of Title III, § 2518(1)(c), is Constitutional in Origin*

The defendants correctly contend that in seeking the warrant to wiretap Kaufman's telephone the government failed to make the full and complete statement concerning necessity required by 18 U.S.C. § 2518(1)(c). They assert that § 2518(1)(c) is a solely statutory provision. Thus, defendants claim that *Giordano* rather than *Franks* provides the standard applicable to deciding their motion to suppress the 1984–85 electronic surveillance even if the judicially crafted exclusionary rule applies to violations of provisions of Title III that reflect constitutional requirements.

In litigating *Ferrara,* the government in 1990 agreed with defendants' present position, stating that "the necessity requirement of Title III is not of constitutional dimension .... The requirement that the applicant demonstrate that other investigative techniques have been exhausted or are unavailable is imposed by the Title III statute and not the Constitution. *See Berger, supra.*" Government's Response to Defendant Patriarca and Ferrara's Motions to Suppress All Evidence Derived from Oral Intercept Order in M.B.D. 89–1015 and to Dismiss the Indictment (Dec. 31, 1990) at 17 n.8. The government now asserts that § 2518(1)(c) is "rooted in the Fourth Amendment," but also states that "the constitutional derivation of the necessity clause is not beyond dispute." Government's Submission Pursuant to Court's March 28[sic], 1999 Order and Opposition to Defendant Flemmi's Motion to Suppress the Fruits of Electronic Surveillance at Vanessa's Restaurant (Apr. 6, 1999) at 37. *See also* Apr. 13, 1999 Tr. at 135 (government characterizes issue of whether a violation of § 2518(1)(c) is also a violation of the Fourth Amendment as "not clear-cut").

In *Ferrara,* this court found that § 2518(1)(c) was constitutional in character. 771 F.Supp. at 1288. As set forth below, the court finds that the jurispru-dence since *Ferrara* supports this conclusion.

The Fourth Amendment states that:

[1] The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and [2] no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and persons and things to be seized.

U.S. Const. amend. IV.

In *Ferrara,* this court wrote that:

To obtain a warrant to intercept communications the government must make a "full and complete statement of the facts and circumstances relied upon" to satisfy several constitutional criteria. § 2518(1)(b), (c), (d). These include a "full and complete statement as to whether or not other investigative procedures have been tried and failed, or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." § 2518(1)(c). This showing of necessity reflects the Fourth Amendment requirement that searches and seizures be "reasonable" and addresses the related statements in *Berger,* 388 U.S. at 57, 87 S.Ct. at 1882, and *Katz,* 389 U.S. at 355–56, 88 S.Ct. at 513–14, that courts should authorize "no greater invasion of privacy ... than [is] necessary under the circumstances." *See also* Goldsmith, *The Supreme Court and Title III: Rewriting the Law of Electronic Surveillance,* 74 J.Crim.L. & Criminology 1, 126 (1983).

771 F.Supp. at 1288. Thus, based on the previously described analysis, and following the predominant practice of the Court of Appeals for the First Circuit, the court applied the judicially crafted *Franks* test in deciding whether to suppress the evidence intercepted at 34 Guild Street because of the violation of § 2518(1)(c) that was proven. *Id.* at 1304–11.

Once again, defendants present thoughtful criticism of this court's reasoning in *Ferrara*. *See* Memorandum of Law in Support of the Defendants' Motion to Suppress Electronic Surveillance Conducted in this Case (Jan. 29, 1999) ("Defs.' Mem. in Supp. of Mot. to Suppress") at 81–94. First, defendants argue that the necessity provision of Title III is not rooted in the Fourth Amendment because, as they correctly note, there is nothing in the Fourth Amendment, or in traditional search and seizure law, which requires that law enforcement personnel exhaust or otherwise attempt other investigative procedures before resorting to an application for a conventional search warrant. *See* W. LaFave & J. Israel, *Criminal Procedure* § 1.2(h) (1984).

In addition, the defendants accurately observe that the Senate Report concerning Title III identifies expressly several provisions as intended to conform to the requirements of the constitution as interpreted in *Berger* and *Katz*, including § 2518(1)(b) which relates to particularity. *See* S.Rep. No. 90–1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2190. However, there is no reference to *Berger*, *Katz*, or the Fourth Amendment in the analysis of the necessity provision. *See id.*

Defendants recognize the argument, discussed below, that the necessity provision of Title III is a component of a constitutionally compelled substitute for pre-search notice. They argue, however, that the Supreme Court implicitly rejected this claim in stating that: "In [*U.S. v. Donovan*, 429 U.S. 413, 429 n. 19, 97 S.Ct. 658, 50 L.Ed.2d 652], we held that Title III provided a constitutionally adequate substitute for advance notice by requiring that once the surveillance operation is completed the authorizing judge must cause notice to be served on those subjected to surveillance. *See* 18 U.S.C. § 2518(8)(d)." *Dalia v. United States*, 441 U.S. 238, 248, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979).

Defendants also argue that the mere fact that § 2518(1)(c) is intended to limit the use of electronic surveillance does not mean that it is not solely statutory in origin. The requirement that a high ranking official of the Department of Justice authorize an application for a warrant for electronic surveillance is intended to serve the same purpose and has been recognized by the Supreme Court to be statutory rather than constitutionally based. *Giordano*, 416 U.S. at 527–28, 94 S.Ct. 1820.

Defendants point out that the Court of Appeals for the First Circuit has referred to § 2518(1)(c) as a "statutory preference for less intrusive techniques" than wiretapping. *Ashley*, 876 F.2d at 1072. In addition, in at least one other Circuit the *Giordano* test rather than the *Franks* test has been employed in granting a motion to suppress for a violation of § 2518(1)(c). *See United States v. Mondragon*, 52 F.3d 291, 294 (10th Cir.1995).

Defendants' arguments that § 2518(1)(c) is solely statutory in origin are thought provoking. They are not, however, persuasive.

The showing of necessity mandated by § 2518(1)(c) is constitutionally compelled because requiring the government to persuade a court that conventional methods of investigation are not likely to succeed or are too dangerous requires a showing of a form of the "exigent circumstances" that must be made to render a search "reasonable" in the absence of the pre-search notice to the target that is ordinarily required by the Fourth Amendment. This is a specific application of the principle that in performing their constitutional function of protecting people from unreasonable searches and seizures judges should authorize "no greater invasion of privacy ... than [is] necessary under the circumstances." *Berger*, 388 U.S. at 57, 87 S.Ct. 1873; *Katz*, 389 U.S. at 355–56, 88 S.Ct. 507.

Electronic surveillance must be conducted secretly to be effective. *Berger*, 388 U.S. at 60, 87 S.Ct. 1873. It is obvious that if a target is given prior notice that he

will be subject to electronic surveillance on a particular telephone or at a particular place, incriminating conversation is unlikely to be intercepted. *Katz*, 389 U.S. at 356 n. 16, 88 S.Ct. 507.

However, when the Fourth Amendment was enacted prior notice had long been regarded as an essential element of a reasonable search unless certain, exceptional circumstances were demonstrated. *Wilson v. Arkansas*, 514 U.S. 927, 931–34, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995); *Ker v. California*, 374 U.S. 23, 38–40, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). *See also* Charles L. Black, Jr., "Foreword: 'State Action,' Equal Protection, and California's Proposition," 81 *Harv. L.Rev.* 69, 190 (1967) ("It has been held at common law for over 300 years that in executing a search warrant the officer must give notice of his aim and authority before entering."). Thus, there is a tension between what the Fourth Amendment usually demands and an inherent requirement of electronic surveillance as an investigative technique.

These conflicting considerations are not irreconcilable, however. "The fundamental command of the Fourth Amendment is that searches and seizures be reasonable." *New Jersey v. T.L.O.*, 469 U.S. 325, 340, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). *See also Wilson*, 514 U.S. at 931, 115 S.Ct. 1914; *Ferrara*, 771 F.Supp. at 1290–91. In *Wilson*, the Supreme Court made clear that whether prior notice was given to the subject of a search "is an element of the reasonableness inquiry under the Fourth Amendment." 514 U.S. at 934, 115 S.Ct. 1914. It is not, however, an inflexible requirement. *Id.* Rather, "countervailing ... law enforcement interests" may render a search reasonable even if prior notice had not been given. *Id.* at 936, 115

S.Ct. 1914. Thus, a search may be conducted in compliance with the Fourth Amendment without giving prior notice if doing so "would be dangerous or futile, or ... would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Richards v. Wisconsin*, 520 U.S. 385, 394, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997).

The fact that the Fourth Amendment usually requires pre-search notice was recognized by the Supreme Court in *Berger*. In *Berger*, the Court held that a New York electronic surveillance statute had a series of defects which caused it to violate the Fourth and Fourteenth Amendments. 388 U.S. at 44, 87 S.Ct. 1873. In doing so, the Court stated that:

> the statute's procedure, necessarily because its success depends on secrecy, has no requirement for notice as do conventional warrants, nor does it overcome this defect by requiring some showing of special facts. On the contrary, it permits uncontested entry without any showing of exigent circumstances. Such a showing of exigency, in order to avoid notice would appear more important in eavesdropping, with its inherent dangers, than that required when conventional procedures of search and seizure are utilized.

*Id.* at 60, 87 S.Ct. 1873.[79] *See also United States v. Mesa–Rincon*, 911 F.2d 1433, 1442 (10th Cir.1990).

Defendants understand that § 2518(1)(c) was included in Title III to address the pre-search notice issue presented by *Berger*. *See* Defs.' Mem. in Supp. of Mot. to Suppress at 87–89. This understanding is correct.

**79.** Contrary to defendants' contention, the discussion in footnote 16 of *Katz*, 389 U.S. at 355 n. 16, 88 S.Ct. 507, is not inconsistent with this court's interpretation of *Berger* as requiring a showing of necessity as a form of exigent circumstances as a component of a constitutionally sufficient substitute for pre-search notice. *Katz* cites *Ker*, 374 U.S. at 37– 41, 83 S.Ct. 1623, an early case in which the Court found that exigent circumstances may constitutionally justify a search without notice to the target. Footnote 16 of *Katz*, however, does not address the issue now presented as directly as *Berger* and the other authorities discussed in this Memorandum.

The legislative history of Title III includes a statement by Professor Robert Blakey, who took a leading role in drafting the statute, that:

[S]uch a showing of 'special facts' or 'exigent circumstances' [as enunciated in *Berger*] would unquestionably be met by a legislative requirement that judicial authorization for the use of electronic surveillance techniques be conditioned on a showing that 'normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried.' This is the English standard now for the use of wiretapping by the Home Secretary's warrant. (Devlin, The Criminal Prosecution in England 65–69 (1958)).

*Controlling Crime Through More Effective Law Enforcement,* Hearings Before The Subcommittee on Criminal Laws and Procedures of the Committee on the Judiciary of the United States Senate 90th Cong., 1st Sess., at 935, 977 (1967).

In addition, the Senate Report cites *Read v. Case,* 4 Conn. 166 (1822) as a source for the requirement that the government make a full and complete statement concerning whether normal investigative techniques have been tried and failed, are likely to be futile if employed, or would be too dangerous. *See* S.Rep. No. 90–1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2190. *Read* is a case dealing with the question of whether notice is required before an officer enters a home and whether exceptional circumstances may vitiate the need for pre-search notice. *Read,* 4 Conn. at 170.

Accordingly, this court agrees that:

The legislative history of these provisions make it ... clear that 18 U.S.C. § 2518(1)(c) and (3)(c) were enacted to satisfy the "special facts" or "exigent circumstances" requirement of *Berger*. U.S.Code Cong. and Adm.News 2112, 2113, 2161–63, 2190–91 (1968); *see also* Blakey and Hancock, "A Proposed Electronic Surveillance Control Act", 43 *N.D.Law* 657, 673–74 f.n. 35 (1968).

Moreover, subsequent lower court decisions have linked the requirements of *Berger* with those provisions. *United States v. Forlano,* 358 F.Supp. 56, 58 (S.D.N.Y.1973) and *United States v. Leta,* 332 F.Supp. 1357, 1361 f.n. 5 (M.D.Pa.1971); *see also United States v. Ford,* 553 F.2d 146, 151 (D.C.Cir.1977). Thus, the "necessity" requirement of § 2518(1)(c) and (3)(c) has both a constitutional and statutory basis.

*United States v. Costello,* 610 F.Supp. 1450, 1465 (N.D.Ill.1985), *aff'd sub nom., United States v. Olson,* 830 F.2d 195 (7th Cir.1987).

Contrary to defendants' contention, the conclusion that § 2518(1)(c) is rooted in the requirements of the Fourth Amendment is not inconsistent with the Supreme Court's decisions in *Donovan* and *Dalia*. In *Donovan,* the Court stated that the provisions of 18 U.S.C. § 2518(8)(d), regarding mandatory and discretionary post-search notice to individuals who have been intercepted, "satisfy *constitutional* requirements." 429 U.S. at 429 n. 19, 97 S.Ct. 658 (emphasis added). Similarly, in *Dalia* the Court wrote that in *Donovan,* "we held that Title III provided a *constitutionally* adequate substitute for advance notice by requiring that once the surveillance operation is completed the authorizing judge must cause notice to be served on those subjected to surveillance. *See* 18 U.S.C. § 2518(8)(d)." *Dalia,* 441 U.S. at 248, 99 S.Ct. 1682 (emphasis added). Thus, *Donovan* and *Dalia* each treat the usual requirement of pre-search notice as a constitutional consideration.

As is implicit in *Donovan* and explicit in *Dalia,* the fact that § 2518(8)(d) addresses the constitutional question of whether a search without prior notice is reasonable does not mean that § 2518(1)(c) does not also address this concern. In *Donovan,* 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652, it evidently was not disputed that the government had made the required full and complete statement concerning necessity

in applying for the warrant at issue. Thus, its holding that post-search notice was a constitutionally adequate substitute for pre-search notice was implicitly premised on the understanding that the judge, in issuing the warrant, had made a properly informed decision that the use of less intrusive, conventional investigative techniques would be inadequate. This point was made more clearly in *Dalia*, in which the Court held that the "Fourth Amendment does not prohibit *per se* a covert entry performed for the purpose of installing otherwise legal electronic bugging equipment," 441 U.S. at 248, 99 S.Ct. 1682, and went on to state, in part, in a supporting footnote:

> [I]n issuing the Title III order, the court found that "[n]ormal investigative procedures reasonably appear to be unlikely to succeed and are too dangerous to be used." And in his opinion denying petitioner's subsequent suppression motion, the same judge stated: "The affidavits which supported the application for the warrant in question indicated that resort to electronic surveillance, to overhear meetings at Dalia's office and conversations on Dalia's telephones, was required to identify the sources of Dalia's stolen goods, those working with him to transport and store stolen property, and the scope of the conspiracy. Oral evidence of this criminal enterprise was only available inside Dalia's business premises." The District Court, therefore, concluded that the circumstances required the approach used by the officers . . . .

*Id.* at 248 n. 8, 99 S.Ct. 1682 (internal citations omitted). Thus, the holding in *Dalia* that post-entry notice was constitutionally adequate in an electronic surveillance case was expressly premised on the understanding that the government had made the full and complete statement concerning necessity mandated by § 2518(1)(c).

In his treatise, Judge Carr agrees that § 2518(1)(c) has a constitutional origin. Carr, *supra,* § 4.4(d), at 4–65–67. He too finds that, "[o]ne constitutional basis for § 2518(1)(c) is the Supreme Court's determination in *Berger v. New York* that the New York eavesdropping statute was defective on its face in part because it contained no requirement for notice, while failing to 'overcome this defect by requiring some showing of special facts.' " *Id.* at 4–65 (quoting *Berger,* 388 U.S. at 60, 87 S.Ct. 1873). Judge Carr also states that "[a] second constitutional origin for the necessity requirement is the doctrine that intrusions under the Fourth Amendment are limited to the justification upon which they are based." *Id.* at 4–66. Other commentators generally agree that § 2518(1)(c) is rooted in the requirements of the Fourth Amendment. Michael Goldsmith, "Criminal Law: The Supreme Court and Title III: Rewriting the Law of Electronic Surveillance," 74 *J.Crim. L. & Criminology* 1, 126 (1983); Daniel F. Cook, "Electronic Surveillance, Title III, and the Requirement of Necessity," 2 *Hastings Const. L.Q.,* 571, 577–86 (1975); *Cf.* Clifford S. Fishman & Anne T. McKenna, 1 *Wiretapping and Eavesdropping* 8–96 n. 35 (2d ed. 1995) (" 'The "other investigative procedures" requirement may be constitutional, as well as statutory' " (quoting Cook, "Electronic Surveillance," 2 *Hastings Const. L.Q.* at 577–86)).

Therefore, in essence, the Fourth Amendment usually requires pre-search notice. If the government wishes to employ electronic surveillance, it must persuade a neutral judge that it is reasonable to dispense with pre-search notice, and rely instead on post-search notice, because conventional investigatory techniques that would provide a subject pre-search notice are inadequate or too dangerous. The Constitution and Title III require that the government provide to the court a full and complete statement concerning the necessity for electronic surveillance in order to permit the court to perform its function properly. This requirement was not satisfied in this case.

E. *The Motion to Suppress the 1984–85 Surveillance is Meritorious*

As indicated earlier, the motion to suppress the 1984–85 electronic surveillance is meritorious under any of the arguably applicable standards. The government's best chance of prevailing would be based on the argument that § 2518(1)(c) concerning necessity and § 2518(1)(b) concerning particularity each codifies a constitutional requirement; the judicially crafted exclusionary rule applies to violations of such provisions; therefore, the two-prong *Franks* test should be applied to decide the motion to suppress the 1984–85 electronic surveillance. This formulation of the issue is most favorable to the government because it requires proof that the government intentionally, or with reckless disregard for the truth, submitted a materially false or misleading application. *Franks*, 438 U.S. at 171–72, 98 S.Ct. 2674. Thus, even evidence intercepted as a result of a materially false and misleading application may be saved if the defendant does not prove the requisite state of mind. *Id.*

Defendants assert that even if a judicially crafted exclusionary rule, rather than § 2515 as interpreted in *Giordano,* should be applied, the *Franks* standard is not appropriate where necessity rather than, as in *Franks*, probable cause is at issue. *See Franks*, 438 U.S. at 155–56, 98 S.Ct. 2674. In order to obtain a conventional search warrant the government must only provide the court with information sufficient to demonstrate that there is probable cause to believe (a) that a crime has been, or is being, committed and (b) that the proposed search will produce evidence of that crime. *Dalia*, 441 U.S. at 255, 99 S.Ct. 1682; *United States v. Feliz*, 182 F.3d 82, 86 (1st Cir.1999); *United States v. Zayas–Diaz*, 95 F.3d 105, 110–11 (1st Cir. 1996). The government is, therefore, not required to provide the court all of the information which it has that would tend to establish or strengthen the required showing of probable cause. Thus, with regard to probable cause, the government has the

legitimate discretion to withhold information from an application for a conventional search warrant in an effort to protect the confidentiality of the identity of an informant, among other things. *Rivera v. United States*, 928 F.2d 592, 604–05 (2d Cir.1991).

This principle is codified in Title III. With regard to establishing that there is probable cause for the issuance of a warrant to conduct electronic surveillance, the government must make "a full and complete statement of the facts and circumstances *relied upon by the applicant*, to justify his [or her] belief that an order should be issued." 18 U.S.C. § 2518(1)(b) (1994) (emphasis added). "Thus, the government has some discretion to rely upon and disclose less than all of its evidence tending to establish probable cause, as long as there is no effort to mislead the court into approving a warrant which might otherwise not have been issued." *Ferrara*, 771 F.Supp. at 1306–07.

As described previously, however, § 2518(1)(c), which requires that the government persuade the court that electronic surveillance is necessary, does not codify a generally applicable common law requirement, but rather is part of the statute's scheme to provide a constitutionally sufficient substitute for pre-search notice. In contrast to the statutory requirements concerning probable cause, the government's obligation to make a "full and complete statement" concerning necessity is unqualified. *See* 18 U.S.C. § 2518(1)(c) (1994). The government is not permitted to disclose only the information that it wishes to rely upon. Rather, the government is obligated to inform the court of all of the relevant information that the agencies participating in the investigation possess concerning necessity. *Mastroianni*, 749 F.2d at 908–10; *Aviles*, 170 F.3d at 866.

Defendants argue that the first prong of the *Franks* test, which makes the government's state of mind relevant to the suppression inquiry, may be reasonable with

regard to the issue of probable cause on which the government has some legitimate discretion concerning what it discloses in an application for a warrant. They contend, however, that in enacting § 2518(1)(c) Congress and the President decided that the government must make full disclosure of relevant information in its effort to persuade a judge that electronic surveillance is necessary. Therefore, they assert that it is an impermissible form of "judicial legislation" for the court to permit intercepted evidence to be utilized where this statutory requirement has not been satisfied. In essence, they suggest that even if the judiciary does have the discretion to craft an exclusionary rule for a violation of § 2518(1)(c), it should adopt the *Giordano* test.

There is no reported case that addresses the defendants' argument, which this court finds to be logical and reasonably compelling. However, as noted earlier, cases in many circuits, including the First Circuit, have applied the *Franks* standard in deciding motions to suppress for alleged violations of § 2518(1)(c). *See, e.g., Mastroianni*, 749 F.2d at 908–10 (1st Cir.); *Cole*, 807 F.2d at 267 (1st Cir.); *Miller*, 116 F.3d at 664 (2d Cir.); *United States v. King*, 991 F.Supp. 77, 89–90 (E.D.N.Y.1998); *Guerra–Marez*, 928 F.2d at 669–71 (5th Cir.); *United States v. Gruber*, 994 F.Supp. 1026, 1041, 1048–50 (N.D.Iowa 1998); *Aviles*, 170 F.3d at 868–69 (9th Cir.); *United States v. Homick*, 964 F.2d 899, 904 (9th Cir.1992); *Ippolito*, 774 F.2d at 1485 (9th Cir.); *Green*, 175 F.3d at 828 (10th Cir.). Accordingly, the court deems it prudent and appropriate to analyze the issue concerning the 1984–85 electronic surveillance as if *Franks* applied to violations of § 2518(1)(c). The subsequent *Giordano* analysis, however, would be equally applicable if the court were to accept defendants' argument that *Giordano* should be deemed an appropriate standard even if § 2518(1)(c) is constitutional in origin and subject to a judicially crafted exclusionary rule.

As indicated earlier, *Franks* provides for suppression when the government has [1] "intentionally, or with reckless disregard for the truth," submitted an application that is [2] materially false or misleading. *Franks*, 438 U.S. at 155–56, 171–72, 98 S.Ct. 2674. "Intentionally" means "[t]o do something purposely, and not accidentally." *Black's Law Dictionary* 810 (6th ed.1990).

With regard to "reckless disregard," in *Franks* the Supreme Court stated that:

"[W]hen the Fourth Amendment demands a factual showing ... the obvious assumption is that there will be a truthful showing." .... *"truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true.*

438 U.S. at 164–65, 98 S.Ct. 2674 (quoting *United States v. Halsey*, 257 F.Supp. 1002, 1005 (S.D.N.Y.1966)) (emphasis added). *See also United States v. Clapp*, 46 F.3d 795, 800 (8th Cir.1995) ("Courts, including our own, that have attempted to define reckless disregard for the truth have looked to what the affiant, 'believed or appropriately accepted' as true ....") (citing cases).

In order to demonstrate reckless disregard, a defendant must prove that those acting for the government did not believe a representation to be true or that they in fact entertained "serious doubts" as to the truth of the matter asserted. *Clapp*, 46 F.3d at 799–801; *United States v. A Residence Located at 218 Third St., New Glarus, Wis.*, 805 F.2d 256, 258–59 (7th Cir.1986); *United States v. Williams*, 737 F.2d 594, 602 (7th Cir.1984); *United States v. Castellanos*, 820 F.Supp. 80, 84 (S.D.N.Y.1993); *Dorfman*, 542 F.Supp. at 368–69, *aff'd sub nom., United States v. Williams*, 737 F.2d 594. Reckless disregard can be proven inferentially from circumstances presenting obvious reasons to doubt the veracity of the allegations at issue. *Clapp*, 46 F.3d at 799–801; *A Residence Located at 218 Third St., New Glarus, Wis.*, 805 F.2d at 258–59;

*Williams,* 737 F.2d at 602; *Castellanos,* 820 F.Supp. at 84; *Dorfman,* 542 F.Supp. at 368–69. Reckless disregard can be inferred from, among other things, the failure to provide the court information that any reasonable person would understand the court would want to know. *United States v. Jacobs,* 986 F.2d 1231, 1234–35 (8th Cir.1993); *United States v. Vigeant,* 176 F.3d 565, 572 (1st Cir.1999)(finding reckless disregard because of numerous, material omissions and false statements).

At times, the failure to discover information in the possession of a participating investigative agency has contributed to a finding of reckless disregard. *See United States v. Chesher,* 678 F.2d 1353, 1361 (9th Cir.1982) ("unexplained failure" of experienced affiant asserting target of proposed search was a Hell's Angel to discover four-year-old report relating to target's expulsion from gang "tends to support a claim of recklessness"); *United States v. Fox,* 790 F.Supp. 1487, 1494 (D.Nev.1992) (where experienced agent had reason to doubt veracity of his representations, "failure to discover . . . information [in a file he could have read] reflected a reckless disregard for the truth."), *aff'd sub nom., United States v. Austin,* 8 F.3d 30 (9th Cir. 1993).

■ Where, as here, the FBI was participating in a joint investigation with the DEA when the application was submitted on December 24, 1984, the full and complete statement concerning necessity mandated by § 2818(1)(c) required inclusion of the relevant information possessed by those participating in the matter on behalf of the FBI, most particularly Ring. *Mastroianni,* 749 F.2d at 909–10; *Aviles,* 170 F.3d at 867. Indeed, the government recognizes that because the court has found that the Bureau was involved in the joint investigation when the application was submitted, the " 'FBI knowledge' is also relevant and important to the validity of the [December 24, 1984] electronic surveillance order . . . ." Gov. Post–Hearing Brief at 331 n.109.

The government's obligation in this matter was described in *Aviles,* a recent decision of the Court of Appeals for the Ninth Circuit, in which Trott, now a federal judge, joined. In *Aviles,* the FBI and DEA were jointly engaged in a narcotics investigation, but not fully cooperating. 170 F.3d at 866. A motion to suppress evidence derived from a wiretap alleged that the government had violated § 2518(1)(c) by failing to include in the affidavit submitted by an FBI agent, Allen, information that a participating DEA agent, Tse, had withheld from him. *Id.* In finding that a violation of the first prong of the *Franks* test had been proven, the Court of Appeals for the Ninth Circuit wrote:

> The reason Allen did not say more about Tse's investigation of Barrenechea was that Tse had been closemouthed about it, even at a meeting on April 15, 1992 with Allen and AUSA Canepa where Tse was informed that a wiretap application was being considered. Tse was close-mouthed to protect his own investigation. As Allen testified, such things are not common, but they do occur. They are the bane of government—agencies charged with overlapping tasks sometimes more zealous in protecting their turf than in achieving the common objective.

\* \* \* \* \* \*

> *Agent Tse knew that Allen, a fellow task force member, was preparing an affidavit in support of an application for court-ordered electronic surveillance. An agent in Agent Tse's position has an obligation to disclose to a fellow task force member all information material to such an application. Tse's failure to discharge this obligation was an error. It is as a representative of the government that an applicant for a wiretap authorization applies to the court. The government cannot so compartmentalize its activities that it hides from the*

*court information that might be relevant.*

Tse's duty, if he had material facts, was enforceable by AUSA Canepa going to Tse's superiors in the DEA and obtaining reports she must have known he would have made. The sanction for failure to get these reports and for Tse's silence is the risk that the wiretap application be held invalid. *Tse's failure to disclose reports in his possession was intentional on Tse's part, and his intention is attributable to Agent Allen. See United States v. Jacobs,* 986 F.2d 1231, 1234 (8th Cir.1993); *see also United States v. Wood,* 57 F.3d 733, 737 (9th Cir.1995) (for Brady purposes, prosecutor charged with knowledge of material known to FDA). Tse's motive in withholding material information would have been irrelevant.

*Id.* at 866–67 (emphasis added).

The principle applied in *Aviles* is not novel. Indeed, less than two months before the December 24, 1984 application was filed, the Court of Appeals for the First Circuit emphasized, in a District of Massachusetts case, the requirement that affidavits contain up-to-date information concerning the necessity for electronic surveillance that is in the possession of all agencies participating in a joint investigation. *Mastroianni,* 749 F.2d at 908–10. *Mastroianni,* which was decided on October 30, 1984, involved a joint DEA–Massachusetts State Police investigation. *Id.* at 908. A State Trooper, McGreal, filed an affidavit in support of a state wiretap application which represented that "[a]s of this date" efforts to penetrate the targeted organization had failed. *Id.* Five days earlier, however, a member of the organization, Cellilli, had agreed to cooperate with a DEA agent, O'Brien, who was participating in the joint investigation. *Id.*

Although the Court of Appeals for the First Circuit held that the district court did not abuse its discretion in finding that the affidavit did not contain reckless misrepresentations, it held that, "McGreal should have made a final check with all agencies involved in the investigation before submitting his affidavit." *Id.* at 909–10. The court went on to provide a warning to the government, stating:

> [W]e wish to express our concern about delayed communications between government investigators in a case such as this. It is our view that O'Brien was unwise in failing to notify McGreal earlier of his meeting with Cellilli, no matter how uncertain O'Brien might have been about the extent of Cellilli's cooperation. The state police were bearing the primary responsibility and this meeting would seem to have been a major development. Whether or not the challenged statement in the affidavit was untrue in light of this meeting, the magistrate should have been informed of the new development in the case. It may be that in other circumstances, a five-day delay in transmitting such information would be too long to avoid a finding of recklessness.

*Id.* at 910. The court also noted that it had "serious reservations about whether a magistrate would have approved the wiretap application when he did if he had been aware of Cellilli's apparent decision to cooperate." *Id.* at 909 n. 6.

The requirement that all participating agencies contribute to the full and complete statement concerning necessity mandated by § 2518(1)(c) is a particular application of the Supreme Court's statement in *Franks* that "police could not insulate one officer's deliberate misstatement merely by relaying it through an officer—affiant personally ignorant of its falsity." 438 U.S. at 164 n. 6, 98 S.Ct. 2674. This is a principle that has been applied in the Title III context in cases decided both before and after *Mastroianni. See e.g. Dorfman,* 542 F.Supp. at 366 n. 18; *United States v. Tufaro,* 593 F.Supp. 476, 485–86 (S.D.N.Y. 1983); *Cole,* 807 F.2d at 264–65, 267–68. *See also* Carr, *supra,* § 6.2(d)(1)(A), at 6–61 ("The 'fellow officer rule' may be applied, so that information known to one

investigator, but not communicated to the affiant, may be attributed to the affiant regardless of his actual ignorance .... Given the care with which surveillance applications and affidavits are prepared, it is appropriate to demand that all available information be communicated to the officer preparing the application.").

As described in detail in § II.17, *supra*, despite the then recent ruling in *Mastroianni*, neither the United States Attorney's Office, the DEA, nor the FBI considered its implications for the 1984–85 electronic surveillance or obeyed its holding. Like Agent Tse in *Aviles*, Ring, representing the FBI, knew that the DEA and United States Attorney's Office would have to prepare an application and affidavit seeking a warrant to conduct electronic surveillance in an investigation in which the FBI would participate. On behalf of the FBI, Ring had an obligation to disclose to the affiant and applicant "all information material to such an application." *Aviles*, 170 F.3d at 867. Motivated by a determination not to discuss or disclose the status of Flemmi and Bulger as FBI informants to the DEA, the United States Attorney's Office or the court,[80] and by a

desire to minimize the risk that the FBI would be blamed if the investigation was compromised, Ring ignored that obligation and did not even read the Boeri affidavit. If Ring had done so, it would have been obvious to him that the affidavit was fundamentally false and misleading in communicating to the court that the proposed electronic surveillance was necessary to obtain evidence that the FBI wished to use to develop a prosecutable case against Bulger, Flemmi, Kaufman, and others for illegal gambling and other Title 18 offenses. As explained in detail earlier, the FBI had no intention of even considering the evidence that might be intercepted. Rather, the FBI agents assigned to work with the DEA were instructed not to share the information they acquired with anyone else at the FBI.

Similarly, the applicant and affiant, Crossen and Boeri, each recklessly disregarded the legal obligations imposed by § 2518(1)(c) and the truth of their submissions to the court. Notwithstanding the Court of Appeals for the First Circuit's recent admonition in *Mastroianni*, they failed to consult the FBI, which they properly characterized as a participant in the

---

**80.** This court recognizes that the government is faced with a dilemma when there is a conflict between its duty to be candid with the court in its applications for warrants and its desire to protect the identity of its informants. In the rare cases in which the government has been caught after mischaracterizing the role of its informants in applications for warrants, this practice has been properly condemned. *Strini*, 658 F.2d at 598; *Falls*, 34 F.3d at 681–82. In *Strini*, the Court of Appeals for the Eighth Circuit stated that:

We emphasize that we do not condone the masking of the identity of the informant to the court. We cannot sanction any attempt to mislead the court. We point out that there are alternative procedures open to the government to protect the name of an informant and they should be used in the future. *Strini*, 658 F.2d at 598.

This direction, however, has not always been followed. *Falls*, 34 F.3d at 682 n. 6. In *Falls*, in an attempt to keep a witness's cooperation from being discerned, the prosecutor whose deceptive conduct was criticized in *Strini* mischaracterized the cooperating wit-

ness as an individual who was continuing to commit crimes. *Falls*, 34 F.3d at 681–82 and n. 6. In response, the court wrote:

[W]e expressly disapprove of the government's failure to inform the issuing judge that C/W–1 was Thelma Wyant. We are not unsympathetic to the need to ensure the safety of cooperating witnesses in this type of situation. However, safety concerns are not compromised by sworn testimony before the issuing judge fully disclosing the fact of and the reason for masking the witness's identity in the affidavit.

*Id.* at 682 (citations omitted).

This court agrees with the Court of Appeals for the Eighth Circuit that neither the Fourth Amendment nor Title III permit the government to make false or misleading representations to the court in order to protect the confidentiality of its informants. Rather, the government must candidly provide required information, in a form acceptable to the court, and assume any inherent risk that the identity of its informants will be discovered by others, or forego the opportunity for electronic surveillance in order to avoid that risk.

joint investigation, concerning the necessity for electronic surveillance. This failure contributes to the conclusion that they, as representatives of the government, acted with reckless disregard for the truth of their statements to the court. *See, e.g., United States v. Namer,* 680 F.2d 1088, 1094 (5th Cir.1982) (failure of applicants to obtain a formal, expert opinion caused statement that instruments were "classified as securities" to be found to have been made with reckless disregard for the truth); *United States v. Alvarez,* 127 F.3d 372, 374–75 (5th Cir.1997) (failure to consult attorney contributes to finding that incorrect characterization of conduct as "sexual" was made with reckless disregard for the truth).

Moreover, the affiant and applicant did not believe a central message of their submission to the court on December 24, 1984—that the requested electronic surveillance was necessary to the FBI's effort to develop a prosecutable case against Bulger, Flemmi, Kaufman, and others for illegal gambling and other Title 18 offenses. Rather, Boeri and Crossen believed that Flemmi and Bulger were FBI informants whom the Bureau would seek to protect rather than prosecute. They, for good reasons and correctly, did not expect the FBI to conduct an investigation of Bulger, Flemmi, or their colleagues. Yet, with at least reckless disregard for the truth, Crossen and Boeri filed an application and supporting affidavit which communicated this fundamentally misleading message.

The false and misleading representations and omissions in the December 24, 1984 application and Boeri affidavit were material. Thus, defendants have also satisfied the second prong of the *Franks* test.

More specifically, under *Franks,* once reckless disregard for the truth is established, the remaining question is whether the excluded information was necessary to the required findings of probable cause or necessity, or whether the remaining content of the affidavit was sufficient. *Franks,* 438 U.S. at 156, 98 S.Ct. 2674. The Court of Appeals for the First Circuit has stated that information is not "material" if a warrant would have "necessarily, nevertheless, have issued" if the court had been properly informed. *Cole,* 807 F.2d at 268. For present purposes, the court assumes that, as the government contends, false or misleading information is "material" under *Franks* if it was essential to establishing probable cause or necessity. *See United States v. Colkley,* 899 F.2d 297, 301 (4th Cir.1990).[81]

In general, reviewing courts are instructed to read affidavits in a " 'practical and commonsense manner,' " rather than in a "hypertechnical manner," when their sufficiency to establish probable cause or necessity is at issue. *United States v. Santarpio,* 560 F.2d 448, 452–53 (1st Cir.1977) (quoting *United States v. Scibelli,* 549 F.2d 222, 226 (1st Cir.1977)). This standard is often invoked by the government in response to efforts by defen-

**81.** In *Ferrara,* this court noted that in *Ippolito,* 774 F.2d at 1486–87, the Court of Appeals for the Ninth Circuit held that if a reasonable judge "could have denied" the application if fully informed, the information at issue was material. *Ferrara,* 771 F.Supp. at 1305. Thus, this court stated "material information" could be deemed "to be information which reasonably might have prompted a district judge being asked to issue the warrant to have denied the request. If a reasonable judge either might or might not have authorized the requested electronic surveillance if fully informed, the information at issue is material, and its omission requires suppression." *Id.* This statement was premised on the under-

standing that there may be matters on which reasonable judges would differ and if the government intentionally or with reckless disregard for the truth filed a false or misleading application, in order to deter such misconduct, suppression should be granted if any reasonable judge would have declined to authorize the warrant. In *Ferrara* and in the instant case the government argued that this formulation of "materiality" is more favorable to the defendants than the standard established by *Franks.* Because it ultimately makes no difference to the outcome in the instant case, as in *Ferrara, id.* at 1305–06, the court has employed the standard for defining materiality advocated by the government.

dants to dissect affidavits and detract from their "force as a whole." *Leisure,* 844 F.2d at 1354–55. It is equally appropriate to focus on the force of an affidavit as a whole when, as here, false and misleading representations and omissions permeate the government's submission. Indeed, the Court of Appeals for the First Circuit, among other courts, has taken this approach in affirming the suppression of evidence based on a series of defects when, "[u]nlike a warrant application in which the falsehood can be traced to one sentence or paragraph that can be isolated easily and deleted, [the application at issue] suffered from the cumulative effect of its multiple problems." *Brock v. Brooks Woolen Co., Inc.,* 782 F.2d 1066, 1072 (1st Cir.1986). *See also Ailemen,* 986 F.Supp. at 1241 ("Due to the large number of misrepresentations and the deceptive conduct of the government throughout the wiretap application and review process, the suppression motion now before the court is not amenable to a piecemeal analysis.").

The propriety of considering the December 24, 1984 application and affidavit as a whole, in a commonsense manner, is reinforced by the reality recognized by the Supreme Court in *Franks:* applications for warrants are presented *ex parte* and are often acted on in haste because of the perceived urgent need for a court order. 438 U.S. at 169, 98 S.Ct. 2674. Accordingly, judicial officers being asked to issue warrants may frequently consider applications as a whole and decide whether to grant them based on an overall impression of whether the requirements of Title III have been met.

The nature of the review process, and the obligation that it imposes on the government, was recently described by the district court in *Ailemen,* in the course of granting a motion to suppress for failure to make the full and complete statement concerning necessity required by § 2518(1)(c). 986 F.Supp. at 1246. In *Ailemen,* the court wrote:

There is one additional set of considerations that must be borne in mind by judges who are addressing the kinds of issues raised here and by law enforcement agents who are drafting affidavits for wiretaps. The district judges to whom these kinds of affidavits are presented face, at least in many urban courts, pressing and diverse demands on their clearly limited resources. Many (unlike Judge Jensen) have no background in criminal law. Many will not have a refined understanding of the subtleties of the necessity requirement. And in many instances, the government will present the affidavit the same day it hopes to begin the wiretap. Judges, of course, are not required to complete their reviews on a timetable set by the investigators, but many judges feel constrained to try to respond promptly to what they assume is a real law enforcement need.

Given these foreseeable facts of judicial life, it is wholly unrealistic to expect most district judges to spend hours and hours of assertive analytical effort dissecting and probing affidavits like this. It is reasonable to expect reviewing judges to be conscientious, and to read the affidavits carefully, but the affidavits must be crafted in a way that will permit a conscientious district judge to understand all the essential elements of the investigatory situation without committing an unreasonable number of hours to the effort. This means that the affidavits must be straightforward (clear, direct, and succinct) about the matters that are most important to the necessity determination. They must be drafted to communicate clearly and quickly the actual state of the investigation and of the government's knowledge. In short, the foreseeable circumstances in which many district judges will be reviewing these kinds of affidavits place a real premium on quality and honesty in drafting. Knowing that a wiretap can threaten core values in our society and that a reviewing district judge will be

forced to rely heavily on the product of their work, the government's agents and lawyers should make extra efforts to be sure their affidavits fulfill Congress' expectations.

*Id.*

As described previously, the December 24, 1984 Boeri affidavit was not only false and misleading with regard to the need for electronic surveillance to assist the FBI in developing a prosecutable Title 18 case against Bulger, Flemmi, and others. It also was drafted in a convoluted and confusing manner which obscured the fact that there was not probable cause to believe that evidence of any Title 21 drug offense would be intercepted if a warrant to tap Kaufman's telephone was issued.

More specifically, reading the affidavit as a whole, in a commonsense manner, a reasonable judge would have perceived that there was probable cause to believe that Flemmi and Kaufman would be intercepted discussing illegal gambling and other Title 18 offenses that the FBI was investigating with a view to developing a prosecutable case. If he or she focused carefully on parsing the confusing Boeri affidavit, a reasonable judge would have doubted that there was probable cause to believe that evidence of any Title 21 offense would be intercepted if the requested wiretap on Kaufman's telephone were authorized. Acting with the usual sense of urgency, perhaps magnified by the approach of Christmas eve, a reasonable judge would have felt it was unnecessary to focus or rely on the Title 21 information because an ample showing had been made concerning both the probable cause and necessity for the wiretap for the investigation of Title 18 offenses that the FBI was conducting.

As described previously, the message communicated by the Boeri affidavit was fundamentally misleading. "Orders authorizing interceptions of either wire or oral communications may be entered only after the court has made specific determinations concerning the likelihood that the intercep-

tion will disclose evidence of *criminal* conduct." *Dalia,* 441 U.S. at 249, 99 S.Ct. 1682 (emphasis added). Thus, the government has an obligation to advise the court if it has information indicating that the conduct it is investigating is not criminal at all. For example, in *Brock,* the Court of Appeals for the First Circuit affirmed the invalidation of a search warrant in part because conduct described in the application as a violation of Occupational Health and Safety Administration regulations had been authorized in a prior settlement agreement. 782 F.2d at 1072. *See also Namer,* 680 F.2d at 1091, 1094 (suppression granted where loan commitments were recklessly mischaracterized as "securities" and, therefore, there was no probable cause to believe securities laws were violated); *Alvarez,* 127 F.3d at 374–75 (motion to suppress granted where affidavit recklessly mischaracterized conduct as "sexual" within the meaning of the penal code).

In the instant case, there is a substantial question whether the involvement of Flemmi in gambling and related activities described in the Boeri affidavit was criminal because, as the FBI's Principal Legal Adviser in Boston later concluded, Flemmi's informant file provided "a clear indication that FBI Agents were aware of his involvement in illegal activity (primarily illegal gambling activity) and at least had tacitly authorized his participation in such activity." Ex. 271. This information should have been disclosed in the December 24, 1984 application. *Brock,* 782 F.2d at 1072; *Namer,* 680 F.2d at 1091, 1094; *Alvarez,* 127 F.3d at 374–75.

As described earlier, if this requirement had been recognized, the application would not have been submitted. If, however, this information and Flemmi's status as an FBI informant had been disclosed to the court, any reasonable judge would have questioned the necessity of the proposed wiretap. In any event, whether he asked or not, the judge should also have been informed that Bulger and Flemmi had

made statements to the FBI concerning their gambling and other activities, which the government now claims can be used against them in a criminal prosecution. "Any reasonable person would have known that this is the kind of thing the judge would wish to know" in deciding whether the requested wiretap was necessary. *Jacobs,* 986 F.2d at 1235.

Even more importantly, the court should have been informed that the proposed electronic surveillance was not needed to facilitate any investigation of any Title 18 offense by the FBI. Rather, the Bureau did not intend to consider the intercepted evidence at all. This alone would have been fatal to any effort to obtain a warrant based on the information in the Boeri affidavit relating to possible Title 18 offenses because, "those seeking a warrant must demonstrate to the [judge] their probable cause to believe that 'the evidence sought will aid in a particular apprehension or conviction' for a particular offense." *Dalia,* 441 U.S. at 255, 99 S.Ct. 1682 (quoting *Warden v. Hayden,* 387 U.S. 294, 307, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967)).

Accordingly, all of the information in the Boeri affidavit suggesting that a tap on Kaufman's telephone was necessary to facilitate investigation of Title 18 offenses must be disregarded. *Franks,* 438 U.S. at 156, 98 S.Ct. 2674. The court is required, therefore, to assess whether the remaining content of the affidavit relating to drug offenses being investigated by the DEA was sufficient to justify issuance of the requested warrant. It was not.

█ More specifically, the application failed to satisfy the probable cause requirements of the Fourth Amendment and Title III. In order to issue a warrant for a wiretap, the court must find both that (1) there is probable cause to believe that an individual has committed, or is committing a designated offense, and (2) there is probable cause to believe that "particular communications concerning that offense will be obtained" if the warrant is issued. § 2518(3)(a) and (b). This is a codification of the requirements imposed by the Fourth Amendment generally.

The Court of Appeals for the First Circuit has recently addressed the meaning of these requirements, stating:

> A warrant application must demonstrate probable cause to believe that (1) a crime has been committed—the "commission" element, and (2) enumerated evidence of the offense will be found at the place to be searched—the so-called "nexus" element. *See United States v. Zayas–Diaz,* 95 F.3d 105, 111 (1st Cir. 1996). With regard to the "nexus" element, the task of a magistrate in determining whether probable cause exists is "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him … there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In order to establish probable cause, the facts presented to the magistrate need only "warrant a man of reasonable caution" to believe that evidence of a crime will be found. *Texas v. Brown,* 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (plurality opinion). The probable cause standard "does not demand showing that such a belief be correct or more likely true than false." *Id.*

*Feliz,* 182 F.3d at 86.

The government argues that the Court of Appeals for the First Circuit has also at times made the general statement that reviewing courts should "accord 'considerable deference'" to a magistrate's determination that information in a particular affidavit establishes probable cause. *Id.; Zayas Diaz,* 95 F.3d at 111; *United States v. Taylor,* 985 F.2d 3, 6 (1st Cir.1993). These statements, however, were not made in cases involving a claim under *Franks* that material information had been intentionally or recklessly omitted from an application. Rather, they merely ad-

dressed the sufficiency of the showing of probable cause. Thus, the prescribed deference is implicitly premised on the assumption that the judicial officer issuing the warrant was fully and clearly informed and, therefore, should not be reversed if his judgment was reasonable although, upon reflection by a reviewing court, perhaps not right.

This assumption is not valid in the instant case. First, Boeri's affidavit was replete with Title 18 information that must now be disregarded, but which would have frustrated any effort by the issuing judge to analyze the probable cause issues relating to the purported Title 21 offenses. *See Ailemen,* 986 F.Supp. at 1235–36. Once again, in view of the ample information concerning the purported Title 18 offenses, a reasonable judge would have recognized that there did not appear to be adequate evidence to support the issuance of the warrant on Title 21 grounds alone, but, acting with a sense of urgency, would have felt that it was neither necessary nor appropriate to ask for more information or deny the warrant for this reason.

Moreover, in the instant case the issuing judge was denied information possessed by the FBI that would have undermined the assertion that there was probable cause to believe that Bulger and Flemmi would be intercepted discussing any drug offense on Kaufman's telephone. Crossen, Stutman, Boeri, and Reilly each believed that Bulger and Flemmi were FBI informants. As Stutman testified, it was natural for them to wonder whether Bulger and Flemmi were involved in any of the activity under investigation—including the narcotics related activity of interest to the DEA—in connection with their relationship with the FBI. Stutman Apr. 15, 1998 Tr. at 169–71; § II.17. As the FBI was participating in the joint investigation for which electronic surveillance was sought, the FBI could and should have been asked this question, among others. *See Mastroianni,* 749 F.2d at 909–10; *Aviles,* 170 F.3d at 867; *Chesher,* 678 F.2d at 1360; *Fox,* 790 F.Supp. at 1494. A candid response to this question would have disclosed that Connolly had written in a document available to Ring that, "[Flemmi's] contacts, at [Connolly's] direction ... may have resulted in the false belief that [Flemmi] is involved in narcotics," Ex. 8, and that Ring himself felt that any indication that Bulger and Flemmi were involved with drugs was "not consistent with [the FBI's] intelligence." Ex. 13.

Perceived bureaucratic imperatives prevented the United States Attorney's Office and the DEA from obtaining this information, evaluating it, and disclosing it to the court. In the circumstances, the deference accorded to the decision of the judge who issued the warrant when only the sufficiency of the showing of probable cause is in question is not appropriate. *See Vigeant,* 176 F.3d at 572 n. 8; *United States v. Ricciardelli,* 998 F.2d 8, 16 (1st Cir.1993). However, even under that standard, the necessary showing of probable cause to believe that evidence of any Title 21 offense would be intercepted by a wiretap on Kaufman's telephone has not been made.

The evidence supporting the claim that there was probable cause to believe that a wiretap on Kaufman's telephone would result in the interception of evidence of any Title 21 drug offense is addressed in detail in § II.17, *supra.* In summary, Boeri's representation that Kaufman had telephonic contact with Bulger is simply false. As Boeri acknowledged in his testimony, the mass of information generated from many months of pen registers on various telephones used by Bulger and Kaufman did not disclose a single call between them. Thus, on December 24, 1984, there was no probable cause to believe that Bulger would be intercepted discussing anything on Kaufman's telephone. Consistent with this, Bulger was not intercepted when the wiretap was instituted.

The Boeri affidavit contained ample evidence to establish probable cause that Flemmi and Kaufman would be intercepted by a tap on Kaufman's telephone.

There was, however, virtually no basis to believe that they had discussed any narcotics offenses or would do so. The few paragraphs of the Boeri affidavit which the government contends establish probable cause to believe that Bulger and Flemmi were committing drug offenses contain no reference to Kaufman. Moreover, the informant characterized as CS–4, who was represented to be "a personal acquaintance" of Kaufman, characterized him as being close to Flemmi in the illegal gaming and loansharking business, a "front man" for Bulger and Flemmi in the "hot car" business, and a person they use for their more difficult sports betting. Ex. 133, ¶¶ 62(h),(i), and (j). CS–4 did not claim Kaufman was involved in narcotics activity with Flemmi, Bulger, or any one else.

As described previously, the 104–page Boeri affidavit contained only two references to Kaufman's possible involvement with narcotics. His telephone number was found in an address book seized from Caruana, who was a fugitive from drug charges. The Boeri affidavit did not, however, assert that Caruana and Kaufman had called each other during the DEA's investigation or were expected to do so. The Boeri affidavit did contain information indicating that Kaufman had spoken, on his telephone, to Joseph Murray. However, the government did not even assert, and the issuing judge did not find, that there was probable cause to believe that Kaufman and Murray would be intercepted discussing a drug offense or anything else if the requested warrant was issued. Exs. 133 (Under Seal), 138 (Under Seal), 139 (Under Seal).

As Judge Garrity, or any other reasonable judge, would have recognized if the Boeri affidavit had been presented without the false and misleading references to Title 18 offenses, there was not probable cause to believe that the wiretap being sought would result in the interception of Kaufman discussing a Title 21 drug offense with Flemmi, Bulger, or anyone else.

Nevertheless, the government argues that the motion to suppress should be denied because there was probable cause to believe that Kaufman would be intercepted discussing Title 18 offenses. Gov. Post Hearing Brief at 340. This may be true. However, Boeri and Crossen did not believe that the DEA had the authority to investigate Title 18 offenses and, in any event, the DEA did not intend to do so. In addition, the FBI did not intend to use any intercepted evidence to investigate Kaufman for committing any Title 18 offense, and Boeri and Crossen did not expect the Bureau to do so. This information would plainly have been material to any judge assessing the necessity for electronic surveillance to develop a Title 18 case against Kaufman. The failure to include it in the application involved at least reckless disregard for the truth of the representations relating to Kaufman. *Jacobs*, 986 F.2d at 1234.

There is also a more fundamental reason that the application for the 1984–85 electronic surveillance should not be saved from suppression based on the alleged adequacy of the Title 18 information it contained concerning Kaufman. A wiretap on Kaufman's telephone was requested solely because the DEA was hoping to obtain evidence sufficient to justify electronic surveillance of Bulger's home and automobile, which it had been unable to acquire in its previous year of investigation. The government would not have sought a warrant to tap Kaufman's telephone to develop a case against him. Thus, this court would have to engage in a fantastic and transparent fiction in order to deny the motion to suppress on the basis that the government suggests. To do so would be contrary to the purposes of the judicially crafted exclusionary rule and the related provisions of Title III.

The *Franks* test is premised on the principle that the exclusion of evidence is necessary in certain circumstances to deter violations of Fourth Amendment rights. *Franks*, 438 U.S. at 169–71, 98 S.Ct. 2674.

In addition, with regard to motions to suppress electronic surveillance, the *Franks* standard serves, in a fashion, the purposes of § 2515, which are " 'not only to protect the privacy of communications, but also to ensure that the courts do not become partners in illegal conduct' " and " 'to protect the integrity of court ... proceedings.' " *Bianco*, 998 F.2d at 1126 (quoting *Gelbard v. United States*, 408 U.S. 41, 51, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972) (citation omitted)). Indulging in the fictions necessary to treat the December 24, 1984 application and Boeri affidavit as a genuine effort to develop a Title 18 prosecution of Kaufman would deeply implicate the courts in government's illegal conduct and pollute the future proceedings in this case.

■■■ The Court of Appeals for the First Circuit has not decided whether the good faith exception to the exclusionary rule relating to Fourth Amendment violations is ever applicable in a Title III case. *Cunningham*, 113 F.3d at 294. However, as the Supreme Court explained in *United States v. Leon*, when warrants are involved, the good faith exception relies substantially on the efficacy and integrity of the warrant procedure. *United States v. Leon*, 468 U.S. 897, 913–14 & n. 12, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Thus, *Leon* indicated that a warrant that violates *Franks* is not subject to the good faith exception to the exclusionary rule that it created. *Id.; Jacobs*, 986 F.2d at 1235; *Colkley*, 899 F.2d at 300; *Ferrara*, 771 F.Supp. at 1298. The Court of Appeals for the First Circuit has consistently applied this principle in non-Title III cases. *Vigeant*, 176 F.3d at 572; *Ricciardelli*, 998 F.2d at 16–17; *United States v. Fuccillo*, 808 F.2d 173, 178 (1st Cir.1987).

■■■ The government acknowledges that the good faith exception to the exclusionary rule is available only when the government has properly performed its duty of disclosure to the court. *See* Apr. 13, 1999 Tr. at 162. Accordingly, even assuming, without finding, that *Leon* might apply in some Title III cases, it would not operate to save the 1984–85 electronic surveillance from suppression because a *Franks* violation has been established.

If, as this court now believes, § 2515, as interpreted in *Giordano* and its progeny including *Cunningham*, provides the proper standard for deciding the motion to suppress the 1984–85 electronic surveillance, the analysis is more straightforward. The requirement of § 2518(1)(c) that the application contain a full and complete statement concerning necessity is by its terms one of the "statutory requirements that directly and substantially implement[s] the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *Giordano*, 416 U.S. at 527, 94 S.Ct. 1820. *See also Mondragon*, 52 F.3d at 293. Thus, suppression is required where the requirements of § 2518(1)(c) have not been satisfied. *Giordano*, 416 U.S. at 527, 94 S.Ct. 1820; *Cunningham*, 113 F.3d at 293–94.

The government failed to make the required full and complete statement concerning necessity with regard to the December 24, 1984 application. The government has also failed to " 'demonstrate[ ] to the court's satisfaction that the statutory purpose has been achieved despite the violation.' " *Cunningham*, 113 F.3d at 293–94 (quoting *United States v. Johnson*, 696 F.2d 115, 121 (D.C.Cir.1982)). Rather, as a result of the violation of § 2518(1)(c), a warrant was issued that would not otherwise have been authorized.

F. *A Hearing is Necessary to Identify the Evidence Which Must be Suppressed Because of the Government's Unlawful Conduct Concerning the 1984–85 Electronic Surveillance and to Determine if Any Other Remedy is Required*

For the foregoing reasons, the December 24, 1984 Order authorizing the wiretap

on Kaufman's telephone was unlawfully obtained. The motion to suppress the evidence obtained as a result of that Order is meritorious. Accordingly, neither the communications intercepted pursuant to that Order, nor any evidence derived from them, may be used at trial. 18 U.S.C. § 2515 (1994).

■ "Once surveillance evidence has been suppressed, that evidence cannot, under § 2515, contribute directly or indirectly to a conviction." Carr, *supra*, § 6.4, at 6–84.6. The fatally flawed December 24, 1984 Boeri affidavit was expressly incorporated in his February 1, 1985 affidavit, which resulted in the issuance of a warrant extending the tap on Kaufman's telephone and also authorizing bugs for Bulger's automobile and apartment. Ex. 135, ¶ 5. Both of his prior affidavits were expressly incorporated in Boeri's March 1, 1985 affidavit, which prompted the issuance of a warrant authorizing the continued bugging of Bulger's automobile and apartment. Ex. 136, ¶ 5. Thus, suppression is required of all of the evidence intercepted as a result of the tap on Kaufman's telephone and the bugs in Bulger's automobile and apartment.

The government represents that it did not present any of the evidence intercepted on Kaufman's telephone or in Bulger's automobile or apartment to the grand juries which returned the indictments in this case. It would, however, have been improper for the grand jury to have received any evidence derived from those interceptions or for the government to have otherwise indirectly used the evidence illegally intercepted to develop its presentation to the grand jury. 18 U.S.C. § 2515 (1994). It is not possible on the present record to determine whether this occurred. Therefore, further proceedings will be necessary to decide if the government made derivative use of the evidence being suppressed in its presentation to the grand jury and, if so, what remedy, if any, is required.

It is also now necessary to determine whether any evidence was derived from

the 1984–85 interceptions being suppressed in order to assure that such evidence is excluded at trial. 18 U.S.C. § 2515 (1994). In addition, the court must decide if any other remedy, including dismissal, is required. *Nardone v. United States*, 308 U.S. 338, 339–41, 60 S.Ct. 266, 84 L.Ed. 307 (1939); *Alderman v. United States*, 394 U.S. 165, 183, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

In § III.1.D(4), *supra*, the court has addressed the issues presented by the misuse of information that Flemmi provided after being assured, among other things, of use and derivative use immunity if he assisted the FBI in its efforts to obtain warrants used to bug 98 Prince Street, Vanessa's, and 34 Guild Street. The same issues must also be addressed concerning the 1984–85 electronic surveillance. *See also* Carr, *supra*, § 6.4, at 6–84.6 to 6–104; Fishman & McKenna, *supra*, §§ 23.17–23.26, at 23–37 to 23–65.

The effect of all of the evidence that will be suppressed will have to be assessed cumulatively. It appears that if Flemmi can prove that "a substantial portion of the case against him" is, for one reason or another, the "fruit of the poisonous tree," he will be entitled to have the case dismissed. *Nardone*, 308 U.S. at 341, 60 S.Ct. 266. However, before deciding how to proceed, the court will provide the parties with an opportunity to address the issues generated by the finding that the motion to suppress the 1984–85 electronic surveillance is meritorious.

3. *Flemmi is Not an "Aggrieved Person" With Standing to Seek Suppression of the Interceptions at Vanessa's Under Title III*

■ As described in § III.1.D(3) *supra*, Flemmi is entitled to suppression of the evidence intercepted at Vanessa's, and any evidence derived from it, under his agreement with the government. Flemmi asserts that he also has standing to seek suppression of that evidence under Title

III because he was named as a person expected to be overheard in the application for the warrant to bug Vanessa's even though, having been told of the installation of the bug, he was not intercepted. This contention is incorrect. *United States v. Ruggiero*, 928 F.2d 1289, 1303 (2d Cir. 1991); *United States v. Charles*, No.Crim. 97–10107–PBS, 1998 WL 204696, at *11 (D.Mass. Jan.13, 1998).

 As a "general rule ... Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Alderman*, 394 U.S. at 174, 89 S.Ct. 961. Thus, to have Fourth Amendment rights an individual must have been a " 'victim of an invasion of privacy.' " *Id.* at 173, 89 S.Ct. 961 (quoting *Jones v. United States*, 362 U.S. 257, 261, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)). More specifically, an individual has a Fourth Amendment right that may have been violated only if the person or something in which he has a legitimate expectation of privacy has been the subject of a search. *Id.; United States v. Salvucci*, 448 U.S. 83, 92–93, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois*, 439 U.S. 128, 147–48, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Therefore, as Flemmi was not intercepted, and had no possessory interest or other basis for claiming a reasonable expectation of privacy concerning Vanessa's, he is not a person who may challenge the electronic surveillance conducted there as a violation of the Fourth Amendment.

Flemmi claims, however, that Title III establishes standing to litigate alleged violations of the statute which is broader than standing under the Fourth Amendment and includes those, like him, who have been named in a warrant as a target of the electronic surveillance. More specifically, Flemmi argues that pursuant to § 2518(10)(a) any "aggrieved person" may move to suppress wire or oral communication intercepted pursuant to Title III. The statute states that:

"aggrieved person" means a person who was a party to any intercepted wire, oral, or electronic communication *or* a person against whom the interception was directed.

18 U.S.C. § 2510(11) (1994) (emphasis added). Flemmi asserts that as a named target of the electronic surveillance at Vanessa's he was "a person against whom the interception was directed" and, therefore, has standing to seek suppression relating to Vanessa's based upon alleged violations of Title III.

The meaning of the phrase "person against whom the interception was directed" is, however, ambiguous. If intended, § 2510(11) could have clearly stated that a person has standing if he is identified in a warrant as expected to be overheard engaging in incriminating conversation. The Massachusetts counterpart of Title III does this by defining an "aggrieved person" as:

> any individual who was a party to an intercepted wire or oral communication *or who was named in the warrant authorizing the interception,* or who would otherwise have standing to complain that his personal or property interest or privacy was invaded in the course of an interception.

Mass. Gen. Laws Ann. ch. 272, § 99(B)(6) (West 1990) (emphasis added). Section 2510(11) not only *fails to include such a clear* expression of legislative intent, its phrase "person against whom the interception was directed" has been interpreted to be:

> synonymous with the Supreme Court's language in *Alderman* conferring standing upon one whose premises are the subject of electronic surveillance. That is, one against whom an interception is directed is one whose premises have been surveilled by means of an electronic listening device ....

*United States v. Ahmad*, 347 F.Supp. 912, 933 (M.D.Pa.1972), *modified on other grounds sub nom., United States v. Berrigan*, 482 F.2d 171 (3rd Cir.1973).

In view of the ambiguity concerning the meaning of the statutory language on which Flemmi relies, it is appropriate to consider the legislative history of § 2510(11). It states, in pertinent part, that the statutory definition of "aggrieved person" "is intended to reflect existing law." Sen. Rep. No. 90–1097, at 2169 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2180.

The first case cited in the legislative history with regard to "existing law" was the Supreme Court's decision in *Jones*, 362 U.S. 257, 80 S.Ct. 725, which is the origin of the language now at issue. *Id.* As the Supreme Court noted in *Alderman*, it had held in *Jones* that:

> In order to qualify as a "person aggrieved by an unlawful search and seizure" one must have been a victim of a search or seizure, *one against whom the search was directed*, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else.
>
> \* \* \* \* \* \*
>
> Ordinarily, then, it is entirely proper to require of one who seeks to challenge the legality of a search as the basis for suppressing relevant evidence that he allege, and if the allegation be disputed that he establish, that he himself was the victim of an invasion of privacy.

*Alderman*, 394 U.S. at 173, 89 S.Ct. 961 (quoting *Jones*, 362 U.S. at 261, 80 S.Ct. 725) (emphasis added). The Supreme Court has stated that:

> The above-quoted statement from *Jones* suggests that the [underlined] language was meant merely as a parenthetical equivalent of the previous phrase "a victim of a search or seizure." To the extent that the language might be read

more broadly, it is dictum which was impliedly repudiated in *Alderman v. United States, supra*, and which we now expressly reject.

*Rakas*, 439 U.S. at 135, 99 S.Ct. 421. Accordingly, in *Rakas* the Supreme Court rejected the claim that a person's Fourth Amendment rights were violated because a search was "directed" against him, although he was not a "victim" of the search. *Id.* at 132–38, 99 S.Ct. 421.

In view of the foregoing, the court finds that Judge Carr has persuasively written that:

> In the context of the *Jones* decision, the clause, "one against whom the search was directed," appears to be adjectival, descriptive of an attribute of one who was searched himself or whose premises were searched. This language, incorporated in § 2510(11), is therefore a limitation, or at most a restatement of the preceding clause in *Jones*, rather than an expansion of the class of persons endowed with standing.
>
> \* \* \* \* \* \*
>
> In § 2510(11), however, this language is used in the disjunctive: one has standing if he was either a party "or a person against whom the interception was directed." Nonetheless, in view of the specific intention to conform § 2510(11) to existing principles, Congress did not intend to expand standing doctrines . . . .

Carr, *supra*, § 6.2(b)(3), at 6–36.6 to 6–37.

The only reported cases directly addressing Flemmi's contention that he should be deemed to have standing because he was named as a target in the Vanessa's warrant agree implicitly with Judge Carr's analysis.[82] The Court of Ap-

---

82. The court recognizes that, as Flemmi argues, there are cases finding no standing that have stated that "a defendant has standing to challenge electronic surveillance only if he can 'show that it was directed at him, that the Government intercepted his conversations or that the [intercepted] communications occurred at least partly on his premises.' " *United States v. Gambale*, 610 F.Supp. 1515, 1521 (D.Mass.1985) (Keeton, J.) (quoting *United States v. Williams*, 580 F.2d 578, 583 (D.C.Cir.1978)); *United States v. Mavroules*,

peals for the Second Circuit has stated that the standing requirements of Title III are "'to be construed in accordance with the standing requirements usually applied to suppression claims under the fourth amendment'" and, therefore, held that named targets of electronic surveillance who were not actually intercepted lacked standing to move to suppress. *Ruggiero,* 928 F.2d at 1303 (quoting *Gallo,* 863 F.2d at 192). Another judge of this District Court has agreed. *Charles,* 1998 WL 204696, at * 11 (Saris, J.).

In view of the legislative history concerning § 2510(11), this court also concurs with the conclusion reached by the Court of Appeals for the Second Circuit in *Ruggiero.* Accordingly, Flemmi lacks standing to litigate his claim that the electronic surveillance at Vanessa's violated Title III.

> 4. *DeLuca Does Not Have Standing to Move to Suppress the Evidence Intercepted at 34 Guild Street For a Violation of Title III Because the 1998 Supreme Court Decision in Minnesota v. Carter Indicates That Although His Conversation was Intercepted, It Did Not Constitute an "Oral Communication" As Defined in the Statute, and DeLuca's Fourth* Amendment *Rights Were Not Violated*

■ Defendant Robert DeLuca was overheard and tape-recorded participating in the LCN induction ceremony conducted at 34 Guild Street on October 29, 1989. Prior to the Supreme Court's December 1, 1998 decision in *Carter,* 525 U.S. 83, 119 S.Ct. 469, the government did not contend that DeLuca lacked standing to move to suppress the evidence intercepted at 34 Guild Street. In its January 29, 1999 submission, however, the government argued for the first time that in light of *Carter,* the discussion at 34 Guild Street did not constitute an "oral communication" within

the meaning of Title III and, therefore, DeLuca is not an "aggrieved person" with standing to maintain his motion to suppress.

The court provided the defendants an opportunity to brief the implications of *Carter* for the instant case, held a hearing on this question, and received from the parties additional memoranda addressing issues that came into sharper focus at the hearing. Upon careful consideration of the novel issue of the meaning of the decision in *Carter* for Title III cases, the court finds the government's position to be correct. *Carter* indicates that the bugging of the LCN induction ceremony did not violate DeLuca's Fourth Amendment rights. In addition, although the matter is not perfectly clear, the court finds that when Title III was enacted it was intended that evolving, contemporary conceptions of reasonable expectations of privacy be applied in deciding whether an intercepted conversation constitutes an "oral communication" subject to suppression under Title III. In view of the decision in *Carter,* the court finds that DeLuca did not at 34 Guild Street engage in what the statute defines as an "oral communication" and, therefore, DeLuca is not an "aggrieved person." Thus, his motion to suppress must be denied for lack of standing.

More specifically, 18 U.S.C. § 2518(10)(a) provides that a motion to suppress for a violation of Title III may be brought by "[a]ny aggrieved person." As indicated earlier, § 2510(11) defines an "aggrieved person" as:

> a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed . . .

18 U.S.C. § 2510(11) (1994). Section 2510(4) defines "intercept" as the "aural or other acquisition of the contents of any wire, electronic, or oral communication

---

813 F.Supp. 115, 117 (D.Mass.1993) (Collings, Mag. J.) (quoting *Gambale, supra*). These statements are, however, dicta in deci-

sions that did not address, let alone analyze, the issue presented in the instant case.

through the use of any electronic, mechanical, or other device." The terms "wire communication" and "oral communication" are each separately defined in Title III.

There is an important distinction between the definition of wire communications in § 2510(1) and oral communications in § 2510(2), whereby it is illegal to intercept an oral communication only when the communication is "uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." There need be no showing by the government that the victim had a justifiable expectation of conversational privacy in a telephone conversation.

Carr, *supra*, § 8.1(a)(3) at 8–5 (quoting § 2510(2)).[83]

The Court of Appeals for the First Circuit has stated the statutory provision that a statement be made with the subjective expectation that it will not be intercepted "under circumstances justifying such expectation" "require[s] that the speaker have an expectation of *privacy* that is objectively reasonable." *United States v. Rose*, 669 F.2d 23, 25 (1st Cir.1982) (emphasis added). As discussed more fully below:

According to the legislative history of Title III, this definition [of "oral communication"] was intended to parallel the "reasonable expectation of privacy" test created by the Supreme Court in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). *See* S.Rep. No. 1097, 90th Cong.2d Sess., *reprinted in* 1968 U.S.Code Cong. & Admin.News 2112–2274. *See also United States v. Harrelson*, 754 F.2d 1153 (5th Cir.1985). Thus, Congress limited its protection of "oral communications" under Title III to those statements made where "first, a person [has] exhibited an actual (subjec-

tive) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *Katz*, 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring).

*In the Matter of John Doe Trader Number One*, 894 F.2d 240, 242 (7th Cir.1990). *See also In re High Fructose Corn Syrup Antitrust Litig.*, 46 F.Supp.2d 819, 827 (C.D.Ill.1999) ("the case law in this and other circuits is clear that the definition of 'oral communication' in § 2510(2) is intended to parallel the reasonable expectation of privacy test set forth in *Katz*.").

The reasoning of the Court of Appeals for the Seventh Circuit in *John Doe Trader Number One* is consistent with the conclusions explicitly and implicitly reached in the decisions relied upon by the Court of Appeals for the First Circuit in *Rose*. For example, in deciding that the bugging of an apartment to which the defendants gained entry by making false representations to the landlord did not require a warrant because the defendants' conversation there did not constitute "oral communication" as defined in § 2510(2), the Court of Appeals for the Second Circuit stated:

As we have been advised, "the Fourth Amendment protects people, not places," *Katz v. United States, supra*, 389 U.S. at 351, 88 S.Ct. at 511, and the statutory definition of an "oral communication" tracks this constitutional concept. The question we have before us is whether the subjective expectation of privacy violated by the allegedly illegal intrusion is one society is prepared to recognize as "'justifiable.'"

*United States v. Pui Kan Lam*, 483 F.2d 1202, 1206 (2d Cir.1973) (footnote omitted). *See also United States v. McIntyre*, 582 F.2d 1221, 1223 (9th Cir.1978) ("The legislative history behind § 2510(2) reflects Congress's intent that *Katz* ... serve as a guide to define communications that are

---

**83.** Section 2510(2) states in full that:
"oral communication" means any oral communication uttered by a person exhibiting an expectation that such communica-

tion is not subject to interception under circumstances justifying such expectation, but such term does not include any electronic communication ...

uttered under circumstances justifying an expectation of privacy"); *Holman v. Central Ark. Broad. Co.*, 610 F.2d 542, 544 & n. 3 (8th Cir.1979) (deciding that no "oral communication" was intercepted because speaker had no reasonable expectation of privacy.).

The highest courts of several states, interpreting the federal statute or state statutory provisions that were identical or substantially similar to § 2510(2), have also concluded that the justifiable expectation that conversation will not be intercepted test is synonymous with the *Katz* justifiable expectation of privacy test. For example, the Supreme Court of Pennsylvania has held that:

> In determining whether the expectation of non-interception was justified under the circumstances of a particular case, it is necessary for a reviewing court to examine the expectation in accordance with the principles surrounding the right to privacy, for one cannot have an expectation of non-interception absent a finding of a reasonable expectation of privacy.

*Agnew v. Dupler*, 553 Pa. 33, 717 A.2d 519, 523 (1998). *See also Commonwealth v. Look*, 379 Mass. 893, 909–10, 402 N.E.2d 470 (1980) ("[T]he Federal statute requires that a speaker have a justifiable expectation of privacy with regard to 'oral communications.' 18 U.S.C. § 2510(2) (1976). In determining what is a justified expectation of privacy for purposes of § 2510, we must look to traditional Fourth Amendment law"); *Wilks v. Commonwealth*, 217 Va. 885, 889, 234 S.E.2d 250 (1977) ("the justifiable expectation of noninterception contained in the statutory definition of the term 'oral communication' is equivalent to the constitutional expectation of privacy.").

Nevertheless, DeLuca argues that § 2510(2) does not, as it could have, employ the "reasonable expectation of privacy" language of *Katz* and asserts that the terms of the statute manifest the intention of Congress and the President to provide protection against bugging in some circum-

stances in which conventional searches and seizures would be permissible. There appears to be no reported decision in a criminal case that supports this contention. There are, however, several civil cases in which it has been held that a reasonable expectation of privacy and a reasonable expectation that conversation will not be surreptitiously broadcast or recorded are not equivalent. For example, the Court of Appeals for the Eleventh Circuit has held that a postal employee might have a reasonable expectation that conversation at his work space would not be bugged and overheard by his employer in another part of the building even though he knew that the workers with whom he was conversing could hear him. *Walker v. Darby*, 911 F.2d 1573, 1578–79 (11th Cir.1990). *See also Wesley v. WISN Div.-Hearst Corp.*, 806 F.Supp. 812, 814 (E.D.Wis.1992) (discussing *Walker*). Similarly, it has been held that whether a person had a justified belief that she would not be recorded was an issue of fact to be decided by a jury where the plaintiff in a civil case alleged that she had agreed to be interviewed by television journalists, but was secretly videotaped and recorded despite her refusal to appear on camera. *Boddie v. American Broad. Cos.*, 731 F.2d 333, 335, 338–39 (6th Cir.1984). *See also Bianco v. American Broad. Cos.*, 470 F.Supp. 182, 185 (N.D.Ill.1979); Fishman & McKenna, *supra*, § 2.15 at 2–19 to 2–20 n.58 and § 6.37 at 6–79 to 6–81.

The foregoing civil cases, however, each involved suits between private parties and, therefore, did not implicate the Fourth Amendment, which imposes limitations only on the government. It is possible, therefore, that the decisions in those cases can be reconciled with the substantial precedent in criminal cases equating the standard of § 2510(2) with the standard of the Fourth Amendment by recognizing that there may be circumstances in which society would deem the government's interest in effective law enforcement sufficient to render unreasonable an individual's expec-

tation that he would not be intercepted by the government, but society would consider such an expectation justified with regard to interception by a private party.

In any event, the weight of authority indicates that the "expectation that [a] communication is not subject to interception" test was not, as DeLuca claims, chosen to express an intent to provide protection against bugging by the government when conventional forms of search and seizure would be permissible. Rather, the terms of § 2510(2) reflect the understanding that there are circumstances in which an individual might know that he can be seen, and in this sense has no general right to privacy, but would nevertheless reasonably expect that he will not be overheard. In essence, it appears that § 2510(2) was drafted to capture the distinction made in *Katz* when the Supreme Court stated that:

> The Government stresses the fact that the telephone booth from which the petitioner made his calls was constructed partly of glass, so that he was as visible after he entered it as he would have been if he had remained outside. But what he sought to exclude when he entered the booth was not the intruding eye—it was the uninvited ear. He did not shed his right to do so simply because he made his calls from a place where he might be seen.

389 U.S. at 352, 88 S.Ct. 507. *See also* Fishman & McKenna, *supra*, § 2.15 n.56 at 2–19; Carr, *supra*, § 3.2(b) at 3–14.

Prior to the 1998 decision in *Carter*, the question whether the reasonable expectation of privacy standard should be employed in interpreting § 2510(2) was not viewed by the parties or the court as having any significance in the circumstances of the instant case. However, this has now become an issue that is material to the question of whether DeLuca has standing to maintain his motion to suppress the electronic surveillance conducted at 34 Guild Street.

In *Ferrara*, the government did not contend that the defendants who were intercepted at 34 Guild Street lacked standing to maintain their motion to suppress based on Title III. Nor did the government base its claim that no Fourth Amendment violation had occurred on the assertion that the defendants who were intercepted did not have a justifiable expectation of privacy with regard to their discussion at that location. Thus, with regard to Title III the court simply held that, "[e]ach of those [defendants] intercepted is an 'aggrieved person' with standing to litigate this motion to suppress. *See* §§ 2510(11) and 2518(10)(a)." *Ferrara*, 771 F.Supp. at 1281.

With regard to the question of whether the Order authorizing the roving bug was unconstitutional as applied, this court in *Ferrara* found that defendants lacked standing to assert that the entry to install listening devices injured their rights because they "had no possessory interest or reasonable expectation of privacy concerning 34 Guild Street before they arrived there on October 29, 1989." *Id.* at 1292. The court added that:

> The Fourth Amendment does, however, apply to the defendants' conversations while at 34 Guild Street because individuals legitimately expect that their conversations while in the homes of others will be private and society is prepared to recognize such expectations as reasonable. *See Minnesota v. Olson*, 495 U.S. 91, 110 S.Ct. 1684, 1687, 109 L.Ed.2d 85 (1990); *Katz*, 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring).

*Id.* However, in finding that the search and seizure at issue was "reasonable," as required by the Fourth Amendment, the court noted that the "activity at issue ... did not involve an invasion of any defendant's home or office" and, therefore, "in balancing the competing considerations to determine reasonableness, the value to be attributed to defendants' expectation of privacy is diminished." *Id.* at 1293 (citing

*United States v. Torres*, 751 F.2d 875, 883 (7th Cir.1984)).

In *Bianco*, the Court of Appeals for the Second Circuit reached the same results. First, the court cited *Gallo*, 863 F.2d at 192, for the proposition mentioned in § III.3, *supra*, that "Title III suppression provisions [are] to be construed in accordance with [the] standing requirements of [the] Fourth Amendment ...." *Bianco*, 998 F.2d at 1122. The Second Circuit then found that none of the defendants had standing to assert that the entry to 34 Guild Street to install listening devices injured their rights, but that the defendants who were intercepted had standing to seek suppression of the evidence recorded by those devices. *Id.*

As indicated earlier, the government did not during the lengthy evidentiary hearing in the instant case assert that, although intercepted at 34 Guild Street, DeLuca lacked standing to maintain his motion to suppress. The government did, however, raise this defense after the Supreme Court issued its decision in *Carter* on December 1, 1998.

In *Carter*, "the Supreme Court effectively heightened the burden for a defendant claiming a reasonable expectation of privacy in a dwelling other than his own home, when the defendant's presence in the dwelling is for a commercial or business purpose." *United States v. Gordon*, 168 F.3d 1222, 1226 (10th Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 2384, 144 L.Ed.2d 786 (1999). In the process, the Supreme Court indicated that while Justice Harlan's two-part test for determining whether a Fourth Amendment violation has occurred remains valid, Katz would not be found to have satisfied the requirement that his subjective expectation of privacy be regarded by society as justified if his case were presented to the Supreme Court for the first time today.

Katz had made a call from a public telephone booth. *Katz*, 389 U.S. at 348, 88 S.Ct. 507. He could be seen speaking in the telephone booth, but could not ordinarily have been overheard. *Id.* at 352, 88 S.Ct. 507. Without obtaining a warrant, and without penetrating the telephone booth, FBI agents attached an electronic listening and recording device to the outside of the structure and recorded Katz's part of the telephone conversation. *Id.* at 348–49, 88 S.Ct. 507. The Supreme Court found that this constituted an unreasonable search and seizure because no warrant authorizing it had been issued. *Id.* at 358–59, 88 S.Ct. 507. Therefore, it held that the Fourth Amendment had been violated. *Id.*

In explaining its decision, the Supreme Court described the evolutionary nature of Fourth Amendment law and explained that it was overruling its prior precedents. *Id.* at 353, 88 S.Ct. 507. As the Court stated, "[i]t is true that the absence of such [physical] penetration [of a structure] was at one time thought to foreclose further Fourth Amendment inquiry, *Olmstead v. United States*, 277 U.S. 438, 457, 466, 48 S.Ct. 564, 72 L.Ed. 944 [ (1928) ]; *Goldman v. United States*, 316 U.S. 129, 134–36, 62 S.Ct. 993, 86 L.Ed. 1322 [ (1942) ], for that Amendment was thought to limit only searches and seizures of tangible property." *Id.* at 352–53, 88 S.Ct. 507. The Court noted, however, that its subsequent decisions had "departed from the narrow view on which [*Olmstead* ] rested" and had held that the Fourth Amendment applied not only to tangible items but also to the recording of oral statements overheard without any trespass. *Id.* at 353, 88 S.Ct. 507 (citing *Silverman v. United States*, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)). Thus, the Supreme Court wrote:

> We conclude that the underpinnings of *Olmstead* and *Goldman* have been so eroded by our subsequent decisions that the "trespass" doctrine there enunciated can no longer be regarded as controlling.

*Id. See also id.* at 362 & n.*, 88 S.Ct. 507 (Harlan, J., concurring).

Instead, the Court emphasized that "the Fourth Amendment protects people, not places." *Id.* at 351, 88 S.Ct. 507. As Justice Harlan elaborated in his concurrence:

[T]he rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as "reasonable."

*Id.* at 361, 88 S.Ct. 507 (Harlan, J., concurring). Implicitly applying this test, the Court in *Katz* stated that:

No less than an individual in a business office, *in a friend's apartment,* or in a taxicab, a person in a telephone booth may rely upon the protection of the Fourth Amendment. One who occupies it, shuts the door behind him, and pays the toll that permits him to place a call is surely entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world. To read the Constitution more narrowly is to ignore the vital role that the public telephone has come to play in private communication.

*Id.* at 352, 88 S.Ct. 507 (emphasis added)(footnotes omitted). *See also id.* at 361, 88 S.Ct. 507 (Harlan, J., concurring) (telephone booth "is a temporarily private place whose momentary occupants' expectations of freedom from intrusion are recognized as reasonable.").

In a footnote in *Katz,* the Supreme Court cited *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), for the proposition that an individual has a justifiable expectation of privacy in a friend's apartment. *Id.* at 352 n. 11, 88 S.Ct. 507. In *Jones,* the defendant who had a key to his friend's apartment, where he kept a suit and shirt and may have slept a night in the past but not recently, was found to have standing to maintain a motion to suppress the fruits of a search of the apartment in part because "anyone legitimately on premises where a search occurs may challenge its legality . . . ." 362 U.S. at 259, 267, 80 S.Ct. 725.

*Katz* was decided in 1967, and was considered by Congress and the President when Title III was enacted in 1968. *See, e.g.,* S.Rep. No. 90–1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2153. Since *Katz* was decided, Justice Harlan's two-part expectation of privacy test has been consistently employed by the Supreme Court in Fourth Amendment cases. *See, e.g., Rakas,* 439 U.S. at 143, 99 S.Ct. 421; *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979); *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); *California v. Greenwood,* 486 U.S. 35, 38, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988); *Minnesota v. Olson,* 495 U.S. 91, 96–97, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990); *Carter,* 119 S.Ct. at 473. However, the places in which individuals have been deemed to have a justifiable expectation of privacy have become fewer than suggested by the expansive language of *Katz* quoted earlier. *See Katz,* 389 U.S. at 352, 88 S.Ct. 507.

In *Rakas,* the Supreme Court held that passengers did not have a justifiable expectation of privacy, and therefore no Fourth Amendment right, with regard to the search of an automobile despite the fact that they were, like the defendant in *Jones,* "legitimately on the premises." 439 U.S. at 141–42, 150, 99 S.Ct. 421. Thus, *Rakas* narrowed the definition of the scope of Fourth Amendment protection as it had been described eighteen years earlier in *Jones.*

In reaffirming the applicability of the legitimate expectation of privacy test in determining whether Fourth Amendment rights are implicated, the court in *Rakas* wrote:

[I]t would, of course, be merely tautological to fall back on the notion that those expectations of privacy which are legitimate depend primarily on cases deciding exclusionary-rule issues in criminal cases. Legitimation of expectations of

privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law *or to understandings that are recognized and permitted by society.*

*Id.* at 143 n. 12, 99 S.Ct. 421 (emphasis added). There are civil cases and criminal prosecutions in which juries, as representatives of the community, decide whether an expectation of privacy is regarded as justified by society. *See e.g., Boddie,* 731 F.2d at 338–39; *Duncan,* 598 F.2d at 849–50. In such cases, it is true that judges are not the arbiters of what expectations of privacy society regards as reasonable. There are, however, also many exclusionary rule cases in which judges do make that decision. *See, e.g., United States v. Fultz,* 146 F.3d 1102, 1105 (9th Cir.1998)(holding that homeless person enjoyed reasonable expectation of privacy in closed cardboard box in garage of residence in which he kept his belongings); *United States v. Shanks,* 97 F.3d 977, 980 (7th Cir.1996) (holding that defendant lacked reasonable expectation of privacy in garbage located outside curtilage of home); *United States v. Gooch,* 6 F.3d 673, 677 (9th Cir.1993) (holding that defendant had reasonable expectation of privacy in his tent pitched on public campground); *United States v. Cardona–Sandoval,* 6 F.3d 15, 21 (1st Cir.1993) (holding that captain has reasonable expectation of privacy in all areas of his ship). In any event, for the purpose of defining the scope of the protection afforded by the Fourth Amendment, at least in cases involving factual situations not precisely addressed in prior precedents, juries and judges have the discretion to apply contemporary conceptions of what expectations should be deemed justified.

This has been done by the Supreme Court in Fourth Amendment cases decided since *Katz.* For example, in 1979, in *Rakas,* the court expressly overruled the holding in *Jones* that a person "legitimately on the premises" had standing to allege

a violation of his Fourth Amendment rights. 439 U.S. at 142, 147–48, 99 S.Ct. 421.

In 1990, in *Olson,* the Supreme Court held that an individual's status "as an overnight guest [in another person's home] is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." 495 U.S. at 96–97, 110 S.Ct. 1684. The decision in *Olson* was rooted in what the court characterized as the "longstanding social custom" of "staying overnight in another's home." *Id.* at 98, 110 S.Ct. 1684. The Court stated that, "[f]rom the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside." *Id.* at 99, 110 S.Ct. 1684. The Court also noted that the host was "willing to share his house and his privacy with his guest." *Id.* Thus, Olson's status as an overnight guest was found to provide him with a Fourth Amendment right which could be violated by a search of the home in which he was staying. *Id.* at 100, 110 S.Ct. 1684.

It was the then recent decision in *Olson* that influenced the government to concede, and this court to hold, in *Ferrara* that those intercepted at 34 Guild Street were entitled to maintain motions to suppress based on alleged violations of both the Fourth Amendment and of Title III. *Ferrara,* 771 F.Supp. at 1281, 1292. However, in 1998, in *Carter,* the Supreme Court addressed a situation in which the defendants had met for several hours, with their unindicted host in her apartment, to engage in a purely commercial transaction. 119 S.Ct. at 471, 473–74. The defendants had not been to the apartment previously and did not stay overnight. *Id.* at 473–74. Although the defendants and their host were bagging cocaine, the government acknowledged that "the illegality of the host-guest conduct ... would not alter the

[Fourth Amendment] analysis." *Id.* at 483 (Ginsburg, J., dissenting).

The majority in *Carter* employed the two-part expectation of privacy test enunciated by Justice Harlan in *Katz. Id.* at 472–74. It stated that:

If we regard the overnight guest in *Minnesota v. Olson* as typifying those who may claim the protection of the Fourth Amendment in the home of another, and one merely "legitimately on the premises" as typifying those who may not do so, the present case is obviously somewhere in between. But the purely commercial nature of the transaction engaged in here, the relatively short period of time on the premises, and the lack of any previous connection between respondents and the householder, all lead us to conclude that respondents' situation is closer to that of one simply permitted on the premises. We therefore hold that any search which may have occurred did not violate their Fourth Amendment rights.

Because we conclude that respondents had no legitimate expectation of privacy in the apartment, we need not decide whether the police officer's observation constituted a "search."

*Id.* at 474.

In his concurrence in *Carter*, Justice Scalia, joined by Justice Thomas, criticized the use of the two-part *Katz* test, stating:

the only thing the past three decades have established about the *Katz* test (which has come to mean the test enunciated by Justice Harlan's separate concurrence in *Katz,* ) *see* [*Katz* ] at 360, 88 S.Ct. 507 ... is that, unsurprisingly, those "actual (subjective) expectation[s] of privacy" "that society is prepared to recognize as 'reasonable,'" (citation omitted), bear an uncanny resemblance to those expectations of privacy that this Court considers reasonable.

*Id.* at 477 (Scalia, J., concurring) (quoting *Katz,* at 361, 88 S.Ct. 507). Justices Scalia and Thomas urged abandoning the *Katz*

test and adopting a more literal adherence to the text of the Fourth Amendment, which they characterized as having the "obvious meaning ... that each person has the right to be secure against unreasonable searches and seizures in his own person, house, papers, and effects." *Id.* at 475.

Four Justices disagreed with the majority's decision that the defendants' Fourth Amendment rights were not implicated in the circumstances of the *Carter* case. *See id.* at 480 (Breyer, J., concurring on other grounds, but "agree[ing] with Justice Ginsburg that respondents can claim Fourth Amendment protection"), and 481 (Ginsburg, J., with whom Stevens, J. and Souter, J. joined, dissenting). The dissent did not, however, urge a restoration of the "legitimately on the premises" standard stated in *Jones* and subsequently abandoned. *Id.* at 481. Rather, the dissenters reasoned that:

when a homeowner or lessor personally invites a guest into her home to share in a common endeavor, whether it be for conversation, to engage in leisure activities, or for business purposes licit or illicit, that guest should share his host's shelter against unreasonable searches and seizures.

*Id.* In the view of the dissenters, the "logic of [*Olson* ] extends to shorter term guests as well. *See* 5 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 11.3(b), at 137 (3d ed. 1996) ('[I]t is fair to say that the *Olson* decision lends considerable support to the claim that shorter-term guests also have standing.')." *Carter,* 119 S.Ct. at 482.

The dissenters in *Carter* also stated that the "Court's decision in this case veers sharply from the path marked in *Katz.*" *Id.* at 483. This court agrees with this observation and further finds that *Carter* actually indicates that the result in *Katz* would be different if the same facts were, for the first time, presented to the Supreme Court today.

Katz spent a few moments in a public telephone booth, which was no one's home, and engaged in commercial conversation. *Katz,* 389 U.S. at 348, 88 S.Ct. 507. The defendants in *Carter* spent several hours in their host's home and engaged in commercial conduct and, presumably, some conversation. As described earlier, in *Katz,* the Court reasoned that an individual in a telephone booth—like a person in a business office, taxicab, or friend's apartment—had a legitimate expectation that what he said there would not be broadcast to the world. *Katz,* 389 U.S. at 352, 88 S.Ct. 507.

If the expectation of privacy validated in *Katz* remained legitimate today, it would logically follow that it is at least equally true that one who is invited to another's home, and conducts and discusses business with his host, for several hours, behind closed doors also has a justifiable expectation of privacy. Yet *Carter* recently held that he does not. Although *Katz,* 389 U.S. at 352, 88 S.Ct. 507, referred to the "vital role [of] . . . the public telephone in private communication," this court does not believe that reasonable members of contemporary American society would say that a person has a more legitimate expectation that he or she will not be overheard in a public telephone booth, where there is a foreseeable risk of rude intrusion, than behind locked doors in another's home. Thus, this court believes that the rulings in *Katz* and *Carter* are only reconcilable if it is candidly acknowledged that the expectations that the Supreme Court finds society deems justifiable have changed since *Katz* was decided in 1967, and Title III was enacted in 1968.

The lower courts have, as they must, faithfully followed the Supreme Court's decision in *Carter.* Thus, individuals briefly in someone else's apartment or motel room, for the purpose of conducting business, have recently been found not to have Fourth Amendment rights which could have been violated by a search of the premises. *United States v. Flores,* 172 F.3d 695, 699 (9th Cir.1999) (apartment); *Gordon,* 168 F.3d at 1226–27 (motel room of another person for which defendant had a key). However, after *Carter* an individual has been deemed to have a reasonable expectation of privacy concerning a warehouse he did not own or rent, but for which he had the only key, "giving him a measure of control and ability to exclude others," and in which he kept personal and business papers. *United States v. Chaves,* 169 F.3d 687, 690–91 (11th Cir.1999).

DeLuca has the burden of proving that he had a Fourth Amendment right that may have been violated by the electronic surveillance conducted at 34 Guild Street in order to maintain his motion to suppress on constitutional grounds. *Rakas,* 439 U.S. at 132 n. 1, 99 S.Ct. 421; *United States v. Mancini,* 8 F.3d 104, 107 (1st Cir.1993). *Carter* and its emerging progeny demonstrate that he has not satisfied that burden.

First, the government suggests that DeLuca lacks standing even under the "legitimately on [the] premises test" enunciated in *Jones,* which, as described earlier, was valid precedent when Title III was enacted, but later overruled. More specifically, the government claims that DeLuca has failed to bear his burden of proving that he was lawfully at 34 Guild Street. Rather, the government contends that the evidence indicates that DeLuca had never met the DiStefanos, let alone visited their home, and therefore should not be deemed to be an invitee or otherwise legitimately present at 34 Guild Street. If the factual issue of his status at 34 Guild Street was ultimately material to this court's decision concerning whether DeLuca has standing to litigate his motion to suppress, the court would provide him an opportunity to supplement the record because he did not during the lengthy evidentiary hearing have fair notice that his standing was in dispute. This issue is not, however, outcome determinative in any event. Thus, in view of the fact that DiStefano authorized Russo, Ferrara, Mercurio, and Federico to

use his home, and there is no proof that he restricted their right to invite others to join them, the court assumes for present purposes that DeLuca was lawfully at 34 Guild Street.

Similarly, the court assumes, without finally finding, that DeLuca had a subjective expectation that his conversation at 34 Guild Street would not be intercepted. The precautions that were taken to protect the secrecy of the location of the ceremony suggest that DeLuca may have feared that the government would try to bug the LCN induction ceremony in which he was participating. They also indicate, however, that DeLuca would have known that 34 Guild Street had been selected in an effort to assure that any such effort would not succeed. It is highly doubtful that DeLuca would have participated in the ceremony if he had actually believed that it was being bugged. In the circumstances, it is most appropriate to assume that DeLuca had a subjective expectation that he would not be intercepted rather than reopen the hearings to receive additional evidence on this issue. *Duncan*, 598 F.2d at 850 & n. 6 (person who merely suspects the possibility of interception may still have an actual expectation that he will not be intercepted); Fishman & McKenna, *supra*, § 2.22 at 2–30 to 2–31.

However, even drawing inferences from the facts in a manner most favorable to DeLuca, he was only an invitee to 34 Guild Street. DiStefano was not present to host DeLuca and share with him DiStefano's personal, legitimate expectation of privacy. DeLuca was only at 34 Guild Street for several hours and did not stay overnight. The purpose of his visit was purely business. In the circumstances, *Carter* compels the conclusion that any expectation of privacy that DeLuca had while at 34 Guild Street was not one that society would deem justified. *Carter*, 119 S.Ct. at 474; *Flores*, 172 F.3d at 698–99; *Gordon*, 168 F.3d at 1226–27. Thus, the electronic surveillance conducted at 34 Guild Street did not violate his Fourth Amendment rights.

There remains, however, the critical question of whether DeLuca is nevertheless an "aggrieved person" with standing to seek suppression under Title III. DeLuca in effect contends that if this matter had arisen in 1968, when Title III was enacted, he would for Fourth Amendment purposes have been deemed to have had a justified expectation that his conversation at 34 Guild Street would not have been intercepted, and also asserts that the statute codified and froze the then existing law regarding such justifiable expectations. This court concludes that DeLuca is correct concerning his characterization of the state of the law in 1968, but that in incorporating in § 2510(2) the two-part test for defining rights protected by the Fourth Amendment, Congress and the President recognized the dynamic nature of Fourth Amendment jurisprudence and intended that the definition of "oral communication" evolve in tandem with the future development of the law concerning the Fourth Amendment.

As described previously, when Title III was enacted in 1968, the Supreme Court's decision in *Jones*, which was favorably cited in *Katz*, provided standing to litigate a Fourth Amendment claim to anyone who was "legitimately on [the] premises." *Jones*, 362 U.S. at 267, 80 S.Ct. 725; *Katz*, 389 U.S. at 352 n. 11, 88 S.Ct. 507. As described in § III.3, *supra*, the legislative history of § 2510(11) states that the definition of "aggrieved person" "is intended to reflect existing law" and cites *Jones* as the first example of "existing law." *See* S.Rep. No. 90–1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2179–80. Moreover, *Katz* held that a person briefly using a public telephone booth for commercial conversation had a justified expectation of privacy. Thus, the court agrees that if this matter were being addressed in 1968, DeLuca, as a person legitimately at 34 Guild Street, and otherwise similarly situated to Katz, would have been deemed to have had a justified expectation that his conversation there would not be intercepted and, there-

fore, would have had standing as an "aggrieved person" to litigate his claim that the electronic surveillance conducted at 34 Guild Street violated Title III. *See United States v. Carroll*, 337 F.Supp. 1260, 1263 (D.D.C.1971) ("it appears evident that the factual situation presented in [*Katz* ] was the model of a situation which [Title III] was designed to prohibit. And in *Katz*, it is apparent that the federal agents were unable to overhear the recorded conversations without a bugging device.").

However, in 1968, Congress and the President were also on clear notice of the dynamic quality of the law relating to the Fourth Amendment. As described earlier, the Supreme Court in *Katz* traced the changing interpretation of the Fourth Amendment from its decision in *Olmstead*, which was expressly overruled. Thus, when Title III was enacted it was foreseeable that the law concerning the Fourth Amendment would continue to evolve.

It is not clear from the text of § 2510(2) whether in addition to codifying the two-part *Katz* test, Title III also intended to freeze permanently the then current conception of the circumstances that would justify an expectation that a person would not be intercepted. The legislative history of § 2510(2) is, however, illuminating on this issue.

The section by section analysis of the statute which relates to § 2510(2) states:

> Paragraph (2) defines "oral communication" to include any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation. *The definition is intended to reflect existing law. See Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Compare United States v. South–Eastern Underwriters Ass'n., 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440*

*(1944) with Lee v. Florida, 191 So.2d 84 (1966), cert. granted, 389 U.S. 1033, 88 S.Ct. 762, 19 L.Ed.2d 820 (1968) Term.* The persons's subjective intent or the place where the communication is uttered is not necessarily the controlling factor. Compare *Linnell v. Linnell,* 249 Mass. 51, 143 N.E. 813 (1924), with *Freeman v. Freeman,* 238 Mass. 150, 130 N.E. 220 (1921). Nevertheless, such an expectation would clearly be unjustified in certain areas; for example, a jail cell (*Lanza v. New York*, 370 U.S. 139, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962)) or an open field (*Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924)). Ordinarily, however, a person would be justified in relying on such expectation when he was in his home (*Silverman v. United States*, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)) or office (*Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967)), but even there, his expectation under certain circumstances could be unwarranted, for example, when he speaks too loudly. *See State v. Cartwright*, 246 Or. 120, 418 P.2d 822 (1966), *cert. denied* 386 U.S. 937, 87 S.Ct. 961, 17 L.Ed.2d 810 (1967). The person's expectation that his communication is or is not subject to "interception," defined in paragraph (4), discussed below, is thus to be gathered and evaluated from and in terms of all the facts and circumstances.

S.Rep. No. 90–1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2178 (emphasis added). The foregoing statement that the "definition [of oral communication] is intended to reflect existing law," citing *Katz*, does not alone clarify whether the statute only intended to adopt Justice Harlan's two-part test or whether it is also intended to freeze the law concerning legitimate expectations as it was applied in *Katz*.[84]

---

**84.** In *Alderman,* the Supreme Court, in dicta, noted that in enacting Title III Congress could have extended the right to litigate a motion to suppress an alleged violation of the statute to persons who did not have standing to allege a Fourth Amendment violation, but did not do so. 394 U.S. at 175–76 & n. 9, 89 S.Ct. 961. The Court recognized that only an "aggrieved

However, the subsequent direction to "compare" *South–Eastern Underwriters Association* with *Lee* provides some meaningful guidance.

In 1968, the current version of *A Uniform System of Citation* (the "Bluebook") stated that the signal "Compare ... with" meant that the "[a]uthorities cited, taken together, offer some support for statement in text." Harvard Law Review Ass'n, *A Uniform System of Citation* 87 (11th ed.1967). With regard to the pertinent portion of the legislative history of Title III, *South–Eastern Underwriters Association* is the first cited case. It stands for the proposition that in enacting legislation Congress and the President may choose not to freeze its meaning at the time of enactment, but rather may intend that the statute be interpreted and applied in light of future judicial decisions. 322 U.S. at 556–58, 64 S.Ct. 1162.

More specifically, *South–Eastern Underwriters Association* addressed the question of whether the Sherman Act applied to the insurance industry. *Id.* at 535–36, 64 S.Ct. 1162. When the Sherman Act was enacted in 1890, the Supreme Court had held that insurance was not commerce and, therefore, only the states had the power to regulate the insurance industry. *Id.* at 533–34, 64 S.Ct. 1162. By 1944, when *South–Eastern Underwriters Association* was decided, the law concerning the Commerce Clause had evolved to the point where it was permissible for the federal government to regulate insurance. *Id.* at 552–53, 64 S.Ct. 1162. Thus, the question before the Court was whether the Sherman Act should be interpreted to apply to the insurance industry. In deciding that the Sherman Act was in 1944 applicable to the insurance industry, the Court stated:

> person" may move to suppress the contents of an oral communication for a violation of Title III and stated that the "Act's legislative history indicates that 'aggrieved person' ... should be construed in accordance with existent standing rules." *Id.* This court believes that

Appellees argue that the Congress knew, as doubtless some of its members did, that this Court had prior to 1890 said that insurance was not commerce and was subject to state regulation, and that therefore we should read the Act as though it expressly exempted that business. But neither by reports nor by statements of the bill's sponsors or others was any purpose to exempt insurance companies revealed. And we fail to find in the legislative history of the Act an expression of a clear and unequivocal desire of Congress to legislate only within that area previously declared by this Court to be within the federal power. Cf. *Helvering v. Griffiths,* 318 U.S. 371, 63 S.Ct. 636, 87 L.Ed. 843; *Parker v. Motor Boat Sales,* 314 U.S. 244, 62 S.Ct. 221, 86 L.Ed. 184. We have been shown not one piece of reliable evidence that the Congress of 1890 intended to freeze the proscription of the Sherman Act within the mold of then current judicial decisions defining the commerce power. On the contrary, all the acceptable evidence points the other way. That Congress wanted to go to the utmost extent of its Constitutional power in restraining trust and monopoly agreements such as the indictment here charges admits of little, if any, doubt. The purpose was to use that power to make of ours, so far as Congress could under our dual system, a competitive business economy.

*Id.* at 556–59, 64 S.Ct. 1162. Thus, the citation to *South–Eastern Underwriters Association* indicates an understanding that Congress and the President had the power to link the scope of a statute's applicability to future judicial decisions and intended to exercise that power in crafting the definition of "oral communication" employed in § 2510(2).

> the dicta in *Alderman* essentially presents the same issue as the legislative history of § 2510(2) concerning the meaning of "existing law," and does not indicate how that issue should be resolved.

The import of the citation to *Lee* in the legislative history of Title III is less clear. In the cited decision in *Lee*, the District Court of Appeals of Florida traced successive decisions of the Florida courts regarding the right of the government to overhear and record conversations on what the intercepted speakers knew were party lines. 191 So.2d at 85–86. Taken together, however, *South–Eastern Underwriters Association* and *Lee* support the conclusion that § 2510(2) was intended to assure that Justice Harlan's two-part standard for determining standing would be employed in Title III cases and that relevant future judicial decisions interpreting the Fourth Amendment be employed in applying that standard.

The legislative history of § 2510(11), defining "aggrieved person," also reflects the understanding of Congress that the law concerning standing to allege a violation of the Fourth Amendment was evolutionary in character and that this dynamic quality was an element of existing law. S.Rep. No. 90–1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2179–80. As indicated earlier the legislative history states that the definition of "aggrieved person" "is intended to reflect existing law" and cites *Jones* as the first case that represents existing law. *Id.* The last case cited is *United States ex rel. Deforte v. Mancusi*, 379 F.2d 897 (2d Cir.1967). In *Mancusi*, the Court of Appeals for the Second Circuit described "the law's evolution on [Fourth Amendment] 'standing.'" *Id.* at 902. It also stated with regard to *Jones* that:

> while [Jones] informs us as to what is not required to confer standing, the Supreme Court has avoided formulating, and perhaps deliberately, any specific rules for determining what is required. The Court apparently recognized that sweeping legal pronouncements which

are meaningful are difficult to articulate because the individual's right to privacy in the particular case often conflicts with and must be balanced against society's need for efficient and vigorous police protection. It appears that a proper balance can be struck only on a 'case-by-case basis.'

*Id.* Thus, the reference to *Mancusi* in the legislative history of § 2510(11) reinforces the view that the framers of Title III intended and expected that future judicial decisions would be employed in deciding the threshold standing issue of when a subjective expectation that a conversation would not be intercepted would be deemed justifiable.

Utilizing post-Title III decisions in Fourth Amendment cases regarding reasonable expectations of privacy is consistent with the Court of Appeals for the First Circuit's observation that because "Title III is designed to protect privacy interests similar to those reflected in the Fourth Amendment ... Fourth Amendment precedent is highly relevant" in deciding some Title III issues. *Cunningham*, 113 F.3d at 294 (applying post–1968 Fourth Amendment precedent to deciding Title III issue).[85] It is also compatible with the Court of Appeals for the Second Circuit's observation that the definition of "aggrieved person" "is to be construed in accordance with standing requirements usually applied to suppression claims under the fourth amendment." *Gallo*, 863 F.2d at 192 (citing *Alderman*, 394 U.S. at 175–76 & n. 9, 89 S.Ct. 961). *See also Bianco*, 998 F.2d at 1122.

Moreover, there was a logical reason for Congress and the President to incorporate in the definition of "oral communication" the foreseeably evolving constitutional law regarding violations of the Fourth Amendment. Title III was intended to "con-

---

**85.** In the instant case the government has indicated that in light of *Carter*, if *Cunningham* were to arise now it would argue that the defendant did not have a justifiable expectation of privacy concerning the conversations in a tavern at issue in *Cunningham*, 113 F.3d at 290, and, therefore, was not an "aggrieved person" with standing to move to suppress the interception of those conversations. Apr. 13, 1999 Tr. at 67.

form[ ] to the constitutional standards set out in" *Berger* and *Katz* and, therefore, to be a statute that would pass constitutional muster. *See* S.Rep. No. 90–1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2113. If, as DeLuca argues, the statute froze the jurisprudence concerning justifiable expectations of privacy in 1968 and, as might have then been predicted based on the trajectory of the law from *Olmstead* to *Katz,* future decisions provided more protection for personal privacy than *Katz,* in some circumstances warrantless electronic surveillance might now be permissible under Title III, but nevertheless violate the Fourth Amendment. In such cases Title III would be unconstitutional as applied. Thus, prosecutions would be imperilled in cases in which the government had complied with the statute. By incorporating future judicial decisions concerning justifiable expectations of privacy for Fourth Amendment purposes in the definition of "oral communication[s]" protected by Title III, the framers of the statute would have prevented such cases from ever arising.

In summary, courts, including the Court of Appeals for the First Circuit in *Rose,* have uniformly stated in criminal cases that a person has a justifiable expectation that he will not be intercepted within the meaning of § 2510(2) if he has a justifiable expectation of privacy for Fourth Amendment purposes. In the context of Title III "privacy" relates only to being overheard rather than to being seen. When Title III was enacted, Congress and the President knew that Fourth Amendment law was evolutionary. The relevant legislative history of Title III indicates that it was intended that future Fourth Amendment decisions concerning reasonable expectations of privacy be employed in interpreting § 2510(2)'s definition of "oral communication" and § 2510(11)'s definition of "aggrieved person." *Carter* represents the present state of the relevant Fourth Amendment law. The decision in *Carter* compels the conclusion that DeLuca did not have a reasonable expectation of privacy at 34 Guild Street. Thus, he did not have a Fourth Amendment right that could have been violated by the bugging of that location. Accordingly, his conversation at 34 Guild Street did not constitute an "oral communication" within the meaning of § 2510(2). Therefore, DeLuca is not an "aggrieved person" with standing to maintain his motion to suppress the electronic surveillance conducted there.

This decision would perhaps be surprising to some of those who participated in the enactment of Title III. In 1968, the direction of the law from *Olmstead* to *Katz* would probably have suggested that the future evolution of Fourth Amendment jurisprudence would, if anything, provide even more protection for personal privacy than *Katz.* As described in this decision, the Fourth Amendment as interpreted in *Carter* provides less protection for privacy in 1999 than it did as interpreted in *Katz* in 1967.

It might be argued that if this development had been anticipated, Congress and the President would not have linked the statutory definition of "oral communication" to the evolving Fourth Amendment law concerning reasonable expectations of privacy because they wished to preclude electronic surveillance in some circumstances in which conventional searches and seizures were permissible. Congress and the President had the authority to do this. *Alderman,* 394 U.S. at 175, 89 S.Ct. 961. Indeed, they could have provided standing to litigate an alleged violation of Title III to anyone whose conversation was intercepted by a bug just as they provided, in § 2510(1), standing to anyone overheard speaking on a telephone that was tapped. The statute and its legislative history, however, do not manifest the intent to do this. In the circumstances, this court lacks the legitimate authority to, in effect, rewrite the statute based on a hypothesis concerning possible, unarticulated motives or expectations of the framers of Title III. *See United States v. Constantine,* 296 U.S. 287, 299, 56 S.Ct. 223, 80 L.Ed. 233 (1935)

(Cardozo, J., dissenting) ("There is a wise and ancient doctrine that a court will not inquire into the motives of a legislative body ..."); Felix Frankfurter, "The Reading of Statutes," in *Of Law and Men* 60–61 (1956).

Nevertheless, the court confesses that the decision that DeLuca lacks standing to maintain his motion to suppress raises some disturbing questions. DeLuca argues that this decision suggests that the government may engage in electronic surveillance without a warrant in many circumstances in which it has been previously understood that court authorization was required. This concern may be well founded. As indicated earlier, the government has in this case suggested that it could properly place a bug at a table in a tavern without a warrant because its patrons do not have a justified expectation that their conversation in such a place will not be overheard. Apr. 13, 1999 Tr. at 67. Therefore, the government has indicated that it could have argued, and the Court of Appeals for the First Circuit should have found, that the defendant in *Cunningham,* 113 F.3d 289, lacked standing to litigate his motion to suppress. DeLuca also contends that if this court's decision concerning his lack of standing is correct, the government may often have the right to engage in roving electronic surveillance without making the showings required by 18 U.S.C. § 2511(11)(a), and obtaining a warrant, because Title III would not be applicable if it were impractical to specify the place to be bugged because the target was planning to meet others, but not stay overnight, at a location that was not his own home or office, and which he had not used before for other purposes.

The troublesome hypothetical questions that DeLuca raises are not now before the court and, therefore, need not be decided. In general, however, this court believes that it would be prudent and appropriate for the government to continue to seek warrants even in circumstances in which it might later be able to argue successfully

that no "oral communication" was intercepted. *See United States v. Harrelson,* 754 F.2d 1153, 1171 (5th Cir.1985). It appears, however, that the government has more discretion in this area than it imagined until recently.

If the decision concerning DeLuca's lack of standing in this case is of concern to Congress and the President, they can, of course, amend Title III. In this case the court has been required to decide many issues regarding the proper interpretation of Title III which would benefit from being clarified by Congress and the President. These include whether the judicially crafted *Franks* test should be utilized when Title III has been violated, § III.2.B, *supra,* and whether a judicial remedy exists for the failure of the Department of Justice official authorizing an application for a warrant to make the informed judgment contemplated by § 2616(1), § III.2.A, *supra.* With regard to the question of standing, Congress and the President might decide that more protection should be afforded concerning the interception of conversations than is provided by the Fourth Amendment with regard to conventional searches and seizures, perhaps because electronic surveillance is conducted without pre-search notice, § III.2.C, *supra,* or because they decide that special weight should be given to protecting the confidentiality of communications, *see* 5 Walter LaFave, *Search and Seizure,* (3d ed.1996) § 2.2(e) at 443–44. However, these are decisions concerning the scope of statutory law which are to be made by the political branches of our government.

In addition, the holding that DeLuca and those similarly situated lack standing to litigate alleged violations of Title III might prompt higher courts, including the Court of Appeals for the First Circuit, to revise their prior decisions that uniformly state in criminal cases that a person does not have a justifiable expectation that he will not be intercepted for the purposes of § 2510(2) if he does not have a reasonable expectation of privacy with regard to being

overheard for Fourth Amendment purposes. It could, for example, be reasoned that *Katz* held that the Fourth Amendment protects people not places, and that a person has the right in a telephone booth, and by implication in a private home, to exclude the "uninvited ear." *Katz*, 389 U.S. at 352, 88 S.Ct. 507. Arguably, the import of the previously quoted legislative history concerning § 2510(2) is simply that an individual has a legitimate expectation that he will not be intercepted by a listening device if he has a reasonable expectation that he will not be overheard by the naked ear. *See Walker*, 911 F.2d at 1579; *Carroll*, 337 F.Supp. at 1263.

The decisions in cases such as *Rose* and *John Doe Trader Number One* would not have been different if this standard had been employed. For example, in *Rose* the Court of Appeals for the First Circuit found that any subjective expectation of privacy the defendants may have had was not reasonable because they "were broadcasting on the ham radio frequency, commonly known to be a means of communication to which large numbers of people have access as receivers." 669 F.2d at 26. Similarly, in *John Doe Trader Number One*, the tape-recording at issue was made by an FBI agent who was "clearly present only a few feet from Doe and was able to overhear and record each of Doe's state-

ments." 894 F.2d at 243. Accordingly, the statements in *Rose* and *John Doe Trader Number One* equating the statutory right not to be intercepted with the Fourth Amendment right to privacy are, arguably, unnecessarily broad.

Moreover, it might be found that this court's reliance on the references in the legislative history of Title III to *South–Eastern Underwriters Association* and *Mancusi* in discerning statutory intent to have the meaning of § 2510(2) follow the evolution of Fourth Amendment jurisprudence is inconsistent with the Court of Appeals for the First Circuit's statement in *Vest I* that, "Congress clearly intended that the provisions of section 2518(10)(a), which defines the class entitled to make a motion to suppress, rather than the judicially-developed notions of 'standing,' would control the question of who could bring such a motion." 813 F.2d at 482. This court, however, does not believe that it has disregarded applicable First Circuit precedent because the quoted statement in *Vest I* was only dicta. It did not emerge from any consideration of the issue presented in the instant case.[86]

For the reasons set forth previously, this court finds that the weight of existing case law, which is supported by the pertinent legislative history, indicates that De-Luca lacks standing to maintain his motion

---

**86.** It might also be reasoned that Title III recognizes that there are circumstances in which a person knows that he is being overheard, but justifiably expects that he will not be recorded, because 18 U.S.C. §§ 2511(2)(c) and (2)(d), which authorize the consensual recording of conversations in certain circumstances, would otherwise be superfluous with regard to oral communications because when Title III was enacted the Supreme Court had held that an individual did not for Fourth Amendment purposes have a legitimate expectation that someone to whom he was speaking in person would not record his statements. *See United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971); *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). *See also In re High Fructose Corn Syrup Antitrust Litig.*, 46 F.Supp.2d at 825–26. As has been noted in rejecting this reasoning, however,

§§ 2511(2)(c) and (2)(d) also apply to "wire and electronic types of communication, which, at least in the case of wire communications, are protected against interception regardless of the speaker's reasonable expectation of privacy." *In re High Fructose Corn Syrup Antitrust Litig.*, 46 F.Supp.2d at 827. Absent § 2511(2)(c) and (2)(d), consensual monitoring of telephone conversations would not be permitted. It appears to this court that although redundant in view of the definition of "oral communication" in § 2510(2), oral communications were included in §§ 2511(2)(c) and (2)(d) to make clear that the statute authorized consensual monitoring of person to person discussions as well as telephone conversations. The failure to include oral communications in those provisions could have given the mistaken impression that consensual monitoring of such discussions was not permitted.

to suppress the electronic surveillance conducted at 34 Guild Street. Although this is a challenging issue on which judges might differ, it is not clear to this court that the Court of Appeals for the First Circuit, or indeed the Supreme Court, would, in effect, revise existing jurisprudence to find that DeLuca does have standing. Thus, his motion to suppress is being denied. *See United States v. Salvucci*, 599 F.2d 1094, 1098 (1st Cir.1979) ("Until the Supreme Court rules on this question, we are not prepared to hold that the automatic standing rule of *Jones* has been implicitly overruled by *Simmons.* That is an issue which the Supreme Court must resolve."), *rev'd,* 448 U.S. 83, 95, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980).

As DeLuca's motion to suppress is being denied for lack of standing, it is not necessary for the court to decide the merits of the issues he has sought to litigate. If this court's decision concerning standing is appealed and reversed, the Court of Appeals for the First Circuit may in the process also clarify whether the standards of *Franks* or *Giordano* should be employed in deciding DeLuca's motion to suppress. *See* § III.2.B, *supra.* Thus, it is most appropriate for this court to decline to address the merits of DeLuca's motion at this time. The court will issue the additional necessary findings of fact and conclusions of law if its decision concerning DeLuca's lack of standing is reviewed and this case is remanded.

## IV. CONCLUSION

In view of the foregoing, Flemmi's motion to dismiss this case against him based on an alleged agreement that he would not be prosecuted in exchange for his service as an FBI informant is being denied. In addition, he lacks standing to maintain his motion to suppress the electronic surveillance conducted at Vanessa's on Fourth Amendment or Title III grounds. Similarly, DeLuca lacks standing to maintain his motion to suppress the electronic surveillance conducted at 34 Guild Street.

As also explained, however, several of Flemmi's motions are meritorious. He has proven that suppression of the 1984–85 electronic surveillance, and any evidence derived from it, is required. In addition, Flemmi has demonstrated that he had an enforceable agreement that, in return for his assistance to the FBI, none of the evidence intercepted at 98 Prince Street, Vanessa's, or 34 Guild Street would be used against him directly or indirectly. It was, therefore, improper for the government to present evidence intercepted at 98 Prince Street and 34 Guild Street to the grand juries which returned indictments against Flemmi. It is not possible to decide on the present record whether evidence derived from the 1984–85 electronic surveillance, 98 Prince Street, Vanessa's, and/or 34 Guild Street was presented to those grand juries.

Additional hearings will be necessary to decide this question and to determine whether the improper presentation of evidence to the grand juries which returned indictments against Flemmi requires that the case against him be dismissed. In addition, the parties must address, and the court may have to decide, the related issues of whether the case against Flemmi should be dismissed to vindicate his constitutional right to Due Process or as an exercise of the court's supervisory powers. The additional hearings to be conducted will also permit the court to identify the evidence which will be ordered excluded at trial if the case against Flemmi continues, including evidence that may be excluded on the possible alternative ground that if unauthorized promises of immunity were made, Flemmi's statements concerning 98 Prince Street, Vanessa's, and 34 Guild Street were involuntary.

In essence, the record for deciding Flemmi's motions to dismiss and suppress is incomplete. Therefore, the court will hold the hearings necessary to determine whether this case must be dismissed and, if not, the scope of the evidence to be excluded at trial before entering any Order that may be appealable by the United

States pursuant to 18 U.S.C. §§ 2518(10)(b) or 3731.[87]

## V. ORDER

Accordingly, it is hereby ORDERED that:

1. Flemmi's motion to dismiss based on an alleged agreement that he would not be prosecuted is DENIED.

2. Flemmi's motion to suppress the electronic surveillance conducted at Vanessa's Restaurant because of alleged violations of the Fourth Amendment and Title III is DENIED.

3. DeLuca's motion to suppress the electronic surveillance conducted at 34 Guild Street is DENIED.

4. A hearing to plan the future proceedings required by the decisions described in this Memorandum, and to address related issues including discovery, will be held on October 19, 1999, at 9:30 a.m.

---

87. The court also intends to decide the motion to suppress the evidence intercepted at the Hilton Hotel on December 11, 1991, prior to deciding the motion to dismiss because if that motion to suppress is meritorious, it has implications for the merits of the motion to dismiss.